IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
|         Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST | § | |
| AIRLINES CO., VIRGIN AMERICA | § | |
| INC., AMERICAN AIRLINES, | § | |
| INC., UNITED AIRLINES, INC., SEAPORT | § | |
| AIRLINES, INC., UNITED STATES | § | |
| DEPARTMENT OF TRANSPORTATION, | § | |
| AND THE FEDERAL | § | |
| AVIATION ADMINISTRATION, | § | |
|         Defendants. | § | |

## CITY OF DALLAS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, the City of Dallas (the "City"), and files this original complaint

seeking declaratory relief pursuant to 28 U.S.C. § 2201 regarding the Defendants and the rights

and obligations of the City and of the Defendants under federal law concerning the use of aircraft

gates at the Dallas Love Field airport.

## I.  INTRODUCTION

1.      Mandates from two federal agencies under color of federal law and conflicting

legal claims and litigation threats by several airlines under federal law have put the City in an

impossible situation that only this Court can resolve. An impending July 6, 2015, deadline that

may cause chaos at Love Field requires the City to file this action now.

2.      The City owns and operates the airport generally known as Love Field in the City and County of Dallas, Texas, within the Northern District of Texas.  For decades, operations at Love Field were restricted by a federal law, the so-called Wright Amendment.  In 2006, Congress amended and reformed the Wright Amendment so that certain restrictions expired in October, 2014.  The City has lease agreements running through 2028 with Southwest Airlines Co. ("Southwest"), United Airlines, Inc. ("United"), and American Airlines, Inc. ("American") for the preferential use of the 20 gates at Love Field and for the use of other airport facilities.[1] Some of the rights and/or access provided by the leases have been transferred to other air carriers: United has subleased its gates to Southwest, and American has subleased its gates to Virgin America Inc. d/b/a Virgin America Airlines Inc. ("Virgin"); Virgin allows Seaport Airlines, Inc. ("Seaport") to operate from a Virgin gate under a gate use agreement[2]; and Southwest allows Delta Air Lines, Inc. ("Delta") to operate under a gate use agreement.[3]  In October 2014, certain of the most significant restrictions, such as the prohibition against long-haul domestic flights by full-size passenger aircraft, under the Wright Amendment ceased but the legal number of gates at Love Field was reduced.  This has triggered demands on the City for additional access and use of the limited number of gates.  All of the Signatory Airlines' current leases at Love Field predate the reform (substantial repeal) of the Wright Amendment in 2006.

3.      The City's leases with the Signatory Airlines at Love Field give each Signatory Airline the preferential right to use its gates and requires the City to mandate accommodation requests for gate use from new entrants to the airport, but only to the extent that granting such

---

[1] Southwest, United, and American are sometimes collectively termed the "Signatory Airlines" because they have signed leases for Love Field.
[2] Gate use agreements are contractual licenses between air carriers that, unlike subleases, have not traditionally required the City's consent at Love Field. The City is not a party either to the subleases or to the gate use agreements cited in this complaint.
[3] The Signatory Airlines collectively with Delta, Virgin and Seaport are referred to as the "Airlines."  Airline companies generally are termed "air carriers" to avoid confusing them with the specific Airlines.

request would not unduly interfere with the Signatory Airline's flight schedule and if the requesting new entrant air carrier and the Signatory Airline cannot agree on voluntary accommodation terms.  In addition, if there is voluntary or mandatory gate accommodation but the Signatory Airline and the new entrant cannot agree on all necessary terms of gate use, the City is to determine the missing terms (for example, the amount of compensation for gate use or duration or conditions of accommodation).

4.      The City has received conflicting demands and claims concerning the use of the limited number of gates at Love Field from some of the Airlines, principally between Southwest and Delta, and from the U.S. Department of Transportation ("DOT") and one of its subsidiary agencies, the Federal Aviation Administration ("FAA") (DOT and FAA together are referred to as the "Federal Agencies").  The City is faced with irreconcilable demands, each under color of federal law, that include explicit threats of litigation or risk of other legal sanctions.

5.      DOT is the parent agency of FAA.  The FAA administers most of the DOT and FAA grants received by the City for use at Love Field.  DOT and FAA assert adverse consequences for the City's FAA grants if the City does not accommodate Delta in compliance with DOT's directions.

6.      The City brings this action seeking a judgment declaring the rights and obligations of the City and of the Airlines and the Federal Agencies, and resolving conflicting interpretations of the federal statutes, federal regulations, other instruments, and the leases, in relation to gate accommodation at Love Field.  The City brings this action to resolve the disputes, to enable it to perform its obligations, and to prevent disruption of service to the flying public.  There is an imminent threat of irreparable harm to the public and to Love Field from air operations disruption at Love Field on and after July 6, 2015, when Delta's latest temporary

permission to use gate slots for which Southwest claims preferential lease rights expires.  This likely will necessitate temporary and preliminary injunctive relief unless these Airlines reach a voluntary resolution.

7.      The Federal Agencies regulate many facets of Love Field operations.  Among other things, under the authority of title 49, U.S. Code, DOT enforces competition standards for Love Field and other airports and the FAA administers monetary grants to Love Field and other airports.   In addition, FAA has authorized the City to collect passenger facility charges (sometimes called "PFCs") from departing Love Field passengers to help finance Love Field improvements. These Federal Agencies have told the City that the City's title 49 responsibilities to foster competition require the City to provide long-term gate accommodation to Delta at Love Field gates leased by Southwest regardless of Southwest's plans to uses the gates, at least if those plans were announced after Delta's gate request.  The Federal Agencies further state that this accommodation must last for as long as Delta maintains the same pattern of service regardless of Southwest's future gate use plans.

8.      However, these requirements disregard federal statutory provisions in the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA") protecting Signatory Airlines' Love Field preferential gate rights from interference under color of title 49.  The City has been unable to obtain an explanation from the Federal Agencies why those protections would not apply to Delta's accommodation requests.  Some details of the accommodation obligations imposed on the City by these Federal Agencies, such as the duration of any accommodation, do not appear to be authorized by title 49 and do not appear consistent with gate accommodation policies at other airports.  The City has been unable to obtain reconciliation from these Federal Agencies between their requirements for Delta's accommodation request at Love Field and

nationwide practices that the Federal Agencies appear to have sanctioned at other airports.  The Signatory Airlines' Love Field provide leases two possible ways that these Federal Agencies might permissibly require the City to override the lease protections for the Signatory Airlines' lease rights without subjecting the City to suit for breaching the lease:  (1) the Federal Agencies could expressly threaten the City's FAA grants for Love Field after reviewing the lease – the lease provides that such threat would require amendment of the lease to negate the threat – However DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well; or (2) the agencies might be able to enter into an agreement with the City – provide lease that the lease terms are subordinated to such agreements under certain circumstances.  However the Federal Agencies have refused to consider negotiating an agreement with the City and the City does not believe that DOT and the City could negotiate a valid agreement that was inconsistent with WARA.  A WARA provision provides the one avenue that could allow the agencies to override the Signatory Airlines' preferential gate lease rights at Love Field:  they could adopt nationwide regulations that would be authorized by federal law to preempt preferential gate rights.  However, the Federal Agencies' directives to the City are for Love Field only, whereas the governing federal statute, as shown below, requires that any such preemption be on a nationwide basis.  Finally the Federal Agencies ignore WARA provisions, also as shown below, that provide that Signatory Airlines' and the City's compliance with and performance under a certain "Five Party Agreement" is deemed to constitute compliance with their respective title 49 obligations, and that agreement protects the Signatory Airlines' preferential gate rights at Love Field.[4]

---

[4] The Federal Agencies' ability to use a grant threat or agreement to deprive Signatory Airlines of their preferential gate rights may be limited by the federal statute protecting preferential gate rights unless the rights are limited by

9.      The City is faced with several options, all of which place the City at significant risk.  The City could make a decision that appeared to benefit one Airline and face certain litigation from other Airlines.  The City could comply with the Federal Agencies' interpretations of the City's legal obligations and face certain litigation from Airlines.  The City could comply with its obligations under leases and other contractual commitments but would thereby face liability from the Federal Agencies and other Airlines.  Most troublingly, the Federal Agencies have required that the City take actions that appear to violate the City's lease obligations, but have refused to impose their mandate in a form that might allow the City to comply with the Federal Agencies' directives without violating the City's lease obligations; all while retaining the FAA's option to deprive the City of aviation grant money if the City does not comply with the Federal Agencies' interpretations of the City's gate accommodation obligations.  In short, the City needs judicial intervention to understand and perform its legal obligations and rights so it can move forward with management of its Love Field airport in a legal manner in the best interest of the flying public and the residents of the City of Dallas.  Absent direction and declaratory relief from this Court, that would be impossible.

## II.  JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1367; 5 U.S.C. 701 *et seq*.; and 28 U.S.C. § 2201.  To the extent that any state law issues are involved, they so relate to the federal questions presented that they form part of the same case and controversy.  28 U.S.C. § 1367.

11.      On December 17, 2014, DOT General Counsel sent the Dallas City Attorney a letter establishing DOT's position on Delta's gate accommodation request and instructing the City how to handle that request ("First DOT Letter").  On June 15, 2015, DOT General Counsel

nationwide regulation.  That possibility is explained below.

sent a Dallas Assistant City Attorney a letter incorporating the First DOT Letter by reference, and elaborating and expanding on several provisions of the First DOT Letter ("Second DOT Letter").  The Second DOT Letter, among other things, explicitly asserted that the City's aviation grant eligibility for Love Field would be conditioned on compliance with the views expressed in the First DOT Letter.  The First DOT Letter and the Second DOT Letter (together the "DOT Letters"[5]) each is a final agency action of DOT issued in violation of the Administrative Procedure Act ("APA") and WARA.  WARA sets forth legal obligations for the operation of Love Field by which the federal government and others must comply.  Judicial review of action under WARA is subject to section 706(2) of the APA.[6]

12.     Neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because DOT acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110.  DOT's powers with respect to Love Field gate allocation matters are unique due to the enactment of WARA (*i.e.*, Love Field is the only U.S. airport to have such specific statutory directives).  Concerning those matters, DOT is statutorily constrained to act within the context of WARA.  See Section 5(d)(1).  Therefore, any DOT action with respect to Love Field, regardless of the more general powers that DOT may have under other federal law, necessarily are authorized from the power granted to it pursuant to WARA.  Therefore, neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because the agency acted pursuant to WARA  and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110.  The "plain language" of section

---

[5] The actions accomplished by the DOT Letters are collectively termed the "DOT Action."  The effective date of the DOT action should be deemed to be the date of the Second DOT Letter.  Although FAA was not an issuer of either DOT Letter, as shown below, FAA has acted together with its parent agency, DOT, to effectuate the DOT Action and the DOT Action is attributable to the FAA as well as to DOT.  For example, the Second DOT letter threatens the City's eligibility for grants that are administered by FAA.

[6] True and complete copies of the following instruments are appended to this complaint in an Appendix:  Exhibit 1: First DOT Letter; Exhibit 2: Second DOT Letter; Exhibit 3; WARA; and Exhibit 4: a certain "Five Party Agreement" hereinafter defined.

46110(a) expressly applies only to federal agency actions carried out under the designated parts in title 49 of the United States Code.  WARA does not appear in title 49 of the U.S. Code. *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2nd. Cir. 2003) (finding a lack of jurisdiction under earlier version of Section 46110 because the plain language "this part" authorized judicial review of only those actions carried out under Part A, not Part B); see also *City of Los Angeles v. FAA*, 239 F.3d 1033, 1035 (9th Cir. 2001) (same).  Instead the DOT Action and the DOT Letters are reviewable under the Declaratory Judgment Act, 28 U.S.C. § 2201.

13.     Alternatively, the DOT Action is not a final agency action but, through the DOT Letters, DOT and FAA have nevertheless in violation of their authority as restricted by WARA, interfered with and attempted to interfere with preferential gate use rights protected by Love Field leases and by WARA by issuing the DOT Letters.  This interference materially prejudices the City as airport landlord and airport manager.  DOT can interfere with Signatory Airlines' preferential gate rights under their leases but must act only on a nationwide basis, as required by section 5(e)(2)(B)(ii) of WARA.  This Court has jurisdiction to declare that DOT must take action to fulfill the mandatory requirements that any agency action eliminating or limiting preferential gate rights at Love Field must be taken only through a nationwide action.  DOT's failure to do so has been unlawfully withheld and unreasonably delayed in violation of the APA and WARA. See 5 U.S.C. § 706(1).

14.     In the further alternative, even in the absence of the Federal Agencies, the Court still has jurisdiction of the controversy involving the Airlines and the City under its federal question and supplemental subject-matter jurisdictional authority.  28 U.S.C. §§ 1331, 1337, 1367.

15.     Declaratory Judgment on the federal questions presented by the DOT Action is appropriate and within the Court's subject-matter jurisdiction because, among other things,

a.   the City claims the right under WARA not to be required to limit Signatory Airlines' preferential gate rights at Love Field to accommodate other air carriers when the accommodations will unduly interfere with the Signatory Airlines' flight schedules regardless of the limits imposed by the DOT Letters because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

b.   The City claims the right under WARA to decline to mandate accommodation of gate use requests from Delta or any other air carrier to the extent that granting the request would unduly interfere with the flight schedules of any Signatory Airlines regardless of the limits imposed by the DOT Letters, because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

c.   The City claims eligibility under the authority of WARA for Airport Improvement Program (AlP) grants from the FAA under 49 U.S.C. § 47107, regardless of the disqualification for such grants imposed by the DOT Letters so long as the City provides gate access to preferential gates at Love Field in accordance with WARA.

d.   The City is protected by WARA from DOT and FAA interference with its compliance with the Five Party Agreement (hereinafter defined) and the leases for Love Field of the Signatory Airlines, except that DOT could

interfere with the Signatory Airlines' preferential gate rights if it did so on a nationwide basis.

e.   The City is protected by the federal WARA statute from any obligation to modify its Love Field lease with Signatory Airlines that arguably might arise from the threat in the Second DOT Letter to the City's AIP grants because the circumstances of DOT's threat are not based on a review of the lease as required to trigger the lease modification requirement, and DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well.

f.   If the City is obligated to mandate the terms of gate accommodations at Love Field, it is permitted by WARA to include in those terms an amount of compensation from the requesting air carrier to the accommodating Signatory Airline that include consideration of the Signatory Airline's indirect costs including amounts actually paid by the Signatory Airlines for the use of gates and fair market values of gates, despite the prohibition against such considerations in the DOT Letters.

g.   The Airlines claim competing and conflicting rights based on federal law, including WARA and title 49.

16.   Venue is proper with this Court pursuant to 28 U.S.C. § 1391.

### III.   PARTIES

17.   The City is a Texas home rule municipal corporation with its principal offices located in Dallas County, Texas at 1500 Marilla Street, Dallas TX 75201.

18.     Delta is a Delaware business corporation with its headquarters located in Atlanta, Georgia, authorized to do business in the State of Texas, and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

19.     Southwest is a Texas business corporation with headquarters in Dallas, Texas, authorized to do business in the State of Texas and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

20.     Virgin is a Delaware business corporation with headquarters in Burlingame, California, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

21.     American is a Delaware business corporation with headquarters in Fort Worth, Texas, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

22.     Seaport is an Alaska business corporation, with headquarters located in Portland, Oregon, authorized to do business in the State of Texas, and may be served through its registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.  Seaport is named solely because its rights may be impacted by declaratory judgment related to Virgin.

23.     United is a Delaware corporation, with its headquarters in Chicago, Illinois, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

24.     DOT is a federal agency and may be served with process through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-

1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to the Anthony Fox, Secretary, Department of Transportation at 1200 New Jersey Ave. SE, Washington, D.C. 20590.

25.     The FAA is a federal agency and may be served through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to Michael P. Huerta, Administrator, Federal Aviation Administration at 800 Independence Ave. SW Washington, D.C. 20591.

## IV.     FACTS

**Love Field History and the Wright Amendment**

26.     Love Field was initially constructed as a United States Army airbase during World War I.  In 1928, the City acquired the air field and commercial operations began.

27.     In 1964 the Civil Aeronautics Board ("CAB"), an FAA predecessor, determined that the competition between the Dallas and Fort Worth airports was harmful and ordered Dallas and Fort Worth to reach a voluntary agreement designating one airport through which CAB-regulated carriers would serve both communities.  The cities were unable to designate any existing airports and instead agreed to construct a new airport, Dallas-Fort Worth International Airport ("DFW Airport"), located roughly midway between Dallas and Fort Worth (the two cities are approximately 32 miles apart).  All federally certified air carriers agreed to cease

operations at the cities' airports and move operations to DFW Airport.  DFW Airport opened in 1974.

28.     Southwest was not a federally certified carrier at that time and continued its operations from Love Field.  At the time, all of its flights were within the State of Texas.  After passage of the Airline Deregulation Act of 1978, (Pub. L. No. 95-504, 92 Stat. 1705 (1978)), Southwest made plans to expand service outside of Texas from Love Field.  Other air carriers announced plans for Love Field operations.  In 1980, Congress adopted the Wright Amendment.  (Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980)).  Under the Wright Amendment, flight operations from Love Field were generally limited to Texas and four adjacent states.

29.     In 1998, Congress adopted the so-called Shelby Amendment, which added Alabama, Kansas, and Mississippi as states that could be served directly from Love Field.  (Pub. L. 105-66, § 337, 111 Stat. 1425 (1997)).

30.     In 2005, Congress adopted the so-called Bond Amendment to add Missouri to the states that could be served directly from Love Field.  (Pub. L. No. 109-115, § 181, 119 Stat. 2396 (2006)).

31.     In early 2006, members of Congress suggested that the cities of Dallas and Fort Worth propose a long term solution to the Wright Amendment's limitations on Love Field flight operations.

32.     On or about July 11, 2006, the City of Dallas, the City of Fort Worth, the Dallas-Ft. Worth International Airport Board, Southwest, and American entered into an agreement (referred to as the "Five Party Agreement").  The underlying principle of the Five Party Agreement was to resolve the manner in which service could be provided at Love Field in the future.  The Five Party Agreement provided that Southwest would obtain preferential use of 16

gates, American would obtain preferential use of two gates, and ExpressJet Airlines, Inc. ("ExpressJet") would obtain preferential use of two gates.  Southwest agreed not to operate from DFW Airport unless it surrendered a Love Field gate, up to eight gates, for each DFW gate that it acquired.  Flight operations were limited to 6:00 a.m. to 11:00 p.m. and no international flights would originate from Love Field.  The number of gates at Love Field would be reduced from the then existing 32 gates to 20.  The agreement also stated, "To the extent a new entrant carrier seeks to enter Love Field, [the City] will seek voluntary accommodation from existing carriers" but if an agreement was not reached then the City agreed "to require the sharing of any preferential lease gates, pursuant to the terms of existing lease agreements."   (Five Party Agreement, para. 1.b.)

33.     ExpressJet's leasehold interests were later acquired by United.

**The Wright Amendment Reform Act of 2006**

34.     On October 13, 2006, Congress adopted WARA.  (Pub. L. 109-352, 120 Stat. 2011 (2006)).  WARA incorporated and adopted many of the terms of the Five Party Agreement as federal law, although several other provisions of the Five Party Agreement remain in force as contractual obligations independent of WARA.  The statute repealed the Wright Amendment limitations on long-distance domestic flights, with the repeal becoming effective in eight years (in 2014).  Under the Five Party Agreement, international flights were banned from originating at Love Field and Southwest was barred from operating at DFW Airport unless it gave up a Love Field gate, up to eight gates, for each gate used at DFW.  The City was required to reduce the 32 existing gates to a total of 20 gates.  WARA also required the City to "determine the allocation of leased gates and manage Love Field in accordance with the contractual rights and obligations existing as of the effective date of [WARA] for certificated air carriers providing scheduled

passenger service at Love Field on July 11, 2006.  To accommodate new entrant air carriers, [the City] shall honor the scarce resource provision of the existing Love Field leases."

35.    WARA provided that neither FAA nor DOT could take action that was inconsistent with the Five Party Agreement or that challenged the legality of any provision of the agreement. As noted above, the Five Party Agreement gave the Signatory Airlines, including Southwest, preferential gate rights. WARA also provided that it did not limit FAA, DOT, or other federal agency from enforcing requirements of law or grant assurances that imposed obligations to make Love Field available on a reasonable and nondiscriminatory basis to air carriers seeking to use its facilities *except* that the Act could not be construed to require the City "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."

36.    Further, WARA provided that the Five Party Agreement "and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code."  WARA § 5(d)(2).  As noted above, both Southwest and the City are parties to the Five Party Agreement.  Delta is not.  American is a party and Virgin, as American's subtenant, may have American's WARA's gate rights protections.  United is not a party.  The Court may be asked to decide if Southwest's WARA gate protections extend to the gates it subleases from United.

37.    Under WARA and the Five Party Agreement, any Love Field gates that revert to the City because of lease expiration or other reasons become common use gates.  Thus Southwest has preferential gate use rights at Love Field for 16 gates under its direct lease with

the City until 2028 and probably enjoys United's preferential gate rights for the two gates that it has subleased from United gates through 2028, unless any preferential gate rights are lost by lease termination or nationwide regulations adopted by a Federal Agency, or other reason. American retains preferential gate rights at Love Field subject to similar conditions until the expiration of its lease on 2028.   Virgin probably now exercises American's preferential gate rights as American's subtenant until 2028, again subject to the same conditions for keeping those rights.  Delta and Seaport have no lease rights except by virtue of their contractual arrangements with other Airlines.

**Grant Assurances**

38.     The City has received federal grant funds for Love Field from the FAA.  Each time the City receives a grant, the City enters into an agreement with the FAA.  Each agreement contractually binds the City to various assurances to the federal government generally referred to as Grant Assurances.  Grant Assurances are themselves mandated by federal law.  49 U.S.C. § 47107.  Among the City's assurances are to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."   FAA Airport Compliance Manual (FAA Order 5190.6B), Appx. A at 10, Grant Assurance 22.a.  Another pertinent portion of Grant Assurance 22 reads:

> e. Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and use similar facilities, *subject to reasonable classifications such as tenants or nontenants and signatory air carriers and nonsignatory air carriers.* Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes

obligations substantially similar to those already imposed on air carriers in such classification or status.

*Id.*, Grant Assurance 22.e (emphasis added).

**Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21)**

39.     In 2000, Congress adopted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (generally known as AIR-21).   (Pub. L. No. 106-181, 114 Stat. 61 (2000)).   One of its provisions requires that the City, as the proprietor of Love Field, must provide the FAA with a "Competition Plan" that outlines the City's methods for enhancing competition to ensure that all air carriers wishing to serve its airport are provided with a reasonable opportunity to provide such service.   DOT has the right to periodically review the implementation of Competition Plans of all covered airports and can conduct site visits to ensure that competition plans are being successfully implemented.

40.     The City submitted its most recent update to its Competition Plan in 2009.   The update explained that the City intended to accommodate requests for access by applying the gate sharing provisions contained in the current leases.   Competition Plan Update for Dallas Love Field, letter from Daniel T. Weber, June 3, 2009, at page 5.

**Leases at Love Field**

41.     On or about February 13, 2009, the City and Southwest amended and restated a pre-existing master lease agreement for 16 gates at Love Field.   The term of the lease lasts until September 30, 2028.

42.     On or about March 11, 2009, the City and American amended and restated a pre-existing master lease agreement for two gates at Love Field.   The term of the lease lasts until September 30, 2028.   With the consent of the City, which was given in conformity with the

recommendation of the U.S. Department of Justice ("DOJ"[7]), on or about May 12, 2014, American subleased its two Love Field gates to Virgin as part of a much broader program of gate divestitures imposed on American by DOJ through agreed federal district court judgments as a condition of DOJ not objecting to a merger between American's parent corporation and US Airways Group Inc. ("US Air").

43.     On or about October 1, 2008, the City amended and restated a preexisting master lease agreement with now-defunct Continental Airlines for two gates at Love Field.  Continental later merged with United so that United is now the City's lessee for those two gates.  The term of the lease lasts until September 30, 2028.  After DOJ declined to object, and with the consent of the City, on or about January 28, 2015, United subleased its two Love Field Gates to Southwest, giving Southwest lease or sublease control over 18 of Love Field's 20 gates.

**Terms of the Master Leases**

44.     Under the terms of the master leases for Love Field (which are essentially identical for each Signatory Airline's master lease), the Signatory Airlines' lease specific space (but not including any gates) at the airport.  Depending on which space was involved, the leased area could be for exclusive use or preferential use.  Exclusive use space refers to those portions of the airport where the Signatory Airline has the sole right of use.  No gate rights were exclusive.  Preferential use space refers to those portions of the airport where the Airline was contemplated to be the primary but not sole user.  Airlines were also given access to common use space.  The leased gates were all part of the lessees' preferential use space.  Each Signatory Airline agreed that when it had no scheduled use the Airline leasing the preferential gates would allow other scheduled and nonscheduled air carriers to use the gates as circumstances and the

---

[7] Although DOJ is of course of federal agency, the City does not include DOJ as within the defined term, "Federal Agency," used in this complaint.

public interest required for loading and unloading but such use could not take precedence over the Signatory Airline's scheduled use.  Each Signatory Airline acknowledged that the facilities "may become a scarce resource if a new entrant airline … requests to provide service at the Airport" and agreed "to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement."  Each Signatory Airline retained priority in use of its leased gates if there was a scheduling conflict.  The requesting air carrier could be charged fees which were to be based on the accommodating Signatory Airline's direct and indirect costs plus a reasonable allowance for administration.  If a voluntary agreement for accommodation could not be reached, the lease created a procedure by which the City was notified of the accommodation request and that the City could select a Signatory Airline to accommodate the requesting air carrier.  If the air carriers could not reach agreement on the terms of the accommodation, the City could decide disputed terms of the accommodation request, including, if necessary, the amount of fees and charges.

45.     One lease provision requires lease modification if DOT threatens the City's AIP grants after reviewing the lease.  This provision reads in full as follows:

Section 14.02. Competitive Access.

City and Airline acknowledge that certain portions of this Agreement may be subject to review by the DOT, including but not limited to, the FAA or any other Governmental Agency, concerning possible effects on airline competition and access at the Airport. In the event the federal government threatens to withhold federal assistance, or other sanctions, as a result of such review, City and Airline agree to modify this Agreement accordingly to reflect any necessary change as a result of such action.

46.     However, DOT has already reviewed and approved the lease provisions.

47.     Another term of the lease subordinates the lease provisions to certain agreements between the City and any federal agency.  The subordination clause provides is full:

Section 14.34. Subordination.

This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof.

48.     Prior to receipt of the Second DOT Letter, the City informally suggested to DOT that DOT might wish to consider attempting to negotiate an agreement with the City to effectuate some of the positions expressed in the First DOT Letter.  DOT informally declined this suggestion.  Any such agreement between the City and the United States would not be valid or enforceable to the extent that it contained terms that were inconsistent with any terms of WARA. The City is aware of no agreement, and the DOT Letters cite none, between the City and any federal agency that come within the scope of section 14.34.

Another relevant lease section addresses force majeure and provides in full:

Section 14.12. Force Majeure.

Neither City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reasons of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, acts of the public enemy, acts of a superior Governmental Agency, weather conditions, floods, riots, rebellions, acts of sabotage, or any other circumstances for which it is not responsible or which are not in its control; provided, however, that this Section shall not apply to failures by Airline to pay the rentals, fees and charges specified under this Agreement.

**American's Merger with US Air and Virgin's Sublease**

49.     In 2013, US Air and American's parent corporation, AMR Corp., announced plans to merge.  On or about August 12, 2013, DOJ and six state attorneys general and the

District of Columbia filed a civil antitrust lawsuit challenging the proposed merger.   In November 2013, as part of a settlement of the pending action, DOJ required US Air and AMR to divest slots and gates at various airports across the country.   The settlement agreement, which was embodied in an agreed federal district court judgment, required divestment of the two American gates at Love Field.

50.     Delta, Southwest, and Virgin each made proposals for American's lease rights to the two gates. DOJ approved the proposal made by Virgin and opposed the others.  Accordingly, as stated above, the two American gates at Love Field were sublet to Virgin following the City's consent.  Virgin and Seaport entered into a gate use agreement under which Seaport has two daily flights from Virgin's gates.    On or about October 13, 2014, Virgin started commercial passenger operations at Love Field.

51.     Representatives of DOJ have informed the City that Virgin is not subject to any accommodation requirement under the lease for a reasonable period that shall be approximately one year from the start of its operations at Love Field on or about October 13, 2014, in order to allow Virgin time to solidify its position at the airport.  Neither DOT nor FAA has commented to the City on that DOJ position.

52.     In filed court pleadings and related instruments, DOJ has repeatedly stated on behalf of the United States, and structured one or more agreed judgments to be consistent with its position, that Love Field and DFW Airport comprised a single market for commercial passenger air travel.  The history underlying DFW Airport's creation also supports that market definition.

53.     In 2014, United elected to cease current flight operations at Love Field.   It initially entered into a gate use agreement with Southwest on or about September 18, 2014.

Subsequently, Southwest acquired United's preferential gate use interest at Love Field through a sublease to which the City consented on or about January 28, 2015.

**American's Sublease to Delta**

54.     With the City's consent, on or about July 8, 2009, Delta entered into a month-to-month sublease with American for a portion of American's two gates.  After its settlement with DOJ and upon entering into its divesting sublease with Virgin, American advised Delta that the sublease would be terminated effective October 12, 2014.   On information and belief, Delta was selling tickets for flights after October 12, 2014 even though it had no then-current lease, sublease, or other arrangement for the use of Love Field after October 2014.  The City is not aware that Delta informed its customers of its lack of gate rights at Love Field when offering or selling those tickets.

**Requests for Accommodation**

55.     On or about September 18, 2014, Delta advised the City that its sublease with American was about to expire and invoked the accommodation process under the master airport leases.  Delta then had and continues to have operation to and from DFW Airport.

56.     The City conferred with the other Airlines and all Airlines (both Signatory Airlines and those operating under a sublease or gate use agreements) advised the City that any proposed accommodation would unduly interfere with their operations.   Based on this information, the City advised Delta that the City could not accommodate their request at Love Field.  Delta responded and invoked the City's competition plan, the grant assurances, and other unspecified federal law and urged immediate short-term accommodation and claimed it would otherwise suffer immediate and irreparable injury.

57.      Shortly thereafter, representatives of City, DOT, FAA, and the Airlines conferred and attempted to reach a resolution regarding the accommodation request.

58.      On or about November 6, 2014, United and Delta reached a temporary gate use agreement by which Delta could continue its operation of five flights a day using the two Southwest gates (which Southwest had subleased from United) until January 6, 2015.  On or about January 6, 2015, United and Delta further agreed to continue the term of their gate use agreement until July 6, 2015.  Southwest, after subleasing United's gates, agreed to honor United's extended gate use agreement with Southwest upon the expiration of the temporary gate use agreement.

59.      On or about November 10, 2014, the City forwarded its proposed principles, criteria, and model to be used to determining any accommodation requests at Love Field to the Airlines and DOT.  The Airlines responded with comments and revisions consistent with their respective positions.  DOT did not provide any written comments.

60.      On December 17, 2014, DOT's General Counsel sent the Dallas City Attorney the First DOT Letter, summarizing DOT's understanding of prior communications between DOT and the City and providing guidance as to DOT's position on the City's legal obligations with respect to Delta's gate accommodation request.  Pursuant to the City's request for guidance, the First DOT Letter detailed DOT's position on several key issues concerning the City's legal obligations with respect to any accommodation request at Love Field.  The First DOT Letter stated once an air carrier had been accommodated, it was entitled to maintain its ongoing pattern of service even after the expiration of any agreement between the accommodated and accommodating air carriers as long as the pattern of operations remained unchanged.  The First DOT Letter also stated that the accommodating Signatory Airline was limited to recovering only

its pro-rata share of the subleased facilities lease rate plus a reasonable allowance for administration that may not exceed 25%.

61.     After confirming that the First DOT Letter could be released, the City advised the Airlines that the City would have no choice but to follow and abide by the guidance as stated in the First DOT Letter in formulating and applying its accommodation procedures until and unless judicial or other competent authority held the First DOT Letter not to enunciate binding standards.

62.     DOT also provided informal advice to the City that supplemented and amplified the contents of the First DOT Letter.  DOT informally advised the City that any accommodation request should be evaluated as of the date of the request, using Airline operations as of a snapshot date.  DOT further informally advised that future planned operations of incumbent Airlines could be considered but only as to a limited time in the future, such as six months, and only if tickets were being sold for the future flights.

63.     At the time of the First DOT Letter, Love Field was experiencing rapid changes in is pattern of flight operations due mainly to reduction in the number of gates and initiation of long-haul air service as WARA became effective.  Attached to and incorporated into the First DOT Letter by reference was a compendium of airport competition plan requirements, "Airport Competition Plans; Highlights of Reported Actions to Reduce Barriers to Entry and Enhance Competitive Access" (Nov. 2010).  The First DOT Letter referred to the attachment as follows:

> We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access. The compendium table focuses on airports that have developed pro-competitive tools to accommodate requesting carriers in conformity with the competition plan requirements.

First DOT Letter at 2.   None of the examples in the attachment included permanent accommodation mandates for preferential use gates.   None of the examples were for airports that are prohibited by law from adding gates.   None of the examples were for airports whose dominant signatory carrier is prohibited by law from operating at a neighboring airport without surrendering gates, nor for airports for which the associated city could not be required to "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis," as required by WARA.   None of the examples included airports for which a private agreement provided a safe harbor for deemed title 49 compliance as does WARA for Love Field respecting Five Party Agreement performance.

64.     Representatives of DOJ have told the City, consistent with DOJ's litigation position in the American-US Air merger controversy, that the relevant market for evaluating competition among local air carriers is the Dallas-Fort Worth Metroplex, including DFW Airport, and not just any one airport such as Love Field.   Representatives of DOT have informally advised the City that DOT considers the relevant market for evaluating competition for accommodation purposes to be only Love Field.  The City informed DOT and DOJ of those conflicting positions but has been unsuccessful in securing reconciliation of those conflicting positions from DOT and DOJ.  As stated above, DOT has not commented to the City on DOJ's position.

65.     On February 13, 2015, Southwest filed a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit seeking a review of the First DOT Letter. Southwest asserted the First DOT Letter was a final agency action pursuant to 49 U.S.C. § 46110, and that it was arbitrary, capricious, an abuse of discretion, not in accordance with law, in

excess of statutory authority, and without observance of required procedures.  Delta intervened in the action, defending the First DOT Letter as a valid final agency action.   As noted above, the City does not believe that section 46110 applies to review of the First DOT Letter.  The City is not a party to the D.C. Circuit proceeding.

66.     The Court of Appeals will not issue a final decision by the time the gate use agreement between United and Delta expires on July 6, 2015.  Under the current scheduling order DOT's initial substantive brief is not due until July 22, 2015.  The case remains pending as *Southwest Airlines Co. v. U.S. Dept. of Transp.*, Case No. 15-1036 (D.C. Cir.).

67.     On or about February 23, 2015, Delta demanded Southwest and the City permanently accommodate its current 5 operating flights. On or about the same date, Delta gave notice to Southwest, Virgin, and Seaport demanding that an *additional* eight flights be accommodated at Love Field.

68.     On or about February 27, 2015, Southwest responded and rejected both of Delta's accommodation demands.  In its response, Southwest stated that it had been and was expanding service between Love Field and additional cities so that by August 9, 2015, it would be averaging at least 10 daily flights on all of the 18 gates to which it had rights (for a total of 180 flights per day) and there would be no capacity to accommodate any Delta flights.   In its response, Southwest advised the City (with a copy going to others including Delta) that Southwest offered to extend the duration  of Delta's use of Southwest gates past July 6, 2015, to July 19, 2015.  The City is unaware that Delta ever accepted that offer and Delta's more recent communications are inconsistent with such acceptance.

69.     On or about March 10, 2015, Virgin responded to Delta's request.  It stated that any accommodation of Delta would be contrary to the DOJ's reasons for opposing divestiture of

American gates to Delta and to the settlement agreement regarding that divesture.  Virgin also stated that it would be operating 19 daily flights starting in April 2015 and that it had an agreement with Seaport who was operating two flights on its gates for a total of 21 flights on two gates.  Therefore Virgin stated it had no space to accommodate additional flights or Delta's request.

70.     Delta has subsequently advised the City that it never received a response from Seaport and considers its request to Seaport as rejected.

71.     On or about April 9, 2015, American made a request to the City that up to 4 daily flights be accommodated at Love Field.  However, the City is unaware of any American accommodation request to other Airlines for Love Field gates.

72.     As a result of the many accommodation requests and current operations, the City faces requests for the following daily flights:  180 (Southwest) + 11 (Delta) + 4 (American) + 19 (Virgin) + 2 (Seaport) for a total of 216 operations at 20 gates which legally and safely can only accommodate up to 200 flights a day.

73.     The City cannot accommodate all 216 flights at Love Field.  As a result, the City needs to consider the accommodation provisions under the master leases, WARA and the Five Party Agreement to determine how to allocate scarce gate resources at Love Field, in other words, to determine how many if any requested gate slots can be accommodated and mandate accommodation for those slots.  However, the City must resolve the conflicting legal directions and positions detailed here before it can do so.

74.     On or about April 16, 2015, the City circulated a revised version of its draft accommodation procedures to the Airlines and to DOT for their comment.  The Airlines responded on or about April 28, 2015.  Many of their comments were highly critical of the

revised procedure and provided revisions to advance their respective positions.  The Airlines'
positions were not consistent.  DOT did not comment.

75.     On or about May 19 through 24, and again on June 11 and 12, 2015, the City
attempted to negotiate an extended temporary or a long-term gate accommodation agreement
between Delta and Southwest.  Each Airline informally signaled what it might accept as a
compromise, but rejected the proposals the other Airline floated.  No agreement was reached.

76.     Since shortly after receipt of the First DOT Letter, the City sought clarification
and guidance from DOT and the FAA, and in particular asked that whatever terms DOT sought
to dictate as to gate accommodate be in the format of a mandate and not mere guidance.  The
City also requested the legal basis for DOT's conclusions and also requested clarification in light
of the WARA provisions.  On June 15, 2015, DOT responded to those requests by issuing the
Second DOT Letter.  After confirming that DOT did not object, the City circulated the Second
DOT Letter to all of the Airlines on the same day.

77.     The Second DOT Letter explained that DOT relied upon the grant assurance
statute and the competition plan statute as the basis for its conclusions DOT reiterated that the
City "is required to accommodate a requesting carrier unless Love Field's facilities are fully
utilized at the time of the request, or the Signatory Airlines at the time of the request are selling
tickets for future flights fully-utilizing the facilities."  It stated that a Signatory Airline's planned
future operations should not be considered unless the carrier was selling tickets for the future
flights and consideration of such plans would be inconsistent with grant assurances.  It repeated
that an accommodated carrier must be allowed to continue a similar pattern of service.  The letter
concluded by stating that the decision on Delta's request was the City's responsibility but the
City "must make this decision made in compliance with the grant assurances and [the City's]

other legal obligations.  The Letter contained no reference to WARA or to any specific lease provisions.

**Current Operations**

78.     As of the date of commencing the instant litigation, Southwest leases 16 gates and subleases two additional gates from United at Love Field.  Delta is currently operating its five daily flights from Southwest's gates.  Virgin subleases the remaining two Love Field gates from American.  Seaport, through its agreement with Virgin, operates two daily flights.

79.     On information and belief, Delta is selling tickets for flights after July 6, 2015 even though it has no current lease, sublease, or other arrangement for the use of Love Field after that date. Southwest has stated it has starting selling tickets for its planned expansion, with flights starting in August and that it needs exclusive access to all of its gates starting on July 6 so that it can remodel them for its expanded service.  Upon information and belief, Southwest and Delta are selling tickets for flights after July 6, 2015, that would require the use of the same Love Field gates simultaneously for two aircraft – one from each Airline.  These actions create the risk of chaos at Love Field when passengers for two flights attempt to arrive or depart at the same gates at the same times, and even worse create safety issues should two aircraft try to use the same gate concurrently or if frustrated passengers get aggressive.

80.     Beginning with its sublease from American through July 6, 2015, Delta has been operating at Love Field under month-to-month or six-month-at-a time-arrangements with flight to Atlanta, Georgia.

81.     Southwest flights to and from Love Field since the effective date of WARA have served local Texas cities and cities throughout the United States.  Southwest's announced intent to use the space and time now used by Delta would serve other cities rather than just Atlanta.

82.     Delta currently has gate facilities and operations at DFW Airport.  Southwest does not have a DFW Airport presence, and to obtain any future DFW Airport gates it would have to surrender Love Field gates.

83.     The City has granted no special or exclusive gate use privileges to Southwest, American, United, or their sublessees or gate users.  These Airlines' rights to use gates derive from the preferential use terms of the master lease, the Five Party Agreement, and WARA. While DOT has provided the City with informal guidance and the  DOT Letters set forth DOT's views on the City's obligations, neither DOT nor FAA has required or directed that the City take action to interfere with Southwest's, American's, United's, or their sublessees' preferential gate use rights.  Because of the explicit protection for preferential gate use rights in WARA, the City is uncertain whether DOT or the FAA could lawfully require the City to interfere with a Signatory Airline's, or its sublessee's, preferential gate use rights at Love Field unless that requirement were imposed on all airports in the country. Southwest has stated it would sue the City if the City violated Southwest's lease rights respecting gate use.  In particular, Southwest threatened suit if it was forced to accommodate Delta fights past August 9, 2015.  Despite the apparent lack of authority to enforce the DOT Letters, DOT and FAA claim the right to treat any departure from the terms of the DOT Letters by the City as a Grant Assurance violation.

## V. CONFLICTING DEMANDS, CLAIMS, AND INTERPRETATIONS

84.     The City has received conflicting claims, demands, and interpretations of the governing statutes, regulations, judgments, and the leases from the Airlines and the two Federal Agencies.  A number of the carriers have implicitly or explicitly threatened litigation and/or other adverse consequences if the City takes any action that any party perceives is contrary to its interests or directions.

85.   In its latest communications with the City, Delta:

    a.   claims that the City must follow the First DOT Letter as a formal agency directive;

    b.   has threatened that the City would be "better advised" to grant its accommodation requests as required by existing federal law;

    c.   has invoked authority for its accommodation from the requirements related to the City's Grant Assurances and Competition Plan;

    d.   claims that ample gate availability existed at the time of the requests for accommodation and that its pending requests should be granted without further delay;

    e.   claims entitlement to a permanent or long term accommodation;

    f.   argues that Congress emphasized the importance to maintain access to new entrants, and that it is a new entrant;

    g.   requests immediate accommodation in accordance with the First DOT Letter as to its request for five flights and that within 30 days that a forced accommodation for its requested eight additional flights be issued;

    h.   argues that the First DOT Letter is a final and binding directive;

    i.   disputes that "pattern of service" is limited to the same equipment or city-pair;

    j.   argues that any attempt to so define "pattern of service" would be contrary to federal law; and

k.   appears to assert that its rights to accommodation are superior to Southwest's, American's, United's, or their sublessees' preferential gate use rights under their leases.

l.   In addition, via telephone on June 17, 2015, a Delta attorney represented to an attorney for the City that Delta had drafted and was ready to file an administrative complaint with DOT against the City, essentially to enforce the DOT Letters.

86.   In its latest communications with the City, Virgin:

a.    argues that accommodation requirements should not be for the benefit of large legacy Airlines, particularly those with significant operations at DFW;

b.   argues the policies should instead help develop low-cost entrant air carriers; and

c.   claims any forced accommodation imposed on it would unduly interfere with its rights, be contrary to its agreement with the City, and violate the DOJ settlement.

87.   In its latest communications with the City, Southwest:

a.    claims it has the legal right to fully utilize all gates that it leases at Love Field and this right includes Southwest's ability to expand its own operations on those gates at any time;

b.   claims that the City has no legal right to abrogate its rights to fully utilize its leased gates;

    c.   relies on WARA, the City's competition plan as approved by the FAA, the 1999 FAA/DOT "Airport Business Practices and Their Impact on Airline Competition," and Southwest's lease with the City;

    d.   claims that any attempt by the City to prevent Southwest from adding flights for its planned expansion would be unlawful, cause severe and irreparable harm, and would be subject to an immediate challenge by Southwest; and

    e.   claims a mandatory accommodation would be improper and unlawful, violate the terms of the lease, would reduce competition, and would constitute an unlawful taking of its property.

88.    If the City fails to comply with duly authorized direction from the DOT, it faces immediate loss of its substantial grant funds, injunctive action and further penalties which would irreparably damage the City.  The City seeks to ensure that its residents and the flying public are well served at Love Field but it is impossible to resolve the competing and conflicting claims without judicial interpretation, direction, and decision.

88.    Examples of the conflicting interpretations, each of which is concrete and ripe, start with who is entitled to be accommodated.  The accommodation provisions of the lease provide that "a new entrant airline (Requesting Airline)" should be accommodated if the accommodation does not unduly interfere with the Signatory Airline's operating schedules.  Delta asserts that it is a new entrant.  Southwest asserts that Delta is not a new entrant since it has been continuously operating from Love Field since at least 2009 and that the term "new entrant" is not limited to Love Field but must also include consideration of air carriers currently at DFW Airport.  DOT has told the City to treat Delta as a new entrant.  DOT has rejected Southwest's

contention (shared by DOJ) that DFW Airport and Love Field comprise a single competitive market.

89.     Conflicts exist as to what constitutes an accommodation and how long it must last.  Delta acknowledges that it has been accommodated in the sense that it has been able to continue flight operations since its sublease with American was terminated.  However, Delta asserts that it must be permanently accommodated regardless of Southwest or any other Airline's planned expansion or the terms of its agreement with United.  Southwest asserts that Delta has no such rights and that Delta's accommodation must yield to the use of gates by those with contractual lease rights for the use of the gates.  DOT has directed that Delta is a "new entrant," entitled to gate accommodation, because it is not a Signatory Airline, despite its operations history at Love Field, and that Delta has a continuing right to use the gate slots it may obtain through accommodation as long as it continues its pattern of service even if the agreement by which Delta was voluntarily accommodated has a certain expiration date.  When the City sought to define what constituted a pattern of service, DOT declined to provide advice and Delta has claimed that the City's proposed definition of DOT's term is unlawful.

90.     Conflicts exist over how much should be paid for any accommodation.  Delta asserts that whatever accommodation is provided, it only has to pay a pro rata share of lease payments made by the accommodating Airline to the City.  Southwest asserts that any payment by Delta must include direct costs, indirect costs, lost profits, and administration costs, including as a cost component for what Southwest paid to United to obtain the rights to use United's gates.  Virgin has asserted that Delta had the opportunity to enter into the market place, compete, and pay United for right to use some or all of the gates.  Virgin contends that Delta should not be allowed to acquire the rights without competing in the open market and paying fair value.  DOT

tells the City that Delta need only pay the direct costs and administrative costs, regardless of what Southwest paid for any gates or of the fair market value of any gates.

91.     Conflicts exist over whether an accommodation is feasible.  Stated differently, the Airlines disagree as to how and when the City should assess whether an accommodation would unduly interfere with the Signatory Airline's operations.  Delta argues that a snapshot date should be used that limits consideration to the date of the request and a limited six month look ahead.  DOT generally agrees with Delta's position.  Both Virgin and Southwest dispute the position.  Virgin maintains any look-ahead must be at least 12 months and does not depend on the sale of tickets.  Southwest disputes the entire contention.  It has further contended that the timing of Delta's accommodation request, coinciding with rapid changes at Love Field due to the repeal of the Wright Amendment, make the use of any snapshot and look-ahead approach impractical and irrational as applied to Delta's current requests.

92.     As to how to determine whether an accommodation is feasible, the Airlines disagree as to the applicable factors such as time on gate, time between turns, and buffer times between sequential flights.  Virgin argues it needs more time because of the type of flights it offers.  The Airlines disagree as to the maximum number of flights that can occur at any particular gate.  DOT has told the City that from its perspective, it is the total number of passenger seats that operate through a particular gate that is determinative and that the goal should be to maximize the use of each gate.

93.     Conflicts exist as to what criteria the City should or must use in making an accommodation decision.  Delta argues that destination cities from Love Field are relevant, DOT asserts that the City may not consider flight destinations and can only consider gate utilization (however that is measured).

94.     Conflict exists between the City and the Federal Agencies over whether, in making an accommodation decision, the City must, can or may not consider other air service in the Dallas – Ft. Worth metropolitan area.

95.     Conflicts exist among Virgin, the Federal Agencies and DOJ as to whether Virgin's gates may be considered in an accommodation decision or whether Virgin is exempt from making an accommodation and, if so, for how long.

96.     The communications between and among the City, the Airlines, and the Federal Agencies, and DOJ establish that the above conflicts each and collectively present a complex set of controversies that are concrete and ripe for judicial determination.   There is a real and substantial controversy of sufficient immediacy and reality that exists between the parties having adverse legal consequences.   The City has clear standing to seek judicial resolution of these controversies.   If the City, on or before July 6, 2015, directs Southwest and/or Virgin to accommodate Delta, Southwest and/or Virgin claim an immediate loss of valuable rights and interests (and injury to their passengers).   If the City does not direct an accommodation on or before July 6, 2015, Delta claims an immediate loss of valuable rights and interests (and injury to its passengers).   Whatever action or inaction the City takes, it faces the prospect of an enforcement action from DOT or FAA that could result in loss of the City's ability to collect passenger facility charges and to receive federal airport grants.

97.     There is simply not enough room to accommodate everyone.   On information and belief, the Airlines are selling tickets to the public that regardless of the City's decision cannot all be honored.   There are 20 gates and space for about 200 flights.   Upon information and belief, the Airlines are selling tickets to far more than 200 flights.   Delta has suggested that Delta may retain security to protect their continued use of the space they are currently using after July 6,

2015. The potential disruption to the flying public under such a circumstance would be enormous and could have national ramifications immediately after the extraordinarily busy Independence Day weekend travel. Unless these controversies are resolved, the disruptions will continue to recur, and may rise to a level implicating public safety.

98. DOT and FAA have advised the City that any decision must be made with controlling effect given to the City's Grant Assurance obligations and its obligation to comply with its Competition Plan. DOT officials have stated that any decision not consistent with their understanding runs the risk of violating the terms of the Grant Assurance and Competition Plan. Delta characterizes DOT's communications as threats of enforcement action. However, DOT has carefully refrained from making an overt threat that failure to accommodate Delta or failure to comply with the terms of the First DOT Letter necessarily will be a violation of the City's Grant Assurances or Competition Plan. DOJ has advised that Virgin is exempt from any accommodation request for at least one year regardless of whether Virgin is fully utilizing the subleased gates. DOT has declined to opine on that issue.

99. The City believes that it is forced to conform to the standards stated in the First DOT Letter and DOJ communications or risk severe pecuniary loss and possible closure of Love Field if federal grants and ability to levy passenger facility charges are lost. The City has been and will be adversely affected by the DOT and FAA positions which involve the rights and obligations of the City and the Airlines and legal consequences flow from those positions.

100. Even without DOT or FAA involvement, there is an imminent threat of litigation against the City from the Airlines. Of course, two of the Airlines are already involved in litigation with DOT over the First DOT Letter. Southwest has advised the City that any City decision that interferes with its planned expansion "would be subject to an immediate

challenge;" would constitute an unlawful taking; would create potential liability of millions of dollars; and the City should consider the potential liability before making any decision. Southwest has stated it will challenge in court any attempt by the City to force accommodation of Delta that prevents it from operating its new flights starting August 9, 2015.  Delta and Virgin have been a bit more circumspect but the existence of an imminent threat of litigation from either is present.   Delta has advised the City that a failure to accommodate will violate the City's federal obligations including its Grant Assurances; interfere with rates, routes, and fares that are explicitly preempted by federal law; be anti-competitive or contrary to the Competition Plan; and constitute serious (but unspecified) violations of the City's legal obligations.  Delta states it has exhausted its efforts and that there has been no action by the City "despite the laudable efforts and enforcement threats by DOT."   Virgin claims there are compelling legal reasons why it cannot be forced to accommodate and that such action would be unlawful.

101.    All parties claim competition as justification for their position with the ultimate goal of better service and fares.  All note the unique circumstances at Love Field.  Delta and Virgin claim Southwest has control of 90% of Love Field's gates.  Southwest responds that it is barred from competing at DFW and relies on its historical impact on competition.  The factual underpinnings of this case reflect the confusing and conflicting nature of the policies regarding competition as reflected in federal law.

102.    The Federal Agencies insist on an accommodation decision according to their view of the law or the City risks enforcement actions for failing to comply with the required assurances and competition plan.  But no matter what the decision, the City will be sued by one or more of the Airlines and perhaps even by the Federal Agencies and/or DOJ.  The case and controversy is actual, concrete, and ripe for judicial decision.

103.    The City emphasizes that it seeks clarity of its obligations and rights rather than any particular result.

104.    Although the City recommends that temporary injunctive relief be granted to preserve the status quo during this litigation if Southwest and Delta cannot resolve their issues, the City anticipates that Delta and Southwest will present evidence supporting their respective views of what the status quo should be. The City is not likely to need to take a position in that dispute other than to urge that a preliminary injunction will be necessary to preserve the status quo and prevent chaos at Love Field in the public interest during the busy summer travel season.

105.    As July 6, 2015, approaches, if Southwest and Delta have still not reached voluntary agreement, even if only a temporary further gate use extension, and the Court has not issued a preliminary injunction, the City likely will seek a temporary restraining order to preserve the status quo in order to prevent chaos at Love Field when Delta's current gate use arrangement with Southwest expires on that date.

## VI. CLAIMS

### CLAIM I: The Federal Agencies have violated the APA and WARA

106.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105.

107.    The APA confers a right of judicial review on any party adversely affected by agency action. *See* 5 U.S.C. § 702. The DOT Letters and the DOT Action each is a final agency action issued in violation of the APA and WARA.

108.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.     Under WARA, federal agencies shall not make "findings or determinations, issue orders or rules . . . , or take any other actions . . . that are inconsistent with [the Five Party Agreement] . . . ." Pub. L. 109-352, Section 5(d)(1)(A).   The Five Party Agreement requires respect for preferential gate leases at Love Field.

110.     In the DOT Letters, the Federal Agencies direct the City to "continue the accommodation [of Delta] and ensure that space is available so that [Delta] is able to maintain its pattern of service on an ongoing basis . . . ." First DOT Letter at 2. By directing the City to accommodate Delta on an indefinite and ongoing basis, DOT has violated WARA by effectively forcing the City to abrogate preferential gates leases protected by the Five Party Agreement. The DOT Letters are therefore unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should issue judgment so declaring.

111.     Additionally, WARA mandates that the Federal Agencies shall not require the modification or elimination of preferential gate leases at Love Field "unless such modification or elimination is implemented on a on a nationwide basis." Pub. L. 109-352, Section 5(e)(2)(B)(ii). However, the DOT Letters require the City to eliminate preferential gates leases without requiring that the elimination be implemented on a nationwide basis. Thus, the DOT Letters and the DOT Action are each unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should enter judgment so declaring.

112.     Alternatively, if the any DOT Letter or the DOT Action is not a final agency action under the APA, the Federal Agencies' interference with preferential gate use rights protected by Love Field leases violates of the APA and WARA. Section 5(d)(1)(A) of WARA broadly and expressly prohibits the Federal Agencies from interfering with the Five Party Agreement and WARA further mandates that any elimination or modification of preferential gate

leases at Love Field shall only be implemented on a nationwide basis. Pub. L. 109-352, Section (e)(2)(B)(ii). The Federal Agencies have failed to comply with WARA's mandate in violation of the APA, and the Court should enter judgment so declaring.

## CLAIM II: Declaratory Judgment

113.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

114.    In addition or in the alternative, pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City, the Airlines, and the Federal Agencies under WARA, title 49, and other federal law.

115.    The DOT Letters have caused significant uncertainty as to the City's rights under WARA and to the rights and obligations of the City with respect to the Federal Agencies' directives in the Five Party Agreement, the leases and subleases with the Airlines, and the City's Grant Assurances and other obligations to DOT and FAA, and to the Airlines.

116.    In particular, the City requests that the Court declare, in consideration of WARA, the Five Party Agreement, the DOT Letters, the leases and subleases, the City's Grant Assurances and other obligations to DOT and FAA, and the Airlines, and all other applicable laws, regulations, and instruments, the terms, conditions, and scope at Love Field of:

a.  The City's right and obligation to determine pending gate accommodation requests in the absence of voluntary Airline accommodation agreements;

b.  The proper considerations and procedures for the City to adopt in considering and deciding gate accommodation requests at Love Field;

c.  The meaning of each Signatory Airline's preferential rights to gate use and obligations to accommodate other Airlines' gate use requests;

d.   Delta's rights to temporary and permanent gate accommodation;

e.   American's rights to temporary and permanent gate accommodation;

f.   DOT and FAA's authority under WARA  and related federal laws and Grant Assurances to require the City to mandate that a Signatory Airliner, or sub-lessee, or other gate user provide permanent gate accommodation to other carriers if such accommodation would unduly interfere with their flight schedule, including defining "unduly interfere," declaring the durational requirements of any such mandatory accommodation, declaring the permissible considerations in mandating compensation for such mandatory accommodation, and declaring the circumstances under which each Signatory Airline's, sub-lessee's, or other gate user's schedule protects that carrier from having to provide gate accommodation; and;

g.   Such other and further declaratory relief as may be requested by the City and to which the Court may appear proper.

## CLAIM III: Declaratory Judgment

117.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

118.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that any action or inaction that the City may take or decline to take respecting gate accommodation requests at Love Field shall not constitute violations of any Grant Assurances to FAA, the Competition Plan, or other federal law to the extent that such City action or inaction is consistent with the orders and judgment of the Court in this civil action.

## CLAIM IV: Declaratory Judgment

119.     The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

120.     Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that if the City is compelled by the DOT, including by the DOT Action and any provisions of the DOT Letters, to interfere with any Signatory Airline's preferential gate use rights under the Signatory Airlines' lease, the City will have been

> prevented from performing any of its obligations [under the lease] by reasons of . . . acts of a superior Governmental Agency, . . . or any other circumstances for which it is not responsible or which are not in its control

under the Southwest Lease (and Master Lease) section 14.12, and therefore be declared not to have breached said lease by such interference.

## CLAIM V: Declaratory Judgment

121.     The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

122.     Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that the City's consent to the United-Southwest sublease of United's Love Field Gates was not anti-competitive and was not a violation of any Grant Assurance given DOJ's lack of objection, DOT's lack of objection, and further declaring DOT and FAA are estopped from finding that that

the consent or the sublease, or the two together, was or were a Grant Assurance violation or from otherwise treating the consent or the sublease as a violation.

## VII.
## TEMPORARY INJUNCTIVE RELIEF MAY BE NECESSARY

123.    As described above, the voluntary temporary gate accommodation agreement, which allows Delta to operate, expires on July 6, 2015.  Delta has announced that it is continuing to sell tickets for flights to and from Love Field for after July 6, 2015.  Southwest has announced that it plans to operate flights in the times and gates currently being used by Delta.  Both parties claim a right to fly to and from Love Field from essentially the same place and time and both have made demand on the City to enforce their respective positions.   An additional purpose in filing this  action is to allow the interested parties, if they so desire, to seek temporary injunctive relief and to provide further motivation for them to reconcile their differences until the Court can finally determine the respective rights of the parties.

124.    If other parties fail to do so in time for the Court to consider their requests, the City may find it necessary to seek a temporary restraining order or a preliminary injunction to prevent chaos at Love Field on and after July 6, 2015, during the pendency of this suit.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, the City requests that the Court find and declare: 1) that the Federal Agencies have violated the APA and WARA and 2) the rights and legal obligations of the City and the Airlines under WARA, related federal laws and regulations, and Grant Assurances, and agreements of the interested parties, as requested above.  The City further requests that it be awarded its reasonable attorney fees, its costs, and such other relief as the Court finds just.

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY
CITY OF DALLAS, TEXAS

WARREN M.S. ERNST
CITY ATTORNEY

By ____s/ Peter B. Haskel_____
    CHARLES ESTEE
    Assistant City Attorney
    State Bar of Texas No. 06673600
    charles.estee@dallascityhall.com
    PETER B. HASKEL
    Executive Assistant City Attorney
    peter.haskel@dallascityhall.com
    State Bar of Texas No. 09198900
    7BN Dallas City Hall
    1500 Marilla Street
    Dallas, Texas 75201
    Telephone – 214/670-3519
    Telecopier – 214/670-0622

ATTORNEYS FOR PLAINTIFF, CITY OF DALLAS

**APPENDIX**

Exhibit 1 – First DOT Letter

Exhibit 2 – Second DOT Letter

Exhibit 3 – WARA

Exhibit 4 – Five Party Agreement

**Tuccelli, Leah Kay**

| | |
|---|---|
| **From:** | jacqulyn.mitchell@dot.gov on behalf of kathryn.thomson@dot.gov |
| **Sent:** | Wednesday, December 17, 2014 5:07 PM |
| **To:** | Ernst, Warren; Haskel, Peter |
| **Subject:** | Dallas Love Field |
| **Attachments:** | Dallas Love Field.pdf |

Please see the attached letter from Kathryn B. Thomson.

Thanks,

Jacqulyn Mitchell
U.S. Department of Transportation
Executive Assistant to the General Counsel
1200 New Jersey Avenue S.E.
Washington, DC 20590
(202) 366-4702





**U.S. Department of Transportation**

Office of the Secretary of Transportation

GENERAL COUNSEL

1200 New Jersey Avenue, SE
Washington, DC 20590

December 17, 2014

<u>**SENT VIA ELECTRONIC MAIL**</u>

Mr. Warren M.S. Ernst
Dallas City Hall
1500 Marilla Street
Room 7DN
Dallas, Texas 75201-6622
(214) 670-3519
warren.ernst@dallascityhall.com

Dear Mr. Ernst,

This letter references our telephone conversations on December 8 and 11, 2014, regarding Delta Air Lines, Inc.'s request for long-term accommodation of its five daily departures at Dallas Love Field (DAL) and the policy of the City of Dallas regarding reasonable air carrier access.

We appreciate your understanding of the City's legal obligations under Federal law to reasonably accommodate all air carriers seeking to provide service at the airport, including the Competition Plan statute (49 U.S.C. § 47107(k)) and the obligations of the grant assurances accepted in connection with Airport Improvement Program grants to take all reasonable efforts to accommodate air carriers seeking to serve DAL. We are pleased that you are taking an active role in assisting requesting carriers in obtaining gate space at your airport such as by formalizing the process in your use and lease agreements to monitor gate utilization and availability and by contacting the signatory carriers at the airport to encourage voluntary accommodation.

In connection with the Secretary of Transportation's responsibility to ensure the successful implementation of competition plans under 49 U.S.C. § 47107(k), you have asked us for our views regarding competition plan requirements for addressing accommodation requests at DAL, including the length of accommodation for accommodated carriers and other related issues. We are providing this guidance in light of the unique circumstance at DAL, including the constrained nature of the airport and other restrictions of the Five Party Agreement and Wright Amendment Reform Act of

2006 (Pub. L. No. 109-352).   We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access.  The compendium table focuses on airports that have developed pro-competitive tools to accommodate requesting carriers in conformity with the competition plan requirements.  Our 1999 task study entitled *Airport Business Practices and Their Impact on Airline Competition* may also be helpful to you and is available online at http://ntl.bts.gov/lib/17000/17100/17129/PB2000108301.pdf.

       As we discussed, ensuring that Federally-assisted airports make reasonable accommodations for requesting carriers, whether new entrants or other carriers seeking expansion, and maximize the utilization of their existing resources, especially at gate-constrained airports like DAL, are important objectives for the Department of Transportation (DOT).  We recognize your efforts to develop a baseline chart for determining gate availability, as well as your efforts to enforce Section 4.06(F) of the Use and Lease Agreement requiring the signatory carriers to provide monthly gate utilization reports.  Knowing when and where gate space is available at any given time is critical to the City's ability to provide timely and responsive assistance to requesting carriers.[1]  Maintaining an accurate, up-to-date gate utilization report will be critical for the City's ongoing obligation to ensure reasonable access for accommodated and requesting carriers.  Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signatory carrier, the City will accommodate the requesting carrier to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers.

       With respect to the length of the accommodation, for the accommodation to be meaningful at DAL, it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights.  Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date.  It is the City's responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis, based on the available space on the snapshot date of the original accommodation request, even after the expiration or termination of any agreement between the accommodated carrier and signatory carriers.[2]

---

[1] We have also discussed that accommodation requests should be resolved on a first-come, first-served basis.  In the future, if the verified gate utilization report at DAL shows there is less space available than has been requested, the City must offer the space that is available to the requesting carrier.  Moreover, due to the gate constraints at DAL under Federal law and the Five Party Agreement, if future reports show that no space is available at DAL, and the requesting carriers, signatory carriers, and the City have fully applied all of the accommodation procedures provided in the Use and Lease Agreement, the City may deny the request for accommodation.  The City would then be required to submit a competitive access report under 49 U.S.C. § 47107(s) to explain the reasons for the denial of access.

[2] If the accommodated carrier seeks to change its pattern of service, such as increasing service or requesting times that are not within a reasonable window of the times at which it was originally accommodated, such requested changes would constitute a new request for accommodation.

The City must also ensure that the accommodation is at reasonable rates.[3]  Our competition plan policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus a reasonable allowance for administration, are reasonable.  Many airport proprietors impose a ceiling on such an allowance and our policy is that, in any event, the allowance may not exceed 25%.  Our competition plan policy also requires that airports oversee these administrative fees.  Keeping these concepts in mind, it is within the City's discretion to assess the reasonableness of voluntary accommodation requests.

We hope this is helpful to you.  We will continue to monitor this process and ask that you provide us periodic reports on the status of the accommodation of requesting carriers at DAL.  If you have any questions, please feel free to call me.

Sincerely yours,

Kathryn B. Thomson

---

[3] See 49 U.S.C. § 47107(a)(1); FAA Grant Assurance 22, *available at* http://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip.pdf.

Tuccelli, Leah Kay

| | |
|---|---|
| **From:** | cindy.baraban@dot.gov |
| **Sent:** | Monday, June 15, 2015 2:22 PM |
| **To:** | Ernst, Warren; Haskel, Peter |
| **Cc:** | Tuccelli, Leah Kay |
| **Subject:** | Dallas Love Field Letter |
| **Attachments:** | City of Dallas Love Field Letter (Final) (Signed) 6-15-15.pdf |

Good afternoon.  Please see the attached letter from the General Counsel.  A hard copy is also on its way to Peter.

Best regards,

Cindy Baraban
Attorney-Advisor
Office of the General Counsel
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590
(202) 366-9159



**EXHIBIT**

2



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Avenue, SE
Washington, DC 20590

June 15, 2015

Peter B. Haskel
Executive Assistant City Attorney
Dallas City Hall
1500 Marilla Street, Room 7DN
Dallas, Texas 75201-66222

Dear Mr. Haskel:

I am writing in response to your February 26, 2015 email, which seeks further guidance and
information from the U.S. Department of Transportation (DOT) regarding letters received by
the City of Dallas (City) from Delta Air Lines concerning two accommodation requests for
gates and related space at Dallas Love Field (DAL or Love Field).  In addition, you have
asked for guidance and further explanation with regard to my December 17, 2014 letter to the
City.  That letter provided general guidance as to how the City should go about addressing
accommodation requests, considering the unique circumstances at Love Field.

As noted in the December 17 letter, the City has

> legal obligations under Federal law to reasonably accommodate all
> air carriers seeking to provide service at [Love Field], including the
> Competition Plan statute . . . and the obligations of the grant
> assurances accepted in connection with Airport Improvement
> Program grants to take all reasonable efforts to accommodate air
> carriers seeking to serve DAL.

Further, the letter provided guidance as to steps that the City should consider in assessing a
request for accommodation from a new entrant carrier such as Delta or other carriers seeking
expansion and determining the length of such anticipated accommodation at Love Field.  The
letter also reminded the City that, by law, the accommodation must be provided at reasonable
rates.  We believe that the letter provided sufficient guidance to permit the City to assess and
make a determination regarding Delta's requests.

Your February 26 email has now asked for further guidance, specifically, whether the
positions outlined in the December 17 letter were also "standards that are necessary for the
City to comply with the grant assurances between DOT and the City."  The answer to that
question is yes.  Our views regarding the consideration of requests for accommodation at

Love Field are derived from, among other things, our interpretation of the grant assurances and the statute upon which they are based.

The Airport Improvement Program (AIP) grant assurances statute, 49 U.S.C. § 47107, says in part that the Secretary of Transportation may *only* approve grant applications for an airport development project *if* he receives assurances that

> (1)  The airport will be available for public use on reasonable conditions and without unjust discrimination; [and]
>
> \*      \*      \*      \*
>
> (4)  A person providing … aeronautical services to the public will not be given an exclusive right to use the airport . . . .

49 U.S.C. § 47107(a); *see also* 49 U.S.C. § 40103(e).  These statutory requirements are incorporated in, and become a part of, every AIP grant agreement, and specifically in grant assurances numbers 22 and 23.  The City has received numerous AIP grants that contain these conditions, so there is no doubt that these grant assurances govern the City's actions with respect to Delta's requests for accommodation and any other future requests for accommodation that the City may receive with respect to Love Field.

It is DOT's view that making reasonable efforts to accommodate new entrants or other carriers seeking expansion at Love Field, as described in our December 17 letter, follows the airport's obligation to make the airport available on "reasonable conditions" and "without unjust discrimination."  Likewise, efforts to accommodate new entrants or other carriers seeking expansion at Love Field ensure that the airport has not given an "exclusive right" to a carrier at the airport.  In accordance with the Competition Plan statutes, 49 U.S.C. §§ 40117(k), 47106(f), the City has acknowledged these accommodation obligations in its initial Competition Plan and in each of three updates to the Competition Plan.  Specifically, the City's most recent Competition Plan update states its "inten[tion] to accommodate requests for access by applying the gate sharing provisions contained in . . . Section 4.06F of the new Restated Lease," wherein each incumbent carrier agrees to accommodate new entrants "at such times that will not unduly interfere with its operating schedule."

As explained in the December 17 letter, our view is that the grant assurances, the Competition Plan and other authorities noted above require that "if a requesting carrier is unable to arrange a voluntary accommodation with a signatory carrier," the City is obligated to "accommodate the requesting carrier to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers."  In other words, we believe that the City is required to accommodate a requesting carrier unless Love Field's facilities are fully-utilized at the time of the request, or the signatory carriers at the time of the request are selling tickets for future flights fully-utilizing the facilities.  We do not believe that it would be consistent with the grant assurances or with the City's Competition Plan for the City, in determining gate utilization and the "operating schedule" of the incumbent carriers, to take into account expanded, unscheduled service that a signatory carrier had not announced and offered for sale at the time of the request.  We have considered whether it would be appropriate for the City to take into account a signatory carrier's unscheduled future plans, but

believe – in light of our experience with the manner in which carriers make (and often change or abandon) expansion plans as circumstances change over time or proposed routes become less desirable – that the City should not consider such plans as sufficiently reliable indicators of future utilization.  To do so may give a signatory carrier the ability to block a competitor's accommodation request by deciding or asserting, after a request is made, that it will expand service.  Consideration of unscheduled plans could also make it difficult for the City to make consistent and objective decisions, both because the City would have no reasonable way of knowing which unscheduled plans to take into account, and because unscheduled plans may not provide sufficient data to conduct a meaningful gate utilization analysis.  Our view is that such results would be inconsistent with the grant assurances and the other authorities noted above, which ensure that Federally-assisted airports develop reasonable accommodation procedures that provide new entrants and incumbent carriers the ability to compete fairly for access to limited airport facilities.

As also explained in the December 17 letter, our view is that, once accommodated at Love Field, "the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights," and that "the accommodated carrier should not be pushed out by incumbent carriers at a later date."  It is the City's responsibility to manage gate space and any forced accommodation, and, as may be necessary over time, the accommodated carrier may be accommodated by different signatory carriers on different gates.  How that is accomplished is left to the judgment of the City as the airport operator.  However, the City and Love Field's signatory carriers must remain mindful of the need to accommodate the carrier's continuing pattern of service.  We believe that just as a dominant signatory carrier should not be able to block a requesting carrier from accessing Love Field by announcing future plans to expand service shortly after an accommodation request is made, a dominant carrier should not be able to do so at a later date.  We also believe that allowing a requesting carrier to continue a similar pattern of service is necessary in order to make any accommodation economically meaningful; if a requesting carrier could be pushed out after a short time period, new entrants would have very little incentive to ever seek to initiate service at a limited-capacity airport.  We do not believe, however, that any forced accommodation would need to continue if at any time the City converts certain recaptured gates to common use and capacity is there available for the accommodation.  Indeed, given the capacity constraints at Love Field, we strongly recommend the City consider this and other actions to facilitate entry and enhance competitive access at the expiration of the City's current leases or the next available opportunity.

With this additional guidance regarding the applicability of the grant assurances to the City's actions, we expect that the City will be able to carry out, in reasonable and timely fashion, the accommodation efforts we described in our December 17 letter.  As with other grant assurances, DOT reserves the right to pursue appropriate action if it were to determine that there has been a violation of the grant assurances.  At this time, we have made no determination as to whether such a violation has occurred.

We believe that the December 17 letter already addresses the City's remaining questions, and/or that it is unnecessary for DOT to comment on those questions at this time.  DOT's decision not to comment further should not be construed as agreement with, or acquiescence

to, any statements contained in your email.  The views expressed in this letter also should not be construed as relating to considerations of competition issues under the antitrust laws.

I note, as I have in the past, that it is the City's responsibility to decide how to act on Delta's requests.  The City, of course, must make this decision in compliance with the grant assurances and its other legal obligations.  DOT has expressed its views to the City on this subject and also given guidance about some aspects of those obligations.  Ultimately, however, it is the City that must make a decision, and I urge you to do so in a reasonable and timely manner.

Please contact me if you have any questions or would like to discuss these issues further.

Sincerely yours,

Kathryn B. Thomson

𝔒𝔫𝔢 𝔥𝔲𝔫𝔡𝔯𝔢𝔡 𝔑𝔦𝔫𝔱𝔥 ℭ𝔬𝔫𝔤𝔯𝔢𝔰𝔰
𝔬𝔣 𝔱𝔥𝔢
𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔬𝔣 𝔄𝔪𝔢𝔯𝔦𝔠𝔞

## AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday,
the third day of January, two thousand and six*

## 𝔄𝔫 𝔄𝔠𝔱

To amend section 29 of the International Air Transportation Competition Act of
1979 relating to air transportation to and from Love Field, Texas.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Wright Amendment Reform
Act of 2006".

### SEC. 2. MODIFICATION OF PROVISIONS REGARDING FLIGHTS TO AND FROM LOVE FIELD, TEXAS.

(a) EXPANDED SERVICE.—Section 29(c) of the International Air
Transportation Competition Act of 1979 (Public Law 96–192; 94
Stat. 35) is amended by striking "carrier, if (1)" and all that follows
and inserting the following: "carrier. Air carriers and, with regard
to foreign air transportation, foreign air carriers, may offer for
sale and provide through service and ticketing to or from Love
Field, Texas, and any United States or foreign destination through
any point within Texas, New Mexico, Oklahoma, Kansas, Arkansas,
Louisiana, Mississippi, Missouri, or Alabama.".

(b) REPEAL.—Section 29 of the International Air Transportation
Competition Act of 1979 (94 Stat. 35), as amended by subsection
(a), is repealed on the date that is 8 years after the date of enact-
ment of this Act.

### SEC. 3. TREATMENT OF INTERNATIONAL NONSTOP FLIGHTS TO AND FROM LOVE FIELD, TEXAS.

No person shall provide, or offer to provide, air transportation
of passengers for compensation or hire between Love Field, Texas,
and any point or points outside the 50 States or the District of
Columbia on a nonstop basis, and no official or employee of the
Federal Government may take any action to make or designate
Love Field as an initial point of entry into the United States
or a last point of departure from the United States.

### SEC. 4. CHARTER FLIGHTS AT LOVE FIELD, TEXAS.

(a) IN GENERAL.—Charter flights (as defined in section 212.2
of title 14, Code of Federal Regulations) at Love Field, Texas,
shall be limited to—

(1) destinations within the 50 States and the District of
Columbia; and

(2) no more than 10 per month per air carrier for charter
flights beyond the States of Texas, New Mexico, Oklahoma,
Kansas, Arkansas, Louisiana, Mississippi, Missouri, and Ala-
bama.



EXHIBIT

3

S. 3661—2

(b) CARRIERS WHO LEASE GATES.—All flights operated to or from Love Field by air carriers that lease terminal gate space at Love Field shall depart from and arrive at one of those leased gates; except for—

(1) flights operated by an agency of the Federal Government or by an air carrier under contract with an agency of the Federal Government; and

(2) irregular operations.

(c) CARRIERS WHO DO NOT LEASE GATES.—Charter flights from Love Field, Texas, operated by air carriers that do not lease terminal space at Love Field may operate from nonterminal facilities or one of the terminal gates at Love Field.

## SEC. 5. LOVE FIELD GATES.

(a) IN GENERAL.—The city of Dallas, Texas, shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates. Thereafter, the number of gates available for such service shall not exceed a maximum of 20 gates. The city of Dallas, pursuant to its authority to operate and regulate the airport as granted under chapter 22 of the Texas Transportation Code and this Act, shall determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006. To accommodate new entrant air carriers, the city of Dallas shall honor the scarce resource provision of the existing Love Field leases.

(b) REMOVAL OF GATES AT LOVE FIELD.—No Federal funds or passenger facility charges may be used to remove gates at the Lemmon Avenue facility, Love Field, in reducing the number of gates as required under this Act, but Federal funds or passenger facility charges may be used for other airport facilities under chapter 471 of title 49, United States Code.

(c) GENERAL AVIATION.—Nothing in this Act shall affect general aviation service at Love Field, including flights to or from Love Field by general aviation aircraft for air taxi service, private or sport flying, aerial photography, crop dusting, corporate aviation, medical evacuation, flight training, police or fire fighting, and similar general aviation purposes, or by aircraft operated by any agency of the Federal Government or by any air carrier under contract to any agency of the Federal Government.

(d) ENFORCEMENT.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Transportation and the Administrator of the Federal Aviation Administration may not make findings or determinations, issue orders or rules, withhold airport improvement grants or approvals thereof, deny passenger facility charge applications, or take any other actions, either self-initiated or on behalf of third parties—

(A) that are inconsistent with the contract dated July 11, 2006, entered into by the city of Dallas, the city of Fort Worth, the DFW International Airport Board, and others regarding the resolution of the Wright Amendment issues, unless actions by the parties to the contract are not reasonably necessary to implement such contract; or

(B) that challenge the legality of any provision of such contract.

S. 3661—3

(2) COMPLIANCE WITH TITLE 49 REQUIREMENTS.—A contract described in paragraph (1)(A) of this subsection, and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code.

(e) LIMITATION ON STATUTORY CONSTRUCTION.—

(1) IN GENERAL.—Nothing in this Act shall be construed—

(A) to limit the obligations of the parties under the programs of the Department of Transportation and the Federal Aviation Administration relating to aviation safety, labor, environmental, national historic preservation, civil rights, small business concerns (including disadvantaged business enterprise), veteran's preference, disability access, and revenue diversion;

(B) to limit the authority of the Department of Transportation or the Federal Aviation Administration to enforce the obligations of the parties under the programs described in subparagraph (A);

(C) to limit the obligations of the parties under the security programs of the Department of Homeland Security, including the Transportation Security Administration, at Love Field, Texas;

(D) to authorize the parties to offer marketing incentives that are in violation of Federal law, rules, orders, agreements, and other requirements; or

(E) to limit the authority of the Federal Aviation Administration or any other Federal agency to enforce requirements of law and grant assurances (including subsections (a)(1), (a)(4), and (s) of section 47107 of title 49, United States Code) that impose obligations on Love Field to make its facilities available on a reasonable and non-discriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field.

(2) FACILITIES.—Paragraph (1)(E)—

(A) shall only apply with respect to facilities that remain at Love Field after the city of Dallas has reduced the number of gates at Love Field as required by subsection (a); and

(B) shall not be construed to require the city of Dallas, Texas—

(i) to construct additional gates beyond the 20 gates referred to in subsection (a); or

(ii) to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis.

## SEC. 6. APPLICABILITY.

The provisions of this Act shall apply to actions taken with respect to Love Field, Texas, or air transportation to or from Love Field, Texas, and shall have no application to any other airport (other than an airport owned or operated by the city of Dallas or the city of Fort Worth, or both).

S. 3661—4

**SEC. 7. EFFECTIVE DATE.**

Sections 1 through 6, including the amendments made by such sections, shall take effect on the date that the Administrator of the Federal Aviation Administration notifies Congress that aviation operations in the airspace serving Love Field and the Dallas-Fort Worth area which are likely to be conducted after enactment of this Act can be accommodated in full compliance with Federal Aviation Administration safety standards in accordance with section 40101 of title 49, United States Code, and, based on current expectations, without adverse effect on use of airspace in such area.


*Speaker of the House of Representatives.*



*Vice President of the United States and*
*President of the Senate.*



**City of Dallas**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |
| **CITY OF DALLAS** | § |

I, **ROSA A. RIOS,** City Secretary of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

## FILE NO. 06-1838

filed in my office as official records of the City of Dallas, and that I have custody and control of said records.

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **17**th day of **June, 2015**.



**ROSA A. RIOS**
**CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

PREPARED BY: LJ



EXHIBIT
4

# BEGIN
# FILE NUMBER:

# 06-1838

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL

JUNE 28, 2006

06-1838

Addendum addition 51:   Authorize a concurrent resolution of the cities of Dallas and Fort Worth (1) approving the June 15, 2006 Joint Statement between the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines and Dallas/Fort Worth International Airport (Parties) to resolve the Wright Amendment issues; (2) authorizing a contract between the Parties incorporating the terms of the June 15, 2006 Joint Statement of the Parties; and (3) requesting the United States Congress to incorporate the terms of the June 15, 2006 Joint Statement in any legislation enacted by Congress regarding the Wright Amendment - Financing: No cost consideration to the City

Councilmember Rasansky moved to approve the resolution.

Motion seconded by Councilmember Salazar.

After discussion, Mayor Miller called the vote on Councilmember Rasansky's motion to approve the resolution:

| | | |
|---|---|---|
| Voting Yes: | [11] | Miller, Garcia, Medrano, Oakley, Salazar, Chaney, Griffith, Koop, Natinsky, Rasansky, Hunt |
| Voting No: | [1] | Thornton-Reese, |
| Absent: | [3] | Hill, Fantroy, Blaydes absent when vote taken |

Mayor Miller declared the motion adopted.

OFFICE OF THE CITY SECRETARY                    CITY OF DALLAS, TEXAS

COUNCIL CHAMBER

June 28, 2006

DALLAS RESOLUTION NO. 061838

FORT WORTH RESOLUTION NO. _____

**A CONCURRENT RESOLUTION OF THE CITY COUNCILS OF THE CITIES OF DALLAS AND FORT WORTH, TEXAS: (1) APPROVING THE JUNE 15, 2006 JOINT STATEMENT AMONG THE CITY OF DALLAS, CITY OF FORT WORTH, SOUTHWEST AIRLINES, AMERICAN AIRLINES AND DFW INTERNATIONAL AIRPORT (THE "PARTIES") TO RESOLVE THE "WRIGHT AMENDMENT" ISSUES; (2) AUTHORIZING THE EXECUTION OF A CONTRACT BETWEEN THE PARTIES INCORPORATING THE TERMS OF THE JUNE 15, 2006 JOINT STATEMENT; AND (3) REQUESTING THE UNITED STATES CONGRESS TO INCORPORATE THE TERMS OF THE JUNE 15, 2006 JOINT STATEMENT IN ANY LEGISLATION ENACTED BY CONGRESS REGARDING THE WRIGHT AMENDMENT**

WHEREAS, the Cities of Dallas and Fort Worth, Texas (the "Cities") jointly own the Dallas/Fort Worth International Airport ("DFW") which is operated for and on behalf of the Cities by a Joint Airport Board (the "Board") pursuant to the terms, provisions and requirements of a certain "Contract and Agreement" between the Cities and pursuant to the terms, provisions and requirements of the "1968 Regional Airport Concurrent Bond Ordinance" (as amended and supplemented, the "1968 Ordinance"); and

WHEREAS, pursuant to the 1968 Ordinance and various ordinances supplemental thereto (the 1968 Ordinance and the supplemental ordinances being referred to herein collectively as the "Outstanding Ordinances"), the Cities heretofore issued and there are currently outstanding Joint Revenue Bonds of the Cities, the proceeds of which were used to construct, improve, enlarge and equip DFW; and

WHEREAS, the Cities each own and operate other airports that provide various aviation and air carrier services in the Dallas/Fort Worth metropolitan area; and

WHEREAS, the Outstanding Ordinances set forth certain provisions relating to other airports owned by the Cities, which airports by their nature may be potentially competitive with the operation of DFW, including the covenants to take certain actions as may be necessary, appropriate and legally permissible to limit certificated air carrier services at such airports; and

WHEREAS, subsequent to the adoption of the 1968 Ordinance, including the covenants contained therein regarding competition with DFW by other airports owned by the Cities, the Congress of the United States passed and enacted the Airline Deregulation Act of 1978, pursuant to which provisions restricting permitted flight destinations by commercial air carriers were eliminated; and

| APPROVED _____ | APPROVED _____ | APPROVED _____ |
| HEAD OF DEPARTMENT | CITY CONTROLLER | CITY MANAGER |

COUNCIL CHAMBER


June 28, 2006

WHEREAS, in February 1980, the Congress enacted Section 29 of the International Air Transportation Competition Act of 1979, commonly referred to as the " Love Field Amendment" or "Wright Amendment" and declared it to be consistent with the public convenience and necessity to limit air carrier service out of Dallas Love Field Airport ("Love Field") (i) to any interstate destination in an aircraft having a passenger capacity of 56 seats or less (the "Commuter Aircraft Exception"), or on charter flights not exceeding 10 per month, and (ii) to points within Texas and the four states adjacent to Texas (Louisiana, Arkansas, Oklahoma and New Mexico) in aircraft of any size, subject to certain restrictions on through service or ticketing; and

WHEREAS, in 1997, Congress passed an amendment to the Wright Amendment, commonly referred to as the Shelby Amendment, that (i) expanded the adjacent-state rule of the Wright Amendment to allow aircraft of any size to fly to three additional states (Kansas, Alabama, and Mississippi) and (ii) provided that aircraft weighing not more than 300,000 pounds that is reconfigured to accommodate 56 or fewer passenger would comply with the Commuter Aircraft Exception of the Wright Amendment and such aircraft could fly to and from Love Field to any interstate destination; and

WHEREAS, in 2005, Congress again passed an amendment to the Wright Amendment which expanded the adjacent-state rule to add the state of Missouri, thereby allowing aircraft of any size to fly to and from Love Field to any point within Texas, Alabama, Arkansas, Kansas, Louisiana, Mississippi, Missouri, Oklahoma, and New Mexico, subject to certain restrictions on through service or ticketing; and

WHEREAS, certain Congressional leaders have introduced legislation to either repeal or further modify the restrictions of the Wright Amendment, which could impact air capacity and air service in the North Central Texas region; and

WHEREAS, certain Members of Congress informed the Cities that it would be preferable for the Cities to present a local solution for addressing airport capacity and air service needs in the North Central Texas region and particularly, in the Dallas/ Fort Worth metropolitan area, prior to any further action being taken by Congress that would directly impact such aviation services in the region; and

WHEREAS, in response to various pending and proposed Congressional actions that would further affect, modify, or repeal the Wright Amendment, the City Councils of Dallas and Fort Worth, on March 8, 2006 and March 7, 2006, respectively, passed a Concurrent Resolution (identified as Dallas Resolution No. 06-0870 and Fort Worth Resolution No. 3319-03-2006), requesting members of the United States Congress to refrain from taking any action regarding, or making any further amendments to, the Wright Amendment in order to allow the Cities an opportunity to work towards a local solution for addressing airport capacity and air service in the North Central Texas region, and to present a mutually agreed upon plan to the Congress for its consideration; and

WHEREAS, the City of Dallas, pursuant to Resolution No. 06-0997, adopted April 6, 2006, commissioned an Impact Analysis/Master Plan Update for Love Field by DMJM Aviation, Inc., to provide updated information and analysis as to aircraft noise, air quality, traffic impact, and economic impact at Love Field if the Wright Amendment were repealed or substantially modified; and

WHEREAS, the Love Field Impact Analysis/Master Plan Update prepared by DMJM Aviation, Inc., and GRA, Inc., found that, in the absence of the Wright Amendment, the overall impacts of operating 20 gates at Love Field under a "No Wright Amendment scenario" are the most comparable to the environmental thresholds agreed to and established in the 2001 Master Plan/Impact Analysis 32 Gate scenario with the Wright Amendment in place; and

WHEREAS, after investigation and analysis of the available facts and giving due consideration to the economic, environmental, and personal welfare and interests of their respective residents, the general public, and the holders of DFW Airport Joint Revenue Bonds, the Cities conferred, deliberated, and agreed to a local solution regarding the Wright Amendment and related matters that best serves such interests given the likelihood that Congress could take action to repeal or substantially modify the Wright Amendment; and

WHEREAS, the local solution was agreed to by the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines and DFW International Airport (the "Parties") as evidenced by the Joint Statement Among the Parties to Resolve the "Wright Amendment" Issues executed June 15, 2006 (the "Joint Statement"); NOW, THEREFORE,

BE IT RESOLVED BY THE CITY COUNCILS OF THE CITIES OF DALLAS AND FORT WORTH, ACTING CONCURRENTLY:

Section 1.     That the Joint Statement attached hereto as Exhibit A is hereby approved.

---

APPROVED _____   APPROVED _____   APPROVED _____
　　　　　HEAD OF DEPARTMENT　　　　　　　　　　　CITY CONTROLLER　　　　　　　　　　　　　CITY MANAGER

Section 2.   That following approval as to form by the Dallas City Attorney and approval as to form and legality by the Fort Worth City Attorney, the respective City Managers of the cities of Dallas and Fort Worth are hereby authorized to sign a contract between the Parties incorporating the terms of Exhibit A.

Section 3.   That any legislation enacted by the Congress of the United States affecting or modifying the Wright Amendment, shall incorporate and implement the provisions and spirit of the Joint Statement set forth in Exhibit A.

Section 4.   That anything set forth in this Resolution, the Joint Statement, and the contract authorized hereby incorporating the terms of Exhibit A that requires the expenditure of public funds or the creation of any monetary obligation by either of the cities be strictly subject to the appropriation of funds for such purposes or the provisions for the payment of such obligation through issuance of legally permissible bonds or other debt obligations.

Section 5.   That nothing set forth in this Resolution, the Joint Statement, or the contract authorized herein, shall require the cities of Dallas or Fort Worth or the DFW Airport Board to take any action that would result in: **(i)** the loss of eligibility for future Federal airport grants for either city or the DFW Airport Board, or **(ii)** FAA disapproval of any Passenger Facility Charge Application for either city or the DFW Airport Board, or **(iii)** either city or the DFW Airport Board being found to be in non-compliance with its existing obligations under Federal aviation law.

Section 6.   That the Resolution shall take effect only from and after passage by both the City Councils of Dallas and Fort Worth.

APPROVED BY
CITY COUNCIL

JUN 28 2006

City Secretary

APPROVED
HEAD OF DEPARTMENT

APPROVED
CITY CONTROLLER

APPROVED
CITY MANAGER



EXHIBIT "A"

   

# JOINT STATEMENT
# AMONG THE CITY OF DALLAS, THE CITY OF FORT WORTH, SOUTHWEST AIRLINES, AMERICAN AIRLINES, AND DFW INTERNATIONAL AIRPORT TO RESOLVE THE "WRIGHT AMENDMENT" ISSUES

1. The City of Dallas, the City of Fort Worth, Southwest Airlines, American Airlines, and DFW International Airport, hereinafter, the "Parties," agree to seek the enactment of legislation to initially amend section 29 of the International Air Transportation Act of 1979, more commonly known as the "Wright Amendment" and ultimately seek its repeal as follows:

   a. To immediately allow airlines serving Dallas Love Field (DLF) to offer through ticketing to destinations within the 50 United States and the District of Columbia and to market such services; and

   b. Except as provided below, to eliminate all the remaining restrictions on service from DLF after eight years from the enactment of legislation.

2. The Parties agree that international commercial passenger service shall be limited exclusively to Dallas/Fort Worth International Airport. The Cities of Dallas and Fort Worth ("Cities") shall work jointly to encourage all such flights into DFW International Airport. Through ticketing to or from a destination beyond the 50 United States and the District of Columbia shall be prohibited from Dallas Love Field.

3. The Parties agree that consistent with the updated DLF Master Plan, the number of gates available for scheduled passenger air service at DLF will be, as soon as practicable, reduced from the 32 gates envisioned in 2000 to 20 gates.[1,2]

---

[1] Airlines may not subdivide a "gate." A gate shall consist of one passenger hold room and one passenger loading jet bridge supporting one aircraft parking space, and no hardstand operations shall be permitted.

[2] The Parties agree that, upon four years after enactment of legislation as provided herein, 16 gates would be leased by Southwest Airlines, 2 would be leased by American Airlines, and 2 would be leased by Continental Airlines. American Airlines and Southwest Airlines agree to voluntarily surrender any rights under existing leases to reduce the number of gates necessary to implement this agreement. Southwest Airlines also agrees that the 5 remaining gates in the North Concourse at Love Field will not be used for passenger service and the facility shall be modified as necessary up to and including demolition to ensure it can never be utilized for passenger service. To the extent a new entrant carrier seeks to enter Dallas Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas's existing lease agreements. To the extent that any existing airline leases at Dallas Love Field revert to Dallas, these gates shall be converted to common utilization during the existing term of the lease.

4.  The City of Dallas agrees that it will negotiate a voluntary noise curfew at DLF precluding scheduling airline flights between 11 p.m. and 6 a.m.

5.  The City of Dallas agrees that it will significantly redevelop portions of DLF consistent with the updated DLF Master Plan, including acquisition of the portions of the lease on the Lemmon Avenue facility up to and including condemnation, necessary to fulfill the obligations under this agreement. The City of Dallas further agrees to the demolition of the Legend gates immediately upon acquisition of the lease to ensure the facility can never again be used for passenger service. Southwest Airlines and the City of Dallas shall agree on a phase-in of capital projects and which party will manage construction. The City of Dallas also agrees to the modernization of the main terminal. It is agreed by the parties that a minimum investment of $150 million and up to a maximum of $200 million (in 2006 dollars) will be made by the City of Dallas and included in the cost of operating the airport as necessary and appropriate. This amount is exclusive of the acquisition and demolition of the Lemmon Avenue gates and the development and construction of the people mover to Love Field. The City of Dallas and Southwest Airlines will mutually agree on capital projects exceeding $200 million, exclusive of the Lemmon Avenue gate acquisition and the people mover. Southwest Airlines' out-of-pocket capital costs for any of the capital projects shall be credited toward the minimum and maximum requirements. The capital and operating costs for those redeveloped and modernized facilities will be included in the landing fee and space rental charges to be collected from the users of those facilities; however, the operating reserve shall not exceed one year operating costs (operating and maintenance plus debt service) during the term of Southwest Airline's lease. These adjustments to landing fees and facility costs will be included by the City of Dallas as necessary and appropriate to cover these improvements upon enactment of the legislation. The current plan also included the retirement of existing debt and the issuance of new debt for these new improvements. All improvements shall be made by the expiration of the 8-year period. The City of Dallas will seek approval to use PFCs to fund DART access to Love Field ("people mover").

6.  The Cities agree that they will both oppose efforts to initiate commercial passenger air service at any area airport other than DFW during the eight-year period. "Commercial passenger air service" does not include a spaceport or air taxi service as defined by Part 135 of the Federal Aviation Regulations. The City of Dallas and the City of Fort Worth agree to jointly oppose any attempts to repeal or modify the Wright Amendment earlier than the eight -year period To the extent any other airport within an eighty-mile radius seeks to initiate scheduled commercial passenger service within this eight-year period, both cities agree to work diligently to bring that service to DFW, or if that effort fails, then to airports owned by the Cities of Dallas and/or Fort Worth.

7.  This agreement is predicated upon the condition that Congress will enact legislation to implement the terms and spirit of this agreement. Congress should not exempt additional states from the Wright Amendment during the eight-year period before it is eliminated.

8.  This agreement shall not be modified except upon mutual agreement of all parties.

9.  The Cities acknowledge their outstanding D/FW Airport bond covenants, to the extent such covenants are legally enforceable, and nothing in this agreement is intended to nor shall contravene such covenants. By the execution of this agreement, Southwest Airlines does not surrender any of its rights to operate at Love Field except as explicitly outlined in this agreement.

Joint Statement Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and DFW International Airport to Resolve the "Wright Amendment" Issues

Page 2 of 4

061838

10. If Southwest Airlines or its affiliate or code share partner (except for published/scheduled code share service from DFW to Midway Airport as of June 14, 2006) chooses to operate from another airport within an 80-mile radius of Love Field in addition to its operations at Love Field, then for every such gate which Southwest operates at another airport within this radius, Southwest will voluntarily relinquish control of an equivalent number of gates at Love Field, up to 8 gates and such gates shall be made available to other carriers.  If other carriers are not interested in these gates, then they can be made available to Southwest Airlines for its use on a common use basis. This requirement to relinquish gates shall expire in 2025.

11. If American Airlines or its affiliate or code share partner chooses to operate from another airport within an 80-mile radius of Love Field in addition to its operations at DFW Airport and Love Field, then for every such gate which American operates at another airport within this radius except for DFW International Airport and Love Field, American Airlines will relinquish control of an equivalent number of gates at Love Field, up to one and one-half gates and such gates shall be made available to other carriers.  If other carriers are not interested in these gates, then they can be made available to American Airlines for its use on a common use basis.  This requirement to relinquish gates shall expire in 2025.

12. Each carrier shall enter into separate agreements, as appropriate, to memorialize its obligations under this proposed local solution.  Similarly, the Cities shall enter into such agreements as necessary to implement the proposed local solution.  All such agreements are subject to the requirements of law and to the extent legally permissible.

13. In the event that Congress passes legislation that is inconsistent with the Parties' agreement herein, or subsequently amends that legislation, and if Southwest or its affiliate or code share partner commences non-stop service to or from Love Field to a state not currently allowed under the Wright Amendment, then Southwest will voluntarily relinquish control of 8 gates and such gates will be made available to other carriers.  If other carriers are not interested in these gates, then they can be made available to Southwest Airlines for their use on a common use basis.  Likewise, in the event that Congress passes legislation that is inconsistent with the Parties' agreement herein, or subsequently amends that legislation, and if American Airlines or its affiliate or code share partner commences non-stop service to or from Love Field to a state not currently allowed under the Wright Amendment, then American Airlines will relinquish control of 1 and one-half gates and such gates will be made available to other carriers. If other carriers are not interested in these gates, then they can be made available to American Airlines for its use on a common use basis

14. The Parties hereby represent to the Congress of the United States, and to the Citizens of the Dallas-Fort Worth that they have approved of and support the proposed local solution.  The Parties each separately covenant that they will not now or in the future, support, encourage or participate in any effort to defeat or modify or amend the legislation that is described in this Agreement.

15. This is an agreement in principle only and is subject to definitive contracts being approved by both City Councils.  This agreement in principle is also subject to final approval of the DFW International Airport Board.  The parties agree that the final document memorializing this proposed local solution shall be consistent with all federal rules, regulations and laws.  The Parties agree that for this agreement to be binding, it must be executed by all parties no later than July 15th, 2006.

Joint Statement Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and
DFW International Airport to Resolve the "Wright Amendment" Issues

Page 3 of 4

061838

16. If the U.S. Congress does not enact the legislation by December 31, 2006, which would allow the Parties to implement this agreement in accordance with its terms, then the agreement is null and void unless all parties agree to extend the agreement.

17. As part of this agreement, the City of Dallas agrees to extend American Airlines' and Southwest Airlines' lease to 2028.


Executed this the 15th Day of June, 2006.


The Honorable Laura Miller
Mayor of Dallas

The Honorable Mike J. Moncrief
Mayor of Fort Worth


Herbert D. Kelleher
Chairman of the Board
Southwest Airlines

Daniel P. Garton
Executive Vice President Marketing
American Airlines

Jeffrey P. Fegan
Chief Executive Officer
DFW International Airport

Joint Statement Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and
DFW International Airport to Resolve the "Wright Amendment" Issues

Page 4 of 4

06 1838

   

### CONTRACT
### AMONG THE CITY OF DALLAS, THE CITY OF FORT WORTH, SOUTHWEST AIRLINES CO., AMERICAN AIRLINES, INC., AND
### DFW INTERNATIONAL AIRPORT BOARD INCORPORATING THE SUBSTANCE OF THE TERMS OF THE JUNE 15, 2006 JOINT STATEMENT BETWEEN THE PARTIES TO RESOLVE THE "WRIGHT AMENDMENT" ISSUES

WHEREAS, certain Members of the United States Congress have introduced legislation to either repeal or further modify the restrictions of the Wright Amendment, as amended by the 1997 Shelby Amendment and the 2005 Amendment (herein referred to as the "Wright Amendment"), or prohibit commercial air passenger service at Dallas Love Field Airport ( "Love Field"); and

WHEREAS, certain Congressional leaders informed the Cities of Dallas and Fort Worth (collectively, the "Cities") that it would be preferable for the Cities to present a local solution for addressing airport issues in the North Central Texas region and particularly, in the Dallas/ Fort Worth metropolitan area, prior to any further action being taken by Congress that would directly impact aviation services in the region; and

WHEREAS, in response to various pending and proposed Congressional actions that would further affect, modify, or repeal the Wright Amendment, the City Councils of Dallas and Fort Worth, on March 8, 2006 and March 7, 2006, respectively, passed a Concurrent Resolution (identified as Dallas Resolution No. 06-0870 and Fort Worth Resolution No. 3319-03-2006), requesting members of the United States Congress to refrain from taking any action regarding, or making any further amendments to, the Wright Amendment in order to allow the Cities an opportunity to work towards a local solution for addressing airport issues in the North Central Texas region, and to present a mutually agreed upon plan to the Congress for its consideration; and

WHEREAS, the City of Dallas, pursuant to Resolution No. 06-0997, adopted April 6, 2006, commissioned an Impact Analysis/Master Plan Update for Love Field by DMJM Aviation, Inc., to provide updated information and analysis as to aircraft noise, air quality, traffic impact, and economic impact at Love Field if the Wright Amendment were repealed or substantially modified; and

WHEREAS, the Love Field Impact Analysis Update prepared by DMJM Aviation, Inc. and GRA, Inc. found that, in the absence of the Wright Amendment, the overall impacts of operating 20 gates at Love Field under a "No Wright Amendment scenario" are the most comparable to the environmental thresholds agreed to and established in the 2001 Master Plan/Impact Analysis 32 gate scenario with the Wright Amendment in place; and

WHEREAS, earlier this year, the Honorable Laura Miller, Mayor of Dallas, and the Honorable Mike Moncrief, Mayor of Fort Worth, held a series of meetings with interested parties in an effort to reach a local agreement regarding Love Field that would end the prolonged and divisive controversies between the two Cities and that would serve and protect the interests of all citizens of the Dallas-Fort Worth area, including

residents living in the vicinity of Love Field, as well as business, consumer, and other constituencies affected by the Love Field controversies; and

WHEREAS, after investigation and analysis of the available facts and giving due consideration to the economic, environmental, and personal welfare and interests of their respective residents, the general public, and the holders of DFW Airport Joint Revenue Bonds, the Cities of Dallas and Fort Worth conferred, deliberated, and agreed to a local solution regarding the Wright Amendment and related matters that best serves such interests given the likelihood that Congress could take action to repeal or substantially modify the Wright Amendment; and

WHEREAS, the Mayors, in consultation with other leaders in the two cities, first were able to reach a basic agreement between themselves and with representatives of the Dallas/Fort Worth International Airport Board ("DFW Board"); and

WHEREAS, the Mayors, representatives of the DFW Board, and other governmental officials then met separately with Southwest Airlines and American Airlines to advise those airlines that the local governments would announce a local solution and recommend it to Congress and that they wanted the airlines to consent to, and endorse, the local solution; and

WHEREAS, the Mayors and representatives of the DFW Board thereafter conducted certain limited negotiations separately with Southwest Airlines and American Airlines; and

WHEREAS, Southwest Airlines and American Airlines concluded, separately, that the local solution reached among, and urged upon them by, the local governments would be favorably received by the Congress, and that under the circumstances presented, the airlines should support the effort of the Cities and the DFW Board and acquiesce in, and agree to support, the local solution; and

WHEREAS, the City Councils of Dallas and Fort Worth, on June 28, 2006 and July 11, 2006, respectively, passed a Concurrent Resolution (identified as Dallas Resolution No. _06-1838_____ and Fort Worth Resolution No. _3386-07-2006_ ) and the DFW Board on June 29, 2006 passed Resolution No._2006-06-210_, approving the Joint Statement signed by the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and the DFW Board on June 15, 2006, authorizing the execution of this Contract between the Parties incorporating the substance of the Joint Statement, and requesting the United States Congress to enact legislation consistent therewith;

Therefore, the Parties agree as follows:

## ARTICLE I.

1. The City of Dallas, the City of Fort Worth, Southwest Airlines, American Airlines, and DFW Board, (herein, the "Parties,") agree to seek the enactment of legislation to allow for the full implementation of this Contract including, but not limited to, amending section 29 of the International Air Transportation Competition Act of 1979, more commonly known as the "Wright Amendment" and ultimately effect its repeal as follows:

   a. To immediately allow airlines serving Love Field to offer through ticketing between Love Field and any destinations (including international destinations) through any point in Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, and Alabama, and to market such services;

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and DFW Board to Resolve the "Wright Amendment" Issues

Page 2 of 11

b.  Except as provided herein, to eliminate all the remaining restrictions on air service from Love Field after eight years from the enactment of legislation; and

c.  To limit charter flights as set forth in Article II, Section 16 of this Contract.

2.  The Parties agree that non-stop international commercial passenger service to and from the Dallas-Fort Worth area shall be limited exclusively to DFW International Airport ("DFW Airport"). The Cities shall work jointly to encourage all such flights into DFW Airport.

3.  The Parties agree that consistent with a revised Love Field Master Plan, based upon the 2006 Love Field Impact Analysis Update prepared by DMJM Aviation, Inc., the number of gates available for passenger air service at Love Field will be, as soon as practicable, reduced from the 32 gates envisioned in the 2001 Love Field Master Plan to 20 gates and that Love Field will thereafter be limited permanently to a maximum of 20 gates.

a.  Airlines may not subdivide a "gate." A gate shall consist of one passenger hold room and one passenger loading jet bridge supporting one aircraft parking space, and no hardstand operations, except as allowed herein, shall be permitted. Nothing shall preclude any airline from utilizing hardstands for RON parking, maintenance, training, or for irregular operations (i.e. flights that were scheduled originally for one of the twenty available gates and cannot be accommodated thereon due to weather, maintenance or unforeseen emergencies), or other uses that do not involve passenger air service.

b.  American Airlines and Southwest Airlines agree to voluntarily surrender gate rights under existing leases in order to reduce the number of gates as necessary to implement this agreement. During the four year period from the date the legislation as provided herein is signed into law: Southwest Airlines shall have the preferential use of 15 gates under its existing lease to be used for passenger operations; American Airlines shall have the preferential use of 3 gates under its existing lease to be used for passenger operations; and ExpressJet Airlines, Inc., shall have the preferential use of 2 gates under its existing lease to be used for passenger operations. Thereafter, Southwest Airlines shall have the preferential use of 16 gates under its existing lease to be used for passenger operations; American Airlines shall have the preferential use of 2 gates under its existing lease to be used for passenger operations; and ExpressJet Airlines, Inc., shall have the preferential use of 2 gates under its existing lease to be used for passenger operations. In consideration of Southwest Airlines' substantial divestment of gates at Love Field and the need to renovate or reconstruct significant portions of the concourses, Southwest Airlines shall have the sole discretion (after consultation with the City) to determine which of its gates it uses within its existing leasehold at Love Field during all phases of reconstruction. Upon the earlier of (i) the completion of the concourse renovation, or (ii) 4 years from the date the legislation as provided herein is signed into law, all Parties agree that facilities will be modified as necessary, up to and including demolition, to ensure that Love Field can accommodate only 20 gates for passenger service. To the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas' existing lease agreements. To the extent that any existing airline gates leased at Love Field revert to the City of Dallas, these gates shall be converted to common use during the existing term of the lease.

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and DFW Board to Resolve the "Wright Amendment" Issues

Page 3 of 11

4.  The City of Dallas agrees that it will negotiate a voluntary noise curfew at Love Field precluding scheduling passenger airline flights between 11 p.m. and 6 a.m.  Southwest Airlines and American Airlines shall enter into agreements with respect thereto with the City of Dallas.

5.  The City of Dallas agrees that it will significantly redevelop portions of Love Field, including the modernization of the main terminal, consistent with a revised Love Field Master Plan based upon the Love Field Impact Analysis Update prepared by DMJM Aviation, Inc. (the "Love Field Modernization Program" or "LFMP").  In addition, the City agrees that it will acquire all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation, necessary to fulfill its obligations under this Contract.  The City of Dallas further agrees to the demolition of the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility can never again be used for passenger service.

The Parties agree that a minimum investment of $150 million and up to a maximum of $200 million in 2006 dollars (the "Spending Cap"), as adjusted for inflation, will be made by the City of Dallas for the LFMP, and that the capital and operating costs for the LFMP may be recovered through increased landing fees, space rental charges, or Passenger Facility Charges ("PFCs").  The Parties contemplate that financing the LFMP will include both the retirement of existing debt and the issuance of new debt for the LFMP.

The Spending Cap shall be exclusive of the costs connected with the acquisition and demolition of the Lemmon Avenue gates and of the capital costs associated with the development and construction of a "people mover" connector to the DART mass transit system ("the Connector").  The costs for the acquisition and demolition of the Lemmon Avenue gates will be recovered from airport users, but the capital costs for the Connector may not be included in airline terminal rents or landing fees, except as expressly provided for herein below.  The City of Dallas may seek approval to use PFC revenues for the Connector, and Southwest Airlines agrees to support such application. The City of Dallas shall, in addition, seek state, federal, DART, and any other available public funds to supplement such PFC funds; provided, however, that nothing herein shall obligate the City of Dallas to undertake the Connector project.  Notwithstanding the preceding, in the event PFC funds are not approved for the Connector, the City of Dallas may use airport funds for the Connector; provided, however, if airport funds are used for the Connector, the City of Dallas shall be obligated to apply for, and use, PFCs to pay for PFC eligible portions of the LFMP.  In any event, the combined total spending for both the LFMP and the Connector, exclusive of PFCs, shall not exceed the Spending Cap, except as provided immediately below.

In the event that PFCs are not approved for either the Connector or the LFMP, as provided herein, terminal rents and landing fees may be used for such improvements, thus exceeding the Spending Cap; provided, however, that the City shall use its best efforts to seek and use PFCs, state, federal, DART, and any other available public funds (other than City of Dallas general funds) as the only sources of funding for the Connector and to avoid impacting terminal rents and landing fees.

Except as otherwise provided herein, capital costs in excess of the aforementioned Spending Cap that impact terminal rents and landing fees shall be subject to agreement between Southwest Airlines and the City of Dallas, except that, following consultation with Southwest Airlines, the City of Dallas may proceed with necessary projects required for reasons of safety, security, normal maintenance and repair, or federal mandate, and such costs may be included in terminal rents and

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and DFW Board to Resolve the "Wright Amendment" Issues

Page 4 of 11

landing fees.  The operating reserve of Love Field shall never exceed one year's operating costs (operating and maintenance plus debt service) during the term of Southwest Airlines' lease.

To recover the costs of the LFMP, the City of Dallas shall negotiate amendments of the Leases of Terminal Building Premises previously entered into with Southwest Airlines, American Airlines, and ExpressJet Airlines, Inc., and will also adopt City ordinances modifying the terminal rents and landing fees to be paid by airline users of Love Field.

Southwest Airlines and the City of Dallas shall agree on a phase-in of the LFMP and will decide which party will fund and manage the construction of the LFMP.  Southwest Airlines' expenditures for its share of the LFMP's capital costs shall be credited toward the minimum and maximum requirements.  To the extent possible, the LFMP shall be completed by the expiration of the 8-year period.

6. The Cities agree that they will both oppose efforts to initiate commercial passenger air service at any area airport other than DFW Airport (and Love Field, subject to the provisions contained herein) during the eight-year period. "Commercial passenger air service" does not include a spaceport or air taxi service as defined by Part 135 of the Federal Aviation Regulations. The Cities agree to jointly oppose any attempts to repeal or further modify the Wright Amendment earlier than the eight-year period. To the extent any other airport within an eighty-mile radius of Love Field seeks to initiate scheduled commercial passenger service within this eight-year period, both the Cities agree to work diligently to bring that service to DFW Airport, or if that effort fails, then to airports owned by the Cities of Dallas and/or Fort Worth.

7. The continuation of this Contract beyond December 31, 2006, is conditioned on Congress having enacted legislation prior thereto, allowing the Parties to implement the terms and spirit of this Contract.  It is the position of the Parties that Congress should not exempt additional states from the Wright Amendment during the eight-year period before it is eliminated.

8. This Contract shall not be modified except upon mutual agreement of all of the Parties.

9. The Cities acknowledge their outstanding DFW Airport bond covenants, to the extent such covenants are legally enforceable, and nothing in this Contract is intended to nor shall contravene such covenants.  By the execution of this Contract, Southwest Airlines does not surrender any of its rights to operate at Love Field except as explicitly outlined in this Contract.

10. If Southwest Airlines or its affiliate or code share partner (except for published/scheduled code share service from DFW Airport to Midway Airport as of June 14, 2006) chooses to operate passenger service from another airport within an 80-mile radius of Love Field in addition to its operations at Love Field, then for every such gate which Southwest Airlines, its affiliate or code share partner, operates or uses at another airport within this radius, Southwest Airlines will voluntarily relinquish control of an equivalent number of gates at Love Field, up to 8 gates and such gates shall be made available to other carriers.  If other carriers are not interested in these gates, then they can be made available to Southwest Airlines for its use on a common use basis.  This requirement to relinquish gates shall expire in 2025.  This provision shall not apply to a code share partner not operating under Southwest Airlines' or its affiliates' code at an airport within this 80-mile radius.

11. If American Airlines or its affiliate or code share partner chooses to operate passenger service from another airport within an 80-mile radius of Love Field in addition to its operations at DFW Airport and Love Field, then for every such gate which American Airlines, its affiliate or code share partner, operates or uses at another airport within this radius except for DFW Airport and Love Field, American Airlines will voluntarily relinquish control of an equivalent number of gates at Love Field, up to one and one-half gates and such gates shall be made available to other carriers. If other carriers are not interested in these gates, then they can be made available to American Airlines for its use on a common use basis. This requirement to relinquish gates shall expire in 2025. This provision shall not apply to a code share partner not operating under American Airlines' or its affiliates' code at an airport within this 80-mile radius.

12. Each carrier shall enter into separate agreements and take such actions, as necessary or appropriate, to implement its obligations under this Contract. Similarly, the Cities shall enter into such agreements and take such actions, as necessary or appropriate, to implement the Contract. All such agreements and actions are subject to the requirements of law. Such agreements shall include amendments to: (i) American Airlines' Love Field terminal lease; and (ii) Southwest Airlines' Love Field terminal lease. The City of Dallas shall develop a revised Love Field Master Plan consistent with this Contract.

13. In the event that Congress at any time, enacts legislation that repeals the Wright Amendment sooner than the eight years identified in paragraph 1.b. of Article I. herein, or authorizes service (except for through ticketing service as contemplated by paragraph 1.a. of Article I. herein) between Love Field and one or more domestic or international destinations other than those currently allowed under the Wright Amendment during the eight year period, and if Southwest Airlines or its affiliate or code share partner commences non-stop service to or from Love Field to a destination not currently allowed under the Wright Amendment, then Southwest Airlines will voluntarily relinquish control of 8 gates and such gates will be made available to other carriers. If other carriers are not interested in these gates, then they can be made available to Southwest Airlines for their use on a common use basis. This provision shall not apply to a code share partner not operating under Southwest Airlines' or its affiliates' code. Likewise, in the event that Congress, at any time, enacts legislation that repeals the Wright Amendment sooner than the eight years identified in paragraph 1.b. of Article I. herein, or authorizes service (except for through ticketing service as contemplated by paragraph 1.a. of Article I. herein) between Love Field and one or more domestic or international destinations other than those currently allowed under the Wright Amendment during the eight year period, and if American Airlines or its affiliate or code share partner commences non-stop service to or from Love Field to a destination not currently allowed under the Wright Amendment, then American Airlines will voluntarily relinquish control of half of its gates and such gates will be made available to other carriers. If other carriers are not interested in these gates, then they can be made available to American Airlines for its use on a common use basis. This provision shall not apply to a code share partner not operating under American Airlines' or its affiliates' code.

14. The Parties hereby represent to the Congress of the United States, and to the Citizens of the Dallas-Fort Worth area that they approve of and support the local solution as set forth in this Contract. The Parties each separately covenant that they will support, encourage and seek the passage of legislation necessary and appropriate to implement the terms and spirit of this Contract. The Parties each separately covenant that they will oppose any legislative effort that is inconsistent with the terms of this Contract.

15. The Parties agree that the final documentation to implement this local solution shall be consistent with all federal rules, regulations and laws. The Parties agree that for this Contract to be binding, it must be executed by all parties no later than July 15th, 2006.

16. If the U.S. Congress does not enact legislation by December 31, 2006, that would allow the Parties to implement the terms and spirit of this Contract, including, but not limited to, the 20 gate restriction at Love Field, then this Contract is null and void unless all parties agree to extend this Contract.

17. As part of this Contract, the City of Dallas agrees to grant American Airlines and Southwest Airlines options to extend their existing terminal leases until 2028.

## ARTICLE II.  ADDITIONAL PROVISIONS

1.  <u>SUBJECT TO FEDERAL GRANT ASSURANCES, ETC</u>.  Nothing in this Contract shall require the City of Dallas, the City of Fort Worth or the DFW Airport Board to take any action that would result in (i) the loss of eligibility for future Federal airport grants for either city or the DFW Airport Board or (ii) FAA disapproval of any Passenger Facility Charge (PFC) application for either city or the DFW Airport Board, or (iii) either city or the DFW Airport Board being found to be in non-compliance with its existing obligations under Federal aviation law.

2.  <u>FUNDING</u>.  Any capital spending obligations of the City of Dallas under this Contract for airport projects that require the expenditure of public funds or the creation of any monetary obligation shall be limited obligations, payable solely from airport revenues or the proceeds of airport revenue bonds issued by or on behalf of the City of Dallas, such revenue bonds being payable and secured by the revenues derived from the ownership and operation of Love Field.  In order to satisfy its obligations hereunder, the City of Dallas agrees to use best efforts to issue and sell revenue bonds in such amounts and on terms that are commercially reasonable in the credit markets.  Southwest Airlines and American Airlines hereby each agree to enter into such additional agreements that are necessary to facilitate the issuance of such revenue bonds, provided, however, nothing herein shall obligate either airline to be an obligor or guarantor of such bonds.  Neither the obligations under this Contract nor the obligations with respect to such revenue bonds shall constitute a debt of the City of Dallas payable from, or require the payment or expenditure of funds of the City of Dallas from, ad valorem or other taxes imposed by the City of Dallas.

3.  <u>VENUE</u>.  The Parties agree that in the event of any litigation in connection with this Contract, or should any legal action be necessary to enforce the terms of this Contract, exclusive venue shall lie in either Dallas County, Texas or Tarrant County, Texas.

4.  <u>NON-LIABILITY FOR OTHER PARTIES' OBLIGATIONS, COSTS, AND ATTORNEYS FEES</u>.  Each Party hereunder shall only be responsible and liable for its own obligations, costs, and attorneys fees in connection with the performance of this Contract, or any dispute or litigation that may arise in connection with this Contract.

5.  <u>APPLICABLE LAWS AND REPRESENTATIONS</u>.  This Contract is made subject to the provisions of the Charter and ordinances of the cities of Dallas and Fort Worth, in existence as of the date hereof, and all applicable State and federal laws. Each City, as to itself only, represents and warrants that its existing Charter and ordinances do not preclude such City from executing this

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and
DFW Board to Resolve the "Wright Amendment" Issues

Page 7 of 11

Contract or performing its obligations under this Contract in accordance with its terms. American Airlines, Southwest Airlines and the DFW Board, each as to itself only, represent and warrant that it has the full power and authority to enter into this Contract and perform its obligations under this Contract in accordance with its terms.

6. <u>EFFECTIVE DATE</u>. Notwithstanding anything to the contrary herein, the Parties agree that (i) Sections 1, 7, 8, 9, 14, 15, and 16 of Article I. and all Sections of Article II. shall take effect as of the last date of execution of this Contract by any of the Parties and (ii) the remaining Sections of Article I. shall take effect on the date that legislation that would allow the Parties to implement the terms and spirit of this Contract is signed into law.

7. <u>NON-SEVERABILITY</u>.
(a)      The terms of this Contract are not severable. Therefore, in the event any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal, or unenforceable in any respect, then this Contract shall be considered null and void and unenforceable, except as otherwise may be agreed to by all Parties.
(b)      Notwithstanding paragraph (a) hereof, each Party shall use its best efforts to restore or replace the affected provisions so as to effectuate the original intent of the Parties.

8. <u>COUNTERPARTS</u>. This Contract may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument.

9. <u>CAPTIONS</u>. The captions to the various clauses of this Contract are for informational purposes only and shall not alter the substance of the terms and conditions of this Contract.

10. <u>SUCCESSORS AND ASSIGNS; SUBLESSEES</u>. This Contract shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Further, the Parties agree that any sublessee or other entity who subleases or uses either American Airlines' or Southwest Airlines' gates at Love Field is subject to and bound by the terms of this Contract, including, but not limited to, paragraph 13 of Article I.

11. <u>NO THIRD PARTY BENEFICIARIES</u>. The provisions of this Contract are solely for the benefit of the Parties hereto; and nothing in this Contract, express or implied, shall create or grant any benefit, or any legal or equitable right, remedy, or claim hereunder, contractual or otherwise, to any other person or entity.

12. <u>NOTICES</u>. All notices required or permitted under this Contract shall be personally delivered or mailed to the respective Parties by depositing same in the United States mail, postage prepaid, at the addresses shown below, unless and until the Parties are otherwise notified in writing of a new address by any Party. Mailed notices shall be deemed communicated as of five days after mailing.

If intended for the City of Dallas:                With a copy to:

City Manager, City of Dallas                      City Attorney, City of Dallas
City Hall, Room 4EN                               Dallas City Hall, Rm. 7CN
1500 Marilla Street                              1500 Marilla Street
Dallas, Texas 75201                              Dallas, Texas 75201

061838

| | |
|---|---|
| If intended for the City of Fort Worth: | With a copy to: |
| City Manager, City of Fort Worth<br>1000 Throckmorton<br>Fort Worth, Texas 76102 | City Attorney, City of Fort Worth<br>1000 Throckmorton<br>Fort Worth, Texas 76102 |
| If intended for the DFW International<br>Airport Board: | With copy to: |
| Chief Executive Officer<br>DFW International Airport Board<br>P.O. Drawer 619428<br>3200 E. Airfield Drive<br>DFW Airport, TX 75261-9428 | Legal Counsel<br>DFW International Airport Board<br>P.O. Drawer 619428<br>3200 E. Airfield Drive<br>DFW Airport, TX 75261-9428 |
| If intended for American Airlines, Inc.: | With copy to: |
| Chief Executive Officer<br>American Airlines, Inc.<br>4333 Amon Carter Blvd., MD 5621<br>Fort Worth, Texas 76155 | General Counsel<br>American Airlines, Inc.<br>4333 Amon Carter Blvd., MD 5618<br>Fort Worth, Texas 76155 |
| If intended for Southwest Airlines Co.: | With copy to: |
| Chief Executive Officer<br>Southwest Airlines Co.<br>2702 Love Field Drive<br>Dallas, Texas 75235 | General Counsel<br>Southwest Airlines Co.<br>2702 Love Field Drive<br>Dallas, Texas 75235 |

13.   PARTIAL WAIVER OF GOVERNMENTAL IMMUNITY.  The Cities and the DFW Board, by signing this Contract and to the extent permitted by law, waive their respective immunity from suit by the Parties, but only with respect to a suit to enforce this Contract by a Party seeking a restraining order, preliminary or permanent injunctive relief, specific performance, mandamus, or declaratory relief.  The Cities and the DFW Board do not waive any other defense or bar against suit available to the Cities or the DFW Board.

14.   NO INDIVIDUAL LIABILITY.   To the extent allowed by law, no officer, agent, employee, or representative of any of the Parties shall be liable in his or her individual capacity, nor shall such person be subject to personal liability arising under this Contract.

15.   LIMITATION OF REMEDIES.  UNDER NO CIRCUMSTANCES SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY HEREUNDER, IN CONTRACT OR IN TORT, FOR MONETARY DAMAGES RESULTING IN WHOLE OR IN PART FOR ANY BREACH BY SUCH PARTY, WHETHER NEGLIGENT OR WITH OR WITHOUT FAULT ON ITS PART, OF ANY

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and<br>DFW Board to Resolve the "Wright Amendment" Issues

Page 9 of 11

PROVISION OF THIS CONTRACT. PROVIDED, HOWEVER, (AND IN EXCHANGE FOR THE FOREGOING SENTENCE), IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH BY ANY PARTY, ALL PARTIES AGREE THAT EACH NON-BREACHING PARTY WILL BE ENTITLED TO SEEK ALL EQUITABLE REMEDIES INCLUDING, WITHOUT LIMITATION, DECREES OF SPECIFIC PERFORMANCE, RESTRAINING ORDERS, WRITS OF PRELIMINARY AND PERMANENT INJUNCTION AND MANDAMUS, AS WELL AS DECLARATORY RELIEF, TO ENFORCE THIS CONTRACT. PROVIDED, FURTHER, AS A PREREQUISITE TO THE FILING OF ANY LAWSUIT BY ANY PARTY, ALL PARTIES SHALL IN GOOD FAITH SUBMIT ANY DISPUTE TO NON-BINDING MEDIATION, WHICH MUST BE COMPLETED WITHIN 60 DAYS FROM THE DATE NOTICE REQUESTING MEDIATION IS COMMUNICATED PURSUANT TO SECTION 12. OF ARTICLE II. OF THIS CONTRACT.

16. <u>LOVE FIELD GENERAL AVIATION, U.S. GOVERNMENT FLIGHTS AND CHARTER FLIGHTS</u>. Nothing in this Contract is intended to affect general aviation service at Love Field, including, but not limited to, flights to or from Love Field by general aviation aircraft for air taxi service, private or sport flying, aerial photography, crop dusting, business flying, medical evacuation, flight training, police or fire fighting, and similar general aviation purposes, or by aircraft operated by any agency of the U.S. Government or by any airline under contract to any agency of the U.S. Government. Charter flights at Love Field shall be limited to destinations within the 50 United States and the District of Columbia and shall be limited to no more than ten per month per air carrier except as otherwise permitted by Section 29(c) of the Wright Amendment. All flights operated by air carriers that lease terminal gate space shall depart from and arrive at one of those leased gates. Charter flights operated by air carriers that do not lease terminal space may operate from non-terminal facilities or one of the 20 terminal gates. For the purposes of this Contract, "charter flight" shall have the meaning currently given in 14 C.F.R. 212.2 (2006). This limitation shall remain in effect permanently.

17. <u>ENTIRE AGREEMENT</u>. This Contract embodies the complete agreement of the Parties hereto relating to the matters in this Contract; and except as otherwise provided herein, cannot be modified without written agreement of all the Parties, to be attached to and made a part of this Contract.

EXECUTED as of this the _11th_ day of July, 2006.

CITY OF DALLAS, TEXAS                    APPROVED AS TO FORM:

Mary K. Suhm, City Manager               Thomas P. Perkins, Jr., City Attorney

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and DFW Board to Resolve the "Wright Amendment" Issues

Page 10 of 11

CITY OF FORT WORTH, TEXAS

Charles R. Boswell, City Manager

DALLAS/FORT WORTH INTERNATIONAL
AIRPORT BOARD

Jeffrey P. Fegan, Chief Executive Officer

AMERICAN AIRLINES, INC.

Gerard J. Arpey, Chairman and
Chief Executive Officer

APPROVED AS TO FORM AND
LEGALITY:

David L. Yett, City Attorney

APPROVED AS TO FORM:

Gary Keane, D/FW Legal Counsel

SOUTHWEST AIRLINES CO.

Herbert D. Kelleher, Executive Chairman

Final Contract Among the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines, and
DFW Board to Resolve the "Wright Amendment" Issues

Page 11 of 11

CATEGORY:    PUBLIC HEARINGS AND RELATED ACTIONS

| | |
|---|---|
| **AGENDA DATE:** | June 28, 2006 |
| **COUNCIL DISTRICT(S):** | N/A |
| **DEPARTMENT:** | City Attorney's Office |
| **CMO:** | Thomas P. Perkins, Jr., 670-3491 |
| **MAPSCO:** | N/A |

## SUBJECT

Authorize a concurrent resolution of the cities of Dallas and Fort Worth **(1)** approving the June 15, 2006 Joint Statement between the City of Dallas, City of Fort Worth, Southwest Airlines, American Airlines and Dallas/Fort Worth International Airport (Parties) to resolve the Wright Amendment issues; **(2)** authorizing a contract between the Parties incorporating the terms of the June 15, 2006 Joint Statement of the Parties; and **(3)** requesting the United States Congress to incorporate the terms of the June 15, 2006 Joint Statement in any legislation enacted by Congress regarding the Wright Amendment - Financing: No cost consideration to the City

## BACKGROUND

Council was briefed in Closed Session on June 26, 2006.

## PRIOR ACTION/REVIEW (Council, Boards, Commissions)

This item was deferred by City Council vote on June 14, 2006.

## FISCAL INFORMATION

No cost consideration to the City.

END
FILE NUMBER:

06-1838