UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST AIRLINES CO., VIRGIN AMERICA INC., AMERICAN AIRLINES, INC., UNITED AIRLINES, INC., SEAPORT AIRLINES, INC., UNITED STATES DEPARTMENT OF TRANSPORTATION, AND THE FEDERAL AVIATION ADMINISTRATION, | § § § § § § § § § | Civil Action No. 3:15-cv-02069-K |
| | § | |
| Defendants. | § | |

**BRIEF IN SUPPORT OF SOUTHWEST'S VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION AGAINST DELTA AIR LINES, INC.**

Defendant Southwest Airlines Co. files this Brief in Support of its Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Delta Air Lines, Inc.

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................. 4

II.  BACKGROUND AND FACTS ....................................................................................... 4

    A.  To serve the Dallas-Fort Worth area, Southwest only operates flights out of Love Field, whereas Delta primarily operates flights out of Dallas-Fort Worth International Airport ("DFW"). ............................... 4

    B.  Delta is given the opportunity to prepare to exit Love Field and rely exclusively on DFW, but refuses. ............................................................. 5

    C.  Southwest provides Delta temporary use of gates at Love Field in late 2014. ............................................................................................ 5

    D.  United provides Delta temporary use of gates at Love Field in early 2015. ................................................................................................... 6

    E.  Southwest will fully utilize its gates once Delta's License expires—and Southwest has booked tens of thousands of passengers on those flights. ................................................................................................... 7

    F.  Delta has stated it will not comply with the License and will not vacate Southwest's gates. ........................................................................ 8

    G.  Delta's actions will disrupt travel of potentially more than 25,000 passengers .............................................................................................. 9

    H.  While Southwest cannot provide for its ticketed passengers out of other gate space, Delta can easily provide for its ticketed passengers out of DFW. ................................................................................................ 10

    I.  Without a decision from the Court, there will be chaos at Love Field. .......... 11

III. CAUSES OF ACTION ................................................................................................... 12

    A.  Count One: Trespass ....................................................................................... 12

    B.  Count Two: Declaratory Judgment ................................................................. 12

    C.  Count Three: Requests for Injunctive Relief .................................................. 13

IV.  PRAYER ........................................................................................................................ 16

## TABLE OF AUTHORITIES

**CASES**

*Beathard Joint Venture v. W. Hous. Airport Corp.*,
   72 S.W.3d 426 (Tex. App.—Texarkana 2002, no pet.) ...................................................... 13, 14

*O'Connor v. Smith*,
   427 Fed. App'x 359 (5th Cir. 2011) .................................................................................. 13, 14

## I.     INTRODUCTION

Southwest has 18 gates at Love Field Airport, which are leased from the City of Dallas (the "City"). Delta currently operates five daily flights out of Southwest's gates pursuant to a temporary license agreement with Southwest that expires on July 6, 2015. Southwest has implemented plans to fully utilize its 18 gates after the Delta license expires. Indeed, Southwest will operate 180 flights a day, or an industry-leading gate utilization of ten flights a day per gate, and has already sold in excess of 25,000 tickets to passengers who will fly on five new flights that will be run out of the gates that Delta is currently utilizing. Remarkably, Delta has told Southwest and the City that it will not vacate Southwest's Love Field gates when its license expires, meaning that Delta has admitted that it will trespass on Southwest's property beginning on July 7, 2015. And Delta's current actions further indicate Delta's intent to trespass. Indeed, Delta is currently selling tickets for travel out of Southwest's gates after July 6. Correctly perceiving the imminent disaster that Delta's trespass is about to create, the City has filed this lawsuit. Southwest now seeks injunctive relief prohibiting Delta from trespassing on Southwest's gates and a declaration from this Court that Southwest Airlines is the sole lawful operator of the gates after July 6, 2015.

## II.     BACKGROUND AND FACTS

**A. To serve the Dallas-Fort Worth area, Southwest only operates flights out of Love Field, whereas Delta primarily operates flights out of Dallas-Fort Worth International Airport ("DFW").**

1.     Southwest operates 18 gates at Love Field. It operates 16 of the gates pursuant to a lease with the City (the "Southwest Lease"), which owns Love Field. *See* City of Dallas' Original Complaint [Doc. 1] (the "City's Complaint"), at ¶ 41. Southwest operates an additional two gates pursuant to a sublease with United Airlines, Inc. (the "United Sublease"). *Id.* at ¶ 53.

Pursuant to federal law, Southwest may not operate any gates at DFW without giving up an equal number of gates at Love Field. *Id.* at ¶¶ 32, 34.

2. Delta, a large legacy carrier that runs substantial operations out of DFW, previously operated five daily flights to Atlanta from Love Field on American Airlines, Inc.'s ("American") leased gates. *Id.* at ¶ 54-55.

3. Following American's merger with U.S. Airways, American was required to give up its two Love Field gates. *Id.* at ¶ 54. Accordingly, American informed Delta that it would no longer be able to run its five flights on American's gates. *Id.* Nevertheless, Delta made false representations by advertising for sale flights from Love Field for dates that Delta knew it did not have any basis to operate at Love Field. *Id.* While it continued to advertise and sell these flights, Delta sought forced accommodation at Love Field. *Id.* at ¶ 55.

**B.** **Delta is given the opportunity to prepare to exit Love Field and rely exclusively on DFW, but refuses.**

4. Over the past several months, Southwest, Delta, the City, and other affected airlines have engaged in discussions regarding Delta's stated desire to continue to operate flights at Love Field despite the lack of any lease rights. As a result of these discussions, Delta was provided temporary gate access by lease-holding Love Field airlines on multiple occasions, along with the opportunity to prepare for the expiration of its access rights at Love Field. At every step, however, Delta refused these opportunities and pressed forward with its attempts to force its way into continued operation at Love Field without a legal right to remain there.

**C.** **Southwest provides Delta temporary use of gates at Love Field in late 2014.**

5. In late 2014, Southwest agreed to provide Delta with temporary use of one of its then-available gates from October 13, 2014, through January 6, 2015, to operate five daily flights to Atlanta, in addition to flights that Delta offers between Atlanta and DFW Airport. *See*

http://www.delta.com/air-shopping/findFlights.action. Southwest agreed to this arrangement voluntarily, consistent with industry practice when gate space is not being fully utilized by the leaseholder, as well as to protect passengers who had booked Delta flights that Delta had advertised and sold tickets for on dates that Delta either knew or should have known it had no lawful right to operate.

6. By virtue of Southwest voluntarily and temporarily providing Delta gate access, Delta had the opportunity to fulfill its commitment to passengers and adjust its future schedule to avoid making false representations about its schedule after January 6, 2015. Nevertheless, Delta continued to make such false representations by advertising for sale flights from Love Field after January 6, 2015, even though it did not, at the time, have any legal basis to operate at Love Field after January 6.

**D.    United provides Delta temporary use of gates at Love Field in early 2015.**

7. With Delta's temporary gate use agreement with Southwest set to expire, and Delta having wrongfully sold flights from Love Field that would occur after January 6, 2015, United (prior to the consummation of its sublease with Southwest) voluntarily offered to temporarily allow Delta to operate on a then-available United gate for a period of 180 days, commencing on January 7, 2015, and ending on July 6, 2015. Amazingly, Delta initially refused United's generous offer, but, faced with the chaos and embarrassment of having sold flights to customers it could not provide, Delta eventually accepted that offer. Later, when Southwest entered into a sublease with United for two Love Field gates, Southwest agreed to honor Delta's temporary gate license agreement (the "License") through the License's expiration on July 6, 2015. A true and correct copy of the License is attached hereto as Ex. 1 (App. 1).

**E. Southwest will fully utilize its gates once Delta's License expires—and Southwest has booked tens of thousands of passengers on those flights.**

8. On February 26, 2015, Southwest publicly announced and began selling an additional 16 flights from Love Field scheduled to begin August 9, 2015, including flights to 8 new nonstop destinations. *See* Ex. 2 (App. 17). This announcement means that, as of August 9, 2015, Southwest will be operating 180 week-day flights to 50 nonstop destinations out of its 18 Love Field gates, resulting in an average of 10 flights-per-gate per day, leaving no room for any additional flights through its Love Field gates.

9. On February 27, 2015, Southwest specifically provided notice to Delta and the City of its 180-flights-per-day schedule beginning August 9. A true and correct copy of the notice is attached hereto as Ex. 3 (App. 19). At the same time Southwest also offered to extend Delta's License for two weeks—until July 19, 2015. This notice gave Delta ample time to prepare for the expiration of its access to gates at Love Field. Delta never responded to this offer.

10. Beginning July 20, 2015 at the latest, Southwest must begin reconstruction of the gate holdroom now being used by Delta in order to fit the space for Southwest's flights and passengers, so that it is ready for the new flights scheduled to launch on August 9. *See* Ex. 7, Declaration of Bob Montgomery, at ¶ 5 (App. 31). Accordingly, on June 12, 2015, Southwest requested that Delta confirm when it intended to vacate the facilities pursuant to the License, so that Southwest could schedule this reconstruction work. The June 12 letter informed Delta that, in the absence of a response, Southwest would proceed with the assumption that Delta would vacate the facilities by midnight, July 6, 2015. A true and correct copy of the June 12 letter is attached hereto as Ex. 4 (App. 25). Delta has not responded to this letter.

**F.      Delta has stated it will not comply with the License and will not vacate Southwest's gates.**

11.     During a telephone call on June 17, 2015, counsel for Delta, Kenneth P. Quinn, informed Southwest that despite the impending termination date of July 6, 2015, Delta is not going to return the leased space to Southwest and, instead, has every intention of remaining on the space and using it for the Atlanta flights for the indefinite future based on letters issued by the U.S. Department of Transportation in December 2014 and June 2015 relating to Love Field. *See* Ex. 5, Declaration of Roy Goldberg, at ¶ 5.  Mr. Quinn made it clear that absent a court order Delta was not going to vacate the space even after the license agreement with Southwest terminates on July 6, 2015.  *See id.*  Furthermore, Delta's station manager at Love Field informed Southwest employees that Delta had no plans to leave Love Field, even after the expiration of its License.  *See* Ex. 6, Declaration of Mark Desimone, at ¶ 3 (App. 28).  Delta has even gone so far as to inform the City that it will employ security personnel in order to physically prevent Southwest from using its Love Field gate space following the expiration of Delta's License.  *See* City's Complaint, at ¶ 97.  Delta's stated plan to trespass on Southwest's leased gate space may easily deteriorate into a scenario of battling passengers, half of whom have no flights, dueling airlines and clashing private security personnel—precisely the situation the City, Southwest, and the other airlines which provided Delta with ample time to leave Love Field have worked so diligently to avoid.

12.     In sum, Delta has admitted that, as of July 7, 2015, it will trespass on Southwest's Love Field gates and will disrupt and/or prevent Southwest's planned operations on those gates, by physical force if necessary.  Furthermore, Delta has represented that it will permanently trespass on Southwest's property, as it has "no intention" of ever leaving the gate space.  Delta's intention is made all the more clear by the fact that it continues to accept reservations for its

**BRIEF IN SUPPORT OF SOUTHWEST'S VERIFIED APPLICATION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,

current five daily flights after July 6, 2015.  *See* Ex. 7, Declaration of Bob Montgomery, at ¶ 3 (App. 30).

### G.     Delta's actions will disrupt travel of potentially more than 25,000 passengers

13.     As noted above, Southwest announced and began selling 16 additional daily Love Field flights that will begin in August.  These new flights include service to eight new nonstop cities from Love Field and additional nonstop service to other destinations.  If Delta is not restrained from trespassing Southwest's Love Field space, however, Southwest will have to forgo at least five of these daily flights in order to allow Delta to operate five flights between Love Field and Atlanta.  Ex. 7, at ¶ 4 (App. 30).

14.     If Delta is not immediately restrained from trespassing on Southwest's Love Field gate space, Southwest will not be able to operate its full schedule of flights that are set to begin August 9, and will have to cancel already-sold flights, causing travel chaos in Dallas.  This will force passengers to scramble to make alternate arrangements, probably at much higher cost, or to cancel their planned travel.  If Southwest is forced to cancel just five of its previously scheduled flights, *at least 25,000* currently booked passengers would have their flights canceled, and the number would likely be much higher depending on which flights Southwest must cancel and considering that bookings on Southwest's new flights are going up every week.  *See* Ex. 8, Declaration of Adam Decaire, at ¶ 3 (App. 32).

15.     Furthermore, because Southwest operates as a "point-to-point" carrier and not on a "hub and spoke" model (like Delta Airlines), if Southwest is forced to forgo five flights at Love Field after July 6, 2015, Southwest's flight network operations would be interrupted far beyond Love Field. For example, rather than flying an aircraft back and forth between two city pairs in a "hub and spoke" model, Southwest aircraft typically originate in one city and travel to an

ultimate destination via various downline segments. Each city pair segment between the originating city and the ultimate destination of the aircraft is typically marketed as an available fare to a customer. Accordingly, if a downline segment, for example, Dallas Love Field, is removed as an available "waypoint," the remainder of the downline path would also be interrupted. In that case, Southwest would suffer a negative impact to its entire network, including, at a minimum, the need to re-route aircraft and the likely cancellation of bookings and/or flights beyond Dallas Love Field.  *Id.* at ¶ 4 (App. 33).

16.     Finally, Southwest will be precluded from offering consumers certain low-cost nonstop flights from Love Field, including nonstop service to destinations like Boston, Charlotte, Detroit, Omaha, Philadelphia, Pittsburgh, Raleigh/Durham, and Salt Lake City—service that depends on Southwest's ability to make full utilization of all of its Love Field gates. Because the Dallas-Fort Worth market has only two major airports—Love Field and DFW—and because Southwest is only able to operate out of Love Field, Southwest's affected passengers will have no flights if Delta impermissibly remains on Southwest's gates, forcing Southwest to cancel its own flights.

**H.     While Southwest cannot provide for its ticketed passengers out of other gate space, Delta can easily provide for its ticketed passengers out of DFW.**

17.     In contrast to Southwest, Delta already operates a large number of flights out of DFW[1], which has an abundance of available gate space. Ex. 7, at ¶ 6 (App. 31). If Delta has already wrongfully sold tickets for flights from Love Field after July 6, 2015 (the date Delta's License expires), Delta can provide for those passengers without substantially altering their travel plans by transferring those passengers to flights leaving from DFW.  *Id.*  Indeed, Delta

---

[1] Dallas-Fort Worth is a single integrated aviation market served by two competing airports (DFW and Love Field) and, thus, the Court may take into account Delta's ability to access the Dallas-Fort Worth market via DFW.

already offers 12 daily flights between DFW and Atlanta. *Id.* Southwest, unlike Delta, does not operate out of DFW (in fact, it is federally restricted from doing so) and, therefore, cannot switch passengers to a flight leaving from DFW. *Id.* at ¶ 7 (App. 31). Not only is Southwest federally restricted from operating out of DFW, it has no lease agreement, gate license, or any other legal access to DFW. It has no employees, equipment, or maintenance operations at DFW. Delta has all of those things. Moreover, Southwest has a legal right to operate out of the Love Field gates in question. Delta does not.

**I.     Without a decision from the Court, there will be chaos at Love Field.**

18. As things stand now, if Delta does not vacate Love Field on July 6, 2015, it will very shortly result in Southwest and Delta each running scheduled flights out of Southwest's Love Field gates—gates which only Southwest has a right to operate on. These scheduled flights will conflict with one another, causing mass confusion and chaos at Love Field. Thousands of passengers will show up for flights that are scheduled to run out of the same gate at the same time—a physical impossibility. Additionally, employees for Southwest and Delta will need to occupy the same space to service passengers and operate their respective flights. Likewise, multiple planes will be seeking access at a single gate. In short, without a decision from this Court, the situation at Love Field in the weeks following July 6, 2015 will be a disaster—all thanks to Delta's trespass and refusal to acknowledge Southwest's property rights. An order from this Court enjoining Delta from trespassing on Southwest's property will ensure that Southwest's passengers are provided for at Love Field, and Delta's passengers are provided for at the ample space available at DFW.

19. For these reasons and those set forth below, this Court should grant Southwest immediate injunctive relief, both to protect Southwest's property rights and to protect the rights of the flying public.

## III. CAUSES OF ACTION

### A. Count One: Trespass

20. Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

21. Pursuant to the Southwest Lease and the United Sublease, Southwest has a lawful right to possess its Love Field gates.

22. Delta has admitted that it will physically, intentionally, and voluntarily enter Southwest's property without a legal right to do so upon the expiration of its License.

23. Delta's trespass will cause injury to Southwest's right of possession.

24. Southwest seeks injunctive relief to enjoin Delta's trespass, in addition to its actual damages.

### B. Count Two: Declaratory Judgment

25. Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

26. Pursuant to the Southwest Lease and the United Sublease, Southwest has a lawful right to possess its Love Field gates.

27. Delta's only right to Love Field gate access is pursuant to the License.

28. The License expires on July 6, 2015.

29. After the License expires, Delta will have no legal right to gate access at Love Field. Despite this, Delta intends to continue to occupy and operate out of Southwest's Love Field gates after the License expires.

30. Thus, there exists a case or controversy as to whether Delta has any right to operate out of Southwest's Love Field gates following July 6, 2015.

31. Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that (1) Southwest has a possessory right to its 18 Love Field gates, and (2) Delta has no right to occupy or operate out of Southwest's Love Field gates after July 6, 2015.

C. **Count Three: Requests for Injunctive Relief**

32. Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

33. Southwest is entitled to injunctive relief to enjoin Delta's trespass on its Love Field gates.

34. *First*, Southwest has demonstrated a substantial likelihood of success on the merits. Delta's only legal right to access at Love Field is through its License with Southwest. The License expires on July 6, 2015. Nevertheless, Delta refuses to vacate Southwest's Love Field space upon expiration of its License. To the contrary, Delta has confirmed on multiple occasions that it will continue occupying and using Southwest's Love Field gate space after the expiration of its License. Delta's actions clearly constitute a trespass. *See Beathard Joint Venture v. W. Hous. Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.) (holding that an airport licensee committed a trespass by continuing to use the licensed premises after its license expired); *O'Connor v. Smith*, 427 Fed. App'x 359, 366-68 (5th Cir. 2011) (affirming injunction against trespasser).

35. *Second*, Southwest will suffer irreparable injury if the injunction is not issued. As an initial matter, when a trespasser is invading the possession of another's property, the element of irreparable injury is satisfied without any additional showing. *See Beathard*, 72 S.W.3d at 432; *O'Connor*, 427 Fed. App'x at 366. Furthermore, Southwest and its passengers will be irreparably harmed by Delta's trespass, as flights that have already been scheduled and sold will have to be cancelled, and passengers will either have to cancel planned travel or, if possible, make last minute alternate arrangements. Additionally, Southwest, and by extension Love Field, will suffer immense reputational harm if Southwest is forced to cancel flights for the tens of thousands of passengers who have booked travel with Southwest at Love Field.

36. In August 2015, Southwest will operate 180 flights per day through its Love Field gates. This amounts to full utilization of the gates, leaving no room for additional flights. Thus, if Delta is allowed to trespass on Southwest's Love Field space after July 6, 2015, Southwest will not be able to operate its full schedule of flights and will be precluded from making full use of its leased space. Ex. 7, at ¶ 4 (App. 30). Southwest's previously–booked passengers, then, will have to either cancel travel plans or make alternate arrangements, if any are available, as Southwest cannot provide for these passengers at nearby DFW because federal law restricts Southwest's ability to operate out of DFW and, as noted above, Southwest has no lease agreement, gate license, or any other legal access to DFW and has no employees, equipment, or maintenance operations at DFW. *Id.* ¶ 7 (App. 31).

37. *Third*, the injury that Southwest and the flying public will endure if the injunction is denied far outweighs any injury to Delta if the injunction is granted. Delta, unlike Southwest, already operates most of its Dallas fights out of DFW, which has an abundance of available gate space. Ex. 7, at ¶ 6 (App. 31). If Delta has already wrongfully sold tickets for flights from Love

Field after July 6, 2015, Delta can provide for those passengers without substantially altering their travel plans by transferring those passengers to flights leaving from DFW. *Id.* Accordingly, the only injury to Delta would be the minor inconvenience of notifying passengers that their flights will operate at DFW instead of Love Field. This injury is far outweighed by the harm to Southwest and its passengers, who will likely have to cancel vacation, business, or personal travel plans that have already been scheduled and paid for, all so that Delta can continue to run 5 flights to Atlanta—flights that Delta can, and already does, run from DFW.

38. *Fourth*, the grant of injunction will not disserve the public interest; to the contrary, granting the injunction is the only way to *serve* the public interest. As discussed above, Southwest cannot move passengers to DFW, because it does not operate out of DFW and is restricted by federal law from doing so. Thus, if Southwest is forced to cancel flights due to Delta's trespass, those passengers will likely have to cancel their travel plans, missing out on the weddings, funerals, vacations, and/or business meetings they are flying to attend. At the very least, Southwest's passengers will have to scramble to make alternate travel arrangements with other airlines, assuming any are available, and likely at much higher cost. In contrast, for any flights that Delta has sold for dates after the expiration of its License, it can move those passengers to DFW, where Delta already operates and where there is ample space for additional Delta flights. Then, all passengers traveling to and from Dallas can be served by the airline they have booked at the times they have booked. Clearly, the public interest is served by an order enjoining Delta's trespass. Only such an order will protect *both* the passengers on the flights that Southwest has lawfully sold, as well as passengers on the flights that Delta has unlawfully sold.

39. For these reasons, in order to preserve the status quo and protect Southwest's and the flying public's rights during the pendency of this action, pursuant to Federal Rule of Civil

Procedure 65 Southwest requests that Delta be cited to appear and show cause as to why it should not be restrained or enjoined from trespassing on Southwest's Love Field gates following the expiration of the License.

40. Specifically, Southwest requests that the Court enter a temporary restraining order that shall be effective for fourteen days, enjoining Delta and its agents, servants, employees, attorneys, and any persons or entities acting in concert or participation with Delta, from trespassing on Southwest's Love Field gates following the expiration of the License.

41. Southwest further requests that the Court set its Application for a Preliminary Injunction for hearing no more than fourteen days from the entry of the Temporary Restraining Order, and upon conclusion of the hearing, enter a preliminary injunction that shall remain in force for the duration of this lawsuit and which shall enjoin Delta and its agents, servants, employees, attorneys, and any persons or entities acting in concert or participation with Delta, from trespassing on Southwest's Love Field gates following the expiration of the License.

42. Southwest finally requests that upon a final hearing, the Court enter a permanent injunction that shall enjoin Delta and its agents, servants, employees, attorneys, and any persons or entities acting in concert or participation with Delta, from trespassing on Southwest's Love Field gates following the expiration of the License.

43. Southwest is willing to post a bond.

## IV.    PRAYER

For these reasons, Plaintiff Southwest Airlines Co. hereby requests that the Court award the following relief against Delta Air Lines, Inc.:

a.    Enter a Temporary Restraining Order, as requested above;

b. Set Southwest's Application for Preliminary Injunction for hearing so a decision can be made as soon as possible and, in any event, prior to July 6, 2015, order expedited discovery related to the same, and upon conclusion of the hearing on Southwest's Application for Preliminary Injunction, enter a preliminary injunction for the duration of this lawsuit, as requested above;

c. Upon final hearing, enter a permanent injunction, as requested above;

d. Award Southwest reasonable and necessary attorneys' fees and court costs; and

e. Grant all such other and further relief at law or in equity that the Court may deem just and proper.

DATED: June 19, 2015               Respectfully submitted,

*/s/ Kent D. Krabill*
John T. Cox, III
Texas Bar No. 24003722
Email: tcox@lynnllp.com
Kent D. Krabill
Texas Bar No. 24060115
Email: kkrabill@lynnllp.com
Britta Erin Stanton
Texas Bar No. 24036976
bstanton@lynnllp.com
Stephen M. Cole
Texas Bar No. 24078358
Email: scole@lynnllp.com

**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3838 – Facsimile

**COUNSEL FOR DEFENDANT/CROSS-PLAINTIFF SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 19, 2015, the foregoing document was served on all counsel of record through the Court's ECF system. Additionally, a courtesy copy was served on counsel for Delta, as set forth below, due to its emergency nature.

*<u>Via Email</u>*
Kenneth P. Quinn
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, D.C. 20036-3006
Kenneth.quinn@pillsburylaw.com

        */s/ Kent D. Krabill*
        Kent D. Krabill

## **VERIFICATION**

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

    BEFORE ME, the undersigned authority, on this day personally appeared Stacy Cozad, and, after being duly sworn, stated under oath that she is the Associate General Counsel-Litigation for Defendant/Cross-Plaintiff Southwest Airlines Co.; that she has read Southwest's Brief in Support of Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction; and that the statements contained in the foregoing unless otherwise stated or supported are within her personal knowledge and are true and correct.

_____
Stacy Cozad

    SWORN TO AND SUBSCRIBED BEFORE ME on June 19th, 2015, to certify which witness my hand and official seal.

_____
Notary Public, State of Texas

My commission expires: 1/5/2016

4817-6097-7957, v. 1



MONIQUE GOUJAT
Notary Public
State of Texas
My Comm. Expires 01-05-2016