UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

_____
                                                                )
CITY OF DALLAS,                                      )
                                                                )
                    Plaintiff,                              )
                                                                )
          v.                                                   )
                                                                )          Civil Action No: 3:15-cv-2069-K
DELTA AIR LINES, INC., SOUTHWEST      )
AIRLINES CO., VIRGIN AMERICA INC.,     )
AMERICAN AIRLINES, INC., UNITED        )
AIRLINES, INC., SEAPORT AIRLINES,      )
INC., UNITED STATES DEPARTMENT       )
OF TRANSPORTATION, AND THE            )
FEDERAL AVIATION                            )
ADMINISTRATION,                              )
                                                                )
                    Defendants.                          )
_____)


**DELTA AIR LINES, INC.'S COMBINED BRIEF IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AGAINST SOUTHWEST AIRLINES CO. AND IN OPPOSITION TO SOUTHWEST'S VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION AGAINST DELTA AIR LINES, INC.**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND AND FACTS .............................................................................. 5

I.      The Federal Aviation Administration has plenary authority to regulate federal grant funding for airports and to enforce the promises airport sponsors make as a condition of accepting federal funding. .................................................................................................. 5

        A.      Competition plan requirement ................................................................ 8

        B.      Deference to DOT and FAA interpretations ........................................... 9

II.     The City is required to promote competition at Love Field by allowing non-incumbent carriers such as Delta to serve the airport whenever possible ......................... 10

        A.      The Five Party Agreement requires the City to accommodate Delta. ................. 10

        B.      The Airport Use and Lease Agreements require the City to accommodate Delta. .......................................................................................... 11

        C.      The Wright Amendment Reform Act of 2006 codifies into federal law the City's obligation to accommodate new entrants such as Delta ............................ 13

        D.      The City's Competition Plan for Love Field requires accommodation of Delta. ..................................................................................... 14

III.    The City has repeatedly promised that it will—and DOT has repeatedly directed that the City must—accommodate Delta at Love Field ................................................ 15

        A.      The City has promised to accommodate Delta at Love Field. ....................... 16

        B.      DOT has directed the City to accommodate Delta at Love Field. .................. 20

ARGUMENT ..................................................................................................... 25

I.      There is a substantial likelihood that Delta will succeed on the merits because federal law gives Delta the unequivocal right to continue operating at Love Field. ........ 26

II.     Delta, not Southwest, has demonstrated that it will suffer irreparable harm if a preliminary injunction is not issued. ........................................................... 35

        A.      The status quo must be preserved to protect Delta's existing Love Field flights. ............................................................................... 35

        B.      Southwest can avoid harm to its passengers without evicting Delta from Love Field. ........................................................................ 36

C.      Delta, unlike Southwest, will suffer immediate irreparable harm if not granted injunctive relief ........................................................................................... 39

D.      Southwest cannot claim irreparable harm from its own choice to defy the DOT ................................................................................................................................. 41

III.    The balance of harms favors granting Delta injunctive relief because Southwest can avoid any potential disruption to its customers by making any one of a few simple, feasible operational changes ............................................................................ 43

IV.     Granting a preliminary injunction will serve the public interest by preventing chaos at Love Field, protecting Delta's reasonable reliance, and enforcing federal law. ....................................................................................................................................... 44

CONCLUSION ............................................................................................................................ 45

TABLE OF AUTHORITIES

## Cases

*41 N. 73 W., Inc. v. U.S. D.O.T.*,
  408 F. App'x 393 (2d Cir. 2010) ........................................................... 5

*Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*,
  483 F.2d 1 (5th Cir. 1973) ................................................................... 22

*Barnes v. Mathis*,
  353 S.W.3d 760 (Tex. 2011) ................................................................ 27

*Block Corp. v. Nunez*,
  No. 1:08-CF-53, 2008 WL 1884012 (N.D. Miss. Apr. 25, 2008) ......................................... 36

*Boston Air Charter v. Norwood Airport Commission, Norwood, Massachusetts*,
  FAA Docket No. 16-07-03 (Aug. 14, 2008) ........................................ 26

*City & Cnty. of San Francisco v. FAA*,
  942 F.2d 1391 (9th Cir. 1991) ........................................................... 4, 7

*Colbert v. Brennan*,
  2013 U.S. Dist. LEXIS 117077 (E.D. La. Aug. 16, 2013) ................... 40

*Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*,
  457 S.W.3d 414 (Tex. 2015) ................................................................ 27

*Flamingo Express, Inc. v. FAA*,
  536 F.3d 561 (6th Cir. 2008) ................................................................. 4

*Garcia v. Yonkers School Dist.*,
  561 F.3d 97 (2d Cir. 2009) ............................................................ 22, 32

*Hooters, Inc. v. City of Texarkana, Tex.*,
  897 F. Supp. 946 (E.D. Tex. 1995) ..................................................... 36

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ............................................................... 23

*Maxim United, LLC v. Bd. of County Comm'rs of Jefferson County*,
  FAA Docket No. 16-01-10 (April. 2, 2002) ........................................ 25

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) .......................................................... 40, 41

*Penobscot Air Serv., Ltd. v. FAA*,
  164 F.3d 713 (1st Cir. 1999) ................................................................. 7

*Pinson v. Santana*,
  2014 U.S. Dist. LEXIS 54075 (N.D. Tex. Feb. 19, 2014) ................... 38

*Queens Concerned Neighbors, Inc. v. FAA*,
  229 F.3d 387 (2d Cir. 2000) ................................................................. 7

*Sekhar v. United States*,
  133 S. Ct. 2720 (2013) ......................................................................... 2

*Sosa v. Lantz*,
  660 F. Supp. 2d 283 (D. Conn. 2009) .................................................................... 2

*Southwest Airline Co. v. U.S. Dep't of Transp.*,
  No. 15-1036 (D.C. Cir. filed Feb. 13, 2015) .......................................................... 21

*Vantico Holdings S.A. v. Apollo Mgmt.*,
  247 F. Supp. 2d 437 (S.D.N.Y. 2003) .................................................................... 38

**Statutes**

120 Stat. 2011 (2006), § 5(a) .............................................................................. 11, 24, 28

120 Stat. 2011 (2006), § 5(d)(2) .................................................................................. 29

49 U.S.C. § 40103(e) ...................................................................................... 5, 26

49 U.S.C. § 40113 .................................................................................................. 5

49 U.S.C. § 40117(k) ............................................................................................ 22

49 U.S.C. § 40117(k)(2) ........................................................................................ 6

49 U.S.C. § 47017(a) ............................................................................................ 22

49 U.S.C. § 47106(f) ............................................................................................ 22

49 U.S.C. § 47106(f)(2) ........................................................................................ 6

49 U.S.C. § 47107(a)(1) ........................................................................................ 25

49 U.S.C. § 47107(a)(4) ........................................................................................ 26

49 U.S.C. § 47107(g) ............................................................................................ 5

49 U.S.C. § 47107(h) ............................................................................................ 31

49 U.S.C. § 47122 ................................................................................................ 5

**Other Authorities**

152 Cong. Rec. S10,561-62 (daily ed. Sept. 29, 2006) .............................................. 31

AAIA, Pub. L. 97–248, 96 Stat. 324 (Sept. 3, 1982) .................................................. 4

Black's Law Dictionary (10th ed. 2014) ...................................................................... 2

FAA Airport Improvement Program Grant Histories for 2010-2014, *available at*
  http://www.faa.gov/airports/aip/grant_histories/ ...................................................... 4

FAA Grant Assurance 22a (implementing 49 U.S.C. § 47107(a)(1)) ............................ 5

FAA Grant Assurance 23 .................................................................................... 5, 26

FAA Guidance Letter 04-08, *Requirements for Airline Competition Plans* (Sep. 30, 2004) ......... 6

FAA Order 5190 .................................................................................................... 5

FAA Order 5190.6A (FAA Oct. 2, 1989) .................................................................... 25

FAA Order 5190.6B (FAA Sept. 30, 2009) ............................................................ 5, 26

FAA/OST Task Force, *Airport Business Practices and Their Impact on Airline*

*Competition* (Oct. 1999) ............................................................................... 5

H. Rep. 109-600 (2006) ................................................................................ 31

*In re City of Santa Monica*, FAA Doc. 16-02-08 (Director's Determination) (May 27, 2008) ...................................................................................................... 4

Letter from Catherine M. Lang, FAA Office of Airport Planning and Programming, to Mr. William DeCota, Port of New York and New Jersey (Aug. 28, 2001), *available at* https://www.panynj.gov/airports/pdf/FAA-Letter-August-2001.pdf ...................... 6

Reforming the Wright Amendment: Hearing Before the H. Subcomm. on Aviation, 109th Cong. 89 (July 12, 2006) ........................................................................... 31

S. Rep. 109-317 (2006) ................................................................................ 30

**Regulations**

14 C.F.R. § 158.19(b) ................................................................................... 6

14 C.F.R. § 16.109 ....................................................................................... 7

14 C.F.R. § 16.109(a) ................................................................................... 5

**INTRODUCTION**

Since 2009, Delta Air Lines has been operating only five flights per day from Dallas Love Field to its Atlanta hub, which offers passengers connecting flights to hundreds of destinations beyond.  But for Southwest Airlines, this is five flights too many.  Southwest has a virtual monopoly over Love Field.  It controls 18 of the airport's 20 gates, operates roughly 175 flights per day, and carries 93.13% of the airport's passenger traffic (with announced schedules to carry more than 97% of all flights).  Yet to hear Southwest tell it, there is no room for Delta's five daily flights.  On July 7, 2015, Southwest intends to take matters into its own hands and eliminate this last vestige of meaningful competition at Love Field by evicting Delta from the airport so that it can initiate an entirely new slate of flights.

Those actions are unlawful under a number of federal laws.  Most notably, allowing Southwest to evict Delta from Love Field would violate a December 17, 2014 directive from the General Counsel of the Department of Transportation ("DOT") requiring the City of Dallas to accommodate Delta's flight operations at Love Field.  In a filing it made *yesterday* with the Court of Appeals for the District of Columbia Circuit, Southwest acknowledged that DOT's December 17 letter issues "binding directives on the City and the Love Field signatory airlines [*i.e.*, Southwest]."  Those directives state in no uncertain terms that the City must force Southwest to accommodate Delta's five daily flights at Love Field.  Southwest's plan to evict Delta from Love Field would also cause violations of the City's statutory and contractual obligations to prevent unjust discrimination and the grant of an exclusive right at Love Field; the Five Party Agreement governing the operation Love Field; the City's commitment in its Competition Plan to accommodate Delta at Love Field; and the contracts and lease agreements that govern access to Love Field.

Beyond the fact that the City and Southwest have a legal obligation to accommodate

1

Delta, the nature of the status quo and the need for emergency interim relief to preserve that status quo are self-evident.  This Court should enter an immediate temporary restraining order preserving Delta's right and ability to continue operating its five daily flights out of Love Field and barring Southwest from interfering with the status quo while the underlying legal issues are definitively resolved in the appropriate forum.

The parties to this dispute have opposed views on the merits of the underlying legal issues, but all agree that it is imperative for this Court to issue interim injunctive relief pending a full resolution of the merits.  The City foresees "chaos" at Love Field beginning on July 7th if "passengers for two flights attempt to arrive or depart at the same gates at the same times."[1] Southwest similarly predicts an "imminent disaster" at Love Field absent this Court's intervention.[2]  The City apparently supports any form of injunctive relief, so long as it need not make its own decision, despite DOT's directive.  Both the City and Southwest encourage this Court to grant temporary interim relief to preserve the "status quo" pending final resolution of the relevant legal issues.[3]  Delta strongly agrees with the City and Southwest about the potential for "chaos" on July 7th and the need for immediate interim relief from this Court to preserve the status quo.

But Southwest's view of the "status quo" distorts that concept beyond recognition. According to Southwest, preserving the "status quo" would entail:  (1) discontinuing Delta's five daily flights after July 6th; (2) evicting Delta from the gate it currently shares; (3) "reconstructing" that gate to Southwest's new specifications; and (4) initiating an entirely new slate of flights beginning sometime in August to cities that Southwest does not currently serve

---

[1] Complaint (ECF No. 1) ¶ 79

[2] Brief in Support of Southwest's Application for a TRO (ECF No. 11) at 4; *see also id.* at 11 ¶ 18.

[3] Complaint ¶ 104; Southwest TRO Brief ¶ 39.

from Love Field.[4]  In other words, Southwest believes that this Court should preserve the "status quo" by allowing it to operate new flights to new cities, from newly remodeled facilities that currently house Delta's operations.

That argument "sounds absurd, because it is." *Sekhar v. United States*, 133 S. Ct. 2720, 2727 (2013).  The "status quo" is "[t]he situation that currently exists," Black's Law Dictionary (10th ed. 2014) (emphasis added), such that the situation on July 7th replicates the situation on July 5th, rather than a radically reconfigured situation that changes both the daily operations and the physical configuration of the airport.  *See Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (denying TRO where plaintiff sought "affirmative relief changing the status quo").  The status quo is hardly a mystery here; it is the situation that currently exists and has existed since 2009, in which Delta operates five flights per day from Love Field to Atlanta.  The proper way to preserve the status quo is for this Court to enjoin both Southwest and the City from interfering with Delta's leased facilities or operations while resolution of this dispute proceeds.

Delta's overwhelming likelihood of success on the merits further buttresses the need to preserve the status quo in this manner.   In exchange for tens of millions of dollars in federal funds, the City has agreed to comply with both statutory obligations and grant conditions relating to the operation and use of Love Field, including binding obligations prohibiting unjust discrimination or exclusive access to airport facilities.  The General Counsel of the DOT has twice advised the City, in writing, that the failure to accommodate new entrants such as Delta on reasonable terms would violate these binding federal commitments.  The City has even acknowledged that DOT has told the City that federal law "require[s] the City to provide long-term gate accommodation to Delta at Love Field gates leased by Southwest . . . ."  And the

---

[4] Southwest TRO Brief ¶¶ 8–16.

contracts and lease agreements that govern access to Love Field clearly and explicitly contemplate the possibility that one or more carriers may need to be accommodated on another carrier's gates.  Indeed, the City's own Competition Plan update from 2009 is explicit that the City "will accommodate Delta based on the gate share provisions of" the City's lease agreements.

Despite its newfound ambivalence, the City has assured Delta on many previous occasions that it would follow DOT's directives and ensure that Delta's flights were accommodated on reasonable terms—representations upon which Delta directly relied in planning its operations and selling tickets to thousands of customers.  The City had it right the first time: federal and state law and the relevant agreements governing Love Field make it crystal clear that the City must operate Love Field for the benefit of the traveling public at large, not for the benefit of a single carrier.  Delta unquestionably has a right to the ongoing accommodation of its scheduled flights at Love Field.

If this Court does not enjoin Southwest from evicting Delta from its current flights at Love Field, Delta will suffer immediate and irreparable harm.  Southwest seeks to eliminate all five flights that Delta flies out of Love Field.  As a result, if Delta does not receive injunctive relief, every single passenger who is booked on Delta's flights after July 7—approximately 20,000 passengers—will have his or her flight cancelled, with a need to rebook on short notice.  That mass cancellation will cause significant harm to Delta's operations, to say nothing of the operational disaster caused by a last-minute need to accommodate 20,000 people at a different airport on different flights.  In contrast to Delta, Southwest can ameliorate any minimal inconvenience to its passengers of having to proceed with 175 flights rather than 180 by making minor adjustments to its schedule.  As a result, the balance of harms strongly favors granting

4

injunctive relief to Delta and denying such relief to Southwest.  Moreover, the public interest is best served by preserving the limited competition that Delta is able to introduce to Southwest's near-monopoly at Love Field, and by avoiding the mass cancellations that Southwest's desired strategy would cause.

Finally, Southwest's claim that it will not be able to execute its planned flight-schedule expansion if Delta is allowed to continue operating at Love Field is demonstrably false.  Before the City filed this lawsuit, Southwest offered to accommodate Delta at Love Field beyond July 6 if Delta would agree to give Southwest gate space at other airports or pay an exorbitant fee.  By its own admission, then, Southwest *could* accommodate Delta at Love Field without disrupting its own operations.  Southwest does not want to, but its desire to make an anti-competitive power play at Love Field is not enough to overcome the binding force of DOT direction and other federal law. This Court should deny Southwest's motion for temporary restraining order, grant Delta's motion for a temporary restraining order, and enjoin Southwest from interfering with the status quo in which Delta operates five daily flights from Love Field to Atlanta.[5]

**BACKGROUND AND FACTS**

I.   **The Federal Aviation Administration has plenary authority to regulate federal grant funding for airports and to enforce the promises airport sponsors make as a condition of accepting federal funding.**

DOT and its operating administration, the Federal Aviation Administration ("FAA"), exercise plenary and preemptive authority over federally funded airports like Dallas Love Field. To receive funding under the Airport Improvement Program ("AIP"), a federal funding program

---

[5] For the convenience of the Court and the parties, and so as to streamline the briefing process in this expedited proceeding, Delta is filing this single, consolidated motion and response to Southwest's motion instead of separately filing a motion and a response.  Counsel for Delta conferred with counsel for Southwest before filing, and Southwest does not oppose this consolidated filing.  The length of this consolidated filing is less than the combined length allowed under the Local Rules for a motion and a response.

created by the Airport and Airway Development Act of 1982 ("AAIA"), 49 U.S.C. § 47101, et

seq., an airport sponsor must agree to comply with statutory obligations and over three dozen

grant assurances relating to the operation and use of the airport.

The FAA oversees federal financial assistance for the development of public-use airports

under the AIP.  Federal law mandates that the FAA administer the AIP in a manner consistent

with "fostering competition, preventing unfair methods of competition in air transportation,

maintaining essential air transportation, and preventing unjust and discriminatory practices."

AAIA, Pub. L. 97–248, 96 Stat. 324 (Sept. 3, 1982).

Love Field has received over $38 million in AIP funding over the last five years and

imposes and uses Passenger Facility Charges ("PFCs") to fund FAA-approved projects.[6]  As a

result, Love Field, like other AIP participants, is subject to more than dozen contractual

obligations known as "grant assurances" regarding the operation and use of the airport.  When an

airport sponsor such as the City accepts an AIP Grant, the grant assurances "become binding

obligations between the airport sponsor and the Federal government."  *Flamingo Express, Inc. v.

FAA*, 536 F.3d 561, 563 (6th Cir. 2008) (quotations omitted)); *see also City & Cnty. of San

Francisco v. FAA*, 942 F.2d 1391, 1396 (9th Cir. 1991).  These grant assurances "are important

factors in maintaining a high degree of safety and efficiency in airport design, construction,

operation and maintenance, as well as ensuring the public reasonable access to the airport."  *In re

City of Santa Monica*, FAA Doc. 16-02-08 (Director's Determination) (May 27, 2008).

For example, the grant assurances require that airport sponsors must agree to maintain the

airport to meet FAA safety standards and to ensure that airport land is used in a way that is

---

[6]   FAA   Airport   Improvement   Program   Grant   Histories   for   2010-2014,   *available   at*
http://www.faa.gov/airports/aip/grant_histories/.  The total amount of AIP funding received may be approximately
$23 million.  The FAA grant histories list 3 grants for $7.9 million for "apron rehabilitation" during that time frame.

compatible with airport use.  Most importantly for this case, grant assurances require the airport

sponsor to make the airport available "as an airport for public use on reasonable terms and without

unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial

aeronautical activities offering services to the public at the airport." FAA Grant Assurance 22a

(implementing 49 U.S.C. § 47107(a)(1)).[7]  This obligation exists whether "an air carrier or user

is a tenant, subtenant, or nontenant," FAA Order 5190, ¶ 9.1(a), and an airport sponsor "may not

deny an air carrier access solely based on the nonavailability of existing facilities." *Id.* ¶ 9.8.  An

airport sponsor also must ensure, as a matter of grant assurances and a stand-alone statute, 49

U.S.C. 40103(e), that it does not directly or indirectly grant *any* carrier an exclusive right to use

an airport.  49 U.S.C. § 40103(e); Grant Assurance 23; FAA Order 5190.6B, ¶ 8.2.  Under this

prohibition, airport sponsors may not "claim[] lack of gate availability when, in fact, gates are

not fully utilized; relinquish[] control of airport facilities to incumbent carriers for purposes of

negotiating access with a new entrant; [or] permit[] unreasonable sublease fees or conditions to

be imposed on new entrants."[8]

The Secretary of Transportation is responsible for ensuring an airport sponsor's

compliance with its grant assurances and related statutory obligations to provide access, 49

U.S.C. § 47107(g).  That responsibility is delegated to the FAA Administrator, who is vested

with jurisdiction over monitoring and enforcing grant assurances, and for monitoring and

enforcing compliance with the prohibition on exclusive rights, 49 U.S.C. § 40113.  The FAA

"enforces compliance with . . . Grant Assurances by applying procedures delineated in" 14

C.F.R. Part 16.  *41 N. 73 W., Inc. v. U.S. Dep't of Transp.*, 408 F. App'x 393, 396 (2d Cir. 2010).

---

[7] *See also* Declaration of Holden Shannon ("Shannon Decl.") ¶ 17, Ex. J.

[8] FAA/OST Task Force, *Airport Business Practices and Their Impact on Airline Competition* (Oct. 1999).

If the FAA finds an apparent violation of these statutory obligations or grant assurances, the FAA may issue a cease and desist order, a compliance order, or an order imposing various types of penalties including termination of the airport's eligibility for grants, suspension of the payment of grant funds to the airport, or withholding approval of any new grant applications. *See* 49 U.S.C. § 47122; 14 C.F.R. § 16.109(a). Federal law mandates that the FAA administer the AIP in a manner consistent with "fostering competition, preventing unfair methods of competition in air transportation, maintaining essential air transportation, and preventing unjust and discriminatory practices." AAIA, Pub. L. 97–248, 96 Stat. 324 (Sept. 3, 1982).

Two particular components of the DOT's and FAA's authority are most relevant here: the requirement that the airport sponsor submit a competition plan, and the deference due to the FAA's decisions.

### A.       Competition plan requirement

The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), Pub. L. 106-181, requires that the City submit an acceptable competition plan to the Secretary of Transportation before it can impose a new PFC or receive grants under the AIP, 49 U.S.C. §§ 40117(k) and 47106(f). The Secretary is charged with reviewing competition plans "from time-to-time to ensure that each covered airport successfully implements its plan." 49 U.S.C. § 40117(k)(2). The Secretary has delegated the responsibility to review and approve competition plans to the FAA. *See* 14 C.F.R. § 158.19(b).

A competition plan must include, among other things, "information on the availability of airport gates and related facilities, leasing and sub-leasing arrangements, gate-use requirements, and gate-assignment policy." 49 U.S.C. § 47106(f)(2). As interpreted by the FAA, AIR-21 requires an airport's competition plan to include a discussion of the "process for accommodating new service and for service by a new entrant" and "[p]lans to make gates and related facilities

8

available to new entrants or to air carriers that want to expand service at the airport and methods of accommodating new gate demand by air carriers." FAA Guidance Letter 04-08, *Requirements for Airline Competition Plans* (Sep. 30, 2004). The FAA consistently has interpreted the competition plan requirements as focusing on individual airports – not airport systems or metropolitan area – when assessing availability of gates for new entrants.[9] And Love Field itself—not the Dallas/Fort Worth Metropolitan Area—is subject to its own requirement to submit and make commitments in its airport competition plan.

### B.    Deference to DOT and FAA interpretations

As the agency responsible for interpreting and enforcing federal aviation law, including the grant assurance and competition plan requirements of the AAIA and AIR-21, the FAA is entitled to substantial deference when doing so. *See Queens Concerned Neighbors, Inc. v. FAA*, 229 F.3d 387, 394 (2d Cir. 2000) (holding that FAA's interpretation of statutory PFC requirements was due *Chevron* deference); *Penobscot Air Serv., Ltd. v. FAA*, 164 F.3d 713, 725 n.12 (1st Cir. 1999) (holding that FAA's interpretation of what constituted grant of exclusive right was entitled to *Chevron* deference); *City & Cnty. of San Francisco*, 942 F.2d at 1396 ("The FAA's interpretation of what constitutes unjust discrimination within the meaning of [the AAIA] will be upheld unless it is unreasonable."). The FAA has authority to issue administrative cease and desist orders that prohibit an airport sponsor from acting in manner contrary to the airport sponsor's obligations under federal law. 14 C.F.R. § 16.109.

---

[9] Letter from Catherine M. Lang, FAA Office of Airport Planning and Programming, to Mr. William DeCota, Port of New York and New Jersey (Aug. 28, 2001) ("We note that the focus of the competition plan requirement . . . is on individual airports, rather than airport systems. Therefore, we must, in reviewing your plan for [the airport], focus on conditions at that airport."), *available at* https://www.panynj.gov/airports/pdf/FAA-Letter-August-2001.pdf.

II.     **The City is required to promote competition at Love Field by allowing non-incumbent carriers such as Delta to serve the airport whenever possible.**

A.      **The Five Party Agreement requires the City to accommodate Delta.**

Much of the factual backdrop relevant this dispute arose in response to the now-repealed Wright Amendment.   Commercial air service started at Love Field in 1929.   In 1969, before beginning construction of the Dallas/Fort Worth International Airport ("DFW"), all of the airlines then operating at Love Field signed agreements to relocate their flights to DFW when it opened.   In 1971, Southwest started operating at Love Field, initially providing service only within Texas.   When the City and the City of Fort Worth ("Fort Worth") opened DFW in 1973, Southwest remained at Love Field, while the other airlines moved to DFW.   In 1978, Congress deregulated the airline industry, and Southwest began planning to offer flights from Love Field to points outside of Texas.   In 1979, however, Congress passed the Wright Amendment, which amended the Federal Aviation Act to prohibit service by medium and large aircraft (more than 56 seats) between Love Field and any point outside of Texas and its four surrounding states (Arkansas, New Mexico, Louisiana, and Oklahoma).   Later amendments to the Wright Amendment added Alabama, Kansas, Mississippi, and Missouri to the Love Field service area.

In response to calls for further liberalization or elimination of flight restrictions at Love Field, the Cities of Dallas and Fort Worth, the DFW International Airport Board, Defendant American Airlines, and Southwest entered into an agreement (the "Five Party Agreement") on July 11, 2006, to govern future operations and development at Love Field.   Among other things, the Five Party Agreement sought the enactment of legislation that would amend, and ultimately repeal, the limitations on Love Field operations imposed by the Wright Amendment.[10]   In

---

[10]  Shannon Decl. ¶ 16, Ex. N.

exchange for lifting these limitations, the Five Party Agreement called for the reduction of gate capacity at Love Field, from 32 to 20 gates, which the agreement allocated among Southwest (16 gates), American (2 gates), and ExpressJet Airlines, Inc. (2 gates, which were later acquired by Defendant United Airlines).

In the Five Party Agreement, the City agreed, and is obligated, to seek forced accommodation of new entrant carriers at Love Field. Specifically, the Five Party Agreement provides that "[t]o the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas *agrees to require* the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements."[11]

### B. The Airport Use and Lease Agreements require the City to accommodate Delta.

The details and logistics of the City's obligation to force accommodation at Love Field are spelled out in the Airport Use and Lease Agreements the City has entered into with three carriers—Southwest, American, and United Airlines (collectively, the "Lease Agreements").[12] The Lease Agreements "define and allocate the Airport's gates" and include "provisions that are consistent with accomplishing the terms of the Five Party Agreement."[13]  Under § 4.06 of the Lease Agreements, if "a new entrant carrier seeks to begin service at" Love Field, the City is obligated to "seek voluntary accommodation from its existing airline lessees to accommodate the

---

[11] *Id.*, Article I.3.b (emphasis added).

[12] *See, e.g.*, Shannon Decl. ¶ 2, Ex. O. The terms of the three Airport Use and Lease Agreements are "essentially identical." Complaint at 18 ¶ 44.

[13] Shannon Decl. ¶ 2, Ex. O, at 2.

new entrant service."[14]   And "[i]f the existing carriers are not able or are not willing to accommodate the new entrant service, then the City *agrees to require* the sharing of" the incumbent airlines' leased gates.[15]   In addition, section 14.09 of the Lease Agreement expressly incorporates the airport grant assurances into the Lease Agreement and makes the Lease subordinate to those grant assurances.[16]

Section 4.06(F) of each of the Lease Agreements contains a scarce-resource provision that acknowledges that Love Field's facilities "may become a scarce resource if a new entrant airline ('Requesting Airline') requests to provide service at the Airport"[17] and lays out a four-step process through which a potential new entrant carrier may seek accommodation at Love Field:

1) The requesting airline must seek voluntary accommodation by attempting to secure gate space and other necessary facilities on a voluntary basis from one of the incumbent airlines at Love Field.[18]

2) If the requesting airline has contacted all of the incumbent airlines and exhausted all reasonable efforts to secure voluntary accommodation, the requesting airline may notify the City's Director of Aviation, who in turn must "notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner."[19]

3)  At the end of that 30-day period, if none of the incumbent airlines have agreed to voluntarily accommodate the requesting airline, the City is obligated to "select a Signatory Airline to accommodate the Requesting Airline" and send a written notice to that Signatory Airline requiring accommodation within 30 days of receipt of the notice.[20]

---

[14] *Id.* at 22 § 4.06(D)(4)

[15] *Id.* (emphasis added)

[16] *Id.* at 65 § 14.09.

[17] *Id.* at 22 § 4.06(F).

[18] *Id.*

[19] *Id.* at 22 § 4.06(F)(2).

[20] *Id.* at 23 § 4.06(F)(3).  Although section 4.06(F)(3) states that the Director "may select a Signatory Airline to
*(Cont'd on next page)*

4) At the end of that second 30-day period (in other words, 60 days after the requesting airline first provides notice to the City's director of aviation), the incumbent airline that has been selected for accommodation must accommodate the requesting airline by sharing a portion of its leased gates and allowing the requesting airline to operate flights out of that shared gate space.[21]

Thus, under the Lease Agreements, when a new entrant airline makes an exhaustive but unsuccessful effort to seek voluntary accommodation from incumbent carriers, the City is subject to a mandatory duty to force accommodation of the new entrant.

### C.   The Wright Amendment Reform Act of 2006 codifies into federal law the City's obligation to accommodate new entrants such as Delta.

On October 13, 2006, Congress enacted the Wright Amendment Reform Act of 2006, Pub. L. No. 109-352, 120 Stat. 2011 (2006) (the "Reform Act").  The Reform Act codified into federal law many of the most important provisions of the Five Party Agreement.  It permanently capped the number of Love Field gates at 20 and provided that the limitations on nonstop flights at Love Field would expire in eight years on October 13, 2014.  Once the limitations were lifted, air carriers would be able to fly nonstop from Love Field to any state in the United States.

Section 5(a) of the Reform Act requires the City to "determine the allocation of leased gates and manage Love Field in accordance with" the provisions of the Lease Agreements.[22] This includes an express requirement that the City must "accommodate new entrant air carriers"

---

*(Cont'd from previous page)*

accommodate the Requesting Airline," the "may" is permissive only if accommodating the requesting carrier would "unduly interfere" with the incumbent's operating schedule; otherwise, the incumbent has "agree[d] to accommodate" requesting airlines. *Id.* at 22 § 4.06(F).

[21] *Id.* at 23 § 4.06(F)(4).

[22] *See* Reform Act § 5(a).  The Reform Act technically requires the City to manage Love Field "in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006." *Id.*  But the leases that were in effect as of the Reform Act's effective date were amended and restated in 2008 and 2009 into the Airport Use and Lease Agreements. *See* Complaint at 17–18 ¶¶ 41–43.

13

by "honor[ing] the scarce resource provisions of the existing Love Field leases."[23]   Section 5(a) thus codifies into federal law the City's obligation under the Lease Agreements to force accommodation of new entrant carriers at Love Field.

Section 5(e) of the Reform Act explicitly reserves to the FAA its jurisdiction to enforce grant assurance and statutory obligations related to grant assurance compliance and the prohibition on exclusive rights.  ("Nothing in this Act shall be construed . . .(e) to limit the authority of the Federal Aviation Administration or any other Federal agency to enforce requirements of law and grant assurances . . . that impose obligations on Love Field to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field.")

### D.   The City's Competition Plan for Love Field requires accommodation of Delta.

The City has repeatedly acknowledged and confirmed that when new entrant airlines wish to begin providing service at Love Field, the City is obligated to force accommodation if necessary in order to promote competition.

The City filed its initial Love Field Competition Plan (the "Competition Plan") on July 31, 2001.  In its plan, the City "recognize[d] that, by having accepted Federal grants, it has undertaken a legal obligation to provide reasonable air carrier access at Love Field."[24]  The City further recognized that its leases with incumbent carriers "include gate-sharing provisions . . .

---

[23] *See* Reform Act, § 5(a).

[24] City of Dallas, Airline Competition Plan at 2 (July 31, 2001), available at http://www.dallas-lovefield.com/pdf/CompetitionPlan.pdf.

*requiring* accommodation of other airlines within the lease premises of the incumbent airlines."[25]

In an update to its Competition Plan filed in February 2005, the City once again acknowledged its obligation "to make all reasonable efforts to accommodate carriers seeking to provide service at Love Field," "reiterated its willingness to enforce the gate sharing provisions of the leases to make space available to" potential new entrants, and stated that it "continue[s] to be committed to ensuring that any carrier seeking to provide service to Love Field receives reasonable access to needed facilities."[26]

The City filed another update to its Competition Plan in June 2009, and in that update the City specifically acknowledged its obligation to use the scarce-resource provision of the Lease Agreements to force accommodation of Delta at Love Field.  The City reaffirmed its general commitment "to accommodating new entrants" and explained that "[i]n the future, the City intends to accommodate requests for access by applying the gate sharing provisions contained in the current lease—provisions which have been incorporated in Section 4.06F of the new Restated Lease."[27]   Moreover, at the time of the 2009 update Delta had informed the City of its intent to provide service at Love Field, and the City's update included a specific plan to accommodate Delta.  The City represented that "[o]nce the terminal redevelopment is completed, *the City will accommodate Delta* based on the gate sharing provisions of the preferential use lease."[28]

**III.    The City has repeatedly promised that it will—and DOT has repeatedly directed that the City must—accommodate Delta at Love Field.**

Delta currently offers five daily flights from Love Field to its hub, Atlanta's Hartsfield-Jackson International Airport.  Delta has been operating out of Love Field since the summer of

---

[25] *Id.* at 6 (emphasis added).

[26] Shannon Decl. ¶ 15, Ex. L at 1, 4.

[27] Shannon Decl. ¶ 15, Ex. M at 4–5.

[28] *Id.* at 5 (emphasis added).

2009, when it subleased a gate from American Airlines.  Delta's sublease with American was extinguished as a result of the 2013 merger between American and US Airways.  As a condition of its approval of the merger, the Department of Justice announced in November 2013 that American would be required to divest its two gates at Love Field.  In May 2014, Defendant Virgin America announced that the City had approved Virgin's request to sublease the two Love Field gates American was divesting.  Accordingly, Delta's sublease at Love Field would terminate on October 12, 2014.

### A.     The City has promised to accommodate Delta at Love Field.

In its complaint, the City incorrectly states that Delta first requested accommodation at Love Field "[o]n or about September 18, 2014."[29]  In actuality, Delta first began seeking accommodation from the City under the Five Party Agreement and the Lease Agreements in June 2014.  Delta began the four-step accommodation process set out in the scarce-resource provisions of the Lease Agreements by seeking voluntary accommodation from the incumbent airlines.  In June 2014, Michael Anastas, a Regional Director for Delta, sent letters to United Airlines, Southwest Airlines, and American Airlines formally seeing voluntary accommodation of Delta's scheduled services at Love Field under § 4.06(F) of the Lease Agreements between the airport and each of these carriers.  Mr. Anastas also notified Mark Duebner, the City's Director of Aviation at Love Field, that Delta was beginning the process of seeking voluntary accommodation from the three incumbent carriers.[30]  On July 16, 2014, Delta provided written notice to the City that Delta had contacted all three signatory carriers, that none was willing to voluntarily accommodate Delta at Love Field, and that Delta thus had exhausted all reasonable

---

[29] Complaint at 22 ¶ 55.

[30] Shannon Decl. ¶ 4.

efforts to secure accommodation.  Delta also formally requested forced accommodation from the City.[31]

Delta expected that the City would live up to its end of the bargain under the Lease Agreements and under federal law by notifying the three incumbent carriers of the need to accommodate Delta and—if none of them was willing to do so voluntarily—requiring one of the three to accommodate Delta under § 4.06(F)(2) of the Lease Agreements.   And indeed, throughout the summer and fall of 2014, the City repeatedly represented to Delta that it intended to do exactly that:

- On June 13, 2014, Mark Duebner (the City's aviation director) and Michael Anastas (a Delta regional director) spoke by telephone about Delta's request and need for accommodation, and Mr. Duebner assured Mr. Anastas that Duebner would do everything in his authority to make sure the City accommodated Delta.

- In a follow-up phone conversation on June 22, 2014, between Mr. Duebner and Holden Shannon (a Senior Vice President for Delta), Mr. Duebner committed to Mr. Shannon that the City would accommodate Delta's existing schedule.

- During August and September, 2014, Delta representatives participated in meetings with Love Field staff to prepare for Delta's accommodation at one or more of the gates of the incumbent carriers.  One of these meetings occurred on Thursday, September 11, 2014.  At the meeting, the City represented and committed that it would require United to accommodate Delta.  Mr. Duebner told Mr. Anastas, "I will notify United tomorrow, Monday at the latest, and tell them they need to accommodate Delta so you can plan your move."

- During a telephone conversation on September 18, 2014, Mr. Duebner committed to Mr. Shannon that the airport would find a way to accommodate Delta's existing schedule of five daily flights from Love Field to Atlanta.

- On September 19, 2014, Mr. Duebner and Mr. Anastas spoke by telephone, and Mr. Duebner represented to Mr. Anastas that he had notified United that it would be required to accommodate Delta.

- On September 22, 2014, Mr. Duebner twice committed to Mr. Anastas that the City would require United to accommodate Delta after Delta's sublease with American expired on October 12, 2014.[32]

---

[31] Shannon Decl. ¶ 4, Ex. E.

[32] Shannon Decl. ¶ 18.

Despite the City's repeated promises that it would accommodate Delta's expanded operations at Love Field, on Monday, September 29, Mr. Duebner sent Delta a letter reneging on the City's promise and informing Delta for the first time that the City would not accommodate Delta at Love Field.[33]   In his letter, Mr. Duebner also stated that United and Southwest had entered into a Gate Use License Agreement under which United would assign some of its gate space to Southwest.[34]

Even though Delta had formally notified the City of its request for forced accommodation on July 16, 2014, and Section 4.06(F)(2) of the Lease Agreements required the City to act on that request within thirty days, the City still had not acted on Delta's request in early October 2014. With its sublease from American set to expire on October 12, 2014, Delta had no choice but to enter into a short-term agreement that would allow Delta to continue operating at Love Field. Accordingly, on October 10, 2014, Delta entered into a Gate Use License Agreement with Southwest and a Facilities Use License Agreement with United, the combined effect of which was to allow Delta to continue operating at Love Field until January 6, 2015.  Delta signed these agreements—even though the economic terms did not comply with DOT requirements and were less favorable than the terms the City offered Southwest—because they were the only way Delta could avoid disruption of its scheduled service, displacement of its traveling customers, and irreparable harm to its business reputation and good will.

In November 2014, the City notified Delta, Southwest, United, and Virgin that it intended to develop a Love Field accommodation policy to use on Delta's pending accommodation request.  In connection with that effort, the City retained an aviation-industry consultant to

---

[33] Shannon Decl. ¶ 3, Ex. D.

[34]   *Id.*

analyze and model gate-space availability and gate utilization at Love Field.  The City presented the preliminary results of the consultant's analysis in a November 20, 2014 meeting with the four carriers.  The consultant's analysis concluded that as of November 5, 2014, it was possible and feasible for Love Field to accommodate Delta's five daily flights.

The City announced its accommodation policy less than two weeks later, on December 1, 2014.  The City's policy confirms that the City will begin its accommodation analysis by determining "a 'Snapshot Date' that will start the time period for assessing reasonable accommodation."[35]  Although City policy sets the Snapshot Date at the day of the request, the City has represented in writing that it will treat November 5, 2014, as the Snapshot Date for purposes of evaluating Delta's request for accommodation.[36]  Delta has consented to and relied on the City's use of November 5, 2014, as the Snapshot Date.

Once a Snapshot Date is selected, the City's policy requires the City to "determine what schedule will be used for assessing scheduled operations.  Normally, this will be the schedule for the six months following the Snapshot Date"[37]  With the City's having selected November 5, 2014, as the Snapshot Date, City policy indicates that the City should assess Southwest's scheduled operations based on Southwest's schedule from November 5, 2014, to May 4, 2015.  During that six-month window, Southwest was operating between 149 and 153 flights per day out of sixteen gates at Love Field.  Given that each gate at Love Field can accommodate at least ten flights per day, Southwest could accommodate Delta's five daily flights on one of its sixteen leased gates without any disruption to or interference with its operations.  Moreover, Southwest acquired even more gate capacity when it subleased two gates from United in April 2015.

---

[35] Shannon Decl. ¶ 6, Ex. A, Accommodation Criteria & Allocation System at 1.

[36] Shannon Decl. ¶ 3, Ex. B.

[37] Shannon Decl. ¶ 6, Ex. A, Accommodation Criteria & Allocation System at 1.

At the same time the City announced its Love Field accommodation policy, the City renewed its promise to accommodate Delta at Love Field.  In a December 1, 2014 letter to Delta, Southwest, and Virgin America, the City acknowledged that Delta had exhausted all reasonable efforts to secure voluntary accommodation and formally initiated the 30-day countdown contemplated by Section 4.06 of the Airport Use and Lease Agreements.[38]  The City instructed each of the three incumbent carriers to "consider whether it can accommodate Delta's request" for accommodation and represented to the incumbent carriers and Delta "that if Delta has not been accommodated within 30 days, *the City will select a signatory airline to comply with Delta's accommodation request* in a non-discriminatory manner to the extent that accommodation will not unduly interfere with the signatory airline's operating schedule."[39] The City reiterated that "[o]n December 31, 2014, if we have not received notification that Delta has been voluntarily accommodated, *the City will make a mandatory accommodation* as provided in the Use and Lease Agreement."[40]

### B.      DOT has directed the City to accommodate Delta at Love Field.

In early December 2014, the City sought additional direction from DOT on how to handle Delta's request for long-term accommodation at Love Field and comply with its federal obligations.  On December 17, 2014, DOT provided the City with binding, enforceable direction in the form of a letter to the City from its general counsel, the Honorable Kathryn B. Thomson. In its December 17 letter, DOT clarified four important points concerning the existence and contours of the City's accommodation obligation.

First, DOT's December 17 letter confirmed that the City is obligated under existing

---

[38] Shannon Decl. ¶ 3, Ex. B at 2 (emphasis added).

[39] *Id.* (emphasis added).

[40] *Id.* (emphasis added).

federal law to accommodate Delta at Love Field: "Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signature carrier, *the City will accommodate the requesting carrier* to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers."[41]

Second, DOT specified that the determination of whether accommodation is "possible given the current gate usage" should be made "based on the available space on the snapshot date of the original accommodation request."[42]  Thus, if an incumbent carrier announces plans for a future increase in service *after* receiving a request for accommodation, the City should not consider those planned future service increases when determining whether accommodation is possible.  A flight may be considered as part of the accommodation analysis only if it was either "current[ly]" operated or part of the signatory carrier's "already-announced, for-sale services" as of the date of the accommodation request.

Third, DOT clarified that the City was required to provide accommodation on a long-term basis and could not make Delta's right to operate at Love Field subordinate or secondary to the right of any incumbent carrier:

> With respect to the length of the accommodation, for the accommodation to be meaningful at [Love Field], it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights. Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date.[43]

The City thus has a continuing "responsibility to continue the accommodation and ensure that

---

[41] Shannon Decl. ¶ 11, Ex. I.

[42] *Id.*

[43] *Id.*

space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis."[44]

Finally, DOT's December 17 letter reaffirms that "[t]he City must also ensure that the accommodation is at reasonable rates."[45]  Specifically, DOT's "competition plan policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus" an reasonable allowance for administration not to exceed 25%, "are reasonable."[46]

The City thus received exactly the kind of clear, unequivocal guidance from DOT that it had requested in early December.  Yet the City did nothing.  The City had promised in its December 1 letter that it would "make a mandatory accommodation" on "December 31, 2014," unless it received a notice of voluntary accommodation.  The City did not receive a notice of voluntary accommodation at any point during December 2014.  Yet December 31, 2014, came and went without the City's honoring its promise and making a mandatory accommodation.

With Delta's Gate Use and Facilities Use License Agreements expiring on January 6, 2015, the City's failure to make good on its promise to force accommodation by the end of December left Delta with no choice but to again enter into a short-term agreement that would enable it to continue operating out of Love Field.  Accordingly, on January 6, 2015, Delta entered into two agreements with United that allowed Delta to continue operating at Love Field until July 6, 2015.

On January 5, 2015, the City made still another promise to accommodate Delta at Love Field.  In a letter to Delta, the DOT, Southwest, and United, the City explained that its preference

---

[44] *Id.*

[45] *Id.* at 3.

[46] *Id.*

was to see "the carriers [] reach a permanent consensual resolution concerning Delta's request for gate accommodation" so that the City would "not hav[e] to mandate accommodation" but reiterated and reaffirmed that the City "will continue our mandatory accommodation process unless informed by carriers that it is no longer necessary."   The referenced "mandatory accommodation process" is the process begun by the City's December 1, 2014 letter, in which the City promised that "it will make a mandatory accommodation" of Delta at Love Field.

On January 28, 2015, the City yet again promised to accommodate Delta at Love Field. Throughout the time that Delta has been seeking accommodation at Love Field, Southwest has been seeking to further entrench its status as the dominant carrier at the airport by permanently subleasing two gates from United (thereby giving Southwest control over 18 of the 20 gates at Love Field).  The Lease Agreements require the City to consent to any sublease at Love Field. The City provided its written consent to the United–Southwest sublease on January 28, 2015.[47]

The City missed a golden opportunity to resolve this dispute by conditioning its consent to the sublease on Southwest's agreeing to accommodate Delta at Love Field.  Even though Delta's request for accommodation had been pending for more than seven months, the City simply gave an unconditional consent to the sublease.  In its consent, however, the City represented that it was treating the DOT's December 17, 2014 letter "as promulgating final and binding directives" that governed the City's handling of the "request for accommodation at Love Field by Delta." The DOT's December 17, 2014 letter stated that the DOT expected the City to accommodate Delta at Love Field if possible.[48] As explained above, it is possible to accommodate Delta at Love Field.  Thus, the City's statement in its written consent is an acknowledgement and a

---

[47]   Shannon Decl. ¶ 13, Ex. K.

[48]   Shannon Decl. ¶ 11, Ex. I.

representation that the City is subject to and will comply with the DOT's binding directive that Delta should be accommodated at Love Field.

Over the next several months, Delta continued to ask the City to honor its repeated promises and adhere to DOT's directive by accommodating Delta at Love Field.[49]   And Delta advised the City repeatedly, including by email on May 25, 2015, that Delta was relying on the City's repeated representations that the City intended to force accommodation at Love Field.

The City insisted that it needed still more guidance from DOT before it could make a final decision on how to proceed.   On June 15, 2015, DOT responded to the City's request for additional guidance by sending the City a second letter, which confirmed that uncertainty about what needed to happen at Love Field existed only in the City's mind: "We believe that the [December 17] letter provided sufficient guidance to permit the City to assess and make a reasonable determination regarding Delta's requests."[50] The June 15 letter also confirmed that the City's obligation to accommodate Delta is a matter of federal law—specifically, it flows from: the AIP grant-assurances statute, 49 U.S.C. § 47017(a); the AIP grant agreements; and the competition-plan statute, 49 U.S.C. §§ 40117(k), 47106(f).[51]   DOT also reiterated the common-sense, competition-promoting proposition that "a dominant signatory carrier should not be able to block a requesting carrier from accessing Love Field by announcing future plans to expand service [] after an accommodation request is made."[52]   DOT concluded by confirming for the City that DOT expected the City "to carry out, in a reasonable and timely fashion, the

---

[49] Shannon Decl. ¶ 8, Ex. G.

[50] Shannon Decl. ¶ 12, Ex. J at 1.

[51] *Id.* at 2.

[52] *Id.* at 3.

accommodation efforts we described in our December 17 letter."[53]   The City responded to DOT's letter by initiating this lawsuit.

ARGUMENT

The Court should enter a temporary restraining order freezing the status quo and thereby allowing Delta to continue operating its limited schedule of five daily flights from Love Field to Atlanta pending final resolution of this proceeding. To secure either a temporary restraining order or a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *E.g.*, *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted). "The purpose of a temporary restraining order is to preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009).   Likewise, "[a] preliminary injunction's function is simply to preserve the status quo until the merits can be adjudicated." *Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973).   The status quo is not defined by the parties' existing *legal rights*.   It is defined by "the reality of the existing status and relationships between the parties," regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights. *Dominion Video Satellite v. EchoStar Satellite*, 269 F.3d 1149, 1155 (10th Cir. 2001)

Delta readily satisfies the criteria for issuance of a temporary restraining order or preliminary injunction.   This Court should accordingly preserve the status quo pending final

---

[53] *Id.*

resolution of this complex, multi-party dispute by ensuring that Delta is able to continue operating its current schedule of flights beyond July 6th despite Southwest's threats to evict Delta from Love Field.  Delta simply seeks to continue operating *beyond* July 6th the exact same flight schedule that it was operating *before* July 6th, which is the very definition of maintaining the status quo.  Southwest, in contrast, contemplates a TRO or injunction that would radically *change* the status quo by terminating all of Delta's flights, evicting Delta from Love Field, changing the physical configuration of the gate Delta currently uses, and initiating a slate of all-new flights beginning in August.  This Court should grant Delta's motion, deny Southwest's motion, and ensure that the *current* schedule of flights at Love Field is not disrupted while this case is proceeding.

I.   **There is a substantial likelihood that Delta will succeed on the merits because federal law gives Delta the unequivocal right to continue operating at Love Field.**

Delta is substantially likely to prevail on its claim that DOT's December 17 letter requires the City to force Southwest to accommodate Delta's continued operation of five flights per a day at Love Field.  Delta has a clear right under federal law to continue operating at Love Field.  This is evident not only in the plain meaning of the grant assurances, federal statutory obligations, Five Party Agreement, the City's representations to Congress, and the City's representations to DOT in its Competition Plan, but most recently on the face of DOT's December 17 letter, which explains that DOT expects that "*the City will accommodate the requesting carrier* to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers."[54]  Undisputed evidence—including the findings and analysis of the City's own consultant—establishes that it is possible to

---

[54] Shannon Decl. ¶ 11, Ex. I at 2 (emphasis added).

accommodate Delta at Love Field without impacting the services Southwest was offering or had announced as of the City's selected snapshot date of November 5, 2014.[55]   In light of this evidence, DOT's December 17 letter is an unconditional directive requiring the City to accommodate Delta.

In its complaint, the City repeatedly concedes that DOT's December 17 letter and June 15 letter require the City to accommodate Delta at Love Field:

- "In the DOT Letters, the Federal Agencies direct the City to 'continue accommodation of Delta and ensure that space is available so that Delta is able to maintain its pattern of service on an ongoing basis."[56]

- "These Federal Agencies have told the City that the City's title 49 responsibilities to foster competition require the City to provide long-term gate accommodation to Delta at Love Field gates leased by Southwest . . . ."[57]

- "[T]he City [has] have no choice but to follow and abide by the guidance as stated in the First DOT Letter in formulating and applying its accommodation procedures until and unless judicial or other competent authority [holds] the First DOT Letter not to enunciate binding standards."[58]

On this point, the City gets it right: DOT has made it clear beyond any debate that the City is obligated to accommodate Delta at Love Field.

DOT's position is correct as a matter of federal law.  The December 17 letter's conclusion that the City must accommodate Delta at Love Field finds support in at least four different federal provisions.

First, the Wright Amendment Reform Act requires the City to "honor the scarce resource

---

[55] *See supra* at Background Section III.A.  Undisputed evidence also shows that it possible to accommodate Delta at Love Field without impacting Southwest's then-current and -announced services as of July 16, 2014 (the date Delta first notified the City that the voluntary-accommodation process had failed and requested forced accommodation) and September 18, 2014 (the date Delta reiterated its request for forced accommodation in a written demand to the City).

[56] Complaint at 40 ¶ 110 (quoting DOT's December 17 Letter at 2) (alterations omitted).

[57] *Id.* at 4 ¶ 7.

[58] *Id.* at 24 ¶ 61.

provisions of" of the Lease Agreements at Love Field.[59]   The scarce-resource provisions require the City to participate in a four-step, 60-day forced-accommodation process whenever a non-signatory airline wants to offer service at Love Field.[60]   Delta initiated that forced-accommodation process nearly a year ago, in June 2014, and notified the City that voluntary accommodation was unavailable on July 16, 2014.  Under § 4.06(F)(2) of the Lease Agreements, that notification obligated the City to select a signatory airline for forced accommodation within the next 30 days.   In other words, the City should have selected a signatory for forced accommodation by August 15, 2014.  The City failed to do so.   DOT's December 17 letter merely confirms what should have been obvious all along: the City must live up to its commitments and obligations under the Lease Agreements and, in turn, the Reform Act.

Second, the Airport Improvement Program ("AIP") grant-assurances statute requires the City to make Love Field "available for public use on reasonable conditions and without unjust discrimination."   49 U.S.C. § 47107(a)(1).  This statutory requirement – like the many other requirements in § 47107 that are preconditions of receiving federal assistance – has been incorporated into the AIP grant agreements between the City and FAA.  DOT's June 15 letter expressly confirms that the conclusions in DOT's December 17 letter "are derived from, among other things, our interpretation of the grant assurances and [§ 47107(a)].[61]   Grant Assurance 22 requires the City to give uniform treatment to all airlines making the same or similar use of Love Field.  *See* FAA Order 5190.6A, §§ 3-1 & 4-14(a)(2) (FAA Oct. 2, 1989).  If the City were to fail to grant Delta long-term gate access despite providing long-term access to similarly situated airlines, the City would violate Grant Assurance 22.  *See, e.g.*, *Maxim United, LLC v. Bd. of*

---

[59] *See* Reform Act § 5(a).

[60] *See supra* at nn.17–21 and accompanying text.

[61] Shannon Decl. ¶ 12, Ex. J at 1–2.

*County Comm'rs of Jefferson County*, FAA Docket No. 16-01-10 at 18 (April. 2, 2002) (Director's Determination) (finding that the county had restricted the complainant to a greater extent than any other similarly situated entity, in violation of Grant Assurance 22). Accordingly, the directives in DOT's December 17 letter were necessary to give effect to Grant Assurance 22.

Third, federal law and AIP grant-assurances statute also prohibits the City from granting any airline "an exclusive right to use the airport." *See* Grant Assurance 23; 49 U.S.C. § 47107(a)(4); *accord id.* § 40103(e) ("A person does not have an exclusive right to use an air navigation facility on which Government money has been expended."). This statutory requirement also has been incorporated into the AIP grant agreements between the City and FAA. An exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause or fails to provide an opportunity for qualified applicants to be an aeronautical service provider. *See* FAA Order 5190.6B, §8.9d (FAA Sept. 30, 2009). If the City does not accommodate Delta, it would deny Delta the continued opportunity to be an aeronautical service provider at Love Field, cede control of Love Field's gates to a small number of airlines while unreasonably excluding Delta from the same long-term gate access it has granted to others, and thereby violate Grant Assurance 23. *See, e.g.*, *Boston Air Charter v. Norwood Airport Commission, Norwood, Massachusetts*, FAA Docket No. 16-07-03 at 14 (Aug. 14, 2008) (Final Agency Decision) (town violated Grant Assurance 23 by entering into lease agreements that effectively restricting commercial fuel sales to one enterprise). Thus, DOT's December 17 letter was also consistent with Grant Assurance 23.

As detailed above, the City has acknowledged on three occasions—in its initial Competition Plan filed in 2001 and in updates filed in 2005 and 2009—that the Lease

Agreements obligate the City to require accommodation when a non-signatory airline wishes to provide service at Love Field.[62]  Most pointedly, in its 2009 update the City promised that it "will accommodate Delta based on the gate share provisions of" the Lease Agreements.[63] DOT's December 17 letter therefore gives force and effect to the requirements of the competition-plan statute and the representations the City has made in its Competition Plan and various updates thereto.

For these four reasons, DOT's December 17 letter was correct to conclude that the City must accommodate Delta at Love Field.   It follows that Delta is substantially likely to prevail on the merits of its claim that it is entitled to continue operating at Love Field.

Southwest's brief does not even address the validity or effect of DOT's December 17 letter.  Southwest contends that Delta will be trespassing upon Southwest's property if Delta continues to operate at Love Field past July 6.  But Southwest's claim can succeed only if the Court follows Southwest's lead and pretends that the December 17 letter does not exist.  A "'trespass to real property'" occurs only when there "'is an *unauthorized* entry upon the land of another.'"  *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 422 (Tex. 2015) (emphasis in original) (alteration omitted) (quoting *Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011)).  A person who enters upon the land of another under the authority of a superior right to possession does not commit a trespass.  *See, e.g.*, *CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd.*, 264 S.W.3d 381, 387 (Tex. App. – Houston [1st Dist.] 2008).  In the December 17 letter, DOT made a valid, federally enforceable determination that the City must accommodate Delta at Love Field.   That determination obligates the City to force

---

[62] *See supra* at nn.25–28 and accompanying text.

[63] Shannon Decl. ¶ 15, Ex. M at 5.

accommodation under sections 4.06(F) and 14.02 of Southwest's Lease Agreement, and forced accommodation will give Delta a superior right to gate usage during the time it is operating its flights.

The City contends that DOT's December 17 letter is invalid because it conflicts with the Reform Act,[64] but this contention starts from the false premise that the accommodation directive in DOT's December 17 letter somehow abrogates or disregards Southwest's preferential gate-use rights under the Lease Agreement.  In fact, the opposite is true.  In substance, the December 17 letter does nothing more than order the City to follow the forced-accommodation procedure spelled out in the Lease Agreement and fulfill its long-standing federal obligations.

Section 5(a) of Reform Act requires the City to "accommodate new entrant air carriers" at Love Field by "honor[ing] the scarce resource provisions" in the Lease Agreements.[65]  The scarce-resource provisions in Section 4.06 of the Lease Agreement provide that if the signatory carriers are not willing to voluntarily accommodate a new-entrant carrier, "then the City *agrees to require* the sharing of" the signatory carriers' leased gates pursuant to the four-step procedure laid out in Section 4.06(F).[66]  For the reasons explained above, by failing to require accommodation of Delta at any point over the last year, the City has breached its forced-accommodation obligation under the Lease Agreement.  Moreover, Section 14.09 of the Lease Agreement makes the Lease Agreement subordinate to the grant assurances and requires both the City and Southwest to comply with DOT's interpretation the grant assurances.[67]  Thus, the City's derogation of its obligations under the grant assurances constitutes a second, independent breach

---

[64] *See* Complaint at ¶¶ 8, 15, 34–36, 83, 109–111.

[65] *See* Reform Act, § 5(a).

[66] Shannon Decl. ¶ 2 Ex. O at 22 § 4.06(D)(4) (emphasis added).

[67] *Id.* at 65 § 14.09.

of the Lease.

The City's breach of its forced-accommodation obligations under the Lease Agreement also constitutes a breach of its accommodation obligation under the Five Party Agreement. Article 1.3.b of the Five Party Agreement provides that when "a new entrant carrier seeks to enter Love Field" and the incumbent carriers will not voluntarily accommodate the new entrant, the City of Dallas is obligated "to require the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements."[68]  Thus, by failing to require the sharing of preferential lease gates under the Lease Agreement's scarce-resource provision, the City has failed to implement the provisions of article 1.3.b of the Five Party Agreement.

For this reason, the City's arguments about the safe-harbor provision in section 5(d)(2) of the Reform Act are a non-starter.[69]  Section 5(d)(2) provides that "any actions taken by the parties to [the Five Party Agreement] that are *reasonably necessary to implement its provisions*[] shall be deemed to comply in all respects with the parties' obligations under Title 49, United States Code."[70]  A breach of an agreement is not reasonably necessary to implement that agreement's provisions. Since the City's failure to accommodate Delta is a breach of its accommodation obligation under the Five Party Agreement, the City cannot rely on the safe harbor provision in section 5(d)(2) of the Reform Act.

Thus, there is no conflict between DOT's December 17 letter and the Reform Act.  Both instruments contemplate: (1) that incumbent carriers such as Southwest will enjoy the preferential gate-use rights created by the Lease Agreement, but (2) that the City may accommodate a new entrant carrier such as Delta by forcing an incumbent carrier to share its

---

[68] Shannon Decl. ¶ 16 Ex. N, Article I.3.b (emphasis added).

[69] *See* Complaint ¶¶ 8, 36, 63.

[70] Reform Act § 5(d)(2) (emphasis added).

preferential-use gates with the new entrant, so long as the accommodation does not disrupt the incumbent carrier's flight schedule.  Requiring an incumbent carrier to share its preferential leased gates with a new-entrant carrier does not abrogate or eliminate the preferential gate leases.[71]  Indeed, the Lease Agreement itself specifies that Southwest "is contemplated to be the primary, but not the sole, user" of its preferential use gates.[72]  Although Section 5(d) of the Reform Act prohibits any order inconsistent with the Five Party Agreement, Article 1, paragraph 3.b of the Five Party Agreement expressly contemplates forced accommodation of new entrants when Love Field's incumbent carriers are not able or willing to accommodate the new service.

Moreover, the Reform Act does not displace the provision in the Lease Agreement allowing the parties to modify the lease by consent. Southwest and the City agreed in section 14.02 of the Lease Agreement that they would modify lease terms as needed to avoid grant-assurance violations or other enforcement action threatened by the federal government relating to airport access and competition concerns.[73] The Reform Act leaves DOT/FAA's authority over these matters intact. If Congress wanted to rule out as an enforcement tool a lease modification process to which Southwest and other lessees had consented, it would have said so explicitly, given its confirmation of DOT/FAA's continuing enforcement role at Love Field with regard to airport access and competition.

The City's reliance on Section 5(e)(2)(B) of the Reform, which provides that the City cannot be required to modify or eliminate preferential gate leases with air carriers to allocate gate capacity to new entrants unless done so on a nationwide basis, is misplaced for several reasons. First, Delta is not asking the City to modify the Lease Agreements, nor must the City do so to

---

[71] *Contra* Complaint ¶¶ 110–11.

[72] Shannon Decl. ¶ 2 Ex. O at 9 § 1.46.

[73] *Id.* at 59 § 14.02.

accommodate Delta, because the Lease Agreements already contain provisions by which the City can force Southwest to accommodate Delta.  Section 4.06(F) of the Lease Agreement.  Even if a modification was required, the DOT's December 17 letter, as an expression of the agency's policy, has nationwide effect.

Second, the Reform Act's legislative history further supports the applicability of federal access requirements: "[i]t is not Congressional intent to limit *any air carrier's* access to either airport."[74]  Congress fully expected that "non-incumbent carriers [would] be given the same opportunities to start air service at Love Field as such carriers would be afforded at other U.S. airports, and that FAA oversight of such matters at Love Field would continue."[75]  Indeed, during the consideration of the Reform Act, the Mayors and City Attorneys of Dallas and Fort Worth jointly wrote the Chairs and Ranking Members of the House and Senate Judiciary Committees and promised that:

> In truth, carriers would not be prevented from obtaining access to Love Field in the future. . . . [T]he 'scarce resources' provision of the lease permit the City of Dallas to unilaterally require an incumbent airline to accommodate requesting airline in its premises. Thus, the assertion that accommodation of new entrants resides solely within the good graces of the incumbent airlines is false.[76]

As the City's then-Mayor testified: "if [a new entrant airline] came in and said we would like a gate, we have language in all of our leases with our tenants that say we have to make room for that new entrant. We have always had that language in our leases and that language will not

---

[74] S. Rep. 109-317, at 17 (2006) (emphasis added).

[75] H. Rep. 109-600, at 5 (2006); see also Remarks of Sen. Cornyn, 152 Cong. Rec. 10,560 (2006) ("The legislation before us recognizes that the city of Dallas is the entity responsible for operating Love Field, and will reduce the gates there to 20 and will allocate those gates with existing commitments and obligations, including commitments to accommodate potential new entrants.").

[76] 152 Cong. Rec. S10,561-62 (daily ed. Sept. 29, 2006) (Letter from Laura Miller, Mayor of City of Dallas, and Thomas P. Perkins, Jr., City Attorney, City of Dallas, to Sen. Arlen Specter, Sen. Patrick Leahy, Hon. F. James Sensenbrenner, Jr., and Hon. John Conyers, Jr. (Sept. 28, 2006).

disappear."[77]

Third, if the Reform Act prevented the FAA from enforcing grant assurances at DAL, the FAA would have modified the City's grant agreement to reflect the Reform Act's changes. *See* 49 U.S.C. § 47107(h) (setting forth procedure for modifying grant assurances). And finally, the prohibition on granting exclusive rights has an independent statutory basis in 49 U.S.C. § 40103(e).

* * *

For these reasons, there is no merit to the City's contention that DOT's December 17 letter is invalid because it conflicts with the Reform Act. DOT's December 17 letter is a valid, enforceable agency directive. And the accommodation obligation it imposes on the City makes Delta substantially likely to prevail on the merits of this declaratory-judgment dispute.[78]

## II. Delta, not Southwest, has demonstrated that it will suffer irreparable harm if a preliminary injunction is not issued.

### A. The status quo must be preserved to protect Delta's existing Love Field flights.

"The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia,* 561 F.3d at 107. The City, Southwest, and Delta all agree that this Court should act to preserve the "status quo" pending a final adjudication on the merits to prevent "chaos" and an "impending disaster" at Love Field. By definition, the "status quo" means the *existing* state of the world. *See Dominion Video Satellite*, 269 F.3d at 1155. This Court's task is

---

[77] Reforming the Wright Amendment: Hearing Before the H. Subcomm. on Aviation, 109th Cong. 89 (July 12, 2006) (statement of Laura Miller, Mayor of Dallas).

[78] Delta's likelihood of success on the merits based on the federal rights described in this brief is more than sufficient to warrant the issuance of a temporary restraining order. Delta also reserves its rights to add both federal and state-law counterclaims as part of its answer that will further buttress its likelihood of success on the merits.

thus straightforward:  because Delta currently operates five daily departures from Love Field (as it has for several years), the Court should order that those flights be permitted to continue in their existing form while this litigation is pending.

Southwest, in contrast, has advanced a novel and wholly untenable theory of the "status quo."  As noted above, Southwest seeks a temporary restraining order or preliminary injunction that would:  order Delta to discontinue its scheduled flights at Love Field beyond July 6th; evict Delta from its gate; allow Southwest to rebuild that gate to its unique specifications; and allow Southwest to initiate a *new* slate of flights in August to a number of cities that it does not currently serve from Love Field.   That contention is antithetical to the entire concept of the "status quo."   Rather than simply preserving the existing arrangements while litigation is pending, Southwest seeks to dramatically alter both its operations and Delta's operations at Love Field.  Indeed, Southwest even seeks to *physically alter* the gate in question by renovating it to Southwest's specifications.

In short, Delta simply seeks to operate on July 7th the same flights that it will operate on July 5th, while Southwest seeks to upend the current state of affairs and literally restructure the facilities at Love Field.  Any proper conception of the status quo would allow Delta's existing flights to continue while this litigation is pending.

> **B.      Southwest can avoid harm to its passengers without evicting Delta from Love Field.**

Wholly apart from its profoundly flawed view of the status quo, Southwest argues that it will suffer irreparable injury if an injunction is not granted.  Its argument rests on its desire to expand its flight options dramatically in an attempt to squeeze out Delta's five existing flights. Southwest argues that because it drove ahead with selling tickets on additional flights, despite the DOT's definitive determination that the City must accommodate new entrants based on

preexisting flight schedules, it is now entitled to injunctive relief to save it from the consequences of its decision.

Southwest's argument fails.  Most notably, it has failed to demonstrate that it would have to cancel a single passenger's booking if this Court declines to grant it the expansion of its rights at Love Field that it seeks.  Through minor operational adjustments, it can accommodate all of its ticketed passengers—and it offers no evidence to the contrary.  In contrast, Delta has no ability to ameliorate the immediate and irreparable harm that it will face if its application for a preliminary injunction is denied, because it will be *required* to move every single passenger to another airport.  In any event, Southwest's harm is entirely the result of its own indefensible choice to defy the DOT's unambiguous ruling that the City must accommodate Delta at Love Field.  As a result, it is not entitled to injunctive relief.

Southwest has made no effort to demonstrate that minor adjustments of passengers' departure times would be inadequate to prevent the claimed irreparable harm.  It bears emphasis that even if Southwest is denied its requested injunctive relief, it *concedes* that it will be able to fly *175* flights daily out of Love Field.  Southwest has failed to demonstrate that a schedule of 175 flights is not sufficient to accommodate all of its currently booked passengers.

Indeed, it appears highly likely that Southwest could avoid this supposedly irreparable harm entirely if it so chose.  Southwest, unlike Delta, conducts a massive operation from Love Field with numerous daily flights to many destinations.  Cortelyou Decl. ¶ 9.  For at least seven markets, Southwest operates between 7 and 21 daily peak day departures in each direction, including 21 daily flights to and from Houston Hobby; 11 daily flights to and from Austin; 10 daily flights to and from San Antonio; 8 daily flights to and from New Orleans; and 7 daily flights to and from Chicago Midway, Kansas City, and St. Louis.  *Id.*  Most of those flights will

not be full, and certainly those occurring after August 9 are not fully booked now.  For example, Southwest's average load factor on flights between Love Field and Houston Hobby in the year ending March 2015 was 78%--*i.e.*, only 78% of the average flight was full.  Cortelyou Decl. ¶ 10.  It thus has ample room to reduce its Houston flights by a minimum of four a day without leaving passengers unserved.  In fact, Southwest reduces its flight frequencies all the time, having reduced frequencies from Love Field to Albuquerque, Austin, El Paso, Houston Hobby, Little Rock, Kansas City, San Antonio, St. Louis, and Tulsa, all between October and November 2014.  Cortelyou Decl. ¶ 16.

Even beyond the reality that Southwest's flights are certainly not all already full, Southwest also has the option of accommodating passengers by using larger aircraft or cancelling a single flight from each of five routes.  *Id*. ¶¶ 10-11.  As a result, Southwest could easily reduce its Love Field schedule by five flights beginning in August if necessary with no need to materially inconvenience a single passenger.  *Id.* ¶ 11.  Southwest's theory of irreparable harm thus turns on proving that it would irreparably harm its reputation for a certain number of passengers to be forced to shift their departure time within the same airport by 30 minutes to an hour.

Southwest's theory of irreparable harm faces an even more fundamental problem:  it has failed to prove that no more than ten flights may leave from any one gate per day, and thus has failed to prove that 185 flights cannot be accommodated on 18 gates.  As an initial matter, there is no dispute that Virgin and Seaport (through an agreement with Virgin) collectively operate 21 daily flights on two gates.  Compl. ¶ 69; Cortelyou Decl. ¶ 5.  As a result, those airlines are operating at least eleven flights on one of the two gates, or an average of 10.5 daily flights per gate.  Southwest could similarly offer eleven flights on five of its gates and ten on the other

38

thirteen, for an average of 10.3 departures per gate.  Cortelyou Decl. ¶ 5.  Indeed, Delta's Senior Vice President – Network Planning Robert J. Cortelyou submitted a proposed gate plot that assumes Southwest's announced 180 flights and Delta's current five flights, and shows how all 185 can be accommodated if Southwest's flights are optimally gated.  *Id.* Exh. B.  Southwest has offered no analysis or evidence to support its own *ipse dixit* to the contrary.

The falsity of Southwest's claim of irreparable harm is confirmed by Southwest's own conduct.  Southwest has indicated that it will allow Delta space on one of its gates if Delta is willing to either transfer it gate space at another airport or pay $30 million—far more than DOT would permit—for the right to use a portion of one of its gates.  Shannon Decl. ¶ 19.  In other words, Southwest is attempting to use its monopoly of Love Field to extract unreasonable benefits from Delta, suggesting that this is a power play by Southwest, not a true irreparable harm that must be avoided. As a result, Southwest is not entitled to injunctive relief to evict Delta from Love Field.

### C.   Delta, unlike Southwest, will suffer immediate irreparable harm if not granted injunctive relief

In sharp contrast, if Delta does not receive injunctive relief that entitles it to maintain its current flights past July 6, there is no dispute that it will be required to cancel *every* flight it currently operates and is scheduled to continue to operate from Love Field.  As a result, *every single passenger* that is booked on its flights will be, at a minimum, forced to move to DFW. *See* Cortelyou Decl. ¶ 17.  Southwest dismisses this as a "minor inconvenience," Br. at 15, but simply has no basis for asserting that this is true, much less that passengers will see it as such. Forcing passengers to move to what will be, for some, a significantly less convenient airport will cause reputational harm to Delta no less than canceling those passengers' flights, particularly given that these are passengers who consciously chose to fly from Love Field rather than DFW.

Cortelyou Decl. ¶¶ 17-18.   Moreover, moving Love Field passengers and potentially entire flights to DFW will require significant last minute operational changes, requiring coordination of aircraft, flight crews, gates, staff, and other resources at a different airport on less than two weeks' notice.   Southwest does not face these difficulties, both because it will shift flights only within the same airport and because its expanded bookings do not begin until August 9, over a month after Delta's.

Delta has already sold almost 20,000 tickets for travel on its Love Field flights after July 7, *all of which* must be cancelled in favor of proposed alternative flights from another airport. Cortelyou Decl. ¶ 19.   Many customers will no doubt blame Delta for changing their airport without consent; and the inevitable segment of passengers who overlook the change and arrive at Love Field will be even angrier.   A "loss of a business's customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable." *Block Corp. v. Nunez*, No. 1:08-CF-53, 2008 WL 1884012, at *6 (N.D. Miss. Apr. 25, 2008); *Hooters, Inc. v. City of Texarkana, Tex.*, 897 F. Supp. 946, 949 (E.D. Tex. 1995) ("When the nature of a plaintiff's loss would make damages difficult to calculate, the injury is not fully compensable by money damages.   These imprecise damages also include the loss of customer goodwill.").

Moreover, if Delta is evicted from Love Field entirely, that will cause unquantifiable harm to its capacity to later effectively compete with Southwest if the Court resolves this litigation in its favor.   After all, a customer who bought a Delta ticket from Love Field, only to have it changed to DFW or cancelled because Delta is not allowed to operate from Love Field at all, is likely to hesitate before buying another Delta ticket from Love Field.   Alternatively, many of Delta's business and time sensitive passengers, who often enjoy elite status in Delta's frequent

flyer program and are some of Delta's most valuable and important customers, may shift their allegiance to another airline entirely if Delta is unable to fly from Love Field.  Cortelyou Decl. ¶ 24.  Although Southwest does not offer many of the premium services that such passengers often value, those customers who chose Delta based on its offering such services from Love Field may reevaluate their preference among the other airlines who do offer similar services if those passengers are forced to fly from DFW.  *Id.*

### D.     Southwest cannot claim irreparable harm from its own choice to defy the DOT

In addition to failing on the facts, Southwest's argument elides a significant difference between the (entirely theoretical) harm that it would suffer if this Court does not grant it injunctive relief to expand its flight schedule and the harm that Delta would suffer if this Court does not grant injunctive relief to maintain the status quo.  The harms Southwest claims— passenger inconvenience, reputational harm, and trespass to legal rights—would be fully applicable to the circumstance where Delta is evicted from Love Field and *its* flights are cancelled.[79]  But Delta has acted in good faith reliance on the assurances of the City that it would be accommodated at Love Field and on the DOT's unambiguous letter—which the City has repeatedly acknowledged is final and binding—directing the City in no uncertain terms to accommodate Delta.  *See* Shannon Decl. ¶¶ 11-17.  In contrast, Southwest has simply ignored the DOT and sold tickets in defiance of its order.  Indeed, in its application for a TRO, Southwest

---

[79]Southwest suggests that these harms are somehow worse for it because it maintains a "point-to-point" system, rather than a "hub-and-spoke" system.  But that is false.  Whether a carrier focus on "point-to-point" service, which provides nonstop service for its passengers to multiple locations, or a "hub-and-spoke" service, where a carrier sells a significant percentage of its tickets to passengers seeking to make a connection through a carrier's hub, is irrelevant to and independent of how the carrier's network planners will route aircraft.  Cortelyou Decl. ¶¶ 13-14. That is, Delta may fly its same aircraft back and forth between Love Field and Atlanta all day, or it can (and sometimes does) schedule a single aircraft to begin the day at Love Field and then continue beyond Delta to other cities.  *Id.*  Southwest is simply wrong that this distinction in how passengers travel somehow affects the difficulty of cancelling flights.

does not deem the DOT's letter—which it has treated as a final, binding agency action for purposes of filing a petition for review in the D.C. Circuit—as worthy of discussion. Instead, it treats this case as a routine property dispute in which the DOT's views warrant no consideration.

This Court should decline to grant Southwest injunctive relief to aid it in defying the DOT. Consistent with general equitable principles, a party "cannot rely on its own actions to create the risk of irreparable injury which it then seeks to avoid by the issuance of a preliminary injunction." *Vantico Holdings S.A. v. Apollo Mgmt.*, 247 F. Supp. 2d 437, 454 (S.D.N.Y. 2003). *See also Pinson v. Santana*, 2014 U.S. Dist. LEXIS 54075, *2 (N.D. Tex. Feb. 19, 2014) ("[S]elf-inflicted harm cannot satisfy the irreparable harm requirement necessary to support a preliminary injunction.").

DOT sent a letter to the City declaring the requirements of federal law on December 17, 2014. In particular, the DOT clarified that when a carrier requesting access is not voluntarily accommodated, the City was required to "accommodate the requesting carrier to the extent possible given the *current gate usage*, without impacting current or already-announced, for-sale services by the signatory carriers." Letter at 2 (emphasis added). No one disputes that, when Delta requested access, Southwest had not announced or placed on sale the additional flights that it now claims preclude Delta's access. Moreover, the DOT clarified that an accommodated carrier "is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights." *Id*. Finally, the DOT clarified that the "City must also ensure that the accommodation is at reasonable rates." *Id*. at 3.

In short, DOT made it *absolutely clear* that the City could not deny Delta access simply because Southwest did not want Delta to be able to operate out of Love Field. Moreover, DOT's letter stemmed inexorably from the requirements of federal law and the City's own competition

plan, which as recently as 2009 specifically stated that "[o]nce the terminal redevelopment is completed, the City will accommodate Delta based on the gate sharing provisions of the preferential use lease."[80]   Yet on February 26, 2015—nearly two months after the DOT letter, and with full knowledge of the promises in the Competition Plan—Southwest publicly announced and began selling an additional 16 flights from Love Field anyway.   That decision is indefensible, and this Court should not now impair Delta's rights under federal law to shield Southwest from the consequences of its own decision to ignore federal law.   *See also* Section I.

### III. The balance of harms favors granting Delta injunctive relief because Southwest can avoid any potential disruption to its customers by making any one of a few simple, feasible operational changes.

The balance of harms favors Delta's requested injunction.   *See generally* Cortelyou Decl. For the same reasons that denying Delta an injunction maintaining the status quo will cause irreparable harm, while denying Southwest an injunction to *change* the status quo will not, the balance of harms favors granting Delta's request for an injunction and denying Southwest's. Most, if not all, passengers who have tickets booked on Southwest flights from Love Field after August 9, 2015 (when Southwest claims to need the additional flights) can be accommodated on other Southwest flights from Love Field with minor adjustments.   Cortelyou Decl. ¶¶ 3-16.   *None* of the passengers who have tickets booked on Delta flights from Love Field after July 6, 2015 (when Southwest seeks to evict Delta) can be accommodated on other Delta flights from Love Field because there will be no such flights.   *Id.* ¶ 17.   Accordingly, the harm to both Delta and to its customers far outweighs the harm to Southwest and its customers.

---

[80] *See supra* Background Section II.D.

**IV.    Granting a preliminary injunction will serve the public interest by preventing chaos at Love Field, protecting Delta's reasonable reliance, and enforcing federal law.**

Finally, this Court must "look beyond the immediate interests of the named litigants and [] consider the situation of the consumers" affected by this case. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625 (5th Cir. 1985). Because much of the harm that will result from denying Delta an injunction will fall on members of the public, the public interest necessarily favors minimizing that harm on Delta's customers. As set forth above, the harm to Delta's customers far outweighs the prospective harm to Southwest's customers, and the public interest favors Delta correspondingly. Moreover, the public interest favors promoting respect for the law by prohibiting Southwest from receiving a reward for defying federal law. *See Colbert v. Brennan*, 2013 U.S. Dist. LEXIS 117077, *9 (E.D. La. Aug. 16, 2013) (noting the "general public policy that favors compliance with the law").

Finally, it should not be lost in this case that Southwest has a near-monopoly on flights from Love Field—it controls 90% of its gates. Moreover, if Southwest succeeds in evicting Delta, it will have a *total monopoly* of the Love Field-Atlanta market. There is no carrier other than Delta that has access to Love Field which is likely to enter this market. Cortelyou Decl. ¶ 23. Plus, by preserving Delta's access to Love Field, the Court will ensure that the traveling public has access to Delta's hub airport in Atlanta. The synergies of Delta's hub-and-spoke network allow Delta to offer passengers traveling from Dallas convenient one-stop connections through Atlanta to hundreds of destinations throughout the United States, Europe, Latin America, and the rest world. *Id.* ¶ 13. Regardless of whether the antitrust agencies would treat DFW and Love Field as part of a single market for antitrust purposes, it cannot be doubted that members of the public are better off if there is competition within Love Field than if there is not. Accordingly, if the choice is between having 180 flights for Southwest and 0 for Delta, or 175

44

flights for Southwest and 5 for Delta, it is unquestionably better for the public to have at least that limited presence by Delta to constrain Southwest's power over those who, for whatever reason, prefer Love Field and will pay a premium to fly from there.  *See, e.g., Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985) (noting the "vital public interest involved in protecting the consumers of [the party] against the harmful effect of overcharges").

CONCLUSION

For these reasons, Delta respectfully asks the Court to enter a temporary restraining order and a preliminary injunction prohibiting Southwest during the pendency of this lawsuit from evicting Delta from Love Field on July 6, expanding its flight operations on Love Field, or taking any other action that is inconsistent with Delta's right under federal law to long term accommodation at Love Field.

DATED:  June 23, 2015.

Respectfully submitted,

_____*/s/ Rob Walters*_____
Robert C. Walters
Karl G. Nelson
Ashley E. Johnson
Russell H. Falconer
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201-6911
Telephone:  (214) 698-3100
Facsimile:  (214) 698-3400

Kenneth P. Quinn
Jennifer E. Trock
PILLSBURY WINTHROP SHAW PITTMAN
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8898

ATTORNEYS FOR DELTA AIR LINES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2015, a true and correct copy of the foregoing document was served via email upon the following counsel of record.

Charles Estee
charles.estee@dallascityhall.com
Peter B Haskel
peter.haskel@dallascityhall.com
Dallas City Attorney's Office
1500 Marilla St.
7th Floor
Dallas, TX 75201
P: 214-670-3038
F: 214-670-0622
*Attorneys for the City of Dallas*

Michael V Powell
mpowell@lockelord.com
Locke Lord Bissell & Liddell LLP
2200 Ross Avenue, Ste 2200
Dallas, TX 75201-6776
P: 214-740-8520
Fax: 214-740-8800
*Attorney for American Airlines, Inc.*

Stephen McClain Cole
scole@lynnllp.com
John T Cox , III
tcox@lynnllp.com
Kent D Krabill
kkrabill@lynnllp.com
Britta E Stanton
bstanton@lynnllp.com
Lynn Tillotson Pinker & Cox LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
P: 214-981-3800
F: 214-981-3839
*Attorneys for Southwest Airlines Co.*

David Michael Glass

david.glass@usdoj.gov
U.S. Dep't of Justice
Civ. Div., Fed. Progs. Br.
20 Massachusetts Ave., N.W., Room 7200
Washington, DC 20530
202-514-4469
*Attorney for U.S. DOT and FAA*

John Robert Robertson
robby.robertson@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20001-1109
P: 202-637-5774
F: 202-637-5910

Barry C Barnett
bbarnett@susmangodfrey.com
Susman Godfrey LLP
901 Main St.
Suite 5100
Dallas, TX 75202-3775
P: 214-754-1900
F: 214-754-1933
*Attorneys for Virgin America Inc.*


____*/s/ Rob Walters*____
Robert C. Walters