## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-cv-02069-K |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST | § | |
| AIRLINES CO., VIRGIN AMERICA INC., | § | |
| AMERICAN AIRLINES, INC., UNITED | § | |
| AIRLINES, INC., SEAPORT AIRLINES, | § | |
| INC., UNITED STATES DEPARTMENT OF | § | |
| TRANSPORTATION, and THE FEDERAL | § | |
| AVIATION ADMINISTRATION, | § | |
| | § | |
| Defendants. | § | |

---

## DEFENDANT SOUTHWEST AIRLINES CO.'S FIRST AMENDED ANSWER TO CITY OF DALLAS' ORIGINAL COMPLAINT, COUNTERCLAIM AGAINST CITY OF DALLAS, AND CROSSCLAIM AGAINST DELTA AIR LINES, INC.

---

Defendant Southwest Airlines Co. hereby files this First Amended Answer to City of Dallas' Original Complaint, Counterclaim Against City of Dallas, and Crossclaim Against Delta Air Lines, Inc..

### ANSWER

Any allegation not expressly admitted is denied.

### I.      INTRODUCTION

1.      Mandates from two federal agencies under color of federal law and conflicting legal claims and litigation threats by several airlines under federal law have put the City in an impossible situation that only this Court can resolve. An impending July 6, 2015, deadline that may cause chaos at Love Field requires the City to file this action now.

---

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in the first sentence of Paragraph 1, and therefore denies them. Southwest admits the remaining allegations contained in Paragraph 1, except that, due to the July 2, 2015 execution of a Gate Use License Agreement between Southwest and Delta, the July 6, 2015 deadline has been extended to allow this Court to rule on the various applications for injunctive relief.**

2.      The City owns and operates the airport generally known as Love Field in the City and County of Dallas, Texas, within the Northern District of Texas. For decades, operations at Love Field were restricted by a federal law, the so-called Wright Amendment. In 2006, Congress amended and reformed the Wright Amendment so that certain restrictions expired in October, 2014. The City has lease agreements running through 2028 with Southwest Airlines Co. ("Southwest"), United Airlines, Inc. ("United"), and American Airlines, Inc. ("American") for the preferential use of the 20 gates at Love Field and for the use of other airport facilities.  Some of the rights and/or access provided by the leases have been transferred to other air carriers: United has subleased its gates to Southwest, and American has subleased its gates to Virgin America Inc. d/b/a Virgin America Airlines Inc. ("Virgin"); Virgin allows Seaport Airlines, Inc. ("Seaport") to operate from a Virgin gate under a gate use agreement; and Southwest allows Delta Air Lines, Inc. ("Delta") to operate under a gate use agreement.  In October 2014, certain of the most significant restrictions, such as the prohibition against longhaul domestic flights by full-size passenger aircraft, under the Wright Amendment ceased but the legal number of gates at Love Field was reduced. This has triggered demands on the City for additional access and use of the limited number of gates. All of the Signatory Airlines' current leases at Love Field predate the reform (substantial repeal) of the Wright Amendment in 2006.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 2 except the last sentence.  As to the last sentence, Southwest admits that the contractual rights and obligations of the Signatory Airlines at Love Field predate the reform (substantial repeal) of the Wright Amendment in 2006, but denies the remainder thereof.**

3.      The City's leases with the Signatory Airlines at Love Field give each Signatory Airline the preferential right to use its gates and requires the City to mandate accommodation requests for gate use from new entrants to the airport, but only to the extent that granting such request would not unduly interfere with the Signatory Airline's flight schedule and if the requesting new entrant air carrier and the Signatory Airline cannot agree on voluntary accommodation terms. In addition, if there is voluntary or mandatory gate accommodation but the Signatory Airline and the new entrant cannot agree on all necessary terms of gate use, the City is to determine the missing terms (for example, the amount of compensation for gate use or duration or conditions of accommodation).

**RESPONSE:  Southwest admits the allegations contained in Paragraph 3.**

4.      The City has received conflicting demands and claims concerning the use of the limited number of gates at Love Field from some of the Airlines, principally between Southwest and Delta, and from the U.S. Department of Transportation ("DOT") and one of its subsidiary agencies, the Federal Aviation Administration ("FAA") (DOT and FAA together are referred to as the "Federal Agencies"). The City is faced with irreconcilable demands, each under color of federal law, that include explicit threats of litigation or risk of other legal sanctions.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 4.**

5.      DOT is the parent agency of FAA. The FAA administers most of the DOT and FAA grants received by the City for use at Love Field. DOT and FAA assert adverse

consequences for the City's FAA grants if the City does not accommodate Delta in compliance with DOT's directions.

**RESPONSE:  Southwest admits the allegations contained in the first two sentences of Paragraph 5.   Southwest is without sufficient information to admit or deny the remaining allegations in Paragraph 5.**

6.      The City brings this action seeking a judgment declaring the rights and obligations of the City and of the Airlines and the Federal Agencies, and resolving conflicting interpretations of the federal statutes, federal regulations, other instruments, and the leases, in relation to gate accommodation at Love Field. The City brings this action to resolve the disputes, to enable it to perform its obligations, and to prevent disruption of service to the flying public. There is an imminent threat of irreparable harm to the public and to Love Field from air operations disruption at Love Field on and after July 6, 2015, when Delta's latest temporary permission to use gate slots for which Southwest claims preferential lease rights expires. This likely will necessitate temporary and preliminary injunctive relief unless these Airlines reach a voluntary resolution.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 6, except that, due to the July 2, 2015 execution of a Gate Use License Agreement between Southwest and Delta, the July 6, 2015 deadline has been extended to allow this Court to rule on the various applications for injunctive relief.**

7.      The Federal Agencies regulate many facets of Love Field operations. Among other things, under the authority of title 49, U.S. Code, DOT enforces competition standards for Love Field and other airports and the FAA administers monetary grants to Love Field and other airports. In addition, FAA has authorized the City to collect passenger facility charges

(sometimes called "PFCs") from departing Love Field passengers to help finance Love Field improvements. These Federal Agencies have told the City that the City's title 49 responsibilities to foster competition require the City to provide long-term gate accommodation to Delta at Love Field gates leased by Southwest regardless of Southwest's plans to uses the gates, at least if those plans were announced after Delta's gate request. The Federal Agencies further state that this accommodation must last for as long as Delta maintains the same pattern of service regardless of Southwest's future gate use plans.

**RESPONSE:  Southwest admits the allegations contained in the first three sentences of Paragraph 7.  Southwest is without sufficient information to admit or deny the remaining allegations in Paragraph 7.  With regard to the last sentence of Paragraph 7, Southwest defers to the text of the DOT letters dated December 17, 2014 and June 15, 2015 for their precise wording.**

8.     However, these requirements disregard federal statutory provisions in the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA") protecting Signatory Airlines' Love Field preferential gate rights from interference under color of title 49. The City has been unable to obtain an explanation from the Federal Agencies why those protections would not apply to Delta's accommodation requests. Some details of the accommodation obligations imposed on the City by these Federal Agencies, such as the duration of any accommodation, do not appear to be authorized by title 49 and do not appear consistent with gate accommodation policies at other airports. The City has been unable to obtain reconciliation from these Federal Agencies between their requirements for Delta's accommodation request at Love Field and nationwide practices that the Federal Agencies appear to have sanctioned at other airports. The Signatory Airlines' Love Field provide leases two possible ways that these Federal Agencies

might permissibly require the City to override the lease protections for the Signatory Airlines' lease rights without subjecting the City to suit for breaching the lease: (1) the Federal Agencies could expressly threaten the City's FAA grants for Love Field after reviewing the lease – the lease provides that such threat would require amendment of the lease to negate the threat – However DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well; or (2) the agencies might be able to enter into an agreement with the City – provide lease that the lease terms are subordinated to such agreements under certain circumstances. However the Federal Agencies have refused to consider negotiating an agreement with the City and the City does not believe that DOT and the City could negotiate a valid agreement that was inconsistent with WARA. A WARA provision provides the one avenue that could allow the agencies to override the Signatory Airlines' preferential gate lease rights at Love Field: they could adopt nationwide regulations that would be authorized by federal law to preempt preferential gate rights. However, the Federal Agencies' directives to the City are for Love Field only, whereas the governing federal statute, as shown below, requires that any such preemption be on a nationwide basis. Finally the Federal Agencies ignore WARA provisions, also as shown below, that provide that Signatory Airlines' and the City's compliance with and performance under a certain "Five Party Agreement" is deemed to constitute compliance with their respective title 49 obligations, and that agreement protects the Signatory Airlines' preferential gate rights at Love Field.

**RESPONSE:  Southwest admits that "the Federal Agencies' directives to the City are for Love Field only, whereas the governing federal statute, as shown below, requires that any such preemption be on a nationwide basis."  Southwest lacks knowledge or**

**information sufficient to form a belief about the truth of the remaining allegations in paragraph 8 and is unable to admit or deny those remaining allegations in paragraph 8.**

9.      The City is faced with several options, all of which place the City at significant risk. The City could make a decision that appeared to benefit one Airline and face certain litigation from other Airlines. The City could comply with the Federal Agencies' interpretations of the City's legal obligations and face certain litigation from Airlines. The City could comply with its obligations under leases and other contractual commitments but would thereby face liability from the Federal Agencies and other Airlines. Most troublingly, the Federal Agencies have required that the City take actions that appear to violate the City's lease obligations, but have refused to impose their mandate in a form that might allow the City to comply with the Federal Agencies' directives without violating the City's lease obligations; all while retaining the FAA's option to deprive the City of aviation grant money if the City does not comply with the Federal Agencies' interpretations of the City's gate accommodation obligations. In short, the City needs judicial intervention to understand and perform its legal obligations and rights so it can move forward with management of its Love Field airport in a legal manner in the best interest of the flying public and the residents of the City of Dallas. Absent direction and declaratory relief from this Court, that would be impossible.

**RESPONSE:  Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 9, and therefore denies them.**

## II.      JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1367; 5 U.S.C. 701 et seq.; and 28 U.S.C. § 2201. To the extent that any state law issues are involved,

they so relate to the federal questions presented that they form part of the same case and controversy. 28 U.S.C. § 1367.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 10.**

11.    On December 17, 2014, DOT General Counsel sent the Dallas City Attorney a letter establishing DOT's position on Delta's gate accommodation request and instructing the City how to handle that request ("First DOT Letter"). On June 15, 2015, DOT General Counsel sent a Dallas Assistant City Attorney a letter incorporating the First DOT Letter by reference, and elaborating and expanding on several provisions of the First DOT Letter ("Second DOT Letter"). The Second DOT Letter, among other things, explicitly asserted that the City's aviation grant eligibility for Love Field would be conditioned on compliance with the views expressed in the First DOT Letter. The First DOT Letter and the Second DOT Letter (together the "DOT Letters"5) each is a final agency action of DOT issued in violation of the Administrative Procedure Act ("APA") and WARA. WARA sets forth legal obligations for the operation of Love Field by which the federal government and others must comply. Judicial review of action under WARA is subject to section 706(2) of the APA.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 11.**

12.    Neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because DOT acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. DOT's powers with respect to Love Field gate allocation matters are unique due to the enactment of WARA (i.e., Love Field is the only U.S. airport to have such specific statutory directives). Concerning those matters, DOT is statutorily constrained to act within the context of WARA. See Section 5(d)(1). Therefore, any DOT action with respect to Love Field, regardless of the more general powers that DOT may have under

other federal law, necessarily are authorized from the power granted to it pursuant to WARA. Therefore, neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because the agency acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. The "plain language" of section 46110(a) expressly applies only to federal agency actions carried out under the designated parts in title 49 of the United States Code. WARA does not appear in title 49 of the U.S. Code.  *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2nd. Cir. 2003) (finding a lack of jurisdiction under earlier version of Section 46110 because the plain language "this part" authorized judicial review of only those actions carried out under Part A, not Part B); see also *City of Los Angeles v. FAA*, 239 F.3d 1033, 1035 (9th Cir. 2001) (same). Instead the DOT Action and the DOT Letters are reviewable under the Declaratory Judgment Act, 28 U.S.C. § 2201.

**RESPONSE:  The allegations of Paragraph 12 constitute a legal conclusion to which no response is required.**

13.     Alternatively, the DOT Action is not a final agency action but, through the DOT Letters, DOT and FAA have nevertheless in violation of their authority as restricted by WARA, interfered with and attempted to interfere with preferential gate use rights protected by Love Field leases and by WARA by issuing the DOT Letters. This interference materially prejudices the City as airport landlord and airport manager. DOT can interfere with Signatory Airlines' preferential gate rights under their leases but must act only on a nationwide basis, as required by section 5(e)(2)(B)(ii) of WARA. This Court has jurisdiction to declare that DOT must take action to fulfill the mandatory requirements that any agency action eliminating or limiting preferential gate rights at Love Field must be taken only through a nationwide action. DOT's

failure to do so has been unlawfully withheld and unreasonably delayed in violation of the APA and WARA. See 5 U.S.C. § 706(1).

**RESPONSE:  The allegations of Paragraph 13 constitute a legal conclusion to which no response is required.**

14.     In the further alternative, even in the absence of the Federal Agencies, the Court still has jurisdiction of the controversy involving the Airlines and the City under its federal question and supplemental subject-matter jurisdictional authority. 28 U.S.C. §§ 1331, 1337, 1367.

**RESPONSE:  The allegations of Paragraph 14 constitute a legal conclusion to which no response is required.**

15.     Declaratory Judgment on the federal questions presented by the DOT Action is appropriate and within the Court's subject-matter jurisdiction because, among other things,

a.   the City claims the right under WARA not to be required to limit Signatory Airlines' preferential gate rights at Love Field to accommodate other air carriers when the accommodations will unduly interfere with the Signatory Airlines' flight schedules regardless of the limits imposed by the DOT Letters because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

b.   The City claims the right under WARA to decline to mandate accommodation of gate use requests from Delta or any other air carrier to the extent that granting the request would unduly interfere with the flight schedules of any Signatory Airlines regardless of the limits imposed by the DOT Letters, because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

c.   The City claims eligibility under the authority of WARA for Airport Improvement Program (AIP) grants from the FAA under 49 U.S.C. § 47107, regardless of the disqualification for such grants imposed by the DOT Letters so long as the City provides gate access to preferential gates at Love Field in accordance with WARA.

d.   The City is protected by WARA from DOT and FAA interference with its compliance with the Five Party Agreement (hereinafter defined) and the leases for Love Field of the Signatory Airlines, except that DOT could

interfere with the Signatory Airlines' preferential gate rights if it did so on a nationwide basis.

e.    The City is protected by the federal WARA statute from any obligation to modify its Love Field lease with Signatory Airlines that arguably might arise from the threat in the Second DOT Letter to the City's AIP grants because the circumstances of DOT's threat are not based on a review of the lease as required to trigger the lease modification requirement, and DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well.

f.    If the City is obligated to mandate the terms of gate accommodations at Love Field, it is permitted by WARA to include in those terms an amount of compensation from the requesting air carrier to the accommodating Signatory Airline that include consideration of the Signatory Airline's indirect costs including amounts actually paid by the Signatory Airlines for the use of gates and fair market values of gates, despite the prohibition against such considerations in the DOT Letters.

g.    The Airlines claim competing and conflicting rights based on federal law, including WARA and title 49.

**RESPONSE:  The allegations of Paragraph 15 constitute a legal conclusion to which no response is required.**

16.    Venue is proper with this Court pursuant to 28 U.S.C. § 1391.

**RESPONSE:  The allegations of Paragraph 16 constitute a legal conclusion to which no response is required.**

### III.    PARTIES

17.    The City is a Texas home rule municipal corporation with its principal offices located in Dallas County, Texas at 1500 Marilla Street, Dallas TX 75201.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 17.**

18.    Delta is a Delaware business corporation with its headquarters located in Atlanta, Georgia, authorized to do business in the State of Texas, and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 18.**

19.     Southwest is a Texas business corporation with headquarters in Dallas, Texas, authorized to do business in the State of Texas and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 19.**

20.     Virgin is a Delaware business corporation with headquarters in Burlingame, California, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 20.**

21.     American is a Delaware business corporation with headquarters in Fort Worth, Texas, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 21.**

22.     Seaport is an Alaska business corporation, with headquarters located in Portland, Oregon, authorized to do business in the State of Texas, and may be served through its registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136. Seaport is named solely because its rights may be impacted by declaratory judgment related to Virgin.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 22.**

23.     United is a Delaware corporation, with its headquarters in Chicago, Illinois, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 23.**

24.     DOT is a federal agency and may be served with process through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to the Anthony Fox, Secretary, Department of Transportation at 1200 New Jersey Ave. SE, Washington, D.C. 20590.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 24.**

25.     The FAA is a federal agency and may be served through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to Michael P. Huerta, Administrator, Federal Aviation Administration at 800 Independence Ave. SW Washington, D.C. 20591.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 25.**

## IV.     FACTS

**Love Field History and the Wright Amendment**

26.     Love Field was initially constructed as a United States Army airbase during World War I. In 1928, the City acquired the air field and commercial operations began.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 26.**

27.     In 1964 the Civil Aeronautics Board ("CAB"), an FAA predecessor, determined that the competition between the Dallas and Fort Worth airports was harmful and ordered Dallas and Fort Worth to reach a voluntary agreement designating one airport through which CAB-

regulated carriers would serve both communities. The cities were unable to designate any existing airports and instead agreed to construct a new airport, Dallas-Fort Worth International Airport ("DFW Airport"), located roughly midway between Dallas and Fort Worth (the two cities are approximately 32 miles apart). All federally certified air carriers agreed to cease operations at the cities' airports and move operations to DFW Airport. DFW Airport opened in 1974.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 27.**

28.     Southwest was not a federally certified carrier at that time and continued its operations from Love Field. At the time, all of its flights were within the State of Texas. After passage of the Airline Deregulation Act of 1978, (Pub. L. No. 95-504, 92 Stat. 1705 (1978)), Southwest made plans to expand service outside of Texas from Love Field. Other air carriers announced plans for Love Field operations. In 1980, Congress adopted the Wright Amendment. (Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980)). Under the Wright Amendment, flight operations from Love Field were generally limited to Texas and four adjacent states.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 28.**

29.     In 1998, Congress adopted the so-called Shelby Amendment, which added Alabama, Kansas, and Mississippi as states that could be served directly from Love Field. (Pub. L. 105-66, § 337, 111 Stat. 1425 (1997)).

**RESPONSE:  Southwest admits the allegations contained in Paragraph 29.**

30.     In 2005, Congress adopted the so-called Bond Amendment to add Missouri to the states that could be served directly from Love Field. (Pub. L. No. 109-115, § 181, 119 Stat. 2396 (2006)).

**RESPONSE:  Southwest admits the allegations contained in Paragraph 30.**

31.     In early 2006, members of Congress suggested that the cities of Dallas and Fort Worth propose a long term solution to the Wright Amendment's limitations on Love Field flight operations.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 31.**

32.     On or about July 11, 2006, the City of Dallas, the City of Fort Worth, the Dallas-Ft. Worth International Airport Board, Southwest, and American entered into an agreement (referred to as the "Five Party Agreement"). The underlying principle of the Five Party Agreement was to resolve the manner in which service could be provided at Love Field in the future. The Five Party Agreement provided that Southwest would obtain preferential use of 16 gates, American would obtain preferential use of two gates, and ExpressJet Airlines, Inc. ("ExpressJet") would obtain preferential use of two gates. Southwest agreed not to operate from DFW Airport unless it surrendered a Love Field gate, up to eight gates, for each DFW gate that it acquired. Flight operations were limited to 6:00 a.m. to 11:00 p.m. and no international flights would originate from Love Field. The number of gates at Love Field would be reduced from the then existing 32 gates to 20. The agreement also stated, "To the extent a new entrant carrier seeks to enter Love Field, [the City] will seek voluntary accommodation from existing carriers" but if an agreement was not reached then the City agreed "to require the sharing of any preferential lease gates, pursuant to the terms of existing lease agreements." (Five Party Agreement, para. 1.b.)

**RESPONSE:  Southwest admits the allegations contained in Paragraph 32.**

33.     ExpressJet's leasehold interests were later acquired by United.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 33.**

**The Wright Amendment Reform Act of 2006**

34.     On October 13, 2006, Congress adopted WARA. (Pub. L. 109-352, 120 Stat. 2011 (2006)). WARA incorporated and adopted many of the terms of the Five Party Agreement as federal law, although several other provisions of the Five Party Agreement remain in force as contractual obligations independent of WARA. The statute repealed the Wright Amendment limitations on long-distance domestic flights, with the repeal becoming effective in eight years (in 2014). Under the Five Party Agreement, international flights were banned from originating at Love Field and Southwest was barred from operating at DFW Airport unless it gave up a Love Field gate, up to eight gates, for each gate used at DFW. The City was required to reduce the 32 existing gates to a total of 20 gates. WARA also required the City to "determine the allocation of leased gates and manage Love Field in accordance with the contractual rights and obligations existing as of the effective date of [WARA] for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006. To accommodate new entrant air carriers, [the City] shall honor the scarce resource provision of the existing Love Field leases."

**RESPONSE:    Southwest admits the allegations contained in Paragraph 34, however, Southwest defers to the text of the Act for precise wording and construction.**

35.     WARA provided that neither FAA nor DOT could take action that was inconsistent with the Five Party Agreement or that challenged the legality of any provision of the agreement. As noted above, the Five Party Agreement gave the Signatory Airlines, including Southwest, preferential gate rights. WARA also provided that it did not limit FAA, DOT, or other federal agency from enforcing requirements of law or grant assurances that imposed obligations to make Love Field available on a reasonable and nondiscriminatory basis to air carriers seeking to use its facilities except that the Act could not be construed to require the City "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity

to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."

**RESPONSE:   Southwest admits the allegations contained in Paragraph 35, however, Southwest defers to the text of the Act for precise wording and construction.**

36.    Further, WARA provided that the Five Party Agreement "and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code." WARA § 5(d)(2). As noted above, both Southwest and the City are parties to the Five Party Agreement. Delta is not. American is a party and Virgin, as American's subtenant, may have American's WARA's gate rights protections. United is not a party. The Court may be asked to decide if Southwest's WARA gate protections extend to the gates it subleases from United.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in the last sentence of paragraph 36, and therefore denies them. Southwest admits the remaining allegations contained in Paragraph 36, however, Southwest defers to the text of the Act for precise wording and construction.**

37.    Under WARA and the Five Party Agreement, any Love Field gates that revert to the City because of lease expiration or other reasons become common use gates. Thus Southwest has preferential gate use rights at Love Field for 16 gates under its direct lease with the City until 2028 and probably enjoys United's preferential gate rights for the two gates that it has subleased from United gates through 2028, unless any preferential gate rights are lost by lease termination or nationwide regulations adopted by a Federal Agency, or other reason.  American retains preferential gate rights at Love Field subject to similar conditions until the expiration of its lease on 2028. Virgin probably now exercises American's preferential gate rights as American's

subtenant until 2028, again subject to the same conditions for keeping those rights. Delta and Seaport have no lease rights except by virtue of their contractual arrangements with other Airlines.

**RESPONSE: Southwest admits the allegations contained in Paragraph 37, however, Southwest defers to the text of the Act for precise wording and construction.**

**Grant Assurances**

38.     The City has received federal grant funds for Love Field from the FAA. Each time the City receives a grant, the City enters into an agreement with the FAA. Each agreement contractually binds the City to various assurances to the federal government generally referred to as Grant Assurances. Grant Assurances are themselves mandated by federal law. 49 U.S.C. § 47107. Among the City's assurances are to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." FAA Airport Compliance Manual (FAA Order 5190.6B), Appx. A at 10, Grant Assurance 22.a. Another pertinent portion of Grant Assurance 22 reads:

> e. Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and use similar facilities, subject to reasonable classifications such as tenants or nontenants and signatory air carriers and nonsignatory air carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

*Id.*, Grant Assurance 22.e (emphasis added).

**RESPONSE: Southwest lacks information sufficient to admit or deny the allegations contained in the second and third sentences of Paragraph 38, and therefore**

denies them.  The allegations contained in the fourth sentence of Paragraph 38 constitute a legal conclusion to which no response is required.  Southwest admits the remaining allegations contained in Paragraph 38.

**Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21)**

39.     In 2000, Congress adopted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (generally known as AIR-21). (Pub. L. No. 106-181, 114 Stat. 61 (2000)). One of its provisions requires that the City, as the proprietor of Love Field, must provide the FAA with a "Competition Plan" that outlines the City's methods for enhancing competition to ensure that all air carriers wishing to serve its airport are provided with a reasonable opportunity to provide such service. DOT has the right to periodically review the implementation of Competition Plans of all covered airports and can conduct site visits to ensure that competition plans are being successfully implemented.

**RESPONSE:  Southwest admits the allegations contained in the first sentence of Paragraph 39.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in paragraph 39, and therefore denies them.**

40.     The City submitted its most recent update to its Competition Plan in 2009. The update explained that the City intended to accommodate requests for access by applying the gate sharing provisions contained in the current leases. Competition Plan Update for Dallas Love Field, letter from Daniel T. Weber, June 3, 2009, at page 5.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 40, and therefore denies them.**

**Leases at Love Field**

41.     On or about February 13, 2009, the City and Southwest amended and restated a pre-existing master lease agreement for 16 gates at Love Field. The term of the lease lasts until September 30, 2028.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 41.**

42.     On or about March 11, 2009, the City and American amended and restated a preexisting master lease agreement for two gates at Love Field. The term of the lease lasts until September 30, 2028. With the consent of the City, which was given in conformity with the recommendation of the U.S. Department of Justice ("DOJ"), on or about May 12, 2014, American subleased its two Love Field gates to Virgin as part of a much broader program of gate divestitures imposed on American by DOJ through agreed federal district court judgments as a condition of DOJ not objecting to a merger between American's parent corporation and US Airways Group Inc. ("US Air").

**RESPONSE:  Southwest admits the allegations contained in Paragraph 42.**

43.     On or about October 1, 2008, the City amended and restated a preexisting master lease agreement with now-defunct Continental Airlines for two gates at Love Field. Continental later merged with United so that United is now the City's lessee for those two gates. The term of the lease lasts until September 30, 2028. After DOJ declined to object, and with the consent of the City, on or about January 28, 2015, United subleased its two Love Field Gates to Southwest, giving Southwest lease or sublease control over 18 of Love Field's 20 gates.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 43.**

**Terms of the Master Leases**

44.     Under the terms of the master leases for Love Field (which are essentially identical for each Signatory Airline's master lease), the Signatory Airlines' lease specific space

(but not including any gates) at the airport. Depending on which space was involved, the leased area could be for exclusive use or preferential use. Exclusive use space refers to those portions of the airport where the Signatory Airline has the sole right of use. No gate rights were exclusive. Preferential use space refers to those portions of the airport where the Airline was contemplated to be the primary but not sole user. Airlines were also given access to common use space. The leased gates were all part of the lessees' preferential use space. Each Signatory Airline agreed that when it had no scheduled use the Airline leasing the preferential gates would allow other scheduled and nonscheduled air carriers to use the gates as circumstances and the public interest required for loading and unloading but such use could not take precedence over the Signatory Airline's scheduled use. Each Signatory Airline acknowledged that the facilities "may become a scarce resource if a new entrant airline … requests to provide service at the Airport" and agreed "to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement." Each Signatory Airline retained priority in use of its leased gates if there was a scheduling conflict. The requesting air carrier could be charged fees which were to be based on the accommodating Signatory Airline's direct and indirect costs plus a reasonable allowance for administration. If a voluntary agreement for accommodation could not be reached, the lease created a procedure by which the City was notified of the accommodation request and that the City could select a Signatory Airline to accommodate the requesting air carrier. If the air carriers could not reach agreement on the terms of the accommodation, the City could decide disputed terms of the accommodation request, including, if necessary, the amount of fees and charges.

**RESPONSE:   Southwest admits the allegations contained in Paragraph 44, however, Southwest defers to the actual terms of the master leases.**

45.     One lease provision requires lease modification if DOT threatens the City's AIP grants after reviewing the lease. This provision reads in full as follows:

> Section 14.02. Competitive Access.
>
> City and Airline acknowledge that certain portions of this Agreement may be subject to review by the DOT, including but not limited to, the FAA or any other Governmental Agency, concerning possible effects on airline competition and access at the Airport. In the event the federal government threatens to withhold federal assistance, or other sanctions, as a result of such review, City and Airline agree to modify this Agreement accordingly to reflect any necessary change as a result of such action.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 45.**

46.     However, DOT has already reviewed and approved the lease provisions.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 46.**

47.     Another term of the lease subordinates the lease provisions to certain agreements between the City and any federal agency. The subordination clause provides is full:

> Section 14.34. Subordination.
>
> This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 47.**

48.     Prior to receipt of the Second DOT Letter, the City informally suggested to DOT that DOT might wish to consider attempting to negotiate an agreement with the City to effectuate some of the positions expressed in the First DOT Letter. DOT informally declined this suggestion. Any such agreement between the City and the United States would not be valid or

enforceable to the extent that it contained terms that were inconsistent with any terms of WARA. The City is aware of no agreement, and the DOT Letters cite none, between the City and any federal agency that come within the scope of section 14.34.

Another relevant lease section addresses force majeure and provides in full:

Section 14.12. Force Majeure.

Neither City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reasons of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, acts of the public enemy, acts of a superior Governmental Agency, weather conditions, floods, riots, rebellions, acts of sabotage, or any other circumstances for which it is not responsible or which are not in its control; provided, however, that this Section shall not apply to failures by Airline to pay the rentals, fees and charges specified under this Agreement.

**RESPONSE:   Southwest admits the allegation contained in the last sentence of Paragraph 48.   The allegations contained in the third sentence of Paragraph 48 constitute a legal conclusion to which no response is required.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 48, and therefore denies them.**

**American's Merger with US Air and Virgin's Sublease**

49.     In 2013, US Air and American's parent corporation, AMR Corp., announced plans to merge. On or about August 12, 2013, DOJ and six state attorneys general and the District of Columbia filed a civil antitrust lawsuit challenging the proposed merger. In November 2013, as part of a settlement of the pending action, DOJ required US Air and AMR to divest slots and gates at various airports across the country. The settlement agreement, which was embodied in an agreed federal district court judgment, required divestment of the two American gates at Love Field.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 49.**

50.     Delta, Southwest, and Virgin each made proposals for American's lease rights to the two gates. DOJ approved the proposal made by Virgin and opposed the others. Accordingly, as stated above, the two American gates at Love Field were sublet to Virgin following the City's consent. Virgin and Seaport entered into a gate use agreement under which Seaport has two daily flights from Virgin's gates. On or about October 13, 2014, Virgin started commercial passenger operations at Love Field.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 50.**

51.     Representatives of DOJ have informed the City that Virgin is not subject to any accommodation requirement under the lease for a reasonable period that shall be approximately one year from the start of its operations at Love Field on or about October 13, 2014, in order to allow Virgin time to solidify its position at the airport. Neither DOT nor FAA has commented to the City on that DOJ position.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in Paragraph 51, and therefore denies them.**

52.     In filed court pleadings and related instruments, DOJ has repeatedly stated on behalf of the United States, and structured one or more agreed judgments to be consistent with its position, that Love Field and DFW Airport comprised a single market for commercial passenger air travel. The history underlying DFW Airport's creation also supports that market definition.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 52.**

53.     In 2014, United elected to cease current flight operations at Love Field. It initially entered into a gate use agreement with Southwest on or about September 18, 2014. Subsequently, Southwest acquired United's preferential gate use interest at Love Field through a sublease to which the City consented on or about January 28, 2015.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 53.**

**American's Sublease to Delta**

54.     With the City's consent, on or about July 8, 2009, Delta entered into a month-to-month sublease with American for a portion of American's two gates. After its settlement with DOJ and upon entering into its divesting sublease with Virgin, American advised Delta that the sublease would be terminated effective October 12, 2014. On information and belief, Delta was selling tickets for flights after October 12, 2014 even though it had no then-current lease, sublease, or other arrangement for the use of Love Field after October 2014. The City is not aware that Delta informed its customers of its lack of gate rights at Love Field when offering or selling those tickets.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 54.**

**Requests for Accommodation**

55.     On or about September 18, 2014, Delta advised the City that its sublease with American was about to expire and invoked the accommodation process under the master airport leases. Delta then had and continues to have operation to and from DFW Airport.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in the first sentence of Paragraph 55, and therefore denies them. Southwest admits the remaining allegations contained in Paragraph 55.**

56.     The City conferred with the other Airlines and all Airlines (both Signatory Airlines and those operating under a sublease or gate use agreements) advised the City that any proposed accommodation would unduly interfere with their operations. Based on this information, the City advised Delta that the City could not accommodate their request at Love Field. Delta responded and invoked the City's competition plan, the grant assurances, and other

unspecified federal law and urged immediate short-term accommodation and claimed it would otherwise suffer immediate and irreparable injury.

**RESPONSE:   Southwest admits that Southwest advised the City that accommodation would unduly interfere with its operations.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in paragraph 56, and therefore denies them.**

57.   Shortly thereafter, representatives of City, DOT, FAA, and the Airlines conferred and attempted to reach a resolution regarding the accommodation request.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 57.**

58.   On or about November 6, 2014, United and Delta reached a temporary gate use agreement by which Delta could continue its operation of five flights a day using the two Southwest gates (which Southwest had subleased from United) until January 6, 2015. On or about January 6, 2015, United and Delta further agreed to continue the term of their gate use agreement until July 6, 2015. Southwest, after subleasing United's gates, agreed to honor United's extended gate use agreement with Southwest upon the expiration of the temporary gate use agreement.

**RESPONSE:   Southwest admits the allegations contained in the third sentence of Paragraph 58. Southwest lacks information sufficient to admit or deny the remaining allegations contained in paragraph 58, and therefore denies them.**

59.   On or about November 10, 2014, the City forwarded its proposed principles, criteria, and model to be used to determining any accommodation requests at Love Field to the Airlines and DOT. The Airlines responded with comments and revisions consistent with their respective positions. DOT did not provide any written comments.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 59, and therefore denies them.**

60.     On December 17, 2014, DOT's General Counsel sent the Dallas City Attorney the First DOT Letter, summarizing DOT's understanding of prior communications between DOT and the City and providing guidance as to DOT's position on the City's legal obligations with respect to Delta's gate accommodation request. Pursuant to the City's request for guidance, the First DOT Letter detailed DOT's position on several key issues concerning the City's legal obligations with respect to any accommodation request at Love Field. The First DOT Letter stated once an air carrier had been accommodated, it was entitled to maintain its ongoing pattern of service even after the expiration of any agreement between the accommodated and accommodating air carriers as long as the pattern of operations remained unchanged. The First DOT Letter also stated that the accommodating Signatory Airline was limited to recovering only its pro-rata share of the subleased facilities lease rate plus a reasonable allowance for administration that may not exceed 25%.

**RESPONSE:   Southwest admits the allegations contained in Paragraph 60 but defers to the text of the DOT Letters for their precise wording.**

61.     After confirming that the First DOT Letter could be released, the City advised the Airlines that the City would have no choice but to follow and abide by the guidance as stated in the First DOT Letter in formulating and applying its accommodation procedures until and unless judicial or other competent authority held the First DOT Letter not to enunciate binding standards.

**RESPONSE:  Southwest lacks information sufficient to admit or deny that the City confirmed the DOT Letter could be released, and therefore denies it.  Southwest admits the remaining allegations contained in paragraph 61.**

62.    DOT also provided informal advice to the City that supplemented and amplified the contents of the First DOT Letter. DOT informally advised the City that any accommodation request should be evaluated as of the date of the request, using Airline operations as of a snapshot date. DOT further informally advised that future planned operations of incumbent Airlines could be considered but only as to a limited time in the future, such as six months, and only if tickets were being sold for the future flights.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 62, and therefore denies them.**

63.    At the time of the First DOT Letter, Love Field was experiencing rapid changes in is pattern of flight operations due mainly to reduction in the number of gates and initiation of long-haul air service as WARA became effective. Attached to and incorporated into the First DOT Letter by reference was a compendium of airport competition plan requirements, "Airport Competition Plans; Highlights of Reported Actions to Reduce Barriers to Entry and Enhance Competitive Access" (Nov. 2010). The First DOT Letter referred to the attachment as follows:

> We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access. The compendium table focuses on airports that have developed procompetitive tools to accommodate requesting carriers in conformity with the competition plan requirements.

First DOT Letter at 2. None of the examples in the attachment included permanent accommodation mandates for preferential use gates. None of the examples were for airports that are prohibited by law from adding gates. None of the examples were for airports whose dominant

signatory carrier is prohibited by law from operating at a neighboring airport without surrendering gates, nor for airports for which the associated city could not be required to "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis," as required by WARA. None of the examples included airports for which a private agreement provided a safe harbor for deemed title 49 compliance as does WARA for Love Field respecting Five Party Agreement performance.

**RESPONSE:   Southwest admits that Love Field was experiencing changes, but denies that this was solely the result of "WARA [becoming] effective."   Southwest admits the remaining allegations contained in Paragraph 63.**

64.     Representatives of DOJ have told the City, consistent with DOJ's litigation position in the American-US Air merger controversy, that the relevant market for evaluating competition among local air carriers is the Dallas-Fort Worth Metroplex, including DFW Airport, and not just any one airport such as Love Field. Representatives of DOT have informally advised the City that DOT considers the relevant market for evaluating competition for accommodation purposes to be only Love Field. The City informed DOT and DOJ of those conflicting positions but has been unsuccessful in securing reconciliation of those conflicting positions from DOT and DOJ. As stated above, DOT has not commented to the City on DOJ's position.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 64, and therefore denies them, however, Southwest admits that the DFW and Love Field airports are in a single market, and that this is consistent with prior DOJ positions.**

65.     On February 13, 2015, Southwest filed a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit seeking a review of the First DOT Letter. Southwest asserted the First DOT Letter was a final agency action pursuant to 49 U.S.C. § 46110, and that it was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of required procedures. Delta intervened in the action, defending the First DOT Letter as a valid final agency action. As noted above, the City does not believe that section 46110 applies to review of the First DOT Letter. The City is not a party to the D.C. Circuit proceeding.

**RESPONSE:  Southwest admits the allegations in paragraph 65, except the statement of what the City believes is a legal conclusion, to which no response is necessary.**

66.     The Court of Appeals will not issue a final decision by the time the gate use agreement between United and Delta expires on July 6, 2015. Under the current scheduling order DOT's initial substantive brief is not due until July 22, 2015. The case remains pending as *Southwest Airlines Co. v. U.S. Dept. of Transp.*, Case No. 15-1036 (D.C. Cir.).

**RESPONSE:  Southwest admits the allegations contained in paragraph 66, except that, due to the July 2, 2015 execution of a Gate Use License Agreement between Southwest and Delta, the July 6, 2015 deadline has been extended to allow this Court to rule on the various applications for injunctive relief.**

67.     On or about February 23, 2015, Delta demanded Southwest and the City permanently accommodate its current 5 operating flights. On or about the same date, Delta gave notice to Southwest, Virgin, and Seaport demanding that an additional eight flights be accommodated at Love Field.

**RESPONSE:  Southwest admits the allegations contained in paragraph 67.**

68.      On or about February 27, 2015, Southwest responded and rejected both of Delta's accommodation demands. In its response, Southwest stated that it had been and was expanding service between Love Field and additional cities so that by August 9, 2015, it would be averaging at least 10 daily flights on all of the 18 gates to which it had rights (for a total of 180 flights per day) and there would be no capacity to accommodate any Delta flights. In its response, Southwest advised the City (with a copy going to others including Delta) that Southwest offered to extend the duration of Delta's use of Southwest gates past July 6, 2015, to July 19, 2015. The City is unaware that Delta ever accepted that offer and Delta's more recent communications are inconsistent with such acceptance.

**RESPONSE:  Southwest admits the allegations contained in paragraph 68.**

69.      On or about March 10, 2015, Virgin responded to Delta's request. It stated that any accommodation of Delta would be contrary to the DOJ's reasons for opposing divesture of American gates to Delta and to the settlement agreement regarding that divesture. Virgin also stated that it would be operating 19 daily flights starting in April 2015 and that it had an agreement with Seaport who was operating two flights on its gates for a total of 21 flights on two gates. Therefore Virgin stated it had no space to accommodate additional flights or Delta's request.

**RESPONSE:  Southwest admits the allegations contained in paragraph 69.**

70.      Delta has subsequently advised the City that it never received a response from Seaport and considers its request to Seaport as rejected.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in paragraph 70, and therefore denies them.**

71.     On or about April 9, 2015, American made a request to the City that up to 4 daily flights be accommodated at Love Field. However, the City is unaware of any American accommodation request to other Airlines for Love Field gates.

**RESPONSE:  Southwest admits the allegations contained in the first sentence of Paragraph 71.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 71, and therefore denies them.**

72.     As a result of the many accommodation requests and current operations, the City faces requests for the following daily flights: 180 (Southwest) + 11 (Delta) + 4 (American) + 19 (Virgin) + 2 (Seaport) for a total of 216 operations at 20 gates which legally and safely can only accommodate up to 200 flights a day.

**RESPONSE:  Southwest admits that Love Field can only accommodate up to 200 flights a day, and that Southwest has published a schedule for 180 daily flights beginning August 9, 2015.  Southwest denies the remaining allegations contained in Paragraph 72.**

73.     The City cannot accommodate all 216 flights at Love Field. As a result, the City needs to consider the accommodation provisions under the master leases, WARA and the Five Party Agreement to determine how to allocate scarce gate resources at Love Field, in other words, to determine how many if any requested gate slots can be accommodated and mandate accommodation for those slots. However, the City must resolve the conflicting legal directions and positions detailed here before it can do so.

**RESPONSE: Southwest admits the first sentence of paragraph 73.  Southwest admits the City must consider the accommodation provisions under Airline leases at Love Field.  Southwest denies the remaining allegations in paragraph 73.**

74.     On or about April 16, 2015, the City circulated a revised version of its draft accommodation procedures to the Airlines and to DOT for their comment. The Airlines responded on or about April 28, 2015. Many of their comments were highly critical of the revised procedure and provided revisions to advance their respective positions. The Airlines' positions were not consistent. DOT did not comment.

**RESPONSE:  Southwest admits the allegations contained in the first three sentences of Paragraph 74.  Sentence 4 of Paragraph 74 is a legal argument to which no response is necessary.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 74, and therefore denies them.**

75.     On or about May 19 through 24, and again on June 11 and 12, 2015, the City attempted to negotiate an extended temporary or a long-term gate accommodation agreement between Delta and Southwest. Each Airline informally signaled what it might accept as a compromise, but rejected the proposals the other Airline floated. No agreement was reached.

**RESPONSE:  Southwest admits that additional negotiations were had and that no agreement was reached.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 75, and therefore denies them.**

76.     Since shortly after receipt of the First DOT Letter, the City sought clarification and guidance from DOT and the FAA, and in particular asked that whatever terms DOT sought to dictate as to gate accommodate be in the format of a mandate and not mere guidance. The City also requested the legal basis for DOT's conclusions and also requested clarification in light of the WARA provisions. On June 15, 2015, DOT responded to those requests by issuing the Second DOT Letter. After confirming that DOT did not object, the City circulated the Second DOT Letter to all of the Airlines on the same day.

**RESPONSE:  Southwest admits that the DOT sent the second letter on or about June 15 and that the City circulated the letter to the airlines.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 76, and therefore denies them.**

77.     The Second DOT Letter explained that DOT relied upon the grant assurance statute and the competition plan statute as the basis for its conclusions DOT reiterated that the City "is required to accommodate a requesting carrier unless Love Field's facilities are fully utilized at the time of the request, or the Signatory Airlines at the time of the request are selling tickets for future flights fully-utilizing the facilities." It stated that a Signatory Airline's planned future operations should not be considered unless the carrier was selling tickets for the future flights and consideration of such plans would be inconsistent with grant assurances. It repeated that an accommodated carrier must be allowed to continue a similar pattern of service. The letter concluded by stating that the decision on Delta's request was the City's responsibility but the City "must make this decision made in compliance with the grant assurances and [the City's] other legal obligations. The Letter contained no reference to WARA or to any specific lease provisions.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 77, but defers to the text of the second DOT Letter for its precise wording.**

**Current Operations**

78.     As of the date of commencing the instant litigation, Southwest leases 16 gates and subleases two additional gates from United at Love Field. Delta is currently operating its five daily flights from Southwest's gates. Virgin subleases the remaining two Love Field gates from American. Seaport, through its agreement with Virgin, operates two daily flights.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 78.**

79. On information and belief, Delta is selling tickets for flights after July 6, 2015 even though it has no current lease, sublease, or other arrangement for the use of Love Field after that date. Southwest has stated it has starting selling tickets for its planned expansion, with flights starting in August and that it needs exclusive access to all of its gates starting on July 6 so that it can remodel them for its expanded service. Upon information and belief, Southwest and Delta are selling tickets for flights after July 6, 2015, that would require the use of the same Love Field gates simultaneously for two aircraft – one from each Airline. These actions create the risk of chaos at Love Field when passengers for two flights attempt to arrive or depart at the same gates at the same times, and even worse create safety issues should two aircraft try to use the same gate concurrently or if frustrated passengers get aggressive.

**RESPONSE: Southwest admits the allegations contained in Paragraph 79, except that, due to the July 2, 2015 execution of a Gate Use License Agreement between Southwest and Delta, the July 6, 2015 deadline has been extended to allow this Court to rule on the various applications for injunctive relief.**

80. Beginning with its sublease from American through July 6, 2015, Delta has been operating at Love Field under month-to-month or six-month-at-a time-arrangements with flight to Atlanta, Georgia.

**RESPONSE: Southwest admits the allegations contained in Paragraph 80.**

81. Southwest flights to and from Love Field since the effective date of WARA have served local Texas cities and cities throughout the United States. Southwest's announced intent to use the space and time now used by Delta would serve other cities rather than just Atlanta.

**RESPONSE: Southwest admits the allegations contained in Paragraph 81.**

82.     Delta currently has gate facilities and operations at DFW Airport. Southwest does not have a DFW Airport presence, and to obtain any future DFW Airport gates it would have to surrender Love Field gates.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 82.**

83.     The City has granted no special or exclusive gate use privileges to Southwest, American, United, or their sublessees or gate users. These Airlines' rights to use gates derive from the preferential use terms of the master lease, the Five Party Agreement, and WARA. While DOT has provided the City with informal guidance and the DOT Letters set forth DOT's views on the City's obligations, neither DOT nor FAA has required or directed that the City take action to interfere with Southwest's, American's, United's, or their sublessees' preferential gate use rights. Because of the explicit protection for preferential gate use rights in WARA, the City is uncertain whether DOT or the FAA could lawfully require the City to interfere with a Signatory Airline's, or its sublessee's, preferential gate use rights at Love Field unless that requirement were imposed on all airports in the country. Southwest has stated it would sue the City if the City violated Southwest's lease rights respecting gate use. In particular, Southwest threatened suit if it was forced to accommodate Delta fights past August 9, 2015. Despite the apparent lack of authority to enforce the DOT Letters, DOT and FAA claim the right to treat any departure from the terms of the DOT Letters by the City as a Grant Assurance violation.

**RESPONSE:  Southwest admits the allegations contained in sentences 1, 2, 5 and 6 of Paragraph 83.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 83, and therefore denies them.**

## V.     CONFLICTING DEMANDS, CLAIMS, AND INTERPRETATIONS

84.     The City has received conflicting claims, demands, and interpretations of the governing statutes, regulations, judgments, and the leases from the Airlines and the two Federal Agencies. A number of the carriers have implicitly or explicitly threatened litigation and/or other adverse consequences if the City takes any action that any party perceives is contrary to its interests or directions.

**RESPONSE:   Southwest admits that Southwest has stated that it will seek legal action to protect its rights. Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 84, and therefore denies them.**

85.     In its latest communications with the City, Delta:

    a.    claims that the City must follow the First DOT Letter as a formal agency directive;

    b.    has threatened that the City would be "better advised" to grant its accommodation requests as required by existing federal law;

    c.    has invoked authority for its accommodation from the requirements related to the City's Grant Assurances and Competition Plan;

    d.    claims that ample gate availability existed at the time of the requests for accommodation and that its pending requests should be granted without further delay;

    e.    claims entitlement to a permanent or long term accommodation;

    f.    argues that Congress emphasized the importance to maintain access to new entrants, and that it is a new entrant;

    g.    requests immediate accommodation in accordance with the First DOT Letter as to its request for five flights and that within 30 days that a forced accommodation for its requested eight additional flights be issued;

    h.    argues that the First DOT Letter is a final and binding directive;

    i.    disputes that "pattern of service" is limited to the same equipment or city-pair;

    j.    argues that any attempt to so define "pattern of service" would be contrary to federal law; and

k.   appears to assert that its rights to accommodation are superior to Southwest's, American's, United's, or their sublessees' preferential gate use rights under their leases.

l.   In addition, via telephone on June 17, 2015, a Delta attorney represented to an attorney for the City that Delta had drafted and was ready to file an administrative complaint with DOT against the City, essentially to enforce the DOT Letters.

**RESPONSE:    Southwest lacks information sufficient to admit or deny the allegations contained in Paragraph 85, and therefore denies them.**

86.   In its latest communications with the City, Virgin:

a.   argues that accommodation requirements should not be for the benefit of large legacy Airlines, particularly those with significant operations at DFW;

b.   argues the policies should instead help develop low-cost entrant air carriers; and

c.   claims any forced accommodation imposed on it would unduly interfere with its rights, be contrary to its agreement with the City, and violate the DOJ settlement.

**RESPONSE:    Southwest lacks information sufficient to admit or deny the allegations contained in Paragraph 86, and therefore denies them.**

87.   In its latest communications with the City, Southwest:

a.   claims it has the legal right to fully utilize all gates that it leases at Love Field and this right includes Southwest's ability to expand its own operations on those gates at any time;

b.   claims that the City has no legal right to abrogate its rights to fully utilize its leased gates;

c.   relies on WARA, the City's competition plan as approved by the FAA, the 1999 FAA/DOT "Airport Business Practices and Their Impact on Airline Competition," and Southwest's lease with the City;

d.   claims that any attempt by the City to prevent Southwest from adding flights for its planned expansion would be unlawful, cause severe and irreparable harm, and would be subject to an immediate challenge by Southwest; and

e.   claims a mandatory accommodation would be improper and unlawful, violate the terms of the lease, would reduce competition, and would constitute an unlawful taking of its property.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 87.**

88.     If the City fails to comply with duly authorized direction from the DOT, it faces immediate loss of its substantial grant funds, injunctive action and further penalties which would irreparably damage the City. The City seeks to ensure that its residents and the flying public are well served at Love Field but it is impossible to resolve the competing and conflicting claims without judicial interpretation, direction, and decision.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in the first sentence of Paragraph 88, and therefore denies them.  The second sentence of Paragraph 88 is a legal argument to which no response is necessary.**

88.     Examples of the conflicting interpretations, each of which is concrete and ripe, start with who is entitled to be accommodated. The accommodation provisions of the lease provide that "a new entrant airline (Requesting Airline)" should be accommodated if the accommodation does not unduly interfere with the Signatory Airline's operating schedules. Delta asserts that it is a new entrant. Southwest asserts that Delta is not a new entrant since it has been continuously operating from Love Field since at least 2009 and that the term "new entrant" is not limited to Love Field but must also include consideration of air carriers currently at DFW Airport. DOT has told the City to treat Delta as a new entrant. DOT has rejected Southwest's contention (shared by DOJ) that DFW Airport and Love Field comprise a single competitive market.

**RESPONSE:  The first sentence of Paragraph 88 [sic] above is a legal argument which requires no response.  Southwest admits the allegations contained in sentences 2, 3 and 4 of Paragraph 88 [sic] above.  Southwest lacks information sufficient to admit or deny**

the remaining allegations contained in Paragraph 88 [sic] above, and therefore denies them.

89.     Conflicts exist as to what constitutes an accommodation and how long it must last. Delta acknowledges that it has been accommodated in the sense that it has been able to continue flight operations since its sublease with American was terminated. However, Delta asserts that it must be permanently accommodated regardless of Southwest or any other Airline's planned expansion or the terms of its agreement with United. Southwest asserts that Delta has no such rights and that Delta's accommodation must yield to the use of gates by those with contractual lease rights for the use of the gates. DOT has directed that Delta is a "new entrant," entitled to gate accommodation, because it is not a Signatory Airline, despite its operations history at Love Field, and that Delta has a continuing right to use the gate slots it may obtain through accommodation as long as it continues its pattern of service even if the agreement by which Delta was voluntarily accommodated has a certain expiration date. When the City sought to define what constituted a pattern of service, DOT declined to provide advice and Delta has claimed that the City's proposed definition of DOT's term is unlawful.

**RESPONSE:  The first sentence of Paragraph 89 is a legal argument which requires no response.  Southwest admits the allegations contained in sentences 3 and 4 of Paragraph 89.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 89, and therefore denies them.**

90.     Conflicts exist over how much should be paid for any accommodation. Delta asserts that whatever accommodation is provided, it only has to pay a pro rata share of lease payments made by the accommodating Airline to the City. Southwest asserts that any payment by Delta must include direct costs, indirect costs, lost profits, and administration costs, including

as a cost component for what Southwest paid to United to obtain the rights to use United's gates. Virgin has asserted that Delta had the opportunity to enter into the market place, compete, and pay United for right to use some or all of the gates. Virgin contends that Delta should not be allowed to acquire the rights without competing in the open market and paying fair value. DOT tells the City that Delta need only pay the direct costs and administrative costs, regardless of what Southwest paid for any gates or of the fair market value of any gates.

**RESPONSE:  The first sentence of Paragraph 90 is a legal argument which requires no response.   Southwest admits the allegations contained in the second sentence of Paragraph 90. Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 90, and therefore denies them.**

91.     Conflicts exist over whether an accommodation is feasible. Stated differently, the Airlines disagree as to how and when the City should assess whether an accommodation would unduly interfere with the Signatory Airline's operations. Delta argues that a snapshot date should be used that limits consideration to the date of the request and a limited six month look ahead. DOT generally agrees with Delta's position. Both Virgin and Southwest dispute the position. Virgin maintains any look-ahead must be at least 12 months and does not depend on the sale of tickets. Southwest disputes the entire contention. It has further contended that the timing of Delta's accommodation request, coinciding with rapid changes at Love Field due to the repeal of the Wright Amendment, make the use of any snapshot and look-ahead approach impractical and irrational as applied to Delta's current requests.

**RESPONSE:  The first sentence of Paragraph 91 is a legal argument which requires no response.   Southwest lacks information sufficient to admit or deny the allegations**

contained in sentence 6 of Paragraph 91, and therefore denies them.  Southwest admits the remaining allegations contained in Paragraph 91 above.

92.     As to how to determine whether an accommodation is feasible, the Airlines disagree as to the applicable factors such as time on gate, time between turns, and buffer times between sequential flights. Virgin argues it needs more time because of the type of flights it offers. The Airlines disagree as to the maximum number of flights that can occur at any particular gate. DOT has told the City that from its perspective, it is the total number of passenger seats that operate through a particular gate that is determinative and that the goal should be to maximize the use of each gate.

**RESPONSE:  Southwest admits the allegations contained in sentences 1 and 3 of Paragraph 92.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 92, and therefore denies them.**

93.     Conflicts exist as to what criteria the City should or must use in making an accommodation decision. Delta argues that destination cities from Love Field are relevant, DOT asserts that the City may not consider flight destinations and can only consider gate utilization (however that is measured).

**RESPONSE:  The first sentence of Paragraph 93 is a legal argument which requires no response. Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 93, and therefore denies them.**

94.     Conflict exists between the City and the Federal Agencies over whether, in making an accommodation decision, the City must, can or may not consider other air service in the Dallas – Ft. Worth metropolitan area.

**RESPONSE:  Paragraph 94 is a legal argument which requires no response.**

95.     Conflicts exist among Virgin, the Federal Agencies and DOJ as to whether Virgin's gates may be considered in an accommodation decision or whether Virgin is exempt from making an accommodation and, if so, for how long.

**RESPONSE:  Paragraph 95 is a legal argument which requires no response.**

96.     The communications between and among the City, the Airlines, and the Federal Agencies, and DOJ establish that the above conflicts each and collectively present a complex set of controversies that are concrete and ripe for judicial determination. There is a real and substantial controversy of sufficient immediacy and reality that exists between the parties having adverse legal consequences. The City has clear standing to seek judicial resolution of these controversies. If the City, on or before July 6, 2015, directs Southwest and/or Virgin to accommodate Delta, Southwest and/or Virgin claim an immediate loss of valuable rights and interests (and injury to their passengers). If the City does not direct an accommodation on or before July 6, 2015, Delta claims an immediate loss of valuable rights and interests (and injury to its passengers). Whatever action or inaction the City takes, it faces the prospect of an enforcement action from DOT or FAA that could result in loss of the City's ability to collect passenger facility charges and to receive federal airport grants.

**RESPONSE:  Sentences 1, 2 and 3 of Paragraph 96 contain legal arguments which require no response.  Southwest admits that Southwest will claim a loss of its rights if directed to accommodate Delta.  Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 96, and therefore denies them.**

97.     There is simply not enough room to accommodate everyone. On information and belief, the Airlines are selling tickets to the public that regardless of the City's decision cannot all be honored. There are 20 gates and space for about 200 flights. Upon information and belief,

the Airlines are selling tickets to far more than 200 flights. Delta has suggested that Delta may retain security to protect their continued use of the space they are currently using after July 6, 2015. The potential disruption to the flying public under such a circumstance would be enormous and could have national ramifications immediately after the extraordinarily busy Independence Day weekend travel. Unless these controversies are resolved, the disruptions will continue to recur, and may rise to a level implicating public safety.

**RESPONSE:   Southwest denies that everyone (i.e., all air carriers) are legally entitled to be "accommodated" at Love Field.   Southwest admits that Delta is selling tickets at times that it does not have gate access, and that Southwest is selling tickets for the same times. Southwest admits the allegations contained in Sentences 3, 4, 6 and 7 of Paragraph 97.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 97, and therefore denies them.**

98.   DOT and FAA have advised the City that any decision must be made with controlling effect given to the City's Grant Assurance obligations and its obligation to comply with its Competition Plan. DOT officials have stated that any decision not consistent with their understanding runs the risk of violating the terms of the Grant Assurance and Competition Plan. Delta characterizes DOT's communications as threats of enforcement action. However, DOT has carefully refrained from making an overt threat that failure to accommodate Delta or failure to comply with the terms of the First DOT Letter necessarily will be a violation of the City's Grant Assurances or Competition Plan. DOJ has advised that Virgin is exempt from any accommodation request for at least one year regardless of whether Virgin is fully utilizing the subleased gates. DOT has declined to opine on that issue.

**RESPONSE:   Southwest admits the allegations contained in Sentences 1, 2 and 4 of Paragraph 98.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 98, and therefore denies them.**

99.     The City believes that it is forced to conform to the standards stated in the First DOT Letter and DOJ communications or risk severe pecuniary loss and possible closure of Love Field if federal grants and ability to levy passenger facility charges are lost. The City has been and will be adversely affected by the DOT and FAA positions which involve the rights and obligations of the City and the Airlines and legal consequences flow from those positions.

**RESPONSE:   Sentence 2 of Paragraph 99 contains a legal argument which requires no response.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 99, and therefore denies them.**

100.     Even without DOT or FAA involvement, there is an imminent threat of litigation against the City from the Airlines. Of course, two of the Airlines are already involved in litigation with DOT over the First DOT Letter. Southwest has advised the City that any City decision that interferes with its planned expansion "would be subject to an immediate challenge;" would constitute an unlawful taking; would create potential liability of millions of dollars; and the City should consider the potential liability before making any decision. Southwest has stated it will challenge in court any attempt by the City to force accommodation of Delta that prevents it from operating its new flights starting August 9, 2015. Delta and Virgin have been a bit more circumspect but the existence of an imminent threat of litigation from either is present. Delta has advised the City that a failure to accommodate will violate the City's federal obligations including its Grant Assurances; interfere with rates, routes, and fares that are explicitly preempted by federal law; be anti-competitive or contrary to the Competition Plan; and

constitute serious (but unspecified) violations of the City's legal obligations. Delta states it has exhausted its efforts and that there has been no action by the City "despite the laudable efforts and enforcement threats by DOT." Virgin claims there are compelling legal reasons why it cannot be forced to accommodate and that such action would be unlawful.

**RESPONSE: Southwest admits the allegations contained in Sentences 2, 3 and 4 of Paragraph 100. Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 100, and therefore denies them.**

101.   All parties claim competition as justification for their position with the ultimate goal of better service and fares. All note the unique circumstances at Love Field. Delta and Virgin claim Southwest has control of 90% of Love Field's gates. Southwest responds that it is barred from competing at DFW and relies on its historical impact on competition. The factual underpinnings of this case reflect the confusing and conflicting nature of the policies regarding competition as reflected in federal law.

**RESPONSE: Southwest admits that Southwest has informed City it is effectively barred from competing at DFW and that Southwest has had a positive impact on competition in the Dallas-Fort Worth market and throughout the airline industry. Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 101, and therefore denies them.**

102.   The Federal Agencies insist on an accommodation decision according to their view of the law or the City risks enforcement actions for failing to comply with the required assurances and competition plan. But no matter what the decision, the City will be sued by one or more of the Airlines and perhaps even by the Federal Agencies and/or DOJ. The case and controversy is actual, concrete, and ripe for judicial decision.

**RESPONSE:   Sentence 3 of Paragraph 102 contains a legal argument which requires no response.   Southwest lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 102, and therefore denies them.**

103.    The City emphasizes that it seeks clarity of its obligations and rights rather than any particular result.

**RESPONSE:  Southwest admits the allegations contained in Paragraph 103.**

104.    Although the City recommends that temporary injunctive relief be granted to preserve the status quo during this litigation if Southwest and Delta cannot resolve their issues, the City anticipates that Delta and Southwest will present evidence supporting their respective views of what the status quo should be. The City is not likely to need to take a position in that dispute other than to urge that a preliminary injunction will be necessary to preserve the status quo and prevent chaos at Love Field in the public interest during the busy summer travel season.

**RESPONSE:  Paragraph 104 contains a legal argument which requires no response.**

105.    As July 6, 2015, approaches, if Southwest and Delta have still not reached voluntary agreement, even if only a temporary further gate use extension, and the Court has not issued a preliminary injunction, the City likely will seek a temporary restraining order to preserve the status quo in order to prevent chaos at Love Field when Delta's current gate use arrangement with Southwest expires on that date.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in Paragraph 105, and therefore denies them.**

## VI.    CLAIMS

### CLAIM I: The Federal Agencies have violated the APA and WARA

106.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105.

**RESPONSE:  No response is necessary.**

107.    The APA confers a right of judicial review on any party adversely affected by agency action. See 5 U.S.C. § 702. The DOT Letters and the DOT Action each is a final agency action issued in violation of the APA and WARA.

**RESPONSE:  Paragraph 107 contains a legal argument which requires no response.**

108.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**RESPONSE:   Southwest admits the allegations contained in Paragraph 108, however, Southwest defers to the text of the Act for precise wording and construction.**

109.    Under WARA, federal agencies shall not make "findings or determinations, issue orders or rules . . . , or take any other actions . . . that are inconsistent with [the Five Party Agreement] . . . ." Pub. L. 109-352, Section 5(d)(1)(A). The Five Party Agreement requires respect for preferential gate leases at Love Field.

**RESPONSE:   Southwest admits the allegations contained in Paragraph 109, however, Southwest defers to the text of the Act for precise wording and construction.**

110.    In the DOT Letters, the Federal Agencies direct the City to "continue the accommodation [of Delta] and ensure that space is available so that [Delta] is able to maintain its pattern of service on an ongoing basis . . . ." First DOT Letter at 2. By directing the City to accommodate Delta on an indefinite and ongoing basis, DOT has violated WARA by effectively forcing the City to abrogate preferential gates leases protected by the Five Party Agreement. The

DOT Letters are therefore unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should issue judgment so declaring.

**RESPONSE: Southwest admits the allegations contained in Paragraph 110.**

111.    Additionally, WARA mandates that the Federal Agencies shall not require the modification or elimination of preferential gate leases at Love Field "unless such modification or elimination is implemented on a on a nationwide basis." Pub. L. 109-352, Section 5(e)(2)(B)(ii). However, the DOT Letters require the City to eliminate preferential gates leases without requiring that the elimination be implemented on a nationwide basis. Thus, the DOT Letters and the DOT Action are each unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should enter judgment so declaring.

**RESPONSE: Southwest admits the allegations contained in Paragraph 111.**

112.    Alternatively, if the any DOT Letter or the DOT Action is not a final agency action under the APA, the Federal Agencies' interference with preferential gate use rights protected by Love Field leases violates of the APA and WARA. Section 5(d)(1)(A) of WARA broadly and expressly prohibits the Federal Agencies from interfering with the Five Party Agreement and WARA further mandates that any elimination or modification of preferential gate leases at Love Field shall only be implemented on a nationwide basis. Pub. L. 109-352, Section (e)(2)(B)(ii). The Federal Agencies have failed to comply with WARA's mandate in violation of the APA, and the Court should enter judgment so declaring.

**RESPONSE: Southwest admits the allegations contained in Paragraph 112.**

### CLAIM II: Declaratory Judgment

113.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE: No response is necessary.**

114.    In addition or in the alternative, pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City, the Airlines, and the Federal Agencies under WARA, title 49, and other federal law.

**RESPONSE:   Paragraph 114 is a request for relief to which no response is necessary.**

115.    The DOT Letters have caused significant uncertainty as to the City's rights under WARA and to the rights and obligations of the City with respect to the Federal Agencies' directives in the Five Party Agreement, the leases and subleases with the Airlines, and the City's Grant Assurances and other obligations to DOT and FAA, and to the Airlines.

**RESPONSE:   Southwest lacks information sufficient to admit or deny the allegations contained in Paragraph 115, and therefore denies them.**

116.    In particular, the City requests that the Court declare, in consideration of WARA, the Five Party Agreement, the DOT Letters, the leases and subleases, the City's Grant Assurances and other obligations to DOT and FAA, and the Airlines, and all other applicable laws, regulations, and instruments, the terms, conditions, and scope at Love Field of:

    a.    The City's right and obligation to determine pending gate accommodation requests in the absence of voluntary Airline accommodation agreements;

    b.    The proper considerations and procedures for the City to adopt in considering and deciding gate accommodation requests at Love Field;

    c.    The meaning of each Signatory Airline's preferential rights to gate use and obligations to accommodate other Airlines' gate use requests;

    d.    Delta's rights to temporary and permanent gate accommodation;

    e.    American's rights to temporary and permanent gate accommodation;

    f.    DOT and FAA's authority under WARA and related federal laws and Grant Assurances to require the City to mandate that a Signatory Airliner, or sub-lessee, or other gate user provide permanent gate accommodation to other carriers if such accommodation would unduly interfere with their

flight schedule, including defining "unduly interfere," declaring the durational requirements of any such mandatory accommodation, declaring the permissible considerations in mandating compensation for such mandatory accommodation, and declaring the circumstances under which each Signatory Airline's, sub-lessee's, or other gate user's schedule protects that carrier from having to provide gate accommodation; and;

g.   Such other and further declaratory relief as may be requested by the City and to which the Court may appear proper.

**RESPONSE:   Paragraph 116 is a request for relief to which no response is necessary.**

## CLAIM III: Declaratory Judgment

117.   The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE:  No response is necessary.**

118.   Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that any action or inaction that the City may take or decline to take respecting gate accommodation requests at Love Field shall not constitute violations of any Grant Assurances to FAA, the Competition Plan, or other federal law to the extent that such City action or inaction is consistent with the orders and judgment of the Court in this civil action.

**RESPONSE:   Paragraph 118 is a request for relief to which no response is necessary.**

## CLAIM IV: Declaratory Judgment

119.   The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE:  No response is necessary.**

120.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that if the City is compelled by the DOT, including by the DOT Action and any provisions of the DOT Letters, to interfere with any Signatory Airline's preferential gate use rights under the Signatory Airlines' lease, the City will have been

> prevented from performing any of its obligations [under the lease] by reasons of .. . acts of a superior Governmental Agency, . . . or any other circumstances for which it is not responsible or which are not in its control

under the Southwest Lease (and Master Lease) section 14.12, and therefore be declared not to have breached said lease by such interference.

**RESPONSE:   Paragraph 120 is a request for relief to which no response is necessary.**

### CLAIM V: Declaratory Judgment

121.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE:  No response is necessary.**

122.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that the City's consent to the United-Southwest sublease of United's Love Field Gates was not anti-competitive and was not a violation of any Grant Assurance given DOJ's lack of objection, DOT's lack of objection, and further declaring DOT and FAA are estopped from finding that that the consent or the sublease, or the two together, was or were a Grant Assurance violation or from otherwise treating the consent or the sublease as a violation.

**RESPONSE:   Paragraph 122 is a request for relief to which no response is necessary.**

## VII.   TEMPORARY INJUNCTIVE RELIEF MAY BE NECESSARY

123.    As described above, the voluntary temporary gate accommodation agreement, which allows Delta to operate, expires on July 6, 2015. Delta has announced that it is continuing to sell tickets for flights to and from Love Field for after July 6, 2015. Southwest has announced that it plans to operate flights in the times and gates currently being used by Delta. Both parties claim a right to fly to and from Love Field from essentially the same place and time and both have made demand on the City to enforce their respective positions. An additional purpose in filing this action is to allow the interested parties, if they so desire, to seek temporary injunctive relief and to provide further motivation for them to reconcile their differences until the Court can finally determine the respective rights of the parties.

**RESPONSE:  Southwest admits sentences 1, 2 and 3 of Paragraph 123, except that, due to the July 2, 2015 execution of a Gate Use License Agreement between Southwest and Delta, the July 6, 2015 deadline has been extended to allow this Court to rule on the various applications for injunctive relief.  Southwest admits that both it and Delta claim a right to operate out of the gates, but denies that Delta has any such right. Sentence 5 of Paragraph 123 contains a legal argument which requires no response.**

124.    If other parties fail to do so in time for the Court to consider their requests, the City may find it necessary to seek a temporary restraining order or a preliminary injunction to prevent chaos at Love Field on and after July 6, 2015, during the pendency of this suit.

**RESPONSE:  Paragraph 124 contains a legal argument which requires no response.**

### SOUTHWEST'S COUNTERCLAIM AGAINST THE CITY OF DALLAS AND CROSSCLAIM AGAINST DELTA

#### I.      PARTIES

1.      Defendant/Cross-Plaintiff/Counter-Plaintiff Southwest Airlines Co. is a Texas corporation with its principal place of business in Dallas County, Texas.

2.      Defendant/Cross-Defendant Delta Air Lines, Inc. is a Delaware corporation doing business in Texas, with its principal place of business in Atlanta, Georgia.  Delta has appeared in this action for all purposes and may be served through counsel.

3.      Plaintiff/Counter-Defendant City is a Texas home rule municipal corporation with its principal offices located in Dallas County, Texas.  The City has appeared in this action for all purposes and may be served through counsel.

#### II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Southwest's cross-claim pursuant to 28 U.S.C. § 1332 because Southwest and Delta are citizens of different States and the amount in controversy exceeds $75,000.

5.      This Court has subject matter jurisdiction over Southwest's counter-claim pursuant to 28 U.S.C. § 1331.  All state law issues so relate to the federal questions presented that they form part of the same case and controversy pursuant to 28 U.S.C. § 1367.

6.      This Court has personal jurisdiction over Defendant Delta Airlines, Inc. because it is doing business in Texas and has committed torts in Texas.

7.      Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims occurred in this county.

### III.   BACKGROUND AND FACTS[1]

**A.**   **Introduction**

8.      This case concerns Delta's efforts to deprive Southwest of its contractual rights to fully utilize the gates it negotiated for and now preferentially leases at Love Field.  Delta has no lease or other contractual right from the City (or anyone else) to operate out of Love Field.  Nevertheless, it seeks accommodation (i.e., the use of gate space leased to other airlines) at Love Field to operate at least 5 daily flights out of gates that it has no right to use at the expense of the current preferential leaseholders.  In seeking such accommodation, Delta has – contrary to the carriers' contractual rights and in direct conflict with federal law – demanded that the City force the existing Love Field carriers to provide Delta with gate access in perpetuity.

9.      Instead of complying with its contractual obligations requiring it to deny Delta's request, the City has thrown up its hands and sought relief from this Court, asking for a declaratory determination as to Delta's rights, if any, to continue to access gates space at Love Field far into the future.

10.     Meanwhile, though Delta lacks any legal right to occupy gate space at Love Field past the expiration of its license, it has refused to vacate.  Indeed, Delta continues to sell tickets for flights from Love Field for dates long after the expiration of its license.

11.     Remarkably, not only does the firestorm created by Delta's demands have no basis in law, but it has no basis in practical fact either.  Unlike Southwest, which is essentially restricted from operating out of any airport other than Love Field in the Dallas-Fort Worth area, Delta already maintains a significant presence at the Dallas/Fort Worth International Airport ("DFW").  And since Love Field and DFW serve the identical market, Delta can simply shift its

---

[1] Southwest incorporates by reference the background and facts set forth in its Brief in Support of Its Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction Against Delta Air Lines, Inc. [Doc. 11].

5 flights to DFW with no practical effect. Moreover, contrary to Delta's refrain that Southwest has a "virtual monopoly," the reality is that Southwest operates only 18 of the 185 gates serving the Dallas-Fort Worth region (or 9.7%), while Delta operates 6 of the 185 gates serving the Dallas-Fort Worth region (or 3.2%).[2] By comparison, in Atlanta, where Delta has its hub, it operates 117 of the 207 gates serving the greater Atlanta region (or 56.5%),[3] while Southwest operates 18 of the 207 gates (or 8.7%).

12. Forcing Southwest to mandatorily accommodate Delta would violate federal law, a Congressionally-approved agreement regarding gate usage at Love Field, and Southwest's lease with the City.

**B.** **History of Southwest and Love Field**

13. Southwest is one of the largest, most respected, and successful airlines in the United States, despite many years of significant restrictions imposed upon it at its home base of Dallas, Texas.

14. In the forty years following the decision to build DFW, the story of Love Field and DFW has been marked by an abundance of legislation, litigation, administrative proceedings, and, ultimately, compromise. During this time, Southwest has provided consumers in the Dallas-Fort Worth area with hundreds of millions, if not billions, of dollars in savings from its low-fare air services to and from Love Field. Through Southwest's successful efforts to keep Love Field open, and thereby provide competition in air fares with the airlines operating at

---

[2] As set forth in the City's Original Complaint, the Department of Justice has repeatedly stated on behalf of the United States, and structured one or more agreed judgments to be consistent with its position, that Love Field and DFW Airport comprises a single market for commercial passenger air travel. *See* City's Complaint, at ¶ 52.

[3] Atlanta is the 9th largest metropolitan area in the United States, and is the only city in the top 10 that lacks a secondary commercial airport. Delta accounts for approximately 78% of Atlanta's total passenger traffic.

nearby DFW, Southwest has consistently protected the interests of Dallas-Fort Worth area consumers for low-cost travel options.

15.     By the mid-2000s, it had become apparent that the Wright Amendment, originally enacted in 1979 for the purpose of promoting a once-fledgling DFW, was an outdated, anti-competitive relic that unnecessarily restricted commercial air service at Love Field.

16.     Thus, in 2006, Congress urged the cities of Dallas and Fort Worth, as well as the DFW Board and the airlines, to work together on a proposal that would eliminate the Wright Amendment restrictions.

17.     On July 11, 2006, representatives of Dallas, Fort Worth, DFW, American Airlines ("AA"), and Southwest finalized a local agreement, referred to as the Five-Party Agreement, which would lead to the repeal of the Wright Amendment.  A true and correct copy of the Five-Party Agreement is attached hereto as Exhibit 1.

18.     Certain terms of the Five-Party Agreement were codified as the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA"), reflecting acceptance by the U.S. House of Representatives and Senate of the Five-Party Agreement.  A true and correct copy of WARA is attached hereto as Exhibit 2.

19.     The Five-Party Agreement and WARA involved the immediate repeal of "through-ticketing" restrictions at Love Field, and enacted the eventual repeal of domestic interstate restrictions on air service from Love Field, effective October 13, 2014.  Additionally, WARA imposed specific obligations on the City of Dallas.  WARA provides, in pertinent part:

> The city of Dallas . . . shall determine the allocation of leased gates and manage Love Field *in accordance with contractual rights and obligations* existing as of the effective date of this act for certified air carriers providing scheduled passenger service at Love Field on July 11, 2006.

Ex. 2, at § 5(a) (emphasis added).

20.     In order to reach the compromise embodied in the Five-Party Agreement, the airlines serving Love Field, including Southwest, agreed to reduce the number of gates at Love Field from 32 to 20 and permanently limit the number of gates at Love Field to 20.  Southwest agreed to this reduction, and agreed to provide hundreds of millions of dollars for improvements to Love Field, in exchange for being guaranteed full use of its remaining Love Field gates and the eventual repeal of the Wright Amendment.

21.     Notably, the Five-Party Agreement establishes Southwest as the <u>only</u> airline whose growth in the Dallas-Fort Worth market is effectively limited to Love Field.  The Five-Party Agreement restricts Southwest by precluding it from operating any gates at DFW (or any other airport within an 80-mile radius of Love Field) without correspondingly relinquishing control of an equivalent number of gates at Love Field.  *See* <u>Ex. 1</u>, Art. I, ¶ 10.  However, the Five-Party Agreement does <u>not</u> restrict Southwest from operating additional gates at Love Field.

22.     In agreeing to the 20-gate cap at Love Field and the penalties it would incur by operating at DFW, Southwest relied on assurances in the Five-Party Agreement and WARA that it would have the right to fully utilize the gates it operates at Love Field.

## C.     <u>Southwest's Gate Sublease with United Airlines</u>

### *1.     AA/US Airways Merger and the DOJ Settlement*

23.     In 2013, AA and US Airways announced plans to merge the two airlines.

24.     Following this announcement, the United Stated Department of Justice ("DOJ") filed a lawsuit in the United States District Court for the District of Columbia to block the proposed merger.

25.     In early 2014, the airlines and the DOJ settled the lawsuit, thus permitting the merger to go forward, but, as part of this settlement, AA was required to divest itself of its two leased gates at Love Field.

26.     Meanwhile, in anticipation of the then-upcoming repeal of the domestic interstate restrictions at Love Field, Southwest announced 20 new cities that it would begin serving from Love Field in 2014.   However, because Southwest is the principal low-cost competitor to the much larger AA in the Dallas-Fort Worth market, demand for Southwest's nonstop services from Love Field far exceeded its then-existing gate capacity.   Thus, access to AA's divested gates (or any additional Love Field gates) would have allowed Southwest to provide the Dallas-Fort Worth market with the benefits of new nonstop flights to 14 additional destinations that would otherwise not be possible.   Accordingly, Southwest sought to obtain a sublease of the two Love Field gates AA was divesting.

27.     Delta and Virgin America, Inc. ("Virgin") also sought use of the additional AA gates. Delta was at that time operating flights on the AA gates pursuant to a temporary use agreement with AA.

28.     Although Southwest demonstrated that giving it access to the two Love Field gates would provide the Dallas-Fort Worth market with new nonstop flights to 14 additional destinations that would otherwise not be possible, Virgin proposed adding only three new markets, and Delta sought only to serve a single market.

29.     The City, as the owner and operator of Love Field, had to provide its consent to any sublease of the two Love Field gates.

30.     The City retained L.E.K. Consulting L.L.C. ("L.E.K."), a leading aviation strategy advisor, to evaluate the public statements of plans from the interested carriers, identify key

benefits to Dallas citizens and Love Field, determine what aligned strategically with continued support of DFW, and provide an analysis of which carrier would best serve Dallas citizens and travelers, as well as Love Field and DFW, by using AA's two Love Field gates.

31.     Following extensive research and independent analysis, L.E.K. determined that "Southwest [was] the most attractive option for the City of Dallas."  A true and correct copy of L.E.K.'s recommendation is attached hereto as Exhibit 3.

32.     Furthermore, the Campbell-Hill Aviation Group ("Campbell-Hill") conducted a study quantifying the economic benefits of Southwest service on two additional gates at Love Field, and found that Southwest's proposed service would:

a.     Reduce airfares nearly $100 per roundtrip in the new Love Field markets;

b.     Produce more than $210 million in fare savings annually to Dallas residents and visitors;

c.     Result in 1.4 million additional passengers per year flying to and from Dallas; and

d.     Attract 350,000 new visitors to the Dallas area annually—visitors who will spend money in the local economy generating over 4,700 new jobs, $214 million in annual earnings to local workers, and $559 million in local sales per year.

A true and correct copy of the Campbell-Hill report is attached hereto as Exhibit 4.

33.     Virgin and Delta, unlike Southwest, did not have restrictions on expanding at DFW, which had, and continues to have, available gates.

34.     Despite the evidence strongly supporting awarding the AA lease to Southwest, and even though Virgin was not restricted from expanding at DFW, the City approved AA and the DOJ's proposed sublease of the two Love Field gates to Virgin.

35.     As Southwest was (and is) the only low cost carrier that could effectively provide rigorous price competition to AA — the dominant airline in the Dallas-Fort Worth market — the decision to award the sublease to Virgin was an unconventional and puzzling result.

36.     In addition to the empirical evidence, public and private individuals supported awarding the gates to Southwest.  Numerous letters from elected officials, chambers of commerce, convention and visitors' bureaus, other private organizations, and innumerable private citizens poured into the City's office in support of Southwest.

37.     Despite this overwhelming evidence and support for giving the gates to Southwest, the City awarded the two AA gates to Virgin.

38.     Following AA's divestiture to Virgin, the gate allocation at Love Field was as follows:  Southwest retained 16 leased gates (which constituted its entire presence in the Dallas-Fort Worth market, which has a total of 185 gates), Virgin leased two gates, and United leased two gates.

### 2.     *The United Gates*

39.     Upon information and belief, on or about August 1, 2001, the City and Continental Airlines, Inc.'s predecessor in interest, ExpressJet (collectively, "Continental"), entered into a Lease of Terminal Building Premises concerning Continental's operations at Love Field.

40.     Pursuant to the Five-Party Agreement and the enactment of WARA, Continental and the City entered into an Amended and Restated Lease of Terminal Building Premises (Airport Use and Lease Agreement), effective October 1, 2008 (the "United Lease").  United is the successor in interest to Continental under the United Lease.

41.     On October 6, 2014, United and Southwest reached an agreement (the "Asset Transfer Agreement") whereby Southwest would sublease (the "United Sublease") United's two gates at Love Field (the "United Gates").  United's Lease provided that the City could not unreasonably withhold or delay its consent to any sublease or assignment of the United Gates.

42.     Nevertheless, the City unreasonably delayed its consent for more than three months, finally consenting to the United Sublease, subject to certain terms and conditions, on January 28, 2015.

43.     Southwest submitted the United Sublease to the DOJ Antitrust Division for its review.  Following the DOJ's investigation, it allowed the United Sublease to go into effect without imposing any conditions in January 2015.

**D.     The Accommodation of Delta**

  *1.     Delta's Requested Accommodation and the Carriers' Attempts to Accommodate Delta*

44.     At or around the same time that Southwest was negotiating the Asset Transfer Agreement with United, Delta, who had previously operated on AA's gates via month-to-month agreements, began seeking long-term accommodation at Love Field, as its access at American's gates was expiring upon AA's divestiture of those gates.

45.     The City's Lease with the airlines at Love Field contains provisions governing the possible accommodation of other airlines at Love Field.  A true and correct copy of Southwest's Lease with the City is attached hereto as Exhibit 5.

46.     Specifically, section 4.06.C of Southwest's Lease provides that Southwest must allow other airlines to use its gates only *"[a]t those times that [Southwest] has no scheduled use for one or more of its assigned Gate(s)*." Ex. 5, at § 4.06.C (emphasis added).  However, the Lease is explicit that "*in no event shall said use by others take precedence over [Southwest's] scheduled use*." *Id.* (emphasis added).  The Lease also provides that incumbent airlines will accommodate a requesting airline only **"***at such times that will not unduly interfere with [the incumbent airline's] operating schedule.***"** *Id.* at § 4.06.F. (emphasis added).  Thus, Southwest

has a completely unrestricted contractual right to make full utilization of its leased gates, including by expanding its scheduled service on those gates.

47.     The Five-Party Agreement and WARA require the City to manage requests for accommodation in accordance with the City's Love Field leases.  *See* Ex. 1, at Art. I, ¶ 3(b); Ex. 2, at § 5(a).  Accordingly, both WARA and the Five-Party Agreement require the City to honor Southwest's right to make full utilization of its leased gates.

48.     WARA contains additional provisions dealing specifically with accommodation.[4] WARA provides that it does not act to limit the authority of the federal government to enforce requirements of law and grant assurances[5] which impose obligations on Love Field to "make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities."   However, WARA also provides that such obligations "shall not be construed to require the city of Dallas . . . to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."   Ex. 2, at § 5(e)(2)(B)(ii).  In other words, WARA makes clear that federal law and the grant assurances regarding the City's operation of Love Field *do not require* the City to modify existing carriers' preferential lease rights in order to accommodate a requesting airline, unless such modification or elimination is implemented on a nationwide basis.

---

[4] Under WARA, the City is required to manage Love Field "in accordance w/[ pre-existing] contractual rights and obligations," which includes, among other things, the Five Party Agreement. *See* Ex. 2, at §5(a).  The Five Party Agreement makes clear that questions of accommodation should be decided in accordance with the provisions of the Southwest's Lease with the City.   *See* Ex. 1, at Art. I(1)(a).  As discussed above, Southwest's Lease, in turn, specifically sets forth the conditions under which any forced accommodation must occur.

[5] When an airport operator, such as the City, accepts federal funds for airport projects, it must provide certain "grant assurances" to the federal government regarding their operation of the airport(s).  A list of the grant assurances can be found on the Federal Aviation Administration's ("FAA") website, at the following address: http://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip.pdf.

49.     On September 18, 2014, Delta requested gate accommodation at Love Field from the City to run 5 flights a day out of Love Field solely to a single destination—Atlanta's Hartsfield-Jackson International Airport.

50.     Following Delta's request, Southwest and the other Love Field carriers voluntarily worked with Delta to provide Delta with the temporary usage of gate space that was not then being fully utilized.  From the outset, Southwest intended Delta's usage of the gate space to be temporary, as Southwest had long planned and intended to fully utilize its gates starting in 2015.  Indeed, Southwest agreed to the Five Party Agreement (which was subsequently codified in WARA), thereby giving up additional gate space and promising to spend (and ultimately did spend) hundreds of millions of dollars on Love Field, and also paid a large amount of money to acquire United's two gates, just so it could be in a position to fully utilize its 18 gates at Love Field.  Consistent with its intention to fully utilize its gates in 2015, Southwest specifically agreed to provide Delta with temporary use of one of its gates that was then available from October 13, 2014, through January 6, 2015, to run its five daily flights. Southwest agreed to this arrangement voluntarily, consistent with industry practice where gate space is not being fully utilized by the leaseholder, as well as to protect passengers who had booked Delta flights based on the fact that Delta had advertised for sale and accepted bookings for flights at dates and times that Delta either knew or should have known it had no right to operate.  By virtue of Southwest voluntarily and temporarily providing Delta gate access, Delta had the opportunity to fulfill its commitment to passengers and adjust its future schedule to avoid making false representations about its schedule after January 6, 2015.  Nevertheless, Delta continued to make such false representations by advertising for sale flights from Love Field on

and after January 6, 2015, even though it did not, at the time, have any basis to operate at Love Field after January 6.

51.     With Delta's temporary gate use agreement with Southwest set to expire, and with Delta having wrongfully sold flights from Love Field that would occur after January 6, 2015, United voluntarily offered to allow Delta to operate temporarily on United's gates (which United was not then fully utilizing) for a period of 180 days, commencing on January 7, 2015, under essentially the same terms and conditions as Delta's temporary gate use agreement with Southwest.   Amazingly, Delta initially refused United's generous offer because it did not constitute *permanent* accommodation at Love Field as Delta was then demanding.   As discussed more fully below, Delta eventually accepted this offer.

52.     During negotiations of Delta's accommodation request, Delta made clear that it was not seeking the traditional temporary accommodation that has been the industry practice for accommodating non-tenant airlines at airports around the country; rather, it was demanding an unprecedented right of *permanent* accommodation at Love Field.   In essence, Delta was seeking to acquire Love Field gate space on a permanent basis without acquiring a lease with the City and without paying the existing leaseholder fair market value for such extremely valuable space.

53.     During negotiations, Delta approached Southwest about permanent access on its gates at Love Field.   However, as set forth above, Southwest had plans to fully utilize its then-16 Love Field gates plus the 2 gates it would eventually sublease from United.   Beginning August 2015, Southwest's flight schedule increases to 180 daily flights pursuant to an additional tranche of service that was announced in February 2015.   These 180 flights represent full utilization of Southwest's 18 gates under any reasonable measure.   Thus, Southwest could not provide Delta permanent gate access without negatively impacting operations and customer experience at Love

Field.  However, in an effort to come to a voluntary commercial agreement regarding gate access, Southwest made several alternative offers to Delta for a potential longer-term gate access deal at Love Field in exchange for fair compensation for the value of the gate space involved. These offers included proposals for an exchange of value representative of the gate space that would be necessary to allow Delta to operate its five flights at Love Field.

54.     Remarkably, Delta refused Southwest's offers without participating in any meaningful negotiation.  In essence, Delta demanded that Southwest forego five of its own flights at Love Field, give up valuable and scarce Love Field gate space to Delta so that Delta could run its five daily flights, and accept no more than nominal rent as compensation.

### 2.     The Initial "Mandatory Accommodation" Process

55.     Southwest's Love Field Lease with the City provides that the airlines are responsible for working out a voluntary accommodation arrangement, if gate space is available for such an arrangement.  If this is not achieved, the City can initiate a formal accommodation process.  However, the City is precluded from initiating this process unless and until a requesting airline demonstrates to the City that it has "exhausted all reasonable efforts to secure accommodations." Ex. 5, at § 4.06.F.2.

56.     As set forth above, Southwest made reasonable offers to Delta for a voluntary, long-term commercial agreement for gate access at Love Field.  Delta refused these offers and refused to provide reasonable counter-offers or otherwise participate in negotiations over its demand for permanent gate access.

57.     Despite Delta's refusal to participate in good faith negotiations over a long term gate access agreement at Love Field, on December 1, 2014, the City sent a letter (the "Initial Mandatory Accommodation Letter") to Southwest, Virgin, United, and Delta informing the

airlines that the City was initiating the formal process with the airlines whereby the City would select an incumbent carrier that would be forced accommodate Delta.

58.     Aside from being premature because Delta did not exhaust all reasonable efforts to secure accommodation, the Initial Mandatory Accommodation Letter also violated other of the City's contractual and statutory duties regarding its management of Love Field, which Southwest explained in its December 8, 2014 response to the Initial Mandatory Accommodation Letter.  A true and correct copy of Southwest's response is attached hereto as Exhibit 6.

59.     Furthermore, the Initial Mandatory Accommodation Letter also violated Southwest's rights under its Lease.  The City's "Accommodation Criteria" provided that the City would make its accommodation decision based on the carrier's published schedules as of a "snap shot" date, which the City said ordinarily would be the date of the accommodation request.  The effect of this "snap shot" date is to preclude a signatory carrier from expanding its own service on its leased gates for any schedule published after the "snap shot" date or for schedules published as of the "snap shot" date that extend beyond 6 months after that date.  As the City now appears to recognize in its Original Complaint, mandating accommodation based on a "snap shot" date would have violated Southwest's preferential use rights under the Lease.  Ex. 5, at § 4.06.C & F.  The use of a "snap shot" date also would have conflicted with long-standing policies of the FAA and DOT, which have never required that accommodation decisions be based on a carrier's schedules only as of a "snap shot" date.  In fact, the DOT's policy, as stated in the DOT/FAA publication *Airport Business Practices and Their Impact on Airline Competition* (1999) ("*ABP Guide*"), is that, in considering an accommodation request, "an air

carrier tenant is *not* required to cancel flights or to forfeit its use of airport facilities." *Id.* at p. 13 (emphasis added).[6]

60.     Moreover, the City's proposed 6 month cutoff after the "snap shot" date for consideration of incumbent carrier schedules is not only arbitrary, but depending on the specific "snap shot" date chosen, could be highly prejudicial to Southwest given its deliberately gradual expansion of service in the post-Wright Amendment repeal period.  Southwest has progressively and systematically increased Love Field service over the last several months, from 118 nonstop daily flights just prior to the October 2014 repeal, to 166 flights today, to 180 flights beginning August 9.

61.     Southwest's measured expansion of service was done in full consideration of the significant operational, reliability, and passenger-handling considerations that arose from operating at the newly-rebuilt Love Field.  Southwest's decision to gradually ramp up its post-repeal service has been prudent, as a number of operational and other challenges at the airport have arisen during this period that needed to be addressed, including passenger parking problems.  The use of a "snap shot" date with a 6 month cutoff would penalize Southwest for using its good judgment in not over-taxing the new airport by immediately launching the maximum possible schedule as of the October 2014 repeal of the Wright Amendment, but instead ramping up to the level of 180 flights over a period of several months.

62.     Importantly, despite purporting to initiate the mandatory accommodation process, the City never mandated that Delta be accommodated.

### 3.     *The DOT Letters*

63.     In connection with Delta's demand for accommodation, the City sought input from the DOT regarding the City's obligations under federal law and the grant assurances.

---

[6] The *ABP Guide* is publicly available at http://ntl.bts.gov/lib/17000/17100/17129/PB2000108301.pdf.

64.     On December 17, 2014, the DOT sent a letter to the City (the "First DOT Letter") advising the City as to its accommodation responsibilities.   Remarkably, in contravention of longstanding DOT and FAA policies and Southwest's Lease rights, the DOT noted that any mandatory accommodation made by the City for a requesting carrier must be made on a *permanent* basis, so long as the accommodated carrier continues its requested service. Furthermore, the First DOT Letter approved the use of the novel "snap shot" date to determine availability for accommodation.

65.     The DOT's statements contravene and unlawfully modify Southwest's Lease rights to make full use of its leased gates.   Ex. 5, at § 4.06.C & F.   In addition, these statements not only lack support in federal law which, as discussed above, explicitly does *not* require the City to modify existing carriers' leases in order to accommodate a requesting airline, but also contradict longstanding DOT and FAA policies providing that an air carrier tenant is not required to cancel flights or forfeit use of airport facilities for an accommodated carrier.   *ABP Guide* at p. 13.

66.     Furthermore, such "permanent accommodation," if it were applied by the DOT on a nationwide basis, would jeopardize airport financing and impose unreasonable burdens on airport management, as carriers would be significantly less inclined to agree to leases for gate space at airports that could, at any moment, be permanently taken away.

67.     Despite the objectionable and unsupported statements in the First DOT Letter, the DOT correctly reaffirmed that any accommodation decision was, first and foremost, "within the City's discretion."

68.     Even though the First DOT Letter was contrary to federal law and long-standing policies regarding the operation of airports, and was sent without public input by affected parties,

the City informed the airlines that it was treating the 2014 Letter as promulgating final and binding directives on the City.  Because the City was treating the First DOT Letter as a final and binding order, Southwest was forced to appeal the DOT Letter to the U.S. Court of Appeals for the D.C. Circuit.  Southwest's appeal is pending as of the date of this filing.

69.     On June 15, 2015, the DOT sent the City a second letter (the "Second DOT Letter") (collectively, the "DOT Letters"), largely reiterating the positions the DOT took in the First DOT Letter.  However, again, the Second DOT Letter made clear that "it is the City's responsibility to decide how to act on Delta's requests" and that "[u]ltimately . . . it is the City that must make a decision."

70.     Upon discovering the contents of the First DOT Letter, numerous airport operators around the country wrote to the DOT expressing their concern over the Letter's contents.  A true and correct copy of certain of these letters is attached hereto as Exhibit 7.  In their letters, the airport operators noted the "harmful implications" that the policies set forth in First DOT Letter would have on airports throughout the country.  Namely, airports are concerned with the "fundamental departure from decades of industry understanding of federal competition requirements" that the First DOT Letter set forth by declaring that accommodation may last in perpetuity at the option of the accommodated carrier.  The airports operators' letters clearly demonstrate that the policies promoted by the DOT Letters, if applied on a nationwide basis, would wreak havoc on airports throughout the country by fundamentally changing the nature of airport lease rights.  The airport operators are further frustrated that the DOT would make such a fundamental change in policy without any input by airport operators, airlines, and other stakeholders that are directly affected by such policy.

### 4.      Delta's and AA's New Accommodation Requests

71.      Following the First DOT Letter, on December 24, 2014, the City issued a letter purporting to require the temporary continuation of the then-existing gate use license agreement between Southwest and Delta that was set to expire on January 6, 2015.  Although it was not made clear in the letter, the City subsequently informed the airlines that its intention was to require United to temporarily accommodate Delta through February 28, 2015.  United reiterated to the City, and to Delta, that it had already offered to voluntarily provide Delta gate access for 180 days.  Delta, faced with the possible embarrassment of having no Love Field gate access on January 7, 2015 despite having sold flights for that date and beyond, eventually accepted United's generous offer.  Remarkably, this near embarrassment only emboldened Delta even more.

72.      On February 23, 2015, with the prospect of its gate use license agreement terminating in July, Delta again demanded accommodation at Love Field, again on a permanent basis, to operate five (5) daily flights, again, solely to a single destination, Atlanta.  But that's not all.  *Delta went even further and requested accommodation for an additional eight (8) daily flights from Love Field.*  Thus, Delta sought to operate thirteen (13) daily flights from Love Field, effectively using most of the additional two gates that Southwest has subleased at great expense from United for its own additional flights – without a lease from the City and without paying fair market value for scarce Love Field space.

73.      Delta's attempts to force its way in to Love Field encouraged other airlines to attempt the same.  AA, despite having just recently been forced to divest two gates at Love Field, and despite operating more than 800 daily flights at DFW, on February 6, 2015, also requested accommodation for four daily flights at Love Field.  This meant that legacy carriers Delta and

AA, without any lease agreement with the City, were now requesting accommodation of 17 daily flights—nearly full use of Southwest's two subleased gates.

74.    AA's and Delta's additional requests for accommodation reveal the potential for abuse that Delta's and the DOT's approach to accommodation presents. *First*, accommodation was designed to ensure that "new entrant carriers" have reasonable access to airport facilities. Neither AA nor Delta is a "new entrant" carrier, which is defined by the DOT as a "relatively small, newly established airline[], with low operating costs and low fares." *ABP Guide* at 83. These legacy carriers, among the largest airlines in the world, do not need access at Love Field to compete in the Dallas-Fort Worth market. Indeed, both AA and Delta already have large bases of operation at DFW and are free to expand their operations at that airport at any time. *Second*, "permanent" accommodation would deprive Southwest of the right to fully utilize its leased gates, which would in turn significantly devalue its Love Field Lease.

75.    In addition, unlike Southwest – which is the prototypical "low-cost" airline, famous for low fares and convenient service frequencies – Delta and American are "high-cost" legacy airlines. These airlines often operate smaller aircraft as opposed to Southwest, which only flies larger jets, and they accept reduced consumer demand in exchange for higher fare levels on routes where they do not compete with Southwest. The end result is that if Delta or American replaces flights operated by Southwest at Love Field, it will lead to significantly reduced Love Field capacity at materially higher costs and fares, and the resulting decline in local economic growth and prosperity.

   **5.    *Southwest's Full Schedule and Notification to Delta of Expiring Gate Access***

76.    On February 26, 2015, Southwest publicly announced and began selling an additional 16 flights from Love Field scheduled to begin August 9, 2015, including flights to 8

new nonstop destinations.  This announcement meant that, as of August 9, 2015, Southwest will be operating 180 peak-day flights to 50 nonstop destinations on its 18 Love Field gates, resulting in an average of 10 flights-per-gate per day—full utilization under any possible gate availability analysis.

77.     On February 27, 2015, Southwest specifically provided notice to Delta and the City of its 180-flights-per-day schedule beginning August 9.  At the same time Southwest, which had honored Delta's gate license agreement with respect to the United Gates in connection with its United Sublease, also offered to extend Delta's gate license agreement for two weeks—until July 19, 2015.  This notice gave Delta plenty of time to prepare for the expiration of its access to gates at Love Field.  Delta never responded to this offer.

### 6.     The City's Second "Mandatory Accommodation" Process

78.     In mid-April 2015, the City indicated to Southwest that it was soon going to be re-initiating the "mandatory accommodation" process.  In connection therewith, on April 16, 2015, the City sent to all affected airlines draft accommodation "criteria," "principles" and "gate scheduling rules," (collectively, the "Proposed Accommodation Criteria") which the City said it would use in making its accommodation decision.  The City sought comments from affected airlines on the Proposed Accommodation Criteria.

79.     Because the Proposed Accommodation Criteria, like the Initial Mandatory Accommodation Letter, violated Southwest's lease rights and were contrary to federal law and long-standing policy governing the operation of airports, Southwest provided a response to the City's Proposed Accommodation Criteria on April 28, 2015, detailing its objections to the criteria.  A true and correct copy of Southwest's Response is attached hereto as <u>Exhibit 8</u>.

80.     As with the Initial Mandatory Accommodation Process, the City never mandated that Delta be accommodated.

### 7.     *Delta's Refusal to Vacate and Planned Trespass*

81.     During a telephone call on June 17, 2015, counsel for Delta, Kenneth P. Quinn, informed Southwest that despite the impending termination date of July 6, 2015, Delta was not going to return the leased space to Southwest and, instead, had every intention of remaining on the space and using it for the Atlanta flights for the indefinite future based on letters issued by the DOT in December 2014 and June 2015 relating to Love Field. Mr. Quinn made it clear that absent a court order Delta was not going to vacate the space even after the license agreement with Southwest terminated on July 6, 2015.  Furthermore, Delta's station manager at Love Field informed Southwest employees that Delta had no plans to leave Love Field, even after the expiration of its License.  Delta even went so far as to inform the City that it would employ security personnel in order to physically prevent Southwest from using its Love Field gate space following the expiration of Delta's License.  *See* City's Complaint, at ¶ 97.  Delta's stated plan to trespass on Southwest's leased gate space could have easily deteriorated into a scenario of battling passengers, half of whom have no flights, dueling airlines and clashing private security personnel—precisely the situation the City, Southwest, and the other airlines which provided Delta with ample time to leave Love Field have worked so diligently to avoid.

82.     In sum, Delta admitted that, as of July 7, 2015, it would trespass on Southwest's Love Field gates and would disrupt and/or prevent Southwest's planned operations on those gates, by physical force if necessary.  Furthermore, Delta represented that it would permanently trespass on Southwest's property, as it had "no intention" of ever leaving the gate space.  Delta's

intention was made all the more clear by the fact that it continued to accept reservations for its current five daily flights after July 6, 2015.

### 8.     The City's Lawsuit and the Extension of Delta's License

83.     Despite Southwest's contractual and statutory rights and the numerous policy reasons for refusing accommodation to a legacy carrier like Delta – which already possesses the ability to compete in, and expand its operations in, the Dallas-Fort Worth market – the City, while never granting Delta's accommodation request, failed to formally deny Delta's accommodation request.

84.     Rather, on June 17, 2015, with Delta's temporary license on Southwest's gates set to expire on July 6, the City filed this lawsuit, seeking, among other things, a declaration from this Court as to what its decision should be.

85.     In response to Delta's threat to trespass on Southwest's property following the expiration of its license, Southwest filed an application for temporary injunctive relief.  Delta and the City likewise filed applications for temporary injunctive relief.

86.     After a telephonic hearing, and in order to provide the Court with more time to review the parties' briefs and consider the significant legal issues involved, Southwest agreed to extend Delta's temporary license agreement.  Southwest and Delta executed a Gate Use License Agreement on July 2, 2015, extending Delta's license to use Southwest's gates to operate 5 flights a day until the earlier of September 30, 2015 or the date the Court issues an order granting injunctive or final relief.  However, Delta continues to seek permanent accommodation at Love Field and still has no intention, absent a court order, of abandoning Southwest's Love Field gates following the expiration of its extended license.

87.     As demonstrated, mandating that Southwest accommodate Delta on Southwest's fully-utilized gates would violate Southwest's lease rights, the Five-Party Agreement, and WARA, and constitute an impermissible taking of Southwest's property rights without just compensation.

## IV.     CAUSES OF ACTION

### A.     Count One: Trespass Against Delta

88.     Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

89.     Pursuant to the Southwest Lease and the United Sublease, Southwest has a lawful right to possess its Love Field gates.

90.     Delta has admitted that it will physically, intentionally, and voluntarily enter Southwest's property without a legal right to do so upon the expiration of its License.

91.     Delta's trespass will cause injury to Southwest's right of possession.

92.     Southwest seeks injunctive relief to enjoin Delta's trespass, in addition to its actual damages.

### B.     Count Two: Declaratory Judgment Against Delta

93.     Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

94.     Pursuant to the Southwest Lease and the United Sublease, Southwest has a lawful right to possess its Love Field gates.

95.     Delta's only right to Love Field gate access is pursuant to the License.

96.     The License expires, at the latest, on September 30, 2015.

97.     After the License expires, Delta will have no legal right to gate access at Love Field.  Despite this, Delta intends to continue to occupy and operate out of Southwest's Love Field gates after the License expires.

98.     Thus, there exists a case or controversy as to whether Delta has any right to operate out of Southwest's Love Field gates following the License's expiration.

99.     Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that (1) Southwest has a possessory right to its 18 Love Field gates, and (2) Delta has no right to occupy or operate out of Southwest's Love Field gates after the expiration of the License.

## C.     Count Three: Declaratory Judgment Against City

100.     Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

101.     There exists a case or controversy as to whether the DOT Letters and/or the Grant Assurances require the City to accommodate Delta at Love Field.

102.     Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that neither the DOT Letters nor the Grant Assurances (nor any provision in federal law) require the City to accommodate Delta at Love Field when doing so will unduly interfere with Southwest's use of its gates.

## D.     Count Four: Declaratory Judgment Against City

103.     Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

104.     Southwest's Lease provides that Southwest could *only* be required to accommodate another airline "[a]t those times that [Southwest] has no scheduled use for one or more of its assigned Gate(s)," that "in no event shall said use by others take precedence over

[Southwest's] scheduled use," and that Southwest would be required to accommodate a requesting airline *only* "at such times that will not unduly interfere with [the incumbent airline's] operating schedule." Thus, Southwest has a completely unrestricted contractual right to make full utilization of its leased gates, including by expanding its scheduled service on those gates.

105.    Nevertheless, the City has failed to deny Delta's accommodation request, even though Southwest will be fully utilizing its gates beginning August 2015.

106.    Thus, there exists a case or controversy as to whether Southwest has the right to fully utilize its Love Field gates.

107.    Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that, pursuant to its Lease, it has the right to fully utilize its leased gates.

E.    **Count Five: Declaratory Judgment Against City**

108.    Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

109.    The Five-Party Agreement requires the City to manage accommodation requests "pursuant to Dallas' existing lease agreements." *See* Ex. 1, at Art. I, § 3(b). WARA requires the City to "determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations." *See* Ex. 2, at § 5(a). As set forth above, the Southwest Lease gives Southwest the right to make full utilization of its leased gates, including by expanding its scheduled service on those gates. *See id.*, at §§ 4.06.C & F.

110.    There exists a case or controversy as to whether the City has fulfilled its contractual and statutory obligations regarding its management of Love Field.

111.    Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that the City would breach its Lease with Southwest, breach the Five-Party Agreement, and violate WARA by (1)

forcing Southwest to accommodate Delta, thereby preventing Southwest from fully utilizing its leased gates for its own operations; (2) basing its accommodation decision on a "snap shot" date of carriers' previously-published schedules; and (3) providing accommodation on a permanent basis.

F.     **Count Six: Declaratory Judgment Against City**

112.    Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

113.    WARA contains provisions dealing specifically with accommodation. WARA provides that it does not act to limit the authority of the federal government to enforce requirements of law and grant assurances[7] which impose obligations on Love Field to "make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities."   However, WARA provides that such obligations "shall not be construed to require the city of Dallas . . . to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."   Ex. 2, at § 5(e)(2)(B)(ii).

114.    There exists a case or controversy as to whether the City is required to modify or eliminate Southwest's preferential gate leases in order to allocate gate capacity to Delta.

115.    Pursuant to 22 U.S.C. § 2201, Southwest seeks a declaration that the City is not required to modify or eliminate Southwest's preferential gate lease at Love Field in order to allocate gate capacity to Delta given that Delta is not a "new entrant" and there has been no

---

[7] When an airport operator, such as the City, accepts federal funds for airport projects, it must provide certain "grant assurances" to the federal government regarding their operation of the airport(s).  A list of the grant assurances can be found on the Federal Aviation Administration's ("FAA") website, at the following address: http://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip.pdf.

modification or elimination of preferential lease rights "implemented on a nationwide basis," as required by WARA section 5(e)(2)(B)(ii).

## G.    <u>Count Seven: Requests for Injunctive Relief</u>

1.     Southwest hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

2.     Southwest's request for temporary injunctive relief is set forth in its Brief in Support of its Verified Application for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction Against Delta Air Lines, Inc.

3.     Southwest is entitled to permanent injunctive relief to enjoin Delta and its agents, servants, employees, attorneys, and any persons or entities acting in concert or participation with Delta, from trespassing on Southwest's Love Field gates following the expiration of the License.

## V.    JURY DEMAND

4.     Southwest hereby requests a trial by jury in this action and has tendered the appropriate fee.

## VI.    PRAYER

For these reasons, Plaintiff Southwest Airlines Co. hereby requests that the Court award the following relief:

a.     Enter judgment on Southwest's claims against Delta and the City;

b.     Enter declaratory judgments for Southwest, as provided above;

c.     Set Southwest's Application for Preliminary Injunction for hearing so a decision can be made as soon as possible, order expedited discovery related to the same, and upon conclusion of the hearing on Southwest's Application for Preliminary

Injunction, enter a preliminary injunction for the duration of this lawsuit, as requested above;

d.      Upon final hearing, enter a permanent injunction, as requested above;

e.      Award Southwest actual damages, reasonable and necessary attorneys' fees, and court costs; and

f.      Grant all such other and further relief at law or in equity that the Court may deem just and proper.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Southwest respectfully ask the Court to deny all relief requested in the City of Dallas' Original Complaint, that Southwest be awarded its attorneys' fees and costs, that judgment be entered in Southwest's favor, and for all such other and further relief, both at law and in equity, to which Southwest may be justly entitled.

DATED:  July 9, 2015                    Respectfully submitted


                                        */s/ Kent D. Krabill*
                                        John T. Cox, III
                                        Texas Bar No. 24003722
                                        Email: tcox@lynnllp.com
                                        Kent D. Krabill
                                        Texas Bar No. 24060115
                                        Email: kkrabill@lynnllp.com
                                        Britta Erin Stanton
                                        Texas Bar No. 24036976
                                        bstanton@lynnllp.com
                                        Stephen M. Cole
                                        Texas Bar No. 24078358
                                        Email: scole@lynnllp.com

                                        **LYNN TILLOTSON PINKER & COX, LLP**
                                        2100 Ross Avenue, Suite 2700
                                        Dallas, TX 75201
                                        Telephone:  214.981.3830
                                        Facsimile:  214.981.3839
                                        **ATTORNEYS FOR DEFENDANT
                                        SOUTHWEST AIRLINES CO.**


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 9, 2015, the foregoing document was served on all counsel of record through the Court's ECF system.


                                        */s/ Kent D. Krabill*
                                        Kent D. Krabill

4814-6138-6789, v.  5

---

**DEFENDANT SOUTHWEST AIRLINES CO.'S FIRST AMENDED ANSWER TO
CITY OF DALLAS' ORIGINAL COMPLAINT, COUNTERCLAIM AGAINST
CITY OF DALLAS, AND CROSSCLAIM AGAINST DELTA AIR LINES, INC.**          **PAGE 82**