# AMENDED AND RESTATED LEASE OF TERMINAL BUILDING PREMISES
## (Airport Use and Lease Agreement)

### by and between

### CITY OF DALLAS

### and

### SOUTHWEST AIRLINES CO.

**EXHIBIT 5**

## TABLE OF CONTENTS

Page

RECITALS ............................................................................................... 1

Article 1. DEFINITIONS. ............................................................................ 4

Article 2.  RIGHTS AND PRIVILEGES
Section 2.01.    Use of Airport .......................................................... 11
Section 2.02.    Ground Handling Services ........................................... 12
Section 2.03.    Rights Reserved by City ............................................. 13
Section 2.04.    Limitations on Use of Airport ...................................... 13
Section 2.05.    Ingress and Egress .................................................... 15
Section 2.06.  . Sales or Distribution of Food and Beverages and Retail Items ............... 15

Article 3.  TERM
Section 3.01.  . Term and Effective Date .............................................. 17
Section 3.02.   Airline's Rights Upon Expiration or Early Termination of Agreement ....... 17
Section 3.03.   Surrender of Leased Premises ....................................... 17
Section 3.04.   Airline's Right to Remove Property ................................. 17

Article 4.  LEASED PREMISES
Section 4.01.   Airline's Leased Premises in the Terminal Building Prior to Completion of
                the Love Field Modernization Program ............................. 18
Section 4.02.   Airline's Leased Premises in the Terminal Building Upon Completion of the
                Love Field Modernization Program ................................. 18
Section 4.03.   Proration of the Rental Cost of Common Use Space ............. 19
Section 4.04.   Pre-LFMP Preferential Use Aircraft Parking Positions .......... 20
Section 4.05.   Post-LFMP Preferential Use Aircraft Parking Positions ......... 20
Section 4.06.   Gate Use and Accommodation of Other Airlines ................. 20
Section 4.07.   Covenant Against Liens .............................................. 23
Section 4.08.   City Right of Entry ................................................... 24
Section 4.09.   Substitution of Exhibits ............................................. 24

Article 5.  RENTALS AND FEES
Section 5.01.   General ................................................................. 25
Section 5.02.   Statistical Report ..................................................... 25
Section 5.03.   Terminal Building Space Rentals .................................... 25
Section 5.04.   Apron Fees ............................................................ 26
Section 5.05.   Landing Fee ........................................................... 26
Section 5.06.   Other Fees and Charges .............................................. 27
Section 5.07.   Payment Provisions ................................................... 28

Article 6.  RECALCULATION OF RENTALS AND FEES
Section 6.01.   General ................................................................. 29
Section 6.02.   Annual Budget ......................................................... 29

Section 6.03. Mid-Year Rate Adjustments ........................................................... 30

Section 6.04. Terminal Building Rental Rates..................................................... 31
Section 6.05. Apron Fee Rates ...................................................................... 32
Section 6.06. Landing Fee Rates .................................................................. 33
Section 6.07. Application of Revenues ........................................................... 34
Section 6.08. Aviation Capital Fund "Cap" ..................................................... 34
Section 6.09. Year-End Adjustment to Actual and Settlement .................................. 35

Article 7. LOVE FIELD MODERNIZATION PROGRAM AND OTHER CAPITAL IMPROVEMENTS
Section 7.01. Love Field Modernization Program ............................................... 37
Section 7.02. Post - LFMP - Capital Improvements to Leased Premises ....................... 39
Section 7.03. Future Capital Improvements...................................................... 41

Article 8. OPERATION AND MAINTENANCE
Section 8.01. Existing Leased Premises Conveyed "As Is" ...................................... 44
Section 8.02. Pre-LFMP Maintenance Obligations............................................... 44
Section 8.03. Post-LFMP Maintenance Obligations of City...................................... 44
Section 8.04. Post-LFMP Maintenance Obligations of Airline ................................... 46

Article 9. INDEMNIFICATION
Section 9.01. Indemnification of City.............................................................. 49

Article 10. INSURANCE
Section 10.01. General ............................................................................... 51
Section 10.02. Insurance Requirements for Subcontractors and Affiliates.................... 51
Section 10.03. No Waiver of Responsibility or Liability ......................................... 52

Article 11. DAMAGE OR DESTRUCTION OF LEASED PREMISES
Section 11.01. Damage or Destruction of Leased Premises...................................... 53
Section 11.02. City Property Insurance ............................................................ 53

Article 12. TERMINATION
Section 12.01. Termination by City................................................................. 54
Section 12.02. Remedies Available to City ........................................................ 54
Section 12.03. Survival of the Obligation of Airline .............................................. 55
Section 12.04. Termination by Airline ............................................................. 56
Section 12.05. Right of Airline to Remove Property .............................................. 57

Article 13. ASSIGNMENT AND SUBLETTING
Section 13.01. Assignment and Subletting ........................................................ 58

Article 14. MISCELLANEOUS PROVISIONS
Section 14.01. Rules and Regulations .............................................................. 59
Section 14.02. Competitive Access ................................................................. 59
Section 14.03. Compliance with Law ............................................................... 59
Section 14.04. Compliance with Environmental Regulations..................................... 60

Section 14.05.  Nondiscrimination ......................................................... 63
Section 14.06.  Payment of Taxes.......................................................... 64
Section 14.07.  Right to Lease to United States Government ....................... 65
Section 14.08.  Consents and Approvals ................................................. 65
Section 14.09.  Rights Reserved to City.................................................. 65
Section 14.10.  Notices ...................................................................... 65
Section 14.11.  City's Right to Audit Books and Records ........................... 66
Section 14.12.  Force Majeure.............................................................. 66
Section 14.13.  Non-Waiver................................................................. 66
Section 14.14.  Place of Payments ........................................................ 66
Section 14.15.  Remedies to be Nonexclusive.......................................... 67
Section 14.16.  Exclusiveness of Airline's Rights...................................... 67
Section 14.17.  Titles ........................................................................ 67
Section 14.18.  Severability ................................................................ 67
Section 14.19.  Operation of Airport  .................................................... 67
Section 14.20.  Successors and Assigns  ................................................ 68
Section 14.21.  Relationship of Parties .................................................. 68
Section 14.22.  Conflict of Interest ....................................................... 68
Section 14.23.  Gift to Public Servant.................................................... 68
Section 14.24.  Construction and Application of Terms.............................. 69
Section 14.25.  Venue ....................................................................... 69
Section 14.26.  Counterparts............................................................... 69
Section 14.27.  Condemnation ............................................................. 69
Section 14.28.  No Partnership, Joint Venture or Joint Enterprise................ 70
Section 14.29.  Brokerage .................................................................. 70
Section 14.30.  Quiet Enjoyment.......................................................... 70
Section 14.31   Most Favored Nations ................................................... 70
Section 14.32.  Notice of Contract Claim ............................................... 71
Section 14.33.  Entire Agreement......................................................... 71
Section 14.34.  Subordination ............................................................. 71

SIGNATURES PAGE ........................................................................... 72

## LIST OF EXHIBITS, ATTACHMENTS & RESOLUTIONS

Page

Resolution No. 08-3403, approved by the Dallas City Council on December 10, 2008. ...... 73

EXHIBIT A.      Airport Layout and Cost Center Plan ................................................. 76

EXHIBIT B.      Pre-LFMP Terminal Area Plan ....................................................... 77

EXHIBIT C.      Post-LFMP Terminal Area Plan ...................................................... 78

EXHIBIT D-1.    Pre-LFMP Leased Premises (Drawings) ............................................ 79

EXHIBIT D-2.    Pre-LFMP Leased Premises (Tabulation of Areas and Rentals) ............... 101

EXHIBIT E-1.    Post-LFMP Leased Premises (Drawings) ........................................... 102

EXHIBIT E-2.    Post-LFMP Leased Premises (Tabluation of Areas) ............................. 107

EXHIBIT F.      Terminal Space and Gate Phasing Plan ............................................ 108

EXHIBIT G.      Statistical Report Format ........................................................... 114

EXHIBIT H-1.    Conceptual Illustration of the Calculation of Rates and Charges ............ 115

EXHIBIT H-2.    Computational Illustration of the Calculation of Rates and Charges ....... 116

EXHIBIT I.      Summary of Operation and Maintenance Responsibilities ..................... 119

EXHIBIT J.      Remain Overnight Parking ........................................................... 122

EXHIBIT K.      Chapter 2-86 of the Dallas City Code .............................................. 123

ATTACHMENT 1.     Insurance Requirements ........................................................ 125

## AMENDED AND RESTATED LEASE OF TERMINAL BUILDING PREMISES
### (Airport Use and Lease Agreement)

This Amended and Restated Lease of Terminal Building Premises (this "Agreement") is made and entered into by and between the City of Dallas, Texas, a municipal corporation (hereinafter defined and referred to as the "City") and Southwest Airlines Co., a Texas corporation (hereinafter defined and referred to as the "Airline"). The City and Airline are sometimes referred to herein as the "Parties" and each of the City and Airline individually is sometimes referred to as a "Party."

### RECITALS:

WHEREAS, City is the owner of Dallas Love Field (hereinafter defined and referred to as "Airport"), which is located in the City of Dallas, Dallas County, Texas; and

WHEREAS, Airline is engaged in the business of commercial air transportation of persons, property, cargo, and mail as a scheduled air carrier and is certificated or otherwise authorized by the United States Government to engage in such business; and

WHEREAS, the City, Airline and other airlines serving the Airport previously entered into a Lease of Terminal Building Premises dated August 1, 2001 (the "Existing Terminal Leases"); and

WHEREAS, on July 11, 2006, the City, the City of Fort Worth, the Dallas-Fort Worth International Airport Board, Southwest Airlines Co. ("Southwest") and American Airlines, Inc. ("American") entered into that certain Contract Among The City of Dallas, The City of Fort Worth, Southwest Airlines Co., American Airlines, Inc., and DFW International Airport Board Incorporating the Substance of the Terms of the June 15, 2006 Joint Statement Between the Parties to Resolve the 'Wright Amendment' Issues affecting Dallas Love Field (the "Five Party Agreement") wherein, among other things, the parties thereto agreed to seek to eliminate restrictions on air service at the Airport set forth in existing federal legislation (commonly referred to as "The Wright Amendment"); and

WHEREAS, On October 13, 2006, Public Law 109-352, commonly known as the "Wright Amendment Reform Act of 2006" was signed into law; and

WHEREAS, the Wright Amendment Reform Act of 2006 provides that the interstate flight restrictions imposed on the Airport since 1979 will be lifted on October 13, 2014, in accordance with other terms and conditions set forth in the Wright Amendment Reform Act of 2006; and

WHEREAS, the City agreed in the Five Party Agreement to negotiate amendments of the Existing Terminal Leases with Southwest, American, and ExpressJet Airlines, Inc. ("ExpressJet"), to provide for, among other things, recovery of the costs of the LFMP, herein defined, and to grant Southwest and American options to extend their Existing Terminal Leases until 2028; and

1

WHEREAS, ExpressJet subsequently assigned its lease rights and obligations to Continental Airlines, Inc. ("Continental"); and

WHEREAS, this Agreement is an amendment to and restatement of Airline's existing Lease of Terminal Building Premises and any other leases Airline may have with City for space in the Terminal Building; and

WHEREAS, in the Five Party Agreement, the City and Southwest agreed to the significant redevelopment of portions of the Airport, including the modernization of the existing terminal facilities at the Airport, a program referred to as the "Love Field Modernization Program" or "LFMP," and City and Southwest agreed to work toward completion of the LFMP by October 2014, eight (8) years from the enactment of the Wright Amendment Reform Act of 2006; and

WHEREAS, following enactment of the Wright Amendment Reform Act of 2006, the City retained consultants to perform a terminal area master plan, a plan referred to as the "Terminal Area Redevelopment Program Study" or "TARPS," establishing the requirements and criteria for terminal expansion and modernization and, in a parallel effort, Southwest retained consultants to explore alternative conceptual layouts for terminal redevelopment, including the alternative conceptual layout that has been identified by City and Southwest as "Option C"; and

WHEREAS, on June 25, 2008, by Resolution No. 08-1877, the Dallas City Council approved a "Term Sheet" negotiated by the City and Southwest in which the consultant recommendations were adopted, establishing the consensus recommendation that Option C is the preferred concept for the LFMP and will satisfy the requirements defined in the TARPS; and

WHEREAS, pursuant to the Term Sheet, City and Southwest agreed to enter into this Agreement that would, among other things: (1) express the intent of the Five Party Agreement pertaining to the ongoing airline operations and use of the Airport both during and after the implementation of the LFMP, (2) define and allocate the Airport's gates, (3) incorporate a new rates and charges methodology (as outlined in Exhibit D to the Term Sheet), (4) develop terms for the use of the Airport, including, but not limited to, the airfield and the terminal area aircraft parking area consistent with the terms negotiated with other airlines using the Airport, (5) develop guidelines for future capital improvements at the Airport, and (6) provide such other provisions that are consistent with accomplishing the terms of the Five Party Agreement; and

WHEREAS, Airline has requested City grant it certain rights, privileges and services in connection with the use of said Airport and its facilities in the conduct of Airline's business as a scheduled air carrier; and

WHEREAS, City is willing to grant Airline such rights, privileges and services upon the terms and conditions and for the consideration hereinafter stated; and

WHEREAS, on December 10, 2008, by Resolution No. 08-3403, the Dallas City Council approved this Agreement.

2

NOW, THEREFORE, for and in consideration of the City's lease to Airline of the Leased Premises, herein defined, the City's grant to Airline of the right to use certain portions of the Airport described herein, the Airline's payment to the City of applicable rents, charges and fees related to the Airline's operations at the Airport and the mutual covenants herein contained, it is agreed and understood by and between the City and Airline as follows:

3

## Article 1. DEFINITIONS

In addition to the words and phrases defined in the Recitals above, the following words and phrases, wherever used in this Agreement, shall, for the purpose of this Agreement, have the following meanings:

1.01. "<u>Affiliate</u>" means any Air Transportation Business that is (A) a parent or subsidiary of, or under common control with, Airline, or (B) shares an International Air Transport Association ("IATA") flight designator code with Airline at the Airport ("Code-Sharing Partner"), or (C) otherwise operates under the same or substantially similar trade name as Airline at the Airport and uses the same or substantially similar livery as Airline; provided, that no major airline, as such term is defined by the FAA, shall be classified as an Affiliate of another major airline unless either clause (A) or clause (B) above defines the relationship between such airlines at the Airport. During such period of time that a company is an Affiliate of Airline in accordance with the terms hereof, Affiliate shall have the rights afforded Airline hereunder without the payment of any additional fees, charges or premiums and shall (1) be charged at the same fees, rates and charges as Airline, and (2) be considered as one party with Airline, for purposes of calculating of any joint use or shared use space charges, and for any reconciliation process related to fees and charges. Airline may, at any time, give the City thirty (30) days prior written notice that such an Air Transportation Business otherwise meeting the definition of an "Affiliate" hereunder shall no longer be considered an Affiliate of Airline for purposes of this Agreement. Airline shall be obligated at all times to keep City apprised, in writing, of any designation of an Affiliate or of the removal of any such designation. Affiliate will not be entitled to a separate MII vote, as defined herein, as a result of this relationship to Airline. Affiliate's operational statistics shall be consolidated with Airline's for purposes of determining Airline's MII voting status.

1.02. "<u>Aircraft Arrival(s)</u>" means the arrival at the Airport of any airline's aircraft; provided, however, that as long as the airline provides scheduled passenger service to the Airport, Aircraft Arrivals shall not include: (A) any flight that arrives at or returns to the Airport because of maintenance, mechanical, meteorological, or other precautionary reason or (B) an aircraft ferried in empty: (i) for scheduled maintenance at the Airport or (ii) to replace a disabled aircraft on a scheduled flight from the Airport. All flights conducted for aircrew training shall be considered an Aircraft Arrival and charged in accordance with Section 5.05 of this Agreement.

1.03. "<u>Airline</u>" means the entity that has executed this Agreement and that is identified in the first paragraph of this Agreement.

1.04. "<u>Airport</u>" means Dallas Love Field, Dallas, Texas, as generally depicted in Exhibit A, Airport Layout and Cost Center Plan, attached hereto and made a part hereof, as it now exists or may be modified or expanded from time to time in the future.

1.05. "<u>Airport Cost Centers</u>" means the cost centers to be used in accounting for Airport revenues and costs for the purposes of calculating rates and charges hereunder, as such areas now exist or may hereafter be modified or expanded and as more particularly described below:

4

A.     "<u>Administration</u>" means all administrative and overhead costs of operating, maintaining, and administering the Airport System not directly chargeable to one of the Airport Cost Centers.

B.     "<u>Airfield</u>" means the runways, taxiways, taxilanes, and apron areas (other than the Apron Area and other leased apron areas), navigational aids, hazard designation and warning devices, airfield security roads and fencing, blast fencing, lighting, clear zones and safety areas for landing, taking off and taxiing of aircraft, avigation easements, land utilized in connection therewith or acquired for such purpose, and facilities, the acquisition, construction or installation cost of which is wholly or partially paid by City, as it now exists and as it may be modified or expanded from time to time.

C.     "<u>Apron Area</u>" means the new aircraft apron pavement and associated hydrant fueling system serving the Terminal Building upon completion of the LFMP, as depicted in Exhibit C, including:  Preferential Use Aircraft Parking Positions, RON parking, and associated taxilanes.

D.     "<u>Other Buildings & Areas</u>" means the other buildings and ground areas of the Airport leased or available for lease to other Airport tenants and users, as they now exist or as they may be modified or expanded from time to time.

E.     "<u>Parking & Ground Transportation Area</u>" means the public automobile parking structures and surface parking areas accommodating public automobile parking and ground transportation vehicle staging at the Airport, as they now exist (as depicted in Exhibit B), as they will exist upon completion of the LFMP (as depicted in Exhibit C), or as they may be modified or expanded from time to time.

F.     "<u>Terminal Building</u>" means the passenger terminal complex: (A) as it now exists as of the Effective Date of this Agreement, as depicted in Exhibit B, and (B) as it will exist upon completion of the LFMP, as depicted in Exhibit C.

G.     "<u>Terminal Roadways</u>" means the terminal access roadway (Cedar Springs Road) and the terminal loop roadways and curbsides serving the Terminal Building, as they now exist (as depicted in Exhibit B), as they will exist upon completion of the LFMP (as depicted in Exhibit C), or as they may be modified or expanded from time to time.

1.06.  "<u>Airport System</u>" means all airport, heliport and aviation facilities, or any interest therein, now or from time to time hereafter owned, operated or controlled in whole or in part by the City, together with all properties, facilities and services thereof, and all additions, extensions, replacements and improvements thereto, and all services provided or to be provided by the City in connection therewith.  The Airport System currently includes the Airport, Dallas Executive Airport, and the City's downtown heliport.

1.07.  "<u>Air Transportation Business</u>" shall have the meaning described in Section 2.01.

5

**1.08.** "<u>Amortization</u>" means the level annual charge required to recover the net cost of a Capital Improvement over the Useful Life of the Capital Improvement at the City's Cost of Capital.

**1.09.** "<u>Annual Terminal Building Requirement</u>" shall have the meaning described in Section 6.04.

**1.10.** "<u>Bonds</u>" means the total combination of:

**A.** "<u>General Airport Revenue Bonds</u>" or "<u>GARBs</u>" means bonds, notes or other funding instruments issued by the City to finance non-LFMP Capital Improvements undertaken in accordance with this Agreement; and

**B.** "<u>LFMP Bonds</u>" means bonds, notes or other funding instruments, the interest and principal payments of which are payable from and secured by the full faith and credit of Southwest, as set forth in the Facilities Agreement.

**1.11.** "<u>Capital Improvement</u>" means any capital improvement or capital asset, or series of related improvements or assets, acquired or constructed by City at the Airport which has a net cost of $100,000 or more and a Useful Life of more than one year.

**1.12.** "<u>Certificated Maximum Gross Landing Weight</u>" or "<u>CMGLW</u>" means the current maximum allowable gross landing weight, expressed in 1,000 pound units or fraction thereof, of each aircraft operated by Airline and certificated by the FAA.

**1.13.** "<u>City</u>" means the City of Dallas, Texas, or such other agency, board, authority, or private entity which may succeed to the jurisdiction of City over the Airport System.

**1.14.** "<u>City Manager</u>" means the chief executive officer of the City exercising direct administrative oversight of the Department of Aviation and the Airport System

**1.15.** "<u>Common Use Space</u>" means those portions of the Leased Premises that all airlines share the right to use.

**1.16.** "<u>Connector</u>" has the meaning described in Section 7.01.C.

**1.17.** "<u>Consumer Price Index</u>" means the "Consumer Price Index - U.S. City Averages for all Urban Consumers, All Items Excluding Energy and Food" (not seasonally adjusted) published by the U.S. Department of Labor, Bureau of Labor Statistics, for the most recently available twelve-month period.

**1.18.** "<u>Cost of Capital</u>" means, for Capital Improvements financed with other Airport funds, the current Revenue Bond Index (of 22-year+, "A" rated bonds) published daily in the Wall Street Journal (or successor publication thereto), as of September 30th of the fiscal year the Capital Improvement is placed in service.

6

**1.19.** "<u>Dallas Area Rapid Transit</u>" **or** "<u>DART</u>" has the meaning described in Section 7.01.C.

**1.20.** "<u>Date of Beneficial Occupancy</u>" **or** "<u>DBO</u>" means the date(s) on which the Director certifies that the LFMP, or any portion thereof, is substantially complete and ready for public occupancy and use.

**1.21.** "<u>Debt Service</u>" means the total combination of:

    **A.** "<u>GARB Debt Service</u>" means the annual interest, principal and sinking fund requirements on GARBs; and

    **B.** "<u>LFMP Debt Service</u>" means the annual interest, principal and sinking fund requirements on LFMP Bonds.

**1.22.** "<u>Debt Service Reserve Fund</u>" means the total combination of:

    **A.** "<u>GARB Debt Service Reserve Fund</u>" means any debt service reserve fund established pursuant to the authorizing documents for any GARBs issued by the City; and

    **B.** "<u>LFMP Debt Service Reserve Fund</u>" means any debt service reserve fund established pursuant to the authorizing documents for any LFMP Bonds issued by the LFAMC,

**1.23.** "<u>Department of Aviation</u>" **or** "<u>DOA</u>" means the organizational entity of the City which has responsibility for the operation and administration of the City's Airport System.

**1.24.** "<u>Department of Transportation</u>" **or** "<u>DOT</u>" means the United States Department of Transportation or any successor organization having the same responsibilities as the Department of Transportation.

**1.25.** "<u>Director</u>" means the City's Director of Aviation, or his or her designee, or such other officer to whom the duties and authority of the Director may be assigned by the City Manager of City or by any agency, board or authority which may subsequently succeed to the jurisdiction of City over the Airport.

**1.26.** "<u>Effective Date</u>" means the date set forth Section 3.01 of this Agreement.

**1.27.** "<u>Emergency Repair & Replacement Reserve</u>" means the DOA's Emergency Repair & Replacement Reserve Account, to be maintained in the amount of $5,000,000.

**1.28.** "<u>Exclusive Use Space</u>" means those portions of the Leased Premises that Airline has the sole right to use.

7

**1.29.** "<u>FAA</u>" means the Federal Aviation Administration or any successor organization having the same responsibilities of the FAA.

**1.30.** "<u>Facilities Agreement</u>" has the meaning set forth in Section 7.01.B.2.

**1.31** "<u>Facilities Payments</u>" means amounts owed by Southwest to the LFAMC under the Facilities Agreement.

**1.32.** "<u>Fiscal Year</u>" refers to City's fiscal year and means the twelve-month period commencing October 1st and ending September 30th of the following calendar year, or such other fiscal year as the Dallas City Council may establish by ordinance.

**1.33.** "<u>Gate</u>" has the meaning described in Section 4.06.

**1.34.** "<u>Governmental Agency</u>" means any federal, state, county or City governmental body with jurisdiction over the Airport or the Parties hereto.

**1.35.** "<u>Ground Handling Services</u>" means any of the following: on and off loading of passengers (including ticketing), baggage, mail or cargo; into-plane fueling; in-flight catering; servicing aircraft lavatories; providing ground power, potable water and preconditioned air; cleaning the interior of aircraft; and any other similar ground services, including on-call or routine aircraft maintenance services.

**1.36.** "<u>Leased Premises</u>" means the Exclusive Use Space, Preferential Use Space, Common Use Space, and Preferential Use Aircraft Parking Positions leased to Airline pursuant to Sections 4.01, 4.02, 4.04, and 4.05 hereof.

**1.37.** "<u>Love Field Airport Modernization Corporation</u>" or "<u>LFAMC</u>" means the local government corporation created by the City under Subchapter D, Ch. 431 of the Texas Transportation Code for the purpose of issuing bonds to finance the LFMP.

**1.38.** "<u>Love Field Modernization Program</u>" or "<u>LFMP</u>" means the ongoing program of improvements and renovations to terminal facilities at the Airport being undertaken by the City and Southwest pursuant to the Program Development Agreement.

**1.39.** "<u>Majority-in-Interest</u>" or "<u>MII</u>" means those Signatory Airlines that: (1) account for at least 66 2/3% of the total rentals, fees and charges paid by all Signatory Airlines and their Affiliates at the Airport during the immediately preceding Fiscal Year *and* (2) represent no fewer than 50% of the number of Signatory Airlines operating at the Airport at any time that MII consultation is required.

**1.40.** "<u>Net Cost</u>" means the total capital cost of each Capital Improvement (including, but not limited to, actual construction costs; architectural and engineering fees, expenses incurred for development, study, analysis, review, design or planning efforts, program management fees, testing and inspection fees, construction management fees, permit fees, and other direct or

8

allocable fees; interest during construction; and allocable out-of-pocket financing costs) less any federal or state grants-in-aid, Passenger Facility Charges or other user charges (if any) used to fund and/or finance the Capital Improvement.

    **1.41.** "<u>Operation and Maintenance Expenses</u>" or "<u>O&M Expenses</u>" means all reasonable and necessary current expenses, paid or accrued, of operating, maintaining, repairing, and administering the Airport; including, without necessarily limiting thereto, salaries and wages, fringe benefits, contractual services, utilities, professional services, police protection services, fire protection services, administrative expenses, the cost of materials and supplies used for current operations, equipment, insurance premiums, the reasonable charges of any paying agents and any other depository bank pertaining to the Airport, as well as reasonable overhead expenses of: (A) the DOA (which shall be fairly allocated among City's airport facilities in accordance with generally accepted accounting practices), and (B) other City departments whose services are directly related or reasonably allocable to the administration of the Airport (which shall be determined in accordance with a City-wide administrative cost allocation plan then in effect); provided, however, Operation and Maintenance Expenses shall not include any allowance for depreciation, payments in lieu of taxes, Capital Improvements, or any charges for the accumulation of reserves for capital replacements.

    **1.42.** "<u>O&M Reserve Account</u>" means the DOA's Operation & Maintenance Reserve Account, to be maintained in the amount of three (3) months, i.e. twenty-five percent (25%) of the DOA's current annual budget of Operation and Maintenance Expenses.

    **1.43.** "<u>Passenger Facility Charge</u>" or "<u>PFC</u>" means any charge imposed from time to time by City on passengers enplaning aircraft at the Airport pursuant to the Aviation Safety and Capacity Expansion Act of 1990 (Pub. L. 101-508), enacted November 5, 1990, as amended, and the implementing regulations (FARs) promulgated thereunder from time to time.

    **1.44.** "<u>PFC Revenues</u>" means the revenues derived from the imposition and collection of Passenger Facility Charges by the City and applied for various purposes as provided for in approved PFC applications.

    **1.45.** "<u>Post-LFMP Airline Leased Space</u>" means the total square footage of Post-LFMP Leased Premises in the Terminal Building as shown on Exhibit E-2, and consisting of the total of the following areas as defined in Section 4.02: "Post-LFMP Exclusive Use Space," "Post-LFMP Preferential Use Space" and "Post-LFMP Common Use Space."

    **1.46.** "<u>Preferential Use Space</u>" means those portions of the Leased Premises where Airline is contemplated to be the primary, but not the sole, user.

    **1.47.** "<u>Pre-LFMP Airline Leased Space</u>" means the total square footage of Pre-LFMP Leased Premises in the Terminal Building as shown on Exhibit D-2, and consisting of the total of the following areas as defined in Section 4.01: "Pre-LFMP Exclusive Use Space," "Pre-LFMP Preferential Use Space" and "Pre-LFMP Common Use Space."

9

**1.48.** "**Program Definition Manual**" means a comprehensive document that provides the expectations of the LFMP, including but not limited to cost, schedule, projects, phasing and general arrangements of facilities; defines the methods used to implement and control the LFMP; and establishes the LFMP Scope, LFMP Schedule and LFMP Budget, as defined in the PDA.

**1.49.** "**Program Development Agreement**" or "**PDA**" means the Program Development Agreement dated November 10, 2008, between City, LFAMC, and Southwest that documents the agreement of those parties regarding implementation of the Love Field Modernization Program, as further defined in Section 7.01.A hereof.

**1.50.** "**Requesting Airlines**" has the meaning described in Section 4.06.E.

**1.51.** "**Revenue Credit Agreement**" has the meaning set forth in Section 7.01.B.3.

**1.52.** "**Signatory Airlines**" means all airlines serving the Airport which: (A) have entered into an Airport Use and Lease Agreement with the City that is substantially identical to this Agreement; and (B) are currently operating regularly scheduled flights at the Airport.

**1.53.** "**Statistical Report**" shall have the meaning described in Section 5.02.

**1.54.** "**Term**" means the period of time set forth Section 3.01 of this Agreement.

**1.55.** "**Term Sheet**" means the Term Sheet between the City of Dallas and Southwest Airlines Co. Regarding the Love Field Modernization Program, dated June 25, 2008.

**1.56.** "**Total Landed Weight**" means the sum of CMGLW of all Aircraft Arrivals of all Signatory Airlines over a stated period of time.

**1.57.** "**Trust Agreement**" has the meaning set forth in Section 7.01.B.1.

**1.58.** "**Useful Life**" means the estimated period of time that the cost of a Capital Improvement is to be recovered through the Amortization process. In general, a Useful Life will be assigned to each Capital Improvement by the Director based on generally accepted airport accounting practices. For purposes of calculating rates and fees under this Agreement, improvements to the Terminal Building financed by City will be assigned the following Useful Life: (A) new aircraft pavement, buildings and facilities— twenty-five (25) years, (B) major renovation or reconstruction of existing aircraft pavement, buildings and facilities— twenty (20) years, (C) new major equipment (such as passenger loading bridges, baggage equipment, security systems or climate control equipment)—15 years, (D) major repairs and major rolling stock (ARFF vehicles)— 10 years, and (E) other vehicles, equipment, computers and peripherals—5 years.

10

## Article 2.  RIGHTS AND PRIVILEGES

**Section 2.01. Use of Airport.**

As long as it does so in accordance with the terms and provisions hereof, the Airline, in common with all other scheduled airlines and general aviation aircraft using the Airport, may utilize the Airport (other than the exclusive space of other tenants) and its facilities for the purpose of conducting Airline's business of a scheduled air carrier certificated or otherwise authorized by the United States Government to engage in the business of commercial air transportation of persons, property, cargo, and mail (hereinafter sometimes referred to as "Air Transportation Business").  The privileges granted hereby include the following:

A.       The use of landing field areas, aprons, roadways, runways, taxiways, runway and taxiway lights, beacons, facilities, equipment, improvements, services and other conveniences for flying, landing, taxiing and takeoffs of aircraft.

B.       The landing, taking-off, flying, taxiing, towing, loading and unloading of aircraft and other equipment used by Airline in its operation of its Air Transportation Business.

C.       The repairing, maintaining, conditioning, servicing (to include exterior aircraft cleaning), testing, including engine "run-ups" and emergency maintenance of aircraft and aircraft engines and systems subject to Section 2.04.E hereof, loading, unloading, parking and staging of aircraft or other equipment of Airline in areas on the Airport designated by the Director for such purposes.

D.       The training of personnel employed by or to be employed by Airline, including employees of Airline's contract service providers.

E.       The installation, maintenance and operation, at Airline's expense, by Airline alone, or in conjunction with any other airline or airlines who are lessees at the Airport or through a nominee, of radio, telephone, and data communications equipment and meteorological and aerial navigation equipment and facilities in or on the Leased Premises for use by Airline in the conduct of its Air Transportation Business; provided, however, that any installations shall be subject to the prior written approval of the Director and whether interior or exterior shall not interfere with the Airport navigation aids or with similar rights granted to other tenants or any Governmental Agency.  In the event of such interference, the Director may require removal, relocation, or modification to eliminate such interference.

F.       The sale, exchange or disposal of gasoline, oil, grease, lubricants, fuels, or propellants for use by Airline in connection with the conduct of its Air Transportation Business (in compliance with existing laws and any applicable agreement therefore); provided however, that Airline may only sell the aforementioned items to Signatory Airlines.

G.       The purchase or otherwise obtaining of services or personal property of any nature including aircraft, engines, accessories, gasoline, oil, greases, lubricants, fuels, propellants, food,

beverages, and other equipment, parts or supplies necessary or convenient to Airline in the conduct of its Air Transportation Business and in the exercise of its rights and privileges herein granted and in the discharge of the obligations herein imposed upon Airline.

     **H.**      The installing, maintaining and operation by the Airline or its nominee of vending machines in Airline's Exclusive Use Space, provided that such space is not accessible to the public, for the purpose of providing and making available foods, beverages and sundry food items only to Airline's employees or contractors.

     **I.**      The installing, maintaining, and operation, without cost to City, by Airline alone or in conjunction with any other Signatory Airlines or other lessees on the Airport, of communication systems between suitable locations in the terminal area, subject to the approval of the Director as to location of the installation of said systems.

     **J.**      The transportation, directly or through a nominee of Airline's choice, of Airline's employees, passengers, cargo, property (including baggage) and mail to and from the Airport.

     **K.**      Subject to the prior written approval of the Director (except as provided in the last sentence of this subsection), the installation and maintenance at Airline's expense, on Leased Premises, of advertising or identifying signs representing its business. Such signs shall be uniform in size, type and location as approved by the Director and shall comply with any applicable City ordinances and be consistent with published Airport System signage criteria.

     **L.**      The conduct of any other operation or activity that is necessary for or related to Airline's Air Transportation Business, subject to the provisions of Section 2.02 hereof.

     **M.**      The rights granted to Airline herein may be exercised by Airline or by another party designated by Airline; however, as between City and Airline, such other party shall be considered Airline's agent. It is specifically provided, however, that Airline shall not grant another airline the right to exercise any of the aforesaid rights on its behalf unless and until such other airline has executed a use and lease agreement with City.

     **N.**      The installation, maintenance and operation by Airline or its nominee on land leased from City for the purpose of a facility for the preparation and sale of meals for consumption aboard aircraft operated by Airline and its subsidiaries, subject to a separate agreement; the Leased Premises shall not be used for such purposes.

     **O.**      The construction of modifications, finishes, and improvements in Airline Leased Premises as Airline may deem necessary or prudent for the operation of its business, subject to the provisions of Section 7.02.B.

### Section 2.02. Ground Handling Services.

     **A.**      **Ground Handling of Airline by Others.** Airline may contract with, or receive from other airlines serving the Airport or other companies, Ground Handling Services for Airline's

12

aircraft, provided that Airline provides advance written notice to the Director (or his designated representative) of such arrangements and uses reasonable efforts to ensure that such other airline or other company shall have obtained from the City a valid operating permit or shall have entered a written agreement with City prior to commencing Ground Handling Services with Airline.

**B.     Ground Handling of Others by Airline.**  Airline may provide Ground Handling Services to aircraft of other airlines using the Airport provided that Airline provides advance written notice to the Director (or his designated representative) of such arrangements and uses its best efforts to ensure that such other airline has obtained a valid operating permit or has entered into a written agreement with City prior to conducting its operations at the Airport.  Airline's insurance, as required in this Agreement, shall provide insurance coverage for such Ground Handling Services.

**Section 2.03.  Rights Reserved by City.**

 **A.     Concession Operations.**

  **1.**     Except as otherwise provided herein, City reserves the exclusive right to itself, its agents and its franchisees, to operate all concession services (including, but not limited to, food/beverage and news/gift concessions, specialty retail shops and carts, vending machines, pay telephones, public use voice and data telecommunications systems, advertising displays, baggage lockers and baggage carts) in the Terminal Building (including areas accessible by the public such as holdrooms, jetbridges, and baggage claim areas); provided however, that City agrees that no concession services shall be located or operated by City or its nominees in any Preferential Use Space or Exclusive Use Space without Airline's prior consent and providing that City shall not exercise such right in a manner that will materially impede passenger ingress or egress or Airline's business operations.

  **2.**     City shall operate all concessions and provide such other services for scheduled airline passenger operations at the Airport, soliciting input from the Signatory Airlines, on selecting concessionaires that provide the highest level of passenger service and that maximize revenues, as it deems necessary and appropriate.  Nothing herein shall limit or preclude City from operating whatever concessions or providing whatever services it may desire at any and all airports and other facilities owned by City.

 **B.     Employee Parking.**  City, through its Director and in consultation with Airline, may develop or cause to be developed an area or areas at the Airport as common parking facilities for the employees of Airline and other Airport tenants.  City reserves the right to assess a reasonable charge for the use of such facilities.  Nothing herein shall preclude Airline from providing parking facilities for its own employees at locations on or off the Airport.

**Section 2.04.  Limitations on Use of Airport.**

A.  **International Airline Service.**  Airline shall not use the Airport for the conduct of non-stop international commercial passenger service.

B.  **Noise Abatement and Voluntary Noise Curfew.**  Airline understands and acknowledges that City is attempting to control or reduce the level of aircraft generated noise in noise sensitive neighborhoods near the Airport.  Therefore, Airline agrees that, except in case of an emergency, operational or weather related delays, it shall use good faith efforts to: (1) adhere to a voluntary noise curfew at the Airport that will preclude scheduled passenger airline flights between 11:00 pm and 6:00 am local time;  (2) control and reduce as much as is practicable the noise emanating from operations of the Leased Premises or in conjunction with the activities conducted thereon; (3) conduct all of its operations and activities in a manner having due regard for aircraft generated noise levels in neighborhoods in close proximity to the Airport; and (4) cooperate with and support City in its efforts to reduce noise from the Airport's operations. Airline reserves its right to contest any policy or regulation of the City which Airline believes to be unreasonable or discriminatory.

C.  **Use of Facilities.**  Airline shall use due care and diligence in its conduct of activities and operations on the Leased Premises.  Airline shall not knowingly permit any act or omission at or about the Airport that may interfere with the effectiveness or accessibility of the drainage and sewage system, electrical system, heating and air conditioning system, fire protection system, sprinkler system, alarm system, fire hydrants and hoses, and security systems, if any, installed or located on or within the Leased Premises or the Airport.

D.  **Insurance Requirements Compliance.**  Airline shall not knowingly permit any act upon the Airport that will invalidate or conflict with any fire or other casualty insurance policies maintained by City (copies of which, together with premium schedules, shall be furnished to Airline on request) covering the Airport or any part thereof.

E.  **Waste Disposal.**  Airline shall not dispose of or knowingly permit disposal of any waste material taken from or products used (whether liquid or solid) with respect to its aircraft into the sanitary or storm sewers at the Airport unless such waste material or products shall first be properly treated by equipment installed for that purpose or unless such disposal is in compliance with applicable Environmental Regulations (as hereinafter defined). All such disposal shall also be in compliance with applicable provisions of Sections 14.03 and 14.04 of this Agreement.

F.  **Flammable Liquids.**  Airline shall not keep or store, during any 24-hour period, flammable liquids within the enclosed portion of the Leased Premises in excess of Airline's working requirements during said 24-hour period, except in storage facilities especially constructed for such purposes in accordance with standards established by the National Board of Fire Underwriters and approved by a Governmental Agency with authority to inspect such facilities for safety compliance. Any such liquids having a flash point of less than 100°F shall be kept and stored in safety containers of a type approved by the Underwriters Laboratories.

14

G.     **Engine Run-ups**. Airline shall perform aircraft engine run-ups only at locations and during time periods approved in advance by the Director.

H.     **Advertising**. Airline shall not use the Leased Premises to advertise or promote the sale of any services or products, except those services related to the transportation of people or cargo by aircraft or as otherwise approved by the Director in accordance with Section 2.01.K.

I.     **Other**. Except as otherwise expressly provided herein, Airline's use of the Airport shall be limited to activities necessary or convenient to the transportation of passengers, persons, property, cargo and mail by air, and Airline shall not enter into activities which compete with City in City's development of any revenue from Airport passengers, tenants, and other users, unless otherwise approved by the Director.

## Section 2.05. Ingress and Egress.

A.     Subject to the other provisions hereof and to the rules and regulations adopted by City under the provisions of Section 14.01 hereof, the following privileges of ingress and egress with respect to the Airport are hereby granted:

1.     **For Airline, its agents, employees, contractors, subcontractors and permitted sublessees and assigns:** the privilege of ingress and egress to the public areas of the Airport and to the Leased Premises. This right shall extend to Airline's aircraft, vehicles, machinery and equipment used in its Air Transportation Business.

2.     **For Airline's passengers, guests and invitees:** the privilege of ingress and egress to areas leased exclusively or preferentially to Airline and to areas provided for use of Airline's passengers, guests and invitees in common with those of other airlines and to public areas and public facilities. This privilege shall extend to vehicles of such passengers, guests and invitees.

3.     **For Airline's suppliers of materials and furnishers of service:** the privilege of ingress and egress to the public areas of the Airport and to areas and facilities leased exclusively or preferentially to Airline and to areas and facilities provided for the common use by Airline or its suppliers of materials and furnishers of services. This privilege shall extend to vehicles, machinery or equipment of such suppliers and furnishers used in their business of furnishing such supplies and services to Airline.

B.     **No Unauthorized Ingress or Egress**. The ingress and egress provided for above shall not be used, enjoyed or extended to any person, airline or vehicle engaging in any activity or performing any act or furnishing any service for or on behalf of Airline that Airline is not authorized to engage in or perform under the provisions hereof unless expressly authorized by the Director.

## Section 2.06. Sales or Distribution of Food and Beverages and Retail Items.

15

A. **In-Flight Catering**. Airline shall have the right to provide in-flight catering for its air passengers either with its own staff or by contract with others. In-flight catering companies serving Airline at the Airport shall enter into an operating agreement or the equivalent thereof with City prior to commencing in-flight catering services to Airline.

B. **Sale or Distribution of Food and Beverages.**

1. The sale of food and beverages (including alcoholic beverages) by Airline shall be limited to Airline's passengers who are on board the aircraft.

2. The distribution of food and/or beverages (at no cost to the public) by Airline in passenger holdrooms shall be permitted with the advance written approval of the Director. If requested by the Director in writing, after consultation with Airline, Airline agrees to purchase such food and/or beverages from City's food and beverage concessionaires operating at the Airport. This provision shall not preclude Airline from permitting the installation of vending machines in areas exclusively accessible and used by Airline's employees or contractors. The Provisions of this Section notwithstanding, all distribution of alcoholic beverages shall comply with all applicable laws.

C. **Airline Lounges**. The sale, distribution or service of food or beverages by Airline shall be expressly permitted in the event that Airline exclusively leases from the City lounge space to be utilized by certain of Airline's passengers. Except as otherwise provided in this Section 2.06, the sale of food or beverages by Airline at the Airport is prohibited, unless written approval is obtained from the Director; provided, however, that in such event, Airline agrees to purchase such food and/or beverages from City's food and beverage concessionaires operating at the Airport or pay Airport the same percentage of gross sales as Airport's concessionaires that provide similar products to passengers at the Airport.

D. **Retail Items**. Airline shall not sell or distribute any types of retail items or merchandise sold by any of City's concessionaires unless written approval is obtained from the Director.

16

## Article 3.  TERM

### Section 3.01. <u>Term and Effective Date</u>.

The Term of this Agreement commences retroactively on October 1, 2008 (the "Effective Date") and ends September 30, 2028, and shall be deemed to amend, restate and supersede Airline's existing Lease of Terminal Building Premises as of the Effective Date hereof.

### Section 3.02. <u>Airline's Rights Upon Expiration or Early Termination of Agreement</u>.

Upon expiration or early termination of this Agreement, all of Airline's rights, authority, and privileges to use the Leased Premises, services and facilities of the Airport as herein granted shall cease (except as specifically provided in Section 3.04 below).

### Section 3.03. <u>Surrender of Leased Premises</u>.

Upon termination of the Agreement, Airline shall surrender the Leased Premises in a similar condition as when received, reasonable wear and tear excepted, and also excepting damage by flood, fire, earthquake, act of God, or the public enemy, not caused by negligence or misconduct of the Airline, its employees, or agents.

### Section 3.04. <u>Airline's Right to Remove Property</u>.

**A.**     Airline shall be entitled, during the term of this Agreement and upon termination hereof, to remove from the Leased Premises, or any part thereof, if owned by Airline, all personal property, aircraft jet-bridges, loading ramps, trade fixtures, tools, machinery, equipment, portable buildings, materials and supplies placed thereon by it; provided that: (1) Airline shall repair all damage resulting from such removal, and (2) Airline shall not be owing City any rental, fees or additional rental, pursuant to the Agreement.  City will allow Airline not more than thirty (30) days after the termination date hereof for such removal unless additional time is mutually agreed upon.

**B.**     If Airline fails to remove its property within thirty (30) days after the termination (or in such time as mutually agreed upon between Airline and Director) of or expiration of this Agreement or in the event City assumes possession of the Leased Premises, City, upon prior reasonable notice to Airline may remove such property to a public warehouse or elsewhere for deposit or retain the same in its own possession at the cost of, and for the account of Airline, without becoming liable for any loss or damage which may be occasioned thereby. If Airline fails to take possession and remove such property, after paying any appropriate rental fees, upon prior notice from the City, within sixty (60) days after termination of the Agreement, the property shall be deemed to be abandoned and City may dispose of the same as required by law.

## Article 4.  LEASED PREMISES

**Section 4.01.  <u>Airline's Leased Premises in the Terminal Building Prior to Completion of the Love Field Modernization Program</u>.**

      **A.**    <u>Exclusive Use Space</u>.   Airline hereby leases from City and City hereby leases to Airline for its exclusive use the various areas in the Terminal Building (the "Pre-LFMP Exclusive Use Space"), as shown in Exhibit D-1 and as listed in Exhibit D-2, attached hereto and by reference made a part hereof for all purposes.

      **B.**    <u>Preferential Use Space</u>.   Airline hereby leases from City and City hereby leases to Airline for its preferential use the various areas in the Terminal Building (the "Pre-LFMP Preferential Use Space"), as shown in Exhibit D-1 and as listed in Exhibit D-2, attached hereto and by reference made a part hereof for all purposes.

      **C.**    <u>Common Use Space</u>.   Airline hereby leases from City, and City hereby leases to Airline for its use in common with other airlines, the areas in the Terminal Building (the "Pre-LFMP Common Use Space"), as shown in Exhibit D-1 and as listed in Exhibit D-2, attached hereto and by reference made a part hereof for all purposes.  Rental costs associated with Pre-LFMP Common Use Space shall be prorated among airlines using the space in accordance with Section 4.03.

      **D.**    <u>Demolition and Relocation of Airline's Pre-LFMP Leased Premises</u>.  All leased areas depicted in Exhibit D-1 and listed in Exhibit D-2 are subject to change as demolitions and relocations take place to facilitate implementation of the Love Field Modernization Program.  As changes in Airline's Leased Premises take place, the City will provide comparable, substitute premises reasonably acceptable to Airline as shown on versions of Exhibit D-2 to confirm those changes, citing the effective date of the changes.  Airline's rental obligations for space leased under this Section 4.01 shall be subject to periodic adjustment in accordance with such revised versions of Exhibit D-2, but in no event shall the rental obligation exceed the amount in the initial versions of Exhibits D-1 and D-2.

**Section 4.02.  <u>Airline's Leased Premises in the Terminal Building Upon Completion of the Love Field Modernization Program</u>.**

      **A.**    <u>Exclusive Use Space</u>.   Upon completion of the Love Field Modernization Program (or any portion thereof), Airline hereby leases from City and City hereby leases to Airline for its exclusive use the various areas in the Terminal Building (the "Post-LFMP Exclusive Use Space"), as shown in Exhibit E-1 and as listed in Exhibit E-2, attached hereto and by reference made a part hereof for all purposes.

      **B.**    <u>Preferential Use Space</u>.  Upon completion of the Love Field Modernization Program (or any portion thereof), Airline hereby leases from City and City hereby leases to Airline for its preferential use the various areas in the Terminal Building (the "Post-LFMP Preferential Use Space"), as shown in Exhibit E-1 and as listed in Exhibit E-2, attached hereto and by reference

18

made a part hereof for all purposes.

C. **Common Use Space.** Upon completion of the Love Field Modernization Program (or any portion thereof), Airline hereby leases from City, and City hereby leases to Airline for its use in common with other airlines, the areas in the Terminal Building (the "Post-LFMP Common Use Space"), as shown in Exhibit E-1 and as listed in Exhibit E-2, attached hereto and by reference made a part hereof for all purposes. Rental costs associated with Post-LFMP Common Use Space shall be prorated among airlines using the space in accordance with Section 4.03.

D. **All Post-LFMP Airline Leased Premises Drawings and Area Tabulations Subject to Change.** The space drawings and area tabulations set forth in Exhibits E-1 and E-2 are preliminary and subject to change as a result of the LFMP planning, design and construction process, which changes shall be mutually agreed upon by Airline and City. Upon completion of the design for the terminal elements of the LFMP, the City will provide Airline with substitute versions of Exhibits E-1 and E-2 which shall be incorporated herewith. Upon completion of construction and beneficial occupancy of the LFMP terminal facilities, the City will provide additional revised versions of Exhibits E-1 and E-2 based on as-built drawings and actual (CAD-based) space tabulations which shall be incorporated herewith. All such revised exhibits, once reviewed and accepted by Airline, shall be confirmed by letter agreement signed by the Director and the Airline's authorized representative as a substitute exhibit to this Agreement and each such revised exhibit, once so confirmed, shall be considered by the Parties hereto as incorporated into and shall be a part of this Agreement in substitution of the exhibit it replaced.

E. **Phased Completion and Occupancy of Post-LFMP Airline Leased Premises.** The areas depicted in Exhibit E-1 and listed in Exhibit E-2 will be incorporated into Post-LFMP Airline Leased Premises in phases as implementation of the Love Field Modernization Program occurs. The current phasing plan for the LFMP is subject to change based on planning, design, construction sequencing and other considerations. As each discrete phase of the LFMP is completed and placed in service, the City will provide Airline with substitute versions of Exhibits E-1 and E-2 confirming those areas being placed into service and citing the effective date of such service. Each such substitution of exhibits shall be subject to the exhibit substitution procedure specified in Section 4.02. D above. Airline's rental obligations for space leased under this Section 4.02 shall be subject to periodic adjustment in accordance with such revised versions of Exhibit E-2.

## Section 4.03. Proration of the Rental Cost of Common Use Space.

A. Prior to, during and following completion of the LFMP, the aggregate rental cost of all Common Use Space, not including Common Use Gates (described in Section 4.06.E), shall be prorated among the airline users of such space as follows:

> 1. Twenty percent (20%) of the aggregate rental cost of the space shall be apportioned equally among the airlines using the space.

> 2. Eighty percent (80%) of the aggregate rental cost of the space shall be

19

apportioned among the airlines using the space based on enplaned revenue passengers.

B.      The basis for prorating the rental cost of all such common use space shall be adjusted annually throughout the Term.  Such adjustments shall take place in September of each year to be effective October 1 for the next Fiscal Year.  Such adjustments shall use revenue enplaned passenger figures for the most recent twelve-month period at the Airport for which data is available.  In making a determination of Airline's share of the eighty percent (80%) rental cost associated with enplaned passengers described above, City will include as enplaned passengers for Airline all passengers enplaned by Airline's Affiliates.

C.      In the event of an increase or decrease in the number of airlines entitled to use common use space prior to the next adjustment period, City shall adjust Airline's common use space rental.  In the case of a new entrant airline to the Airport, City shall estimate the new entrant airline's enplaned passengers (including the enplaned passengers of any Affiliates of the new entrant airline) until such time as the new entrant airline has actual reported enplaned passenger history at the Airport.

**Section 4.04.  Pre-LFMP Preferential Use Aircraft Parking Positions.**

Prior to the completion of the first phase of the LFMP, Airline shall have the preferential right to use the aircraft parking positions (apron pavement) immediately adjacent to and associated with its preferentially leased holdrooms in the Terminal Building.

**Section 4.05.  Post-LFMP Preferential Use Aircraft Parking Positions.**

A.      **Designation of Preferential Use Terminal Apron Area.**  City hereby leases to Airline for Airline's preferential use the new Preferential Use Aircraft Parking Positions at the Terminal Building to be created by the LFMP shown in Exhibit C.

B.      **Parking of Airline's Aircraft.**  Subject to the limitations of Section 4.06 below, Airline shall have the right to park aircraft within Airline's Apron Area for the purpose of loading and unloading passengers, baggage, cargo and mail; provided, that Airline shall not park aircraft in such a manner as would prohibit access, ingress, and egress to and from all aircraft parking positions by aircraft, ramp equipment, and traffic of other airlines or would prohibit the movement of aircraft and ramp equipment to and from the most convenient taxiway and the Terminal Building.

**Section 4.06.  Gate Use and Accommodation of Other Airlines.**

A.      **Definition of a "Gate."**  For the purposes of this Agreement, a "Gate" is defined as one passenger holdroom and one passenger loading bridge supporting one preferential aircraft parking position.  Gates shall not be subdivided (i.e., a gate may not be used to accommodate more than one aircraft simultaneously at any time, and no hardstand operations, except as

20

provided immediately below, shall be permitted).

**B.**     **Remain Overnight Parking ("RON").**   RON parking spaces shall remain under the control of City and nothing in this Agreement shall give Airline any leasehold rights over such RON parking spaces.  Nothing shall preclude any airline from utilizing hardstands for RON parking, maintenance, training, or for irregular operations (i.e. flights that were scheduled originally for one of the twenty available gates and cannot be accommodated thereon due to weather, maintenance or unforeseen emergencies), or other uses that do not involve passenger air service. RON parking positions shall be allocated and assigned to airlines on a preferential use basis, as depicted in Exhibit J, based on the pro-rata share of Gates leased by each airline; provided, however, that two (2) RON parking positions shall remain unassigned and managed by City to accommodate charter and other nonsignatory airlines.

**C.**     **Preferential Rights to the Use of Gates.**   Airline is granted the preferential use of its assigned Gate(s).   At those times that Airline has no scheduled use for one or more of its assigned Gate(s), Airline will allow other scheduled or nonscheduled airlines authorized by City to use Airport facilities to use such Gate(s), as circumstances and the public interest may require, for loading and unloading only, but in no event shall said use by others take precedence over Airline's scheduled use.  For the purposes of this subsection, the term "scheduled use" shall mean a reasonable amount of time, up to thirty (30) minutes, before an aircraft arrives at a Gate and after an aircraft leaves a Gate.  Further, Airline may require such non-preferential airline user to enter into an agreement with Airline to provide adequate insurance and to indemnify Airline from liability in the use of the premises.

**D.**     **Transitioning of Leased Gates.**

**1.**     In the Five Party Agreement, American and Southwest agreed to voluntarily surrender gate rights under their existing Lease of Terminal Building Premises in order to reduce the number of Gates as necessary to implement the terms of that agreement. From the Effective Date of this Agreement through September 30, 2010 (approximately four years from the date of enactment of the Wright Amendment Reform Act of 2006), Southwest shall have the preferential use of fifteen (15) Gates, American shall have the preferential use of three (3) Gates, and Continental shall have the preferential use of two (2) Gates, all to be used for each airline's passenger operations.  Commencing October 1, 2010, Southwest shall have the preferential use of sixteen (16) Gates, American shall have the preferential use of two (2) Gates, and Continental shall have the preferential use of two (2) Gates, all to be used for each airline's passenger operations.

**2.**     In consideration of Southwest's substantial divestment of Gates at the Airport and the need to construct an entirely new central concourse as part of the LFMP, Southwest shall have the sole discretion (after consultation with the City) to determine which of the Gates it uses within its existing leasehold at the Airport during all phases of LFMP implementation.  The current phasing plan for Southwest's Gate use throughout the LFMP construction process is shown in Exhibit F.  Airline reserves the right to alter this

21

plan as it deems necessary, provided that its total number of Gates shall be limited to the allocation set forth in Section 4.06.D.1.

**3.** City and Airline agree that on or before September 30, 2010, existing terminal concourse facilities at the Airport will be modified or demolished as necessary to ensure that the Airport can accommodate only twenty (20) Gates for passenger airline service.

**4.** To the extent a new entrant carrier seeks to begin service at the Airport, the City will seek voluntary accommodation from its existing airline lessees to accommodate the new entrant service as provided for in Section 4.06.E below. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City agrees to require the sharing of Airlines' Preferential Use Space and Gates, also as provided for in Section 4.06.E below.

**5.** To the extent that any of the Gates leased at the Airport revert to City control, such gates shall be converted to common use City-managed Gates for the remaining term of this Agreement.

**E.** **Common Use Gates.** If Airline's rights to use a Preferential Use Gate cease, by virtue of termination or expiration of this Agreement or for any other reason, the Gate shall become a "Common Use Gate" under the control of City subject to terms and per use charges to be established by City.

**F.** **Accommodation of Requesting Airlines.** Airline and City agree that although most of the airline areas in the Terminal Building are or will be leased to Signatory Airlines for their exclusive or preferential use, and Terminal Building facilities at the Airport may become a scarce resource if a new entrant airline ("Requesting Airline") requests to provide service at the Airport. In such circumstances, Airline agrees to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement. In order to facilitate City's role in the accommodation procedure outlined in 1-4 below, Airline shall provide City with a monthly report tracking Airline's Gate assignment and Gate usage data. To insure compliance with this obligation and to provide open access and uniform treatment for all airline tenants, the following procedure is established:

**1.** All requests for airline accommodation in the terminal facilities will be received by the DOA.

**2.** In the event the Requesting Airline has demonstrated to the DOA that it has contacted all airlines and has exhausted all reasonable efforts to secure accommodations, the Director will notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-

22

discriminatory manner.

    **3.**    At the end of said thirty (30) day period, if the Requesting Airline has not been accommodated, the Director may select a Signatory Airline to accommodate the Requesting Airline and, in that event, will send written notice to that Signatory Airline to accommodate Requesting Airline within thirty (30) days from the receipt of said notice. The Director will include in such notice the reason or reasons why the particular Signatory Airline was selected. The selected Signatory Airline will have ten (10) days after receipt of said notice to comment on or dispute such selection.

    **4.**    Unless the Director rescinds such selection within said thirty (30) day period, the Signatory Airline will accommodate the Requesting Airline by sharing a portion of its Leased Premises (ticket counter positions, baggage make-up area, holdroom, aircraft parking position, passenger loading bridge and other appurtenant equipment reasonably necessary for the effective use of such space), subject to the following conditions:

    **a.**    In case of a conflict between schedules of the Signatory Airline and the Requesting Airline, the Signatory Airline will have priority in use of its personnel and its Leased Premises,

    **b.**    If requested to accommodate another carrier pursuant to this paragraph, the Signatory Airline will use its good faith efforts to effect such accommodation in a reasonable and equitable manner.

    **c.**    The Signatory Airline may assess the Requesting Airline reasonable fees and charges under an appropriate contract for services rendered to, or subleased facilities shared with, Requesting Airline and which will be based on the Signatory Airline's direct and indirect costs plus a reasonable allowance for administration. Further, the Signatory Airline may require such Requesting Airline to enter into an agreement with the Signatory Airline to provide adequate insurance and to indemnify the Signatory Airline from liability in the use of the premises. In the event of a dispute regarding these reasonable fees and charges or any other matter regarding this scarce resource provision, including but not limited to, Section 4.06.F.4.a above, and upon the Director's receipt of written notice of such dispute(s), the Director will review available information regarding the dispute(s) and, in good faith and in a non-discriminatory manner render a decision regarding the acceptable fees and charges, or any other matter regarding this scarce resource provision, including but not limited to, Section 4.06.F.4.a above, which will be binding on the Signatory Airline and the Requesting Airline.

**Section 4.07.** <u>Covenant Against Liens.</u>

    Airline shall not cause nor permit any lien against the Leased Premises or any improvements thereto to arise out of or accrue from any action or use thereof by Airline or any

contractor, sub-contractor, supplier or agent; provided, however, that Airline may in good faith contest the validity of any alleged lien.

## Section 4.08. City Right of Entry.

With twenty-four (24) hours advance notice to Airline (except in emergency circumstances), City may enter upon Airline's Leased Premises, without unduly interfering with Airline's operations, (1) at any time for any purpose necessary, incidental to or connected with the performance of Airline's obligations hereunder, or in the exercise of City's governmental functions, and (2) upon the termination or cancellation of this Agreement, and such entry or reentry shall not constitute a trespass nor give Airline a cause of action for damages against City.

## Section 4.09. Substitution of Exhibits.

The Parties agree that the substitution of exhibits as described herein does not constitute an amendment to this Agreement.

24

## Article 5.  RENTALS, FEES AND REPORTS

### Section 5.01. General.

In consideration for the use of the Leased Premises, facilities, rights, and privileges granted hereunder and for the undertakings of City, Airline agrees to pay City, without deduction or set-off, the rentals and fees as set forth in this Article 5 and as recalculated according to the procedures of Article 6. hereof.

### Section 5.02. Statistical Report.

Airline shall submit in writing to the Director on or before the tenth (10th) day of each month the statistical information listed below relative to its scheduled, nonscheduled and charter operations at the Airport for the immediately preceding calendar month, in a format consistent with that provided in Exhibit G, attached hereto and by reference made a part hereof for all purposes.  The statistical information below shall be in addition to any other information elsewhere herein required to be submitted by the Airline each month for City's use in calculating landing fees and other charges pertinent to Airline's operations at the Airport.

A.      Total number of domestic enplaned and deplaned revenue and non-revenue passengers;

B.      Total number of originating, connecting and through revenue passengers;

C.      Total number of Aircraft Arrivals by type of aircraft;

D.      Total CMGLW for Aircraft Arrivals by type of aircraft;

E.      Total pounds of air cargo enplaned and deplaned; and

F.      Total pounds of air mail enplaned and deplaned.

### Section 5.03. Terminal Building Space Rentals.

A.      **Pre-LFMP Terminal Rentals.**  For the Fiscal Year commencing October 1, 2008 and ending September 30, 2009, Airline shall pay City for its existing space in and adjacent to the Terminal Building, as listed in Exhibit D-2, monthly terminal space rent based on the schedule of rental rates in effect as of October 1, 2008, as shown in Exhibit D-2; provided, however, that any space vacated and demolished to accommodate the LFMP shall no longer be charged rent as of the date such space is vacated and demolished.

Beginning October 1, 2009, Airline shall pay City for its Pre-LFMP Exclusive Use Space, Pre-LFMP Preferential Use Space, and Pre-LFMP Common Use Space in the Terminal

25

Building, as listed in Exhibit D-2, monthly terminal space rent based on the following annual rental rates per square foot for the Terminal Building:

| | |
|---|---|
| Ticket Counter / Airline Ticket Offices / Queuing | $20.00 |
| Holdrooms | $20.00 |
| Other Offices | $15.00 |
| Baggage Claim | $15.00 |
| Bag Make-Up / Bag Screening | $10.00 |
| Operations / Support / Restrooms | $10.00 |
| Stairwells / Canopy | $ 5.00 |
| Unenclosed Ramp Area | $ 0.50 |

These rates shall continue to apply to all of Airline's space initially leased under Section 4.01 until such space is vacated for demolition or reconstruction.

The initial calculation of Airline's rental obligation under this Section is shown in Exhibit D-2. As demolitions and relocations take place to facilitate implementation of the Love Field Modernization Program, Airline's rental obligations for space leased under Section 4.01 shall be subject to periodic adjustment in accordance with the procedures of Section 4.01.D.

**B.** **Post-LFMP Terminal Rentals.** Upon completion of each phase of the LFMP, Airline shall pay City for its Post-LFMP Exclusive Use Space, Post-LFMP Preferential Use Space, and its share of the Post-LFMP Common Use Space in the Terminal Building (based on the proration in Section 4.03), as listed in Exhibit E-2, monthly terminal space rent based on the annual rental rates for the Terminal Building calculated each Fiscal Year in accordance with Section 6.04 hereof.

### Section 5.04. Apron Fees.

**A.** **Pre-LFMP Apron Fees.** No fees or charges will be assessed by the City for the use of existing pre-LFMP aircraft parking positions by Airline.

**B.** **Post-LFMP Apron Fees.** Upon completion of the LFMP (or any portion thereof), Airline shall pay City for its Post-LFMP Preferential Use Aircraft Parking Positions monthly apron fees based on the annual apron fee rate for the Apron Area calculated each Fiscal Year in accordance with Section 6.05 hereof.

### Section 5.05. Landing Fees.

**A.** **Pre-LFMP Landing Fees.** Until the completion the first phase of the LFMP, Airline shall pay City for its use of the Airfield monthly landing fees based on the following annual landing fees rates:

| | |
|---|---|
| FY 2009 | **$1.00** per 1,000 pounds of CMGLW |

26

| | |
|---|---|
| FY 2010 | **$1.25** per 1,000 pounds of CMGLW |
| FY 2011 through DBO of the first phase of the LFMP | **$1.50** per 1,000 pounds of CMGLW |

    **B.**    <u>Post-LFMP Landing Fees.</u>  Upon completion of the first phase of the LFMP, Airline shall pay City for its use of the Airfield monthly landing fees based on the annual landing fee rate calculated each Fiscal Year in accordance with Section 6.06 hereof

**Section 5.06.** <u>Other Fees and Charges.</u>

    **A.**    <u>Utilities.</u>  With respect to its Leased Premises and any Airline-installed equipment, machinery and facilities, Airline agrees to pay all water, sewage, electricity, gas and other utility charges which may be charged to Airline for the use thereof, if such charges are separately assessed or metered as appropriate to Airline. Utility bills for metered utilities furnished by the City will be paid monthly or less frequently depending on billing schedule established by the City. For equipment and services in areas not separately metered—including Exclusive Use Space, Preferential Use Space, and Common Use Space—charges for utility services (other than illumination which is to be provided by City and included in the base rental rate) will be calculated by City based on the power rating in kilowatts of the equipment, the estimated number of operating hours per month, and the estimated electric cost in dollars per kilowatt-hour. Meters will be installed where it is economically and mechanically feasible.

    **B.**    <u>Security Fines or Penalties.</u>  Any fines or penalties assessed against City because of Airline's noncompliance with 49 CFR Parts 1540 and 1542 shall promptly be reimbursed to City by Airline within thirty (30) days of Airline's receipt of written notice from the Director setting forth the amount of such fine or penalty; provided, however, that such payment shall not be construed as waiving Airline's right to contest such fine or penalty.

    **C.**    <u>Additional Rent and Charges.</u>  If City has paid any sum or sums, or has incurred any obligations or expense, which Airline has agreed to pay or reimburse City for, or City is required to pay any sum or sums or incurs any obligations or expense by reason of the failure, neglect or refusal of Airline to perform or fulfill any one or more of the conditions, covenants or agreements contained in this Agreement or as a result of any act or omission of Airline contrary to the conditions, covenants and agreements of this Agreement, Airline agrees to pay the sum or sums so paid or the expense so incurred, including all interest, costs, damages and penalties, and the same may be added to any installment of rent thereafter due under this Agreement. Each and every part of the additional sums incurred under this provision shall constitute additional rent, recoverable by City in the same manner and with the same remedies as if it were originally a part of the basic rental.

    **D.**    <u>Other.</u>  City reserves the right to assess, and Airline agrees to pay reasonable charges for the use of other City-provided facilities, equipment, and services, subject to prior consultation by City with Airline regarding the basis for such charges. Nothing shall preclude the City from implementing charges at any time during the fiscal year. City shall publish such charges along with annual rates and charges as set forth in Article 6 of this Agreement.

**Section 5.07. <u>Payment Provisions</u>.**

      **A.**     **<u>Terminal Building Rentals and Apron Fees</u>.** Terminal Building rental payments (for exclusive use and preferential use space and for prorated common use space), and Apron Area Fees shall be due and payable on the first day of each month in advance without invoice from the City.

      **B.**     **<u>Landing Fees</u>.** Landing fees for each month shall be due and payable without invoice from the City on or before the tenth (10th) day following the last day of the preceding month and shall be transmitted to City together with Airline's monthly Statistical Report for the month as required in Section 5.02 hereof.

      **C.**     **<u>Other Fees and Charges</u>.** All other rentals, fees, and charges required hereunder shall be due and payable within thirty (30) days of the date of the invoice therefor.

      **D.**     **<u>Right of City to Verify Airline's Payment</u>.** The acceptance of any payment made by Airline shall not preclude City from verifying the accuracy of Airline's report and computations or from recovering any additional payment actually due from Airline or preclude Airline from later demonstrating that Airline's report was inaccurate and that a lesser amount was properly owed (and to recover any such overpayment).

      **E.**     **<u>Interest on Overdue Amounts</u>.** Any payment not received within five (5) business days of the due date may accrue interest at the rate of 1.5% per month from the due date until the date when full payment is made.

      **F.**     **<u>Form of Payment</u>.** Payments shall be made to the order of "City of Dallas" and shall be sent to the Director's office or such other place as may be designated by the Director from time to time.

### Article 6.  RECALCULATION OF RENTALS AND FEES

**Section 6.01.  General.**

A.       Effective the Fiscal Year (or partial Fiscal Year) in which phase 1 of LFMP terminal facilities are completed and placed in service, and for each Fiscal Year thereafter, airline rentals and fees will be reviewed and recalculated based on the principles and procedures set forth in this Article 6.  For rate setting purposes, the calculations will be made on the basis of DOA estimates of costs and expenses and estimates of total landed weight and shall be provided to Airline at least thirty (30) days prior to the beginning of the Fiscal Year.  For final settlement purposes, all calculations will be made on the basis of actual costs and expenses incurred and will be provided to Airline as soon as possible following the completion of the annual audit of the DOA's financial statements.  City shall use best efforts to complete the annual audit prior to March 31 of the subsequent calendar year.

B.       Airline Terminal Building Rental Rates, Apron Fees and Landing Fees will be calculated in accordance with a "cost center residual" rate-making approach as illustrated conceptually in Exhibit H-1 and computationally in Exhibit H-2.

C.       In calculating airline rentals and fees, costs assigned to the Administration Cost Center will be allocated to the other Airport Cost Centers as follows: (i) fifty percent (50%) based on the proportionate share of nonairline revenues by cost center and (ii) fifty percent (50%) based on based on the proportionate share of direct O&M Expenses by cost center.

**Section 6.02  Annual Budget.**

A.       Each year, City shall adopt an Annual Budget for the Airport and establish Terminal Building rental rates, Apron Fees, and Landing Fee rates.  Such budget, rates, and fees shall take into account City's discussions with Airline and include any revisions resulting from City's budget process.  The Director shall promptly furnish the Signatory Airlines with a copy of such adopted Annual Budget together with the calculation of Terminal Building rental rates, Apron Fees, and Landing Fee rate that shall be effective from and after the beginning of the Fiscal Year for which the Annual Budget is adopted.

B.       The following are the procedures for reviewing and adopting the Annual Budget.

1.       On or before April 1 of each Fiscal Year, the Signatory Airlines shall submit to the Director a written estimate of the Total Landed Weight for Signatory Airlines for the succeeding Fiscal Year.

2.       On or before May 1 of each Fiscal Year, City shall submit to the Signatory Airlines its proposed Annual Budget for the succeeding Fiscal Year, including:

a.       Estimated Airport Operation and Maintenance Expenses, by cost center, including the proposed allocation of administrative and other indirect costs

29

assigned to the Administration Cost Center.

     **b.**    Annual bond debt service, if any, and any associate fund deposits required.

     **c.**    Amortization of City funded assets.

     **d.**   Estimated revenues from all sources other than Airline Terminal Building Rentals, Apron Fees, and Landing Fees for the succeeding Fiscal Year.

     **e.**    A schedule of the Capital Improvements to the Airport proposed to be undertaken by City during the succeeding Fiscal Year including the information required in accordance with Section 7.03.D below.

     **f.**    A preliminary calculation of the Terminal Building rental rate, Apron Fees, and Landing Fee rate for the succeeding Fiscal Year, calculated in accordance with Sections 6.02, 6.04, 6.05, and 6.06.

     **3.**    Within a reasonable time, but no sooner than fifteen (15) days after distribution of the report, the Director shall convene a meeting of the Signatory Airlines to discuss the Annual Budget.

     **4.**    If the Signatory Airlines request additional information concerning the Annual Budget , the Director shall convene a second meeting of the Signatory Airlines. Upon notice by the Director, the second meeting shall be held within thirty (30) days after the first meeting.  At the second meeting, the Director shall respond to questions raised during the first meeting and provide the Signatory Airlines with the requested information concerning the Annual Budget. If, after the second meeting, the Signatory Airlines do not concur with said Annual Budget and so notify the Director within ten (10) days after the second meeting, the Director will at the request of the Signatory Airlines schedule a meeting between the Signatory Airlines and the City Manager.

     **5.**    If, for any reason, the Annual Budget has not been adopted by the Dallas City Council as of the first day of any Fiscal Year, the proposed rentals and fees calculated in accordance herewith shall nonetheless go in effect on that date.  Any subsequent budget adjustments made by the Dallas City Council in adopting the Annual Budget shall be made effective retroactive to the first day of such Fiscal Year.

## Section 6.03  Mid-Year Rate Adjustments.

     In the event that, at any time during a Fiscal Year, the total costs of the Terminal Building, Apron Area, or Airfield, or the aggregate Total Landed Weight of all airlines, is projected by City to vary ten percent (10%) or more from the estimates used in setting the Terminal Building Rental Rate, the Apron Fee Rate, or the Landing Fee Rate, such rates may be adjusted either up or down for the balance of such Fiscal Year, provided that such adjustment is deemed necessary

30

by City. An upward adjustment shall only be used to ensure that adequate revenues will be available from such fees to recover the estimated total costs of the airline-supported cost centers. For each such adjustment, City shall provide the Signatory Airlines with a written explanation of the basis for the rate adjustment(s) and will provide thirty (30) days advance written notice before putting such adjustment(s) into effect. Unless extraordinary circumstances warrant additional adjustments, City will limit such rate mid-year adjustments to no more than once each Fiscal Year.

**Section 6.04.** <u>Terminal Building Rental Rates.</u>

      **A.**    <u>Terminal Building Cost.</u> The total costs of the Terminal Building will be calculated by adding together the following annual amounts:

      **1.**    Direct and Indirect Operation and Maintenance Expenses allocable to the Terminal Building,

      **2.**    Debt Service allocable to the Terminal Building,

      **3.**    Amortization of the Net Cost of each Capital Improvement placed in service in the Terminal Building on or after October 1, 2008,

      **4.**    Annual replenishment of the Operations and Maintenance Reserve Account, the Emergency Repair and Replacement Reserve Fund, the GARB Debt Service Reserve Fund, and/or the LFMP Debt Service Reserve Fund (as necessary to restore those funds to their required balances) allocable to the Terminal Building, and

      **5.**    Fifty percent (50%) of the net deficit in the Terminal Roadways cost center.

      **B.**    <u>Annual Terminal Building Requirement.</u> The annual Terminal Building Requirement is calculated by subtracting the following amounts from the total costs of the Terminal Building:

      **1.**    Seventy-five percent (75%) of all concession revenues generated in the Terminal Building (including, but not limited to, food & beverage, news & gifts, specialty retail, advertising, and other miscellaneous terminal concessions and services),

      **2.**    One hundred percent (100%) of the nonairline terminal building space rentals,

      **3.**    Prior to the completion and beneficial occupancy of the entire LFMP, any remaining Pre-LFMP Airline Rentals under Section 5.03.A hereof,

      **4.**    Other ancillary Terminal Building revenues,

      **5.**    Interest income on the GARB Debt Service Reserve Fund, LFMP Debt Service

31

Reserve Fund, Operating and Maintenance Reserve Account, and Emergency Repair and Replacement Reserve Fund allocable to the Terminal Building, and

     **6.**     A total of seventy-five percent (75%) of the net revenues generated in the Parking & Ground Transportation Area Cost Center will be credited to offset the Annual Terminal Building Requirement described in this Section and the annual Airfield Requirement described in Section 6.06.B. The percentage attributable to each of the two cost centers will be agreed upon on an annual basis during the Annual Budget Process described in Section 6.02.

     **C.**     **Annual Terminal Building Rental Rates.**  The Annual Terminal Building Requirement shall then be divided by total the Post-LFMP Airline Leased Space to determine the average Terminal Building rental rate for the Fiscal Year.

City shall then develop a schedule of rental rates by type of space the weighted average of which shall equate to the required average Terminal Building rental rate, using the following weighting criteria:

|  | Weight |
|---|---|
| Ticket Counter / Airline Ticket / Queuing | 1.00 |
| Holdrooms | 1.00 |
| Baggage Claim | 0.75 |
| Other Offices | 0.75 |
| Operations and Other Support | 0.50 |
| Baggage Make-up | 0.50 |
| Stairwells / Canopy (unenclosed) | 0.25 |

## Section 6.05. Apron Fee Rates.

     **A.**     **Apron Area Costs.**  The total costs of the Apron Area will be calculated by adding together the following annual amounts:

     **1.**     Direct and indirect Operation and Maintenance Expenses allocable to the Apron Area,

     **2.**     Debt Service allocable to the Apron Area, if any,

     **3.**     Amortization of the Net Cost of each Capital Improvement placed in service in the Apron Area on or after October 1, 2008, and

     **4.**     Annual replenishment of the Operations and Maintenance Reserve Account, the Emergency Repair and Replacement Reserve Fund, the GARB Debt Service Reserve Fund, and/or the LFMP Debt Service Reserve Fund (as necessary to restore those funds to their required balances), allocable to the Apron Area.

     **B.**     **Annual Apron Area Requirement.**  The annual Apron Area Requirement will then

32

be calculated by subtracting the following amounts from the total costs of the Apron Area:

    1.    Apron fees charged to non-Signatory Airline users of the Apron Area,

    2.    Other ancillary Apron Area revenues, if any,

    3.    Interest income on the GARB Debt Service Reserve Fund, LFMP Debt Service Reserve Fund, Operating and Maintenance Reserve Account, and Emergency Repair and Replacement Reserve Fund allocable to the Apron Area.

    **C.**    **Annual Apron Rental Rate.** The Annual Apron Area Requirement shall then be divided by the total number of Preferential Use Aircraft Parking Positions (20) to determine the annual Apron Fee rate per aircraft parking position for the Fiscal Year.

## Section 6.06. Landing Fee Rate.

    **A.**    **Total Airfield Costs.** The total costs of the Airfield will be calculated by adding together the following annual amounts:

    1.    Direct and indirect Operation and Maintenance Expenses allocable to the Airfield,

    2.    Debt Service allocable to the Airfield,

    3.    Amortization of the Net Cost of each Capital Improvement placed in service in the Airfield on or after October 1, 2008,

    4.    Annual replenishment of the Operations and Maintenance Reserve Fund, the Emergency Repair and Replacement Reserve Fund, the GARB Debt Service Reserve Fund and/or the LFMP Debt Service Reserve Fund (as necessary to restore those funds to their required balances) allocable to the Airfield, and

    **B.**    **Annual Airfield Requirement.** The Annual Airfield Requirement will then be calculated by subtracting the following amounts from the total Airfield costs calculated in A. above:

    1.    General aviation fuel flowage fees,

    2.    Non-Signatory Airline landing fees,

    3.    Other ancillary Airfield revenues, if any,

    4.    Interest income on the GARB Debt Service Reserve Fund, the LFMP Debt Service Reserve Fund, Operating and Maintenance Reserve Account, and Emergency Repair and Replacement Reserve Fund allocable to the Airfield, and

**5.**      A total of seventy-five percent (75%) of the net revenues generated in the Parking & Ground Transportation Area Cost Center will be credited to offset the Annual Airfield Requirement described in this Section and the Annual Terminal Building Requirement described in Section 6.04.B.  The percentage attributable to each of the two cost centers will be agreed upon on an annual basis during the Annual Budget Process described in Section 6.02.

**C.**      **Annual Landing Fee Rate.**  The Annual Airfield Requirement shall then be divided by the Total Landed Weight of all Signatory Airlines to determine the landing fee rate for the Fiscal Year.

**Section 6.07. Application of Revenues.**

For the purposes of this Agreement, subject to the covenants of City contained in the proceedings authorizing the issuance of GARBs currently outstanding, Airport System revenues shall be deposited into the Aviation Revenue Fund +and applied to the following funds and accounts in the following order of priority:

**A.**      O&M Account – to pay Operation and Maintenance Expenses.

**B.**      O&M Reserve Account – to maintain a balance equal to three (3) months, twenty-five percent (25%), of the current annual operating budget for the Airport System.

**C.**      GARB Debt Service Fund – to pay GARB Debt Service on any bonds, notes or debt instruments that may be issued from time to time by the City to fund Airport System Capital Improvements.

**D.**      GARB Debt Service Reserve Fund – to fund or restore the GARB Debt Service Reserve Fund established in support of GARBs.

**E.**      Southwest Reimbursement Account – to reimburse Southwest for LFMP Debt Service Facilities Payments made by Southwest under the Facilities Agreement with the LFAMC.

**F.**      Emergency Repair & Replacement Reserve – to replenish the balance in this fund to Five Million Dollars ($5,000,000).

**G.**      Aviation Capital Fund – all remaining revenues, to be used pay the Net Costs of Airport System Capital Improvements and for any other lawful purposes of the Airport System, subject to the cap described in Section 6.08.

**Section 6.08. Aviation Capital Fund "Cap."**

34

A.      Under the rate-making mechanism described in this Article 6 above, it is estimated (anticipated) that City will generate surplus annual net revenues from its operation of the Airport System in the approximate amount of the sum of: (1) the net revenues of the Other Buildings & Areas cost center, (2) 25% of the net revenues in the Parking & Ground Transportation Area cost center, and (3) 25% of Terminal concession revenues, less any deficits incurred by the City in the operation of Dallas Executive Airport and the Heliport. These net revenues will flow to the credit of the Aviation Capital Fund to be used to fund the Net Costs of future Airport System Capital Improvements and other lawful Airport System purposes.

B.      From the Effective Date of this Agreement through FY 2014, funds may accumulate without limit in the Aviation Capital Fund to provide funding for the LFMP, the Connector and other Capital Improvements. Effective in FY 2015, the ending balance in the Aviation Capital Fund will be "capped" at $30 million (2015 dollars), which amount shall be increased thereafter by the percent change in the Consumer Price Index. For the purposes of the "cap", the balance in the Aviation Capital Fund shall exclude any moneys accumulated as of September 30, 2014 for the Cedar Springs/Mockingbird interchange improvement project and the Connector project; provided, however, that should construction of either of these projects not have commenced by September 30, 2017, moneys accumulated for the particular project shall no longer be reserved for that purpose and (1) to the extent such moneys cause the balance in the Capital Fund to exceed the $30 million "cap" (adjusted for inflation), such excess over the "cap" shall be credited to the airlines in the annual rate settlement process (described in Section 6.09 below), subject to Section 6.08.C below, and (2) to the extent such moneys do not cause the balance in the Capital Fund to exceed the $30 million "cap" (as adjusted for inflation) such moneys shall remain in the Capital Fund and shall become subject to the "cap" as of that date.

C.      In the rate annual settlement process (described in Section 6.09 below), should the ending balance in the Aviation Capital Fund in a particular Fiscal Year exceed the $30 million "cap" (as adjusted for inflation), the amount of such excess capital funds shall be transferred to the Revenue Fund and applied as further credits to the airlines in the final calculation of terminal rentals, apron fees and landing fees for that Fiscal Year, with the cost center allocation of such additional credits to be determined by City in consultation with the Signatory Airlines during the annual settlement process described in Section 6.09. However, it is further agreed that the application of such excess capital funds shall be limited to an amount that results in an aggregate airline cost per enplaned passenger (defined as the total amount of terminal rentals plus apron fees plus landing fees paid by the Signatory Airlines during such Fiscal Year divided by the total number of passengers enplaned at the Airport by such Signatory Airlines during such Fiscal Year) of $3.00 in that Fiscal Year. Should the application of additional excess capital funds result in reaching this $3.00 cost per enplaned passenger "floor," any remaining excess capital funds shall remain in the Aviation Capital Fund, notwithstanding the $30 million "cap," and be available to City for any lawful purpose relating to the Airport System.

## Section 6.09. Year-End Adjustment to Actual and Settlement.

A.      **Year-End Actual Cost Accounting.** As soon as possible following the close of each Fiscal Year, City shall furnish Airline with an accounting of the costs and expenses actually

35

incurred, revenues and other credits actually realized (reconciled to the audited financial statements of the Airport System), and actual enplaned passengers and landed weights during such Fiscal Year with respect to each of the components of the calculation of Terminal Building Rental Rate, the Apron Fee Rate, and the Landing Fee Rate in this Article 6 and shall recalculate the rates, fees, and charges required for the Fiscal Year based on those actual costs and revenues. If requested by an airline, City shall convene a meeting of the airlines to discuss the calculation of the year-end settlement.

B.     **City Payment to Airline of Excess Rentals, Fees or Charges.**  Subject to the requirements set forth in 6.01 (A), in the event that Airline's rentals, fees, and charges billed and paid during the Fiscal Year were more than the amount of Airline's rentals, fees, and charges required (as recalculated based on actual costs and revenues), such excess amount shall be paid in lump sum to Airline within sixty (60) days of the calculation of such final settlement.

C.     **Airline Payment to City of Rental, Fees or Charges Deficiencies.**  Subject to the requirements set forth in 6.01 (A), in the event that Airline's rentals, fees, and charges billed and paid during the Fiscal Year were less than the amount of Airline's rentals, fees, and charges required (as recalculated based on actual costs and revenues), such deficiency shall be billed to Airline and payable by Airline within sixty (60) days of the date of invoice.

Article 7.  LOVE FIELD MODERNIZATION PROGRAM AND OTHER CAPITAL IMPROVEMENTS

Section 7.01. <u>Love Field Modernization Program</u>.

A.        <u>General</u>.  City and Southwest are currently and jointly undertaking the Love Field Modernization Program, a major capital program to improve and modernize terminal facilities at the Airport, as further described in the Program Development Agreement.  The LFMP includes all of the facilities, infrastructure, systems and equipment for the operation of the future terminal complex, including the terminal building, aircraft parking apron, fueling system, roadways and terminal curbside, baggage handling systems, passenger loading bridges and support systems, and other supporting infrastructure and the finish-out of the Exclusive Use Space of all airlines to a standard level of finish-out in accordance with the Program Development Agreement and the Program Definition Manual.   City shall provide Airline with a copy of the final Program Development Agreement and the completed Program Definition Manual.

B.        <u>Financing the LFMP</u>.  The City has created the Love Field Airport Modernization Corporation ("LFAMC") under Subchapter D, Ch. 431 of Texas Transportation Code and intends to use it to finance a significant portion of the costs of the LFMP, at such time as Southwest and City determine that LFMP Bonds shall be issued.  Key elements of the proposed financing structure are as follows:

1.        <u>Trust Agreement</u>.  The LFAMC will enter into a trust agreement with a Trustee governing the issuance of the payments, the control and distribution of proceeds, the payment principal, interest, and sinking fund requirements on the LFMP Bonds and setting forth other various bond covenants (the "Trust Agreement").

2.        <u>Facilities Agreement</u>.  The LFAMC and Southwest contemplate entering into a special facility agreement which, among other things, will obligate Southwest to make payments to the Trustee in the amount of the LFMP Debt Service less any credits for annual PFC Revenues that City applies toward LFMP Debt Service (the "Facilities Agreement").  Presently the City intends to utilize PFCs in the amount of at least Ten Million Dollars ($10,000,000) annually to repay or otherwise defray the payment of LFMP Debt Service for PFC eligible and approved capital costs of the LFMP.  The actual amount of PFC Revenues could vary, either up or down, subject to (a) City obtaining all necessary approvals from the FAA in future PFC applications to impose and use a PFC at the Airport and (b) eligibility of an adequate portion of the LFMP capital costs, and (c) City being able to develop a financially feasible plan for the Connector.

3.        <u>Revenue Credit Agreement</u>.  City and Southwest contemplate entering into an agreement to provide for crediting back to Southwest the amount of debt service which Southwest will be required to pay on the LFMP Bonds under the Facilities Agreement that the City will recover through the rates and charges mechanism of this Agreement (the "Revenue Credit Agreement").  If bonds are not issued to fund the LFMP, and Southwest fund LFMP improvements with its own funds, the Revenue Credit Agreement will provide a mechanism for crediting back to Southwest any and all funds expended by Southwest to

37

implement the LFMP, including repayment of accrued interest on the funds financed by Southwest at a revenue bond index rate compounded annually.

C.      **The DART Connector.**  Consistent with the Five Party Agreement, City may develop a people mover connector (the "Connector") to connect the Terminal Building to a nearby line of the Dallas Area Rapid Transit ("DART") mass transit system at a station to the immediate south of the Airport.  If any DOA resources are required to be used for the Connector, City shall apply for and, if approved, use PFCs to pay for PFC eligible portions of the LFMP.  The current LFMP funding plan calls for City to impose and use a $4.50 PFC and, upon completion of the LFMP in FY 2015, to apply $10 million per year of PFC Revenues toward LFMP Bond Debt Service and the balance toward debt service on bonds to be issued for the Connector.  Once the costs and funding requirements of the Connector are known, City shall coordinate with Airline and the other airlines serving the Airport to jointly determine the optimal plan for applying available PFC Revenues toward the LFMP and the Connector.  However, in the event PFC funds are not approved for the Connector, or if the combination of available PFC Revenues and other available public funds is not sufficient to fund the entire Connector project, City may use DOA resources (bonds or equity or a combination thereof) to fund the remaining portion of the Connector, and the portion of the Connector financed with DOA resources shall be considered a Terminal Building project recoverable through terminal rentals under Section 6.04 hereof, with the understanding that the project will be amortized over the remaining term of the LFMP or twenty-five (25) years from DBO, whichever is greater.

Nothing herein shall obligate City to undertake the Connector project.

D.      **The Lemmon Avenue Facility.**   To fulfill its obligations under the Five Party Agreement, City plans to acquire (using all available means up to and including condemnation) all or a portion of the lease on the Lemmon Avenue Facility (the now vacant terminal facility once used by Legend Airlines) and to demolish the gates at the Lemmon Avenue Facility immediately upon acquisition of the current lease to ensure that the Lemmon Avenue Facility can never again be used for passenger service.  For the purposes of this Agreement, the acquisition and demolition of the Lemmon Avenue Facility will be considered an Airfield project and the costs recoverable through the landing fee rate base under Section 6.06 hereof.  To the extent that the City generates net revenues from the use of the Lemmon Avenue Facility site, the City shall credit back such net revenues up to the amount recoverable through the landing fee rate base.

E.      **Airline Relocation.**      Airline acknowledges and agrees that, during the implementation of the LFMP, Airline and Airline's customers may be inconvenienced by the construction activity and reasonable relocations necessary to complete the LFMP construction. Airline agrees to cooperate with the Director regarding any such reasonable relocations or construction activities and to reasonably coordinate its operations at the Airport to accommodate such construction activity. The City shall make reasonable efforts to minimize any interference to Airline's operations caused by such relocations or construction activities.

F.      **LFMP Capital Improvements.**  Airline acknowledges and agrees that the LFMP is being implemented, in part, in order to provide new leased premises for Airline's use in carrying

38

out its operations at the Airport. During the LFMP implementation period, Airline agrees not to initiate any renovations in or remodeling of its Leased Premises other than what might be contemplated by the LFMP without the written consent of the Director.

**Section 7.02.   Post-LFMP – Capital Improvements to Leased Premises.**

The Program Development Agreement addresses the understanding and agreement of City and Southwest regarding design and construction of the LFMP. This Section addresses provisions that will apply to any other construction, alteration or installation at the Airport or upon the Leased Premises that Airline may desire to undertake in the future.

A.      **Post-LFMP Responsibility for Alterations, Modifications or Improvements to Leased Premises.** Upon the completion of the LFMP, Airline shall bear all costs in connection with any alterations, modifications or improvements to the Leased Premises required by Airline, except as may otherwise be expressly provided herein or agreed to in the future by the Parties.

B.      **Alterations, Modifications or Improvements.** No alterations, modifications or improvements shall be made by Airline to the Leased Premises unless the Director consents in writing to the proposed changes, which consent shall not be unreasonably or discriminatorily withheld, conditioned or delayed. If the Director permits Airline to make any alterations the following conditions shall apply to such alterations:

1.      **Construction Application.** Prior to entering any contract for such work, or commencing the work itself, Airline shall first submit or cause to be submitted to the Director for his approval, a construction application, together with complete plans and specifications for the proposed work and the name of the contractor to whom Airline proposes to award the contract for such work. Airline further agrees that, if requested by the director, it shall require the contractor to furnish a performance bond and a payment bond approved as to form, substance and surety by the Director. The approval of the Construction Application, plans and specification, the contractor and any performance or payment bond shall be unreasonably withheld, delayed or conditioned.

2.      **Required Standard Construction Contract Provisions.** Airline shall include in all construction contracts entered into by it in connection with any or all of the construction work aforesaid, provisions requiring the contractor, or, in the alternative, Airline, except for the negligence or misconduct of City or any successor-in-interest, as their respective interests may appear, or any of their directors, officers, officials, agents, and employees, to indemnify, hold harmless and defend City, any successor-in-interest, as their interests may appear, their directors, officers, officials, agents and employees against losses occasioned by death, injury to persons or damages to property arising out of or in connection with the performance of any or all of the construction work, against risk of loss or damage to the construction work prior to the completion thereof, and, against the losses resulting from claims and demands by third persons arising out of the performance of the construction work. Additionally, Airline shall provide or cause the contractor to furnish insurance in accordance with the requirements contained in

39

Attachment I – "Insurance Requirements", attached hereto, naming City as additional insured. Airline shall also include or cause to be included in any construction contract such provisions as may be reasonably required by City relating to the operation or performance of the contractor at the Airport.

**3.** **Quality of Materials and Workmanship.** Airline agrees that all work to be performed by it or its contractor, including all workmanship and materials, shall be of first-class quality and shall be performed in full compliance and in accordance with the plans and specifications approved by the Director, and such work shall be coordinated with the Director prior to the commencement or work and subject to his inspection during the performance thereof and after it has been completed.

**4.** **Risk of Loss.** Airline shall assume all risk of loss or damage to all such work prior to the completion thereof, excluding any loss or damage caused by City or its successor-in-interest, as their respective interests may appear, or any of their directors, officers, officials, agents and employees. Airline shall repair or replace any such loss or damage without cost to City, excluding any loss or damage caused by City or any successor-in-interest, as their interest may appear, or any directors, officers, officials, agents and employees. With respect to any loss or damage to such work caused by the City (or any successor-in-interest, as their interest may appear, or any directors, officers, officials, agents and employees), Airline reserves the right to either require City to repair any such loss or damage or repair such loss or damage itself and bill the City for cost of such repair.

**5.** **Preparation and Delivery of Plans, Specifications & Drawings.** Airline shall deliver to, or cause to be delivered to the Director, a set of plans for the improvements, and at reasonable intervals, progress reports of the work performed by it and shall at all times during the term of this Agreement keep such drawings current showing thereon any changes or modifications made in or to the improvements constructed on the Leased Premises. All plans and specifications shall be prepared by architects and engineers licensed in the State of Texas. Upon completion of construction, Airlines shall provide the Director with a complete set of as-built plans on a CD-Rom and PDF format and a hard paper copy, including specifications and addendums. All plans and specifications and all alterations, modifications and improvements to the Leased Premises shall meet all City of Dallas fire and building code requirements, including building permits, and shall provide for construction from material reasonably satisfactory to and acceptable by the Director.

**6.** **Ownership of Improvements.** The alterations, modifications and improvements, excluding trade fixtures therein (which shall remain the property of Airline) shall be owned by the City upon the date that a certificate of occupancy has been issued by the City Building Official, or, the date that Airline has beneficially occupied the improvements so constructed, whichever date is earliest.

7.    **Construction Safety & Security Measures.**  If the performance of any alterations, modifications or improvements to the Leased Premises requires work to be performed near an active taxiway or where safety or security of terminal or air operations is involved, Airline agrees that it will, at its own expense, post guards or erect barriers or other safeguards approved by the Director at such locations so as to provide for the safety of work performed and the security of the work area.

8.    **City Right to Make Certain Improvements in Leased Premises.**  City reserves the right to make, at its sole cost, certain alterations, modifications and improvements in the Leased Premises that benefit or maintain the public or common areas of the airport, including, but not limited to, the Terminal Building and the Apron Areas. City shall exercise such right in cooperation with Airline's construction representatives and will cause the construction work to be carried out with due consideration for minimal disruption in Airline's operations at the Airport.

**Section 7.03. Future Capital Improvements.**

A.    **General.**  City may expand, repair, alter, and improve the Airport (including all runway, taxiway and apron pavements, terminal facilities, roadways, parking facilities, utility systems and other infrastructure) as necessary to provide required facilities and ensure the safe operation of the Airport in the interest of the traveling public and Airport tenants and users, and shall do so free from any liability to Airline for loss of business or damages of any nature whatsoever to Airline occasioned during the making of such improvements, repairs, alterations and additions.  City will confer and coordinate with Airline and the other airlines serving the Airport regarding planned Capital Improvements at the Airport as further provided below.

B.    **Five-Year Capital Improvement Program.**  The DOA prepares and maintains a rolling five-year Capital Improvement Program (the "5-Year CIP") for the Airport System.  In conjunction with the annual rates and charges adjustment process set forth in Article 6 of this Agreement, the DOA shall prepare an updated 5-Year CIP addressing Airport System capital needs for the ensuing 5-year period and shall submit the 5-Year CIP to the Signatory Airlines for their review and comment.  The DOA will also report to the Signatory Airlines at least annually (in conjunction with the Annual Budget process) regarding the progress of its implementation of the prior 5-Year CIP.  Projects that are a part of the 5-Year CIP that have been requested by and solely benefit one airline shall be designated as such in the 5-Year CIP and governed by Section 7.03.F of this Agreement.

C.    **MII Disapprovals.**  Projects or portions of projects in the 5-Year CIP associated with designated airline-supported cost centers—namely, the Terminal Building, the Apron Area, and the Airfield—shall be subject to the disapproval of a Majority-in-Interest in accordance with Sections 7.03.C and D.  If a Majority-in-Interest do not disapprove a project associated with the designated airline-supported cost centers, but Signatory Airlines meeting the requirements of (1) or (2) of Section 1.39 of this Agreement do disapprove a project, the project shall be deferred for one year; the DOA may then re-submit such project to the Signatory Airlines for consideration/disapproval in the immediately following year; provided that in the event there is

41

no disapproval of that project by a Majority-in-Interest in that immediately following year, the DOA may proceed with the project. Projects in other cost centers—namely, Other Buildings & Areas, Parking & Ground Transportation, and Terminal Roadways—shall not be subject to the prior disapproval of the Signatory Airlines, and the City may proceed with such projects at its discretion.

      **D.**    **CIP Review / MII Process.** At the Annual Budget Meeting required under Section 6.02 hereof, or otherwise at any time during each Fiscal Year as needed, City shall present its 5-Year CIP for the ensuing 5-year period and providing supporting information to Airline regarding the scope, cost, schedule and need for the capital projects proposed in the airline-supported cost centers for the immediately ensuing Fiscal Year (year 1 of CIP). Thereafter, Airline shall have 30 days to review the proposed projects and respond in writing as to whether any projects listed in the CIP for year 1 of the CIP are disapproved. The absence of a written response from Airline regarding any of the proposed projects for year 1 of the CIP within the 30-day MII review period shall be deemed a waiver of Airline's opportunity to disapprove such project(s).

      **E.**    **Consequences of MII Disapproval.** In the event a project is disapproved by a Majority-in-Interest of the airlines under the procedures of Section 7.03.D above, the City may elect to either (1) reduce the scope and cost of the project and request airline reconsideration of the project on the basis of those changes, (2) proceed to undertake the project but not include the costs of the project in the calculation of future airline rates and charges or (3) not proceed with the project.

      **F.**    **CIP Projects Exempted from MII.** Notwithstanding the above, the City may undertake additional capital projects in designated airline-supported cost centers and include the costs attributable to such additional capital projects in the appropriate Airline rate base if such proposed additional capital projects are required for reasons of safety, security, normal maintenance and repair, federal mandate or if such capital projects are prudent and necessary to accommodate another air carrier at the Airport; provided that: (1) such facilities are reasonably similar to those being used by the Signatory Airlines in quality of construction, (2) the air carrier for which such facilities are being constructed has executed and delivered to the City an agreement substantially similar to this Agreement prior to the construction of such facilities, and (3) the air carrier for which such facilities are being constructed pays for all the costs associated with the construction of such facilities. The costs of any capital project proposed by the City in the Terminal Building that was requested by and solely benefits only one airline and that is not required for reasons of safety, security, normal maintenance and repair, or federal mandate shall not be charged to the Terminal Building Cost Center but rather recovered as a rental surcharge from the requesting airline.

      **G.**    **Grants / Sponsor's Assurances.** Consistent with good business practices, City agrees to seek the maximum amount of grants and participating funds for the Airport System from the United States of America, and any agency thereof and the State of Texas in carrying out the 5-Year CIP and additional capital projects. City agrees to comply with all the terms and conditions of the Sponsor's Assurances contained in the FAA grant agreements, as the same may be amended from time to time, including the provisions governing the use of airport revenues.

H.      **PFCs / Assurances.**  Consistent with good business practices, City agrees to apply to the FAA for approval to charge various PFCs in carrying out the 5-Year CIP and additional capital projects.  City agrees to comply with all the terms and conditions placed on the collection and expenditure of PFC Revenues by the FAA.

43

## Article 8.  OPERATION AND MAINTENANCE

**Section 8.01.  <u>Existing Leased Premises Conveyed "As Is".</u>**

Airline acknowledges and agrees that it has inspected or has had an opportunity to inspect the existing Leased Premises, and, further acknowledges and agrees by its acceptance hereof that the existing Leased Premises are conveyed "As Is, Where Is", and in its present condition with all faults and that City has not made and does not hereby make and specifically disclaims any representations, guarantees, promises, covenants, agreements, or warranties of any kind or character whatsoever, whether express or implied, oral or written, past present, or future of, as to, concerning or with respect to the nature, quality or condition of the premises, the income to be derived, the suitability of such areas for uses allowed under this Agreement, or merchantability or fitness for a particular purpose.

**Section 8.02.  <u>Pre-LFMP Maintenance Obligations.</u>**

City and Airline maintenance responsibilities in the Pre-LFMP Exclusive Use Space, Pre-LFMP Preferential Use Space, and Pre-LFMP Common Use Space shall remain the same as under the Existing Terminal Lease, as shown on the attached Exhibit I, until such time as Airline ceases to occupy or use such Pre-LFMP Space.  The maintenance responsibilities of City and Airline as Airline begins to occupy and use the Terminal Building's Post-LFMP Exclusive Use Space, Post-LFMP Preferential Use Space, and Post-LFMP Common Use Space shall be governed by Section 8.03 and Section 8.04 of this Agreement and as shown on the attached Exhibit I.

**Section 8.03.  <u>Post-LFMP Maintenance Obligations of City.</u>**

Maintenance obligations of City are described below and summarized in Exhibit I.

**A.     <u>Exclusive Use Space.</u>**    In Exclusive Use Space, City shall furnish (1) building structural maintenance, (2) outside window and building cleaning, (3) heating and air conditioning through its installed systems in those areas so equipped for such services to keep the areas at a reasonable temperature throughout the year, and (4) electrical power for interior area lighting.

**B.     <u>Preferential Use Space.</u>**  In Preferential Use Space, City shall furnish (1) building structural maintenance, (2) inside and outside window and building cleaning, (3) heating and air conditioning through its installed systems in those areas so equipped for such services to keep the areas at a reasonable temperature throughout the year, and (4) electrical power for interior area lighting, (5) electrical relamping, and (6) janitorial services.

**C.     <u>Common Use Space.</u>**   In Common Use Space, City shall furnish (1) building structural maintenance, (2) inside and outside window and building cleaning, (3) heating and air conditioning through its installed systems in those areas so equipped for such services to keep the areas at a reasonable temperature throughout the year, and (4) electrical power for interior area lighting, (5) electrical relamping, and (6) janitorial services.

44

**D.**   **Preferential Use Aircraft Parking Positions.** City shall furnish (1) structural maintenance for the Preferential Use Aircraft Parking Positions, (2) Apron Area lighting, and (3) painting and striping of all aircraft parking position based on aircraft parking plans provided by Airline.

**E.**   **Common Use Airport Facilities.** City shall operate, maintain and keep in good repair the areas and facilities provided by City for the common use of the airlines and the public in accordance with the practices of a reasonably prudent airport operator. City agrees to use its best efforts to keep the Airport free from obstructions and to do all things reasonably necessary for the safe, convenient and proper use of the Airport by those who are authorized to use the same. City shall maintain and operate the Airport in accordance with all applicable standards, rules and regulations of the FAA.

**F.**   **Public Areas of Terminal Buildings.** Except as may otherwise be provided herein, City will operate, maintain and keep in neat, clean, sanitary, sightly and operable condition and repair the public areas of the Terminal Building (except for those areas therein leased to others for their exclusive or preferential use) and all additions, improvements and facilities now or hereafter provided by City at or in connection with the Terminal Building and for common use by all airlines and the public, excepting any improvements or facilities constructed or installed by Airline, either individually or jointly with others and those that Airline has agreed under the provisions hereof to operate or maintain as aforesaid. Except as otherwise provided herein, City will maintain the roof, exterior, structure and utility systems of the Terminal Building in good repair. City will keep the public areas in and around the Terminal Building adequately supplied, equipped and furnished to accommodate the public using same and will operate and maintain directional signs in said public areas, including by way of example, but not by way of limitation, signs indicating the location in the Terminal Building of public facilities provided by City on the Airport. City will use reasonable efforts to provide (1) adequate heat and air conditioning to those areas on the Airport equipped for such service, to keep the areas at a reasonable temperature throughout the year; (2) illumination and drinking water in the public areas in the Terminal Building; (3) adequate lighting for the public vehicular parking facilities; and (4) such janitorial and cleaning services as necessary to keep the public areas and public use restrooms of the Terminal Building and areas adjacent thereto in a neat, clean, sanitary, sightly and operable condition at all times.

**G.**   **Structural Defects / City Failure to Correct.** If City, within a period of thirty (30) days after receipt of written notice from the Airline of the existence of a structural defect or other item for which it is responsible hereunder, fails to correct such defect or item or fails to commence proceeding and continuing with the correction, if the correction cannot reasonably be repaired within thirty (30) days, Airline shall be entitled to do so and to deduct the reasonable cost thereof from any payments due City under this Agreement. Airline shall not be responsible for damage to or repair of the Leased Premises caused by City's failure to properly perform any of the maintenance which it is required to perform under this Agreement or for damage caused by City, its agents or employees.

**H.**   **Temporary Interruption of Services.**

45

**1.** City shall have the right with prior notice to Airline to temporarily discontinue the supply of any of the above services when reasonably necessary in order to make any repairs, alterations, changes or improvements in the Leased Premises or elsewhere in the Terminal Building including all systems for the supply of services. In the event of any such disruption of services, City shall use its best efforts to restore services to the Leased Premises as promptly as reasonably possible and shall coordinate with Airline to minimize, to the extent possible, the disruption of Airline's business.

**2.** No failure, delay or interruption in any of the above services shall be or shall be construed to be an eviction of Airline. Other than as provided herein, no failure, delay or interruption in any of the above described services shall be grounds for any diminution or abatement of the rentals payable hereunder or constitute grounds for any claim by Airline for damages consequential or otherwise unless due to the negligence or misconduct of City, its employees or agents. City shall not unreasonably withhold these services, provided that if a delay or interruption in the provision of the above described services continues for more than five (5) days in a row and impact Airline's ability to operate, then City and Airline agree to consider a reasonable rental credit for the period of impeded operation. Airline shall use its reasonable efforts to utilize City's services in the most economical manner possible. City will notify Airline if City perceives that Airline could better utilize any of the services described in this Section of the Agreement in a material way.

**Section 8.04. Post-LFMP Maintenance Obligations of Airline.**

Maintenance obligations of Airline are described below and summarized in Exhibit I.

**A.** **Exclusive Use Space.** Airline shall provide all maintenance, as shown in Exhibit I, in the Exclusive Use Space not otherwise provided by City under Section 8.03 hereof. Airline shall furnish all janitorial services, all maintenance and operation of Airline-installed improvements and systems in the Exclusive Use Space. Airline shall provide electrical relamping, all decorating and redecorating when required and maintenance for plumbing lines in the Exclusive Use Space. Airline shall maintain the Exclusive Use Space in a neat, clean, sanitary, sightly and operable condition.

**B.** **Preferential Use Space.** Airline shall provide all maintenance, as shown in Exhibit I, in the Preferential Use Space not otherwise provided by City under Section 8.03 hereof.

**C.** **Common Use Space and Baggage Claim Devices.** Airline, in conjunction with the other Signatory Airlines, shall furnish all maintenance and operation of improvements and systems in the Common Use Space including baggage claim conveyors. Airline will conduct its baggage claim operations in a neat, clean, sanitary, and sightly way.

**D.** **Preferential Use Aircraft Parking Positions.** Airline shall keep the Preferential Use Aircraft Parking Positions leased to Airline in a clean, neat and orderly condition and free of foreign objects, and shall periodically on an as-needed basis remove grease, oil, and fuel spills

46

with ramp scrubbing equipment and repair any foreign object damage.

**E.    Passenger Loading Bridges and Baggage Handling Systems.**  Airline shall provide maintenance of all passenger loading bridges and support systems (400 hz ground power, pre-conditioned air, etc.), shall provide janitorial services in the loading bridges, and shall maintain the loading bridges in a neat, clean, sanitary, and sightly condition. Airline, in conjunction with the other Signatory Airlines, shall also maintain all outbound baggage conveyors and baggage sortation systems in proper working order.

**F.    Airline-Constructed Improvements.**  Airline shall cause all improvements and facilities, and additions thereto, constructed or installed by Airline, either alone or in conjunction with other airline tenants, and those constructed or installed by City in Airline's Exclusive Use Space and Preferential Use Space, and all vehicles and equipment operated by Airline on the Airport to be kept and maintained in a safe condition and in good repair (except those repairs and maintenance undertaken by City in Section 8.01 hereof) in accordance with uniform standards applicable to all Airport tenants as established from time to time by the Director. Airline shall keep the Exclusive Use Space and Preferential Use Space and improvements thereon in a sanitary and neat condition and, during construction, shall cause compliance with all health, safety and other laws and requirements applicable thereto; provided, however, that notwithstanding anything herein to the contrary, Airline shall not be obligated to make any capital repairs or structural alterations to so comply, unless necessitated as a result of Airline's construction activities.

**G.    Performance by City Upon Failure of Airline to Maintain.**  In the event Airline fails within ten (10) days after written notice from City to perform any obligation required under this Section 8.02 to be performed by Airline, City may enter the Leased Premises involved, without such entering causing or constituting a termination of this Agreement or an interference with the possession of said Leased Premises by Airline, and do all things reasonably necessary to perform such obligation. Director may charge Airline the reasonable cost and expense of performing such obligation and Airline agrees to pay to City upon demand such charge in addition to any other amounts payable by Airline hereunder; provided, however, that if Airline's failure to perform any such obligation endangers the safety of the public, the employees or property of City, or other tenants of the Airport and Director so states in its written notice to Airline, City may perform such obligation of Airline at any time after the giving of such notice and charge to Airline the reasonable cost and expense of such performance which Airline shall pay as aforesaid.

**H.    Inspection by City.**  City may enter upon the Leased Premises at any reasonable time during normal business hours for any purpose connected with the performance of City's or Airline's obligations hereunder, in the exercise of its governmental functions in observing the performance by Airline of obligations under this Agreement, provided however, City may enter upon the Leased Premises at any reasonable time to determine the condition of the Leased Premises from a standpoint of safety which shall be determined solely at the discretion of the Director.

**I.    Other.**  In its use of the Leased Premises and operations at the Airport, Airline

47

shall also:

    **1.**    Control the conduct and demeanor of its employees and shall require its employees in the Air Operations Area, as defined in the Airport Security Plan, to wear uniforms or provide other visible means of identification;

    **2.**    Control all vehicular traffic in and among the Aircraft Parking Ramp, Aircraft Circulating and Ramp Vehicle Service Station Areas (exclusive of public roadways), as defined in the Airport Security Plan, in accordance with FAR Part l07 and prohibit any unauthorized person from entering the secured areas of the Airport, as defined in the Airport Security Plan, taking all precautions reasonably necessary to promote the safety of its passengers, customers, business visitors and other persons, and employing such means as may be necessary to direct the movement of vehicular traffic in such areas; and

    **3.**    Either itself or by an independent contractor approved by the Director, deposit its garbage, debris and other waste materials in containers located at appropriate areas of the Terminal Building approved by the Director.  Garbage, debris and waster materials from aircraft shall be placed in appropriate compactors or other containers and disposed of as approved by the Director.  Airline shall adequately train, or cause to be trained, its employees or contractors engaged in the use of any trash containers and in systems used to dispose of garbage, waste or debris for proper execution of duties in the air operations and terminal area, as defined in the Airport Security Plan.

    **J.**    **Maintenance Activities in Proximity of Air Operations Areas.**  If the performance of any of the foregoing maintenance, repair, replacement or painting obligations of Airline requires work to be performed near an active taxiway or where safety of terminal or air operations is involved, Airline agrees that it will, at its own expense, post guards or erect barriers or other safeguards approved by the Director at such locations so as to provide for the safety of work performed.

48

## Article 9.  INDEMNIFICATION

Section 9.01.  <u>Indemnification of City</u>.

A.      AIRLINE SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS CITY AND ALL OF ITS OFFICERS, AGENTS, AND EMPLOYEES (THE "INDEMNITEES") FROM ALL SUITS, ACTIONS, OR CLAIMS OF ANY CHARACTER, NAME, OR DESCRIPTION BROUGHT FOR OR ON ACCOUNT OF AIRLINE'S FAILURE TO COMPLY WITH APPLICABLE REGULATIONS OR ON ACCOUNT OF ANY INJURY OR DAMAGE RECEIVED OR SUSTAINED BY ANY PERSON OR PROPERTY AS A RESULT OF THE AIRLINE'S CONDUCT OF ANY ACTIVITY OR OPERATION ON OR IN CONNECTION WITH THE AIRPORT OR THE LEASED PREMISES.  AIRLINE SHALL PAY ANY JUDGMENT, TOGETHER WITH COSTS, WHICH MAY BE OBTAINED AGAINST CITY OR ANY OF ITS OFFICERS, AGENTS, OR EMPLOYEES AS THE RESULT OF SUCH INJURY OR DAMAGE, OR FAILURE TO COMPLY WITH APPLICABLE REGULATIONS. NOTWITHSTANDING THE PROVISIONS OF THIS INDEMNITY CLAUSE, AIRLINE SHALL NOT BE RESPONSIBLE FOR DEFENDING AND HOLDING HARMLESS CITY OR PAYING ANY JUDGMENT OR COSTS IN CONNECTION WITH ANY INVERSE CONDEMNATION, NUISANCE OR ANY OTHER SUCH SUIT DIRECTED AT CITY, AS PROPRIETOR, SOLELY BECAUSE OF THE EXISTENCE OR OPERATION OF THE AIRPORT, EXCEPT THAT AND NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, IT IS AGREED THAT THIS INDEMNITY PROVISION SHALL NOT APPLY TO (AND AIRLINE SHALL NOT BE REQUIRED TO RELEASE, INDEMNIFY, HOLD HARMLESS OR DEFEND ANY INDEMNITEE WITH RESPECT TO) ANY SUITS, ACTIONS, CLAIMS, OR DAMAGES OF ANY CHARACTER ARISING FROM THE SOLE NEGLIGENCE, FAULT OR WILLFUL MISCONDUCT OF ANY INDEMNITEE, AND IN THE EVENT OF JOINT AND CONCURRING NEGLIGENCE OF AIRLINE AND ANY INDEMNITEE, RESPONSIBILITY AND LIABILITY, IF ANY, SHALL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW.

B.      Nothing in this Section 9.01 shall be interpreted to limit City's ability to adjust rental rates and other fees in accordance with the other terms and conditions of this Agreement, and applicable laws and regulations.  Furthermore, no provision in this Agreement is intended to limit City's ability to adjust landing fees or impose other fees in accordance with applicable laws and regulations.

C.      City shall give the Airline prompt notice of any matter covered by this Section 9.01 and shall forward to the Airline every demand, notice, summons, or process received in any claim or legal proceeding covered by this Section.

D.      Notwithstanding the provisions of this Section 9.01, Airline shall not be obligated to indemnify, defend, or hold harmless City or any of its officers, agents, or employees when the injury or damage to a person or property is caused by the negligence or misconduct of City, its officers, agents, or employees.  Nothing in this Section 9.01 shall be interpreted to limit City's ability to adjust rental rates and other fees in accordance with the other terms and conditions of this Agreement, and applicable laws and regulations.  Furthermore, no provision in this Agreement is intended to limit City's ability to adjust landing fees or impose other fees in accordance with applicable laws and regulations.

49

E.     Those provisions of this Section that apply to the Airline shall also apply to any party holding by, through, or under the Airline.

F.     It is the intention of this indemnity Section that the joint and concurring responsibility of City and Airline be borne comparatively in accordance with the law of the State of Texas, without waiving any governmental immunity available to City under Texas law and without waiving any defenses of the Parties under Texas law.  This provision shall not create any cause of action in favor of any third party against City or Airline nor shall it enlarge in any way the liability of City or Airline, this provision being intended solely to provide for indemnification of City from liability for damage to third persons or property as set forth in this paragraph.

G.     City assumes no responsibility for any property placed in or on the Leased Premises or any part thereof, and City is hereby expressly released and discharged from any and all liability for any loss, injury or damage to persons or property that may be sustained by reason of the occupancy of the Leased Premises under this Agreement, unless same is caused by the negligence or willful act of City, its officers, agents or employees.

50

## Article 10.  INSURANCE

**Section 10.01.  General.**

    **A.**    Prior to the commencement of this Agreement by City, Airline shall procure, pay for and maintain the insurance polices and coverages described in Attachment I, attached hereto and incorporated herein as part of this Agreement and wherein Airline may also be referred to as "Lessee"; such polices to be written by companies of recognized financial responsibility, that are of a size and financial strength comparable to insurers of other major international airlines.  The insurance shall be evidenced by delivery to City of certificates of insurance executed by the insurer or its authorized agent stating coverages, limits, expiration dates and compliance with all applicable required provisions. Upon request, City shall be entitled to receive without expense, copies of the policies and all endorsements. CITY HAS NO DUTY TO PAY OR PERFORM UNDER THIS CONTRACT OR AGREEMENT UNTIL SUCH CERTIFICATE HAS BEEN DELIVERED TO CITY and no officer or employee shall have authority to waive this requirement.

    **B.**    City reserves the right to review the insurance requirements of this Section during the effective period of the contract to modify insurance coverages and their limits when deemed necessary and prudent by City's Risk Management Division of the Human Resources Department based upon economic conditions, recommendation of professional insurance advisors, changes in statutory law, court decisions or other relevant factors. Airline agrees to make any reasonable request for deletion, revision or modification of particular policy terms, conditions, limitations, or exclusions (except where policy provisions are established by law or regulation binding upon either party to the contract or upon the underwriter of any such policy provisions). Upon request by City, Airline shall exercise reasonable efforts to accomplish such changes in policy coverages and shall pay the cost thereof.

    **C.**    As an alternative to obtaining and maintaining the "Environmental Impairment/Pollution Insurance" described in Section C.5 of Attachment I, Airline may satisfy such coverage requirement by: (1) maintaining a debt rating from both Moody's and Standard & Poors equal to or better than that rating which is three (3) grades lower than Airline's debt rating as of the Effective Date; or (2) providing to City evidence, in a form acceptable to City, in City's sole judgment, of a restricted cash fund equal to the requirements of the specified insurance; or (3) providing to City a surety bond, in a form acceptable to City in its sole judgment, equal to the requirements of the specified insurance.  One of the three enumerated alternatives in the preceding sentence used to satisfy such requirement of City shall be maintained throughout the term of the Lease and for three (3) years thereafter. Airline agrees that the limits requested in no way limits Airline's full responsibility for clean-up and restoration in the event of a loss. If Airline needs to satisfy the Environmental Impairment/Pollution Insurance requirement with another alternative provided in (1) through (3) above used to satisfy such coverage requirement, Airline shall notify City of its intent to utilize such other alternative, including the identification of such alternative.

**Section 10.02.  Insurance Requirements for Subcontractors and Affiliates.**

A.      Without limiting any of the other obligations or liabilities of Airline, Airline shall require each of its subcontractors and Affiliates performing work under the contract, at the subcontractor's or Affiliate's own expense, to maintain during the term of the contract, levels of insurance that are necessary and appropriate for the services being performed, comply with all applicable laws and are consistent with industry standards.  The subcontractor's of Affiliate's liability insurance shall name the Airline as an additional insured.

B.      Airline shall obtain and monitor the certificates of insurance from each subcontractor and Affiliate.  Airline must retain the certificates of insurance for the duration of the contract and shall have the responsibility of enforcing these insurance requirements among its subcontractors and Affiliates.  City shall be entitled, upon request and without expense, to receive copies of these certificates.

**Section 10.03.  No Waiver of Responsibility or Liability.**

Approval, disapproval or failure to act by City regarding any insurance supplied by the Airline or its subcontractors and Affiliates shall not relieve Airline of full responsibility or liability for damages and accidents as set forth in the contract documents.  Neither shall the bankruptcy, insolvency nor denial of liability by the insurance company exonerate Airline from liability.

52

## Article 11. DAMAGE OR DESTRUCTION OF LEASED PREMISES

**Section 11.01.** <u>Damage or Destruction of Leased Premises</u>.

If, for any reason, the Terminal Building is damaged to such an extent that the Leased Premises is rendered untenantable in whole or in substantial part, then:

**A.** If the repairs and rebuilding necessary to restore the Terminal Building to its condition prior to the occurrence of the damage can reasonably be completed within ninety (90) days from the date on which the damage occurred, the City shall so notify the Airline in writing and the City shall proceed promptly with such repairs and rebuilding, and if the damage is not the result of the negligence or willful act of Airline or its agents, rental for the Leased Premises shall be abated pro rata for the period from the date of the occurrence of such damage to the date upon which such repairs and rebuilding are complete;

**B.** If such repairs and rebuilding cannot reasonably be completed within a ninety-day period, the City, at its option, to be evidenced by notice in writing to the Airline, may either (1) proceed promptly to commence said repairs and rebuilding to its condition prior to the occurrence, in which event the rental shall be abated as described above, or (2) terminate this Agreement with respect to the Leased Premises, in which event the rent shall be abated from and after the date of the occurrence of the damage, if the damage is not the result of the negligence or willful act of Airline or its agents; and

**C.** In the event of a partial or total destruction of the Leased Premises, the Airline shall, as soon as reasonably practicable, remove any and all of its property and/or debris from the such premises or the portion thereof destroyed and if the Airline does not promptly so remove, the City may remove such property to a public warehouse for deposit or retain the same in its own possession and sell the same at public auction, the proceeds of which shall be applied first to the expenses of removal, storage and sale, second to any sums owned by Airline to City, with any balance remaining to be paid to the Airline; if the expenses of such removal, storage and sale shall exceed the proceeds of sale, the Airline shall pay such excess to the City upon demand.

**Section 11.02.** <u>City Property Insurance</u>.

The Terminal Building, exclusive of Airline's Leased Premises, will be insured by City under a policy of fire and extended coverage insurance to the extent of not less than eighty percent (80%) of the insurable value of such property if such percentage of coverage is available. Insurance moneys and funds received on account of the damage to or destruction of such property will be applied by the City to the repair, construction, or replacement of such damaged or destroyed property. Premiums paid by the City for insurance provided in compliance herewith shall be included by the City as a part of Airport operation and maintenance expenses and allocated to the Terminal Building cost center.

## Article 12.  TERMINATION

### Section 12.01.  Termination by City.

Before the end of the Term hereof, the City reserves the right to terminate this Agreement in the event any of the following circumstances should occur:

**A.**      Airline shall fail to make any payment due City under this Agreement on the date that same is due and such failure shall continue for a period of ten (10) days after written notice, given by City, is received by Airline.

**B.**      Airline shall fail to comply with any material term, condition, or covenant of this Agreement, other than one requiring payment to be made when due, and shall not cure such failure within thirty (30) days after written notice thereof to Airline, or, if such failure cannot reasonably be cured within the said thirty (30) days, Airline shall not have commenced to cure such failure within said thirty (30) days and shall not thereafter, with reasonable diligence and good faith, proceed to cure such failure.

**C.**      Airline shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors, or a receiver or trustee shall be appointed for all or substantially all of the assets of Airline, unless City is prevented from terminating this Agreement by any applicable federal or state law.

### Section 12.02.  Remedies Available to City.

Upon the occurrence of any of the events giving the City the right to terminate this Agreement, pursuant to Section 12.01 above, the City shall have the option to pursue any one or more of the following remedies:

**A.**      Terminate this Agreement, in which event Airline shall immediately surrender the Leased Premises to City, and if Airline fails to do so, City may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Leased Premises and expel or remove Airline and any other person who may be occupying the Leased Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim or damages therefor; and Airline agrees to pay to City on demand the amount of all loss and damage which City may suffer by reason of such termination.

**B.**      Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due City hereunder or of any damages accruing to City by reason of the violation of any of the terms, conditions, and covenants herein contained.  If legal action is required to enforce any of such remedies, City shall also be entitled to reasonable attorney's fees.

**C.**      If any of the events enumerated in this Section 12.02, or Section 12.01 above, shall

54

occur prior to Airline taking possession of the Leased Premises, Airline shall not be entitled to enter into possession of the Leased Premises and City, upon the occurrence of any such event or at any time thereafter during the continuance thereof by twenty-four hours' notice, may cancel the interest of the Airline under this Agreement, such cancellation to be effective upon the date specified in such notice.

     **D.**     No acceptance by City of rentals, fees, charges or other payments in whole or in part for any period or periods after a default of any of the terms, covenants and conditions to be performed or observed by Airline shall be deemed a waiver of any right on the part of City to terminate this Agreement.

## Section 12.03.  Survival of the Obligation of Airline.

     **A.**     In the event that the Agreement is terminated in accordance with this Agreement, or in the event that City has re-entered, regained or resumed possession of the Leased Premises in accordance with the provisions of this Agreement, all the obligations of Airline under this Agreement shall survive such termination or cancellation, re-entry, regaining or resumption of possession and shall remain in full force and effect for the full term of this Agreement, and the amount or amounts of rent or charges shall become due and payable to City to the same extent, at the same time or times and in the same manner as if no termination, cancellation, re-entry, regaining or resumption of possession had taken place.

     **B.**     City, upon termination or cancellation, or upon any re-entry, regaining or resumption of possession pursuant to this Agreement, may occupy the Leased Premises or may relet the Leased Premises, and shall have the right to permit any person, firm or corporation to enter upon the Leased Premises and use the same. Such reletting may be of the Leased Premises or a part thereof, or of the Leased Premises or a part thereof together with other space, and for a period of time the same as or different from the balance of the term remaining under this Agreement, and on terms and conditions the same as or different from those set forth in this Agreement. City shall, upon termination or cancellation, or upon its re-entry, regaining or resumption of possession pursuant to this Agreement, have the right to repair or to make structural or other changes in the Leased Premises, including changes which alter the character of the Leased Premises and the suitability thereof for the purposes of the Airline under this Agreement, without affecting, altering or diminishing the obligations of the Airline hereunder. No such reletting shall be or be construed to be an acceptance of surrender. City shall proceed to attempt to relet the Leased Premises as soon as reasonably possible.

     **C.**     In the event of any reletting or any actual use and occupancy by City (the mere right to use and occupy not being sufficient however) there shall be credited to the account of the Airline against its survived obligations under this Agreement any amount actually received by or accruing to City from any Airline, licensee, permittee or other occupier in connection with the use of the Leased Premises or portion thereof during the balance of the Term of the Agreement as the same is originally stated in this Agreement, or from the market value of the occupancy of such portion of the premises as City may during such period actually use and occupy.

**Section 12.04. Termination by Airline.**

      **A.**     **Termination by Airline Generally.** Before the end of the Term hereof, the Airline may terminate this Agreement and any or all of its obligations hereunder at any time that Airline is not in default in the payment of any amount due City hereunder by giving City sixty (60) days' advance notice upon or after the happening and during the continuance of any one of the following events:

          **1.**     The issuance of any court of competent jurisdiction of an injunction or decision in any manner preventing or restraining the use of the Airport or any part thereof so as to substantially affect Airline's use of the Airport in its conduct of an Air Transportation Business;

          **2.**     The issuance of any order, rule, or regulation or the taking of any action by the FAA or other competent Governmental Agency or the occurrence of any flood, fire, earthquake, other casualty, act of God or the public enemy, substantially affecting, for a period of at least sixty days, Airline's use of the Airport in its conduct of an Air Transportation Business;

          **3.**     The default of City in the performance of any material covenant or agreement required to be performed by City hereunder, and the failure of the City to remedy or to take, and be continuing in good faith, action to remedy such default for a period of sixty (60) days after receipt from Airline of written notice to remedy the same; provided, however, that no notice of termination as above provided shall be of any force or effect if City shall have remedied the default prior to receipt of Airline's notice of termination; and

          **4.**     The substantial restriction of City's operation of the Airport by action of the government of the United States, or any department or agency thereof, under its wartime or emergency powers, and continuance thereof for a period of not less than sixty days.

      **B.**     **Other Limited Termination by Airline.** If Airline provides service to 10% or less of the Airport's total enplaned passengers (determined based on the total Airport enplanements for the twelve months preceding the date notice is required as described in 12.04.B.1 and 2 below), Airline shall have two opportunities to terminate this Agreement during the Term; provided however, Airline shall give City notice of its intent to terminate this Agreement one year prior to the effective date of such early termination.

          **1.**     **First Opportunity to Terminate.** An Airline meeting the criteria in 12.04.B above shall have the right to terminate this Agreement effective October 1, 2018. Airline shall give City notice of such intent to terminate no later than October 1, 2017.

          **2.**     **Second Opportunity to Terminate.** An Airline meeting the criteria in 12.04.B above shall have the right to terminate this Agreement effective October 1, 2023. Airline shall give City notice of such intent to terminate no later than October 1, 2022.

**Section 12.05.** <u>Right of Airline to Remove Property</u>.

**A.**      The Airline shall be entitled during the Term of this Agreement to remove from the Leased Premises, or any part thereof, all aircraft jet-bridges, loading ramps, trade fixtures, tools, machinery, equipment, materials and supplies placed thereon by it; subject, however, to any valid lien City may have thereon for unpaid rentals or other amounts, payable by Airline to City hereunder, provided that Airline shall repair all damages resulting from such removal.

**B.**      If Airline fails to remove its property on or before the termination of or expiration of this Agreement, City may remove such property to a public warehouse for deposit or retain the same in its own possession. If Airline fails to take possession and remove such property, after paying any appropriate rental fees, within thirty (30) days after termination of this Agreement, the property shall be deemed to be abandoned and City may sell the same at public auction.

57

## Article 13.  ASSIGNMENT AND SUBLETTING

Section 13.01.  Assignment and Subletting.

A. **Assignment.**  Airline shall not at any time assign this Agreement in whole or in part without the prior written consent of the City Manager; provided, however, that such consent shall not be required for an assignment of this Agreement to an Affiliate of the Airline, any corporation that purchases all or substantially all of Airline's assets, or any corporation with which Airline may merge or consolidate or which may succeed to the business of Airline and for which Airline shall notify City in writing in advance (a "Successor Entity").

B. **Subletting.**  Airline shall have the right to sublet the Leased Premises, or any portion thereof, to any party; provided, it shall first obtain the written approval of the City Manager.

C. **No Release from Obligations.**  No assignment or subletting pursuant to this Section (except assignment to a successor entity, which shall assume Airline's obligations hereunder) shall release Airline from its obligations hereunder.

D. **No Waiver of Responsibility.**  If Airline assigns, sells, conveys, transfers, mortgages, pledges or sublets its interest in this Agreement or if the Leased Premises is occupied by anyone other than Airline, City may collect rent from any person assigned an interest, in any manner, in this Agreement, or any person occupying any portion of the Leased Premises and shall apply the net amount collected to the rentals, fees and charges owed by Airline under this Agreement; but no such collection shall be deemed a waiver by City of the covenants contained herein or an acceptance by City of any such assignee, Affiliate, claimant or occupant as the successor, nor a release of Airline by City from the further performance by Airline of the covenants imposed upon Airline under this Agreement, unless expressly agreed to, in writing, by the City Manager, except to the extent such assignment, sale, conveyance, transfer or sublease is to a Successor Entity, which shall assume Airline's obligations hereunder.

E. **No Loss of Rights.**  It is further agreed that any corporation or other entity affiliated with, subsidiary of, or successor (whether by merger, sale of all or substantially all of its assets, or other amalgamation, reorganization, or otherwise) to Airline shall have the same rights to all or any portion of the Leased Premises in the same manner and to the same extent as Airline under this Agreement and without the payment of any additional rental, fees, or charges to City therefor, provided Airline complies with the rental obligations, and all other obligations of Airline hereunder are fulfilled.

F. **Terms and Provisions Binding.**  All of the terms, provisions, covenants, stipulations, conditions and consideration in this Agreement shall extend to and bind the legal representatives, successors, sublessees, and assigns of the respective Parties hereto.

58

## Article 14.  MISCELLANEOUS PROVISIONS

### Section 14.01. Rules and Regulations.

From time to time, the Director may adopt and  enforce rules and regulations with respect to the occupancy and use of the Airport, its services and facilities, by persons, vehicles, aircraft and equipment that in his opinion will reasonably insure the safe, efficient, and economically practicable operation thereof and provide for the safety and convenience of those using the Airport, and to protect the Airport and its facilities and the public from damage or injury resulting from operations on, into and from the Airport.  Airline agrees to observe and obey any and all rules and regulations as are currently in place and as may be reasonably established from time to time, and to require its officers, agents, employees, contractors, and suppliers, to observe and obey the same.  City reserves the right to deny access to the Airport or its facilities to any person, firm or corporation that fails or refuses to obey and comply with such rules and regulations.  Such rules and regulations of the Airport will not be inconsistent with the terms of this Agreement nor with valid rules, regulations, orders and procedures of the FAA or any other Governmental Agency duly authorized to make or enforce rules and regulations for the operation of the Airport and the operation of aircraft using the Airport.  Airline, upon written request to the Director, shall be furnished (at the notice address provided herein and to Airline's on-Airport manager) a current copy of any such Airport rules or regulations and any amendments thereto.

### Section 14.02.  Competitive Access.

City and Airline acknowledge that certain portions of this Agreement may be subject to review by the DOT, including but not limited to, the FAA or any other Governmental Agency, concerning possible effects on airline competition and access at the Airport.  In the event the federal government threatens to withhold federal assistance, or other sanctions, as a result of such review, City and Airline agree to modify this Agreement accordingly to reflect any necessary change as a result of such action.

### Section 14.03.  Compliance with Law.

A.      General.  Airline shall not use the Airport or any part thereof, or knowingly permit the same to be used by any of its employees, officers, agents, subtenants, contractors, invitees, or licensees for any illegal purposes and shall, at all times during the Term of this Agreement, comply with all applicable regulations, ordinances, and laws of the City, the State of Texas, or the Federal Government, and of any other Governmental Agency.  Nothing in this Section 14.03 shall modify the provisions of Section 14.01 or limit Airline's rights thereunder.

B.      Compliance with Statutes, Ordinances and Regulations.  At all times during the term of this Agreement, Airline shall, in connection with its activities and operations at the Airport:

59

1. Comply with and conform to all applicable present and future laws, statutes, grant assurances and ordinances, and the regulations promulgated thereunder, of all Federal, State, and any other Governmental Agency that apply to or affect, either directly or indirectly, Airline or Airline's operations and activities and to any construction or installation of facilities and improvements by Airline under this Agreement.

2. Obtain, from any Governmental Agency, all licenses, certificates and permits necessary for the conduct of its operations (including licenses regarding intellectual property such as music or video broadcast in the Leased Premises), and to keep them current.

3. Subject to prior written approval of the Director, make, at its own expense, all non-structural improvements, repairs, and alterations to its Exclusive Use Space, equipment, and personal property that are required to comply with or conform to any of such statutes, ordinances, or regulations (subject to Section 14.01).

4. As respects the City, be and remain an independent contractor with respect to all installations, construction, and services performed by or on behalf of Airline hereunder.

### Section 14.04. Compliance with Environmental Regulations.

**A.      Environmental Regulations - General.**  Airline acknowledges that its uses of the Airport and the Leased Premises and the operations, maintenance and activities conducted thereon may be subject to federal, state and local environmental laws, rules and regulations, collectively referred to as "Environmental Regulations", including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, the Resource Conservation and Recovery Act ("RCRA"), as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, 30 Texas Administrative Code, Chapter 334, and other regulations promulgated thereunder by any Governmental Agency.  As a material covenant of this Agreement, Airline, at its sole expense, shall comply with all such present and future Environmental Regulations applicable to Airline's construction, operations, maintenance, use and activities on the Leased Premises.

**B.      Indemnification.**  AIRLINE HEREBY RELEASES, DISCHARGES AND HOLDS CITY HARMLESS FROM, AND AGREES TO INDEMNIFY CITY AGAINST CLAIMS, LIABILITIES, SUITS, DAMAGES, EXPENSES AND FINES ARISING OUT OF OR RESULTING FROM ANY RELEASE, DISCHARGE, SPILL, CONTAMINATION OR POLLUTION BY OR FROM HAZARDOUS WASTES OR SUBSTANCES CAUSED, IN WHOLE OR IN PART, BY AIRLINE, ITS AFFILIATES, CONTRACTORS, SUBCONTRACTORS, AGENTS, OFFICERS, INVITEES AND REPRESENTATIVES.   AIRLINE'S OBLIGATIONS AND LIABILITIES UNDER THIS PARAGRAPH SHALL CONTINUE ONLY IF AND SO LONG AS AIRLINE IS AND REMAINS RESPONSIBLE FOR ANY SUCH RELEASE, SPILL, DISCHARGE, OR CONTAMINATION OF HAZARDOUS SUBSTANCES OR WASTES AS DESCRIBED IN THE IMMEDIATELY PRECEDING SENTENCE.  Notwithstanding any provision in this Section or any other provision of this Agreement, Airline shall not be liable for, and City shall have the sole

responsibility and bear all costs and liabilities for any release, spill discharge, contamination or pollution by or from hazardous wastes or substances (a) occurring or existing prior to the Effective Date of this Agreement, unless caused by Airline; (b) caused by City, its contractors, subcontractors, agents, officers, invitees, or representatives; or (c) occurring after expiration or earlier termination of the term of this Agreement, and not caused by Airline or an Affiliate or a customer of either.

**C.     Cooperation with Governmental Agency Requirements.**

1.     Airline shall, at its sole expense, make all submissions and provide all information to the appropriate Governmental Agency of the state, including without limitation the Texas Commission on Environmental Quality ("TCEQ") or any other successor agency, the U.S. Environmental Protection Agency ("USEPA") and any other local, state or federal authority or agency which requires submission of information regarding any spill, discharge or other reportable release of hazardous wastes or substances for which Airline or its Affiliate is responsible on the Leased Premises during the term of this Agreement. Airline shall provide copies of all such submissions and information to the Director or his designated agent. City shall, at its sole expense, make all such submissions and provide all such information to the appropriate Governmental Agency regarding any spill, discharge or other reportable release of hazardous wastes or substances for which City is responsible.

2.     Should a Governmental Agency having jurisdiction over environmental matters, including the TCEQ or USEPA, determine that a response or plan of action be undertaken due to any spill, discharge, contamination, release or pollution of hazardous substances or wastes for which Airline is responsible on the Leased Premises during the term of this Lease, whether sudden or gradual, accidental or intentional, Airline shall, at its sole expense, prepare and submit the required plans and undertake, implement and diligently perform the required action, response or plan to completion in accordance with the applicable Environmental Regulations and to the reasonable satisfaction of the Director. City shall, at its sole expense, prepare and submit any such required plans and undertake, implement and diligently perform any such required action, response or plan to completion in accordance with the applicable rules and direction of any Governmental Agency due to any spill, discharge, contamination, release or pollution of hazardous substances or wastes for which City is responsible.

3.     Airline shall, at its own expense, demonstrate and maintain any required records, reports and financial responsibility in accordance with applicable Environmental Regulations, including the TCEQ or successor agency regulations, regarding USTs at any new aircraft fueling facilities. Upon request by City, Airline shall annually provide City with documentation demonstrating financial responsibility concerning environmental obligations required of Airline under applicable Environmental Regulations. In the event Airline's financial responsibility should lapse at any time during the leasehold estate or mode of financial responsibility change, Airline shall immediately notify the Director or his designated agent. Such information shall be forwarded to:

61

City of Dallas
Department of Aviation
Love Field Terminal Bldg., Lock Box 16
Dallas, Texas 75235
Attn: Facilities Manager

### D. Stormwater Discharge Regulations

**1.** Airline acknowledges that the Airport is subject to the Texas Pollutant Discharge Elimination System program ("TPDES") and its regulations relating to stormwater discharges for operations that occur at the Airport. Airline further acknowledges that it is familiar with these TPDES stormwater regulations, that it will conduct operations at the Airport in compliance with applicable regulations and any applicable TPDES permit, as either may be amended from time to time.

**2.** City and Airline both acknowledge that close cooperation is necessary to ensure compliance with any applicable TPDES stormwater discharge permit, as well as to ensure safety and to minimize costs. Airline acknowledges that it may be necessary to undertake to minimize the exposure of stormwater to materials generated, stored, handled or otherwise used by Airline as defined in the federal and state stormwater regulations, by implementing and maintaining "Best Management Practices" as defined in 40 CFR, Part 122.2 and as implemented in any applicable TPDES permit, as either may be amended from time to time.

**3.** Airline acknowledges that City's TPDES stormwater discharge permit and any subsequent amendments, extensions or renewals thereto, to the extent applicable to Airline's operations at the Airport, is incorporated by reference into this Agreement. Airline agrees to be bound by all applicable portions of said permit. City shall promptly notify Airline of any changes to any portions of said permit applicable to, or that affect, Airline's operations.

**4.** City shall provide Airline with written notice of those applicable TPDES stormwater discharge permit requirements (including any modifications thereto) that Airline shall be obligated to perform from time to time at the Airport, including, but not limited to: certification of non-stormwater discharges;; preparation of stormwater pollution prevention or similar plans; implementation of "good housekeeping" measures or Best Management Practices; and maintenance of necessary records. Such written notice shall include applicable deadlines. Airline, within thirty (30) days of receipt of such written notice, shall notify City in writing if it disputes any of the TPDES stormwater discharge permit requirements it is being directed to undertake. If Airline does not provide such timely notice, it is deemed to assent to undertake such requirements. If Airline provides City with written notice, as required above, that it disputes such TPDES stormwater discharge permit requirements, City and Airline agree to negotiate a prompt

62

resolution of their differences. Airline warrants that it will not object to City notices required pursuant to this paragraph unless Airline has a good faith basis to do so.

5. City and Airline agree to provide each other upon request, with any non-privileged information collected and submitted to any Governmental Agency pursuant to applicable TPDES stormwater regulations.

6. Airline agrees to participate in any reasonable manner requested by the City in any City organized task force or other work group established to coordinate stormwater activities at the Airport.

E. **No Release of Obligations.** Airline's obligations under this Section shall survive any assignment or subletting of the Leased Premises, provided, City does not specifically release Airline from its obligations herein through City's consent to assignment or sublease. Furthermore, Airline's obligations under this Section shall survive the expiration or earlier termination of this Agreement as to any activity or omissions which occurred during the term of the Agreement.

F. **Defined Terms.** The term "hazardous wastes" is used herein as it is defined in 42 U.S.C. Section 6901 et seq. The term "hazardous substances" is used herein as it is defined in CERCLA.

**Section 14.05. Nondiscrimination.**

A. Airline, for itself, its successors in interest and assigns, as a part of the consideration hereof, does hereby covenant and agree as a covenant running with the land that in the event facilities are constructed, maintained, or otherwise operated on the said property described in this Agreement for a purpose for which a DOT program or activity is extended or for another purpose involving the provisions of similar services or benefits, Airline shall maintain and operate such facilities and services in compliance with all other requirements imposed pursuant to 49 CFR Part 21, Nondiscrimination in Federally Assisted Programs of the DOT, and as said regulations may be amended and City will comply with all of its grant assurances with the federal government.

B. Airline, for itself, its successors in interest, and assigns, as part of the consideration hereof, does hereby covenant and agree, as a covenant running with the land that: (i) no person on the grounds of race, color, national origin, or handicap shall be excluded from participation in, denied the benefits of or be otherwise subjected to discrimination in the use of said facilities; (ii) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, national origin, or handicap shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination; (iii) that Airline shall use the premises in compliance with all other requirements imposed by or pursuant to 49 CFR Part 21, Nondiscrimination in Federally Assisted Programs of the DOT, and as said regulations may be amended.

63

C.      Airline assures that it will comply with pertinent statutes, Executive Orders and such rules as are promulgated to assure that no person shall, on the grounds of race, creed, color, national origin, sex, age, or handicap be excluded from participating in any activity conducted with or benefiting from Federal assistance. This provision obligates Airline or its transferee for the period during which Federal assistance is extended to the airport program, except where Federal assistance is to provide, or is in the form of personal property or real property or interest therein or structures or improvements thereon. In these cases, the provision obligates Airline or any transferee for the longer of the following periods: (i) the period during which the property is used by the sponsor or any transferee for a purpose for which Federal assistance is extended, or for another purpose involving the provision of similar services or benefits; or (ii) the period during which the airport sponsor or any transferee retains ownership or possession of the property.

D.      Airline agrees to ensure that disadvantaged business enterprises as defined in 49 CFR Parts 23/26 have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds provided under this agreement. In this regard, Airline shall take all necessary and reasonable steps in accordance with 49 CFR Parts 23/26 to ensure that disadvantaged business enterprises have the maximum opportunity to compete for and perform contracts. Airline shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of DOT-assisted contracts.

E.      As a condition of this Agreement, Airline covenants that it will take all necessary actions to insure that, in connection with any work under this Agreement, Airline, its associates and subcontractors, will not discriminate in the treatment or employment of any individual or groups of individuals on the grounds of race, color, religion, national origin, age, sex or handicap unrelated to job performance, either directly, indirectly or through contractual or other arrangements. Airline shall also comply with all applicable requirements of the Americans with Disabilities Act, 42 U.S.C.A. §§12101-12213, as amended. In this regard, Airline shall keep, retain and safeguard all records relating to this Agreement or work performed hereunder for a minimum period of 3 years from final lease completion, with full access allowed to authorized representatives of City, upon request, for purposes of evaluating compliance with this and other provisions of this Agreement.

F.      In the event of Airline's breach of any of the above nondiscrimination covenants, City, according to the provisions under this Agreement, shall have the right to terminate this Agreement and to re-enter and repossess the Leased Premises and the facilities thereon, and hold the same as if the Agreement had never been made or issued.

## Section 14.06. Payment of Taxes.

Airline shall pay all taxes that may be levied, assessed or charged upon Airline or its property located on the Airport by the State of Texas or any of its political subdivisions or municipal corporations, and shall obtain and pay for all licenses and permits required by law. However, Airline shall have the right to contest, in good faith, the validity or application of any such tax, license or permit and shall not be considered in default hereunder as long as such contest is in progress. Further, Airline agrees to diligently prosecute such contest.

**Section 14.07.  Right to Lease to United States Government.**

During time of war or national emergency City shall have the right to lease the Airport landing area or any part thereof to the United States Government for use by the Armed Forces and, if any such lease is executed, the provisions of this Agreement insofar as they are inconsistent with the provisions of the lease to the Government shall be suspended; however, such suspension shall not extend the term of this Agreement.  If, as a result of any such lease, the rights or duties of Airline hereunder are materially affected, then Airline shall receive an equitable rental adjustment.

**Section 14.08.  Consents and Approvals.**

Whenever the consent or approval of the City or the Airline is called for herein, it is understood and agreed that such approval shall be in writing and obtained in advance and shall not be unreasonably withheld or delayed.  Any consent or approval required herein to be obtained from or given by City (or Director) may be given by Director, unless otherwise so provided.

**Section 14.09.  Rights Reserved to City.**

Nothing contained herein shall unlawfully impair the right of City to exercise its proprietary governmental or legislative functions.   This Agreement is made subject to the Constitution and laws of the State of Texas and to the Charter of the City of Dallas, Texas, and to the provisions of the Airport Improvement Program Grant Agreements applicable to the Airport and its operation, and the provisions of such agreements, insofar as they are applicable to the terms and provisions of this Agreement, shall be considered a part hereof to the same extent as though copied herein at length to the extent, but only to the extent, that the provisions of any such agreements are required generally by the United States at other civil airports receiving federal funds.  To the best of the City's knowledge, nothing contained in such laws or agreements conflicts with the express provisions of this Agreement.

**Section 14.10.  Notices.**

Notices hereunder shall be sufficient if sent and received by certified or registered mail, postage fully prepaid, to:

**CITY:**                                           **AIRLINE:**
City of Dallas                                  Southwest Airlines Co.
8008 Cedar Springs Road          P.O. Box 3511 HDQ-4PF
Love Field Terminal Building       2702 Love Field Drive
Lock Box 16                                   Dallas, Texas 75235
Dallas, Texas 75235                     Attn:  Bob Montgomery

or to such other respective addresses as the Parties may from time to time designate to each other in writing. Notices will be deemed delivered to the party to whom addressed on the third (3rd) business day following the date on which the same is deposited, postage fully prepaid, in the U.S. mail, by certified or registered mail or as hand delivered and signed for by Airline or Airline's authorized representative, whichever is sooner.

Any notice required herein to be obtained from or given by City (or Director) may be given by Director unless otherwise provided.

## Section 14.11.  City's Right to Audit Books and Records.

Airline agrees to keep books and records on its operations at the Airport and the Director or any other authorized City representative upon reasonable advance written notice to Airline shall have the right to inspect and audit such books and records to ensure compliance with the prevailing municipal bond disclosure requirements and to determine that City has received from Airline all moneys due the City under the terms hereof including, but not limited to, the terminal rentals, apron fees, landing fees and PFCs (if applicable) payable to Airport by Airline.

## Section 14.12.  Force Majeure.

Neither City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reasons of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, acts of the public enemy, acts of a superior Governmental Agency, weather conditions, floods, riots, rebellions, acts of sabotage, or any other circumstances for which it is not responsible or which are not in its control; provided, however, that this Section shall not apply to failures by Airline to pay the rentals, fees and charges specified under this Agreement.

## Section 14.13.  Non-Waiver.

The acceptance of fees by City for any period or periods after a default of any of the terms, covenants and conditions herein contained to be performed, kept and observed by Airline, shall not be deemed a waiver of any right on the part of City to terminate this Agreement pursuant to Article 12 herein.

## Section 14.14.  Place of Payments.

All payments required of the Airline by this Agreement shall be made payable to the City of Dallas and shall be mailed to the office of the Director, Department of Aviation, City of Dallas, 8008 Cedar Springs Road, Love Field Terminal Building, Lock Box 16, Dallas, Texas 75235, or to such other officer or address as may be substituted therefor in writing to Airline by the Director.

66

**Section 14.15.  Remedies to be Nonexclusive.**

All remedies provided in this Agreement shall be deemed cumulative and additional and not in lieu of or exclusive of each other or of any other remedy available to City or Airline at law or in equity (to the extent not inconsistent with the express provisions hereof) and the exercise of any remedy or the existence herein of other remedies or indemnities shall not prevent the exercise of any other remedy.

**Section 14.16.  Exclusiveness of Airline's Rights.**

Nothing herein contained shall be deemed to grant to Airline any exclusive right or privilege within the meaning of Section 308 of the Federal Aviation Act for the conduct of any activity on the Airport, except that, subject to the terms and provisions hereof, Airline shall have the right to exclusive possession of the Exclusive Use Areas specifically leased to Airline under the provisions of this Agreement.

**Section 14.17.  Titles.**

The titles of the several articles and sections of this Agreement are inserted herein for convenience only and are not intended and shall not be construed to limit the scope of any provisions of this Agreement or affect in any manner the interpretation or construction thereof.

**Section 14.18.  Severability.**

If any clause or provision of this Agreement is illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, or is determined to be inconsistent with any of the City's existing or future grant agreements with the United States of America, it is the intention of the Parties that the remainder of this Agreement shall not be affected.  It is also the intention of the Parties to this Agreement that, in lieu of each clause or provision of this Agreement that is illegal, invalid, unenforceable or inconsistent there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid, unenforceable or inconsistent clause or provision as may be possible and may be legal, valid, enforceable and consistent.

**Section 14.19.  Operation of Airport.**

City agrees to maintain and operate the Airport in accordance with all applicable standards, rules and regulations of the FAA or its successor.  City shall exercise its rights hereunder and otherwise operate the Airport with due regard for the operational requirements and long-term interests of the airlines and the interests of traveling public, in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances.

**Section 14.20.  Successors and Assigns.**

Subject to the limitations upon assignment herein contained, this Agreement shall be binding upon and inure to the benefit of the Parties hereto, their respective successors and assigns.

**Section 14.21.  Relationship of Parties.**

This Agreement does not constitute or make Airline the agent or representative of City for any purpose whatsoever.

**Section 14.22.  Conflict of Interest.**

The following Section of the Charter of the City of Dallas pertaining to Conflict of Interest shall be one of the covenants and conditions and a part of the consideration of this Agreement:

"Chapter XXII, Section 11. FINANCIAL INTEREST OF EMPLOYEE OR OFFICER PROHIBITED:  No officer or employee shall have any financial interest, direct or indirect, in any contract with the City or be financially interested, directly or indirectly, in the sale to the City of any land, materials, supplies or services, except on behalf of the City as an officer or employee.  Any violation of this section, with knowledge, express or implied, of the person or corporation contracting with the City shall render the contract involved voidable by the City Manager or the City Council.  The alleged violations of this section shall be matters to be determined either by the Trial Board in the case of employees who have the right to appeal to the Trial Board, and by the City Council in the case of other employees."

**Section 14.23.  Gift to Public Servant.**

**A.**      City may terminate this Agreement immediately if Airline has offered, or agreed to confer any benefit upon an employee or official of the City of Dallas that such employee or official is prohibited by law from accepting.  (The City of Dallas has been advised by the prosecuting authorities that the Section 36.10(4) exception to Section 36.08 and 36.09 of the Texas Penal Code is not available to public servants who have no legal reporting requirements.)

**B.**      For purposes of this Section, "benefit" means anything reasonably regarded as economic gain or economic advantage, including benefit to any other person in whose welfare the beneficiary is interested, but does not include a contribution or expenditure made and reported in accordance with law.

**C.**      Notwithstanding any other legal remedies, City may require Airline to remove any employee of Airline from the designated premises who has violated the restrictions of this Section

68

or any expenditures made as a result of the improper offer, agreement to confer, or conferring of a benefit to an employee or official of the City of Dallas.

## Section 14.24.  Construction and Application of Terms.

**A.**  Wherever in this Agreement a third person singular, neuter pronoun or adjective is used, referring to Airline, the same shall be taken and understood to refer to Airline, regardless of the actual gender or number thereof.

**B.**  Whenever in this Agreement Airline is placed under an obligation or covenant to do or refrain from or is prohibited from doing or is entitled or privileged to do, any act or thing, its obligations shall be performed or its rights or privileges shall be exercised only by its officers and employees and other duly authorized representatives, or by permitted assigns or sublessees of this Agreement of all or any part of the Agreement.

**C.**  Airline's representative, hereinbefore specified (or such substitute as Airline may hereafter designate in writing) shall have full authority to act for Airline in connection with this Agreement and any things done or to be done under the Agreement.

## Section 14.25.  Venue.

Venue of any action brought under this Agreement shall be in Dallas County, Texas, exclusively.

## Section 14.26.  Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be an original.

## Section 14.27.  Condemnation.

**A.**  If, during the term of this Agreement, as the same may be extended under the terms hereof, or otherwise by agreement of the Parties hereto, the entire Leased Premises shall be taken by condemnation or eminent domain proceedings, and such taking relates to the entire fee simple of the Leased Premises as well as the right, title and interest of Airline, then this Agreement shall terminate effective as of the effective date of such taking, and all rights, titles, interests, covenants, agreements and obligations of the Parties hereto thereafter accruing shall cease and terminate except as hereinafter set forth.  In the event of such taking the entire compensation and damages (if not apportioned by the condemnation decree) shall be fairly and equitably apportioned between City and Airline in accordance with respective damage and loss sustained by the fee simple estate and the leasehold estate granted hereunder.

69

**B.**     If, during the term of this Agreement, or any options thereto, a portion of the Leased Premises shall be taken and City and Airline mutually agree that the remaining portion of the Leased Premises can be used for the uses permitted under this Agreement, then the Agreement will continue and the rental thereafter payable by Airline shall be reduced in the same proportion as the area of the part taken by condemnation shall bear to the total area of the Leased Premises immediately prior to the condemnation; provided, however, if Airline, in its discretion, determines that so much of the Leased Premises has been taken as to materially impair the operation of Airline's business, Airline shall have the option to terminate this Agreement as of the date of such taking by giving written notice to City of termination within fifteen (15) days after possession of such part has been taken, whereupon this Agreement shall be of no further force or effect, and City and Airline shall be relieved of any obligations or liabilities under this Agreement as of the date of such taking. Any compensation and damages that may be the result of such taking shall (if not apportioned by a condemnation decree) be fairly and equitably apportioned between City and Airline.

**Section 14.28. No Partnership, Joint Venture or Joint Enterprise.**

It is agreed that no partnership, joint venture or joint enterprise exists between City and Airline or between City and any other person, and City shall not be responsible in any way for any debts of or cash flow deficits incurred by Airline in construction of or operation of the Leased Premises or for the debts or obligations of Airline or any other person or for any cleanup costs or damages incurred by Airline.

**Section 14.29. Brokerage.**

City and Airline each represent and warrant that no broker has been concerned on its behalf in the negotiation of this Agreement and that there is no such broker who is or may be entitled to be paid a commission in connection therewith. City and Airline each shall indemnify and save harmless the other of and from any claim for commission or brokerage made by any such broker when such claim is based in whole or in part upon any act or omission by City or Airline.

**Section 14.30. Quiet Enjoyment.**

City covenants that it has good, right and lawful authority to execute this Agreement, that City has good title to all lands, improvements and related facilities, including all premises leased hereunder, and that throughout the term hereof, Airline shall have, hold and enjoy peaceful and uninterrupted possession of the Leased Premises, subject always to the payment of the rent and other charges and the performance of the covenants, as herein provided to be paid and performed by Airline.

**Section 14.31. Most Favored Nations.**

In the event that the City shall enter into any Airport Use and Lease Agreement, or contract with any other Air Transportation Company with Scheduled Service commencing similar

70

operations at the Airport after the Effective Date of this Agreement and such lease, agreement or contract contains more favorable bond provisions, rentals, charges or fees than this Contract, then the same bond provisions, rentals, charges and fees shall be concurrently and automatically made available to Airline. Nothing in this Section 14.32 shall be construed to apply to any promotional fee waiver agreement offered by the Administration pursuant to the DOT, FAA Policy and Procedures Concerning the Use of Airport Revenue, Federal Register, Vol. 64, No. 30, February 16, 1999 provided the program is available to all Air Transportation Companies which are eligible under the Administration's promotional fee waiver policy.

**Section 14.32. Notice of Contract Claim.**

This Agreement is subject to the provisions of Section 2-86 of the Dallas City Code, attached hereto as Exhibit K, as amended, relating to requirements for filing a notice of a breach of contract claim against City. Airline is expected to fully comply with the requirements of this ordinance, including any amendments thereto, in the event of a claim, in addition to all other requirements in this Agreement related to claims and notice of claims.

**Section 14.33. Entire Agreement.**

This Agreement constitutes the entire agreement of the Parties on the subject matter hereof and may not be changed, modified, discharged or extended except by written instrument duly executed by City and Airline. Airline agrees that no representations or grant of rights or privileges shall be binding upon City unless expressed in writing in this Agreement.

**Section 14.34. Subordination.**

This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof.

EXECUTED this the _13th_ day of _February_____, 2008/9, by City, acting by and through its City Manager in the manner required by the City Charter, being duly authorized by Resolution No. 08-3403 approved by the Dallas City Council on December 10, 2008, and by Airline, acting by and through its duly authorized officer(s).

**CITY OF DALLAS:**
MARY K. SUHM,
City Manager

By:_____
Ramon F. Miguez, P.E.
Assistant City Manager

**SOUTHWEST AIRLINES CO.:**

By:_____
Bob Montgomery
Vice President - Properties

**APPROVED AS TO FORM:**
THOMAS P. PERKINS, JR.,
City Attorney

By:_____
Sarah F. Hasib
Assistant City Attorney

72