**Southwest Airlines Co.**
**2702 Love Field Drive**
**Dallas, TX  75235-1611**



---

**RESPONSE OF SOUTHWEST AIRLINES TO**
**CITY OF DALLAS DECEMBER 1, 2014 NOTICE**
<u>**REGARDING DALLAS LOVE FIELD ACCOMMODATION ISSUES**</u>

December 8, 2014

On December 1, 2014, the City of Dallas ("City") issued a "Notice to Signatory Carriers of City of Dallas' Intent to Commence 30 Day Period to Voluntarily Accommodate Delta Airlines' September 18, 2014 Request for a Gate at Dallas Love Field" ("Notice").  The City's Notice states that the City is beginning a formal 30-day process under Section 4.06F of the City's Love Field Lease with Signatory Airlines to determine whether Delta Airlines can be accommodated at Dallas Love Field voluntarily within 30 days by any signatory airline or that airline's sub-lessee (hereafter "Signatory Airline").  The Notice further states that if such voluntary accommodation is not effected by December 31, 2014, the City will make a "mandatory accommodation" whereby it will select a Signatory Airline to accommodate Delta's request "to the extent that accommodation will not unduly interfere with" that Signatory Airline's operating schedule.

Southwest Airlines hereby responds to the City's Notice under protest. Southwest's submission below of certain information requested by the Notice does not waive any of Southwest's rights related to the Notice or any actions proposed therein. Specifically, the Notice and actions proposed therein are in direct violation of the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA") and the City's Lease, and Southwest reserves any and all rights to take legal action at any time related to the City's issuance of the Notice or any resultant actions taken by the City.

I.     **THE CITY'S NOTICE IS NOT AUTHORIZED UNDER THE LEASE, AS DELTA HAS REFUSED TO ENGAGE IN GOOD FAITH NEGOTIATIONS OVER OFFERS FOR VOLUNTARY ACCOMMODATION AT LOVE FIELD THAT ARE STILL OUTSTANDING**

Under Section 4.06.F.2 of the Amended and Restated Lease of Terminal Building Premises by and between City of Dallas and Southwest Airlines Co. ("Lease"), the City is not authorized to trigger a formal accommodation process unless the requesting airline has demonstrated that it "has exhausted all reasonable efforts to secure accommodations."  Delta Airlines has not done this, and therefore the City's Notice is contrary to the City's obligations under the Lease.

1

**EXHIBIT 6**

At the outset, it must be recognized that Delta's September 18, 2014 letter to the City _cannot_ be considered Delta's communication to the City that it has "exhausted all reasonable efforts" to secure accommodation.  In response to that September 18 request, Southwest agreed to accommodate Delta beginning October 13, 2014 until January 6, 2015. That intervening accommodation triggered a _new process_ whereby Delta must demonstrate to the City that it has "exhausted all reasonable efforts" _after October 13, 2014_ to be accommodated before the City is authorized to institute a formal accommodation process under the Lease.

In fact, following Southwest's October 13, 2014 accommodation of Delta, both United and Southwest tendered new, good faith offers for the continued voluntary accommodation of Delta at Love Field.  United's offer, as we understand it, is to accommodate Delta for six months beginning January 7, 2015 for Delta's five flights on essentially the same terms and conditions that Delta accepted in its current voluntary accommodation agreement with Southwest.  Since October 13, 2014 Southwest made several alternative offers to Delta for a potential longer-term voluntary accommodation at Love Field.

Delta has summarily rejected all of these offers without engaging in any good faith negotiations.  Contrary to the recent claim by Delta's counsel that it "has more than demonstrated its good faith efforts to seek voluntary accommodation," the opposite is true. Delta has rejected all of these offers with little more than a statement that it wishes to rely on the City's mandatory accommodation process instead.   The December 6, 2014 letter from Delta's counsel is no more than an after-the-fact effort to revise the facts.

Delta cannot demonstrate it has "exhausted all reasonable efforts" when its only response to several different offers for voluntary accommodation has been "NO," without engaging in good faith negotiations over the offers it has received.  For this reason alone, any action by the City to act upon Delta's September 18, 2014 accommodation request is contrary to the City's obligations under Section 4.06.F.2 of the Lease, and Southwest objects to the City continuing the process set out in its Notice.  If Delta wishes to pursue an accommodation at Love Field, it must act upon the offer(s) that have been made voluntarily by United and/or Southwest. However, the City has no authority to conduct a formal accommodation process at this time.

Beyond this, the December 6, 2014 letter from Delta's counsel contains several material misrepresentations that merit a response.  Chief among them are repeated claims that Delta somehow has an entitlement to a "long-term" gate accommodation at Love Field.[1]  In fact, Delta has zero right under law or policy to a "long term" accommodation – or, for that matter, any

---

[1] _See, e.g._, Letter from Kenneth Quinn, Dec. 6, 2014, at 1 ("Delta seeks long-term accommodation of its five daily departures and arrivals at Love Field"); ("the Signatory carriers * * * have failed to offer long-term accommodation"); at 2 (Delta seeks "long-term accommodation * * * at Love Field"); at 4 (the City "should not approve any sublease that provides Southwest with additional gates, at least until Delta has been provided long-term accommodation at Love Field"); at 5 ("Southwest and United have no intention of providing Delta with long-term gate accommodation at Love Field").

accommodation that is not secondary to the scheduling needs of the Signatory Airline that is providing space to Delta.  There is nothing in federal law, or the Lease, that entitles Delta to any long-term accommodation at Love Field, or anything but a strictly secondary use of gate space that is not being used by a Signatory Airline.[2]   It is, thus, not surprising that Delta's December 6, 2014 letter is devoid of any legal authority, federal or local, for its core proposition that Delta is entitled to a long-term accommodation at Love Field that may not be modified by the Signatory Airline in perpetuity. Such legal authority does not exist, and no amount of rhetoric can obscure that fact.

There is also no authority in the December 6, 2014 letter for the claim that Delta is entitled to a portion of Southwest's extremely valuable gate space at Love Field for only a nominal rent without compensation to Southwest for the fair value of that space.  Again, there is no support in the law for that proposition, and the letter's insinuation to the contrary misrepresents the law.[3]  Just as Delta would be unwilling to give up its own valuable gate space – at LGA airport, for example - to a competitor without appropriate compensation, Southwest is unwilling to consider a voluntary accommodation of Delta at Love Field without fair compensation for the value that gate space to Southwest in return.  Southwest has offered Delta several reasonable, alternative ways to achieve a long term voluntary accommodation at Love Field, but Delta has refused to seriously discuss any of them or to offer a counter-proposal. Under these circumstances, Delta has not even come close to meeting its burden of demonstrating that it has "exhausted all reasonable efforts" to secure a voluntary accommodation at Love Field.

In addition, the language of the City's December 1 Notice and accompanying letters suggests that the City may have acted improperly by pre-judging the need for a forced accommodation before responses to the Notice have even been submitted.  For example, the letter signed by Warren Ernst on behalf of Mark Duebner states in the first paragraph on page 2 that the City "*will select a signatory airline to comply with Delta's accommodation request….*" The letter further states, in the fourth paragraph of the same page, that "*the City will make a mandatory accommodation…*"  These statements indicate that the City is rushing into a process with a pre-ordained conclusion – namely that it will make a forced accommodation of Delta – before determining whether such an accommodation is either necessary or possible.  This is not

---

[2] *See, e.g.*, DOT Airport Business Practices document (1999) ("ABP Guide"), at 13 (in response to a request for gate accommodation, "an air carrier tenant is not required to cancel flights or to forfeit its use of airport facilities"), and at 15 ("An airport operator is not required to divest a tenant carrier of facilities in use"); Love Field Lease §§ 4.06.C ("At those times that Airline has no scheduled use for one or more of its assigned Gate(s), Airline will allow other scheduled or nonscheduled airlines authorized by City to use Airport facilities to use such Gate(s), . . . but in no event shall said use by others take precedence over Airline's scheduled use"); 4.06.F ("Airline agrees to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule").

[3] The requirement that an "airport operator . . . provide reasonable access on reasonable terms and conditions . . . to subtenants and non-tenants as well" (ABP, at 19) simply means that "airports must be sensitive to assuring that a new entrant is accommodated *on terms reasonably similar to an incumbent's* . . . ." *Id.* at 15 (emphasis added). Southwest's request that Delta pay the same market value for Love Field space that Southwest paid in order to obtain that space ensures that Delta will in fact be "accommodated on terms reasonably similar" to Southwest's. If Delta were allowed to obtain Love Field space for only a nominal rent, as it seeks, Delta would receive much more favorable terms than Southwest itself was required to meet in acquiring the space.

only unwise but unfair.  It also denies affected parties, including Southwest, the due process to which they are entitled.

For the foregoing reasons, the City should promptly withdraw its Notice and terminate the formal accommodation process, as it is in violation of law and contrary to the Love Field Lease.

## I.     THE CITY'S PROPOSED "ALLOCATION PRINCIPLES" ARE UNLAWFUL AND PREJUDICIAL TO SIGNATORY AIRLINES IN MATERIAL RESPECTS

The "Dallas Love Field Allocation Principles" (hereafter "Principles") included with the City's Notice are ambiguous, incomplete, or simply incorrect as a matter of law in material respects.  Accordingly, the Principles must be modified before the City makes any accommodation decisions in reliance on them.

Most importantly, the Principles must be amended to state unambiguously that Signatory Airlines have the legal right to use any or all of their preferentially-leased gates in their own operations, and neither the City nor carriers desiring accommodation at Love Field can preclude Signatory Airlines from exercising that right.  It must be remembered that, in negotiating the Five Party Agreement, Southwest agreed to the 20-gate cap on Love Field (a reduction from the then existing 32 gates) in exchange for being guaranteed full use of at least 16 gates and the repeal of the Wright Amendment.  Any encroachment by the City on Southwest's operations on those gates would violate the Five Party Agreement and WARA.

Consequently, Southwest intends to vigorously defend its right to fully utilize the 16 gates that it has been allocated by the Five Party Agreement and the WARA.  Southwest also intends to fully utilize the two additional Love Field gates it is proposing to sublease from United Airlines (absent a voluntary agreement to accommodate Delta).  There must be nothing in the City's Principles, or any other part of the City's accommodation policy or process, that interferes with Southwest's legal right to fully utilize these gates.

Pursuant to the Love Field Lease, Signatory Airlines indisputably have the right to expand service on their preferentially-leased gates at any time, and any accommodated carriers must give way to allow that expansion, subject to the Signatory Airline providing reasonable notice to any accommodated airlines.

Southwest addressed this principle in detail in its November 17, 2014 Response to the City's request for input on Love Field Accommodation policy (*see* pp. 2-4 of Southwest's Response) and there is no need to repeat that discussion here.  The point is that the schedule needs of Signatory Airlines are paramount in the use of their leased gates, and any operations by accommodated carriers are secondary to those needs.  This principle is embraced in both

the current Lease,[4] as well as in DOT/FAA guidance materials dealing with accommodation issues.[5]

The City's proposed Principles recognize this point to some extent in stating that "*the accommodation must not unduly interfere with the operating schedule of the accommodating carrier*" (first sub-bullet), and "*the accommodating carrier will have priority in the use of its personnel and leased premises*" (fourth sub-bullet).  Yet the Principles fail to state clearly that Signatory Airlines may *expand* their schedules even after they have accommodated a requesting carrier. Therefore, the Principles should be amended to clarify that an accommodation of a requesting carrier by the City is not a decision made in perpetuity; rather the accommodation may be reduced or withdrawn entirely if necessary to accommodate the changing scheduling needs of the Signatory Airline.

Thus, if all Love Field gates are fully utilized by Signatory Airlines at some point in the future, it would be impossible to honor the request of a non-signatory carrier to be accommodated.  The City's Principles should clearly acknowledge that possibility. Indeed, to fail to do so is to deny reality. Today, several U.S. airports are unable to accommodate new entrant carriers due to the fact that all gate space is fully utilized by signatory airlines at those airports. This is the case not only at slot-controlled airports such as DCA, ORD, and LGA (where Delta is the dominant carrier), but also at other large airports, such as LAX.[6]

In these cases the only way a new entrant carrier can be provided gate access is via a commercial transaction in which an incumbent agrees to relinquish space in exchange for consideration from the requesting carrier.  This practice is fully in accord with federal and local laws governing airport accommodations.  The Principles should be amended to acknowledge the possibility that a forced accommodation will not be possible at Love Field if all 20 gates are being fully utilized by Signatory Airlines.

Finally, the Principles must be amended to recognize that Love Field is one of two airports that serve the Dallas market, and the City must take into account the ability of a carrier requesting accommodation at Love Field to access the Dallas market via DFW Airport. Southwest addressed this issue in detail in its November 17, 2014 *Response to City of Dallas Request for Input on Dallas Love Field Accommodation Policy* (pp.7-9 and Exhibits A though F). Yet, at the November 20, 2014 public meeting between City representatives and Love Field airlines, the City's representatives stated that their consideration of Delta's request for accommodation at Love Field would be limited to the facts and circumstances at Love Field, and

---

[4] Section 4.06.F of the Love Field Lease requires that a request for access may be accommodated "*only at such times that will not unduly interfere with the operating schedule of [the Signatory Airline]*," and further states that "*In case of a conflict between schedules of the Signatory Airline and the Requesting Airline, the Signatory Airline will have priority in use of its personnel and its Leased Premises.*"
[5] For example: "*The reasonable access provision of the [grant assurances] requires an airport to accommodate new entrants … at under-used times, or … at unused periods.*" DOT, Airport Business Practices and Their Impact on Airline Competition (1999), at 15 (emphasis added).
[6] Deposition of Gina Marie Lindsey, Executive Director of Los Angeles World Airports, City of Ontario v. City of Los Angeles, No. RIC1306498 (September 10, 2014), at 152 ("*as a matter of practicality, all of the gates [at LAX] are used*").

no consideration would be given to the availability of gates at nearby DFW Airport.  The City's representatives gave no reason for this position other than stating that the DOT had instructed the City to take that view.  The City and its representatives did not mention, much less address, the evidence that Southwest had submitted to the City only three days earlier demonstrating that DFW Airport and Love Field serve the same Dallas market for air services, and that all airlines (except Southwest, whose service is restricted to Love Field) can access the Dallas market effectively via either airport.

The evidence that Southwest submitted showing that Dallas is a single integrated market served by two competing airports is unrefuted by any party involved in the accommodation issue, including the DOT.[7]  No party has even attempted to explain how a carrier that is unable to gain access to Love Field due to a lack of gate space there would in any way be prevented or inhibited from serving Dallas, given the ample availability of gates and other facilities at DFW Airport for use by any interested airline.

This point is critical to the City's consideration of requests for accommodation at Love Field.  Southwest's evidence demonstrates beyond doubt that airlines at both Love Field and DFW compete for the same passengers in the Dallas/Ft. Worth region, and have full access to the market via either airport.  That being the case, it is indisputable that Love Field is *not* an "essential facility" that all airlines must serve in order to access the Dallas market.  Consequently, denying an airline access to Love Field because all gates are being fully utilized by Signatory Airlines does not violate any federal or local law or policy.

For the City to ignore Southwest's evidence on this issue violates the most basic principles of reasoned decision-making.  The only basis given by City representatives for its "one-airport" position – that the DOT told the City to take that position – is improper and legally invalid.[8]  As the local airport proprietor for *both* Love Field and DFW Airport, the City has a responsibility to exercise its proprietary powers in a way that allocates scarce resources and uses between *both* of these airports.  The City's total deference to the DOT on this issue is an abdication of the City's independent responsibility to manage both of its airports efficiently and in the best interests of the public.

Accordingly, the City's Allocation Principles should affirmatively acknowledge that, when evaluating an airline's request for accommodation at Love Field, the City will consider the airline's ability to serve the Dallas market via DFW Airport as a relevant factor.

---

[7] In fact, the FAA recently announced that it considers both Love Field and DFW to be part of a single North Texas Metroplex.  *See* FAA "NextGen Works for Airports" (available on www.FAA.gov) ("A metroplex is a metropolitan area where multiple airports are located"); description of the North Texas Metroplex is available at http://www.faa.gov/nextgen/snapshots/metroplexes/?locationID=6.

[8] A government entity's action "is arbitrary and capricious if it has 'entirely failed to consider an important aspect of the problem' it faces." *SecurityPoint Holdings, Inc. v. TSA*, 769 F3d 1184, 1187 (D.C. Cir. 2014) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  *Id.* at 1198 ("Because TSA 'failed to consider an important aspect of the problem' before it, its decision must be set aside as arbitrary and capricious").

II.     **THE CITY'S PROPOSED "ACCOMMODATION CRITERIA
        AND ALLOCATION SYSTEM" ARE UNFOUNDED, PREJUDICIAL
        TO SOUTHWEST AIRLINES, AND OTHERWISE UNLAWFUL**

The most objectionable aspect of the City's proposed accommodation system is Criterion #1, whereby "carriers with the smallest percentage of flights will receive the highest rating on a scale of 40 points," which purportedly "favors smaller carriers and addresses the need to promote competition."   This criterion is entirely improper.   It will have the effect, deliberately or not, of ensuring that Southwest will automatically be selected to accommodate the requesting carrier (in this case Delta).   It is also unfounded, unfair, and without any basis in either economics or law.   It unfairly penalizes Southwest simply for having the most flights at Love Field, the result of Southwest's decades-long success in competing in the Dallas market. It also totally ignores that Southwest is uniquely prevented from competing at DFW Airport and can only expand service in the Dallas market at Love Field.

As shown in Chart A, the application of Criterion #1 will preordain that Southwest is the carrier selected for mandatory accommodation, and this is true regardless of whether Southwest operates out of 16 gates or 18 gates (assuming approval of the United/Southwest sublease). This is simply the mathematical result of penalizing Southwest for the size of its flight schedule compared to other Signatory Airlines and giving a 40 percent weighting to the result.   The City's selection system is so heavily biased toward this one unfounded factor that it will automatically select Southwest regardless of the other criteria.

Criterion #1 is also prejudicial because there is no correlation between (1) the City's asserted "need to promote competition" and (2) biasing the selection decision against Southwest.   In fact, it is beyond question that Southwest provides a *greater level of competition* in the Dallas market than any other Love Field airline, not only because of its unparalleled history of low-fare service, but also because its large network provides more low-fare options and benefits for more passengers than any other carrier *by far*.   Thus, the use of Criterion #1 by the City of Dallas has the perverse effect of singling out and penalizing the greatest force for airline competition in the City of Dallas, which in turn penalizes customers in the Dallas market.

Southwest's position as the leading low-fare airline in the country is so firmly established that it should not be necessary to recount it here, but it should suffice to say that Southwest's preeminence in this respect has been recognized by the federal government numerous times, including in the DOT's 1993 landmark "Southwest Effect" study,[9] the DOT's 2001 comprehensive analysis of airline competition,[10] and in the DOJ's recent explanation of its

---

[9] Bennett, Randall D.; Craun, James M. (May 1993). "*The Airline Deregulation Evolution Continues: The Southwest Effect*," DOT Office of Aviation Analysis.

[10] DOT "Findings and Conclusions on the Economic, Policy, and Legal Issues," OST-98-3713 (Jan. 17, 2001), at at 29 ("Markets served by Southwest have substantially lower fares than do comparable markets without Southwest service"); *id.* at 30 ("The services offered by Southwest and the newer low-fare airlines greatly benefit many consumers: they both give travelers access to substantially lower fares and greatly increase the size of the market by stimulating traffic"); *id.* at 65-66 (Southwest's conduct in capturing Kansas City-Los Angeles traffic "is not suspect" because it reflected "an example of vigorous competition where the airline with the most efficient operations and best ability to satisfy consumer needs ended up dominating the market").

divestiture recommendations.[11]   Indeed, the Campbell-Hill Aviation Group has estimated that Dallas consumers would lose over $45 million per year in fare savings if Southwest is forced to accommodate Delta (Chart B).

If the City is truly interested in "the need to promote airline competition" in Dallas, it should (1) ensure that Southwest is not required to relinquish gate space to Delta on its fully-utilized 16 gates, and (2) promptly give its approval of the pending United/Southwest gate sublease so that Southwest can provide even more competition for the benefit of Dallas consumers.  The City should remember that the Dallas air services market is heavily dominated by American Airlines, which operates *over 800 flights per day at DFW Airport*.  The greatest competitive restraint to American's DFW service is Southwest Airlines at Love Field.  The City should foster Southwest's ability to compete rather than hamper competition via a forced accommodation of a high-fare carrier that does not provide any meaningful restraint to the dominant American.

Criterion #1 is not only adverse to the City's own economic interests, but also contrary to long-standing principles of fairness toward successful competitors enunciated by the courts, including the maxim that the antitrust laws "are not designed to punish the successful competitor".[12]  As Judge Learned Hand put it, "the successful competitor, having been urged to compete, must not be turned upon when he wins."[13]  Yet the City appears to be "turning upon" Southwest by punishing its success in expanding service at Love Field to the great benefit of Dallas citizens.

For all these reasons, Criterion #1 must be eliminated *completely* from the City's selection system.  Anything short of that will render the City's selection system not only adverse to interests of the City's own residents but legally unsupportable.

Regarding the rest of the proposed selection criteria, Southwest supports Criterion #2, "Gate Utilization Efficiency."   Southwest also supports Criterion #3, "Terminal Passenger Service Operational Disruption," but urges that it be clarified and given greater weight. In our view, there is no constraint associated with baggage claim facilities as the Notice states, but there is a potential ticket counter constraint.  There also are limitations to baggage make-up space.  We believe that potential disruption to these facilities warrants a 20 percent weighting.

Southwest supports Criterion #4, "Unique Circumstances," provided it covers Southwest's unique circumstance under the Five Party Agreement and the WARA of being the only airline that is precluded from competing in the Dallas market via DFW Airport and is instead restricted to serving Dallas via Love Field.  This consideration should be paramount in any accommodation decision, and therefore warrants much greater weight than the mere 10 percent proposed in the City's Notice.

---

[11] "Response of Plaintiff United States to Public Comments on the Proposed Final Judgment," *United States v. US Airways Group, Inc. et al.*, Case No. 1:13-cv-01236 (CKK) (March 10, 2014), at 8-12.
[12] *In re Scott Paper*, 63 F.T.C. 2240, 1963 WL 66924 *5 (1963)
[13] *United States v. Aluminum Co. of America*, 148 F. 2d 416. 430 (2nd Cir. 1945).

**III.     THE LEIGH FISHER GATE USAGE MODEL IS SERIOUSLY FLAWED
AND CANNOT REASONABLY BE USED AS A BASIS FOR MAKING
LOVE FIELD ACCOMMODATION DECISIONS**

The "Allocation System" appended to the City's December 1 Notice states that "[u]sing the Leigh Fisher Gate Utilization Model (or similar model), the City will determine what time slots are available for accommodation without causing undue interference with the incumbent carrier's schedule."   However, the Leigh Fisher model – which City officials themselves characterized as "theoretical" – fails to account for numerous operating constraints, uncertainties, and other factors that are omnipresent in actual Love Field operations.  As such, this academic model is not suitable for making accommodation decisions in the real world, and would likely lead to results that are both operationally impractical and legally indefensible.

- To begin with, the City's proposal to consider only published flight schedules 6 months into the future (from the "snapshot date" of November 5, 2014) in making accommodation decisions is both imprudent and prejudicial to Southwest, as Southwest plans to expand its flight schedules in the summer of 2015, outside the six-month window. Southwest's policy has been to increase operations at the reconstructed Love Field gradually, and only when assured that the new long-haul services can be expanded without risk to operational integrity and passenger convenience. The 6-month proposal is also at odds with the City's recently-executed lease with Virgin America, which provides that the City will consider "any planned Virgin America utilization … to be implemented within a twelve (12) month period…" (Exhibit A of the Virgin America lease, Sec.1.3.5).   Southwest believes this 12-month look-ahead is prudent and should be applied uniformly to all Signatory Airlines in the City's consideration of accommodation requests.

- Beginning January 7, 2014 Southwest will be operating 153 flights on its 16 Love Field gates for an average utilization of 9.6 flights per gate per day. This amounts to full utilization of those gates under any reasonable measure, without room to accommodate another carrier.  In Southwest's experience, any airport with seven or more flights per gate per day should be considered "full", and any airport operator that demands a higher utilization is inviting problems for both airlines and passengers.  Consistent with this view, the federal Transportation Research Board has defined "full gate utilization" as the "range of six to eight daily turns per gate."[14]

- Southwest's gate utilization at Love Field is higher than any airport served by Southwest or Delta and higher even than slot-controlled DCA and LGA airports (Chart D). Southwest is unaware of any airport nation-wide with utilization as high as Love Field. Delta's utilization at ATL, its busiest hub, is only 6.5 flights per gate and its average utilization across all its hubs is just 4.8 flights per gate (Chart E).

---

[14] *Slot-Controlled Airports*, GAO-12-902, at 20 (Sept. 2012)(citing Transportation Research Board of the National Academies, *Reference Guide on Understanding Common Use at Airports* (Washington, D.C. 2010)).

- Because Southwest is uniquely restricted in competing in Dallas via Love Field, Southwest plans to increase service on its 16 gates over time if reasonably possible, i.e., only if such an expansion does not have adverse impacts on operations and customer service.  In February 2015 the schedule increases to 154 flights per day.  Southwest is also tentatively planning a further increase to as many as 160 flights per day (10 flights per gate) in the summer of 2015. Southwest also plans to fully utilize the two gates it would acquire under the United sublease, by scheduling an additional 20 flights on those gates (unless a voluntary accommodation of Delta's five flights is agreed to on those gates, in which case Southwest will forego five of its own flights).  .

- Nevertheless, the consultant's analysis implies that Southwest should operate at an even higher utilization.  As if 10 flights per day were not enough, the Leigh Fisher "preliminary baseline analysis" suggests that operations could theoretically be increased to between 11 and 13 flights per day.  This is a level over twice the national average, and cannot be sustained without significant adverse impacts on Signatory Airline operating schedules and passenger service.

- Significantly, the City does not cite a single example of a U.S. airport that achieves the utilization that the Leigh Fisher model suggests should apply at Love Field, nor a single airline that actually adheres to the model's scheduling assumptions.  The absence of such empirical evidence underscores the fact that the model is wholly unsuitable for real-world scheduling decisions that will significantly affect both airlines and passengers using Love Field.

- In particular, the aircraft turnaround times assumed by the consultant are unrealistically short and inflexible.  They do not allow for operational needs and requirements that are certain to occur, though often at unpredictable times. For example, Love Field is a maintenance base for Southwest, and many Southwest flights require extra ground time to facilitate aircraft swapping into, and out of, maintenance lines. Further, Southwest's aircraft routings are constructed so that a large number of aircraft come back to Love Field  for resolution of deferred maintenance items.

- Love Field is also a Southwest crew base, and many flights require extended ground time to allow for crew changes that involve new crews performing federally-mandated safety and security checks.

- Love Field flights to and from SFO and LGA require extra gate time before and after scheduled arrival/departure times due to frequency flow control programs administered by the FAA's Air Traffic Control (ATC) program for those airports. This extra gate time avoids having both the aircraft and customers wait an undetermined time on the tarmac (a priority for the DOT given its severe penalties for tarmac delays).

- Other aspects of the ATC system introduce complexity and uncertainty in Love Field operations. For example Love Field arrivals from the West were recently changed to

avoid DFW overflights, creating uncertainty in the actual arrival times of those flights and the need for gate buffers at Love Field. There is also uncertainty in the block times for many of Southwest's new long-haul Love Field service to points beyond the former nonstop perimeter. These flights were not flown from Love Field before the October 13 repeal of the Wright Amendment and require some gate buffer to avoid ground holds that would result in greater customer inconvenience.

- Long-haul flights to both coasts result in significant weather impacts on Love Field schedules. As Love Field evolves from a short-haul airport into a long-haul airport as a result of the repeal of the Wright Amendment, these weather impacts introduce greater variability to schedule performance and require greater buffering of schedules as a result. In addition, Southwest's plans to use larger aircraft for many of its long-haul Love Field flights (specifically the 175-seat Boeing 737-800) will also require greater ground time in order to enplane and deplane the larger number of passengers.

- Additionally, Southwest operates a large number of sports and military charters, which are not in published schedules but take up gate time, particularly on certain days and times of the year, and they cannot be ignored.

- Beyond all this, the scheduling of flight arrivals and departures in the real world is inherently an uncertain process that cannot be expected to occur with the kind of minute-by-minute precision that the consultant assumes in its academic utilization analysis. Section 4.C of the Love Field Lease recognizes these inherent uncertainties by allowing Signatory Airlines to include an across-the-board buffer of 30 minutes prior to scheduled arrival and 30 minutes after scheduled departure when accommodating other carriers on their gates. This 30-minute buffer is highly prudent and should continue to be used in the City's accommodation decisions going forward.

- The impact on passengers at the airport from excessive scheduling of flights must also be considered. Typically, passengers arrive for their flights about an hour before scheduled departure. At departure time, all passengers are at the designated gate. Gate hold-rooms are typically sized for the aircraft most commonly used by the Signatory Airline at the airport. When flights are scheduled too close together, delays overwhelm the available facilities, including seating, restrooms, and concessions. Southwest considers these factors when publishing any schedule. We are very concerned that the City does not have this experience. Forced accommodation of additional flights at the already-high utilization levels of Love Field creates a serious risk of overburdening the available facilities and causing significant adverse impacts on passengers.

- The *absolute minimum* time that must be allotted to accommodate a flight by another carrier is *90 minutes*, which would allow 30 minutes for the aircraft turn plus a 30 minute buffer before arrival and after departure. Southwest's published schedule for February 2015 (154 flights on 16 gates, including 30 minute buffers) is graphically displayed on

Chart F.   As can be seen from this chart, there are no 90 minute gaps through the normal 7am – 9pm operating day on this schedule.   Thus, *accommodation of Delta on Southwest's 16 gates is simply not possible because those gates will be fully utilized.*

Even with all of the operational obstacles and uncertainties noted above, Southwest is already scheduling its Love Field gates at an industry-leading level.   The consultant's speculation that unused space may be available on Southwest's Love Field gates that could be used to accommodate another carrier is patently false.   Decisions by the City regarding potential accommodation of new carrier(s) at Love Field cannot be based on "theoretical" assumptions and analysis that are at odds with experience and reality.   As the owner of Love Field, the City has a responsibility to ensure that airport operations run smoothly and without a high risk of aircraft delays and passenger inconvenience due to unrealistic scheduling assumptions.

The City should therefore reject the Leigh Fisher model as a basis for making accommodation decisions, and instead work with Signatory Airlines to develop realistic criteria for the efficient utilization of Love Field gates as well as the potential accommodation of new entrants carriers.

## IV.   THE CITY HAS NO LEGITIMATE REASON FOR CONTINUING ITS REFUSAL TO APPROVE SOUTHWEST'S SUBLEASE OF UNITED'S LOVE FIELD GATES

On October 6, 2014, Southwest and United Airlines entered into an agreement allowing for sublease of United's Love Field gates to Southwest, and the parties promptly notified the City of the transaction and requested the City's consent to the sublease.   The Love Field Lease specifies that leased gates may not be subleased without the City's consent, which "*shall not be unreasonably withheld or delayed.*"[15]   To date, the City has declined to grant consent.   At the aforementioned November 20, 2014 meeting, City representatives conceded that the only reason the City was withholding its approval was the unresolved request for accommodation at Love Field by Delta Airlines.   City representatives also stated that DOT officials had specifically instructed the City not to consent to the sublease until a deal for a long-term accommodation of Delta at Love Field had been reached.   The City's December 1, 2014 Notice continues to treat the pending sublease as integral to the accommodation issue.[16]

Both the DOT's request that the City withhold consent, and the City's refusal to grant its consent, are improper and without legal basis.   The DOT has no authority to approve or disapprove the sublease, and likewise has no authority to interfere with the City's approval of the sublease.   To the extent the DOT has *any* legitimate role in the sublease approval process, it is limited to coordinating with the U.S. Department of Justice Antitrust Division in that agency's review of the sublease under the Hart-Scott-Rodino Act process.   The DOT's interference with the City's review of the sublease is an *ultra vires* act that is prejudicial to both Southwest and United.

---

[15] For example, *see* Section 14.08 of the Love Field Lease.

[16] December 1, 2014 letter from Warren M.S. Ernst on behalf of Mark Duebner included with Notice, at p. 3.

Because the DOT's involvement in the City's consent process is improper, the City's refusal to grant consent on the basis of the DOT's involvement is equally improper. Moreover, the City's asserted reason for withholding consent – that Delta's request for long-term accommodation at Love Field remains unresolved – is itself not a legitimate basis for doing so. The sublease is a private contract between two Love Field tenant airlines. Delta's request for accommodation is a wholly separate issue, one that will exist regardless of whether United or Southwest is in control of United's Love Field gates.  There is no legitimate "linkage" between the sublease and the accommodation request. For the City (or the DOT) to assert such linkage and withhold approval on that basis is arbitrary and prejudicial. It is also in violation of the City's obligation under the Lease not to "unreasonably" withhold or delay its approval.

The City has no legitimate basis for disturbing the business judgment of the airlines to enter into the sublease.  In fact, earlier this year the City approved the sublease of American Airlines' two Love Field gates to Virgin America (over Southwest's objections) essentially because it was a private commercial transaction and the City had no legitimate basis for interfering with it.  The City should do the same here.

Beyond that, Southwest's sublease of the two gates will significantly benefit the City and its residents by increasing travel options, expanding airline competition, and generating greater economic activity in the Dallas area.  And, Southwest will accomplish all this by expanding its share of gates in the Dallas market only from 9% to 10% (Chart G).

In addition, Southwest has made clear that it will fully utilize its existing 16 gates at Love Field, and therefore the only way Southwest can even consider a voluntary accommodation of Delta in the longer term is by obtaining the additional two gates under the United sublease.

For all these reasons, the City should grant its consent to the sublease without further delay.

* * * * * * * * * *

# EXHIBITS

# The City's Criteria for Gate Sharing Would Unlawfully Require Southwest to Accommodate Delta
## (Schedules on Wednesday May 6, 2015)

### A. Assuming UA Gates Are Transferred to WN

**Criterion 1: Percentage of Flights Operated by Each Incumbent Carrier (Max 40 Points)**

|  | Departures | Share | Scalar Adjustment/2 | Points |
|---|---|---|---|---|
| VX | 16 | 8.5% | 1.000 | (40 x 1.000) = 40.0 |
| WN/1 | 173 | 91.5% | 0.092 | (40 x 0.092) = 3.7 |
|  | 189 | 100.0% |  |  |

**Criterion 2: Gate Utilization Efficiency (Max 40 Points)**

|  | Departures | Gates | Departures per Gate | Scalar Adjustment/3 | Points |
|---|---|---|---|---|---|
| VX | 16 | 2 | 8.0 | 0.832 | (40 x 0.832) = 33.3 |
| WN/1 | 173 | 18 | 9.6 | 1.000 | (40 x 1.000) = 40.0 |
|  | 189 | 20 |  |  |  |

**Total for Criteria 1 plus 2 (Max 80 Points)**

|  | Points | Higher than WN |
|---|---|---|
| VX | 73.29 | **29.6** |
| WN/1 | 43.70 |  |

**Remaining Points Available for Criteria 3 plus 4 = 20**

> The City's Proposed Allocation System Automatically Discriminates Against Southwest.

1/ Includes 20 additional flights operated by Southwest with 2 additional gates.
2/ Other airlines' share divided by VX's share.
3/ Other airlines' utilization divided by WN's utilization.
Source:  Innovata Schedules, May 6, 2015 and  City of Dallas , "Love Field Dallas Accommodation Criteria and Allocation System.

# The City's Criteria for Gate Sharing Would Unlawfully Require Southwest to Accommodate Delta
## (Schedules on Wednesday May 6, 2015)

### B. Assuming UA Gates Are Not Transferred to WN

**Criterion 1: Percentage of Flights Operated by Each Incumbent Carrier (Max 40 Points)**

|  | Departures | Share | Scalar Adjustment/1 | Points |
|---|---|---|---|---|
| UA | 12 | 6.6% | 1.000 | (40 x 1.000) = 40.0 |
| VX | 16 | 8.8% | 0.750 | (40 x 0.750) = 30.0 |
| WN | 153 | 84.5% | 0.078 | (40 x 0.078) = 3.1 |
|  | 181 | 100.0% |  |  |

**Criterion 2: Gate Utilization Efficiency (Max 40 Points)**

|  | Departures | Gates | Departures per Gate | Scalar Adjustment /2 | Points |
|---|---|---|---|---|---|
| UA | 12 | 2 | 6.0 | 0.627 | (40 x 0.627) = 25.1 |
| VX | 16 | 2 | 8.0 | 0.837 | (40 x 0.837) = 33.5 |
| WN | 153 | 16 | 9.6 | 1.000 | (40 x 1.000) = 40.0 |
|  | 181 | 20 |  |  |  |

**Total for Criteria 1 plus 2 (Max 80 Points)**

|  | Points | Higher than WN |
|---|---|---|
| UA | 65.10 | **22.0** |
| VX | 63.46 | **20.3** |
| WN | 43.14 |  |

**Remaining Points Available for Criteria 3 plus 4 = 20**

### The City's Proposed Allocation System Automatically Discriminates Against Southwest.

1/ Other airlines' share divided by UA's share.

2/ Other airlines' utilization divided by WN's utilization.

Source:  Innovata Schedules, May 6, 2015 and  City of Dallas , "Love Field Dallas Accommodation Criteria and Allocation System.

# Accommodating Delta on Southwest's Gates Will Cost Dallas Consumers Over $45 Million per Year in Fare Savings

### Assuming the Equivalent of ½ Gate Is Allocated to Delta

**Annual Consumer Fare Savings per Daily Southwest Roundtrip:**     **$9 Million** [1]

**Delta Daily Roundtrips:**     **5**

**Annual Consumer Loss with Allocation from Southwest ($9 million x 5):**     **$45 Million**

1/ Derived from estimate of the consumer savings benefit of Southwest's proposed 20 roundtrips on two new gates. Total Annual Benefits = $177 Million / 20 daily roundtrips.  This was prepared by Campbell-Hill Aviation Group using its econometric demand estimating model.

Chart C

# Delta Can be Fully Accommodated by Virgin America Without Any Reduction in Its Own Fights

|  | Available Delta Departures | Leigh Fisher Available Time Slots |
|---|---|---|
| **Gate Position 15** | 1 | 8:00 – 9:30 am |
|  | 1 | 2:45 – 4:45 pm |
|  | 2 | 5:45 – 8:45pm |
|  | 4 |  |
| **Gate Position 17** | 1 | 7:45 – 9:45 am |
|  | 1 | 10:40 – 12:30 pm |
|  | 1 | 7:30 – 9:10 pm |
|  | 3 |  |
| **Total Slots Available for Delta** | 7 |  |

Note: Includes only time slots with at least 1.5 hours available, not counting the buffers on each side of the time slot.

# Southwest's Utilization at DAL is Higher than the Average Utilization for All Airlines at Delta's 20 Largest Airports



Source:  Innovata schedules –weekday only April 13-17,2015 and Southwest Airlines.  Delta's top 19 airports by flight activity..

# Southwest's Utilization at DAL is Higher than
# the Average Utilization for All Airlines at Delta's 20 Largest Airports

|  | Average Departures per Gate | Average Seats per Departure |
|---|---|---|
| **WN at DAL** | **9.6** | **142** |
| All Airlines at: | | |
| ATL | 6.5 | 135 |
| DTW | 3.7 | 104 |
| MSP | 4.6 | 110 |
| JFK | 4.9 | 164 |
| LGA | 8.4 | 100 |
| SLC | 5.9 | 108 |
| LAX | 6.7 | 147 |
| SEA | 6.4 | 132 |
| BOS | 4.9 | 119 |
| MCO | 4.3 | 154 |
| CVG | 3.0 | 74 |
| SFO | 5.2 | 141 |
| LAS | 4.3 | 154 |
| DCA | 7.7 | 100 |
| ORD | 6.4 | 101 |
| RDU | 5.1 | 100 |
| FLL | 5.8 | 142 |
| TPA | 4.0 | 138 |
| DFW | 6.1 | 118 |

Source:  Innovata schedules –weekday only April 13-17,2015 and Southwest Airlines.

# Southwest's Utilization at DAL is Significantly Higher Than Delta at Any of Its Hubs
## (Weekdays January 12-16, 2015)



**Departures per Gate**

WN at DAL – January 2015 = 9.6

DL Hub Average = 4.8

| DL at ATL | DL at DTW | DL at MSP | DL at LGA | DL at SLC | DL at JFK |
|-----------|-----------|-----------|-----------|-----------|-----------|
| 6.2 | 3.4 | 4.0 | 8.1 | 3.4 | 5.1 |

Source: Innovata Schedules and Delta Website.

CHART F

WN DAL Schedule - published February 2015
154 weekday flights



Indicates Aircraft at Gate
Indicates Gate Buffer for Aircraft Arrival/Departure
Aircraft RON Tow Off Gate
Aircraft RON Remain on Gate
Aircraft Departure Towed on Gate

Chart G

# SWA's Share of Gates in the Dallas/Ft. Worth Market Will Increase Only from 9% to 10% by Sub-Leasing United's 2 Love Field Gates



**SWA with 16 DAL Gates**

9%

Other DAL/DFW 169 Gates
91%



**SWA with 18 DAL Gates**

10%

Other DAL/DFW 167 Gates
90%

**DFW Airport Has 165 Gates, Dallas Love Field Has 20 – Total is 185**

.
Source:  Airport websites.