

**1200 N. Nash Street, Suite 554, Arlington, VA 22209**
**202-713-9596 • charles.leocha@travelersunited.org**

March 11, 2015

**SENT VIA ELECTRONIC MAIL**
Kathryn B. Thomson
Office of the Secretary of Transportation
Department of Transportation General Counsel
1200 New Jersey Avenue, SE
Washington, DC 20590
kathryn.thomson@dot.gov

Dear Ms. Thomson,

Travelers United has recently received a copy of a disturbing letter written by you and sent on December 17, 2014 to the Dallas City Attorney Warren Ernst regarding the need to "make reasonable accommodation for requesting carriers."

The advice that you sent to the City of Dallas is contrary to the carefully crafted remedies enacted by the Department of Justice in their Final Judgment, harms the airports funded by the citizens of Dallas, harms the flying public by restricting choice and is harmful to competition.

As you know, Travelers United (formerly Consumer Travel Alliance) was one of the prime organizations objecting to the proposed merger of American Airlines with US Airways. We were involved intimately in that process and worked together with the Department of Justice (DOJ), Department of Transportation (DOT), the Senate Commerce Committee, Senate Judiciary Committee and House Transportation and Infrastructure Committee to stop the proposed merger.

Our actions did not succeed in stopping the merger. However, Travelers United arguments were included in the original DOJ objection to the merger and the subsequent remedies proposed allowing the merger to move forward. We also filed comments in the Tunney Act proceedings.

**EXHIBIT 7**

The main remedy imposed by DOJ was the divestiture of slots at a selection of airports across the country. Those divestitures were carefully crafted to provide maximum impact for Low Cost Carriers (LCCs). Plus, legacy carriers such as United and Delta were specifically deemed, "not an appropriate divestiture candidate."

**Your letter contradicts the specific remedies negotiated by DOJ to preserve competition**

The intent of DOJ's Final Judgement was to increase competition and choice for consumers. The remedies sought specifically to remove the coordinated effects of an oligopoly that was effectively created by the Final Judgment.

In its comments in the Federal Register, DOJ specifically dealt with the question of Delta Air Lines' request to be permitted to compete for the Love Field gates that were being divested by American Airlines.[1]

> Obtaining access to Love Field will significantly enhance the acquirer's ability to meaningfully compete against New American, thereby furthering the overall goals of the remedy. *See supra*§ II.B.2.b. In contrast, Delta, given its overall size and scope as well as its presence at DFW, can and does challenge New American for the business of corporate customers flying to and from the Dallas area.

DOJ continued in its Final Judgment:

> The allegations of coordination among the legacy carriers fully justify the United States' discretionary decision to direct that the divestiture assets be sold to firms that are unlikely to follow industry consensus, in this case the LCCs. The goal of the divestiture remedy is to enhance the ability of the LCCs to frustrate coordination among the legacy carriers.

Your recent letter to Dallas City Attorney Warren Ernst regarding "reasonable air carrier access" deeply concerns our organization and contradicts the explicit instructions and the intent of DOJ in their merger remedies. The DOJ explanation of their actions even deals specifically with the issues including the sublease that Delta then had at Love Field.[2]

> Finally, Delta's claim that it will be improperly evicted due to the divestiture is similarly unavailing. Delta currently operates one gate under a sub-lease from American that is terminable on thirty-days' notice. (Another airline, Seaport, sub-leases the other

---

[1] https://www.federalregister.gov/articles/2014/03/13/2014-05555/united-states-et-al-v-us-airways-group-inc-et -al-public-comments-and-response-on-proposed-final#p-155

[2] https://www.federalregister.gov/articles/2014/03/13/2014-05555/united-states-et-al-v-us-airways-group-inc-et -al-public-comments-and-response-on-proposed-final#p-170

American gate.) But for the remedy, New American was likely to terminate the subleases and operate the gates itself, [77] an outcome that Delta surely recognizes given the competitive value of the gates once the Wright Amendment restrictions expire in October of this year. Delta, therefore, never had a contractual (or other) right or expectation that it would be able to remain at the American gate. The divestiture does not change this fact.

In the end, the thrust of Delta's position is that its private interests in obtaining divestiture assets should trump the remedial goals of the proposed Final Judgment.

In a footnote,[3] DOJ continues:

The fewer slots that are available to low-cost competitors, the less likely it will be that a LCC will have sufficient slots to challenge Delta in any of its lucrative Reagan National routes. The same concept applies at Love Field, where the divestiture may allow an LCC to offer highly competitive service to business passengers that otherwise may have chosen Delta's service from DFW.

Your letter does not take into account the new access requirements established by the DOJ that seek to encourage LCC growth and the end to coordination among legacy carriers. Plus, your letter seeks to dismiss a specific remedy related to the approval of the AA/USAir merger.

Travelers United finds your letter disheartening.

DOT is the main protector of the public against the profit motives of the airlines, and misleading and deceptive practices. The Department enforces judgments and distributes significant funding to support the aviation infrastructure. With Federal Preemption serving as a barrier to easy and affordable consumer access to the courts, DOT stands as the judge and jury in most issues that affect consumers.

Your reference to competition plans and a 1999 task force study that was created in a world where more than a dozen major airlines competed aggressively are without merit and do not serve the public. In fact, it is exactly those rules that DOJ was dismantling when they developed the Final Judgement in the AA/USAir merger approval.

The instructions in your letter to Mr. Ernst will harm consumers.

**The City of Dallas will lose millions in tax and concession revenues**
If the City of Dallas were to follow your "advice," it will result in the loss of more than half-a million passengers that would transit Love Field due to the fact that Delta's high-fare,

---

[3]

https://www.federalregister.gov/articles/2014/03/13/2014-05555/united-states-et-al-v-us-airways-group-inc-et -al-public-comments-and-response-on-proposed-final#p-169

small-plane service would displace Southwest's low-fare, large plane service that would carry far more passengers. From the airport's point of view, this translates to a direct loss of more than $2.2 million in passenger facility charges, not to mention the losses from lower parking and concessions revenues.

**Dallas is a single market**

Your letter does not take into account that DOJ looks at Dallas as a single market. Remedies for Delta to provide competition services under the rules of DOT's Competition Plan statute are not restricted only to Love Field. Delta can, and does, compete with American Airlines and with United Airlines effectively from DFW Airport.

**Southwest will limit airfares between Dallas and legacy carrier hubs**

The Southwest plans for expansion of flights from the two gates that they procured from United Airlines will mean that consumers will benefit from LCC competition directly to the hubs of the legacy carriers in Charlotte, Detroit, Philadelphia and Salt Lake City — two American hubs and two Delta hubs. This is exactly the kind of route expansion and competition at legacy airline hubs that was envisioned by the negotiators during the approval of the AA/USAirways merger.

**Southwest opens new destinations, Delta provides redundant service**

Should DOT's letter be followed, Dallas area consumers will lose new destinations being served by Southwest. The Delta flights to Atlanta from Love Field only duplicate service to Atlanta that Delta already has from DFW.

**Consumers will pay more because of DOT actions**

According to a study obtained by Travelers United, Southwest domestic airfares are 30 percent lower than Delta's and more than 20 percent lower than American Airlines. Not allowing efficient and effective competition on routes between Love Field and these legacy-carrier hubs will mean consumers will pay more and competition will be eviscerated.

**DOT provided no objections to the DOJ remedies**

Southwest Airlines' plans for expansion at Love Field for 18 gates have been a part of the deliberations throughout the development of the Final Judgment. This should be of no surprise to DOT. Travelers United notes that during the Tunney Act proceeding after the Proposed Final Judgement, DOT never mentioned this interpretation of the Competition Plan. Nor, did DOT refer their 1999 task force study entitled *Airport Business Practices and Their Impact on airline Competition*. It is not proper for DOT to insert itself into this discussion after the merger has closed.

In closing, Travelers United does not believe that your office has the authority to undermine the DOJ's pro-competitive remedies in its Final Judgment by forcing the City to "accommodate" a legacy airline at Love Field. In fact, it has been the DOT's reluctance to

intervene in questions about airport gates that resulted in ultimate remedies proposed by DOJ.

DOT's reluctance to require the full disclosure of airfares and ancillary fees is another instance where The Department has not intervened in commercial arrangements.

DOT, in the case of the gate sub-lease at Love Field, has chosen to take actions that are harmful to consumers. In other cases such as those related to full disclosure of airfares and ancillary fees, DOT has demurred, also harming consumers.

DOT is failing to protect the public. Your letter is inappropriate and serves only the private interests of Delta Air Lines. It does not even recognize or discuss the harm to consumers that will result from your directive to the City.  It should be withdrawn.

Sincerely,

Charles Leocha
Chairman, Travelers United

cc:
Gary C. Kelly, Chairman, President and CEO, Southwest Airlines
Mr. A.C. Gonzalez, City Manager, City of Dallas
Mr. Warren M.S. Ernst, Dallas City Hall
Mr. Eduardo A. Angeles, Associate Administrator for Airports, Federal Aviation Administration



**Memphis
International
Airport**

2491 Winchester Road, Suite 113
Memphis, TN 38116-3856
901/922-8000  Fax 901/922-8099
www.flymemphis.com

March 12, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

It has come to our attention that the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.

The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify what we understand to be our airports' responsibilities under FAA Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past. However, we are concerned that DOT's December 17 letter creates a new "squatter's rights" concept by declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier. Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with its lease rights and long-established industry practice.

Absent a full legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, we are troubled by what appears to be a fundamental departure from decades of industry understanding of federal competition requirements that were adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

We take our compliance responsibilities seriously and have looked to the FAA Airports Office from time-to-time for guidance in this regard. With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process, as required by the federal Administrative Procedures Act.

For the reasons explained above, we respectfully ask that DOT withdraw its December 17 letter and instead work with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Scott A. Brockman, A.A.E.
President and CEO



**LAS VEGAS**

McCARRAN INTERNATIONAL AIRPORT

**Department of Aviation**

ROSEMARY A. VASSILIADIS
DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553

March 13, 2015

The Honorable Anthony Foxx
Secretary of Transportation
**U.S. DEPARTMENT OF TRANSPORTATION**
1200 New Jersey Avenue, SE
Washington, DC 20590

**RE: U.S. Department of Transportation Letter dated December 17, 2014**

Dear Mr. Secretary:

It has come to our attention that the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.

The attached letter, signed by the DOT General Counsel to the Dallas City Attorney, appears to modify what we understand to be our airports' responsibilities under FAA Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past. However, we are concerned that DOT's December 17 letter could have an impact on our flexibility to manage our gates during seasonal peaks. We have consistently accommodated our airlines' gating needs, even during constrained times. While there is no immediate impact to our operation, maintaining this flexibility is imperative to protect our infrastructure and investment. Declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier severely limits the airports ability to manage our operations. Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with its lease rights and long-established industry practice.

Absent a full legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, we are concerned by what appears to be a departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

**Clark County Board of Commissioners**
Steve Sisolak, Chairman • Larry Brown, Vice Chairman
Susan Brager • Tom Collins • Chris Giunchigliani • Mary Beth Scow • Lawrence Weekly

The Honorable Anthony Foxx
**U.S. DEPARTMENT OF TRANSPORTATION**
March 13, 2015
Page 2


We take our compliance responsibilities seriously and have looked to the FAA Airports Office, from time-to-time, for guidance in this regard.   With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process, as required by the Federal Administrative Procedures Act.

For the reasons explained above, we respectfully ask that DOT withdraw its December 17 letter and instead work with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

ROSEMARY A. VASSILIADIS
Director of Aviation

PAD:sb

Enclosure

cc:   Joseph Piurkowski          Scott Kichline              Phillip Detmer
      Lee Thomson

**Clark County Board of Commissioners**
Steve Sisolak, Chairman  •  Larry Brown, Vice Chairman
Susan Brager  •  Tom Collins  •  Chris Giunchigliani  •  Mary Beth Scow  •  Lawrence Weekly



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

GENERAL COUNSEL

1200 New Jersey Avenue, SE
Washington, DC 20590

December 17, 2014

**SENT VIA ELECTRONIC MAIL**
Mr. Warren M.S. Ernst
Dallas City Hall
1500 Marilla Street
Room 7DN
Dallas, Texas 75201-6622
(214) 670-3519
warren.ernst@dallascityhall.com

Dear Mr. Ernst,

This letter references our telephone conversations on December 8 and 11, 2014, regarding Delta Air Lines, Inc.'s request for long-term accommodation of its five daily departures at Dallas Love Field (DAL) and the policy of the City of Dallas regarding reasonable air carrier access.

We appreciate your understanding of the City's legal obligations under Federal law to reasonably accommodate all air carriers seeking to provide service at the airport, including the Competition Plan statute (49 U.S.C. § 47107(k)) and the obligations of the grant assurances accepted in connection with Airport Improvement Program grants to take all reasonable efforts to accommodate air carriers seeking to serve DAL. We are pleased that you are taking an active role in assisting requesting carriers in obtaining gate space at your airport such as by formalizing the process in your use and lease agreements to monitor gate utilization and availability and by contacting the signatory carriers at the airport to encourage voluntary accommodation.

In connection with the Secretary of Transportation's responsibility to ensure the successful implementation of competition plans under 49 U.S.C. § 47107(k), you have asked us for our views regarding competition plan requirements for addressing accommodation requests at DAL, including the length of accommodation for accommodated carriers and other related issues. We are providing this guidance in light of the unique circumstance at DAL, including the constrained nature of the airport and other restrictions of the Five Party Agreement and Wright Amendment Reform Act of

2006 (Pub. L. No. 109-352).   We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access.  The compendium table focuses on airports that have developed pro-competitive tools to accommodate requesting carriers in conformity with the competition plan requirements.  Our 1999 task study entitled *Airport Business Practices and Their Impact on Airline Competition* may also be helpful to you and is available online at http://ntl.bts.gov/lib/17000/17100/17129/PB2000108301.pdf.

        As we discussed, ensuring that Federally-assisted airports make reasonable accommodations for requesting carriers, whether new entrants or other carriers seeking expansion, and maximize the utilization of their existing resources, especially at gate-constrained airports like DAL, are important objectives for the Department of Transportation (DOT).  We recognize your efforts to develop a baseline chart for determining gate availability, as well as your efforts to enforce Section 4.06(F) of the Use and Lease Agreement requiring the signatory carriers to provide monthly gate utilization reports.  Knowing when and where gate space is available at any given time is critical to the City's ability to provide timely and responsive assistance to requesting carriers.[1]  Maintaining an accurate, up-to-date gate utilization report will be critical for the City's ongoing obligation to ensure reasonable access for accommodated and requesting carriers.  Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signatory carrier, the City will accommodate the requesting carrier to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers.

        With respect to the length of the accommodation, for the accommodation to be meaningful at DAL, it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights.  Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date.  It is the City's responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis, based on the available space on the snapshot date of the original accommodation request, even after the expiration or termination of any agreement between the accommodated carrier and signatory carriers.[2]

---

[1] We have also discussed that accommodation requests should be resolved on a first-come, first-served basis.  In the future, if the verified gate utilization report at DAL shows there is less space available than has been requested, the City must offer the space that is available to the requesting carrier.  Moreover, due to the gate constraints at DAL under Federal law and the Five Party Agreement, if future reports show that no space is available at DAL, and the requesting carriers, signatory carriers, and the City have fully applied all of the accommodation procedures provided in the Use and Lease Agreement, the City may deny the request for accommodation.  The City would then be required to submit a competitive access report under 49 U.S.C. § 47107(s) to explain the reasons for the denial of access.
[2] If the accommodated carrier seeks to change its pattern of service, such as increasing service or requesting times that are not within a reasonable window of the times at which it was originally accommodated, such requested changes would constitute a new request for accommodation.

The City must also ensure that the accommodation is at reasonable rates.[3]  Our competition policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus a reasonable allowance for administration, are reasonable.  Many airport proprietors impose a ceiling on such an allowance and our policy is that, in any event, the allowance may not exceed 25%.  Our competition plan policy also requires that airports oversee these administrative fees.  Keeping these concepts in mind, it is within the City's discretion to assess the reasonableness of voluntary accommodation requests.

We hope this is helpful to you.  We will continue to monitor this process and ask that you provide us periodic reports on the status of the accommodation of requesting carriers at DAL.  If you have any questions, please feel free to call me.

Sincerely yours,

Kathryn B. Thomson

---

[3] See 49 U.S.C. § 47107(a)(1); FAA Grant Assurance 22, *available at* http://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip.pdf.



OMA                                    OMAHA AIRPORT AUTHORITY

March 13, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

The Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for the traveling public between Omaha and the Dallas metroplex.

The December 17, 2014 letter directed to the Dallas City Attorney by the DOT General Counsel appears to modify what we understand to be the responsibilities under the Federal Aviation Administration (FAA) Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, the description of airport obligations under federal competition guidelines appears to apply generally to all airport operators including the Omaha Airport Authority.

We are supportive of the policies of the DOT and the FAA regarding competition as interpreted in the past. However, we are concerned that the interpretation offered by the DOT in the December 17, 2014 letter creates a new concept by declaring that any accommodation provided to a non-signatory airline, even a temporary one, may last in perpetuity at the option of the accommodated carrier. That interpretation will likely prevent full utilization of gates at Dallas Love Field consistent with lease rights which will in turn harm the traveling public between Omaha and Dallas.

Ultimately, air service competition between Omaha and the Dallas metroplex relies on the ability of Southwest to maintain control of its gates, subject to the decades of industry understanding of federal competition requirements. We respectfully ask that DOT withdraw its December 17, 2014 letter and initiate efforts with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Christopher E. Martin
Director of Airline Affairs and Airport Operations
Omaha Airport Authority


cc:    Steve A. Coufal, Executive Director Omaha Airport Authority
       Bob Montgomery, Southwest Airlines (via electronic copy)



<span style="float:right">OMAHA AIRPORT AUTHORITY</span>

March 13, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

The Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for the traveling public between Omaha and the Dallas metroplex.

The December 17, 2014 letter directed to the Dallas City Attorney by the DOT General Counsel appears to modify what we understand to be the responsibilities under the Federal Aviation Administration (FAA) Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, the description of airport obligations under federal competition guidelines appears to apply generally to all airport operators including the Omaha Airport Authority.

We are supportive of the policies of the DOT and the FAA regarding competition as interpreted in the past. However, we are concerned that the interpretation offered by the DOT in the December 17, 2014 letter creates a new concept by declaring that any accommodation provided to a non-signatory airline, even a temporary one, may last in perpetuity at the option of the accommodated carrier. That interpretation will likely prevent full utilization of gates at Dallas Love Field consistent with lease rights which will in turn harm the traveling public between Omaha and Dallas.

Ultimately, air service competition between Omaha and the Dallas metroplex relies on the ability of Southwest to maintain control of its gates, subject to the decades of industry understanding of federal competition requirements. We respectfully ask that DOT withdraw its December 17, 2014 letter and initiate efforts with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Christopher E. Martin
Director of Airline Affairs and Airport Operations
Omaha Airport Authority


cc:    Steve A. Coufal, Executive Director Omaha Airport Authority
       Bob Montgomery, Southwest Airlines (via electronic copy)



**Rhonda Hamm-Niebruegge**
**Director**



Francis G. Slay
*Mayor*
City of St. Louis

March 17, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

It has come to our attention that the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have implications for airports throughout the country.

The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify what we understand to be our airports' responsibilities under FAA Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past. However, we are concerned that DOT's December 17 letter appears to change those policies by declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier. Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with long-standing lease rights and industry practice.

Absent a full legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, we are troubled by what appears to be a fundamental departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

P.O. Box 10212 | St. Louis, MO 63145-0212 U.S.A. | City of St. Louis Airport Authority | Main Phone 314-426-8000 | Fax: 314-426-5733



We take our compliance responsibilities seriously and have looked to the FAA Airports Office from time-to-time for guidance in this regard.  With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process.

For the reasons explained above, we respectfully ask that DOT work with all airport and airline stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Rhonda Hamm-Niebruegge
Director of Airports



**BIRMINGHAM-SHUTTLESWORTH**
*INTERNATIONAL AIRPORT*

March 18, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

It has come to our attention that the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.

The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify what we understand to be our airports' responsibilities under FAA Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past. However, we are concerned that DOT's December 17 letter creates a new "squatter's rights" concept by declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier. Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with its lease rights and long-established industry practice.

Absent a full legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, we are troubled by what appears to be a fundamental departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

We take our compliance responsibilities seriously and have looked to the FAA Airports Office from time-to-time for guidance in this regard. With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such

a policy to be proposed through the long-established public notice-and-comment process, as required by the federal Administrative Procedures Act.

For the reasons explained above, we respectfully ask that DOT withdraw its December 17 letter and instead work with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

*Birmingham-Shuttlesworth International Airport*

Alfonso Denson
President and CEO

/jw



**Mayor, Mitchell J. Landrieu**
City of New Orleans

**New Orleans Aviation Board**

Cheryl Teamer
Chairwoman

Doug Thornton
Vice-Chairman

Todd Francis
Jim Hudson
Ti Adelaide Martin
Lea Polk Montgomery
Gary L. Smith, Sr.
Michael Smith
Roger H. Ogden

Iftikhar Ahmad
Director of Aviation

P. O. Box 20007
New Orleans, LA 70141

P: 504-303-7800
F: 504-303-7566

www.flymsy.com

March 19, 2015

Secretary Anthony Foxx
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC  20590

Dear Honorable Secretary Foxx:

It has come to our attention that the U.S. Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.  The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify what we understand to be airports' responsibilities under Federal Aviation Administration (FAA) Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of DOT and FAA policies regarding competition as interpreted in the past.  However, we are concerned that DOT's interpretation may create a new "squatter's rights" concept by declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier. Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with its lease rights and long-established industry practice.

Absent a complete legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, we are troubled by what appears to be a fundamental departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

We take our compliance responsibilities seriously and have looked to the FAA Airports Office for guidance in this regard.  With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process, as required by the federal Administrative Procedures Act.

We respectfully request DOT to withdraw the December 17, 2014 letter and work with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Iftikhar Ahmad

Attachment

cc:      Mr. Kevin Monroe, Assistant Deputy Secretary



**U.S. Department of Transportation**

Office of the Secretary of Transportation

GENERAL COUNSEL

1200 New Jersey Avenue, SE
Washington, DC 20590

December 17, 2014

**SENT VIA ELECTRONIC MAIL**

Mr. Warren M.S. Ernst
Dallas City Hall
1500 Marilla Street
Room 7DN
Dallas, Texas 75201-6622
(214) 670-3519
warren.ernst@dallascityhall.com

Dear Mr. Ernst,

This letter references our telephone conversations on December 8 and 11, 2014, regarding Delta Air Lines, Inc.'s request for long-term accommodation of its five daily departures at Dallas Love Field (DAL) and the policy of the City of Dallas regarding reasonable air carrier access.

We appreciate your understanding of the City's legal obligations under Federal law to reasonably accommodate all air carriers seeking to provide service at the airport, including the Competition Plan statute (49 U.S.C. § 47107(k)) and the obligations of the grant assurances accepted in connection with Airport Improvement Program grants to take all reasonable efforts to accommodate air carriers seeking to serve DAL. We are pleased that you are taking an active role in assisting requesting carriers in obtaining gate space at your airport such as by formalizing the process in your use and lease agreements to monitor gate utilization and availability and by contacting the signatory carriers at the airport to encourage voluntary accommodation.

In connection with the Secretary of Transportation's responsibility to ensure the successful implementation of competition plans under 49 U.S.C. § 47107(k), you have asked us for our views regarding competition plan requirements for addressing accommodation requests at DAL, including the length of accommodation for accommodated carriers and other related issues. We are providing this guidance in light of the unique circumstance at DAL, including the constrained nature of the airport and other restrictions of the Five Party Agreement and Wright Amendment Reform Act of

2006 (Pub. L. No. 109-352). We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access. The compendium table focuses on airports that have developed pro-competitive tools to accommodate requesting carriers in conformity with the competition plan requirements. Our 1999 task study entitled *Airport Business Practices and Their Impact on Airline Competition* may also be helpful to you and is available online at http://ntl.bts.gov/lib/17000/17100/17129/PB2000108301.pdf.

As we discussed, ensuring that Federally-assisted airports make reasonable accommodations for requesting carriers, whether new entrants or other carriers seeking expansion, and maximize the utilization of their existing resources, especially at gate-constrained airports like DAL, are important objectives for the Department of Transportation (DOT). We recognize your efforts to develop a baseline chart for determining gate availability, as well as your efforts to enforce Section 4.06(F) of the Use and Lease Agreement requiring the signatory carriers to provide monthly gate utilization reports. Knowing when and where gate space is available at any given time is critical to the City's ability to provide timely and responsive assistance to requesting carriers.[1] Maintaining an accurate, up-to-date gate utilization report will be critical for the City's ongoing obligation to ensure reasonable access for accommodated and requesting carriers. Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signatory carrier, the City will accommodate the requesting carrier to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers.

With respect to the length of the accommodation, for the accommodation to be meaningful at DAL, it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights. Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date. It is the City's responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis, based on the available space on the snapshot date of the original accommodation request, even after the expiration or termination of any agreement between the accommodated carrier and signatory carriers.[2]

---

[1] We have also discussed that accommodation requests should be resolved on a first-come, first-served basis. In the future, if the verified gate utilization report at DAL shows there is less space available than has been requested, the City must offer the space that is available to the requesting carrier. Moreover, due to the gate constraints at DAL under Federal law and the Five Party Agreement, if future reports show that no space is available at DAL, and the requesting carriers, signatory carriers, and the City have fully applied all of the accommodation procedures provided in the Use and Lease Agreement, the City may deny the request for accommodation. The City would then be required to submit a competitive access report under 49 U.S.C. § 47107(s) to explain the reasons for the denial of access.

[2] If the accommodated carrier seeks to change its pattern of service, such as increasing service or requesting times that are not within a reasonable window of the times at which it was originally accommodated, such requested changes would constitute a new request for accommodation.

The City must also ensure that the accommodation is at reasonable rates.[3]  Our competition plan policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus a reasonable allowance for administration, are reasonable.  Many airport proprietors impose a ceiling on such an allowance and our policy is that, in any event, the allowance may not exceed 25%.  Our competition plan policy also requires that airports oversee these administrative fees.  Keeping these concepts in mind, it is within the City's discretion to assess the reasonableness of voluntary accommodation requests.

We hope this is helpful to you.  We will continue to monitor this process and ask that you provide us periodic reports on the status of the accommodation of requesting carriers at DAL.  If you have any questions, please feel free to call me.

Sincerely yours,

Kathryn B. Thomson

---

[3] See 49 U.S.C. § 47107(a)(1); FAA Grant Assurance 22, *available at*
http://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip.pdf.



Paul J. Wiedefeld, A.A.E.
*Executive Director/CEO*

March 19, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington DC  20590

Dear Mr. Secretary:

It has come to our attention the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.  The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify what we understand to be our airports' responsibilities under FAA Grant Assurances and Competition Plan requirements.  Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past.  However, we are concerned that DOT's December 17 letter creates a new "squatter's rights" concept by declaring that any airline accommodation, even a temporary one, may last in perpetuity at the option of the accommodated carrier.  Should such an accommodation take place on a signatory airline's gate, the accommodation could prevent the signatory carrier from fully utilizing its gate consistent with its lease rights and long-established industry practice.

Absent a full legal review, it is difficult to determine the precise impact of this new position on airport competition plans, management practices, airline leases, airports' ability to attract capital or airport credit ratings.  But, we are troubled by what appears to be a fundamental departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines and other stakeholders that are directly affected.

We take our compliance responsibilities seriously and have looked to the FAA Airports Office from time-to-time for guidance in this regard.  With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process, as required by the federal Administrative Procedures Act.

P.O. Box 8766
BWI Airport
Maryland 21240-0766

**TOLL-FREE**
1 800 I FLY BWI

**FACSIMILE**
410-850-4729

**WEBSITE**
www.bwiairport.com

The Honorable Anthony Foxx
Page Two

For the reasons explained above, we respectfully ask that DOT withdraw its
December 17 letter and instead work with all stakeholders in an open and
collaborative manner should it seek a material change in the Grant Assurances or
Competition Plan requirements.

Sincerely,

Paul J. Wiedefeld, A.A.E.
Executive Director/CEO

Attachment



## CHICAGO DEPARTMENT OF AVIATION

### CITY OF CHICAGO

March 19, 2015

The Honorable Anthony Foxx
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Mr. Secretary:

It has come to our attention that the Department of Transportation (DOT) has taken a position on a gate accommodation matter at Dallas Love Field that could have harmful implications for airports throughout the country.

The attached letter signed by the DOT General Counsel to the Dallas City Attorney appears to modify airports' responsibilities under FAA Grant Assurances and Competition Plan requirements. Although the letter arose from a dispute involving Dallas Love Field, its description of airport obligations under federal competition guidelines appears to apply generally to all U.S. airports.

We are supportive of the DOT's and the FAA's policies regarding competition as interpreted in the past. Chicago has been a model for use of preferential and common use gates successfully to accommodate new entrants and growth of service by existing airlines. Airport's use agreements, competition plans and gate allocation protocols are critical to ensuring the highest utilization of the airport's asset – the gates.

Absent a full legal review, it is difficult to determine the precise impact of this new DOT position on airport competition plans, management practices, airline leases, airports' ability to attract capital, or airport credit ratings. But, this new DOT position appears to be a fundamental departure from decades of industry understanding of federal competition requirements that was adopted without broad input by airports, airlines, and other stakeholders that are directly affected.

The Chicago Department of Aviation (CDA) takes its compliance responsibilities seriously and has looked to the FAA Airports Office from time-to-time for guidance in this regard. With that said, if either the DOT or FAA develops a new interpretation of the Grant Assurances or a new policy concerning Competition Plans, either of which materially impacts the way we manage our airports, we would expect such a policy to be proposed through the long-established public notice-and-comment process, as required by the federal Administrative Procedures Act.

For the reasons explained above, we respectfully ask that DOT withdraw its December 17 letter and instead work with all stakeholders in an open and collaborative manner should it seek a material change in the Grant Assurances or Competition Plan requirements.

Sincerely,

Michael Boland
Acting Commissioner
Chicago Department of Aviation