**RESPONSE OF SOUTHWEST AIRLINES CO. TO CITY OF DALLAS'**
**APRIL 16, 2015 PROPOSED ACCOMMODATION DOCUMENTS**
**FOR DALLAS LOVE FIELD**

April 28, 2015

TABLE OF CONTENTS

I.   SOUTHWEST HAS THE LEGAL RIGHT TO EXPAND SERVICE ON AND FULLY UTILIZE ALL ITS PREFERENTIALLY-LEASED GATES, AND THE CITY CANNOT ABROGATE THAT RIGHT TO ACCOMMODATE ANOTHER AIRLINE

II.  THE CITY'S PROPOSED ACCOMMODATION DOCUMENTS ARE IMPROPER AND UNLAWFUL IN MANY RESPECTS

    A.  The City's Process Fails to Ensure that Non-Tenant Airlines Can Be Accommodated AT Love Field Without Violating Signatory Airline Lease Rights

    B.  The "Snapshot Dates" Proposed by the City are Potentially Improper and Prejudicial to Southwest

    C.  It is Unlawful for the City to Convert a Temporary Accommodation at Love Field into a "Permanent" Accommodation

    D.  The City Fails to Recognize that the Relevant Market for Considering Accommodation Requests is the Dallas-Ft. Worth Area, which Includes Both DFW Airport and Love Field

    E.  The City's Proposed "Size Criterion" for Selecting an Incumbent Airline to Accommodate Non-Tenant Carriers is Prejudicial to Southwest

    F.  The City's Proposed Documents Conflict with the Love Field Lease

    G.  The City's Proposed Gate Scheduling Rules Must be Changed

III. A FORCED ACCOMMODATION OF DELTA OR AMERICAN ON SOUTHWEST'S GATES WOULD REDUCE AIRLINE COMPETITION AND COST CITY RESIDENTS MILLIONS IN LOST FARE SAVINGS

IV.  A FORCED ACCOMMODATION ON SOUTHWEST'S GATES WOULD CONSTITUTE AN UNLAWFUL TAKING OF SOUTHWEST'S PROPERTY, REQUIRING THE CITY TO PAY "JUST COMPENSATION"

V.   CONCLUSION

**EXHIBIT 8**

*Response of Southwest Airlines April 28, 2015*

## I.  SOUTHWEST HAS THE LEGAL RIGHT TO EXPAND SERVICE ON AND FULLY UTILIZE ALL ITS PREFERENTIALLY-LEASED GATES, AND THE CITY CANNOT ABROGATE THAT RIGHT TO ACCOMMODATE ANOTHER AIRLINE

Southwest Airlines Co. ("Southwest") submits this response to the following documents issued by the City of Dallas ("City") on April 16 (collectively the City's proposed "Accommodation Documents"):

- "Love Field Dallas Accommodation Criteria"
- "Dallas Love Field Accommodation Principles"
- "Dallas Love Field Accommodation Process"
- "Gate Scheduling Rules for Accommodation Assessment"

These documents set forth the means and process by which the City is proposing to address requests from non-lessee airlines to be "accommodated" at Dallas Love Field.

Before commenting on the specific City documents, it is critical to recognize an over-arching principle that must govern any Love Field accommodation issue: Southwest Airlines has the legal right to fully utilize all gates which it preferentially leases at Love Field, and this right includes Southwest's ability to expand its own operations on those gates at any time, subject only to giving  reasonable notice to any other airline that may be temporarily accommodated on those gates.

This over-riding legal right is explicitly recognized by Southwest's Love Field Lease; the Five Party Agreement[1]; and the Wright Amendment Reform Act of 2006, ("WARA").[2]  This right is also supported by the Dallas Love Field Competition Plan, which has been approved by the Federal Aviation Administration ("FAA"); long-standing guidance from the FAA and U.S. Department of Transportation ("DOT") governing airport business practices; and decades of industry practice by airport operators relating to the accommodation of new entrant carriers.  The City has no legal basis for abrogating Southwest's right to fully utilize its leased gates.

Southwest has documented in detail the nature and existence of its legal right to fully utilize its leased gates in numerous previous submissions to the City (and to other parties on which the City was copied), all of which Southwest incorporates by reference herein.[3]  The key authorities underlying this right include the following:

---

[1] "Contract Among the City of Dallas, the City of Fort Worth, Southwest Airlines Co., American Airlines, Inc. and DFW International Airport Board," etc., July 11, 2006.

[2] Pub. L. 109-352 (2006).

[3] *Response of Southwest Airlines Co. to City of Dallas Request for Input on Dallas Love Field Gate Accommodation Policy* (November 17, 2014); *Response of Southwest Airlines to City of Dallas December 1,*

- Pursuant to its Love Field Lease,[4] Southwest "is granted the preferential use of its assigned Gate(s)."[5]

- The Lease further provides that "[a]t those times that [Southwest] has no scheduled use for one or more of its assigned Gate(s), [Southwest] will allow other scheduled or nonscheduled airlines authorized by the City to use Airport facilities to use such Gate(s), as circumstances and the public interest may require, for loading and unloading only, *but in no event shall said use by others take precedence over [Southwest Airlines'] scheduled use.*"[6]

- In addition, Section 4.06.F of the Love Field Lease sets forth the parties' written agreement for the handling of accommodation requests.  Among other things, Section 4.06.F makes clear that "In case of a conflict between schedules of the Signatory Airline and the Requesting Airline, *the Signatory Airline will have priority in use of its personnel and its Leased Premises.*"[7]

- Under the WARA, the City cannot be compelled by any federal agency *to "modify or eliminate" Southwest's preferential gate leases in order to allocate gate capacity to new entrant carriers "unless such modification or elimination is implemented on a nationwide basis.*"[8]

- The Dallas Love Field Competition Plan, approved by the FAA in October 2009, specifically adopts and incorporates the Love Field Lease "Accommodation Provisions," including Section 4.06F, in Appendix 1.

- The DOT's own guide on airport business practices validates Southwest's right to fully utilize its own leased space, in providing that "*an airline tenant is not required to cancel flights or forfeit its use of airport facilities*" in order to

---

*2014 Notice Regarding Dallas Love Field Accommodation Issues* (December 8, 2014); Letter from Robert W. Kneisley to Warren M. S. Ernst (December 15, 2014); Letter from Robert W. Kneisley to Kenneth P. Quinn (December 23, 2014); Letter from Mark Shaw to Warren M. S. Ernst (December 31, 2014); Letter from Robert W. Kneisley to Kenneth P. Quinn (January 4, 2015); Letter from Robert W. Kneisley to Kenneth P. Quinn (February 27, 2015) and attached Letter from Bob Montgomery to Mark Duebner City of Dallas (February 27, 2015).

[4] *See* "Amended and Restated Lease of Terminal Building Premises (Airport Use and Lease Agreement) " between the City and Southwest (with an effective date of October 1, 2008) ("Lease") (which covers 16 of the gates) and the "Agreement of Sublease," January 28, 2015 between Southwest and United Air Lines, Inc. for the additional two gates ("Sublease"), for which the City provided its consent. *See Consent to Sublease*, executed by the City, Southwest, and United Airlines, January 28, 2015.  The Sublease incorporates provisions similar to those in the Lease.

[5] Lease § 4.06.C.

[6] *Id.* (emphasis added).

[7] Section 4.06.F.4.a (emphasis added).

[8] WARA, Sec. 5(e)(2)(B)(ii).

accommodate a non-tenant carrier under the federal grant assurances.[9]

The City has no authority to restrict or interfere with Southwest's rights to fully utilize its leased gates at Love Field, and Southwest therefore objects to any provision of the proposed Accommodation Documents that, if implemented, would have the effect of doing so. Southwest specifically reserves the right to challenge any action by the City based on the Accommodation Documents that would preclude Southwest from expanding upon and fully utilizing its 18 leased gates. Southwest also specifically reserves the right to challenge the City's authority to promulgate its Accommodation Documents or engage in the process outlined in those documents to the extent they are inconsistent with the terms of the Love Field Lease.

As the City is aware, Southwest has gradually but steadily expanded its service at Love Field following the October 13, 2014 repeal of the Wright Amendment. The repeal allowed nonstop flights from Love Field to points outside the former nine-state Love Field perimeter for the first time since 1979, and thus opened up enormous new opportunities for Southwest to expand its Dallas service. As a result, Southwest's Love Field service has increased as follows:

| | |
|---|---|
| 10/1/2014 (prior to repeal of W.A.) | 118 flights |
| 10/13/2014 (date of repeal of W.A.) | 140 flights |
| 11/3/2014 | 149 flights |
| 1/7/2015 | 153 flights |
| 4/8/2015 | 166 flights |
| 8/9/2015 | 180 flights |

Today Southwest operates 166 daily flights at Love Field. But more than two months ago, on February 26, 2015, Southwest announced and began selling tickets for a number of additional flights that will bring its total Love Field service to 180 weekday flights as of August 9, 2015. This most recent announcement means that Southwest will be operating an average of ten flights per gate per day on its 18 leased gates at Love Field. This constitutes "full utilization" of Southwest's gates under any reasonable measure -- a fact that is recognized by the City in Item 3 of its proposed Gate Scheduling Rules.

One day after its announcement of additional service - on February 27, 2015 - Southwest specifically gave notice to the City and all other parties that it would be unable to accommodate any other airline on its gates after July 19, 2015, shortly before its August 9, 2015 schedule expansion to 180 daily flights on its 18 gates.[10] Neither the

---

[9] "*Airport Business Practices and Their Impact on Airline Competition,*" FAA/DOT (1999) ("ABP Guide"), at 13.

[10] See letter from Bob Montgomery to Airport Director Mark Duebner, February 27, 2015, stating that

City nor any other party has made any response to Southwest's February 27, 2015 notice.

Nothing in the proposed Accommodation Documents can create authority for the City which it does not possess under law to restrict or prevent Southwest from fully utilizing its Love Field gates. Any attempt by the City to preclude Southwest from adding the flights that it publicly announced on February 26, 2015, and for which Southwest has been selling tickets to the public since that date, would not only be unlawful but would cause severe and irreparable harm to Southwest and its customers.

Simply put, the City cannot lawfully mandate an accommodation of a "requesting carrier" on Southwest's gates in a manner that interferes with Southwest's planned schedule expansion (i.e., after July 19, 2015), whether based on the City's proposed Accommodation Documents or otherwise. Any such action by the City would be subject to an immediate challenge by Southwest.

## II. THE CITY'S PROPOSED ACCOMMODATION DOCUMENTS ARE IMPROPER AND UNLAWFUL IN MANY RESPECTS

### A. The City's Process Fails to Ensure that Non-Tenant Airlines Can Be Accommodated at Love Field Without Violating Signatory Airline Lease Rights

As noted above and in our prior submissions, Love Field signatory airlines have the legal right to use their own leased space for their own operations without interference by any air carriers that were temporarily accommodated at an earlier date when the signatory airline was not using all of its leased space. To some extent, the City's proposed Accommodation Documents recognize this principle. For example, the proposed Accommodation Principles (at p. 1) state that "the accommodation must not unduly interfere with the operating schedule of the accommodating airline." Likewise, the Accommodation Criteria (at p. 2) propose to "assess the extent to which the requesting airline can be accommodated without undue interference with the schedule of the incumbent airline." The proposed Criteria also state at p. 3 that "If the Director determines that none of the requested slots are available from any incumbent airline without unduly interfering with the operating schedule of the incumbent airlines, the Director will notify the requesting airline that its request cannot be accommodated."

Southwest agrees that accommodation of a non-tenant carrier cannot be permitted to interfere with the ability of a signatory airline to fully utilize its leased gate

---

"starting July 20, 2015, Southwest will be unable to provide gate space to any other carrier on our 18 Love Field gates." See also Letter from Robert W. Kneisley to Delta counsel Kenneth B. Quinn February 27, 2015, at 1, stating that "Southwest is not able to offer any accommodation beyond July 19, 2015, due to a lack of available space on its Love Field gates after that date."

space, and specifically agrees with the above-referenced statements.   However, statements elsewhere in the proposed Accommodation Documents contradict this principle.   For example, page 2 of the Accommodation Principles states that the "accommodating airline will have priority in the use of its personnel and leased premises, and other rights as defined in the use and lease agreement *to the extent that such rights are not superseded by the accommodation*" (emphasis added).   This is entirely improper and should be stricken.   There is no legal basis for the City to qualify and restrict the priority of the "accommodating airline" over its own personnel and leased space.

The City's documents are also deficient by not making clear that *a signatory airline has the right to expand service on its own leased gates at any time, including after a temporary accommodation has been made*, subject only to affording any accommodated carrier reasonable notice of its intent to do so.   This could occur if an accommodation was made at a time when the signatory airline's gates were not being fully used.

For example, Southwest itself *voluntarily* accommodated Delta Airlines from October 2014 through early January 2015 because Southwest was not fully using all of its leased gate space during that time.   Likewise, United Airlines agreed to *voluntarily* accommodate Delta from early January 2015 through July 6, 2015, as United was not using all of its leased space during that time.   In its sublease of United's gates, Southwest specifically agreed to honor United's voluntary accommodation of Delta through July 6, 2015.   However, Southwest provided notice to Delta that it can no longer accommodate Delta's flights after July 19, 2015 due to the additional Southwest flights that were announced on February 26, 2015.

The City should clarify that a signatory airline has the right to expand service on its own leased space at any time, subject only to giving reasonable notice to any carrier that has been temporarily accommodated on that space.   Failure to make this clarification would not only create needless uncertainty but put the City in the position of violating the signatory airline's legal rights to fully utilize its preferentially-leased space.

Finally, Southwest objects to the City's description of legal principles and authorities at p.1 of its proposed Accommodation Principles, and in particular, the blanket statement that "In the event of a conflict among these documents, Section 14.34 of each use and lease agreement now in force recognizes that all lease provisions are subordinated to the City's obligations under existing and future agreements between the City and the United States."[11]

---

[11]Accommodation Principles at p. 1 (third bullet).

*Response of Southwest Airlines April 28, 2015*

First, Southwest is not aware that an "agreement" between the City and the United States exists that is in any way inconsistent with Southwest's legal rights as described above.  The City's statement also fails to recognize that such subordination is inherently *qualified*.  Any position of the United States government with which the City has agreed must itself be reasonable and lawful.

Section 14.34 of the Lease states:

This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport or any part thereof.

The "City's obligations under existing and future agreements between the City and the United States" referred to in the Accommodation Principles must be obligations that the United States has the lawful authority to require.  For example, if the federal government required an action by the City that is arbitrary, capricious, an abuse of discretion or otherwise unlawful, the City could not, in turn, demand that the signatory airlines abide by it.

Further, by agreeing to Section 14.34, the signatory airlines did not waive their right to (1) interpret or contest the meaning of any language in an agreement between the City and the United States; or (2) pursue claims that language in such an agreement, as applied by the United States or the City, violates federal law including, without limitation, the U.S. Constitution and its prohibition against the taking of property without just compensation.  *See Walker Field, Colo., Public Authority v. Adams*, 606 F.2d 290, 297 (10th Cir. 1979) (the ability of "the Federal Government [to] impose terms and conditions upon which its money allotments to the States shall be disbursed," may be "barred by some controlling constitutional prohibition"); 8A Am. Jur. 2d Aviation § 92 (same).

### B.  The "Snapshot Dates" Proposed by the City are Potentially Improper and Prejudicial to Southwest

The proposed documents contain numerous references to so-called "snapshot dates" that the City states "will start the time period for assessing reasonable accommodation."[12]  The City also states that the "Director will use the schedule for the six months (180 days) following the Snapshot Date to assess scheduled operations. The Director will not consider flights added or changes to an airline's schedule that take

---

[12]Accommodation Criteria at p. 1.

*Response of Southwest Airlines April 28, 2015*

effect more than six months after the Snapshot Date except for regular seasonal scheduling variations…"[13]

The documents, however, do not specify what particular dates the City is proposing to use for "snapshots" in connection with any of requests for accommodation at Love Field.  Because the City has only described the "snapshots" in the abstract, it is impossible for Southwest to fully understand and evaluate the significance of these proposed "snapshots."   In any event the City has not cited any legal or industry precedent for the use of such "snapshot dates", and Southwest is not aware of their use by any other airports to address accommodation requests.

Southwest objects to the use of any "snapshot date" that would restrict or interfere with Southwest's legal right to expand service upon, and fully utilize its leased gates.  Signatory airlines have the legal right to use any or all of their preferentially-leased gates for their own operations, and neither the City nor carriers desiring accommodation at Love Field can preclude signatory airlines from exercising that right.

Further, the City's proposed 180-day cutoff for consideration of incumbent carrier schedules is not only arbitrary, but depending on the specific "snapshot date" chosen could be highly prejudicial to Southwest, given its deliberately gradual expansion of service in the post-Wright Amendment repeal period.  As noted earlier, Southwest has progressively and systematically increased Love Field service over the last several months, from 118 nonstop daily flights just prior to the October 2014 repeal, to 166 flights today, to 180 flights beginning August 9.

Southwest's measured expansion of service was done in full consideration of the significant operational, reliability, and passenger-handling considerations that arose from operating at the newly-rebuilt Love Field.  Southwest's decision to gradually ramp up its post-repeal service has been prudent, as a number of operational and other challenges at the airport have arisen during this period that needed to be addressed, including passenger parking problems.  Southwest should not now be penalized by using its good judgment in not over-taxing the new airport by immediately launching the maximum possible schedule as of the October 2014 repeal of the Wright Amendment but instead ramping up to the level of 180 flights over a period of several months.

The proposed Accommodation Documents do acknowledge that "unique circumstances" could alter the selection of a snapshot date (proposed Criteria at p. 1), and "special circumstances" may cause "expansion, reduction or other variance" in the time period applied within a snapshot date (proposed Principles at 2).  Southwest submits that the repeal of the Wright Amendment is unquestionably a "unique and special circumstance" that must be taken into consideration in evaluating Southwest's

---

[13] *Id.*

utilization of its Love Field gates.  For the City to ignore the role of this historic event when addressing requests for accommodation would be both arbitrary and indefensible.

### C. It is Unlawful for the City to Convert a Temporary Accommodation at Love Field into a "Permanent" Accommodation

The proposed Accommodation Principles (at p. 2) state that once an airline has been mandatorily accommodated at Love Field, that airline "will be entitled to maintain the pattern of service granted in response to the accommodation decision…"  The City cites no legal authority for this extraordinary and unprecedented "principle," which would deprive the accommodating signatory airline of its right, under the Love Field Lease as well as federal law, to expand upon and fully utilize its own leased gates.  In fact, nothing in federal law or the Love Field Lease entitles a non-signatory airline to a "long-term accommodation."[14]  To the contrary, the Lease makes clear that the rights of a requesting airline are secondary to the rights of the signatory airlines to fully utilize their leased gates.  *See* Lease §§ 4.06.C and 4.06.F.

The City's proposed "principle" in this regard follows almost to the letter the position stated by the DOT General Counsel Kathryn Thomson to Warren Ernst in a December 17, 2014 letter that:

   (a)    "once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights";

   (b)    "the accommodated carrier should not be pushed out by incumbent carriers at a later date"; and

   (c)    it "is the City's responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis, based on the available space on the snapshot date of the original accommodation request…"

The DOT's December 17 Letter cites no legal authority for the proposition that a mandatory accommodation of a non-lessee airline is basically "permanent" as long as it continues to operate the same pattern of service.  This position is flatly inconsistent with Southwest's right to fully utilize its preferentially leased gates at Love Field, as discussed above.  The December 17 Letter also conflicts with DOT's own airport

---

[14] *See* Southwest Airlines December 15, 2014 Letter to Warren Ernst, *supra* fn. 3, at 1-2.

business practice guidelines and federal grant assurance principles that recognize the right of signatory airlines to expand operations on their own gates.[15]

It has never been the policy of FAA/DOT or the practice of U.S. airports to mandate accommodation of a non-tenant airline on another carrier's leased space on a "permanent" basis, or to premise an accommodation on a "snapshot date" that precludes the incumbent airline from expanding its own service after such a specified date. Significantly, the December 17 Letter does not cite any authority or historical precedent for its position on "permanent" forced accommodations and the use of "snapshot dates." Moreover, neither the DOT nor the City has provided a single example of a U.S. airport that has "permanently" accommodated a non-tenant airline consistent with the position stated in the December 17 Letter,[16] - a letter which the City now proposes to follow without any independent analysis or legal support whatsoever.

Requiring a forced accommodation to be "permanent" also violates Southwest's rights under the WARA. Section 5(e)(1)(E) of WARA states that WARA does not limit the authority of the FAA "or any other Federal agency to enforce requirements of law and grant assurances . . . that impose obligations on Love Field to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field." However, the Act narrowly circumscribes that authority. Section 5(e)(2)(B)(ii) of the WARA states that:

> Paragraph (1)(E) shall not be construed to require the city of Dallas . . . to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, *unless such modification or elimination is implemented on a nationwide basis.* (emphasis added).

Neither the DOT's December 17 letter nor the City's proposed Accommodation Documents make any mention of this significant limitation on the City's authority to accommodate new carriers at Love Field.

This statutory language on its face prohibits the City from making an accommodation decision that interferes with Southwest's preferential gate lease rights

---

[15] See *ABP Guide*, supra note 9.

[16] The December 17 Letter attached a "compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access." Letter at 2. However, none of the FAA-approved competition plans listed in the "compendium" adhere to the DOT Letter's position that a mandatory accommodation may be of indefinite duration and based upon a previous "snapshot date." Nor do any of those plans contemplate that a forced accommodation may preclude a signatory airline from expanding service on and fully utilizing its own leased gates.

"unless such modification or elimination is implemented on a nationwide basis."[17] Neither FAA nor DOT has adopted and implemented a policy of modifying or eliminating air carrier preferential lease rights "on a nationwide basis." To the contrary, the December 17 letter states that the DOT is "providing this guidance "in light of the unique circumstance at DAL…" In any case, even if it were inclined to, the DOT could not apply its newly-stated position on "permanent accommodation" on a nationwide basis in any case without following the requirements of the Administrative Procedure Act, 5 U.S.C. § 553, which mandates prior notice and opportunity for comment by interested parties, a process which was not provided before issuance of the December 17 letter.

On February 13, 2015, Southwest filed a petition for review of the DOT's December 17 Letter as arbitrary and capricious, in excess of DOT's statutory authority, and an abuse of discretion, as well as procedurally defective.[18] Because the December 17 letter includes a process that is novel and is without legal authority, the City cannot legitimately rely upon that letter as the source of its own legal authority to mandate a "permanent" accommodation. Accordingly, all references in the City's Accommodation Documents to a mandatory accommodation of "indefinite" or "unlimited" duration should be stricken.

### D. The City Fails to Recognize that the Relevant Market for Considering Accommodation Requests is the Dallas-Ft. Worth Area, which Includes Both DFW Airport and Love Field

The proposed Accommodation Principles state (at p. 2) that the "accommodation will be designed to promote competition at Love Field." Southwest objects to this principle to the extent it is intended to mean "*only* Love Field." The City cannot ignore the fact that Love Field is one of two commercial service airports that serve the greater Dallas-Fort Worth region and compete intensely for passengers in that region. Any accommodation decision that is made without full consideration of this undeniable fact will be inherently flawed and legally untenable.

Southwest fully addressed the issue of the appropriate competitive market for the consideration of accommodation requests in its November 17, 2014 *Response to City of Dallas Request for Input on Dallas Love Field Accommodation Policy* (pp. 7-9 and Exhibits A through F), and its December 8, 2014 *Response to City of Dallas December 1, 2014 Notice Regarding Dallas Love Field Accommodation Issues* (pp. 5-6). The City has not responded to the undisputed evidence that both Love Field and DFW Airport compete for the same passengers in the Dallas-Fort Worth region. For that reason,

---

[17]Even if there were a nationwide elimination or modification of preferential lease rights, such interference with lease rights would constitute an unconstitutional "taking" of the signatory airline's leasehold interest.

[18] U.S. Court of Appeals for the D.C. Circuit, Case No 15-306, February 13, 2015.

under no circumstance can Love Field be considered an "essential facility" that all airlines must serve in order to fully access the Dallas-Fort Worth air services market.

The unconditional clearance by the U.S. Department of Justice Antitrust Division of Southwest's sublease of two Love Field gates from United Airlines in January 2015 is consistent with the view that Love Field is part of a greater Dallas area market that includes DFW Airport. In fact, Southwest's acquisition of two additional gates at Love Field gives it less than ten percent of the 185 gates in the entire Dallas-Fort Worth market served by both Love Field (20 gates) and DFW Airport (165 gates).[19]

*Significantly, the City is already on record as acknowledging that Love Field is part of a larger air services market that includes DFW Airport.* In 2009, when the City applied to the FAA for approval for an increased passenger facility charge ("PFC") at Love Field to fund hundreds of millions of dollars in Love Field improvements leading up to the removal of the Wright Amendment restrictions, the City emphasized that Love Field plays a critical role *in the Dallas-Fort Worth region as a whole.* *See* PFC Application for Love Field (October 29, 2009), at B-81 to B-84 (Attachment A hereto). The City's application stated:

> A significant competitive benefit of PFC #3.08 occurs at the regional level. The Project fulfills a legal requirement for the repeal of flight restrictions at Love Field. *Repeal of these restrictions has already enhanced airline competition in the region and will continue to do so as we document below.* Although Order 5500.1 refers specifically to enhancing airline competition at the airport, *the City requests the FAA to consider the effect of competition in the region in determining whether the significant contribution standard is met.* The statutory standard for approval of a $4.50 PFC level at medium hub airports does not explicitly limit the FAA to considering competitive effects at the airport where the PFC will be collected. (*Id.* at B-81) (emphasis added)

The City added that the use of the PFC's at Love Field "has already enhanced *competition in the region* and will continue to do so," and that the "unique circumstances" relating to Love Field "justify application of the full discretion provided by the statute to the FAA for considering the impact of the project on competition." *Id.* at B-82 (emphasis added). The City also emphasized all of the passengers in "the Dallas-Fort Worth region" that have already benefitted from the "competitive choice" between Love Field and DFW Airport. *Id.* at B-83-84. Further, the City's data showed that nearly 90 percent of the passengers that benefitted from the competition that was spawned by

---

[19] In implementing "NextGen" air traffic control technology, the FAA treats Love Field and DFW Airport as a single metropolitan area referred to as the "North Texas Metroplex." See http://www.faa.gov/nextgen/snapshots/metroplexes/?locationID=6.

repeal of the Wright Amendment took flights from DFW Airport (8.7 million out of a 9.7 million total; Table 9 on page B-83.)

The City's positions on this issue must be consistent.  Having touted the fact that repeal of the Wright Amendment has "enhanced airline competition *in the region*," and having successfully sought to use hundreds of millions of dollars of PFC revenue at Love Field on that basis, the City cannot now reverse course to claim that Love Field is its own competitive universe, somehow isolated from the much larger DFW Airport only a short drive away.  The vast majority of PFCs used to renovate Love Field were charged to Southwest passengers, and Southwest spent millions of dollars of its own funds for the improvements.  The City explicitly predicated its request for approval of those fees on the proposition that the funds raised would enhance competition *in the Dallas-Fort Worth region*.  It is improper for the City to now to ignore that competitive reality and consider an accommodation request as affecting only Love Field rather than the broader Dallas-Fort Worth region.

This point is essential to a proper understanding of the effect of an accommodation at Love Field, for several reasons.  First, as noted above, an airline (other than Southwest) does not need gate space at Love Field in order to access the Dallas-Ft. Worth market.  All such airlines can access that market fully from DFW Airport, which is not gate-constrained and has ample room for growth.  Second, Southwest alone is subject to a unique restriction that effectively limits its service in the Dallas-Ft. Worth area to Love Field.[20]  This necessarily means that any flights of other airlines that are forcibly accommodated on Southwest's Love Field gates will reduce the number of flights that Southwest can offer to the public, thereby reducing Southwest's competition, fare savings, and other benefits to the public.  Yet the reverse scenario is *not* true:  denying an accommodation on Southwest's Love Field gates will not in any way prevent the requesting airline from expanding service in the Dallas-Ft. Worth market, as it is free to do so at DFW Airport at any time and without constraint.

Failure by the City to understand these unique dynamics of the Dallas-Ft. Worth market, and to give them full consideration when addressing an accommodation request, is likely to lead to a decision that not only is adverse to the interests of Dallas-Ft. Worth passengers but which is so uninformed and arbitrary that it will not withstand legal scrutiny.

---

[20] Section 10 of the Five Party Agreement provides that if "Southwest Airlines…chooses to operate passenger service from [DFW Airport]…then for every gate [Southwest uses at DFW Airport] Southwest [must] relinquish control of an equivalent number of gates at Love Field…"

### E. The City's Proposed "Size Criterion" for Selecting an Incumbent Airline to Accommodate Non-Tenant Carriers is Prejudicial to Southwest

Factor 2 of the City's proposed Accommodation Criteria states that the "Incumbent airlines with the greatest percentage of flights [at Love Field] will be considered more able to provide accommodation."  Southwest objects to this factor for the same reasons set forth in detail on pages 7-8 of its December 8, 2014 *Response of Southwest Airlines to City of Dallas December 1, 2014 Notice Regarding Dallas Love Field Accommodation Issues*.

This factor is unwarranted and prejudicial, as it virtually *guarantees* that the City will "select" Southwest, the largest operator at Love Field, to accommodate other carriers.  Southwest has achieved its position at Love Field through superior competition in the Dallas-Ft. Worth marketplace over more than 40 years.  For the City to place a *negative* weighting on this achievement makes a mockery of the process of "selecting" an airline to accommodate another carrier on its leased space.  It is also contrary to long-standing principles of fairness toward successful competitors enunciated by the courts, including the maxim that the antitrust laws "are not designed to punish the successful competitor."[21] The "successful competitor, having been urged to compete, must not be turned upon when he wins."[22]  *See* Southwest December 8, 2014 Response, at 8.

This factor must be eliminated completely from the City's selection system. Anything short of that will render the City's accommodation principles not only adverse to interests of the City's own residents but legally unsupportable.[23]

### F. The City's Proposed Documents Conflict with the Love Field Lease

The proposed Accommodation Documents contain a number of references to, and purported paraphrases of, provisions of the Love Field Lease which differ from the actual Lease language.  Southwest objects to all such language in the Accommodation Documents that is inconsistent with the terms of the Lease, which must prevail.  The City cannot change Lease terms by fiat, i.e., by unilaterally imposing new obligations or restrictions on signatory airlines that differ those airlines' rights under the terms of the

---

[21] *In re Scott Paper*, 63 F.R.C. 2240, 1963 WL 66924, *5 (1963).

[22] *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2nd Cir. 1945).

[23] Southwest agrees with the position that "Airlines with less efficiency will receive higher consideration to provide accommodation."  Accommodation Criteria, at 3. Southwest maintains a highly efficient operation, with a high frequency of gate utilization.  Carriers with less efficient operations should be considered for accommodation before Southwest.

*Response of Southwest Airlines April 28, 2015*

Lease.   Southwest reserves the right to challenge any such language, including specifically the following points, in the final and adopted Accommodation Documents:

1. The proposed Accommodation Criteria (at p. 2), state that "the Director . . . may treat [a] falsehood [in information supplied by airlines to the Director about their operations] as *a material breach of any agreements under which the airline uses Airport resources*" (emphasis added).   This goes far beyond what the Lease provides, and the Lease must control.   Indeed, only the language of the particular agreement at issue can be considered in determining whether an act or omission constitutes a material breach of that agreement.

2. The proposed Accommodation Principles state the ""accommodation will be made in consideration of the circumstances, including the scope of the accommodation request, the schedule of the accommodating airline as reflected in *tickets offered to the public during a test time period, the public interest …*"[24]   It is not clear what is meant by "tickets offered to the public during a test time period," or "the public interest" in this context.   And in any case, this language cannot be used to restrict or interfere with signatory airline Lease rights.

3. The Accommodation Principles at p. 2 state that, for purposes of analyzing schedules of affected airlines, the City will consider published schedules six months into the future "to the extent tickets for those schedules have been made available to the public."   In this respect the word "*legally*" should be inserted before "made available" to make it clear that only the lawful provision of airline seats may be considered.   Importantly, <u>Delta Airlines has no legal right to sell tickets for Love Field flights beyond July 6, 2015</u>, the date that its temporary license to operate on United Airlines' former gates (now Southwest's subleased gates) expires.   Delta certainly should not be given "credit" by the City for flouting the law.

4. The Accommodation Documents over-state the City's authority to change its accommodation principles and to render final decisions upon affected airlines. For example, the City states that its Accommodation Principles and Criteria "may be changed at any time at the City's sole discretion." (Accommodation Principles at p. 3). However, any such change must be consistent with signatory airline lease rights and applicable law.   The City also states without

---

[24]Accommodation Principles at p.1.

qualification that "all decisions by the Director are final and binding on all airlines." (Accommodation Principles at p. 4).  This statement cannot change the fact that affected airlines have all rights under law to challenge a decision by the City administratively and/or in the courts.

5. The City states that in "order to provide orderly and transparent accommodation decisions or to give airlines a better opportunity to reach an accommodation agreement, the City may delay that decision by ordering the maintenance of the status quo for short periods, usually not exceeding 60 days, while an accommodation decision is pending." (Accommodation Principles at p. 2).  Southwest objects to this proposal.  First, this provision directly contradicts a signatory airline's contractual right to use its leased premises when it chooses. Second, the City's use of "status quo" in this respect is impermissibly vague and improper. For example, if the City attempts to order a short-term accommodation for a non-tenant carrier after its temporary gate use agreement expires, the true "status quo" at that point would be that the signatory airline and only that airline has the right to use its own leased gates. The City may not use a "status quo" order to prevent a signatory airline from exercising its legal rights to use its leased premises at the time of its choosing.

6. As noted earlier, Southwest has been selling tickets to the public since February 26, 2015 for a schedule of 180 daily flights at Love Field.  Any attempt by the City, whether in the guise of a status quo order or otherwise, to delay or restrict the operation of any of these scheduled flights will result in severe and irreparable harm to Southwest and its customers.  Any such action by the City would be subject to an immediate challenge by Southwest

### G. The City's Proposed Gate Scheduling Rules Must Be Changed

The proposed Gate Scheduling Rules state they "will be used by the City to establish gate use plans for a specified *Assessment Date* to determine if it can accommodate a request for new service."  (Rules, at 1) (emphasis added).  Southwest objects to the term "Assessment Date" as it is not defined and is otherwise vague.

To the extent the City intends to equate "Assessment Date" with a "snapshot date," for the reasons set forth above, Southwest objects to any "snapshot date" (or "Assessment Date") that violates Southwest's Lease rights, including the right to fully utilize its leased gate space, which includes the right to expand operations on its gates, despite any forced accommodation order.

*Response of Southwest Airlines April 28, 2015*

### Item 1 – "Buffer between scheduled activities"

Item 1(a) of the Gate Scheduling Rules properly allows for 30 minutes between "Departure and arrival," and Item 1(c) correctly permits 30 minutes between "Terminator tow-off and following arrival."  However, Item 1(b) inappropriately only allows 10 minutes between "Departure" and "originator tow-on."  Allowing only 10 minutes instead of 30 minutes for this window makes no sense given that, as a practical matter, there is no difference between an arrival and a "tow-on."  The terms are interchangeable. Accordingly, Item 1(b) should state 30 minutes rather than only 10 minutes.

### Item 2 – "Time on gate"

Item 2(a) should be revised to enlarge the time on gate for originating and terminating flights from 20 minutes to one hour each.  Originating flights need adequate time for aircraft servicing, crew boarding and preparations, and passenger enplaning, and terminating flights require sufficient time for deplaning of passengers plus service and preparation for movement of aircraft.  Additional time is also needed to accommodate the larger aircraft that are increasingly being used at Love Field.  A growing percentage of Southwest's flights are being operated with B737-800 model aircraft which carry 175 passengers, while Southwest's B737-700 aircraft carry 143 passengers.  Southwest's experience is that one hour for total time on gate for both these aircraft types is appropriate.

### Item 3 – "Gate utilization"

Southwest agrees and notes that pursuant to the City's language, as of August 9, 2015, Southwest will be fully utilizing all 18 of its leased gates at Love Field.

### Item 4 – "Leasehold status as of Snapshot Date"

Item 4 proposes a rule to determine "Leasehold status as of Snapshot Date."[25] For the reasons stated above, it is not lawful for the City to use a snapshot date to deprive a signatory airline of its right to fully utilize its leased space, including for expanded operations on the gates.

### Item 5 – "Accommodation of non-leaseholders as of Snapshot Date"

As set forth above, it is not lawful for the City to use a snapshot date to deprive a signatory airline of its right to expand operations upon and fully utilize its leased space whenever it chooses to do so.

---

[25]Gate Scheduling Rules at p. 1.

*Response of Southwest Airlines April 28, 2015*

### Item 6 – "Gate scheduling conflicts on the Assessment Date – resolution by airlines"

Southwest repeats its objection above to the term "Assessment Date" which is undefined and vague.

The reference to "remote operations" is objected to because Article 1, Section 3(a) of the Five Party Agreement prohibits hardstand operations and Section 4.06.A  of the Lease prohibits "remote operations."

### Item 7 – "Gate scheduling on the Assessment Date – mandatory resolution by City"

Item 7(a) proposes a rule for "Gate scheduling conflicts on the Assessment Date" based on permanent accommodation, pursuant to which the "First priority for operations" is "Grandfathered Operations, defined as operations of an airline accommodated within the leasehold of a signatory airline as of a specified Snapshot Date that maintain as of the Assessment Date (i) the same schedule or more restrictive schedule (i.e., later arrival or earlier departure) and (ii) the same origin airport for the arriving flight and destination airport for the departing flight."[26]

Southwest objects to Item 7(a).  First, Southwest repeats its objection to the term "Assessment Date" which is undefined and vague.  *See* comment above regarding Item 1.  Second, for the reasons stated above, it is not lawful for the City to require that a forced accommodation be permanent, or to otherwise interfere with the right of a signatory airline to fully utilize its leased space, including for expanded operations on the gates, which may occur after the forced accommodation order is issued.

Southwest objects to Item 7 (b) because a leaseholder's operations may not lawfully be "subject to Grandfathered Operations of accommodated airlines and surrounding Buffers . . . ."  Rather, as discussed above, the rights of the signatory airlines take precedence over the rights of accommodated airlines, such that the signatory airline has the overriding right to utilize its leased space, including for expanded operations on the gates, which may occur after the forced accommodation order is issued.

### Item 8 – "City right to require gate assignment changes"

Southwest objects to Item 8 of the Gate Scheduling Rules and requests that it be deleted.  Under the Lease, Southwest has the right to use its leased gate space and the City has no right under the Lease to unilaterally demand that Southwest transfer its operations from one area to another.

---

[26]Gate Scheduling Rules at p. 1.

III.   **A FORCED ACCOMMODATION OF DELTA OR AMERICAN ON SOUTHWEST'S GATES WOULD REDUCE AIRLINE COMPETITION AND COST CITY RESIDENTS MILLIONS IN LOST FARE SAVINGS**

The City must seriously consider the negative economic effects a decision to mandate the accommodation of either Delta Airlines and/or American Airlines at Love Field.  Both of these mega-airlines have large bases of operations at DFW Airport, and can easily expand at that airport to add any new flights to the Dallas-Ft. Worth area that they desire.  A forced accommodation of either of these carriers at the highly space-constrained Love Field is not only unnecessary to give them unfettered access to the Dallas-Ft. Worth market but will have extremely negative consequences for the City and its residents.

Since Southwest plans to fully utilize all its Love Field gates beginning in August 2015, and because gate space at Love Field is fixed and cannot be expanded, any forced accommodation of either Delta or American on Southwest's gates will necessarily block Southwest from operating some of the flights it has already scheduled.  For example, if the City were to mandate an accommodation of five Delta flights to Atlanta, Southwest would be unable to operate at least five of the new round-trip flights it plans to launch this August and for which Southwest has been selling tickets for more than two months (see pp. 4-5 above).  Not only would the ticketed passengers lose their flights and travel plans, but the negative consequences to the City would be enormous.

Forcing an accommodation on Southwest's gates would have the perverse effect of *reducing* airline competition in the Dallas-Ft. Worth area and *increasing* the cost of air travel to City residents by millions of dollars.  Just to accommodate Delta's current five flights to Atlanta, for example, Southwest would be forced to cancel its planned new nonstop flights from Dallas to such destinations as Boston, Charlotte, Detroit, Philadelphia, Salt Lake City, and possibly others.  These markets all suffer from high air fares, and Southwest's competition from Love Field will undoubtedly force those fares down sharply, as has happened on the many other new routes that Southwest has entered from Love Field since repeal of the Wright Amendment.

The economic benefits to passengers and the City from Southwest's competition in those five new markets would swamp the minimal benefits from Delta's five small-aircraft flights to Atlanta (all of which Delta could easily operate at DFW Airport).  That is because, unlike Southwest, Delta typically does not offer low fares unless it is forced to do so by low-fare competition from another airline.  In addition, Southwest's planned new flights would be operated with considerably larger aircraft than Delta's.  As estimated by Southwest's outside economists, the consequence of blocking Southwest's competition in the five new markets noted above would be a decline of

more than 440,000 passengers at Love Field annually; an increase in local airfares of more than $75 million annually; and a loss of more than 110,000 visitors by air to Dallas-Ft. Worth annually.[27]   A forced accommodation of additional Delta or American flights beyond Delta's five Atlanta flights would of course have an even greater negative impact on the City and its consumers.

The City needs to be aware of the economic reality that a forced accommodation on Southwest's gates, by curtailing Southwest's low-fare competition, would enhance the ability of both Delta and American (the latter by far the dominant airline in the Dallas-Fort Worth market[28]) to charge higher fares at DFW Airport.  This will diminish airline competition for Dallas-Ft. Worth residents, reduce their choice of flights, and raise their travel costs.

The City must fully consider these serious consequences before making any decision to mandate an accommodation of Delta or American at Love Field.  There is no indication in the proposed Accommodation Documents, however, that the City has given any thought at all to the negative – and completely avoidable – impacts of an imprudent accommodation decision.  The City must amend its process accordingly.

## IV.   A FORCED ACCOMMODATION THAT DEPRIVES SOUTHWEST OF THE FULL USE OF ITS GATES WOULD CONSTITUTE AN UNLAWFUL TAKING OF SOUTHWEST'S PROPERTY, REQUIRING THE CITY TO PAY "JUST COMPENSATION"

An accommodation decision that deprives Southwest of its right to fully utilize its leased space would constitute an unlawful "taking" of Southwest's property in violation of the U.S. Constitution.  As a result, the City would be liable under 42 U.S.C. §1983 for all "just compensation" owed to Southwest, a figure that will run in the many millions of dollars.  *See Love Terminal Partners v. United States*, 97 Fed. Cl. 355 (2011) (government liable for "taking" the leasehold property rights associated with a passenger terminal at Love Field whose destruction was mandated by WARA).  The City must be aware of, and give full consideration to, this potential liability before making any decision to mandate an accommodation of another airline on Southwest's leased gates.

---

[27] Estimates provided by the Campbell-Hill Aviation Group, April 2015.

[28] Full utilization of Southwest's 18 gates at Love Field would amount to 180 daily flights. By contrast, American Airlines operates over 800 daily flights at DFW Airport and there is ample room at the airport for expansion beyond that.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Southwest objects to all portions of the City's proposed Accommodation Documents that are inconsistent with Southwest's legal rights to expand upon and fully utilize its 18 preferentially-leased gates at any time. Southwest also reserves its rights to provide further objections to the City's issuance of final versions of the Accommodation Documents and the decisions made by the City under the Accommodation Documents or otherwise relating to accommodation requests at Love Field.

*******************

*Response of Southwest Airlines April 28, 2015*

## PRIOR SOUTHWEST AIRLINES SUBMISSIONS REGARDING LOVE FIELD ACCOMMODATION THAT ARE INCORPORATED HEREIN BY REFERENCE

*Response of Southwest Airlines Co. to City of Dallas Request for Input on Dallas Love Field Gate Accommodation Policy* (November 17, 2014)

*Response of Southwest Airlines to City of Dallas December 1, 2014 Notice Regarding Dallas Love Field Accommodation Issues* (December 8, 2014)

Letter from Robert W. Kneisley to Warren M. S. Ernst (December 15, 2014)

Letter from Robert W. Kneisley to Kenneth P. Quinn (December 23, 2014)

Letter from Mark R. Shaw to Warren M. S. Ernst (December 31, 2014)

Letter from Robert W. Kneisley to Kenneth P. Quinn (January 4, 2015)

Letter from Bob Montgomery to Mark Duebner City of Dallas (February 27, 2015)

Letter from Robert W. Kneisley to Kenneth P. Quinn (February 27, 2015)

OMB Approved 2120-0557
Exp. 3/31/2010

| Federal Aviation Administration<br>U S Department of Transportation | **PASSENGER FACILITY CHARGE (PFC) APPLICATION** |

| 1. Application Type *(Check all that apply)* | FAA USE ONLY | |
| :--- | :--- | :--- |
| ☒ a.  Impose PFC Charges | **Date Received** | **PFC Number** |
| ☒ b.  Use PFC Revenue | | |
| ☐ c.  Amend PFC No. _____ | | |

## PART I

| 2.  Public Agency Name, Address, and Contact Person | 3.  Airport(s) to Use | 4.  Consultation Dates |
| :--- | :--- | :--- |
| Agency Name    City of Dallas Department of Aviation | | a.  Date of Written Notice to Air Carriers:<br>April 17, 2009 |
| Address    8008 Cedar Springs Road | Dallas Love Field Airport (DAL) | b.  Date of Consultation Meeting with Air Carriers:    May 19, 2009 |
| City, State, ZIP    Dallas, TX 75235 | | c.  Date of Public Notice<br>May 15, 2009 |
| Contact Person    Daniel T. Weber, A.A.E. | | |

## PART II

| 5.  Charges | | | | |
| :--- | :--- | :--- | :--- | :--- |
| a.  Airport to Impose | b.  Level | c.  Total Estimated PFC Revenue by Level | d.  Proposed Effective Date: | e.  Estimated Expiration Date: |
| Dallas Love Field Airport (DAL) | ☐ $1.00  ☐ $2.00  ☐ $3.00<br><br>☐ $4.00  ☒ $4.50 | Impose<br>Use<br>Impose  $306,329,389<br>Use    $306,329,389 | January 1, 2010 | February 1, 2022 |

## PART III

| 6.  Attachments *(Check all that Apply)* | | |
| :--- | :--- | :--- |
| Attached | Submitted with Application Number | Document |
| a.  ☒ | _____ | Airport Capital Improvement Plan |
| b.  ☒ | _____ | Project Information  (Attachment B) |
| c.  ☒ | _____ | Air Carrier Consultation and Public Notice Information |
| d.  ☒ | _____ | Request to Exclude Class(es) of Carriers |
| e.  ☐ | Not Required | Alternative Uses/Projects |
| f.  ☒ | _____ | Competition Plan/Update |
| g.  ☒ | _____ | ALP/Airspace/Environmental |
| h.  ☐ | Not Required | Notice of Intent Project Information |
| i.  ☒ | _____ | Exhibits - Project Drawings |

## PART IV

**7.  With respect to this PFC application I hereby certify as follows:**

To the best of my knowledge and belief, all data in this application are true and correct;

This application has been duly authorized by the governing body of the public agency;

The public agency will comply with the assurances (Appendix A to Part 158) if the application is approved;

For those projects for which approval to use PFC revenue is requested, all applicable ALP approvals, airspace determinations, and environmental reviews required by the National Environmental Policy Act have been completed.

If required, the public agency has submitted a competition plan in accordance with 49 U.S.C. 47106(f); and

If required by 49 U.S.C. 40117(d)(4), adequate provision for financing the airside needs, including runways, taxiways, aprons, and gates, has been made by the public agency.

| a.  Typed Name of Authorized Representative | b.  Title<br>Director of Aviation | c.  Telephone Number<br>(214) 670-603 |
| :--- | :--- | :--- |
| Daniel T. Weber, A.A.E | d.  E-mail Address<br>dan.weber@dallascityhall.com | e.  Fax Number<br>(214) 670-6051 |
| f.  Signature of Authorized Representative | | g.  Date Signed<br>10/29/09 |

**Paperwork Reduction Act Statement:** This form is the FAA's primary source for collecting information for the authority to collect PFC revenue for airport development. This information is used to determine the eligibility and justification of airport development projects regarding safety, security, or capacity of the national air transportation  system; or which reduce noise or mitigate noise impacts resulting from an airport; or furnish opportunities for enhanced competition between or among air carriers. It is  estimated that it will take approximately 5-80 hours to fill out the application depending on the complexity. The use of the form is required to obtain FAA approval of authority to collect PFC revenue (49 U.S.C. 40117(c)). No assurance of confidentiality is necessary or provided. It should be noted that an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.  The OMB control number associated with this collection of information is 2120-0557. Comments concerning the accuracy of this burden and suggestions for reducing the burden should be directed to the FAA at: 800 Independence Ave. SW, Washington, DC, 20591, Attn: Information Collections Clearance Officer, AIO-20.

**FAA Form 5500-1** (3-07) Supersedes Previous Edition

**ATTACHMENT B: PROJECT INFORMATION**

_____FOR FAA USE  _____
PFC Application number: _____

1.  AIRPORT WHERE PROJECT IS LOCATED:
    **Dallas Love Field Airport**
2.  CHECK ONE:  IMPOSE[ ] IMPOSE AND USE[X] USE[ ]

3.  PROJECT TITLE (And Public Agency Project Number, If Appropriate):
**PFC PROJECT 3.08 - New Terminal (Bond Capital, Financing and Interest Expense)**

4.a.  PROJECT DESCRIPTION:
The Love Field Modernization Program will include the replacement of the original ticketing hall, constructed in the 1950s and abandoned in the 1970s, with a new modern ticketing hall for all airlines.  The bag claim hall will be expanded to accommodate future demand levels, and the main lobby will be renovated and expanded.  The primary component of the program is the complete replacement of the three existing concourses with one single concourse.  The final facility will be approximately 800,000 SF and include 20 narrow body gates for three carriers. The project will be completed in 2014 and will include a multi-phase construction program. The project is targeted for LEED Silver certification and plans to incorporate several innovative environmentally friendly concepts. **See Page I-12.**

The New Terminal is planned to be funded with special facility bonds.  PFCs will be utilized to pay a portion of the debt service.  According to the LFMP Financial Model, approximately $319.5 million of bonds will be sold for terminal area projects.  However, approximately $15.6 million will be for terminal support projects, such as employee parking, central power plant and landside tenant relocations.  The net amount of terminal bonds is approximately $303.9 million.  An analysis of the schematic design of the New Terminal building including the PFC-eligible equipment (such as loading bridges, baggage handling equipment, FIDS/BIDS, etc.) indicates that approximately 58.8% of the cost will be PFC eligible. **See Pages I-13 to I-23.** The city plans to commit approximately $10 million per year with an estimated total contribution of $270 million towards PFC-eligible debt service.  This project is requesting PFC funding for approximately 41% of the projected terminal building bond debt service based upon the financial commitment of the City. The planned use of $10 million per year of PFCs for debt service is part of the funding / financing strategy developed in conjunction with the Airport Use and Lease Agreement (AULA) and is not directly based upon PFC eligibility (AULA Article 7.01-B-2).

   b. If applicable for terminal projects,
        1.  Prior to this project, number of ticket counters* <u>48</u>, gates <u>32</u>, and baggage facilities <u>4</u>.
        2.  Number of ticket counters* <u>77</u>, gates <u>20</u>, and baggage facilities <u>5</u> to be constructed or rehabilitated.
        3.  Net change in ticket counters* <u>29</u>, gates <u>-12</u>, and baggage facilities <u>1</u>.

        * Includes curbside and self service ticketing positions.

_____FOR FAA USE  _____
a. Description adequate [ X ]   not adequate [   ]   (indicate deficiencies below)

b. If the project involves the construction of a new runway or modification of an existing runway, the requirements of Order 5200.8, with regard to runway safety areas have been met.  YES[ ] NO [ ].

c. For terminal projects, information regarding ticket counters, gates, and baggage facilities for construction and/or rehabilitation indicated.  YES [ X ]   NO [   ]   N/A [   ]

Form Revised 03/28/2007

## COMPETITION

FAA Order 5500.1, Passenger Facility Charge, in paragraph 10-12.d., states that one of the questions to be considered in establishing whether a project makes a significant contribution to enhancing competition is "Does the project mitigate or remove barriers to increased airline competition at the airport?"  In this case, the answer is yes, because the Project is directly connected to the negotiation of a new terminal lease agreement that includes a number of features that provide increased opportunities for competition. In addition, the project removes a substantial barrier to competition in the region.  That barrier is the restriction on flights incorporated in the Wright Amendment.

### *Competitive Benefits of New lease Terms*

The Five-Party Agreement and Reform Act call for a substantial investment by the City in terminal facilities at DAL.  PFC #3.08 is a component of the City's overall investment that will satisfy these obligations.  To provide a legal framework for financing and operation of the new terminal facilities, and for future capital development, the City and the carriers serving DAL executed a new terminal lease agreement.  Four aspects of the new agreement enhance the City's ability to provide facilities for new entry or expansion at DAL:

- The gate sharing requirements

- The gate recapture provisions

- The treatment of RON positions on the terminal apron

- The majority-in-interest (MII) clause

The Project was a triggering event for the negotiation of the new lease.  Therefore, it would be reasonable to attribute the precompetitive attributes of the new lease to the Project as part of the significant contribution determination.   Those attributes are discussed below.

### The Gate Sharing Requirements

Prior to execution of the new lease, the standard lease agreement did have provisions calling for mandatory accommodation of other carriers, if facilities became scarce. However, that lease also included a statement that "most of the areas covered by this Lease are leased to the Lessee for its exclusive use[.]"[44]  In contrast, the new lease explicitly provides as follows:[45]

> C.       Preferential Rights to the Use of Gates.   Airline is granted the preferential use of its assigned Gate(s).   At those times that Airline has no scheduled use for one or more of its assigned Gate(s), Airline will allow other scheduled or nonscheduled airlines authorized by City to use Airport facilities to use such Gate(s), as circumstances and the public interest may require, for loading and unloading only, but in no event shall said use by others take precedence over Airline's scheduled use.  For the purposes of this subsection, the term "scheduled use" shall mean a reasonable amount of time, up to thirty (30) minutes, before an aircraft arrives at a Gate and after an aircraft leaves a Gate.  Further, Airline may require such non-preferential airline user to enter into an agreement with Airline to provide adequate insurance and to indemnify Airline from liability in the use of the premises.

Form Revised 03/28/2007

The new lease thus explicitly denominates the gates of the new terminal facility as preferential use – avoiding any potential conflict between the denomination of space in the old lease as "exclusive-use" and the provisions requiring gate sharing.  Moreover, the quoted provision specifies that the period for "scheduled use" during which a carrier is not required to accommodate another carrier's flight extends to not more than 30 minutes before or after an aircraft occupies a gate.  This 30 minute window is among the shortest in use by the industry and provides the maximum feasible amount of time during the day when a carrier could be required to accommodate another carrier.[46]

### Gate Recapture Provisions
DAL's new lease includes an explicit gate recapture provision that will assure that any gates relinquished by signatory carriers remain under the City's control as common-use gates, as follows:[47]

> To the extent that any of the Gates leased at the Airport revert to City control, such gates shall be converted to common use City-managed Gates for the remaining term of this Agreement

The previous lease did not include a gate recapture language.  City control of gates in general and the ability to offer gates as common use facility is recognized by the FAA as providing enhanced opportunities for competition from new entrants, especially those intending to enter the DAL market with limited service.

### Treatment of RON Positions
Under the prior lease, aircraft remain overnight (RON) positions adjacent to gates were considered part of the gate leasehold granted to carriers on an exclusive-use basis.  The new lease provides the City with greater control over RON positions.  First under the new lease, RONs are no longer a part of the carriers' gate-lease hold.  Rather, RON positions are now controlled by the City.  Positions are allocated by the City on a preferential use basis to carriers in proportion to their allocation of gates.  In addition, two RON positions are not assigned, but are to be managed by the City to accommodate non-signatory carriers and charter flights.[48]

The FAA has recognized that access to RON aircraft parking positions may be an essential element to successful airline entry and survival in new airport markets.[49]  By converting from a system of exclusively leased RON positions to a system of assigned preferential-use RON positions under City control, the new lease will enhance Love Field's ability to accommodate new entry.

### Majority-In-Interest Clause
The prior DAL lease was structured as a compensatory lease with the objective of assuring that costs associated with the existing facility were met.  There was no concern about funding future development.  In the new lease, the City and carriers desired an arrangement with the flexibility to enable funding not only of the LFMP, but additional capital expenditure in the future.  The arrangement chosen was a form of residual rate-setting methodology, with the carriers' guaranteeing sufficient revenues to pay for operation and maintenance costs as well as debt service.  In exchange for this guarantee, the carriers sought to have majority-in-interest (MII) rights to review capital expenditures.  It is common industry practice for carriers operating under a residual rate setting methodology to include a MII review clause in their airport lease.

Form Revised 03/28/2007

The MII Clause included in the agreement include many features that facilitate development to enable competition.  First the approach of the MII clause is not to require approval of a project before it can go forward.  Rather, it is a "negative MII Clause."  A project can go forward unless a MII of signatory carriers votes to disapprove the project.[50]  Second, an initial vote of disapproval does not prevent the project from going forward.  Rather only a one-year deferral is required, at which time a second MII vote is taken.[51]  Moreover, even after a second MII vote of disapproval, the City still has options for going forward with the project.  The City has the option of reducing the scope of the project and seeking reconsideration by the carriers or proceeding with the project but excluding it from the carrier rate base.[52]  Third the MII clause explicitly exempts projects from the MII review process if the "projects are prudent and necessary to accommodate another air carrier at the Airport[.]"[53]  These features of the DAL MII Clause compare favorably with typical MII provisions that require affirmative approval of projects before they can go forward and do not exempt projects undertaken to accommodate new air carriers.

### Summary

The preferential use provisions in the new lease enhance the City's ability to accommodate new entry.  The MII Clause similarly makes it easier for the City to build facilities to accommodate new entry than does the typical MII Clause in a residual agreement.  The new lease is a direct result of the decision to implement the LFMP, including PFC #3.08.   Therefore, the Project makes a significant contribution to enhancing airline competition at Love Field.

### *Impact on Regional Airline Competition*

A significant competitive benefit of PFC #3.08 occurs at the regional level.  The Project fulfills a legal requirement for the repeal of the flight restrictions at Love Field.  Repeal of these restrictions has already enhanced airline competition in the region and will continue to do so, as we will document below.  Although Order 5500.1 refers specifically to enhancing airline competition at the airport, the City requests the FAA to consider the effect of competition in the region in determining whether the significant contribution standard is met.  The statutory standard for approval of a $4.50 PFC level at medium hub airports does not explicitly limit the FAA to considering competitive effects at the airport where the PFC will be collected.  Rather the statute provides as follows:[54]

> The Secretary may authorize under this section an eligible agency to impose a passenger facility fee of $4.00 or $4.50 * * *, if the Secretary finds –
>
>> (A) in the case of an airport that has more than .25 percent of the total number of annual boardings in the United States, that the project will make a significant contribution to improving air safety and security, increasing competition among air carriers, reducing current or anticipated congestion, or reducing the impact of aviation noise on people living near the airport; and
>>
>> (B) that the project cannot be paid for from funds reasonably expected to be available for the [Airport Improvement Program].

Subparagraph (A) quoted above contains no airport specific reference in connection with increasing competition among air carriers.

Form Revised 03/28/2007

As noted, the situation at Love Field is unique.   Flights and service there were geographically limited by Federal law – the Wright Amendment.   Through the Reform Act, those restrictions are being removed, on the condition that the City make a substantial investment in facilities at the airport.   By fulfilling that condition, PFC #3.08 has already enhanced competition in the region and will continue to do so, as is shown below.   These unique circumstances justify application of the full discretion provided by the statute to the FAA for considering the impact of the project on competition.

As noted in the discussion of "congestion" above, the repeal of the through service restrictions at Love Field has already led to introduction of single-plane one-stop service between Love Field and 18 medium or large hub markets outside the Love Field Service Area.   Considering that non-stop service with large aircraft (over 56 seats) within the Love Field Service area was available in 18 markets in June of this year, the Reform Act has already led to a doubling of the number of markets in which Dallas-Fort Worth metropolitan area travelers enjoy a competitive choice of two airports.   The number of passengers benefitting from this competition is substantial.

Form Revised 03/28/2007

TABLE 9

ORIGIN AND DESTINATION TRAFFIC FOR LARGE AND MEDIUM HUB
SINGLE PLANE MARKETS OUTSIDE OF LOVE FIELD SERVICE AREA[1]

| DESTINATIONS SERVED FROM DFW[2,3] | | DESTINATIONS SERVED FROM DAL[2,3] | | TOTAL FOR BOTH AIRPORTS[2,3] | |
|---|---|---|---|---|---|
| DESTINATION | CY 2008 | DESTINATION | CY 2008 | DESTINATION | CY 2008 |
| BNA | 222,910 | BNA | 55,480 | BNA | 278,390 |
| BUR | 164,750 | | | BUR | 164,750 |
| BWI | 352,980 | BWI | 54,540 | BWI | 407,520 |
| CLE | 88,850 | CLE | 10,990 | CLE | 99,840 |
| DCA | 464,950 | | | DCA | 464,950 |
| FLL | 235,610 | FLL | 30,410 | FLL | 266,020 |
| IAD | 242,350 | | | IAD | 242,350 |
| IND | 203,820 | IND | 10,920 | IND | 214,740 |
| LAS | 691,000 | LAS | 116,320 | LAS | 807,320 |
| LAX | 684,440 | | 69,920 | LAX | 754,360 |
| LGB | 9,040 | | | LGB | 9,040 |
| MCO | 595,100 | MCO | 58,960 | MCO | 654,060 |
| MDW | 55,330 | MDW | 123,780 | MDW | 179,110 |
| MIA | 234,590 | | | MIA | 234,590 |
| OAK | 94,980 | OAK | 38,520 | OAK | 133,500 |
| OMA | 132,590 | OMA | 15,820 | OMA | 148,410 |
| ONT | 168,320 | | | ONT | 168,320 |
| ORD | 963,350 | | | ORD | 963,350 |
| PDX | 186,930 | PDX | 19,810 | PDX | 206,740 |
| PHL | 463,460 | PHL | 21,680 | PHL | 485,140 |
| PHX | 437,750 | PHX | 139,690 | PHX | 577,440 |
| SAN | 334,380 | SAN | 61,490 | SAN | 395,870 |
| SEA | 407,370 | SEA | 31,850 | SEA | 439,220 |
| SFO | 412,050 | | | SFO | 412,050 |
| SLC | 238,730 | SLC | 23,670 | SLC | 262,400 |
| SNA | 386,560 | | | SNA | 386,560 |
| TPA | 286,740 | TPA | 52,070 | TPA | 338,810 |
| Total DFW Passengers | 8,758,930 | Total DAL Passengers | 935,920 | Total Passengers | 9,694,850 |
| Total DFW O&D Passengers | 20,989,760 | Total DAL O&D Passengers | 6,982,790 | Total O&D Passengers | 26,972,550 |

[1]Numbers based on a 10 percent sample survey

[2]Numbers reflect total two-way traffic

[3]Destination markets include all airports serving multi-airport cities, including airports not currently
served from Love Field

Source: Department of Transportation Form 41 Origin-Destination Survey, compiled by OAG Aviation Solutions

**Table 9** shows the origin and destination traffic for both Dallas-Fort Worth International Airport (DFW) and Love Field for medium and large hub airports receiving single plane service outside the Love Field Service area. For DFW, the table shows all airports in a metropolitan region served by multiple airports. For example O & D traffic is shown for

Form Revised 03/28/2007

Chicago O'Hare, as well as Chicago Midway.   As shown in **Table 9**, 9.7 million passengers in the Dallas-Fort Worth region benefitted from having a competitive choice of two airports in 2008.  This figure represents 36 percent of all O & D passengers using the two airports.   Thus, more than a third of the Dallas-Fort Worth region's O & D passengers have already benefited from the competition that PFC#3.08 has enabled. Considering that the O & D passenger count represents two-way traffic, the number of passengers benefiting is greater than the number of passengers served by the Raleigh-Durham, San Jose and Nashville airports, among others.[55]

By fulfilling the legal requirements for elimination of domestic flight restrictions at Love Field PFC #3.08 has already removed barriers to inter-airport competition in the Dallas-Fort Worth region.  A significant number of passengers have already benefitted from competitive single plane service – the equivalent of a medium hub airport.  These benefits will be enhanced in 2014 with the repeal of non-stop flight restrictions.