**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

_____

| | |
|---|---|
| CITY OF DALLAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DELTA AIR LINES, INC., SOUTHWEST | ) |
| AIRLINES CO., VIRGIN AMERICA INC., | ) |
| AMERICAN AIRLINES, INC., UNITED | ) |
| AIRLINES, INC., SEAPORT AIRLINES, | ) |
| INC., UNITED STATES DEPARTMENT | ) |
| OF TRANSPORTATION, AND THE | ) |
| FEDERAL AVIATION | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |

_____ )

Civil Action No: 3:15-cv-2069-K

**DELTA AIR LINES, INC.'S BRIEF IN RESPONSE TO THE CITY'S MOTION FOR A TEMPORARY**
**RESTRAINING ORDER**

TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND AND FACTS ................................................................................................. 4

ARGUMENT ........................................................................................................................... 5

I.    The City Errs in Its Evaluation of the Merits of this Dispute. ........................................... 7

    A.    The City's Federal Law Arguments Reduce To a Claim that Forced
    Accommodation of Delta's Five Proposed Flights Violates the Lease. ................. 8

    B.    The Lease Not Only Allows Accommodation, It *Requires* It. ............................... 9

II.   Changed Circumstances Reinforce that the Avoidance of Irreparable Harm and
the Balance of Harms Favor Preliminary Injunctive Relief in Delta's Favor .................. 16

III.  Southwest's Attempt to Solidify Its Dominance at Love Field Is Contrary to the
Public Interest. ................................................................................................................ 18

CONCLUSION ....................................................................................................................... 19

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auer v. Robbins*,
  519 U.S. 452 (1997) ........................................................................... 13

*Blue Bell Creameries, L.P. v. Denali Co., LLC*,
  No. 4:08-cv-0981, 2008 WL 2965655 (S.D. Tex. July 31, 2008) .......................................... 18

*BMI Salvage Corp. v. FAA*,
  488 F. App'x 341 (11th Cir. 2012) ............................................................ 13

*City & Cnty. of San Francisco v. FAA*,
  942 F.2d 1391 (9th Cir. 1991) ............................................................... 13

*DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.*,
  539 F. Supp. 2d 853 (E.D. La. 2008) ......................................................... 18

*Penobscot Air Serv., Ltd. v. FAA*,
  164 F.3d 713 (1st Cir. 1999) ................................................................ 13

*Queens Concerned Neighbors, Inc. v. FAA*,
  229 F.3d 387 (2d Cir. 2000) ................................................................. 13

*Wenner v. Texas Lottery Comm'n*,
  123 F.3d 321 (5th Cir. 1997) ................................................................ 17

**Statutes**

49 U.S.C. § 40113(a) ............................................................................. 13

49 U.S.C. § 46101 ............................................................................... 13

49 U.S.C. § 47122 ............................................................................... 13

**Other Authorities**

Black's Law Dictionary ........................................................................... 17

**INTRODUCTION**

The City's application for injunctive relief arises from its contention that it is "unfair and unjust for the City to be put in th[e] situation" of having to balance its obligation to comply with the DOT's directives—or risk loss of FAA grants and a lawsuit by Delta—with Southwest's insistence that the City *defy* the DOT's directives.   Dkt. 20, at 9.   Undoubtedly Southwest's threats to sue the City if the City adheres to the dictates of federal law do put added pressure on the City.   But such pressure is insufficient to overcome the City's contractual obligations to accommodate Delta at Love Field, which reflect a longstanding federal policy of promoting competition.

Southwest treats Love Field as its own, recently obtaining City Council approval to change the very name of the road leading into the airport to Herb Kelleher Way, to honor Southwest's founder.   As such, it has repeatedly attempted to ensure that no airline can challenge its dominance at the airport.   When Virgin America secured DOJ approval to take American's two gates in connection with American's merger with US Airways, it was Southwest that made an eleventh hour attempt to push the City to defy the DOJ and instead give those two gates to Southwest.   DOJ was then forced to send a second letter to the City, reaffirming that Southwest "already controls 16 of the 20 Love Field gates," such that "[i]f it obtained the two American gates, it would then dominate 90% of Love Field gates, thereby denying consumers the benefits of meaningful competition at this facilities-constrained airport."   Only then did the City approve Virgin America's entry into Love Field.

So Southwest simply achieved its goal of 90% of Love Field's gates another way. Unable to prevent Virgin America from entering the market, it turned to United, and secured— with the City's consent—a sublease for United's underutilized two gates.   For its part, the City ignored Delta's objections to the City's approval of the sublease unless and until Delta had been

1

accommodated, so as not to further allow Southwest to exclude competition from Love Field. Notwithstanding these objections and Delta's prior request that the City accommodate it at Love Field to fly five flights—less than 3% of what Southwest would fly—the City approved that sublease. In its approval, the City explicitly acknowledged that the DOT letter on accommodation was binding, absent a contrary conclusion by a court. Yet Southwest now seeks to ensure that it has total control of those 18 gates—allowing it to, as the DOJ recognized, "deny[] customers the benefits of meaningful competition."[1]

Even before the Wright Amendment expired, Southwest's dominance at Love Field had been accompanied by one of the highest increases in fare prices between 2007 and 2012 of any airport in the country—the same result as happened at the Southwest-dominated airports of Houston Hobby and Chicago Midway.[2] At each of these airports, Southwest serves over 90% of the passengers, and has been able to significantly increase prices despite the presence of another, larger airport within the same metropolitan area.[3]

A remedy already exists for the harms caused by a lack of competition—a federal policy, derived from federal statute, to ensure that new entrants will be accommodated at federally funded airports like Love Field. That policy is reflected in (i) WARA, (ii) the City's competition

---

[1]  Johnson  Decl. ¶ 2, Ex. A at 2.

[2]  Johnson  Decl. ¶ 3, Ex. B at 8-9, 14; Bureau of Transportation Statistics, *2000-2014 Change in 4th Quarter Average Domestic Fare*, available at http://www.rita.dot.gov/bts/airfares/programs/economics_and_finance/ air_travel_price_index/html/table_12.html.

[3]  Bureau of Transportation Statistics, *Chicago Midway International*, available at http://www.transtats.bts.gov/airports.asp?pn=1&Airport=MDW&Airport_Name=Chicago (last visited July 16, 2015); Bureau of Transportation Statistics, *William P Hobby*, available at http://www.transtats.bts.gov/ airports.asp?pn=1&Airport=HOU&Airport_Name=Houston, (last visited July 16, 2015); Bureau of Transportation Statistics, *Dallas Love Field*, available at http://www.transtats.bts.gov/airports.asp?pn=1&Airport=DAL&Airport_Name=Dallas (last visited July 16, 2015).

plan, (iii) the City's leases with the airlines, (iv) the City's binding grant assurances it agreed to as a condition of receiving federal airport funding, and (v) the Five-Party Agreement, which both the City and Southwest signed, and which specifically provides that, if a new entrant carrier seeks to enter Love Field and "the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements." Dkt. 52-1, at 3.

Yet, when Delta asked the City to live up to its repeated obligations and promises to use forced accommodation to promote competition at Love Field, the City wilted.  Instead, the City has adopted (or at least kowtowed to) Southwest's implausible and unwise construction of the forced accommodation provision of its lease agreement.  According to Southwest (and, by extension, the City), an existing carrier has an absolute right to exclude a new entrant by simply expanding its own service after an accommodation request is made, thereby squeezing out the new entrant.  Given that the *entire purpose* of having a forced accommodation process is to ensure that there is competition even when the existing carriers "are not able or are not willing" to allow the new carrier to enter, Southwest's construction cannot possibly be correct.  When the accommodation request was made *over a year ago*, no one could dispute, including the City's own airport consultants at Leigh Fisher, that Delta's five flights could be accommodated.  As a consequence, the merits of this dispute can and should be resolved straightforwardly in Delta's favor.

The other factors relating to a preliminary injunction likewise weigh heavily in Delta's favor.  The questions of irreparable harm and balance of the harms have largely been resolved since the City filed its application for a TRO.  Southwest has confirmed, as Delta argued in its own application for a TRO, that it could accommodate Delta without the irreparable harm it

claimed.  In contrast, driving Delta from Love Field entirely would cause irreparable harm to Delta's reputation and business standing.  And given the lack of any harm to Southwest from continuing the status quo through the entirety of this suit, the balance of harms likewise weighs heavily in favor of granting Delta's requested relief.

Finally, Delta does not disagree with the City's position that the public interest favors clarifying the rights to operate at Love Field.  But the public interest is more than that.  It also favors honoring the policy of free competition embodied in the controlling lease agreement between the City and Southwest and reinforced in the Wright Amendment Reform Act, the Five-Party Agreement, the City's Competition plan, the federal grant-assurance statutes and obligations, and the DOT's interpretive rulings.  Granting Southwest the absolute control of 18 gates that the DOJ *already opined* would "deny[] consumers the benefits of meaningful competition" cannot be squared with that public interest.  Johnson Decl. ¶ 2, Ex. A at 2.

All parties agree that a declaration from the Court is needed.  No party claims the Lease is ambiguous.  And it is undisputed that Delta can be, because it is being, accommodated.  It may be, therefore, that all that is needed is for the Court to issue a final judgment declaring Delta's right to be accommodated as it is now being accommodated.[4]

### BACKGROUND AND FACTS

Delta refers the Court to the background and facts from its Combined Brief in Support of Its Motion for a Temporary Restraining Order and a Preliminary Injunction Against Southwest

---

[4]  The City moved for a temporary restraining order, not a preliminary injunction, presumably because of the short time between when its brief was filed and the July 6 expiration of Delta's sublease.  However, as the Court is aware, Southwest and Delta have since reached an agreement under which Southwest will not attempt to evict Delta until after September 30.  Accordingly, the immediate urgency has passed.  Delta assumes, however, that the City continues to believe that injunctive relief or declaratory relief is necessary prior to September 30.  As a result, Delta is filing this response to address the City's arguments.

Airlines Co. and in Opposition to Southwest's Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction Against Delta Air Lines, Inc., which it incorporates into this brief by reference.[5]

**ARGUMENT**

The City rightly identifies the governing legal standard for a temporary restraining order (or preliminary injunction), and the necessity of avoiding a crisis by clarifying whether Delta may be evicted from Love Field during the pendency of this suit.  However, its approach of throwing up its hands and suggesting that any resolution of this crisis is just as valid as any other is improper.  In fact, it is crystal clear that the *only* application for preliminary relief that is warranted in this circumstance is Delta's—and indeed, that Delta is entitled to final declaratory and/or injunctive relief.

First, the merits of this case are straightforward.  The City's lease with Southwest (the "Lease") mandates that Southwest accommodate new entrants in certain circumstances, and mandates that, if no airline will accommodate a new entrant, the City must force an airline to do so.  If the Lease requires, or even permits, the City to force Southwest to accommodate Delta— as it does—then the other arguments made by Southwest and the City about the Five-Party Agreement and WARA are irrelevant.  Neither the City nor Southwest contends that the Five Party Agreement or WARA eliminates or alters the accommodation provisions.

As the DOT has persuasively explained, the Lease must be construed to require accommodation any time accommodation is possible "based on the available space on the

---

[5] To avoid repetition, Delta focuses herein on issues not fully covered in its previous brief. However, it fully incorporates every argument made in that brief as if set forth herein and seeks only to expand and clarify those arguments.

snapshot date of the original accommodation request."[6]  This is the only sensible reading of the Lease.   If, as Southwest and the City contend, a lease-holding airline could avoid its accommodation obligation simply by adjusting its own flight schedule, accommodation would be an empty promise.  As the DOT put it, this could "give a signatory carrier the ability to block a competitor's accommodation request by deciding or asserting, after a request is made, that it will expand service" and thus defeat the entire purpose of forced accommodation: ensuring that "new entrants" have "the ability to compete fairly" with "incumbent carriers."[7]  DOT's position is persuasive in its own right and, in any event, is entitled to deference.  Because there is no dispute that Love Field had adequate space available when Delta made its original accommodation request, the Lease requires such accommodation.

Second, events subsequent to Delta's filing of its initial response to Southwest's application for preliminary injunctive relief have confirmed the accuracy of Delta's arguments that Southwest could accommodate Delta without suffering any significant harm.  Delta argued that more than 10 flights could be accommodated at a gate, or that, in the alternative, Southwest could adjust its flight schedule to eliminate 5 flights and still accommodate all affected passengers on other Southwest flights from Love Field, with only minimal changes to their travel schedules.  Southwest has in fact now agreed to accommodate Delta through September 30.

If Southwest can accommodate Delta through September 30, it can do so throughout the pendency of this suit.  Indeed, given Southwest's demonstrated ability to accommodate Delta temporarily, why couldn't Southwest accommodate Delta permanently?  The Lease makes clear

---

[6]  Dkt. 24, Declaration of Holden Shannon ("Shannon Decl.") ¶ 11, Ex. I.

[7]  Shannon Decl. ¶ 12, Ex. J at 3.

that it must, and Southwest's recent actions make clear that it can do so, leaving no room for debate on this point.

In contrast, Delta's irreparable harm if it is evicted—exclusion from the airport entirely, with all the resulting harm to its reputation, and having to cancel every one of its booked Love Field passengers after September 30, unless those passengers are willing to accept reaccommodation on flights Delta operates from an entirely different airport—is substantial. Moreover, the harm to Delta from disruption of its service and confusion among its customers from being driven out of Love Field, even temporarily, is irreparable.  As a result of these two facts, the balance of harms strongly favors granting Delta's requested injunctive relief.

Finally, the City's conception of the public interest is far too cramped.  While it is true that the public interest requires resolution of the parties' impasse "to control the gate situation at Love Field," the public interest is not indifferent between Southwest's requested relief of driving Delta out of Love Field and Delta's requested relief of ensuring that competition—a public interest extolled by the City, DOJ and DOT—remains at Love Field, at least to the extent of Delta's limited presence.

## I.      The City Errs in Its Evaluation of the Merits of this Dispute.

The City is lukewarm on the likelihood of success in this case, explaining that while "Southwest and the City will probably succeed on the merits," the City "also will prevail even if Southwest loses on the merits if the Court declares and clarifies the City's rights and responsibilities under any interpretation of DOT's Actions in light of WARA."  Dkt. 20, at 16-17.  In any event, the City's claim that the DOT's (and Delta's) construction of the lease violates WARA does not stand up to scrutiny.

A.      **The City's Federal Law Arguments Reduce To a Claim that Forced Accommodation of Delta's Five Proposed Flights Violates the Lease.**

The City's merits theory is straightforward. The Five Party Agreement, the City explains, grants preferential use of Love Field gates to Southwest (16 gates), American (2 gates), and ExpressJet Airlines, Inc. (2 gates).[8] The City then claims that WARA provides that neither FAA nor DOT may modify the preferential gate leases, except pursuant to a nationwide policy. Dkt. 20, at 15.

The City incorrectly concludes from this that accommodation of Delta violates WARA and the Five-Party Agreement because it requires Southwest, which holds a lease, to accommodate Delta. The fundamental flaw in the City's reasoning is that it depends entirely on its construction of the Lease, and therefore collapses if the City's interpretation of the Lease is incorrect—which it is.

The City notes that, under the Five Party Agreement, if a new entrant carrier seeks to enter Love Field, the City "will seek voluntary accommodation from existing carriers." If that fails, the City will "require the sharing of any preferential lease gates, pursuant to the terms of existing lease agreements." Dkt. 20, at 14. WARA, too, provides that the City "shall honor the scarce resource provision of the existing Love Field leases." *Id*. The import of these provisions is that the City's (and Southwest's) arguments premised on WARA and the Five-Party Agreement fail if, as Delta and the DOT contend, the Lease allows—indeed, *mandates*—its requested accommodation. After all, neither the Five Party Agreement nor WARA changes the Lease, or grants Southwest or the City greater rights than they have under the Lease. Instead, the

---

8    The ExpressJet gates later went to United, and now have been subleased to Southwest. Accordingly, Southwest's rights to those gates are limited to the rights that ExpressJet had in the gates under the Five Party Agreement.

Five Party Agreement and WARA simply confirm that direct lessees have preferential rights, subject to the rights of accommodation conferred on third parties by the Leases. The Lease clearly provides for forced accommodation, without modification of the Lease.

If Delta's requested accommodation is consistent with the Lease, then, the Five Party Agreement is not violated by the City accommodating Delta. That is because the City's accommodation would be no more than "requir[ing] the sharing of any preferential lease gates, pursuant to the terms of existing lease agreements." Dkt. 20, at 14. And the DOT would not be "modify[ing] or eliminat[ing] preferential gate leases with air carriers" because it would merely be applying the existing accommodation provisions in the existing Lease. Dkt. 52-2, at 3.

As a result, both of the City's main arguments—the WARA argument and the Five-Party Agreement argument—reduce down to the assertion that the Lease entitles Southwest to refuse accommodation *and* permits the City to decline to enforce accommodation. Unfortunately for the City, that assertion is untenable. Moreover, neither argument confronts the reality that WARA explicitly recognizes the City's continuing obligation "to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities"—a duty the City has acknowledged on numerous occasions.

**B.**     **The Lease Not Only Allows Accommodation, It *Requires* It.**

Consistent with the general principle underlying the antitrust laws, the DOT has long taken the position that competition is to be encouraged at public airports. Accordingly, the Leases pursuant to which the City leased gates at Love Field included a detailed procedure by which new entrant airlines—those without gate rights at the airport—can acquire such rights.

Section 4.06(C) of the Lease begins by providing that Southwest "is granted the preferential use of its assigned Gate(s)." Dkt. 52-5. The Lease then summarizes the broad process pursuant to which accommodation will take place. First, "[t]o the extent a new entrant

9

carrier seeks to begin service at the Airport, the City will seek voluntary accommodation from its existing airline lessees to accommodate the new entrant service" as provided by the Lease. Section 4.06(D)(4).   Second, "[i]f the existing carriers are not able or are not willing to accommodate the new entrant service, then the City agrees to require the sharing of Airlines' Preferential Use Space and Gates," as provided by the Lease.   *Id.*   To be clear, the Lease contemplates forced accommodation not only when a carrier is unwilling to accommodate, but also when it is not able to accommodate, thereby addressing the exact situation encountered here, where Southwest has attempted to ramp up its schedule to make accommodation all but impossible.

Section 4.06(F) provides more detail on this process.   In that section, the City and Southwest agreed that space "at the Airport may become a scarce resource if a new entrant ('Requesting Airline') requests to provide service at the Airport."   Both the City and Southwest agreed to accommodate such Requesting Airlines.   Southwest specifically undertook "to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement."   Section 4.06(F).

The City, for its part, agreed that if no airline would or could grant accommodation, the City "will notify all Signatory Airlines in writing that if the Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner."   Section 4.06(F)(2).   After the 30-day period is over, "if the Requesting Airline has not been accommodated, the Director may select a Signatory Airline to accommodate the Requesting

Airline and, in that event, will send written notice to that Signatory Airline to accommodate Requesting Airline within thirty (30) days from the receipt of said notice." *Id*. 4.06(F)(3). This provision is not subject to any exception for undue interference with an airline's schedule. Southwest then agreed that, once selected, the Signatory Airline "will accommodate the Requesting Airline," subject to conditions including, as relevant here, that "[i]n case of a conflict between schedules of the Signatory Airline and the Requesting Airline, the Signatory Airline will have priority in use of its personnel and its Leased Premises." *Id.* 4.06(F)(4).

There is no dispute that Delta properly requested accommodation in June 2014. Yet Southwest did not agree to accommodate Delta, even though it then had adequate space to permit Delta to operate without "unduly interfer[ing] with [Southwest's] operating schedule." Section 4.06(F). In response, the City properly told the incumbent carriers that "if Delta has not been accommodated within 30 days, the City will select a signatory airline to comply with Delta's accommodation request in a non-discriminatory manner to the extent that accommodation will not unduly interfere with the signatory airline's operating schedule."[9] The City undertook to make this "mandatory accommodation" on December 31, 2014. The City simply never followed through on this commitment, despite Southwest being the obvious choice. Similarly, Delta again properly requested accommodation in September 2014.

The dispute between the parties over this process appears to center primarily on the date on which one evaluates whether the requested accommodation would interfere with Southwest's flight schedule—the so-called "snapshot" date. The City and Southwest take the position that if, at any time before or after the request for accommodation, the Signatory Airline desires to expand its flight schedule so as to preclude any other use of gate space, it may do so, thereby

---

[9]  Shannon Decl. ¶ 3, Ex. B at 2.

blocking the accommodation request, and the Requesting Airline has no remedy. Because Southwest, in response to Delta's request, announced an intent to expand its offering to the supposed capacity of its gates, Southwest and the City contend that Delta cannot be accommodated.

The effects of such a reading would be extreme and anti-competitive. For example, a Signatory Airline could be using only 50% of its gates, but refuse to accommodate an airline based on an after-the-fact intention to use all of its gate space. As soon as the accommodation was refused, it could promptly decrease its flights to use only 50% of its gate space, requiring the Requesting Airline to start the process over. Similarly, a Signatory Airline could expand to full capacity, even if it was losing money, for a brief period of time to prevent the Requesting Airline from entering. Once the Requesting Airline responded to the exclusion by amending its business strategy, the Signatory Airline could cease the unprofitable flights and raise prices without risk of competition. Or the Signatory Airline might temporarily agree to accommodate the Requesting Airline, allow the Requesting Airline to make the infrastructure and personnel investments necessary to begin operations, and then expand its flight schedule, squeezing out the Requesting Airline and causing it to suffer significant losses on its investments.

This is why the DOT expressly rejected an approach under which unscheduled future plans must be considered before accommodation, because "[t]o do so may give a signatory carrier the ability to block a competitor's accommodation request by deciding or asserting, after a request is made, that it will expand service."[10] As the agency charged with enforcing the statutes, the grant assurance, and policies regarding promoting reasonable access at airports, *see* 49 U.S.C. §§ 40113(a), 46101, 47122, the DOT's interpretation of the forced-accommodation

---

[10] Shannon Decl. ¶ 12, Ex. J at 3.

regime at Love Field is entitled to deference in this proceeding.  *See* FAA Order 5190.6B at 1-6; *see also Queens Concerned Neighbors, Inc. v. FAA*, 229 F.3d 387, 394 (2d Cir. 2000) (holding that FAA's interpretation of statutory PFC requirements was due Chevron deference); *Penobscot Air Serv., Ltd. v. FAA*, 164 F.3d 713, 725 n.12 (1st Cir. 1999) (holding that FAA's interpretation of what  constituted grant of exclusive right was entitled to Chevron deference); *City & Cnty. of San Francisco v. FAA*, 942 F.2d 1391, 1396 (9th Cir. 1991) ("The FAA's interpretation of what constitutes unjust discrimination within the meaning of [the AAIA] will be upheld unless it is unreasonable."); *BMI Salvage Corp. v. FAA*, 488 F. App'x 341 (11th Cir. 2012) ("An agency's interpretation of its own regulations is 'controlling unless plainly erroneous or inconsistent with the regulation.'") (*quoting Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations and quotation marks omitted)).

In fact, the City's and Southwest's construction would write the entire concept of "forced accommodation" out of the Lease.  Instead, the inquiry would conclude as soon as the Signatory Airlines decided not to voluntarily accommodate.  Anytime the Signatory Airlines did not want the threatened competition, they could simply announce a planned adjustment to their schedules to leave no room for forced accommodation.  No new entrant airline would be able to enter Love Field forever—unless, of course, Southwest decided that it was willing to permit the new competition.  And if the competition turned out to be harmful, Southwest could simply change its mind, express a new desire to increase its flights, and drive the harmful new entrant airline right back out of Love Field.

It is entirely implausible that the parties believed they were adopting, the DOT approved, and Congress intended to bless a provision under which the City has no authority whatsoever to promote competition at Love Field.  This is particularly true given that the provision's theoretical

purpose is to promote competition.  Indeed, the City has relied on the accommodation provision in its Competition Plan to assure the DOT that it will promote competition.  And the DOT has acknowledged that purpose of the accommodation provision, concluding that the grant assurances that the City and Southwest propose the City should defy are intended to "ensure that Federally-assisted airports develop reasonable accommodation procedures that provide new entrants and incumbent carriers the ability to compete fairly for access to limited airport facilities."[11]   To now construe the Lease as providing Southwest with carte blanche to monopolize without limitation would turn this policy on its head.

The DOT's reading is far more logical and consistent with the purposes of the accommodation provision.   It defines a "snapshot date" as the date "of the original accommodation request."[12]  For purposes of deciding whether accommodation is appropriate, the question is whether there is room for the Requesting Airline's proposed flights as of that snapshot date.  If there is, then the Requesting Airline is entitled to be accommodated, and, "once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights."  *Id.*   That approach appropriately balances the rights of the incumbent carrier to make use of its leased gate with the rights of a new carrier to serve its customers and the interest of the public in free competition.  And, as noted above, on that snapshot date, Southwest could easily accommodate Delta.

The City at one point agreed that the accommodation question must be evaluated around a snapshot date rather than on an ongoing basis, and selected November 5, 2014 as the snapshot date.  The City's policy provided that it would consider schedules from November 5, 2014 to

---

[11]   Shannon Decl. ¶ 12, Ex. J at 3.

[12]   Shannon Decl. ¶ 11, Ex. I.

May 4, 2015, a period in which Southwest was operating between 149 and 153 daily flights out of 16 gates.  Given Southwest's concession that at least ten flights a day can be operated out of a gate, that snapshot date too would require the conclusion that Delta could be easily accommodated.  In fact, Southwest's agreement to accommodate Delta through September 30 suggests that it *still* can, without undue interference with its schedule—and thus that it breached the Lease by denying voluntary accommodation.  Yet the City has never made the accommodation that it promised to make and that its Lease and its own policy require.

The Lease requires accommodation of Delta for an additional, independent reason.  Section 14.19 of the Lease requires the City to operate Love Field "in a manner that is consistent with . . . federal grant assurances."  By failing to accommodate Delta with long-term gate access at Love Field despite providing long-term access to similarly situated airlines, the City has violated Grant Assurance 22, which requires the City to make Love Field available "as an airport for public use on reasonable terms and without unjust discrimination."  The City has also violated Grant Assurance 23, which prohibits the City from granting an air carrier an exclusive right at Love Field, by failing to force accommodation of Delta and unreasonably and without just cause excluding Delta from operating at Love Field.  These grant-assurance violations constitute breaches of Section 14.19 of the Lease.  Under Section 14.34 of the Lease, the City's other obligations under the Lease are subordinate to its grant-assurance obligations.  Thus, Section 14.19 of the Lease requires the City to accommodate Delta at Love Field irrespective of any other provision of the Lease.

Given that the Lease mandates that Southwest voluntarily accommodate Delta, and that the City force an airline to accommodate Delta if the signatory airlines refuse, neither the Five Party Agreement nor WARA is violated by such accommodation.  And Delta, as a plainly

15

intended beneficiary of the accommodation provision, has a right to force that accommodation. Accordingly, it is highly likely to succeed on its claim that it must be accommodated pursuant to the Lease.  That favors granting Delta, at a minimum, the requested preliminary injunctive relief; final declaratory and injunctive relief would also be proper.

## II.    Changed Circumstances Reinforce that the Avoidance of Irreparable Harm and the Balance of Harms Favor Preliminary Injunctive Relief in Delta's Favor.

The City is correct that the risk of chaos at Love Field itself establishes a risk of irreparable harm that warrants this Court's granting injunctive relief.  Employing that relief to ensure that Delta is able to provide much-needed competition at Love Field, rather than to aid Southwest in excluding competitors like Delta from the market, makes sense for several reasons.

First, as set forth in Delta's own preliminary injunction application and response to Southwest's preliminary injunction application, which Delta incorporates by reference herein (*see* Dkt 23 at 35-43), Delta will suffer immediate and irreparable harm if it is summarily evicted from Love Field.  Passengers who have already booked flights, which Delta sold in reliance on the DOT letters and the Lease, will be inconvenienced, in many circumstances significantly, by being shifted to fly out of DFW.  And many of those passengers will blame Delta for that result, even if Delta is ultimately proven correct in a trial on this matter.  Likewise, cancellation of Delta's current service from Love Field will create confusion and uncertainty to the flying public, undermine customer loyalty, and impair the value of Delta's efforts to market and build awareness of its Love Field flights.  Even if Delta ultimately prevails and is permitted to resume service out of Love Field, those damages will be irreparable.

Moreover, Southwest will be able to use the period when Delta is driven out of Love Field to solidify its hold on the market for flights from Love Field to Atlanta, causing unquantifiable harm.  If Delta is ultimately able to reenter the market once this litigation is

resolved in its favor, it may have permanently and adversely affected its ability to compete for those flights.

Second, Delta's irreparable harm is unmatched by any harm to Southwest if Delta's requested relief is granted. That has long been clear; Southwest could easily simply fly eleven flights from five of its gates, or could consolidate some of its flights for cities to which it flies multiple flights per day. *See* Dkt. 23, at 36-39. And when pressed by this Court, that is precisely what Southwest agreed to do, reaching an agreement with Delta to accommodate it at Love Field through September 30. Accordingly, Southwest's conduct confirms Delta's arguments that Southwest will not suffer any irreparable harm if injunctive relief is denied to it and granted to Delta. That means that the balance of harms heavily favors Delta.

Finally, that Southwest is now accommodating Delta along with its own flights confirms that the status quo is the current state of affairs in which all parties have their desired flights. The City offers a convoluted justification for treating Southwest's desired state of affairs—under which Delta will be kicked out of its gates—as the status quo, while simply maintaining precisely the same flights that occur today is a change to the status quo. Dkt. 20, at 20-21. But that misunderstands not only the very nature of the status quo (i.e., the "situation that currently exists," *see* Black's Law Dictionary 1448 (8th ed. 2004)), but also the reason to prefer preserving the status quo. If Southwest can accommodate Dallas through September 30, it can keep doing so after that. Accordingly, the least invasive move for this Court is simply to leave things as they are, with all parties flying their desired flights until final declaratory relief can be entered. *See Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) ("Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned.").

III.    **Southwest's Attempt to Solidify Its Dominance at Love Field Is Contrary to the Public Interest.**

Finally, the City addresses the public interest in cursory fashion, asserting that the "public interest demands entry of a TRO against one airline or the other, or both, to control the gate situation at Love Field." Dkt. 20, at 18.  That is true, as far as it goes.  But the public interest is far from indifferent as to which path the Court takes.

It is always in the public interest to enforce and give effect to federal law.  *See, e.g., DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.*, 539 F. Supp. 2d 853, 864 (E.D. La. 2008); *Blue Bell Creameries, L.P. v. Denali Co., LLC*, No. 4:08-cv-0981, 2008 WL 2965655, at *7 (S.D. Tex. July 31, 2008).  An injunction requiring the City to force accommodation of Delta at Love Field would enforce and give effect to the Wright Amendment, the City's Competition Plan, the federal grant-assurance statutes and obligations, and the DOT's interpretation of the obligations they impose.

It is hardly shocking that the DOJ previously declared that Southwest holding 18 of Love Field's 20 gates was bad for consumers, "denying [them] the benefits of meaningful competition."[13]  Similarly, the DOT cautioned that permitting a signatory airline to respond to a request for accommodation by expanding service to block the new entrant—as Southwest proposes to do—would impair the operation of federal law to "provide new entrants and incumbent carriers the ability to compete fairly for access to limited airport facilities," a result that plainly favors the flying public.[14]

Southwest's own track record shows why this is important.  Airports where Southwest carries over 90% of the passengers—including Chicago Midway, Houston Hobby, and Love

---

[13]   Johnson Decl. ¶ 2, Ex. A at 2.

[14]   Shannon Decl. ¶ 12, Ex. J at 3.

Field—have experienced among the very highest increases in fares in recent years.[15]  Permitting Southwest to hold 90% of the gates, and over 90% of the passengers, will merely reinforce that trend.  The public interest plainly lies with a path that will not result in anticompetitive overcharges as a result of exclusionary conduct.

## CONCLUSION

For these reasons, Delta supports the City's request for a preliminary injunction. However, Delta respectfully asks the Court to ensure that the injunction preserves the status quo, benefits the party most likely to succeed, avoids irreparable harm, and serves the public interest. In short, Delta respectfully requests that the Court enter a preliminary injunction prohibiting Southwest during the pendency of this lawsuit from evicting Delta from Love Field.

---

[15] Bureau of Transportation Statistics, *Chicago Midway International*, available at http://www.transtats.bts.gov/airports.asp?pn=1&Airport=MDW&Airport_Name=Chicago (last visited July 16, 2015); Bureau of Transportation Statistics, *William P Hobby*, available at http://www.transtats.bts.gov/ airports.asp?pn=1&Airport=HOU&Airport_Name=Houston, (last visited July 16, 2015); Bureau of Transportation Statistics, *Dallas Love Field*, available at http://www.transtats.bts.gov/airports.asp?pn=1&Airport=DAL&Airport_Name=Dallas (last visited July 16, 2015).

DATED:  July 17, 2015

Respectfully submitted,

*/s/ William B. Dawson*
William B. Dawson
Karl G. Nelson
Ashley E. Johnson
Russell H. Falconer
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201-6911
Telephone:  (214) 698-3100
Facsimile:  (214) 698-3400

Kenneth P. Quinn
Jennifer E. Trock
PILLSBURY WINTHROP SHAW PITTMAN
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8898

ATTORNEYS FOR DELTA AIR LINES, INC.

20

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2015, a true and correct copy of the foregoing document was served via email upon the following counsel of record.

Charles Estee
charles.estee@dallascityhall.com
Peter B Haskel
peter.haskel@dallascityhall.com
Christopher J. Caso
chris.caso@dallascityhall.com
Jennifer A. Brissette
jennifer.brissette@dallascityhall.com
Dallas City Attorney's Office
1500 Marilla St.
7th Floor
Dallas, TX 75201
P: 214-670-3038
F: 214-670-0622
*Attorneys for the City of Dallas*

Michael V Powell
mpowell@lockelord.com
Locke Lord Bissell & Liddell LLP
2200 Ross Avenue, Ste 2200
Dallas, TX 75201-6776
P: 214-740-8520
Fax: 214-740-8800
*Attorney for American Airlines, Inc.*

Stephen McClain Cole
scole@lynnllp.com
John T Cox , III
tcox@lynnllp.com
Kent D Krabill
kkrabill@lynnllp.com
Britta E Stanton
bstanton@lynnllp.com
Lynn Tillotson Pinker & Cox LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
P: 214-981-3800
F: 214-981-3839
*Attorneys for Southwest Airlines Co.*

David Michael Glass
david.glass@usdoj.gov

U.S. Dep't of Justice
Civ. Div., Fed. Progs. Br.
20 Massachusetts Ave., N.W., Room 7200
Washington, DC 20530
202-514-4469
*Attorney for U.S. DOT and FAA*

John Robert Robertson
robby.robertson@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20001-1109
P: 202-637-5774
F: 202-637-5910

Barry C Barnett
bbarnett@susmangodfrey.com
Susman Godfrey LLP
901 Main St.
Suite 5100
Dallas, TX 75202-3775
P: 214-754-1900
F: 214-754-1933
*Attorneys for Virgin America Inc.*

*/s/William B. Dawson*
William B. Dawson