IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| DELTA AIR LINES, INC., SOUTHWEST AIRLINES CO., VIRGIN AMERICA INC., AMERICAN AIRLINES, INC., UNITED AIRLINES, INC., SEAPORT AIRLINES, INC., UNITED STATES DEPARTMENT OF TRANSPORTATION, AND THE FEDERAL AVIATION ADMINISTRATION | § § § § § § § § | CIVIL ACTION NO. 3:15-CV-02069-K |
| *Defendants*. | | |

**DEFENDANT DELTA AIR LINES, INC.'S ANSWER TO CITY OF DALLAS'S ORIGINAL COMPLAINT AND COUNTERCLAIM AGAINST CITY OF DALLAS**

Defendant Delta Air Lines, Inc. ("Delta") hereby files this Answer to the City of Dallas's Original Complaint as follows.

Any allegation not expressly admitted is denied.

## I. INTRODUCTION

1.      Mandates from two federal agencies under color of federal law and conflicting legal claims and litigation threats by several airlines under federal law have put the City in an impossible situation that only this Court can resolve. An impending July 6, 2015, deadline that may cause chaos at Love Field requires the City to file this action now.

**RESPONSE:  Delta denies the allegations in Paragraph 1.**

2.      **[1]** The City owns and operates the airport generally known as Love Field in the City and County of Dallas, Texas, within the Northern District of Texas. **[2]** For decades, operations at Love Field were restricted by a federal law, the so-called Wright Amendment. **[3]**

In 2006, Congress amended and reformed the Wright Amendment so that certain restrictions expired in October, 2014. **[4]** The City has lease agreements running through 2028 with Southwest Airlines Co. ("Southwest"), United Airlines, Inc. ("United"), and American Airlines, Inc. ("American") for the preferential use of the 20 gates at Love Field and for the use of other airport facilities. **[5]** Some of the rights and/or access provided by the leases have been transferred to other air carriers: United has subleased its gates to Southwest, and American has subleased its gates to Virgin America Inc. d/b/a Virgin America Airlines Inc. ("Virgin"); Virgin allows Seaport Airlines, Inc. ("Seaport") to operate from a Virgin gate under a gate use agreement; and Southwest allows Delta Air Lines, Inc. ("Delta") to operate under a gate use agreement. **[6]** In October 2014, certain of the most significant restrictions, such as the prohibition against longhaul domestic flights by full-size passenger aircraft, under the Wright Amendment ceased but the legal number of gates at Love Field was reduced. **[7]** This has triggered demands on the City for additional access and use of the limited number of gates. **[8]** All of the Signatory Airlines' current leases at Love Field predate the reform (substantial repeal) of the Wright Amendment in 2006.

     **RESPONSE:  Delta admits the allegations contained in sentences one, two, three, five, and six of Paragraph 2.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentences four, seven, and eight of Paragraph 2.**

     3.     The City's leases with the Signatory Airlines at Love Field give each Signatory Airline the preferential right to use its gates and requires the City to mandate accommodation requests for gate use from new entrants to the airport, but only to the extent that granting such request would not unduly interfere with the Signatory Airline's flight schedule and if the requesting new entrant air carrier and the Signatory Airline cannot agree on voluntary

accommodation terms. In addition, if there is voluntary or mandatory gate accommodation but the Signatory Airline and the new entrant cannot agree on all necessary terms of gate use, the City is to determine the missing terms (for example, the amount of compensation for gate use or duration or conditions of accommodation).

**RESPONSE:  Delta admits the allegations in Paragraph 3 as they pertain to the City's lease with Southwest.  Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 3.**

4.      **[1]** The City has received conflicting demands and claims concerning the use of the limited number of gates at Love Field from some of the Airlines, principally between Southwest and Delta, and from the U.S. Department of Transportation ("DOT") and one of its subsidiary agencies, the Federal Aviation Administration ("FAA") (DOT and FAA together are referred to as the "Federal Agencies"). **[2]** The City is faced with irreconcilable demands, each under color of federal law, that include explicit threats of litigation or risk of other legal sanctions.

**RESPONSE:  Delta admits the allegations contained in sentence one of Paragraph 4. Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentence two of Paragraph 4.**

5.      DOT is the parent agency of FAA. The FAA administers most of the DOT and FAA grants received by the City for use at Love Field. DOT and FAA assert adverse consequences for the City's FAA grants if the City does not accommodate Delta in compliance with DOT's directions.

**RESPONSE:  Delta admits the allegations in Paragraph 5.**

6.      **[1]** The City brings this action seeking a judgment declaring the rights and

3

obligations of the City and of the Airlines and the Federal Agencies, and resolving conflicting interpretations of the federal statutes, federal regulations, other instruments, and the leases, in relation to gate accommodation at Love Field. **[2]** The City brings this action to resolve the disputes, to  enable it to perform its obligations, and to prevent disruption of service to the flying public. **[3]** There is an imminent threat of irreparable harm to the public and to Love Field from air operations disruption at Love Field on and after July 6, 2015, when Delta's latest temporary permission to use gate slots for which Southwest claims preferential lease rights expires. **[4]** This likely will necessitate temporary and preliminary injunctive relief unless these Airlines reach a voluntary resolution.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentence one and two of Paragraph 6.  Delta admits the allegations in sentences three and four of Paragraph 6, except that in light of the recent agreement between Delta and Southwest granting Delta permission to use gate slots for which Southwest claims preferential lease rights until the earlier of September 30, 2015, or the date on which this Court issues interim or final relief, Delta denies that any imminent threat of irreparable harm began on July 6, 2015.**

7.     **[1]** The Federal Agencies regulate many facets of Love Field operations. **[2]** Among other things, under the authority of title 49, U.S. Code, DOT enforces competition standards for Love Field and other airports and the FAA administers monetary grants to Love Field and other airports. **[3]** In addition, FAA has authorized the City to collect passenger facility charges (sometimes called "PFCs") from departing Love Field passengers to help finance Love Field improvements. **[4]** These Federal Agencies have told the City that the City's title 49 responsibilities to foster competition require the City to provide long-term gate accommodation

4

to Delta at Love Field gates leased by Southwest regardless of Southwest's plans to uses the gates, at least if those plans were announced after Delta's gate request. **[5]** The Federal Agencies further state that this accommodation must last for as long as Delta maintains the same pattern of service regardless of Southwest's future gate use plans.

**RESPONSE:  Delta admits the allegations in sentences one, two, three, and five of Paragraph 7.  Delta admits that the federal agencies have told the City to provide long-term accommodation to Delta at Love Field to the extent possible given gate usage at the time Delta requested accommodation and without impacting any signatory carrier's current or already-announced, for-sale services as of that time.  Delta denies the remaining allegations in sentence four of Paragraph 7.**

8.      **[1]** However, these requirements disregard federal statutory provisions in the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA") protecting Signatory Airlines' Love Field preferential gate rights from interference under color of title 49. **[2]** The City has been unable to obtain an explanation from the Federal Agencies why those protections would not apply to Delta's accommodation requests. **[3]** Some details of the accommodation obligations imposed on the City by these Federal Agencies, such as the duration of any accommodation, do not appear to be authorized by title 49 and do not appear consistent with gate accommodation policies at other airports. **[4]** The City has been unable to obtain reconciliation from these Federal Agencies between their requirements for Delta's accommodation request at Love Field and nationwide practices that the Federal Agencies appear to have sanctioned at other airports. **[5]** The Signatory Airlines' Love Field provide leases two possible ways that these Federal Agencies might permissibly require the City to override the lease protections for the Signatory Airlines' lease rights without subjecting the City to suit for breaching the lease: (1) the

Federal Agencies could expressly threaten the City's FAA grants for Love Field after reviewing the lease – the lease provides that such threat would require amendment of the lease to negate the threat – However DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well; or (2) the agencies might be able to enter into an agreement with the City – provide lease that the lease terms are subordinated to such agreements under certain circumstances. **[6]** However the Federal Agencies have refused to consider negotiating an agreement with the City and the City does not believe that DOT and the City could negotiate a valid agreement that was inconsistent with WARA. **[7]** A WARA provision provides the one avenue that could allow the agencies to override the Signatory Airlines' preferential gate lease rights at Love Field: they could adopt nationwide regulations that would be authorized by federal law to preempt preferential gate rights. **[8]** However, the Federal Agencies' directives to the City are for Love Field only, whereas the governing federal statute, as shown below, requires that any such preemption be on a nationwide basis. **[9]** Finally the Federal Agencies ignore WARA provisions, also as shown below, that provide that Signatory Airlines' and the City's compliance with and performance under a certain "Five Party Agreement" is deemed to constitute compliance with their respective title 49 obligations, and that agreement protects the Signatory Airlines' preferential gate rights at Love Field.

**RESPONSE:  Delta denies the allegations in sentences one, three, five, seven, eight, and nine of Paragraph 8.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentences two, four, and six of Paragraph 8.**

9.      **[1]** The City is faced with several options, all of which place the City at significant risk. **[2]** The City could make a decision that appeared to benefit one Airline and face

certain litigation from other Airlines. **[3]** The City could comply with the Federal Agencies' interpretations of the City's legal obligations and face certain litigation from Airlines. **[4]** The City could comply with its obligations under leases and other contractual commitments but would thereby face liability from the Federal Agencies and other Airlines. **[5]** Most troublingly, the Federal Agencies have required that the City take actions that appear to violate the City's lease obligations, but have refused to impose their mandate in a form that might allow the City to comply with the Federal Agencies' directives without violating the City's lease obligations; all while retaining the FAA's option to deprive the City of aviation grant money if the City does not comply with the Federal Agencies' interpretations of the City's gate accommodation obligations. **[6]** In short, the City needs judicial intervention to understand and perform its legal obligations and rights so it can move forward with management of its Love Field airport in a legal manner in the best interest of the flying public and the residents of the City of Dallas. **[7]** Absent direction and declaratory relief from this Court, that would be impossible.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentences one, two, and three of Paragraph 9.  Delta denies the allegations contained in sentences four, five, six, and seven of Paragraph 9.**

## II. JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1367; 5 U.S.C. 701 *et seq.*; and 28 U.S.C. § 2201. To the extent that any state law issues are involved, they so relate to the federal questions presented that they form part of the same case and controversy. 28 U.S.C. § 1367.

**RESPONSE:  The allegations in Paragraph 11 are a legal conclusion to which no response is required.**

11.     On December 17, 2014, DOT General Counsel sent the Dallas City Attorney a letter establishing DOT's position on Delta's gate accommodation request and instructing the City how to handle that request ("First DOT Letter"). On June 15, 2015, DOT General Counsel sent a Dallas Assistant City Attorney a letter incorporating the First DOT Letter by reference, and elaborating and expanding on several provisions of the First DOT Letter ("Second DOT Letter"). The Second DOT Letter, among other things, explicitly asserted that the City's aviation grant eligibility for Love Field would be conditioned on compliance with the views expressed in the First DOT Letter. The First DOT Letter and the Second DOT Letter (together the "DOT Letters") each is a final agency action of DOT issued in violation of the Administrative Procedure Act ("APA") and WARA. WARA sets forth legal obligations for the operation of Love Field by which the federal government and others must comply. Judicial review of action under WARA is subject to section 706(2) of the APA.

**RESPONSE:  Delta denies the allegation that the two DOT letters were issued in violation of the APA and WARA.  The remaining allegations in Paragraph 11 are a legal conclusion to which no response is required.**

12.     Neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because DOT acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. DOT's powers with respect to Love Field gate allocation matters are unique due to the enactment of WARA (*i.e.*, Love Field is the only U.S. airport to have such specific statutory directives). Concerning those matters, DOT is statutorily constrained to act within the context of WARA. See Section 5(d)(1). Therefore, any DOT action with respect to Love Field, regardless of the more general powers that DOT may have under other federal law, necessarily are authorized from the power granted to it pursuant to WARA.

Therefore, neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because the agency acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. The "plain language" of section 46110(a) expressly applies only to federal agency actions carried out under the designated parts in title 49 of the United States Code. WARA does not appear in title 49 of the U.S. Code. *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2nd. Cir. 2003) (finding a lack of jurisdiction under earlier version of Section 46110 because the plain language "this part" authorized judicial review of only those actions carried out under Part A, not Part B); see also *City of Los Angeles v. FAA*, 239 F.3d 1033, 1035 (9th Cir. 2001) (same). Instead the DOT Action and the DOT Letters are reviewable under the Declaratory Judgment Act, 28 U.S.C. § 2201.

**RESPONSE:  The allegations in Paragraph 12 are a legal conclusion to which no response is required.**

13.    Alternatively, the DOT Action is not a final agency action but, through the DOT Letters, DOT and FAA have nevertheless in violation of their authority as restricted by WARA, interfered with and attempted to interfere with preferential gate use rights protected by Love Field leases and by WARA by issuing the DOT Letters. This interference materially prejudices the City as airport landlord and airport manager. DOT can interfere with Signatory Airlines' preferential gate rights under their leases but must act only on a nationwide basis, as required by section 5(e)(2)(B)(ii) of WARA. This Court has jurisdiction to declare that DOT must take action to fulfill the mandatory requirements that any agency action eliminating or limiting preferential gate rights at Love Field must be taken only through a nationwide action. DOT's failure to do so has been unlawfully withheld and unreasonably delayed in violation of the APA and WARA. See 5 U.S.C. § 706(1).

9

**RESPONSE:  Delta denies that the issuance of the DOT Letters was a violation of DOT and FAA's authority and denies that the DOT Letters interfered with and attempted to interfere with preferential gate use rights protected by Love Field leases.  The remaining allegations in Paragraph 13 are a legal conclusion to which no response is required.**

14.     In the further alternative, even in the absence of the Federal Agencies, the Court still has jurisdiction of the controversy involving the Airlines and the City under its federal question and supplemental subject-matter jurisdictional authority. 28 U.S.C. §§ 1331, 1337, 1367.

**RESPONSE:  The allegations in Paragraph 14 are a legal conclusion to which no response is required.**

15.     Declaratory Judgment on the federal questions presented by the DOT Action is appropriate and within the Court's subject-matter jurisdiction because, among other things,

      a.   the City claims the right under WARA not to be required to limit Signatory Airlines' preferential gate rights at Love Field to accommodate other air carriers when the accommodations will unduly interfere with the Signatory Airlines' flight schedules regardless of the limits imposed by the DOT Letters because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

      b.   The City claims the right under WARA to decline to mandate accommodation of gate use requests from Delta or any other air carrier to the extent that granting the request would unduly interfere with the flight schedules of any Signatory Airlines regardless of the limits imposed by the DOT Letters, because the limits on such City's rights imposed by the DOT Letters directly

conflict with the express terms of WARA.

c.   The City claims eligibility under the authority of WARA for Airport
Improvement Program (AIP) grants from the FAA under 49 U.S.C. § 47107,
regardless of the disqualification for such grants imposed by the DOT Letters
so long as the City provides gate access to preferential gates at Love Field in
accordance with WARA.

d.   The City is protected by WARA from DOT and FAA interference with its
compliance with the Five Party Agreement (hereinafter defined) and the leases
for Love Field of the Signatory Airlines, except that DOT could interfere with
the Signatory Airlines' preferential gate rights if it did so on a nationwide
basis.

e.   The City is protected by the federal WARA statute from any obligation to
modify its Love Field lease with Signatory Airlines that arguably might arise
from the threat in the Second DOT Letter to the City's AIP grants because the
circumstances of DOT's threat are not based on a review of the lease as
required to trigger the lease modification requirement, and DOT has already
reviewed and approved the City's competition plan, which incorporates the
lease's scarce resource terms and WARA codifies those lease terms as well.

f.   If the City is obligated to mandate the terms of gate accommodations at Love
Field, it is permitted by WARA to include in those terms an amount of
compensation from the requesting air carrier to the accommodating Signatory
Airline that include consideration of the Signatory Airline's indirect costs
including amounts actually paid by the Signatory Airlines for the use of gates

11

and fair market values of gates, despite the prohibition against such

considerations in the DOT Letters.

g.   The Airlines claim competing and conflicting rights based on federal law,

including WARA and title 49.

**RESPONSE:  Delta admits the allegations in sub-paragraph 15(g).  Delta denies the remaining allegations in Paragraph 15.**

16.   Venue is proper with this Court pursuant to 28 U.S.C. § 1391.

**RESPONSE:  The allegation in Paragraph 16 is a legal conclusion to which no response is required.**

### III. PARTIES

17.   The City is a Texas home rule municipal corporation with its principal offices located in Dallas County, Texas at 1500 Marilla Street, Dallas TX 75201.

**RESPONSE:  Delta admits the allegations in Paragraph 17.**

18.   Delta is a Delaware business corporation with its headquarters located in Atlanta, Georgia, authorized to do business in the State of Texas, and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE:  Delta admits the allegations in Paragraph 18.**

19.   Southwest is a Texas business corporation with headquarters in Dallas, Texas, authorized to do business in the State of Texas and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19.**

20.   Virgin is a Delaware business corporation with headquarters in Burlingame,

California, authorized to do business in the State of Texas, and may be served through its

registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20.**

21.     American is a Delaware business corporation with headquarters in Fort Worth,

Texas, authorized to do business in the State of Texas, and may be served through its registered

agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21.**

22.     Seaport is an Alaska business corporation, with headquarters located in Portland,

Oregon, authorized to do business in the State of Texas, and may be served through its registered

agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75210-

3136. Seaport is named solely because its rights may be impacted by declaratory judgment

related to Virgin.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22.**

23.     United is a Delaware corporation, with its headquarters in Chicago, Illinois,

authorized to do business in the State of Texas, and may be served through its registered agent

CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23.**

24.     DOT is a federal agency and may be served with process through delivering or

mailing the summons and complaint by registered or certified mail to the United States Attorney

for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to the Anthony Fox, Secretary, Department of Transportation at 1200 New Jersey Ave. SE, Washington, D.C. 20590.

**RESPONSE:  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24.**

25.     The FAA is a federal agency and may be served through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to Michael P. Huerta, Administrator, Federal Aviation Administration at 800 Independence Ave. SW Washington, D.C. 20591.

**RESPONSE:  Delta admits the allegations in Paragraph 25.**

### IV. FACTS

**Love Field History and the Wright Amendment**

26.     Love Field was initially constructed as a United States Army airbase during World War I. In 1928, the City acquired the air field and commercial operations began.

**RESPONSE:  Delta admits the allegations in Paragraph 26.**

27.     In 1964 the Civil Aeronautics Board ("CAB"), an FAA predecessor, determined that the competition between the Dallas and Fort Worth airports was harmful and ordered Dallas and Fort Worth to reach a voluntary agreement designating one airport through which CAB-

14

regulated carriers would serve both communities. The cities were unable to designate any existing airports and instead agreed to construct a new airport, Dallas-Fort Worth International Airport ("DFW Airport"), located roughly midway between Dallas and Fort Worth (the two cities are approximately 32 miles apart). All federally certified air carriers agreed to cease operations at the cities' airports and move operations to DFW Airport. DFW Airport opened in 1974.

**RESPONSE:  Delta admits the allegations in Paragraph 27.**

28.    Southwest was not a federally certified carrier at that time and continued its operations from Love Field. At the time, all of its flights were within the State of Texas. After passage of the Airline Deregulation Act of 1978, (Pub. L. No. 95-504, 92 Stat. 1705 (1978)), Southwest made plans to expand service outside of Texas from Love Field. Other air carriers announced plans for Love Field operations. In 1980, Congress adopted the Wright Amendment. (Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980)). Under the Wright Amendment, flight operations from Love Field were generally limited to Texas and four adjacent states.

**RESPONSE:  Delta admits the allegations in Paragraph 28.**

29.    In 1998, Congress adopted the so-called Shelby Amendment, which added Alabama, Kansas, and Mississippi as states that could be served directly from Love Field. (Pub. L. 105-66, § 337, 111 Stat. 1425 (1997)).

**RESPONSE:  Delta admits the allegations in Paragraph 29.**

30.    In 2005, Congress adopted the so-called Bond Amendment to add Missouri to the states that could be served directly from Love Field. (Pub. L. No. 109-115, § 181, 119 Stat. 2396 (2006)).

**RESPONSE:  Delta admits the allegations in Paragraph 30.**

31.     In early 2006, members of Congress suggested that the cities of Dallas and Fort Worth propose a long term solution to the Wright Amendment's limitations on Love Field flight operations.

**RESPONSE:  Delta admits the allegations in Paragraph 31.**

32.     **[1]** On or about July 11, 2006, the City of Dallas, the City of Fort Worth, the Dallas-Ft. Worth International Airport Board, Southwest, and American entered into an agreement (referred to as the "Five Party Agreement"). **[2]** The underlying principle of the Five Party Agreement was to resolve the manner in which service could be provided at Love Field in the future. **[3]** The Five Party Agreement provided that Southwest would obtain preferential use of 16 gates, American would obtain preferential use of two gates, and ExpressJet Airlines, Inc. ("ExpressJet") would obtain preferential use of two gates. **[4]** Southwest agreed not to operate from DFW Airport unless it surrendered a Love Field gate, up to eight gates, for each DFW gate that it acquired. **[5]** Flight operations were limited to 6:00 a.m. to 11:00 p.m. and no international flights would originate from Love Field. **[6]** The number of gates at Love Field would be reduced from the then existing 32 gates to 20. **[7]** The agreement also stated, "To the extent a new entrant carrier seeks to enter Love Field, [the City] will seek voluntary accommodation from existing carriers" but if an agreement was not reached then the City agreed "to require the sharing of any preferential lease gates, pursuant to the terms of existing lease agreements." (Five Party Agreement, para. 1.b.)

**RESPONSE:  Delta admits the allegations in sentences one, four, five, six, and seven of Paragraph 32.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentence two of Paragraph 32.  Delta admits that the Five Party Agreement provided that Southwest, American, and ExpressJet would have preferential**

16

**use of 16, 2, and 2 gates, respectively, under their existing leases to be used for passenger**

**operations but denies that Southwest, American, or ExpressJet obtained any preferential**

**gate-use rights under or as a result of the Five Party Agreement and denies any remaining**

**allegations in sentence three of Paragraph 32.**

33.     ExpressJet's leasehold interests were later acquired by United.

**RESPONSE:  Delta admits the allegations in Paragraph 33.**

**The Wright Amendment Reform Act of 2006**

34.     On October 13, 2006, Congress adopted WARA. (Pub. L. 109-352, 120 Stat.

2011 (2006)). WARA incorporated and adopted many of the terms of the Five Party Agreement

as federal law, although several other provisions of the Five Party Agreement remain in force as

contractual obligations independent of WARA. The statute repealed the Wright Amendment

limitations on long-distance domestic flights, with the repeal becoming effective in eight years

(in 2014). Under the Five Party Agreement, international flights were banned from originating at

Love Field and Southwest was barred from operating at DFW Airport unless it gave up a Love

Field gate, up to eight gates, for each gate used at DFW. The City was required to reduce the 32

existing gates to a total of 20 gates. WARA also required the City to "determine the allocation of

leased gates and manage Love Field in accordance with the contractual rights and obligations

existing as of the effective date of [WARA] for certificated air carriers providing scheduled

passenger service at Love Field on July 11, 2006. To accommodate new entrant air carriers, [the

City] shall honor the scarce resource provision of the existing Love Field leases."

**RESPONSE:  Delta admits the allegations in Paragraph 34.**

35.     **[1]** WARA provided that neither FAA nor DOT could take action that was

inconsistent with the Five Party Agreement or that challenged the legality of any provision of the

agreement. **[2]** As noted above, the Five Party Agreement gave the Signatory Airlines, including Southwest, preferential gate rights. **[3]** WARA also provided that it did not limit FAA, DOT, or other federal agency from enforcing requirements of law or grant assurances that imposed obligations to make Love Field available on a reasonable and nondiscriminatory basis to air carriers seeking to use its facilities *except* that the Act could not be construed to require the City "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."

**RESPONSE:  Delta admits the allegations in sentences one and three of Paragraph 25.  Delta denies the allegations in sentence two of Paragraph 25.**

36.      **[1]** Further, WARA provided that the Five Party Agreement "and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code." WARA § 5(d)(2). **[2]** As noted above, both Southwest and the City are parties to the Five Party Agreement. **[3]** Delta is not. **[4]** American is a party and Virgin, as American's subtenant, may have American's WARA's gate rights protections. **[5]** United is not a party. **[6]** The Court may be asked to decide if Southwest's WARA gate protections extend to the gates it subleases from United.

**RESPONSE:  Delta admits the allegations in sentences one and two of Paragraph 36.  Delta admits that that neither Delta nor United signed the Five-Party Agreement but denies that Delta is not subject to, bound by, or a beneficiary of the Five Party Agreement and denies the remaining allegations in sentences three and five of Paragraph 36.  Delta admits that American is a party to the Five Party Agreement but lacks knowledge or**

**information sufficient to form a belief about the truth of the remaining allegations in sentence four of Paragraph 36.  Sentence six of Paragraph 36 contains no allegations requiring a response.**

37.        **[1]** Under WARA and the Five Party Agreement, any Love Field gates that revert to the City because of lease expiration or other reasons become common use gates. **[2]** Thus Southwest has preferential gate use rights at Love Field for 16 gates under its direct lease with the City until 2028 and probably enjoys United's preferential gate rights for the two gates that it has subleased from United gates through 2028, unless any preferential gate rights are lost by lease termination or nationwide regulations adopted by a Federal Agency, or other reason. **[3]** American retains preferential gate rights at Love Field subject to similar conditions until the expiration of its lease on 2028. **[4]** Virgin probably now exercises American's preferential gate rights as American's subtenant until 2028, again subject to the same conditions for keeping those rights. **[5]** Delta and Seaport have no lease rights except by virtue of their contractual arrangements with other Airlines.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 37 as to the Five Party Agreement but denies these allegations as to WARA.  Delta denies the allegations in sentence two of Paragraph 37.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentences three and four of Paragraph 37.  Delta denies the allegations in sentence five of Paragraph 37 as to Delta but lacks knowledge or information sufficient to form a belief about the truth of these allegations as to Seaport.**

**Grant Assurances**

38.        The City has received federal grant funds for Love Field from the FAA. Each

time the City receives a grant, the City enters into an agreement with the FAA. Each agreement contractually binds the City to various assurances to the federal government generally referred to as Grant Assurances. Grant Assurances are themselves mandated by federal law. 49 U.S.C. § 47107. Among the City's assurances are to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." FAA Airport Compliance Manual (FAA Order 5190.6B), Appx. A at 10, Grant Assurance 22.a. Another pertinent portion of Grant Assurance 22 reads:

> e. Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and use similar facilities, *subject to reasonable classifications such as tenants or nontenants and signatory air carriers and nonsignatory air carriers.* Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

*Id.*, Grant Assurance 22.e (emphasis added).

**RESPONSE:  Delta admits the allegations in Paragraph 38.**

**Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21)**

39.     In 2000, Congress adopted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (generally known as AIR-21). (Pub. L. No. 106-181, 114 Stat. 61 (2000)). One of its provisions requires that the City, as the proprietor of Love Field, must provide the FAA with a "Competition Plan" that outlines the City's methods for enhancing competition to ensure that all air carriers wishing to serve its airport are provided with a reasonable opportunity to provide such service. DOT has the right to periodically review the

implementation of Competition Plans of all covered airports and can conduct site visits to ensure that competition plans are being successfully implemented.

**RESPONSE:   Delta admits the allegations in Paragraph 39.**

40.      The City submitted its most recent update to its Competition Plan in 2009. The update explained that the City intended to accommodate requests for access by applying the gate sharing provisions contained in the current leases. Competition Plan Update for Dallas Love Field, letter from Daniel T. Weber, June 3, 2009, at page 5.

**RESPONSE:  Delta admits the allegations in Paragraph 40.**

**Leases at Love Field**

41.      On or about February 13, 2009, the City and Southwest amended and restated a pre-existing master lease agreement for 16 gates at Love Field. The term of the lease lasts until September 30, 2028.

**RESPONSE:  Delta admits the allegations in Paragraph 41.**

42.      **[1]** On or about March 11, 2009, the City and American amended and restated a preexisting master lease agreement for two gates at Love Field.  **[2]** The term of the lease lasts until September 30, 2028.  **[3]** With the consent of the City, which was given in conformity with the recommendation of the U.S. Department of Justice ("DOJ"), on or about May 12, 2014, American subleased its two Love Field gates to Virgin as part of a much broader program of gate divestitures imposed on American by DOJ through agreed federal district court judgments as a condition of DOJ not objecting to a merger between American's parent corporation and US Airways Group Inc. ("US Air").

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences one and two of Paragraph 42.  Delta admits the**

21

**allegations in sentence three of Paragraph 42.**

43.    **[1]** On or about October 1, 2008, the City amended and restated a preexisting master lease agreement with now-defunct Continental Airlines for two gates at Love Field. **[2]** Continental later merged with United so that United is now the City's lessee for those two gates. **[3]** The term of the lease lasts until September 30, 2028. **[4]** After DOJ declined to object, and with the consent of the City, on or about January 28, 2015, United subleased its two Love Field Gates to Southwest, giving Southwest lease or sublease control over 18 of Love Field's 20 gates.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences one and three of Paragraph 43.  Delta admits the allegations in sentences two and four of Paragraph 43.**

**Terms of the Master Leases**

44.    Under the terms of the master leases for Love Field (which are essentially identical for each Signatory Airline's master lease), the Signatory Airlines' lease specific space (but not including any gates) at the airport. Depending on which space was involved, the leased area could be for exclusive use or preferential use. Exclusive use space refers to those portions of the airport where the Signatory Airline has the sole right of use. No gate rights were exclusive. Preferential use space refers to those portions of the airport where the Airline was contemplated to be the primary but not sole user. Airlines were also given access to common use space. The leased gates were all part of the lessees' preferential use space. Each Signatory Airline agreed that when it had no scheduled use the Airline leasing the preferential gates would allow other scheduled and nonscheduled air carriers to use the gates as circumstances and the public interest required for loading and unloading but such use could not take precedence over the Signatory Airline's scheduled use. Each Signatory Airline acknowledged that the facilities "may become a

scarce resource if a new entrant airline … requests to provide service at the Airport" and agreed "to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement." Each Signatory Airline retained priority in use of its leased gates if there was a scheduling conflict. The requesting air carrier could be charged fees which were to be based on the accommodating Signatory Airline's direct and indirect costs plus a reasonable allowance for administration. If a voluntary agreement for accommodation could not be reached, the lease created a procedure by which the City was notified of the accommodation request and that the City could select a Signatory Airline to accommodate the requesting air carrier. If the air carriers could not reach agreement on the terms of the accommodation, the City could decide disputed terms of the accommodation request, including, if necessary, the amount of fees and charges.

**RESPONSE:  Delta admits the allegations in Paragraph 44 as they pertain to the City's lease with Southwest, except to the extent that Paragraph 44 is intended to allege that the accommodation procedure created by the lease does not impose a mandatory duty on the City to select a Signatory Airline to accommodate a requesting air carrier, in which case Delta denies that allegation as to the City's lease with Southwest.  Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 44.**

45.     One lease provision requires lease modification if DOT threatens the City's AIP grants after reviewing the lease. This provision reads in full as follows:

Section 14.02. Competitive Access.

City and Airline acknowledge that certain portions of this Agreement may be

23

subject to review by the DOT, including but not limited to, the FAA or any other Governmental Agency, concerning possible effects on airline competition and access at the Airport. In the event the federal government threatens to withhold federal assistance, or other sanctions, as a result of such review, City and Airline agree to modify this Agreement accordingly to reflect any necessary change as a result of such action.

**RESPONSE:  Delta admits the allegations in Paragraph 45 as they pertain to the City's lease with Southwest.  Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 45.**

46.    However, DOT has already reviewed and approved the lease provisions.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 46.**

47.    Another term of the lease subordinates the lease provisions to certain agreements between the City and any federal agency. The subordination clause provides is full:

Section 14.34. Subordination.

This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof.

**RESPONSE:  Delta admits the allegations in Paragraph 47 as they pertain to the City's lease with Southwest.  Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 47.**

48.    Prior to receipt of the Second DOT Letter, the City informally suggested to DOT that DOT might wish to consider attempting to negotiate an agreement with the City to effectuate some of the positions expressed in the First DOT Letter. DOT informally declined this suggestion. Any such agreement between the City and the United States would not be valid or enforceable to the extent that it contained terms that were inconsistent with any terms of WARA. The City is aware of no agreement, and the DOT Letters cite none, between the City and any

federal agency that come within the scope of section 14.34.

Another relevant lease section addresses force majeure and provides in full:

Section 14.12. Force Majeure.

Neither City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reasons of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, acts of the public enemy, acts of a superior Governmental Agency, weather conditions, floods, riots, rebellions, acts of sabotage, or any other circumstances for which it is not responsible or which are not in its control; provided, however, that this Section shall not apply to failures by Airline to pay the rentals, fees and charges specified under this Agreement.

**RESPONSE:  Delta admits that Paragraph 48 accurately quotes Section 14.12 of the City's lease with Southwest.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 48.**

**American's Merger with US Air and Virgin's Sublease**

49.      In 2013, US Air and American's parent corporation, AMR Corp., announced plans to merge. On or about August 12, 2013, DOJ and six state attorneys general and the District of Columbia filed a civil antitrust lawsuit challenging the proposed merger. In November 2013, as part of a settlement of the pending action, DOJ required US Air and AMR to divest slots and gates at various airports across the country. The settlement agreement, which was embodied in an agreed federal district court judgment, required divestment of the two American gates at Love Field.

**RESPONSE:  Delta admits the allegations in Paragraph 49.**

50.      **[1]** Delta, Southwest, and Virgin each made proposals for American's lease rights to the two gates. **[2]** DOJ approved the proposal made by Virgin and opposed the others. **[3]** Accordingly, as stated above, the two American gates at Love Field were sublet to Virgin following the City's consent. **[4]** Virgin and Seaport entered into a gate use agreement under

25

which Seaport has two daily flights from Virgin's gates. **[5]** On or about October 13, 2014, Virgin started commercial passenger operations at Love Field.

**RESPONSE:  Delta admits the allegations in sentences one, two, three, and five of Paragraph 50.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence four of Paragraph 50.**

51.     Representatives of DOJ have informed the City that Virgin is not subject to any accommodation requirement under the lease for a reasonable period that shall be approximately one year from the start of its operations at Love Field on or about October 13, 2014, in order to allow Virgin time to solidify its position at the airport. Neither DOT nor FAA has commented to the City on that DOJ position.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 51.**

52.     In filed court pleadings and related instruments, DOJ has repeatedly stated on behalf of the United States, and structured one or more agreed judgments to be consistent with its position, that Love Field and DFW Airport comprised a single market for commercial passenger air travel. The history underlying DFW Airport's creation also supports that market definition.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 52.**

53.     **[1]** In 2014, United elected to cease current flight operations at Love Field. **[2]** It initially entered into a gate use agreement with Southwest on or about September 18, 2014. **[3]** Subsequently, Southwest acquired United's preferential gate use interest at Love Field through a sublease to which the City consented on or about January 28, 2015.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 53.  Delta**

lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence two of Paragraph 53.  Delta admits that Southwest entered into a sublease agreement with United at Love Field to which the City consented on or about January 28, 2015, and denies the remaining allegations in sentence three of Paragraph 53.

**American's Sublease to Delta**

54.     **[1]** With the City's consent, on or about July 8, 2009, Delta entered into a month-to-month sublease with American for a portion of American's two gates. **[2]** After its settlement with DOJ and upon entering into its divesting sublease with Virgin, American advised Delta that the sublease would be terminated effective October 12, 2014. **[3]** On information and belief, Delta was selling tickets for flights after October 12, 2014 even though it had no then-current lease, sublease, or other arrangement for the use of Love Field after October 2014. **[4]** The City is not aware that Delta informed its customers of its lack of gate rights at Love Field when offering or selling those tickets.

**RESPONSE:  Delta admits the allegations in sentences one and two of Paragraph 54.  Delta admits that it was selling tickets for flights after October 12, 2014, but denies that it did so without a right or entitlement for the use of Love Field after October 2014 and denies any remaining allegations in sentence three of Paragraph 54.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentence four of Paragraph 54.**

**Requests for Accommodation**

55.     **[1]** On or about September 18, 2014, Delta advised the City that its sublease with American was about to expire and invoked the accommodation process under the master airport leases. **[2]** Delta then had and continues to have operation to and from DFW Airport.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 55, unless sentence one of Paragraph 55 is intended to allege that September 18, 2014, was the first date on which Delta advised the City that its sublease with American was about to expire and invoked the accommodation process under the master airport leases, in which case Delta denies sentence one of Paragraph 55.  Delta admits the allegations in sentence two of Paragraph 55.**

56.     **[1]** The City conferred with the other Airlines and all Airlines (both Signatory Airlines and those operating under a sublease or gate use agreements) advised the City that any proposed accommodation would unduly interfere with their operations. **[2]** Based on this information, the City advised Delta that the City could not accommodate their request at Love Field. **[3]** Delta responded and invoked the City's competition plan, the grant assurances, and other unspecified federal law and urged immediate short-term accommodation and claimed it would otherwise suffer immediate and irreparable injury.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence one of Paragraph 56.  Delta admits that the City advised Delta after Delta's September 18, 2014 accommodation request that the City could not accommodate Delta's request at Love Field despite having previously promised and guaranteed to Delta that Delta would be accommodated at Love Field; Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in sentence two of Paragraph 56.  Delta admits the allegations of sentence three of Paragraph 56, unless sentence three of Paragraph 56 is intended to allege that Delta did not invoke the City's competition plan, the grant assurances, and other unspecified federal law; urge immediate short-term accommodation; or claim it would otherwise suffer**

**immediate and irreparable injury until after the City advised Delta that it could not accommodate their request at Love Field, in which case Delta denies sentence three of Paragraph 56.**

57.    Shortly thereafter, representatives of City, DOT, FAA, and the Airlines conferred and attempted to reach a resolution regarding the accommodation request.

**RESPONSE:  Delta admits the allegations in Paragraph 57.**

58.    On or about November 6, 2014, United and Delta reached a temporary gate use agreement by which Delta could continue its operation of five flights a day using the two Southwest gates (which Southwest had subleased from United) until January 6, 2015. On or about January 6, 2015, United and Delta further agreed to continue the term of their gate use agreement until July 6, 2015. Southwest, after subleasing United's gates, agreed to honor United's extended gate use agreement with Southwest upon the expiration of the temporary gate use agreement.

**RESPONSE:  Delta denies that the two gates that were the subject of the November 6, 2014 temporary gate use agreement between United and Delta were "Southwest gates." Delta admits the remaining allegations in Paragraph 58.**

59.    **[1]** On or about November 10, 2014, the City forwarded its proposed principles, criteria, and model to be used to determining any accommodation requests at Love Field to the Airlines and DOT. **[2]** The Airlines responded with comments and revisions consistent with their respective positions. **[3]** DOT did not provide any written comments.

**RESPONSE:  Delta admits the allegations in sentences one and two of Paragraph 59.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence three of Paragraph 59.**

29

60.     On December 17, 2014, DOT's General Counsel sent the Dallas City Attorney the First DOT Letter, summarizing DOT's understanding of prior communications between DOT and the City and providing guidance as to DOT's position on the City's legal obligations with respect to Delta's gate accommodation request. Pursuant to the City's request for guidance, the First DOT Letter detailed DOT's position on several key issues concerning the City's legal obligations with respect to any accommodation request at Love Field. The First DOT Letter stated once an air carrier had been accommodated, it was entitled to maintain its ongoing pattern of service even after the expiration of any agreement between the accommodated and accommodating air carriers as long as the pattern of operations remained unchanged. The First DOT Letter also stated that the accommodating Signatory Airline was limited to recovering only its pro-rata share of the subleased facilities lease rate plus a reasonable allowance for administration that may not exceed 25%.

**RESPONSE:  Delta admits the allegations in Paragraph 60.**

61.     After confirming that the First DOT Letter could be released, the City advised the Airlines that the City would have no choice but to follow and abide by the guidance as stated in the First DOT Letter in formulating and applying its accommodation procedures until and unless judicial or other competent authority held the First DOT Letter not to enunciate binding standards.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations regarding whether the City confirmed that the First DOT Letter could be released.  Delta admits the remaining allegations in Paragraph 61.**

62.     DOT also provided informal advice to the City that supplemented and amplified the contents of the First DOT Letter. DOT informally advised the City that any accommodation

request should be evaluated as of the date of the request, using Airline operations as of a snapshot date. DOT further informally advised that future planned operations of incumbent Airlines could be considered but only as to a limited time in the future, such as six months, and only if tickets were being sold for the future flights.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 62.**

63.     **[1]** At the time of the First DOT Letter, Love Field was experiencing rapid changes in is pattern of flight operations due mainly to reduction in the number of gates and initiation of long-haul air service as WARA became effective. **[2]** Attached to and incorporated into the First DOT Letter by reference was a compendium of airport competition plan requirements, "Airport Competition Plans; Highlights of Reported Actions to Reduce Barriers to Entry and Enhance Competitive Access" (Nov. 2010). **[3]** The First DOT Letter referred to the attachment as follows:

> We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access. The compendium table focuses on airports that have developed procompetitive tools to accommodate requesting carriers in conformity with the competition plan requirements.

First DOT Letter at 2. **[4]** None of the examples in the attachment included permanent accommodation mandates for preferential use gates. **[5]** None of the examples were for airports that are prohibited by law from adding gates. **[6]** None of the examples were for airports whose dominant signatory carrier is prohibited by law from operating at a neighboring airport without surrendering gates, nor for airports for which the associated city could not be required to "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is

implemented on a nationwide basis," as required by WARA. **[7]** None of the examples included airports for which a private agreement provided a safe harbor for deemed title 49 compliance as does WARA for Love Field respecting Five Party Agreement performance.

**RESPONSE:  Delta admits the allegations in sentences two and three of Paragraph 63.  Delta lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 63.**

64.     Representatives of DOJ have told the City, consistent with DOJ's litigation position in the American-US Air merger controversy, that the relevant market for evaluating competition among local air carriers is the Dallas-Fort Worth Metroplex, including DFW Airport, and not just any one airport such as Love Field. Representatives of DOT have informally advised the City that DOT considers the relevant market for evaluating competition for accommodation purposes to be only Love Field. The City informed DOT and DOJ of those conflicting positions but has been unsuccessful in securing reconciliation of those conflicting positions from DOT and DOJ. As stated above, DOT has not commented to the City on DOJ's position.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 64.**

65.     **[1]** On February 13, 2015, Southwest filed a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit seeking a review of the First DOT Letter. **[2]** Southwest asserted the First DOT Letter was a final agency action pursuant to 49 U.S.C. § 46110, and that it was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of required procedures. **[3]** Delta intervened in the action, defending the First DOT Letter as a valid final agency action. **[4]** As

noted above, the City does not believe that section 46110 applies to review of the First DOT Letter. **[5]** The City is not a party to the D.C. Circuit proceeding.

**RESPONSE:  Delta admits the allegations in sentences one, two, three, and five of Paragraph 65.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence four of Paragraph 65.**

66.     **[1]** The Court of Appeals will not issue a final decision by the time the gate use agreement between United and Delta expires on July 6, 2015. **[2]** Under the current scheduling order DOT's initial substantive brief is not due until July 22, 2015. **[3]** The case remains pending as *Southwest Airlines Co. v. U.S. Dept. of Transp.*, Case No. 15-1036 (D.C. Cir.).

**RESPONSE:  Delta admits the allegations in sentences one and three of Paragraph 66.  Delta denies the allegations in sentence two of Paragraph 66.**

67.     On or about February 23, 2015, Delta demanded Southwest and the City permanently accommodate its current 5 operating flights. On or about the same date, Delta gave notice to Southwest, Virgin, and Seaport demanding that an *additional* eight flights be accommodated at Love Field.

**RESPONSE:  Delta admits the allegations in Paragraph 67, except to the extent Paragraph 67 is intended to allege that Delta's February 23, 2015 request was Delta's first request for accommodation of five flights; to that extent Delta denies the allegations of Paragraph 67.**

68.     **[1]** On or about February 27, 2015, Southwest responded and rejected both of Delta's accommodation demands.  **[2]** In its response, Southwest stated that it had been and was expanding service between Love Field and additional cities so that by August 9, 2015, it would be averaging at least 10 daily flights on all of the 18 gates to which it had rights (for a total of

180 flights per day) and there would be no capacity to accommodate any Delta flights.  **[3]** In its response, Southwest advised the City (with a copy going to others including Delta) that Southwest offered to extend the duration of Delta's use of Southwest gates past July 6, 2015, to July 19, 2015.  **[4]** The City is unaware that Delta ever accepted that offer and Delta's more recent communications are inconsistent with such acceptance.

> **RESPONSE:  Delta admits the allegations in sentences one, two, and three of Paragraph 68.  Delta lacks knowledge or information sufficient to form a belief about the truth of the allegations in sentence four of Paragraph 68.**

69.     On or about March 10, 2015, Virgin responded to Delta's request. It stated that any accommodation of Delta would be contrary to the DOJ's reasons for opposing divesture of American gates to Delta and to the settlement agreement regarding that divesture. Virgin also stated that it would be operating 19 daily flights starting in April 2015 and that it had an agreement with Seaport who was operating two flights on its gates for a total of 21 flights on two gates. Therefore Virgin stated it had no space to accommodate additional flights or Delta's request.

> **RESPONSE:  Delta admits the allegations in Paragraph 69.**

70.     Delta has subsequently advised the City that it never received a response from Seaport and considers its request to Seaport as rejected.

> **RESPONSE:  Delta admits the allegations in Paragraph 70.**

71.     On or about April 9, 2015, American made a request to the City that up to 4 daily flights be accommodated at Love Field. However, the City is unaware of any American accommodation request to other Airlines for Love Field gates.

> **RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about**

**the truth of the allegations in Paragraph 71.**

72.    As a result of the many accommodation requests and current operations, the City faces requests for the following daily flights: 180 (Southwest) + 11 (Delta) + 4 (American) + 19 (Virgin) + 2 (Seaport) for a total of 216 operations at 20 gates which legally and safely can only accommodate up to 200 flights a day.

**RESPONSE:  Delta denies that the 20 gates at Love Field can only accommodate 200 flights legally and safely and denies that Delta has requested accommodation for only 11 daily flights.  Delta lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 72.**

73.    [1] The City cannot accommodate all 216 flights at Love Field. [2] As a result, the City needs to consider the accommodation provisions under the master leases, WARA and the Five Party Agreement to determine how to allocate scarce gate resources at Love Field, in other words, to determine how many if any requested gate slots can be accommodated and mandate accommodation for those slots. [3] However, the City must resolve the conflicting legal directions and positions detailed here before it can do so.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence one of Paragraph 73.  Delta admits the allegations in sentence two of Paragraph 73.  Delta denies the allegations in sentence three of Paragraph 73.**

74.    [1] On or about April 16, 2015, the City circulated a revised version of its draft accommodation procedures to the Airlines and to DOT for their comment. [2] The Airlines responded on or about April 28, 2015. [3] Many of their comments were highly critical of the revised procedure and provided revisions to advance their respective positions. [4] The Airlines'

positions were not consistent. **[5]** DOT did not comment.

**RESPONSE:  Delta admits the allegations in sentences one, two, and four of Paragraph 74.  Delta admits that many of the airlines' comments were critical of the revised procedure but lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in sentence three of Paragraph 74.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence five of Paragraph 74.**

75.     On or about May 19 through 24, and again on June 11 and 12, 2015, the City attempted to negotiate an extended temporary or a long-term gate accommodation agreement between Delta and Southwest. Each Airline informally signaled what it might accept as a compromise, but rejected the proposals the other Airline floated. No agreement was reached.

**RESPONSE:  Delta admits that negotiations concerning accommodation took place in May and June 2015.  Delta admits that no agreement was reached between Delta and Southwest.  Delta lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 75.**

76.     **[1]** Since shortly after receipt of the First DOT Letter, the City sought clarification and guidance from DOT and the FAA, and in particular asked that whatever terms DOT sought to dictate as to gate accommodate be in the format of a mandate and not mere guidance. **[2]** The City also requested the legal basis for DOT's conclusions and also requested clarification in light of the WARA provisions. **[3]** On June 15, 2015, DOT responded to those requests by issuing the Second DOT Letter. **[4]** After confirming that DOT did not object, the City circulated the Second DOT Letter to all of the Airlines on the same day.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about**

**the truth of the allegations in sentences one and two of Paragraph 76. Delta admits that DOT issued the Second DOT Letter on June 15, 2015, but lacks knowledge or information sufficient to form a belief about the remaining allegations in sentence three of Paragraph 76. Delta lacks information or knowledge sufficient to form a belief about the allegations regarding whether the City confirmed that DOT did not object to its second letter being circulated but admits the remaining allegations in sentence four of Paragraph 76.**

77.     The Second DOT Letter explained that DOT relied upon the grant assurance statute and the competition plan statute as the basis for its conclusions DOT reiterated that the City "is required to accommodate a requesting carrier unless Love Field's facilities are fully utilized at the time of the request, or the Signatory Airlines at the time of the request are selling tickets for future flights fully-utilizing the facilities." It stated that a Signatory Airline's planned future operations should not be considered unless the carrier was selling tickets for the future flights and consideration of such plans would be inconsistent with grant assurances. It repeated that an accommodated carrier must be allowed to continue a similar pattern of service. The letter concluded by stating that the decision on Delta's request was the City's responsibility but the City "must make this decision made in compliance with the grant assurances and [the City's] other legal obligations. The Letter contained no reference to WARA or to any specific lease provisions.

**RESPONSE:  Delta admits the allegations in Paragraph 77.**

**Current Operations**

78.     **[1]** As of the date of commencing the instant litigation, Southwest leases 16 gates and subleases two additional gates from United at Love Field.  **[2]** Delta is currently operating its five daily flights from Southwest's gates. **[3]** Virgin subleases the remaining two Love Field

gates from American. **[4]**  Seaport, through its agreement with Virgin, operates two daily flights.

**RESPONSE:  Delta admits the allegations in sentences one, two, and four of Paragraph 78.  Delta admits it is currently operating five daily flights at Love Field but denies the remaining allegations in sentence three of Paragraph 78.**

79.      **[1]** On information and belief, Delta is selling tickets for flights after July 6, 2015 even though it has no current lease, sublease, or other arrangement for the use of Love Field after that date. **[2]** Southwest has stated it has starting selling tickets for its planned expansion, with flights starting in August and that it needs exclusive access to all of its gates starting on July 6 so that it can remodel them for its expanded service. **[3]** Upon information and belief, Southwest and Delta are selling tickets for flights after July 6, 2015, that would require the use of the same Love Field gates simultaneously for two aircraft – one from each Airline. **[4]** These actions create the risk of chaos at Love Field when passengers for two flights attempt to arrive or depart at the same gates at the same times, and even worse create safety issues should two aircraft try to use the same gate concurrently or if frustrated passengers get aggressive.

**RESPONSE:  Delta admits that it is selling tickets for flights after July 6, 2015, denies that it lacks a right or entitlement for the use of Love Field after July 6, 2015, and denies any remaining allegations in sentence one of Paragraph 79.  Delta admits the allegations in sentence two of Paragraph 79.  Delta denies the allegations in sentences three and four of Paragraph 79.**

80.      Beginning with its sublease from American through July 6, 2015, Delta has been operating at Love Field under month-to-month or six-month-at-a time-arrangements with flight to Atlanta, Georgia.

**RESPONSE:  Delta admits the allegations in Paragraph 80.**

81.     Southwest flights to and from Love Field since the effective date of WARA have

served local Texas cities and cities throughout the United States. Southwest's announced intent

to use the space and time now used by Delta would serve other cities rather than just Atlanta.

**RESPONSE:  Delta admits the allegations in Paragraph 81.**

82.     Delta currently has gate facilities and operations at DFW Airport. Southwest does

not have a DFW Airport presence, and to obtain any future DFW Airport gates it would have to

surrender Love Field gates.

**RESPONSE:  Delta admits the allegations in Paragraph 82.**

83.     **[1]** The City has granted no special or exclusive gate use privileges to Southwest,

American, United, or their sublessees or gate users. **[2]** These Airlines' rights to use gates derive

from the preferential use terms of the master lease, the Five Party Agreement, and WARA. **[3]**

While DOT has provided the City with informal guidance and the DOT Letters set forth DOT's

views on the City's obligations, neither DOT nor FAA has required or directed that the City take

action to interfere with Southwest's, American's, United's, or their sublessees' preferential gate

use rights. **[4]** Because of the explicit protection for preferential gate use rights in WARA, the

City is uncertain whether DOT or the FAA could lawfully require the City to interfere with a

Signatory Airline's, or its sublessee's, preferential gate use rights at Love Field unless that

requirement were imposed on all airports in the country. **[5]** Southwest has stated it would sue

the City if the City violated Southwest's lease rights respecting gate use. **[6]** In particular,

Southwest threatened suit if it was forced to accommodate Delta fights past August 9, 2015. **[7]**

Despite the apparent lack of authority to enforce the DOT Letters, DOT and FAA claim the right

to treat any departure from the terms of the DOT Letters by the City as a Grant Assurance

violation.

**RESPONSE: Delta admits that the signatory airlines' rights to use gates derive from their lease agreements with the City and denies the remaining allegations in sentence two of Paragraph 83.  Delta lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 83.**

## V. CONFLICTING DEMANDS, CLAIMS, AND INTERPRETATIONS

84.     The City has received conflicting claims, demands, and interpretations of the governing statutes, regulations, judgments, and the leases from the Airlines and the two Federal Agencies. A number of the carriers have implicitly or explicitly threatened litigation and/or other adverse consequences if the City takes any action that any party perceives is contrary to its interests or directions.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 84.**

85.     In its latest communications with the City, Delta:

a.   claims that the City must follow the First DOT Letter as a formal agency directive;

b.   has threatened that the City would be "better advised" to grant its accommodation requests as required by existing federal law;

c.   has invoked authority for its accommodation from the requirements related to the City's Grant Assurances and Competition Plan;

d.   claims that ample gate availability existed at the time of the requests for accommodation and that its pending requests should be granted without further delay;

e.   claims entitlement to a permanent or long term accommodation;

    f.   argues that Congress emphasized the importance to maintain access to new entrants, and that it is a new entrant;

    g.   requests immediate accommodation in accordance with the First DOT Letter as to its request for five flights and that within 30 days that a forced accommodation for its requested eight additional flights be issued;

    h.   argues that the First DOT Letter is a final and binding directive;

    i.   disputes that "pattern of service" is limited to the same equipment or citypair;

    j.   argues that any attempt to so define "pattern of service" would be contrary to federal law; and

    k.   appears to assert that its rights to accommodation are superior to Southwest's, American's, United's, or their sublessees' preferential gate use rights under their leases.

    l.   In addition, via telephone on June 17, 2015, a Delta attorney represented to an attorney for the City that Delta had drafted and was ready to file an administrative complaint with DOT against the City, essentially to enforce the DOT Letters.

**RESPONSE:  Delta denies the allegation in sub-paragraph 85b that it has threatened the City.  Delta denies the allegations in sub-paragraph 85k.  Delta admits the remaining allegations in Paragraph 85.**

86.    In its latest communications with the City, Virgin:

    a.   argues that accommodation requirements should not be for the benefit of large legacy Airlines, particularly those with significant operations at DFW;

    b.   argues the policies should instead help develop low-cost entrant air carriers;

41

and

c.   claims any forced accommodation imposed on it would unduly interfere with its rights, be contrary to its agreement with the City, and violate the DOJ settlement.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 86.**

87.     In its latest communications with the City, Southwest:

a.   claims it has the legal right to fully utilize all gates that it leases at Love Field and this right includes Southwest's ability to expand its own operations on those gates at any time;

b.   claims that the City has no legal right to abrogate its rights to fully utilize its leased gates;

c.   relies on WARA, the City's competition plan as approved by the FAA, the 1999 FAA/DOT "Airport Business Practices and Their Impact on Airline Competition," and Southwest's lease with the City;

d.   claims that any attempt by the City to prevent Southwest from adding flights for its planned expansion would be unlawful, cause severe and irreparable harm, and would be subject to an immediate challenge by Southwest; and

e.   claims a mandatory accommodation would be improper and unlawful, violate the terms of the lease, would reduce competition, and would constitute an unlawful taking of its property.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 87.**

88**[a]**.  **[1]** If the City fails to comply with duly authorized direction from the DOT, it faces immediate loss of its substantial grant funds, injunctive action and further penalties which would irreparably damage the City. **[2]** The City seeks to ensure that its residents and the flying public are well served at Love Field but it is impossible to resolve the competing and conflicting claims without judicial interpretation, direction, and decision.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentence one of Paragraph 88[a].  Delta denies the allegations in sentence two of Paragraph 88[a].**

88**[b]**.  **[1]** Examples of the conflicting interpretations, each of which is concrete and ripe, start with who is entitled to be accommodated. **[2]** The accommodation provisions of the lease provide that "a new entrant airline (Requesting Airline)" should be accommodated if the accommodation does not unduly interfere with the Signatory Airline's operating schedules. **[3]** Delta asserts that it is a new entrant. **[4]** Southwest asserts that Delta is not a new entrant since it has been continuously operating from Love Field since at least 2009 and that the term "new entrant" is not limited to Love Field but must also include consideration of air carriers currently at DFW Airport. **[5]** DOT has told the City to treat Delta as a new entrant. **[6]** DOT has rejected Southwest's contention (shared by DOJ) that DFW Airport and Love Field comprise a single competitive market.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences one, four, and six of Paragraph 88[b].  Delta admits the allegations in sentences two, three, and five of Paragraph 88[b].**

89.      **[1]** Conflicts exist as to what constitutes an accommodation and how long it must last. **[2]** Delta acknowledges that it has been accommodated in the sense that it has been able to

continue flight operations since its sublease with American was terminated. **[3]** However, Delta asserts that it must be permanently accommodated regardless of Southwest or any other Airline's planned expansion or the terms of its agreement with United. **[4]** Southwest asserts that Delta has no such rights and that Delta's accommodation must yield to the use of gates by those with contractual lease rights for the use of the gates. **[5]** DOT has directed that Delta is a "new entrant," entitled to gate accommodation, because it is not a Signatory Airline, despite its operations history at Love Field, and that Delta has a continuing right to use the gate slots it may obtain through accommodation as long as it continues its pattern of service even if the agreement by which Delta was voluntarily accommodated has a certain expiration date. **[6]** When the City sought to define what constituted a pattern of service, DOT declined to provide advice and Delta has claimed that the City's proposed definition of DOT's term is unlawful.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 89.  Delta denies the allegations in sentences two and three of Paragraph 89.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences four and six of Paragraph 89.  Delta admits that the DOT has determined that Delta is a "new entrant" entitled to gate accommodation and that Delta has a continuing right to use the gate slots it may obtain through accommodation as long as it continues its pattern of service; Delta lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in sentence five of Paragraph 89,**

90.     **[1]** Conflicts exist over how much should be paid for any accommodation. **[2]** Delta asserts that whatever accommodation is provided, it only has to pay a pro rata share of lease payments made by the accommodating Airline to the City. **[3]** Southwest asserts that any payment by Delta must include direct costs, indirect costs, lost profits, and administration costs,

44

including as a cost component for what Southwest paid to United to obtain the rights to use United's gates. **[4]** Virgin has asserted that Delta had the opportunity to enter into the market place, compete, and pay United for right to use some or all of the gates. **[5]** Virgin contends that Delta should not be allowed to acquire the rights without competing in the open market and paying fair value. **[6]** DOT tells the City that Delta need only pay the direct costs and administrative costs, regardless of what Southwest paid for any gates or of the fair market value of any gates.

**RESPONSE:  Delta admits the allegations in sentences one, two, and six of Paragraph 90.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences three, four, and five of Paragraph 90.**

91.        **[1]** Conflicts exist over whether an accommodation is feasible. **[2]** Stated differently, the Airlines disagree as to how and when the City should assess whether an accommodation would unduly interfere with the Signatory Airline's operations. **[3]** Delta argues that a snapshot date should be used that limits consideration to the date of the request and a limited six month look ahead. **[4]** DOT generally agrees with Delta's position. **[5]** Both Virgin and Southwest dispute the position. **[6]** Virgin maintains any look-ahead must be at least 12 months and does not depend on the sale of tickets. **[7]** Southwest disputes the entire contention. **[8]** It has further contended that the timing of Delta's accommodation request, coinciding with rapid changes at Love Field due to the repeal of the Wright Amendment, make the use of any snapshot and look-ahead approach impractical and irrational as applied to Delta's current requests.

**RESPONSE:  Delta admits the allegations in sentences one, two, three, and four of Paragraph 91.  Delta lacks information or knowledge sufficient to form a belief about the**

**truth of the allegations in sentences five, six, seven, and eight of Paragraph 91.**

92.      **[1]** As to how to determine whether an accommodation is feasible, the Airlines disagree as to the applicable factors such as time on gate, time between turns, and buffer times between sequential flights. **[2]** Virgin argues it needs more time because of the type of flights it offers. **[3]** The Airlines disagree as to the maximum number of flights that can occur at any particular gate. **[4]** DOT has told the City that from its perspective, it is the total number of passenger seats that operate through a particular gate that is determinative and that the goal should be to maximize the use of each gate.

**RESPONSE:  Delta admits the allegations in sentences one and three of Paragraph 92.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences two and four of Paragraph 92.**

93.      **[1]** Conflicts exist as to what criteria the City should or must use in making an accommodation decision. **[2]** Delta argues that destination cities from Love Field are relevant, DOT asserts that the City may not consider flight destinations and can only consider gate utilization (however that is measured).

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 93.  Delta admits that it argues destination cities are relevant.  Delta lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in sentence two of Paragraph 93.**

94.      Conflict exists between the City and the Federal Agencies over whether, in making an accommodation decision, the City must, can or may not consider other air service in the Dallas – Ft. Worth metropolitan area.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about**

**the truth of the allegations in Paragraph 94.**

95.     Conflicts exist among Virgin, the Federal Agencies and DOJ as to whether Virgin's gates may be considered in an accommodation decision or whether Virgin is exempt from making an accommodation and, if so, for how long.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 95.**

96.     **[1]** The communications between and among the City, the Airlines, and the Federal Agencies, and DOJ establish that the above conflicts each and collectively present a complex set of controversies that are concrete and ripe for judicial determination. **[2]** There is a real and substantial controversy of sufficient immediacy and reality that exists between the parties having adverse legal consequences. **[3]** The City has clear standing to seek judicial resolution of these controversies. **[4]** If the City, on or before July 6, 2015, directs Southwest and/or Virgin to accommodate Delta, Southwest and/or Virgin claim an immediate loss of valuable rights and interests (and injury to their passengers). **[5]** If the City does not direct an accommodation on or before July 6, 2015, Delta claims an immediate loss of valuable rights and interests (and injury to its passengers). **[6]** Whatever action or inaction the City takes, it faces the prospect of an enforcement action from DOT or FAA that could result in loss of the City's ability to collect passenger facility charges and to receive federal airport grants.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences one, two, three, and six of Paragraph 96.  Delta admits the allegations in sentence four of Paragraph 96.  Delta denies the allegations in sentence five of Paragraph 96.**

97.     **[1]** There is simply not enough room to accommodate everyone. **[2]** On

information and belief, the Airlines are selling tickets to the public that regardless of the City's decision cannot all be honored. **[3]** There are 20 gates and space for about 200 flights. **[4]** Upon information and belief, the Airlines are selling tickets to far more than 200 flights. **[5]** Delta has suggested that Delta may retain security to protect their continued use of the space they are currently using after July 6, 2015. **[6]** The potential disruption to the flying public under such a circumstance would be enormous and could have national ramifications immediately after the extraordinarily busy Independence Day weekend travel. **[7]** Unless these controversies are resolved, the disruptions will continue to recur, and may rise to a level implicating public safety.

**RESPONSE:  Delta denies the allegations in sentences one, six, and seven of Paragraph 97.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences two and four of Paragraph 97.  As to sentence three of Paragraph 97, Delta admits there are 20 gates but denies there is only space for 200 flights. Delta admits the allegations in sentence five of Paragraph 97.**

98.     **[1]** DOT and FAA have advised the City that any decision must be made with controlling effect given to the City's Grant Assurance obligations and its obligation to comply with its Competition Plan. **[2]** DOT officials have stated that any decision not consistent with their understanding runs the risk of violating the terms of the Grant Assurance and Competition Plan. **[3]** Delta characterizes DOT's communications as threats of enforcement action. **[4]** However, DOT has carefully refrained from making an overt threat that failure to accommodate Delta or failure to comply with the terms of the First DOT Letter necessarily will be a violation of the City's Grant Assurances or Competition Plan. **[5]** DOJ has advised that Virgin is exempt from any accommodation request for at least one year regardless of whether Virgin is fully utilizing the subleased gates. **[6]** DOT has declined to opine on that issue.

**RESPONSE:  Delta admits the allegations in sentences one, two, and three of Paragraph 98.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences four, five, and six of Paragraph 98.**

99.     The City believes that it is forced to conform to the standards stated in the First DOT Letter and DOJ communications or risk severe pecuniary loss and possible closure of Love Field if federal grants and ability to levy passenger facility charges are lost. The City has been and will be adversely affected by the DOT and FAA positions which involve the rights and obligations of the City and the Airlines and legal consequences flow from those positions.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in Paragraph 99.**

100.     **[1]** Even without DOT or FAA involvement, there is an imminent threat of litigation against the City from the Airlines. **[2]** Of course, two of the Airlines are already involved in litigation with DOT over the First DOT Letter. **[3]** Southwest has advised the City that any City decision that interferes with its planned expansion "would be subject to an immediate challenge;" would constitute an unlawful taking; would create potential liability of millions of dollars; and the City should consider the potential liability before making any decision. **[4]** Southwest has stated it will challenge in court any attempt by the City to force accommodation of Delta that prevents it from operating its new flights starting August 9, 2015. **[5]** Delta and Virgin have been a bit more circumspect but the existence of an imminent threat of litigation from either is present. **[6]** Delta has advised the City that a failure to accommodate will violate the City's federal obligations including its Grant Assurances; interfere with rates, routes, and fares that are explicitly preempted by federal law; be anti-competitive or contrary to the Competition Plan; and constitute serious (but unspecified) violations of the City's legal

obligations. **[7]** Delta states it has exhausted its efforts and that there has been no action by the City "despite the laudable efforts and enforcement threats by DOT." **[8]** Virgin claims there are compelling legal reasons why it cannot be forced to accommodate and that such action would be unlawful.

**RESPONSE:  Delta admits the allegations in sentences one, two, six, and seven of Paragraph 100.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences three, four, and eight of Paragraph 100.  Delta admits that it is asserting counterclaims against the City in this case.  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in the rest of sentence five of Paragraph 100.**

101.     **[1]** All parties claim competition as justification for their position with the ultimate goal of better service and fares. **[2]** All note the unique circumstances at Love Field. **[3]** Delta and Virgin claim Southwest has control of 90% of Love Field's gates. **[4]** Southwest responds that it is barred from competing at DFW and relies on its historical impact on competition. **[5]** The factual underpinnings of this case reflect the confusing and conflicting nature of the policies regarding competition as reflected in federal law.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations in sentences one, two, and four of Paragraph 101.  Delta admits that Southwest controls 90% of Love Field's gates but lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in sentence three of Paragraph 101.  Delta denies the allegations in sentence five of Paragraph 101.**

102.     The Federal Agencies insist on an accommodation decision according to their view of the law or the City risks enforcement actions for failing to comply with the required

assurances and competition plan. But no matter what the decision, the City will be sued by one or more of the Airlines and perhaps even by the Federal Agencies and/or DOJ.  The case and controversy is actual, concrete, and ripe for judicial decision.

**RESPONSE:  Delta lacks information or knowledge sufficient to form a belief about the truth of the allegations Paragraph 102.**

103.     The City emphasizes that it seeks clarity of its obligations and rights rather than any particular result.

**RESPONSE:  Paragraph 103 contains no allegations requiring a response.**

104.     Although the City recommends that temporary injunctive relief be granted to preserve the status quo during this litigation if Southwest and Delta cannot resolve their issues, the City anticipates that Delta and Southwest will present evidence supporting their respective views of what the status quo should be. The City is not likely to need to take a position in that dispute other than to urge that a preliminary injunction will be necessary to preserve the status quo and prevent chaos at Love Field in the public interest during the busy summer travel season.

**RESPONSE:  Paragraph 104 contains no allegations requiring a response.**

105.     As July 6, 2015, approaches, if Southwest and Delta have still not reached voluntary agreement, even if only a temporary further gate use extension, and the Court has not issued a preliminary injunction, the City likely will seek a temporary restraining order to preserve the status quo in order to prevent chaos at Love Field when Delta's current gate use arrangement with Southwest expires on that date.

**RESPONSE:  Paragraph 105 contains no allegations requiring a response.**

**VI. CLAIMS**

**CLAIM I: The Federal Agencies have violated the APA and WARA**

51

106.     The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105.

**RESPONSE:  Delta incorporates and adopts every response to the preceding paragraphs numbered 1 through 105.**

107.     **[1]** The APA confers a right of judicial review on any party adversely affected by agency action. *See* 5 U.S.C. § 702. **[2]** The DOT Letters and the DOT Action each is a final agency action issued in violation of the APA and WARA.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 107.  Delta denies that the DOT letters and the DOT Action each was issued in violation of the APA and WARA.  The remaining the allegation in sentence two of Paragraph 107 is a legal conclusion to which no response is required.**

108.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**RESPONSE:  Delta admits the allegations in Paragraph 108.**

109.     **[1]** Under WARA, federal agencies shall not make "findings or determinations, issue orders or rules . . . , or take any other actions . . . that are inconsistent with [the Five Party Agreement] . . . ." Pub. L. 109-352, Section 5(d)(1)(A). **[2]** The Five Party Agreement requires respect for preferential gate leases at Love Field.

**RESPONSE:  Delta admits the allegations in sentence one of Paragraph 109.  Delta admits that the Five Party Agreement requires the City to require the sharing of preferential lease gates pursuant to the city's the-existing lease agreements and denies the remaining allegations in sentence two of Paragraph 109.**

110.    **[1]** In the DOT Letters, the Federal Agencies direct the City to "continue the accommodation [of Delta] and ensure that space is available so that [Delta] is able to maintain its pattern of service on an ongoing basis . . . ." First DOT Letter at 2. **[2]** By directing the City to accommodate Delta on an indefinite and ongoing basis, DOT has violated WARA by effectively forcing the City to abrogate preferential gates leases protected by the Five Party Agreement. **[3]** The DOT Letters are therefore unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should issue judgment so declaring.

      **RESPONSE:  Delta admits the allegations in sentence one of Paragraph 110.  Delta denies the allegations in sentences two and three of Paragraph 110.**

111.    **[1]** Additionally, WARA mandates that the Federal Agencies shall not require the modification or elimination of preferential gate leases at Love Field "unless such modification or elimination is implemented on a on a nationwide basis." Pub. L. 109-352, Section 5(e)(2)(B)(ii). **[2]** However, the DOT Letters require the City to eliminate preferential gates leases without requiring that the elimination be implemented on a nationwide basis. **[3]** Thus, the DOT Letters and the DOT Action are each unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should enter judgment so declaring.

      **RESPONSE:  Delta admits the allegations in sentence one of Paragraph 111.  Delta denies the allegations in sentences two and three of Paragraph 111.**

112.    Alternatively, if the any DOT Letter or the DOT Action is not a final agency action under the APA, the Federal Agencies' interference with preferential gate use rights protected by Love Field leases violates of the APA and WARA. Section 5(d)(1)(A) of WARA broadly and expressly prohibits the Federal Agencies from interfering with the Five Party Agreement and WARA further mandates that any elimination or modification of preferential gate

leases at Love Field shall only be implemented on a nationwide basis. Pub. L. 109-352, Section

(e)(2)(B)(ii). The Federal Agencies have failed to comply with WARA's mandate in violation of

the APA, and the Court should enter judgment so declaring.

**RESPONSE:  Delta denies the allegations in Paragraph 112.**

### CLAIM II: Declaratory Judgment

113.    The City incorporates and adopts every allegation in the preceding paragraphs

numbered 1 through 105 and 107 through 109.

**RESPONSE:  Delta incorporates and adopts every response to the preceding**

**paragraphs numbered 1 through 105.**

114.    In addition or in the alternative, pursuant to 28 U.S.C. § 2201, the City requests

that the Court declare the rights and legal obligations of the City, the Airlines, and the Federal

Agencies under WARA, title 49, and other federal law.

**RESPONSE:  Paragraph 114 contains no allegations requiring a response.**

115.    The DOT Letters have caused significant uncertainty as to the City's rights under

WARA and to the rights and obligations of the City with respect to the Federal Agencies'

directives in the Five Party Agreement, the leases and subleases with the Airlines, and the City's

Grant Assurances and other obligations to DOT and FAA, and to the Airlines.

**RESPONSE:  Delta denies the allegations in Paragraph 115.**

116.    In particular, the City requests that the Court declare, in consideration of WARA,

the Five Party Agreement, the DOT Letters, the leases and subleases, the City's Grant

Assurances and other obligations to DOT and FAA, and the Airlines, and all other applicable

laws, regulations, and instruments, the terms, conditions, and scope at Love Field of:

      a.   The City's right and obligation to determine pending gate accommodation

requests in the absence of voluntary Airline accommodation agreements;

b. The proper considerations and procedures for the City to adopt in considering and deciding gate accommodation requests at Love Field;

c. The meaning of each Signatory Airline's preferential rights to gate use and obligations to accommodate other Airlines' gate use requests;

d. Delta's rights to temporary and permanent gate accommodation;

e. American's rights to temporary and permanent gate accommodation;

f. DOT and FAA's authority under WARA and related federal laws and Grant Assurances to require the City to mandate that a Signatory Airliner, or sub-lessee, or other gate user provide permanent gate accommodation to other carriers if such accommodation would unduly interfere with their flight schedule, including defining "unduly interfere," declaring the durational requirements of any such mandatory accommodation, declaring the permissible considerations in mandating compensation for such mandatory accommodation, and declaring the circumstances under which each Signatory Airline's, sub-lessee's, or other gate user's schedule protects that carrier from having to provide gate accommodation; and

g. Such other and further declaratory relief as may be requested by the City and to which the Court may appear proper.

**RESPONSE:  Paragraph 116 contains no allegations requiring a response.**

### CLAIM III: Declaratory Judgment

117.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

55

**RESPONSE:  Delta incorporates and adopts every response to the preceding paragraphs numbered 1 through 105.**

118.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that any action or inaction that the City may take or decline to take respecting gate accommodation requests at Love Field shall not constitute violations of any Grant Assurances to FAA, the Competition Plan, or other federal law to the extent that such City action or inaction is consistent with the orders and judgment of the Court in this civil action.

**RESPONSE:  Paragraph 118 contains no allegations requiring a response.**

**CLAIM IV: Declaratory Judgment**

119.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE:  Delta incorporates and adopts every response to the preceding paragraphs numbered 1 through 105.**

120.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that if the City is compelled by the DOT, including by the DOT Action and any provisions of the DOT Letters, to interfere with any Signatory Airline's preferential gate use rights under the Signatory Airlines' lease, the City will have been prevented from performing any of its obligations [under the lease] by reasons of . . . acts of a superior Governmental Agency, . . . or any other circumstances for which it is not responsible or which are not in its control under the

Southwest Lease (and Master Lease) section 14.12, and therefore be declared not to have breached said lease by such interference.

**RESPONSE:  Paragraph 120 contains no allegations requiring a response.**

### CLAIM V: Declaratory Judgment

121.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE:  Delta incorporates and adopts every response to the preceding paragraphs numbered 1 through 105 and 107 through 109.**

122.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that the City's consent to the United-Southwest sublease of United's Love Field Gates was not anti-competitive and was not a violation of any Grant Assurance given DOJ's lack of objection, DOT's lack of objection, and further declaring DOT and FAA are estopped from finding that that the consent or the sublease, or the two together, was or were a Grant Assurance violation or from otherwise treating the consent or the sublease as a violation.

**RESPONSE:  Paragraph 122 contains no allegations requiring a response.**

### VII.

### TEMPORARY INJUNCTIVE RELIEF MAY BE NECESSARY

123.    **[1]** As described above, the voluntary temporary gate accommodation agreement, which allows Delta to operate, expires on July 6, 2015. **[2]** Delta has announced that it is continuing to sell tickets for flights to and from Love Field for after July 6, 2015. **[3]** Southwest has announced that it plans to operate flights in the times and gates currently being used by

Delta. **[4]** Both parties claim a right to fly to and from Love Field from essentially the same place and time and both have made demand on the City to enforce their respective positions. **[5]** An additional purpose in filing this action is to allow the interested parties, if they so desire, to seek temporary injunctive relief and to provide further motivation for them to reconcile their differences until the Court can finally determine the respective rights of the parties.

**RESPONSE:  Delta denies the allegations in sentences one, three, and four of Paragraph 123.  Delta admits the allegations in sentence two of Paragraph 123.  Sentence five of Paragraph 123 contains no allegations requiring a response.**

124.    If other parties fail to do so in time for the Court to consider their requests, the City may find it necessary to seek a temporary restraining order or a preliminary injunction to prevent chaos at Love Field on and after July 6, 2015, during the pendency of this suit.

**RESPONSE:  Paragraph 124 contains no allegations requiring a response.**

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, the City requests that the Court find and declare: 1) that the Federal Agencies have violated the APA and WARA and 2) the rights and legal obligations of the City and the Airlines under WARA, related federal laws and regulations, and Grant Assurances, and agreements of the interested parties, as requested above. The City further requests that it be awarded its reasonable attorney fees, its costs, and such other relief as the Court finds just.

**RESPONSE: The Conclusion and Prayer contains no allegations requiring a response.**

## DELTA'S COMPLAINT AND COUNTERCLAIMS AGAINST THE CITY OF DALLAS

### Introduction

1.      For years, the City of Dallas has promised Congress, the Federal Aviation Administration ("FAA"), the Department of Transportation ("DOT), the airline industry, and the flying public that it is committed to fostering competition at the Love Field airport.  And it has done so with good reason:  competition is only good for consumers.  At Love Field, as in most forums, competition means more choices: more airlines, more flights, more destinations, and more departure times.  Competition also means lower prices.  Little wonder, then, that just last year Mayor Mike Rawlings extolled the virtues of airline competition at Love Field during a City Council meeting, proclaiming that "competition at [Love Field] is good" and "a growth driver for this City" and that the City's goal should be to "continue to drive competition" and "take all this competition and get people flying all over the nation."

2.      The chasm between the City's words and the City's actions could hardly be wider.  Over the last year, Delta has worked tirelessly to continue offering regular non-step service to Atlanta and points beyond out of Love Field.  But when the time came for the City to deliver on its repeated promises that it would support competition at Love Field by accommodating Delta, the City abdicated.  Despite having pledged to Delta that it would ensure Delta's continued operations at Love Field, the City has wilted.

3.      In doing so, the City appears to have abdicated its responsibility to ensure the full and fair competition at Love Field it repeatedly claimed to support and is bound by law to promote.  And Love Field is in desperate need of that kind of competition: Love Field was one of only 24 of the country's largest airports to see increases in inflation-adjusted average fares from 2000 to 2014, and Southwest enjoys near-monopoly power at Love Field, with leases or

subleases for 18 of the airport's 20 statutorily capped gates.  But after initially promising to honor the many commitments it has to promote competition, the City crumbled in the face of Southwest's demands and threats.  The City could have avoided this protracted disagreement and spared the parties and the Court the time and expense of litigation by making good on its obligations under the Lease Agreements that govern gate usage at Love Field—obligations that are codified and reaffirmed in the Wright Amendment Reform Act, the Five Party Agreement, the City's own Competition Plan, and its grant-assurance agreements with the federal government.  Instead, the City has thrown up its hands and asked this Court to make the decision that the City lacks the courage and political will to make.

4.      The City defends its actions by claiming that Delta's requests to be accommodated at Love Field—and the DOT's directives instructing the City to accommodate Delta—are inconsistent with the terms of Southwest's Lease.  This is nonsense.  The Lease Agreement requires the City and Southwest to accommodate Delta so long as it is possible to do so without disrupting the flight schedule Southwest had in place at the time of Delta's accommodation request.  Every reasonable and relevant measure of gate usage and availability (including the City's own measures), as well as actual experience in the intervening months, shows that Southwest could accommodate Delta's flight schedules without any disruption to or interference with its own operations.  Southwest's contention (which the City parrots in its complaint) that it can avoid its accommodation obligation by ramping up its future flight schedule is unsupportable as a matter of federal law and indefensible as a matter of common sense.  Delta can and must be accommodated at Love Field.  By refusing to do so, the City is disregarding its repeated public assurances, its express commitments to Delta, and its binding legal duty to accommodate additional airlines interested in providing service at Love Field.

5.      By misleading Delta about its intentions and walking away from its commitments and agreements, the City threatens to impose extraordinary, irreparable harm on Delta.  The City's failure to accommodate Delta creates an imminent threat of disruption to Delta and its passengers, damage to Delta's business reputation and customer good will, and unnecessary expense and uncertainty.  The City's abject failure to fulfill its legal duty to foster competition and accommodate Delta at Love Field—and its failure to live up to its repeated assurances to Delta and the public—are inexcusable.  Delta therefore asks this Court to enter an injunction ordering the City to do what it was duty-bound under law to do: force accommodation of Delta's operations at Love Field.

## Parties

6.      Counter-Plaintiff Delta Air Lines, Inc. is a Delaware corporation whose principal place of business is located at 1030 Delta Boulevard, Atlanta, Georgia 30354.  Delta is an air carrier engaged in the business of providing commercial passenger air transportation throughout the United States and the world.  Delta is a citizen of the States of Delaware and Georgia.

7.      Counter-Defendant City of Dallas is a municipal corporation located in Dallas County, Texas.  The City is the owner and operator of Love Field.  The City is a citizen of the State of Texas and does not operate as an arm of the State of Texas.

## Jurisdiction and Venue

8.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

9.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

10.     To the extent this Court does not have original jurisdiction of any counterclaim(s) asserted in this action, this Court has jurisdiction under 28 U.S.C. § 1367 because the Court has original jurisdiction of the action and all of the counterclaims asserted herein are so related to one another that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Delta's counterclaims occurred in this judicial district.

## Background and Facts

## I.    Federal Regulation of Federally Funded Airports

12.     DOT and its operating administration, the FAA, exercise plenary and preemptive authority over federally funded airports (such as Dallas Love Field). To receive funding under the federal funding program known as the Airport Improvement Program ("AIP"), an airport sponsor (such as the City) must agree to comply with statutory and contractual obligations relating to the operation and use of the airport.  The purpose of these statutory obligations and grant assurances is to foster full and fair competition in air transportation.

13.     Love Field has received federal funding under AIP.  In fact, over the past five years alone, Love Field has received over $20 million from the federal government for airport improvements.  In addition, Love Field has received federal approval to impose and use a $4.50 passenger facility fee.  As a result, the City is subject to more than a dozen contractual obligations known as "grant assurances" regarding the operation and use of Love Field.  The grant assurances are binding obligations between the City and the federal government.

14.     Grant assurance 22a, which implements 49 U.S.C. § 47107(a)(1), requires the

City to make Love Field available "as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."  The City owes this obligation to all air carriers and users of Love Field, regardless of whether the air carrier or user is a tenant, subtenant, or non-tenant.   This obligation bars the City from denying an air carrier access to Love Field solely based on the non-availability of existing facilities.

15.     Grant assurance 23, which implements 49 U.S.C. § 40103(e), prohibits the City from directly or indirectly granting any carrier an exclusive right to use Love Field.  Under this prohibition, the City may not: claim lack of gate availability when, in fact, gates are not fully utilized; relinquish control of airport facilities to incumbent carriers for purposes of negotiating access with a new entrant; or permit unreasonable sublease fees or conditions to be imposed on new entrants.  At Love Field, a "new entrant" is a non-signatory carrier that either (i) does not currently provide scheduled service at Love Field and has not voluntarily terminated scheduled service at Love Field within the past twelve months; or (ii) operates less than 6 daily flights at Love Field.  Delta is a new entrant at Love Field.

## II.     The City's Competition Plan for Love Field

16.     As a recipient of federal funding under AIP, and as a Passenger Facility Charge sponsor, the City is required under federal law to submit an acceptable competition plan to the Secretary of Transportation.   The FAA consistently has interpreted the competition plan requirements as focusing on individual airports—not airport systems or metropolitan areas— when assessing availability of gates for new entrants.    And Love Field itself—not the Dallas/Fort Worth Metropolitan Area—is subject to its own requirement to submit and make commitments in its airport competition plan.

17.     A competition plan must include, among other things, a discussion of the accommodation of new service and of service by a new entrant.  "Accommodation" is the process by which an airline that already operates regularly scheduled flights at an airport is required by the airport owner, operator, or sponsor to provide a portion of its space at the airport—including gate and related support space—to an airline that seeks to begin service or expand its current service at the airport.

18.     In its competition plans, the City has repeatedly acknowledged that when new entrant airlines wish to begin providing service at Love Field, the City is obligated to force accommodation if necessary in order to promote competition.  The City filed its initial Love Field Competition Plan (the "Competition Plan") on July 31, 2001.  In its plan, the City "recognize[d] that, by having accepted Federal grants, it has undertaken a legal obligation to provide reasonable air carrier access at Love Field."[1]  The City further recognized that its leases with incumbent carriers "include gate-sharing provisions . . . *requiring* accommodation of other airlines within the lease premises of the incumbent airlines."

19.     In an update to its Competition Plan filed in February 2005, the City once again acknowledged its obligation "to make all reasonable efforts to accommodate carriers seeking to provide service at Love Field," "reiterated its willingness to enforce the gate sharing provisions of the leases to make space available to" potential new entrants, and stated that it "continue[s] to be committed to ensuring that any carrier seeking to provide service to Love Field receives reasonable access to needed facilities."

20.     The City filed another update to its Competition Plan in June 2009, and in that

---

[1]  City of Dallas, Airline Competition Plan at 2 (July 31, 2001), available at http://www.dallas-lovefield.com/pdf/CompetitionPlan.pdf.

update the City specifically acknowledged its obligation to force accommodation of Delta at Love Field. The City reaffirmed its general commitment "to accommodating new entrants" and explained that "[i]n the future, the City intends to accommodate requests for access by applying the gate sharing provisions contained in the current lease—provisions which have been incorporated in Section 4.06F of the new Restated Lease."

21.     At the time of the 2009 update, Delta had informed the City of its intent to provide service at Love Field, and the City's update included a specific plan to accommodate Delta. The City represented that "[o]nce the terminal redevelopment is completed, *the City will accommodate Delta* based on the gate sharing provisions of the preferential use lease."

### III.    The Airport Use and Lease Agreements

22.     The lease agreements referenced in the Competition Plan and its updates are the Airport Use and Lease Agreements the City has entered into with three carriers—Southwest, American, and United Airlines (collectively, the "Lease Agreements"). The Lease Agreement between the City and Southwest spells out the details and logistics of the City's obligation to force accommodation at Love Field.

23.     Under § 4.06(D)(4) of the Lease Agreement, if "a new entrant carrier seeks to begin service at" Love Field, the City is obligated to "seek voluntary accommodation from its existing airline lessees to accommodate the new entrant service," and "[i]f the existing carriers are not able or are not willing to accommodate the new entrant service, then the City *agrees to require* the sharing of" the incumbent airlines' leased gates.

24.     Section 14.09 of the Lease Agreement expressly incorporates the airport grant assurances into the Lease Agreement and makes the Lease subordinate to those grant assurances.

25.      Section 4.06(F) of the Lease Agreement contains a scarce-resource provision

that acknowledges that Love Field's facilities "may become a scarce resource if a new entrant airline ('Requesting Airline') requests to provide service at the Airport" and lays out a four-step process through which a potential new entrant carrier may seek accommodation at Love Field:

> A. The requesting airline must seek voluntary accommodation by attempting to secure gate space and other necessary facilities on a voluntary basis from one of the incumbent airlines at Love Field. (§ 4.06(F))
>
> B. If the requesting airline has contacted all of the incumbent airlines and exhausted all reasonable efforts to secure voluntary accommodation, the requesting airline may notify the City's Director of Aviation, who in turn must "notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner." (§ 4.06(F)(2))
>
> C.  At the end of that 30-day period, if none of the incumbent airlines have agreed to voluntarily accommodate the requesting airline, the City is obligated to "select a Signatory Airline to accommodate the Requesting Airline" and send a written notice to that Signatory Airline requiring accommodation within 30 days of receipt of the notice. (§ 4.06(F)(3))
>
> D. At the end of that second 30-day period (in other words, 60 days after the requesting airline first provides notice to the City's director of aviation), the incumbent airline that has been selected for accommodation must accommodate the requesting airline by sharing a portion of its leased gates and allowing the requesting airline to operate flights out of that shared gate space. (§ 4.06(F)(4))

Thus, under the Lease Agreement, when a new entrant airline makes an exhaustive but unsuccessful effort to seek voluntary accommodation from incumbent carriers, the City is subject to a mandatory duty to force accommodation of the new entrant.

## IV.   The Five Party Agreement

26.     In 1979, Congress passed the Wright Amendment, which amended the Federal Aviation Act to prohibit service by medium and large aircraft (more than 56 seats) between Love Field and any point outside of Texas and its four surrounding states (Arkansas, New Mexico, Louisiana, and Oklahoma).   Later amendments to the Wright Amendment added Alabama, Kansas, Mississippi, and Missouri to the Love Field service area.

27.     On July 11, 2006, the Cities of Dallas and Fort Worth, the DFW International Airport Board, Defendant American Airlines, and Southwest entered into an agreement (the "Five Party Agreement") that, among other things, sought the enactment of legislation that would amend and ultimately repeal the limitations on Love Field operations imposed by the Wright Amendment.  In exchange for lifting these limitations, the Five Party Agreement called for the reduction of gate capacity at Love Field, from 32 to 20 gates, which the agreement allocated among Southwest (16 gates), American (2 gates), and ExpressJet Airlines, Inc. (2 gates, which were later acquired by Defendant United Airlines).

28.     In the Five Party Agreement, the City agreed—and is obligated—to compel forced accommodation of new entrant carriers at Love Field.  Specifically, the Five Party Agreement provides that "[t]o the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service.  If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas *agrees to require* the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements."

## V.     The Wright Amendment Reform Act of 2006

29.     On October 13, 2006, Congress enacted the Wright Amendment Reform Act of 2006, Pub. L. No. 109-352, 120 Stat. 2011 (2006) (the "Reform Act").  The Reform Act codified into federal law many of the most important provisions of the Five Party Agreement.  It permanently capped the number of Love Field gates at 20 and provided for the eventual elimination of the limitations on nonstop flights at Love Field.

30.     Section 5(a) of the Reform Act requires the City to "determine the allocation of leased gates and manage Love Field in accordance with" the provisions of the Lease

Agreements.  This includes an express requirement that the City must "accommodate new entrant air carriers" by "honor[ing] the scarce resource provisions of the existing Love Field leases."  Section 5(a) thus codifies into federal law the City's obligation under the Lease Agreements to force accommodation of new entrants (such as Delta) at Love Field.

31.     Section 5(e) of the Reform Act explicitly reserves to the FAA its jurisdiction to enforce grant assurance and statutory obligations related to grant assurance compliance and the prohibition on exclusive rights: "Nothing in this Act shall be construed . . . to limit the authority of the Federal Aviation Administration or any other Federal agency to enforce requirements of law and grant assurances . . . that impose obligations on Love Field to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field."

## VI.     The City's Repeated Promises to Accommodate Delta at Love Field

32.     Delta currently offers five daily flights from Love Field to its hub, Atlanta's Hartsfield-Jackson International Airport, from which passengers can connect to Delta's worldwide network of flights.  Delta has been operating out of Love Field since the summer of 2009, when it subleased a gate from American Airlines.  Delta's sublease with American was extinguished as a result of the 2013 merger between American and US Airways.  As a condition of its approval of the merger, the Department of Justice announced in November 2013 that American would be required to divest its two gates at Love Field.  In May 2014, Defendant Virgin America announced that the City had approved Virgin's request to sublease the two Love Field gates American was divesting.  Accordingly, Delta's sublease at Love Field would terminate on October 12, 2014.

33.    Delta first sought accommodation from the City under the Five Party Agreement and the Lease Agreements in June 2014.  Delta began the four-step accommodation process set out in the scarce-resource provisions of the Lease Agreements by seeking voluntary accommodation from the incumbent airlines.  In June 2014, Michael Anastas, a Regional Director for Delta, sent letters to United Airlines, Southwest Airlines, and American Airlines formally seeking voluntary accommodation of Delta's scheduled services at Love Field under § 4.06(F) of the Lease Agreements between the airport and each of these carriers.  Mr. Anastas also notified Mark Duebner, the City's Director of Aviation at Love Field, that Delta was beginning the process of seeking voluntary accommodation from the three incumbent carriers.  On July 16, 2014, Delta provided written notice to the City that Delta had contacted all three signatory carriers, that none was willing to voluntarily accommodate Delta at Love Field, and that Delta thus had exhausted all reasonable efforts to secure voluntary accommodation.  Delta also formally requested forced accommodation from the City.

34.    Under § 4.06(F)(2) of the Lease Agreements, Delta's July 16, 2014 formal accommodation request obligated the City to select a signatory airline for forced accommodation within the next 30 days (i.e., by August 15, 2014).

35.    Article I.3.b of the Five Party Agreement requires the City "to require the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements," in the event that existing carriers refuse to accommodate a new entrant.

36.    Section 5(a) of the Wright Amendment Reform Act requires the City to "honor the scarce resource provisions of" the Lease Agreements at Love Field.

37.    The Competition Plan and its updates require the City to accommodate non-lease-holding airlines who wish to provide service at Love Field by enforcing the gate-sharing

provisions of the Lease Agreements—specifically, Section 4.06(F).

38. Delta expected that the City would live up to its end of the bargain under the Lease Agreements and under federal law by notifying the three incumbent carriers of the need to accommodate Delta and—if none of them was willing to do so voluntarily—requiring one of the three to accommodate Delta under § 4.06(F)(2) of the Lease Agreements. And indeed, throughout the summer and fall of 2014, the City repeatedly represented to Delta that it intended to do exactly that:

- On June 13, 2014, Mark Duebner (the City's aviation director) and Michael Anastas (a Delta regional director) spoke by telephone about Delta's request and need for accommodation, and Mr. Duebner assured Mr. Anastas that Duebner would do everything in his authority to make sure the City accommodated Delta.

- In a follow-up phone conversation on June 22, 2014, between Mr. Duebner and Holden Shannon (a Senior Vice President for Delta), Mr. Duebner committed to Mr. Shannon that the City would accommodate Delta's existing schedule.

- During August and September, 2014, Delta representatives participated in meetings with Love Field staff to prepare for Delta's accommodation at one or more of the gates of the incumbent carriers. One of these meetings occurred on Thursday, September 11, 2014. At the meeting, the City represented and committed that it would require United to accommodate Delta. Mr. Duebner told Mr. Anastas, "I will notify United tomorrow, Monday at the latest, and tell them they need to accommodate Delta so you can plan your move."

- During a telephone conversation on September 18, 2014, Mr. Duebner committed to Mr. Shannon that the airport would find a way to accommodate Delta's existing schedule of five daily flights from Love Field to Atlanta.

- On September 19, 2014, Mr. Duebner and Mr. Anastas spoke by telephone, and Mr. Duebner represented to Mr. Anastas that he had notified United that it would be required to accommodate Delta.

- On September 22, 2014, Mr. Duebner twice committed to Mr. Anastas that the City would require United to accommodate Delta after Delta's sublease with American expired on October 12, 2014.

39. Despite the City's repeated promises that it would accommodate Delta's expanded operations at Love Field, the City failed to perform its obligation under the Lease Agreements. On Monday, September 29, 2014, Mr. Duebner sent Delta a letter reneging on the

City's promise and informing Delta for the first time that the City would not accommodate Delta at Love Field.  In his letter, Mr. Duebner also stated that United and Southwest had entered into a Gate Use License Agreement under which United would assign its gate space to Southwest— with the City's consent.

40.     The City's approval of this arrangement was completely unanticipated.  During the divestiture of American's gates, the DOJ had repeatedly emphasized the City's obligation to promote competition at Love Field.  For instance, after Virgin America secured DOJ approval to take American's two gates, Southwest made a last-ditch effort to persuade the City to defy the DOJ and confer the gates on Southwest.  The DOJ sent a letter to the City in which it stated the obvious: that Southwest "already controls 16 of the 20 Love Field gates," such that "[i]f it obtained the two American gates, it would then dominate 90% of Love Field gates, thereby denying consumers the benefits of meaningful competition at this facilities-constrained airport." In response, the City agreed to Virgin America's entry into Love Field.

41.     The DOJ's warnings regarding the danger of Southwest's dominance at Love Field are well-founded.  Between 2004 and 2014, domestic fare prices at Love Field increased by an astounding 86%—more than any other top 100 airport (as ranked by volume of passengers) in the United States.  Even before the Wright Amendment expired, fare prices at Love Field between 2007 and 2012 were experiencing one of the highest increases in the country.  Similar fare-price increases occurred at Houston Hobby and Chicago Midway, which are also Southwest-dominated airports.  Southwest serves over 90% of the passengers at these airports, and has been able to significantly increase fare prices at each airport despite the presence of another, larger airport within the same metropolitan area.  Nevertheless, until the introduction of Virgin in May 2014, Southwest's dominance had grown largely unchecked.

42.     The City's approval of Virgin's entry into Love Field suggested that it was aware of Southwest's threat to healthy competition at the airport.  In light of this renewed commitment to competition, Delta fully anticipated that the City would be more than willing to further expand the flying public's options at Love Field.

43.     Nevertheless, even though Delta had formally notified the City of its request for forced accommodation on July 16, 2014, and Section 4.06(F)(2) of the Lease Agreements required the City to act on that request within thirty days, the City still had not acted on Delta's request in early October 2014.  On October 8, 2014, the City Council voted to rename the main road leading to Love Field after Southwest's co-founder, Herb Kelleher.  With its sublease from American set to expire on October 12, 2014, Delta had no choice but to enter into a short-term agreement that would allow Delta to continue operating at Love Field.  Accordingly, on October 10, 2014, Delta entered into a Gate Use License Agreement with Southwest and a Facilities Use License Agreement with United, the combined effect of which was to allow Delta to continue operating at Love Field until January 6, 2015.  Delta signed these agreements—even though the economic terms did not comply with DOT requirements and were less favorable than the terms the City offered Southwest—because they were the only way Delta could avoid disruption of its scheduled service, displacement of its traveling customers, and irreparable harm to its business reputation and good will.

44.     In November 2014, the City notified Delta, Southwest, United, and Virgin that it intended to develop a Love Field accommodation policy to use on Delta's pending accommodation request.  In connection with that effort, the City retained an aviation-industry consultant to analyze and model gate-space availability and gate utilization at Love Field.  The City presented the preliminary results of the consultant's analysis in a November 20, 2014

meeting with the four carriers.  The consultant's analysis concluded that as of November 5, 2014, it was possible and feasible for Love Field to accommodate Delta's five daily flights.

45.     The City announced its proposed accommodation policy less than two weeks later, on December 1, 2014.  The City's proposed policy confirms that the City will begin its accommodation analysis by determining "a 'Snapshot Date' that will start the time period for assessing reasonable accommodation."  Although City policy sets the Snapshot Date at the day of the request, the City has represented in writing that it will treat November 5, 2014, as the Snapshot Date for purposes of evaluating Delta's request for accommodation of its five flights. Delta has consented to and relied on the City's use of November 5, 2014, as the Snapshot Date.

46.     Once a Snapshot Date is selected, the City's policy requires the City to "determine what schedule will be used for assessing scheduled operations.  Normally, this will be the schedule for the six months following the Snapshot Date."  With the City's having selected November 5, 2014, as the Snapshot Date, City policy indicates that the City should assess Southwest's scheduled operations based on Southwest's schedule from November 5, 2014, to May 4, 2015.  During that six-month window, Southwest was operating between 149 and 153 flights per day out of sixteen gates at Love Field.  Given that each gate at Love Field can accommodate at least ten flights per day, Southwest could accommodate Delta's five daily flights—less than 3% of what Southwest would fly—on one of its sixteen leased gates without any disruption to or interference with its operations.  Moreover, Southwest acquired even more gate capacity when it subleased two gates from United in April 2015.

47.     At the same time the City announced its Love Field accommodation policy, the City renewed its promise to accommodate Delta at Love Field.  In a December 1, 2014 letter to Delta, Southwest, and Virgin America, the City acknowledged that Delta had exhausted all

reasonable efforts to secure voluntary accommodation and formally initiated the 30-day countdown contemplated by Section 4.06 of the Airport Use and Lease Agreements. The City instructed each of the three incumbent carriers to "consider whether it can accommodate Delta's request" for accommodation and represented to the incumbent carriers and Delta "that if Delta has not been accommodated within 30 days, *the City will select a signatory airline to comply with Delta's accommodation request* in a non-discriminatory manner to the extent that accommodation will not unduly interfere with the signatory airline's operating schedule." The City reiterated that "[o]n December 31, 2014, if we have not received notification that Delta has been voluntarily accommodated, *the City will make a mandatory accommodation* as provided in the Use and Lease Agreement." Despite this promise, and despite the fact that the City never received a notice of voluntary accommodation, December 31, 2014, came and went without the City's honoring its promise and making a mandatory accommodation.

48.    With Delta's Gate Use and Facilities Use License Agreements expiring on January 6, 2015, the City's failure to make good on its promise to force accommodation by the end of December left Delta with no choice but to again enter into a short-term agreement on unfavorable terms that would enable it to continue operating out of Love Field. Accordingly, on January 6, 2015, Delta entered into two agreements with United that allowed Delta to continue operating at Love Field until July 6, 2015.

49.    On January 5, 2015, the City made still another promise to accommodate Delta at Love Field. In a letter to Delta, the DOT, Southwest, and United, the City explained that its preference was to see "the carriers [] reach a permanent consensual resolution concerning Delta's request for gate accommodation" so that the City would "not hav[e] to mandate accommodation" but reiterated and reaffirmed that the City "will continue our mandatory accommodation process

74

unless informed by carriers that it is no longer necessary."   The referenced "mandatory accommodation process" is the process begun by the City's December 1, 2014 letter, in which the City promised that "it will make a mandatory accommodation" of Delta at Love Field.

50.    On January 28, 2015, the City yet again promised to accommodate Delta at Love Field.   Throughout the time that Delta has been seeking accommodation at Love Field, Southwest has been seeking to further entrench its status as the dominant carrier at the airport by permanently subleasing two gates from United (thereby giving Southwest control over 18 of the 20 gates at Love Field).   The Lease Agreements require the City to consent to any sublease at Love Field.   The City provided its written consent to the United–Southwest sublease on January 28, 2015.   Even though Delta's request for accommodation had been pending for more than seven months and the City easily could have conditioned its consent on Southwest using a fraction of the newly acquired gate space to accommodate Delta, the City gave an unconditional consent to the sublease.   In its consent, however, the City represented that it was treating the DOT's December 17, 2014 letter (*see* discussion *infra* § VII) "as promulgating final and binding directives" that governed the City's handling of the "request for accommodation at Love Field by Delta."   The DOT's December 17, 2014 letter stated that the DOT expected the City to accommodate Delta at Love Field if possible. The relevant data establishes that it is possible to accommodate Delta at Love Field.   Thus, the City's statement in its written consent is a further acknowledgement and representation that the City is subject to and will comply with the DOT's binding directive that Delta should be accommodated at Love Field.

51.    On February 23, 2015, Delta requested accommodation of eight more daily flights at Love Field beginning August 15, 2015.   Delta made its request to Southwest, Virgin, and Seaport.   Delta also notified the City of its request for accommodation.   As of February 23,

2015—the date of Delta's accommodation request—it was possible to accommodate an additional eight daily Delta flights at Love Field in light of the incumbent carriers' then-current gate usage and without impacting their current or already-announced, for-sale services.  Not coincidentally, on February 26, 2015, Southwest first announced its intention to expand its flight schedule at Love Field to 180 daily flights as of August 9, 2015.

52.    Over the next several months, Delta continued to ask the City to honor its repeated promises and adhere to DOT's directive by accommodating Delta at Love Field.  Delta advised the City repeatedly, including by email on May 25, 2015, that Delta was relying on the City's repeated representations that the City intended to force accommodation at Love Field.

**VII.    DOT's Directive Requiring the City to Accommodate Delta at Love Field.**

53.    On December 17, 2014, DOT provided the City with binding, enforceable direction on how to handle Delta's pending request for long-term accommodation at Love Field and comply with its federal obligations.  DOT provided its direction in the form of a letter to the City from its general counsel, the Honorable Kathryn B. Thomson.  In its December 17 letter, DOT clarified four important points concerning the existence and contours of the City's accommodation obligation.

54.    First, DOT's December 17 letter confirmed that the City is obligated under existing federal law to accommodate Delta at Love Field: "Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signature carrier, *the City will accommodate the requesting carrier* to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers."  The relevant data—including the findings and analysis of the City's own consultant—establishes that

it is possible to accommodate Delta at Love Field without impacting the services Southwest was offering or had announced as of the City's selected snapshot date of November 5, 2014.[2]   In light of this data, DOT's December 17 letter is an unconditional directive requiring the City to accommodate Delta.

55.   Second, DOT specified that the determination of whether accommodation is "possible given the current gate usage" should be made "based on the available space on the snapshot date of the original accommodation request."  Thus, if an incumbent carrier announces plans for a future increase in service *after* receiving a request for accommodation, the City should not consider those planned future service increases when determining whether accommodation is possible.  A flight may be considered as part of the accommodation analysis only if it was either "current[ly]" operated or part of the signatory carrier's "already-announced, for-sale services" as of the date of the accommodation request.

56.   Third, DOT clarified that the City is required to provide accommodation on a long-term basis and cannot make Delta's right to operate at Love Field subordinate or secondary to the right of any incumbent carrier:

> With respect to the length of the accommodation, for the accommodation to be meaningful at [Love Field], it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights. Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date.

The City thus has a "responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing

---

[2] The data also shows that it was possible to accommodate Delta at Love Field without impacting Southwest's then-current and -announced services as of July 16, 2014 (the date Delta first notified the City that the voluntary-accommodation process had failed and requested forced accommodation) and September 18, 2014 (the date Delta reiterated its request for forced accommodation in a written demand to the City).

basis."

57.     Finally, DOT's December 17 letter reaffirms that "[t]he City must also ensure that the accommodation is at reasonable rates."   Specifically, DOT's "competition plan policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus" a reasonable allowance for administration not to exceed 25%, "are reasonable."

58.     On June 15, 2015, DOT sent the City a second letter.   The June 15 letter confirmed that the City's obligation to accommodate Delta is a matter of federal law—specifically, it flows from the AIP grant-assurances statute, the AIP grant agreements, and the competition-plan statute.   DOT also reiterated the common-sense, competition-promoting proposition that "a dominant signatory carrier should not be able to block a requesting carrier from accessing Love Field by announcing future plans to expand service [] after an accommodation request is made."   DOT concluded by confirming for the City that DOT expected the City "to carry out, in a reasonable and timely fashion, the accommodation efforts we described in our December 17 letter."

59.     In sum, DOT's two letters direct the City to force accommodation of Delta at Love Field to the extent possible given current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers at Love Field.   And undisputed data—not to mention Southwest's recent conduct—establish that given current gate usage at Love Field, it is possible for Southwest to be accommodated without impacting current or already-announced, for-sale services by the signatory carriers at Love Field.

60.     On June 17, 2015, the City initiated this action in federal court, seeking declaratory relief pursuant to 28 U.S.C. § 2201 regarding Defendants and the rights and

obligations of the City and Defendants under feral law concerning the use of aircraft gates at the Dallas Love Field airport.

## Counterclaims

**Counterclaim I:      Declaratory Judgment**

61.     Delta incorporates by reference the allegations of all of the preceding paragraphs as though fully set forth in this Counterclaim I.

62.     There exists a justiciable case or controversy between Delta and the City as to whether the City is required to force accommodation of Delta at Love Field.

63.     This case is within the Court's subject matter jurisdiction, and the Court has jurisdiction over all the parties to this case.

64.     The Lease Agreement requires the City to force accommodation of Delta at Love Field.  The Five Party Agreement, the Competition Plan and its updates, the Wright Amendment Reform Act, and DOT's recent directives are all consistent with the Lease Agreement and designed to effectuate the Lease Agreement's accommodation provisions and obligations.

65.     The City's failure to force accommodation of Delta at Love Field has caused, and if not corrected will continue to cause, Delta to suffer injury.

66.     Delta seeks a declaration under 22 U.S.C. § 2201 that the City has an obligation to force accommodation of Delta at Love Field.

**Counterclaim II:      Breach of the Lease Agreements**

67.     Delta incorporates by reference the allegations of all of the preceding paragraphs as though fully set forth in this Counterclaim II.

68.     The Lease Agreements are valid, enforceable contracts.

69.     As a new entrant to Love Field and/or a carrier seeking to provide service at Love

Field and/or a signatory to a gate use license agreement, Delta is an intended and/or contemplated and/or third-party beneficiary of the Lease Agreements.  As such, Delta is a proper party to sue for breach of these Agreements.

70.     By seeking to provide service at Love Field and/or enter Love Field as a new entrant carrier, exhausting all reasonable efforts to secure voluntary accommodation from the incumbent carriers, and taking the proper steps to invoke its right to forced accommodation, Delta performed its obligations under the Lease Agreements and thus satisfied every condition precedent under the contract to trigger the City's obligation to force the accommodation of Delta.

71.     In addition, or in the alternative, the Lease Agreements are in writing, state the essential terms of the agreement between Delta and the City, promise that the City will provide Delta with a benefit if Delta performs, and were executed on behalf of the City.  Accordingly, each of the Lease Agreements is a valid and enforceable unilateral contract between Delta and the City.

72.     Delta formed a contract with the City by performing under the Lease Agreement. Delta performed under the Lease Agreement by seeking to provide service at Love Field and/or enter Love Field as a new entrant carrier, exhausting all reasonable efforts to secure voluntary accommodation from the incumbent carriers, and taking the proper steps to invoke its right to forced accommodation.  As a party to the unilateral Lease Agreement contract, Delta is a proper party to sue for breach of the unilateral Lease Agreement contract.

73.     The City breached the Lease Agreements—including, without limitation, the provisions of section 4.06—by failing to force accommodation of Delta at Love Field.

74.     In addition, section 14.19 of the Lease Agreement requires the City to operate Love Field in a manner that is consistent with federal grant assurances.

75.     Grant assurance 22, "Economic Nondiscrimination," requires the City to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." By failing to provide Delta long-term gate access at Love Field despite providing long-term access to similarly situated airlines, the City has violated Grant Assurance 22.

76.     Grant assurance 23, "Exclusive Rights," requires the City to "permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public." By unreasonably and without just cause excluding Delta from operating at Love Field, denying Delta the continued opportunity to be an aeronautical service provider at Love Field, and ceding control of Love Field's gates to a small number of airlines while unreasonably excluding Delta from the same long-term gate access it has granted to others, the City has violated Grant Assurance 23.

77.     By violating Grant Assurances 22 and 23, the City has breached section 14.19 of the Lease Agreement.

78.     The Five Party Agreement—including, without limitation, the provisions of article 1.3.b—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

79.     The City's Competition Plan as updated—including, without limitation, the provisions of Section 1(F) of the Competition Plan, section 4 of the 2005 Competition Plan update, and sections 1 and 1(b) of the 2009 Competition Plan update—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further

confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

80.     The Wright Amendment Reform Act—including, without limitation, the provisions of section 5(a)—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

81.     The DOT's December 17, 2014 letter and June 15, 2015 letter—both individually and jointly—confirm that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirm that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

82.     The City's breaches of the Lease Agreements have caused, and if not corrected will continue to cause, Delta to suffer significant and irreparable injury as a natural, probable, and foreseeable consequence.

83.     There is no adequate remedy at law for the City's breach of the Lease Agreements, and damages would be inadequate compensation.   Delta has performed its obligations under the Lease Agreements.  Accordingly, Delta is entitled to specific performance by the City of the Lease Agreements.

## PRAYER

For these reasons, Plaintiff Delta hereby requests that the Court award the following relief against the City:

a.      declaratory judgments for Delta, as provided above;

b.      a preliminary injunction, issued after notice to the City and a hearing, preserving the status quo and enjoining the City from refusing to provide gate access to Delta

for its existing flight schedule and from ousting Delta from Love Field;

c.      an order requiring specific performance of the City's forced-accommodation

obligation;

d.      a permanent injunction enjoining the City from refusing to comply with the

forced-accommodation provisions of the Lease Agreement;

e.      actual damages in excess of $75,000 resulting from the City's wrongful acts;

f.      reasonable and necessary attorneys' fees pursuant to Chapter 38 of the Texas

Civil Practice and Remedies Code;

g.      costs of suit; and

h.      all other relief at law and in equity to which it may be justly entitled.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Delta respectfully asks the Court to deny

all relief requested in the City's Original Complaint, that Delta be awarded its attorneys' fees and

costs, that judgment be entered in Delta's favor, and for all such other and further relief, both at

law and in equity, to which Delta may be justly entitled.


DATED:  July 20, 2015                          Respectfully submitted,

                                               */s/ Bill Dawson*
                                               William B. Dawson
                                                      SBN 05606300
                                               Karl G. Nelson
                                                      SBN 14900425
                                               Ashley E. Johnson
                                                      SBN 24067689
                                               Russell H. Falconer
                                                      SBN 24069695
                                               GIBSON, DUNN & CRUTCHER LLP
                                               2100 McKinney Ave, Suite 1100
                                               Dallas, TX 75201

83

Telephone: (214) 698-3100
Fax: (214) 698-3400
rwalters@gibsondunn.com
knelson@gibsondunn.com
ajohnson@gibsondunn.com
rfalconer@gibsondunn.com

Kenneth P. Quinn
        DC Bar No. 495423
        *Pro hac vice* application forthcoming
Jennifer E. Trock
        DC Bar No. 486098
        *Pro hac vice* application forthcoming
Pillsbury Winthrop Shaw Pittman
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8898
kenneth.quinn@pillsburylaw.com

COUNSEL FOR DELTA AIR LINES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2015, a true and correct copy of the foregoing document was served upon the following counsel through the Court's CM/ECF System:

Charles Estee
charles.estee@dallascityhall.com
Peter B Haskel
peter.haskel@dallascityhall.com
Christopher J. Caso
chris.caso@dallascityhall.com
Jennifer A. Brissette
jennifer.brissette@dallascityhall.com
Dallas City Attorney's Office
1500 Marilla St.
7th Floor
Dallas, TX 75201
P: 214-670-3038
F: 214-670-0622
*Attorneys for the City of Dallas*

Michael V Powell
mpowell@lockelord.com
Locke Lord Bissell & Liddell LLP
2200 Ross Avenue, Ste 2200
Dallas, TX 75201-6776
P: 214-740-8520
Fax: 214-740-8800
*Attorney for American Airlines, Inc.*

Stephen McClain Cole
scole@lynnllp.com
John T Cox , III
tcox@lynnllp.com
Kent D Krabill
kkrabill@lynnllp.com
Britta E Stanton
bstanton@lynnllp.com
Lynn Tillotson Pinker & Cox LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
P: 214-981-3800
F: 214-981-3839
*Attorneys for Southwest Airlines Co.*

David Michael Glass
david.glass@usdoj.gov
U.S. Dep't of Justice
Civ. Div., Fed. Progs. Br.
20 Massachusetts Ave., N.W., Room 7200
Washington, DC 20530
202-514-4469
*Attorney for U.S. DOT and FAA*

John Robert Robertson
robby.robertson@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20001-1109
P: 202-637-5774
F: 202-637-5910

Barry C Barnett
bbarnett@susmangodfrey.com
Susman Godfrey LLP
901 Main St.
Suite 5100
Dallas, TX 75202-3755
P: 214-754-1900
F: 214-754-1933
*Attorneys for Virgin America Inc.*

J. Eric Gambrell
egambrell@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Ave. Suite 4100
Dallas, TX 75201-4618
P: 214-969-2799
F: 214-9694343

John K. Grantham
jgrantham@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana St., 44th Floor
Houston, TX 77002

P: 214-220-5800
F: 713-236-0822
*Attorneys for United Airlines, Inc.*


/s/ Bill Dawson
William B. Dawson