IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST | § | CIVIL ACTION NO. 3:15-CV-02069-K |
| AIRLINES CO., VIRGIN AMERICA INC., | § | |
| AMERICAN AIRLINES, INC., UNITED | § | |
| AIRLINES, INC., SEAPORT AIRLINES, | § | |
| INC., UNITED STATES DEPARTMENT OF | § | |
| TRANSPORTATION, AND THE FEDERAL | § | |
| AVIATION ADMINISTRATION | § | |
| | § | |
| *Defendants*. | | |

**DEFENDANT DELTA AIR LINES, INC.'S AMENDED COUNTERCLAIM
AGAINST CITY OF DALLAS**

### Introduction

1.     In 2006, Southwest and the City of Dallas agreed that Southwest would have 16

gates at the newly renovated Love Field, a facility that belongs to the City and its citizens who

deserve competition at Love Field.  In the agreement leasing those gates to Southwest, Southwest

and the City agreed that Southwest would accommodate competing airlines' requests for space at

those 16 gates if Southwest's operating schedule had room for the requested competition on the

date that the request was made.   That agreement is required by federal law, which requires that

airports support free competition rather than favoring one airline over others.  As Mayor Mike

Rawlings explained just last year, "competition at [Love Field] is good" and "a growth driver for

this City," and the City's goal should be to "continue to drive competition" and "take all this

competition and get people flying all over the nation."

2.     Southwest, too, publicly professes to value competition.  In the August copy of

Southwest magazine, placed in every seat of its planes, Southwest's CEO Gary Kelly represents that "I'm a true believer that competition also makes us better . . ." and that Southwest "embrace[s] competition" and competes "in every aspect of the Customer Experience."  He states that competition over fares is "not the only competitive factor" and that Southwest "compete[s] with our schedule, our products, and our reliability."  Yet when the City of Dallas dared introduce competition by suggesting that Delta must be accommodated at Love Field—as required by federal law and the leases covering the Love Field gates—Mr. Kelly angrily emailed City Manager A.C. Gonzalez that the City was "reward[ing] competitors that have contributed nothing to Dallas."  Citing billions of dollars in value that Southwest seeks credit for bringing to Dallas and millions of dollars of tax revenues paid, he threatened, as Southwest so often has done, to pull out of Dallas if the City did not help Southwest suppress competition, telling the City that if it did not give in to Southwest's attempts to block Delta, Southwest would punish the City and its tax-paying citizens by "moving on to focus our corporate investments in those markets that place a value on them and their corporate residents."  His message was clear—stand down and allow us to block competition or we will make you pay, dearly.

3.     Southwest's actions match its private belief that Love Field is its own property, rather than its public professions that it supports competition.  Even though Southwest's lease and federal law required Southwest and the City to allow competition at Love Field, Southwest wanted to maximize the huge profits that flow from eliminating competitors at Love Field.  In order to maximize its profits, Southwest needed more than the 16 gates to which it is limited.  As a result, Southwest bullied and threatened the City into allowing Southwest even greater dominance at Love Field, causing harm to Dallas flyers.

4.     Southwest has firsthand experience with the benefits of controlling the vast

majority of gates at a public airport.  In addition to the 16 of 20 gates Southwest was supposed to have at Love Field, Southwest has a dominant presence at Houston Hobby and Chicago Midway—which, like Love Field, are supposed to be public facilities, operated for the benefit of citizens.  At those three airports, including Love Field, Southwest has approximately 90% of the flights, making competition virtually impossible and driving down the quality of services, while the fares have increased in recent years more than at almost any other airport in the United States.

5.      Yet Southwest was not satisfied with its dominance at Love Field.  Southwest and United both had space available when Delta requested accommodation.  But rather than risk Delta providing even a limited challenge to its stranglehold on the airport, Southwest sought to expand its own dominance by announcing an intent to begin to use all of the available space— including United's available space—so that Delta could be kept out.  And Southwest used threats and intimidation to persuade the City to permit this expansion, in violation of its agreement with the City, entered into by the City for the benefit of its citizens.

6.      First, Southwest bullied and threatened the City to award Southwest the two gates that American had to give up as a result of its merger with US Airways.  The City was poised to grant those two gates to Virgin America, at the request of the U.S. Department of Justice, yet Southwest pushed hard for the City to defy the Department of Justice and instead award the gates to Southwest.  Southwest did that despite the fact that its agreement with the City limited Southwest to 16 of the 20 gates.  Not satisfied with this lion's share of the gates, Southwest bore down on the City to force it to award those two American gates to Southwest.

7.      The City would have buckled to the coercive conduct of Southwest had it not been for the Department of Justice, which said, in correspondence to the City, that because

"Southwest already controls 16 of the 20 Love Field gates," if "it obtained the two American gates, it would then dominate 90% of Love Field gates, thereby denying consumers the benefits of meaningful competition at this facilities-constrained airport."   The Department of Justice action empowered the City to refuse to permit Southwest to expand beyond 16 gates by means of subleasing American's gates.   With the benefit of a federal government declaration that Southwest could not have 18 gates, the City approved Virgin America's agreement to take the 2 gates.

8.      During the City's evaluation of the American gates, Southwest assured the City it was not working to obtain access to the remaining two gates, leased by the City to United.   Yet as soon as Southwest failed in its attempt to make the American gates its 17th and 18th gates, it set about to instead make the "*United*" gates its 17th and 18th gates.   The "United" gates had ample availability to accommodate Delta's flights.   But United knew it would make far more money from subleasing those gates to Southwest—which could use them to solidify its monopoly over the airport—than it would from either it or Delta flying competitively.

9.      Accordingly, United sought and obtained an obscene sum from Southwest for helping Southwest prevent Delta from competing with it.   The grotesque amount Southwest paid United for these two gates proves the value of obtaining a monopoly at Love Field.   Southwest's payment to United also quantifies just how much consumers are being gouged by Southwest's monopoly.

10.     There was one potential roadblock in Southwest's plan:  the City had to approve the sublease of United's gates.   Southwest knew that the DOT had told the City that it did not want Southwest to obtain United's gates but rather wanted a permanent arrangement to be made for Delta to have space at Love Field.   And because Southwest obtaining United's gates would

make it almost impossible for other airlines to compete, Southwest and United knew that completing the sublease would cause both Southwest and United to be in violation of their agreement with the City, and indirectly with the citizens of the Dallas.  United protected itself in its agreement with Southwest, making Southwest agree that if they were caught, and the City ordered that Delta or any other airline had to be accommodated at Love Field, Southwest would "use other premises that [Southwest] leases or otherwise subleases at the Airport to accommodate such airlines," not the gates Southwest had secured from United at far above market value.

11.     The City, however, was unable to stand up to Southwest's pressure.  Without the protection of a federal government declaration that Southwest could not have what it wanted, the City feared litigation or lost tax revenue from Southwest if it did not give in.  Thus, immediately on the heels of the DOJ telling Southwest and the City that it would destroy all "meaningful competition" for Southwest to acquire more than 16 gates, Southwest and United coerced the City into approving Southwest's acquisition of the 2 gates leased by United, giving Southwest 18 gates, for a purchase price that shocks the conscience.

12.     The Federal Aviation Administration ("FAA") has now launched an investigation to decide whether the City violated requirements of federal law when it failed to require that Delta be accommodated at Love Field, and when it approved this monopoly-creating transfer of two gates from United to Southwest.  Southwest, for its part, has acknowledged that it was taking a legal risk in subleasing those United gates and coercing the City to approve the transfer, a risk that it was willing to take because of the huge monopoly rewards it would gain by surpassing its 16-gate contractual limit—a benefit it is well aware of based on its monopoly positions at Hobby and Midway airports.

13.     Although there is no question that Southwest's scheme to unlawfully expand its dominance over Love Field breached its agreement with the City, the City's inability to stand firm under Southwest's pressure is a breach of its own contractual duties.  That causes harm that is not limited to competitors, like Delta, who Southwest seeks to push out of the public airport that Southwest wrongly considers its own property.  The more serious harm is to Dallas citizens, who have a right to the benefits that competition will bring to Love Field, and have been denied it by Southwest's bullying and the City's acquiescence.

14.     Delta therefore asks this Court to play the role that the DOJ was forced to play when Southwest pressured the City to give it American's gates.  That is, Delta respectfully requests that the Court declare that, under the agreements that the City and Southwest signed, the City is duty-bound under law to force Southwest to accommodate Delta's operations at Love Field.  Delta further asks this Court to undo the wrong that Southwest and United did through the competition-crushing sublease by declaring that Southwest may control no more than 16 gates, and that its 17th and 18th gates must be given back to the City for the common use of competitors.  Delta respectfully asks the Court to declare that Delta will then have the right to fly the flights it has requested space for from those common use gates.  In the alternative, if Southwest is permitted to keep 18 leased or subleased gates, Delta asks this Court for a declaration that it is entitled to accommodation on reasonable terms for its existing schedule, plus the additional 8 flights it requested in February, on those 18 gates.

**Parties**

15.     Counter-Plaintiff Delta Air Lines, Inc. is a Delaware corporation whose principal place of business is located at 1030 Delta Boulevard, Atlanta, Georgia 30354.  Delta is an air carrier engaged in the business of providing commercial passenger air transportation throughout

the United States and the world.  Delta is a citizen of the States of Delaware and Georgia.

16.     Counter-Defendant City of Dallas is a municipal corporation located in Dallas County, Texas.  The City is the owner and operator of Love Field.  The City is a citizen of the State of Texas and does not operate as an arm of the State of Texas.

## Jurisdiction and Venue

17.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

18.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

19.     To the extent this Court does not have original jurisdiction of any counterclaim(s) asserted in this action, this Court has jurisdiction under 28 U.S.C. § 1367 because the Court has original jurisdiction of the action and all of the counterclaims asserted herein are so related to one another that they form part of the same case or controversy under Article III of the United States Constitution.

20.     To the extent that the City would otherwise be entitled to government immunity from suit in this Court, the City waived that immunity when it initiated this action.  The City's waiver extends to Delta's counterclaims because those counterclaims arise out of the same transaction or occurrence that is the subject matter of the City's complaint.

21.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Delta's counterclaims occurred in this judicial district.

## Background and Facts

I.      **Federal Regulation of Federally Funded Airports**

22.     DOT and its operating administration, the FAA, exercise plenary and preemptive authority over federally funded airports (such as Dallas Love Field). To receive funding under the federal funding program known as the Airport Improvement Program ("AIP"), an airport sponsor (such as the City) must agree to comply with statutory and contractual obligations relating to the operation and use of the airport. The purpose of these statutory and contractual obligations is to foster full and fair competition in air transportation.

23.     Love Field has received federal funding under AIP. In fact, over the past five years alone, Love Field has received over $20 million from the federal government for airport improvements. In addition, Love Field has received federal approval to impose and use a $4.50 passenger facility fee. As a result, the City is subject to more than a dozen contractual obligations known as "grant assurances" regarding the operation and use of Love Field. The grant assurances are binding obligations between the City and the federal government.

24.     Grant assurance 22a, which implements 49 U.S.C. § 47107(a)(1), requires the City to make Love Field available "as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." The City owes this obligation to all air carriers and users of Love Field, regardless of whether the air carrier or user is a tenant, subtenant, or non-tenant. This obligation bars the City from denying an air carrier access to Love Field solely based on the non-availability of existing facilities.

25.     Grant assurance 23, which implements 49 U.S.C. § 40103(e), prohibits the City from directly or indirectly granting any carrier an exclusive right to use Love Field. An "exclusive" right is not limited to a right that is held exclusively by a single carrier, but any right

that a carrier has while one or more other carriers are denied that right.  Under this prohibition, the City may not: claim lack of gate availability when, in fact, gates are not fully utilized; relinquish control of airport facilities to incumbent carriers for purposes of negotiating access with a new entrant; or permit unreasonable sublease fees or conditions to be imposed on new entrants.  Any of these actions would favor the incumbent carrier over carriers without permanent lease rights at the airport.  At Love Field, a "new entrant" includes any carrier that is not a signatory carrier at Love Field.  Thus, the term includes limited incumbent carriers such as Delta who may have a small presence at the airport but are not Lease signatories.

26.     PFC Assurances prohibit PFC-funded facilities, like the terminal at Love Field, from being leased on an exclusive use basis, whether the exclusivity arises out of an exclusive use lease or on a de facto basis when the lease is interpreted to effectively grant an exclusive lease to a signatory carrier to the exclusion of a new entrant.

## II.     The City's Competition Plan for Love Field

27.     As a recipient of federal funding under AIP, and as a Passenger Facility Charge sponsor, the City is required under federal law to submit an acceptable competition plan to the Secretary of Transportation.   The FAA consistently has interpreted the competition plan requirements as focusing on individual airports—not airport systems or metropolitan areas— when assessing availability of gates for new entrants.  As a result, Love Field itself—not the Dallas/Fort Worth Metropolitan Area—is subject to its own requirement to submit and make commitments in its airport competition plan.

28.     A competition plan must include, among other things, a discussion of the accommodation of new service and of service by a new entrant.  "Accommodation" is the process by which an airline that already operates regularly scheduled flights at an airport is

required by the airport owner, operator, or sponsor to provide a portion of its space at the airport—including gate and related support space—to an airline that seeks to begin service or expand its current service at the airport.

29.     In its competition plans, the City has repeatedly acknowledged that when new entrant airlines wish to begin providing service at Love Field, the City is obligated to force accommodation if necessary in order to promote competition.   The City filed its initial Love Field Competition Plan (the "Competition Plan") on July 31, 2001.   In its plan, the City "recognize[d] that, by having accepted Federal grants, it has undertaken a legal obligation to provide reasonable air carrier access at Love Field."[1]   The City further recognized that its leases with incumbent carriers "include gate-sharing provisions . . . *requiring* accommodation of other airlines within the lease premises of the incumbent airlines."

30.     In an update to its Competition Plan filed in February 2005, the City once again acknowledged its obligation "to make all reasonable efforts to accommodate carriers seeking to provide service at Love Field," "reiterated its willingness to enforce the gate sharing provisions of the leases to make space available to" potential new entrants, and stated that it "continue[s] to be committed to ensuring that any carrier seeking to provide service to Love Field receives reasonable access to needed facilities."

31.     The City filed another update to its Competition Plan in June 2009, and in that update the City specifically acknowledged its obligation to force accommodation of Delta at Love Field.   The City reaffirmed its general commitment "to accommodating new entrants" and explained that "[i]n the future, the City intends to accommodate requests for access by applying

---

[1]   City of Dallas, Airline Competition Plan at 2 (July 31, 2001), available at http://www.dallas-lovefield.com/pdf/CompetitionPlan.pdf.

the gate sharing provisions contained in the current lease—provisions which have been incorporated in Section 4.06F of the new Restated Lease."

32.     At the time of the 2009 update, Delta had informed the City of its intent to provide service at Love Field, and the City's update included a specific plan to accommodate Delta. The City represented that "[o]nce the terminal redevelopment is completed, *the City will accommodate Delta* based on the gate sharing provisions of the preferential use lease."

### III.     The Airport Use and Lease Agreements

33.     The lease agreements referenced in the Competition Plan and its updates are the Airport Use and Lease Agreements the City has entered into with three carriers—Southwest, American, and United Airlines (collectively, the "Lease Agreements"). The Lease Agreement between the City and Southwest spells out the details and logistics of the City's obligation to force accommodation at Love Field.

34.     Under § 4.06(D)(4) of the Lease Agreement, if "a new entrant carrier seeks to begin service at" Love Field, the City is obligated to "seek voluntary accommodation from its existing airline lessees to accommodate the new entrant service," and "[i]f the existing carriers are not able or are not willing to accommodate the new entrant service, then the City *agrees to require* the sharing of" the incumbent airlines' leased gates.

35.     Section 14.09 of the Lease Agreement expressly incorporates the airport grant assurances into the Lease Agreement and makes the Lease subordinate to those grant assurances. The Lease Agreement requires both Southwest (in Section 14.03(B)) and the City (in Section 14.19) to operate at the airport in a manner consistent with the grant assurances.

36.     Section 4.06(F) of the Lease Agreement contains a scarce-resource provision that acknowledges that Love Field's facilities "may become a scarce resource if a new entrant

airline ('Requesting Airline') requests to provide service at the Airport" and lays out a four-step process through which a potential new entrant carrier may seek accommodation at Love Field:

A.  The requesting airline must seek voluntary accommodation by attempting to secure gate space and other necessary facilities on a voluntary basis from one of the incumbent airlines at Love Field. (§ 4.06(F))

B.  If the requesting airline has contacted all of the incumbent airlines and exhausted all reasonable efforts to secure voluntary accommodation, the requesting airline may notify the City's Director of Aviation, who in turn must "notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner." (§ 4.06(F)(2))

C.  At the end of that 30-day period, if none of the incumbent airlines have agreed to voluntarily accommodate the requesting airline, the City is obligated to "select a Signatory Airline to accommodate the Requesting Airline" and send a written notice to that Signatory Airline requiring accommodation within 30 days of receipt of the notice. (§ 4.06(F)(3))

D.  At the end of that second 30-day period (in other words, 60 days after the requesting airline first provides notice to the City's director of aviation), the incumbent airline that has been selected for accommodation must accommodate the requesting airline by sharing a portion of its leased gates and allowing the requesting airline to operate flights out of that shared gate space. (§ 4.06(F)(4))

Thus, under the Lease Agreement, when a new entrant airline makes a reasonable but unsuccessful effort to seek voluntary accommodation from incumbent carriers, the City is subject to a mandatory duty to force accommodation of the new entrant.

37.    By entering into the Lease Agreements, the City waived its governmental immunity from liability under those Lease Agreements.

## IV.    The Five Party Agreement

38.    In 1979, Congress passed the Wright Amendment, which amended the Federal Aviation Act to prohibit service by medium and large aircraft (more than 56 seats) between Love Field and any point outside of Texas and its four surrounding states (Arkansas, New Mexico, Louisiana, and Oklahoma).   Later amendments to the Wright Amendment added Alabama,

Kansas, Mississippi, and Missouri to the Love Field service area.

39.     On July 11, 2006, the Cities of Dallas and Fort Worth, the DFW International Airport Board, Defendant American Airlines, and Southwest entered into an agreement (the "Five Party Agreement") that, among other things, sought the enactment of legislation that would amend and ultimately repeal the limitations on Love Field operations imposed by the Wright Amendment.  In exchange for lifting these limitations, the Five Party Agreement called for the reduction of gate capacity at Love Field, from 32 to 20 gates, which the agreement specifically allocated among three airlines—Southwest (16 gates), American (2 gates), and ExpressJet Airlines, Inc. (2 gates, which were later acquired by Defendant United Airlines).  No other airline (including Delta) was a party to the Five Party Agreement or allocated a gate under it; instead, airlines without Lease Agreements who wish to serve Love Field may seek to do so as "new entrants."

40.     In the Five Party Agreement, the City agreed—and is obligated—to compel forced accommodation of new entrant carriers at Love Field.  Specifically, the Five Party Agreement provides that "[t]o the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service.  If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas *agrees to require* the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements."

V.      **The Wright Amendment Reform Act of 2006**

41.     On October 13, 2006, Congress enacted the Wright Amendment Reform Act of 2006, Pub. L. No. 109-352, 120 Stat. 2011 (2006) (the "Reform Act").  The Reform Act codified into federal law many of the most important provisions of the Five Party Agreement.  It

13

permanently capped the number of Love Field gates at 20 and provided for the eventual elimination of the limitations on nonstop flights at Love Field.

42.     Section 5(a) of the Reform Act requires the City to "determine the allocation of leased gates and manage Love Field in accordance with" the provisions of the Lease Agreements.  This includes an express requirement that the City must "accommodate new entrant air carriers" by "honor[ing] the scarce resource provisions of the existing Love Field leases."  Section 5(a) thus codifies into federal law the City's obligation under the Lease Agreements to force accommodation of new entrants (such as Delta) at Love Field.

43.     Section 5(e) of the Reform Act explicitly reserves to the FAA its jurisdiction to enforce grant assurance and statutory obligations related to grant assurance compliance and the prohibition on exclusive rights: "Nothing in this Act shall be construed . . . to limit the authority of the Federal Aviation Administration or any other Federal agency to enforce requirements of law and grant assurances . . . that impose obligations on Love Field to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field."

## VI.     The City's Repeated Promises to Accommodate Delta at Love Field

44.     Delta currently offers five daily flights from Love Field to its hub, Atlanta's Hartsfield-Jackson International Airport, from which passengers can connect to Delta's worldwide network of flights.  Delta has been operating out of Love Field since the summer of 2009, when it subleased a gate from American Airlines.  Delta's sublease with American was extinguished as a result of the 2013 merger between American and US Airways.  As a condition of its approval of the merger, the Department of Justice announced in November 2013 that

14

American would be required to divest its two gates at Love Field.

45.     Both Delta and Southwest sought to obtain the right to use American's gates. After the DOJ made it known that it wanted Virgin America to receive the gates, Southwest nonetheless made a last-ditch effort to persuade the City to defy the DOJ and confer the gates on Southwest.  The DOJ sent a letter to the City in which it reaffirmed its conclusion that the gates should go to Virgin America and stated the obvious: that Southwest "already controls 16 of the 20 Love Field gates," such that "[i]f it obtained the two American gates, it would then dominate 90% of Love Field gates, thereby denying consumers the benefits of meaningful competition at this facilities-constrained airport."   In response to the DOJ's reaffirmation of its previous decision, the City agreed to Virgin America's entry into Love Field.  In May 2014, Defendant Virgin America announced that the City had approved Virgin's request to sublease the two Love Field gates American was divesting.

46.     The divestiture of American's gates caused Delta's sublease at Love Field to terminate on October 12, 2014.  Accordingly, in June 2014, Delta commenced the process of seeking accommodation pursuant to the provisions of the Lease Agreements and the guarantees in the Five Party Agreement and the Competition Plans.

47.     Delta began the four-step accommodation process set out in the scarce-resource provisions of the Lease Agreements by seeking voluntary accommodation from the incumbent airlines.  In June 2014, Michael Anastas, a Regional Director for Delta, sent letters to United Airlines, Southwest Airlines, and American Airlines formally seeking voluntary accommodation of Delta's six scheduled flights at Love Field under § 4.06(F) of the Lease Agreements between the airport and each of these carriers.  Mr. Anastas also notified Mark Duebner, the City's Director of Aviation at Love Field, that Delta was beginning the process of seeking voluntary

accommodation from the three incumbent carriers.  On July 16, 2014, Delta provided written notice to the City that Delta had contacted all three signatory carriers, that none was willing to voluntarily accommodate Delta at Love Field, and that Delta thus had exhausted all reasonable efforts to secure voluntary accommodation.  Delta also formally requested forced accommodation from the City.

48.     Under § 4.06(F)(2) of the Lease Agreements, Delta's July 16, 2014 formal accommodation request obligated the City to select a signatory airline for forced accommodation within the next 30 days (i.e., by August 15, 2014).

49.     Article I.3.b of the Five Party Agreement requires the City "to require the sharing of preferential lease gates, pursuant to Dallas' existing lease arrangements," in the event that existing carriers refuse to accommodate a new entrant.

50.     Section 5(a) of the Wright Amendment Reform Act requires the City to "honor the scarce resource provisions of" the Lease Agreements at Love Field.

51.     The Competition Plan and its updates require the City to accommodate non-lease-holding airlines who wish to provide service at Love Field by enforcing the gate-sharing provisions of the Lease Agreements—specifically, Section 4.06(F).

52.     Delta expected that the City would live up to its end of the bargain under the Lease Agreements and under federal law by notifying the three incumbent carriers of the need to accommodate Delta and—if none of them was willing to do so voluntarily—requiring one of the three to accommodate Delta under § 4.06(F)(2) of the Lease Agreements.  And indeed, throughout the summer and fall of 2014, the City repeatedly represented to Delta that it intended to do exactly that:

- On June 13, 2014, Mark Duebner (the City's aviation director) and Michael Anastas (a Delta regional director) spoke by telephone about Delta's request and need for

16

accommodation, and Mr. Duebner assured Mr. Anastas that Duebner would do everything in his authority to make sure the City accommodated Delta.

- In a follow-up phone conversation on June 22, 2014, between Mr. Duebner and Holden Shannon (a Senior Vice President for Delta), Mr. Duebner committed to Mr. Shannon that the City would accommodate Delta's existing schedule.

- During August and September, 2014, Delta representatives participated in meetings with Love Field staff to prepare for Delta's accommodation at one or more of the gates of the incumbent carriers. One of these meetings occurred on Thursday, September 11, 2014. At the meeting, the City represented and committed that it would require United to accommodate Delta. Mr. Duebner told Mr. Anastas, "I will notify United tomorrow, Monday at the latest, and tell them they need to accommodate Delta so you can plan your move."

- During a telephone conversation on September 18, 2014, Mr. Duebner committed to Mr. Shannon that the airport would find a way to accommodate Delta's existing schedule of five daily flights from Love Field to Atlanta.

- On September 19, 2014, Mr. Duebner and Mr. Anastas spoke by telephone, and Mr. Duebner represented to Mr. Anastas that he had notified United that it would be required to accommodate Delta.

- On September 22, 2014, Mr. Duebner twice committed to Mr. Anastas that the City would require United to accommodate Delta after Delta's sublease with American expired on October 12, 2014.

53.     Despite the City's repeated promises that it would accommodate Delta's expanded operations at Love Field, the City failed to perform its obligation under the Lease Agreements. On Monday, September 29, 2014, Mr. Duebner sent Delta a letter reneging on the City's promise and informing Delta for the first time that the City would not accommodate Delta at Love Field. In his letter, Mr. Duebner also stated that United and Southwest had entered into a Gate Use License Agreement under which United would assign its gate space to Southwest—with the City's consent.

54.     The City's approval of this arrangement was completely unanticipated. During the divestiture of American's gates, the DOJ had repeatedly emphasized the City's obligation to promote competition at Love Field. And these concerns about competition are well-founded. Between 2004 and 2014, domestic fare prices at Love Field increased by an astounding 86%—

more than any other top 100 airport (as ranked by volume of passengers) in the United States. Even before the Wright Amendment expired, fare prices at Love Field between 2007 and 2012 were experiencing one of the highest increases in the country. Similar fare-price increases occurred at Houston Hobby and Chicago Midway, which are also Southwest-dominated airports. Southwest serves over 90% of the passengers at these airports, and has been able to significantly increase fare prices at each airport despite the presence of another, larger airport within the same metropolitan area. Nevertheless, until the introduction of Virgin America in May 2014, Southwest's dominance had grown largely unchecked.

55.     The City's approval of Virgin America's entry into Love Field suggested that it was aware of Southwest's threat to healthy competition at the airport. In light of this renewed commitment to competition, Delta fully anticipated that the City would be more than willing to further expand the flying public's options at Love Field. Competition would not only constrain price at Love Field, but would provide additional options to a significant segment of the flying public that would prefer the superior reliability and service of flying on Delta. This is particularly true given that Southwest's "no frills" service—no assigned or premium seats, no first class—is no longer accompanied by the fare advantages that Southwest was once reputed to provide.

56.     Nevertheless, even though Delta had formally notified the City of its request for forced accommodation on July 16, 2014, and diligently pursued it thereafter; and even though Section 4.06(F)(2) of the Lease Agreements required the City to act on that request within thirty days; the City still had not acted on Delta's request in early October 2014. Ironically, while the City continued its failure to act on Delta's accommodation request, the City Council voted on October 8, 2014 to rename the main road leading to Love Field after Southwest's co-founder,

Herb Kelleher.  With its sublease from American set to expire on October 12, 2014, Delta had no choice but to enter into a short-term agreement that would allow Delta to continue operating at Love Field.   Accordingly, on October 10, 2014, Delta entered into a Gate Use License Agreement with Southwest and a Facilities Use License Agreement with United, the combined effect of which was to allow Delta to continue operating at Love Field until January 6, 2015.  Delta signed these agreements—even though the economic terms did not comply with DOT requirements and were less favorable than the terms the City offered Southwest—because they were the only way Delta could avoid disruption of its scheduled service, displacement of its traveling customers, and irreparable harm to its business reputation and good will.

57.     In November 2014, the City notified Delta, Southwest, United, and Virgin America that it intended to develop a Love Field accommodation policy to use on Delta's pending accommodation request.  In connection with that effort, the City retained an aviation-industry consultant to analyze and model gate-space availability and gate utilization at Love Field.  The City presented the preliminary results of the consultant's analysis in a November 20, 2014 meeting with the four carriers.  The consultant's analysis concluded that as of November 5, 2014, it was possible and feasible for Love Field to accommodate Delta's five daily flights.

58.     The City announced its proposed accommodation policy less than two weeks later, on December 1, 2014.  The City's proposed policy confirms that the City will begin its accommodation analysis by determining "a 'Snapshot Date' that will start the time period for assessing reasonable accommodation."  Although City policy sets the Snapshot Date at the day of the request, the City has represented in writing that it will treat November 5, 2014, as the Snapshot Date for purposes of evaluating Delta's request for accommodation of its five flights.  Delta has consented to and relied on the City's use of November 5, 2014, as the Snapshot Date.

59.     Once a Snapshot Date is selected, the City's policy requires the City to "determine what schedule will be used for assessing scheduled operations.  Normally, this will be the schedule for the six months following the Snapshot Date."  With the City's having selected November 5, 2014, as the Snapshot Date, City policy indicates that the City should assess Southwest's scheduled operations based on Southwest's schedule from November 5, 2014, to May 4, 2015.  During that six-month window, Southwest was operating between 149 and 153 flights per day out of sixteen gates at Love Field.  Given that each gate at Love Field can accommodate at least ten flights per day, Southwest could accommodate Delta's five daily flights—less than 3% of what Southwest would fly—on one of its sixteen leased gates without any disruption to or interference with its operations.  Moreover, Southwest acquired even more gate capacity when it subleased two gates from United in April 2015.

60.     At the same time the City announced its Love Field accommodation policy, the City renewed its promise to accommodate Delta at Love Field.  In a December 1, 2014 letter to Delta, Southwest, and Virgin America, the City acknowledged that Delta had exhausted all reasonable efforts to secure voluntary accommodation and formally initiated the 30-day countdown contemplated by Section 4.06 of the Airport Use and Lease Agreements.  The City instructed each of the three incumbent carriers to "consider whether it can accommodate Delta's request" for accommodation and represented to the incumbent carriers and Delta "that if Delta has not been accommodated within 30 days, *the City will select a signatory airline to comply with Delta's accommodation request* in a non-discriminatory manner to the extent that accommodation will not unduly interfere with the signatory airline's operating schedule."   The City reiterated that "[o]n December 31, 2014, if we have not received notification that Delta has been voluntarily accommodated, *the City will make a mandatory accommodation* as provided in

the Use and Lease Agreement."  Despite this promise, and despite the fact that the City never received a notice of voluntary accommodation, December 31, 2014, came and went without the City's honoring its promise and making a mandatory accommodation.

61.     With Delta's Gate Use and Facilities Use License Agreements expiring on January 6, 2015, the City's failure to make good on its promise to force accommodation by the end of December left Delta with no choice but to again enter into a short-term agreement on unfavorable terms that would enable it to continue operating out of Love Field.  Accordingly, on January 6, 2015, Delta entered into two agreements with United that allowed Delta to continue operating at Love Field until July 6, 2015.

62.     On January 5, 2015, the City made still another promise to accommodate Delta at Love Field.  In a letter to Delta, the DOT, Southwest, and United, the City explained that its preference was to see "the carriers [] reach a permanent consensual resolution concerning Delta's request for gate accommodation" so that the City would "not hav[e] to mandate accommodation" but reiterated and reaffirmed that the City "will continue our mandatory accommodation process unless informed by carriers that it is no longer necessary."  The referenced "mandatory accommodation process" is the process begun by the City's December 1, 2014 letter, in which the City promised that "it will make a mandatory accommodation" of Delta at Love Field.

63.     On January 28, 2015, the City yet again promised to accommodate Delta at Love Field.  When it consented to Southwest's sublease of two gates from United (*see* discussion *infra* § VIII), the City represented that it was treating the DOT's December 17, 2014 letter (*see* discussion *infra* § VII) "as promulgating final and binding directives" that governed the City's handling of the "request for accommodation at Love Field by Delta."  The DOT's December 17, 2014 letter stated that the DOT expected the City to accommodate Delta at Love Field if

possible. The relevant data establishes that it is possible to accommodate Delta at Love Field. Thus, the City's statement in its written consent is a further acknowledgement and representation that the City is subject to and will comply with the DOT's binding directive that Delta should be accommodated at Love Field.

64.     On February 23, 2015, Delta requested accommodation of eight more daily flights at Love Field beginning August 15, 2015.  Delta made its request to Southwest, Virgin, and Seaport.  Delta also notified the City of its request for accommodation.  As of February 23, 2015—the date of Delta's accommodation request—it was possible to accommodate an additional eight daily Delta flights at Love Field in light of the incumbent carriers' then-current gate usage and without impacting their current or already-announced, for-sale services.  Not coincidentally, on February 26, 2015, Southwest first announced its intention to expand its flight schedule at Love Field to 180 daily flights as of August 9, 2015.

65.     Neither Southwest, Virgin, nor Seaport agreed to voluntarily accommodate Delta's request for eight additional flights.  On February 27, 2015, Southwest responded to Delta's accommodation request, stating that it would not "offer any accommodation beyond July 19, 2015."  On March 10, 2015, Virgin sent a letter to Delta stating that it would refuse to accommodate Delta's request for eight additional flights.  Seaport failed to respond to Delta's request by the requested response date of March 9, 2015.

66.     On April 28, 2015, Delta notified the City that it had "exhausted all reasonable efforts to secure voluntary accommodation for the additional eight flights" and requested that the City accommodate its original five-flight request and notify the incumbent carriers of the need to accommodate Delta's request for eight additional flights.

67.     Over the next several weeks, Delta continued to ask the City to honor its repeated

promises and adhere to DOT's directive by accommodating Delta at Love Field.  Delta advised

the City repeatedly, including by email on May 25, 2015, that Delta was relying on the City's

repeated representations that the City intended to force accommodation at Love Field.

**VII.   DOT's Directive Requiring the City to Accommodate Delta at Love Field.**

68.     On December 17, 2014, DOT provided the City with binding, enforceable

direction on how to handle Delta's pending request for long-term accommodation at Love Field

and comply with its federal obligations.  DOT provided its direction in the form of a letter to the

City from its general counsel, the Honorable Kathryn B. Thomson.  In its December 17 letter,

DOT clarified four important points concerning the existence and contours of the City's

accommodation obligation.

69.     First, DOT's December 17 letter confirmed that the City is obligated under

existing federal law to accommodate Delta at Love Field: "Our competition plan policy requires

airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting

carrier is unable to arrange a voluntary accommodation with a signature carrier, *the City will*

*accommodate the requesting carrier* to the extent possible given the current gate usage, without

impacting current or already-announced, for-sale services by the signatory carriers."   The

relevant data—including the findings and analysis of the City's own consultant—establishes that

there was more than ample space at Southwest's gates and United's gates for Delta's requested

five flights on the City's snapshot date of November 5, 2014.[2]   In addition, the relevant data

establishes that there was more than ample space at Southwest's gates to accommodate Delta's

additional requested eight flights when they were requested on February 23, 2015.   In light of

---

[2] The data also shows that it was possible to accommodate Delta at Love Field without impacting Southwest's then-current and -announced services as of July 16, 2014 (the date Delta first notified the City that the voluntary-accommodation process had failed and requested forced accommodation) and September 18, 2014 (the date Delta reiterated its request for forced accommodation in a written demand to the City).

this data, DOT's December 17 letter is an unconditional directive requiring the City to accommodate Delta.

70.    Second, DOT specified that the determination of whether accommodation is "possible given the current gate usage" should be made "based on the available space on the snapshot date of the original accommodation request." Thus, if an incumbent carrier announces plans for a future increase in service *after* receiving a request for accommodation, the City should not consider those planned future service increases when determining whether accommodation is possible. A flight may be considered as part of the accommodation analysis only if it was either "current[ly]" operated or part of the signatory carrier's "already-announced, for-sale services" as of the date of the accommodation request.

71.    Third, DOT clarified that the City is required to provide accommodation on a long-term basis and cannot make Delta's right to operate at Love Field subordinate or secondary to the right of any incumbent carrier:

> With respect to the length of the accommodation, for the accommodation to be meaningful at [Love Field], it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights. Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date.

The City thus has a "responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis."

72.    Finally, DOT's December 17 letter reaffirms that "[t]he City must also ensure that the accommodation is at reasonable rates." Specifically, DOT's "competition plan policy provides that subleasing rates covering the signatory carrier's direct leasing costs for the *pro-rata* share of subleased facilities, plus" a reasonable allowance for administration not to exceed 25%,

"are reasonable."

73.    After the December 17 letter, there could be no doubt that the City was required by the DOT's construction of the grant assurances to order that Delta be accommodated.

74.    On June 15, 2015, DOT sent the City a second letter.   The June 15 letter confirmed that the City's obligation to accommodate Delta is a matter of federal law—specifically, it flows from the AIP grant-assurances statute, the AIP grant agreements, and the competition-plan statute.   DOT also reiterated the common-sense, competition-promoting proposition that "a dominant signatory carrier should not be able to block a requesting carrier from accessing Love Field by announcing future plans to expand service [] after an accommodation request is made."   DOT concluded by confirming for the City that DOT expected the City "to carry out, in a reasonable and timely fashion, the accommodation efforts we described in our December 17 letter."

75.    In sum, DOT's two letters direct the City to force accommodation of Delta at Love Field to the extent possible given current gate usage at the time of Delta's request, without impacting current or already-announced, for-sale services by the signatory carriers at Love Field. And undisputed data—not to mention Southwest's recent conduct—establish that given the gate usage at Love Field at the time of Delta's request to continue its existing flights, as well as at the City's selected snapshot date of November 5, 2014, there was room for Delta to be accommodated for its five existing flights without impacting current or already-announced, for-sale services by the signatory carriers at Love Field.   Similarly, when Delta requested an additional eight flights on February 23, 2015, there was space for those flights without impacting current or already-announced, for-sale services by the signatory carriers.

**VIII.   The City's Approval of Southwest's Anti-Competitive Sublease from United.**

25

76.     As set forth above, the City was required to, but did not, ensure that Delta was accommodated at Love Field.  The City was also required by the Lease Agreements to "exercise its rights hereunder [i.e., under the Lease Agreement] and otherwise operate the airport . . . in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances."

77.     The Lease Agreements confer on the Signatory Airline (as relevant here, United) the "right to sublet the Leased Premises . . . to any party; provided, it shall first obtain the written approval of the City Manager."   Southwest and United entered an agreement under which Southwest would pay an obscene sum of money to United to obtain the near monopoly that the subleased gates would provide it.  Under that agreement, Southwest agreed that if it was forced to accommodate another airline, it would do so on its own leased gates, not the gates subleased from United.   Southwest and United notified the City of their agreement and sought City Manager approval.

78.     Pursuant to the terms of the Lease Agreements, the City Manager has unfettered discretion regarding whether to grant such approval.   Alternatively, the City Manager's discretion is limited, at most, by a provision applicable by its terms only to consent required by "the City or the Airline," which requires that consent "shall not be unreasonably withheld or delayed."

79.     The City had more than adequate reasons to object to the sublease.  First, the City specifically undertook in Section 14.19 of the Lease Agreements to "exercise its rights [under the Lease] and otherwise operate the Airport with due regard for . . . the interests of the traveling public."   The interests of the traveling public are in more, not less, options from Love Field.  Because Delta had already formally requested accommodation, the City knew that the alternative

to greater Southwest concentration was greater competition from Delta. Approving the sublease was thus contrary to the public interest and, as a result, prohibited by the Lease Agreement.

80.     Second, the City specifically undertook in Section 14.19 of the Lease Agreements to "exercise its rights [under the Lease] and otherwise operate the Airport . . . in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances."   Giving Southwest an exclusive right to the airport, and discriminating in its favor in making decisions regarding access to the airport, would violate federal grant assurances.   Accordingly, approving Southwest's acquisition of such an exclusive right was prohibited by the Lease Agreement.

81.     Third, the City knew when it consented to the sublease that Southwest and United each had room to accommodate Delta, but that both were opposing accommodation on the basis that Southwest would use United's gates once those gates were subleased.   Accordingly, its decision to consent despite the fact that Southwest and United were working together to exclude Delta facilitated the effort to frustrate Delta's contractual rights.

82.     Despite these substantial reasons to refuse consent to the sublease, Southwest bullied and threatened the City into granting it the consent it sought.   And despite DOT's clear statements to the City that Delta should be permanently accommodated before the sublease was approved, the City did not require that Delta first be accommodated.   However, the City did represent that it was "treating the 2014 Letter as promulgating final and binding directives to foreclose any allegation that the City is in violation of its federal grant assurances and to avoid the risk of losing federal grants or passenger facility charges."   Yet despite this representation, the City has failed to act in accordance with the grant assurances or the DOT Letters.

## IX.     This Action

83.     Rather than following the course of action outlined in the DOT Letters, on June 17, 2015, the City initiated this action in federal court, seeking declaratory relief pursuant to 28 U.S.C. § 2201 regarding Defendants and the rights and obligations of the City and Defendants under federal law concerning the use of aircraft gates at the Dallas Love Field airport.

84.     By initiating this action, the City waived any governmental immunity from suit and any procedural requisites to suit as to the transactions or occurrences that are the subject matter of the City's complaint.

85.     On June 19, 2015, Delta provided written notice to the City confirming its "exhaustion of [its] good-faith efforts to resolve [its] longstanding request for accommodation at Dallas Love Field" and electing to "view the City [as] in breach" of its obligation to accommodate Delta.  In that letter, Delta notified the City that it would "be seeking legal recourse."

**Counterclaims**

**Counterclaim I:      Declaratory Judgment That Delta Must Be Accommodated.**

86.     Delta incorporates by reference the allegations of all of the preceding paragraphs as though fully set forth in this Counterclaim I.

87.     There exists a justiciable case or controversy between Delta and the City as to whether the City is required to force accommodation of Delta at Love Field.

88.     This case is within the Court's subject matter jurisdiction, and the Court has jurisdiction over all the parties to this case.

89.     When Delta requested accommodation of six flights in June 2014, both Southwest and United could have accommodated those flights without undue interference with their operating schedule.  Similarly, when Delta requested accommodation of eight additional flights

in February 2015, after Southwest subleased United's gates, Southwest could have accommodated those flights without undue interference with its operating schedule.  The Lease Agreement unambiguously requires the City to force permanent accommodation of Delta at Love Field.

90.     The Five Party Agreement, the Competition Plan and its updates, the Wright Amendment Reform Act, and DOT's recent directives are all consistent with the Lease Agreement and designed to effectuate the Lease Agreement's accommodation provisions and obligations.

91.     Under substantial pressure and threats from Southwest, the City did not require that Delta be permanently accommodated at Love Field, despite the Lease Agreements, the DOT's letters, and federal law.  The City's failure to force accommodation of Delta at Love Field has caused, and if not corrected will continue to cause, Delta to suffer injury.

92.     Delta seeks a declaration under 28 U.S.C. § 2201 that the City has an obligation to require that Delta be accommodated at Love Field for the flights requested in its June 2014 and February 2015 letters.

**Counterclaim II:     Declaratory Judgment That the City Must Reclaim Two Gates for Common Use.**

93.     Delta incorporates by reference the allegations of all of the preceding paragraphs as though fully set forth in this Counterclaim II.

94.     There exists a justiciable case or controversy between Delta and the City as to whether the City violated the Lease Agreements when it approved the sublease and thereby granted an exclusive right to Southwest.

95.     This case is within the Court's subject matter jurisdiction, and the Court has

jurisdiction over all the parties to this case.

96.     The City had discretion under the Lease Agreements to approve or disapprove United's sublease to Southwest.  When the City approved that sublease, despite the fact that it gave Southwest an exclusive right at Love Field and was contrary to the public interest, it violated, at a minimum, Section 14.19 of the Lease Agreements.

97.     The only way to remedy the exclusive rights violation caused by the City's action is to declare that Southwest must divest two gates, limiting its control over Love Field to 80% of the available gates as contemplated in the Lease Agreement and Five Party Agreement.  As the DOJ has recognized, permitting Southwest to have 18 of the 20 gates would destroy "meaningful competition" at Love Field.

98.     Because Southwest and United allocated the risk of forced accommodation to Southwest through the sublease provision requiring that any accommodation be done on gates other than those subleased from United, the proper remedy is for Southwest to divest two of its other gates.  Pursuant to Section 4.06(E), the two gates should become "Common Use Gates" under the control of the City.

99.     The City's wrongful approval of the sublease agreement due to pressure from Southwest has caused, and if not corrected will continue to cause, Delta to suffer injury.

100.    Accordingly, Delta seeks a declaration under 28 U.S.C. § 2201 that Southwest may not have lease or sublease rights to more than 16 gates, and that the City must reclaim two Love Field gates to be utilized as common use gates.

**Counterclaim III:     Breach of the Lease Agreements**

101.    Delta incorporates by reference the allegations of all of the preceding paragraphs as though fully set forth in this Counterclaim III.

102.    The Lease Agreements are valid, enforceable contracts.

103.    As a new entrant to Love Field and/or a carrier seeking to provide service at Love Field and/or a signatory to a gate use license agreement, Delta is an intended and/or contemplated and/or third-party beneficiary of the Lease Agreements.  As such, Delta is a proper party to sue for breach of these Agreements.

104.    By seeking to provide service at Love Field and/or enter Love Field as a new entrant carrier, exhausting all reasonable efforts to secure voluntary accommodation from the incumbent carriers, and taking the proper steps to invoke its right to forced accommodation, Delta performed its obligations under the Lease Agreements and thus satisfied every condition precedent under the contract to trigger the City's obligation to force the accommodation of Delta.

105.    In addition, or in the alternative, the Lease Agreements are in writing, state the essential terms of the agreement between Delta and the City, promise that the City will provide Delta with a benefit if Delta performs, and were executed on behalf of the City.  Accordingly, each of the Lease Agreements is a valid and enforceable unilateral contract between Delta and the City.

106.    Delta formed a contract with the City by performing under the Lease Agreement. Delta performed under the Lease Agreement by seeking to provide service at Love Field and/or enter Love Field as a new entrant carrier, exhausting all reasonable efforts to secure voluntary accommodation from the incumbent carriers, and taking the proper steps to invoke its right to forced accommodation.  As a party to the unilateral Lease Agreement contract, Delta is a proper party to sue for breach of the unilateral Lease Agreement contract.

107.    The City breached the Lease Agreements—including, without limitation, the provisions of section 4.06—by, *inter alia*, (1) failing to force accommodation of Delta's request

31

for five flights at Love Field within 30 days of the City's December 1, 2014 letter; (2) failing to subsequently force accommodation of Delta's request for five flights after Delta exhausted its good-faith efforts to obtain its requested accommodation; (3) failing to notify the incumbent carriers of the need to accommodate Delta's request for eight additional flights after Delta exhausted all reasonable efforts to secure voluntary accommodation for that request; and (4) failing to force accommodation of Delta's request for eight additional flights.

108.    In addition, section 14.19 of the Lease Agreement requires the City to operate Love Field in a manner that is consistent with federal grant assurances.

109.    Grant assurance 22, "Economic Nondiscrimination," requires the City to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."  By failing to provide Delta long-term gate access at Love Field despite providing long-term access to similarly situated airlines, the City has violated Grant Assurance 22.

110.    Grant assurance 23, "Exclusive Rights," requires the City to "permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public."  By unreasonably and without just cause excluding Delta from operating at Love Field, denying Delta the continued opportunity to be an aeronautical service provider at Love Field, and ceding control of Love Field's gates to a small number of airlines while unreasonably excluding Delta from the same long-term gate access it has granted to others, the City has violated Grant Assurance 23.

111.    By violating Grant Assurances 22 and 23, the City has breached section 14.19 of the Lease Agreement.

112.    In addition, the City breached section 14.19 of the Lease Agreement by approving United's sublease to Southwest, because approving the sublease was contrary to the interests of the traveling public and contrary to the requirements of applicable law, federal aviation regulations, federal grant assurances, and/or City airport revenue bond ordinances.

113.    The Five Party Agreement—including, without limitation, the provisions of article 1.3.b—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

114.    The City's Competition Plan as updated—including, without limitation, the provisions of Section 1(F) of the Competition Plan, section 4 of the 2005 Competition Plan update, and sections 1 and 1(b) of the 2009 Competition Plan update—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.  It further confirms that the City acted unlawfully when it approved the sublease despite the fact that it would affirmatively harm competition at Love Field.

115.    The Wright Amendment Reform Act—including, without limitation, the provisions of section 5(a)—confirms that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirms that the City's failure to abide by the forced-accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

116.    The DOT's December 17, 2014 letter and June 15, 2015 letter—both individually and jointly—confirm that the Lease Agreements obligate the City to force accommodation of Delta at Love Field and further confirm that the City's failure to abide by the forced-

accommodation provisions of the Lease Agreements is a breach of the Lease Agreements.

117.    The City's breaches of the Lease Agreements have caused, and if not corrected will continue to cause, Delta to suffer significant and irreparable injury as a natural, probable, and foreseeable consequence.

118.    There is no adequate remedy at law for the City's breach of the Lease Agreements, and damages would be inadequate compensation.    Delta has performed its obligations under the Lease Agreements.    Accordingly, Delta is entitled to specific performance by the City of the Lease Agreements.

119.    Delta has substantially complied with all applicable and valid notice requirements, including, to the extent applicable and valid, the requirement under Section 2-86 of the Dallas City Code to provide notice of a breach of contract claim for damages within 180 days of the breach.    The 180-day period had not expired on June 17, 2015, when the City filed its complaint.    The City is equitably estopped from arguing otherwise because, until the City filed its complaint, it represented to Delta that it intended to force accommodation of Delta's requests, and Delta reasonably relied on that representation.    By filing the complaint, the City waived any remaining requirement for Delta to give notice to the City before filing its breach-of-contract claims.

### PRAYER

For these reasons, Plaintiff Delta hereby requests that the Court award the following relief against the City:

a.       a declaration that Southwest's possession of lease and/or sublease rights to more than 16 gates violates the grant assurances and the Lease Agreements;

b.       a declaration that the City must reclaim two of the gates that Southwest currently

leases from the City and dedicate those gates to common use to terminate the unlawful and improper exclusive right to the airport currently held by Southwest, and to adhere to its responsibility of operating the Airport with due regard for the interests of the traveling public;

c.    a declaration that Delta is entitled to be accommodated by Southwest for its existing schedule, for which it requested accommodation in June 2014, and for the eight flights requested in its February 2015 letter to the signatory airlines;

d.    a declaration that the City is required to direct Southwest to accommodate Delta for the flights identified in its June 2014 and February 2015 letters;

e.    a preliminary injunction, issued after notice to the City and a hearing, preserving the status quo and enjoining the City from refusing to provide gate access to Delta for its existing flight schedule and from ousting Delta from Love Field;

f.    an order requiring specific performance of the City's forced-accommodation obligation;

g.    a permanent injunction enjoining the City from refusing to comply with the forced-accommodation provisions of the Lease Agreement;

h.    actual damages in excess of $75,000 resulting from the City's wrongful acts;

i.    reasonable and necessary attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code;

j.    costs of suit; and

k.    all other relief at law and in equity to which it may be justly entitled.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Delta respectfully asks the Court to deny

all relief requested in the City's Original Complaint, that Delta be awarded its attorneys' fees and

costs, that judgment be entered in Delta's favor, and for all such other and further relief, both at

law and in equity, to which Delta may be justly entitled.


DATED:  August 31, 2015                           Respectfully submitted,

                                                  */s/ William B. Dawson*
                                                  William B. Dawson
                                                        SBN 05606300
                                                  Karl G. Nelson
                                                        SBN 14900425
                                                  Ashley E. Johnson
                                                        SBN 24067689
                                                  Russell H. Falconer
                                                        SBN 24069695
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  2100 McKinney Ave, Suite 1100
                                                  Dallas, TX 75201
                                                  Telephone: (214) 698-3100
                                                  Fax: (214) 698-3400
                                                  rwalters@gibsondunn.com
                                                  knelson@gibsondunn.com
                                                  ajohnson@gibsondunn.com
                                                  rfalconer@gibsondunn.com

                                                  Kenneth P. Quinn
                                                        DC Bar No. 495423
                                                        Admitted *pro hac vice*
                                                  Jennifer E. Trock
                                                        DC Bar No. 486098
                                                        Admitted *pro hac vice*
                                                  Pillsbury Winthrop Shaw Pittman
                                                  1200 Seventeenth Street NW
                                                  Washington, DC 20036
                                                  (202) 663-8898
                                                  kenneth.quinn@pillsburylaw.com

                                                  COUNSEL FOR DELTA AIR LINES, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of August, 2015, a true and correct copy of the foregoing document was served upon counsel of record through the Court's CM/ECF System.


*/s/ William B. Dawson*
William B. Dawson