**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CITY OF DALLAS,**<br><br>**Plaintiff,**<br>**v.**<br><br>**DELTA AIRLINES, INC., SOUTHWEST AIRLINES CO., VIRGIN AMERICA INC., AMERICAN AIRLINES, INC., UNITED AIRLINES, INC., SEAPORT AIRLINES, INC., UNITED STATES DEPARTMENT OF TRANSPORTATION, AND THE FEDERAL AVIATION ADMINISTRATION,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 3:15-cv-02069-K** |

**EXECUTIVE SUMMARY OF THE OPINIONS THAT SOUTHWEST AIRLINES CO.'S EXPERT BRIAN M. CAMPBELL, PH.D. MAY OFFER AT THE SEPTEMBER 28-29 PRELIMINARY INJUNCTION HEARING**

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and this Court's Sealed Electronic Order Amending Schedule, dated August 21, 2015, Defendant Southwest Airlines Co. ("Southwest") files this executive summary of the opinions that its expert Brian M. Campbell, Ph.D. may offer at the September 28-29, 2015 preliminary injunction hearing. Because discovery is ongoing, Dr. Campbell reserves the right to amend or supplement his opinions and the bases thereof, if necessary, as discovery progresses, and also reserves the right to supplement his opinions and the basis thereof based on the opinion(s) offered by the experts of other parties and the testimony and other evidence presented during the hearing.

## I. EXPERT QUALIFICATIONS

Dr. Campbell will testify regarding his training, education, experience, and background generally and specifically as it pertains to this case. Specifically, Dr. Campbell is Chairman of the Campbell-Hill Aviation Group, LLC, with offices located just outside Washington, DC, at 700 North Fairfax Street, Suite 300, Alexandria, Virginia. Dr. Campbell has nearly 50 years of experience as an airline executive and economic consultant in the airline and airport industries. A copy of Dr. Campbell's relevant education and experience is attached hereto as Exhibit 1.

## II. EXECUTIVE SUMMARY OF OPINIONS

### A. Southwest's Operations at Love Field Are Not Monopolistic

Contrary to Delta Air Lines Inc.'s ("Delta") core accusation in this lawsuit, Southwest's operations at Love Field are neither anticompetitive nor monopolistic. This is because the Dallas-Fort Worth metropolitan area is a single commercial air services market served by airlines operating out of two competing airports: the Dallas-Fort Worth International Airport ("DFW Airport") and Love Field. DFW Airport and Love Field are only 15 miles apart, and 95% of the population of the Dallas-Fort Worth metroplex is within a 60 minute drive of both airports. Indeed, these two airports are much closer than competing airports that serve other large cities as part of a single market, including airports in both Chicago and Houston.

Moreover, both American Airlines ("American") (Southwest's largest competitor in the Dallas-Fort Worth area) and the U.S. Department of Justice ("DOJ") consider Love Field and DFW Airport as competing airports serving the same geographic market. As further evidence of this single market, Southwest's recent decision to offer a number of new non-stop routes following the expiration of the Wright Amendment in October 2014 has forced American to significantly reduce its fares out of DFW Airport for flights in the same city-pairs as Southwest. Thus, within this single Dallas-Fort Worth geographic market, Southwest currently operates

from only 18 gates, or 9.7%, of the 185 total gates between Love Field (20 total gates) and DFW Airport (165 gates).

Southwest's presence in the Dallas-Fort Worth market contrasts sharply with Delta's dominant presence in Atlanta, where Delta maintains its largest hub. In that market, Delta operates out of 150 of the 207 (or 72%) total gates, as of the end of 2014. Delta also operates 111 domestic non-stop monopoly routes (*i.e.*, routes that are served by no airline other than Delta) at its Atlanta hub, whereas Southwest in the Dallas-Fort Worth market can claim only one monopoly route out of the 52 nonstop routes it operates at Love Field.

**B. <u>Southwest's Post-Wright Amendment Expansion at Love Field Generates Enormous Economic Benefits for the North Texas Economy</u>**

Between October 2014—when the Wright Amendment's restrictions expired—and August 2015, Southwest has added 36 new non-stop routes at Love Field. These 36 routes have already begun to generate significant economic benefits to the North Texas economy and will continue to do so as long as Southwest's operations at Love Field remain unimpeded. Not only do these additional flights produce significant and demonstrable fare savings for area travelers, but service to these 36 new markets have generated (and will continue to generate) over one million additional annual Dallas-Fort Worth area passengers. The economic benefits of Southwest's additional non-stop flights at Love Field increases the number of visitors to the Dallas-Fort Worth area, which, in turn, gives rise to increases in sales by North Texas businesses, new investment and jobs in the area, and overall employee earnings. During just the fourth quarter of 2014 alone, Southwest's Love Field services in the then-15 new nonstop routes produced an estimated 390,000 new Dallas O&D passengers (including 68,000 visitors), $59 million in fare savings, $107 million in additional sales in the North Texas economy, and 3,883 new jobs paying $45 million in annual wages.

By contrast, if forced accommodation of Delta resulted in Southwest's loss of 5 round trip flights per day (a strong possibility), the Dallas-Fort Worth area would stand to lose the economic benefits associated with those additional Southwest flights to several new non-stop markets without Delta adding any countervailing benefit through its accommodated flights. Because Delta, if accommodated, intends simply to operate 5 round-trip flights between its Atlanta hub and Love Field, and because Delta's fares are on average 40% higher than Southwest's, Dallas-Fort Worth passengers would lose an estimated $93 million in annual fare savings as a result of Delta's accommodation. Moreover, forced accommodation of Delta would also result in a decrease of over 550,000 annual passengers to the Dallas-Fort Worth area, including 141,000 annual visitors. This, in turn, would result in significant economic losses to North Texas businesses and employees.

**C. <u>Delta's Actions at Love Field Are a Defensive Move and Are Not Pro-Competitive</u>**

In January 2005, Delta abandoned its hub at DFW Airport, reducing its flights from 223 average daily departures in 2004 to 29 average daily departures in 2005. Knowing that the Wright Amendment restrictions would expire in October 2014 and that Southwest or AirTran would almost certainly add non-stop flights to Atlanta, Delta began service at Love Field in January 2010 with 4 to 5 daily round trips to Atlanta. Because, unlike Southwest, Delta can effectively serve the interests of its Dallas passengers from DFW Airport, it is apparent that Delta's only interest in serving Love Field is simply to seal-up a small leak in its Atlanta hub juggernaut.

**D. <u>The Swelbar Paper That Delta Relies On Is Incorrect and Misleading</u>**

In its briefing, Delta relies on a fatally flawed academic paper from consultant William Swelbar (the "Swelbar Paper") to suggest that: (1) Southwest has caused Love Field to experience "one of the highest increases in fare prices between 2007 and 2012 of any airport in

the country"; and (2) "the same result . . . happened at the Southwest-dominated airports of Houston Hobby [HOU] and Chicago Midway [MDW]."[1] However, the Swelbar Paper is fundamentally flawed for at least three reasons:

*First*, the Swelbar Paper ignores the fact that the average passenger trip length at Love Field increased by 24% for the 2007 to 2012 period studied. Because longer flights are more costly to operate, comparing fares at airports without controlling for the average distance travelled by passengers—which is precisely what the Swelbar Paper does—is inherently misleading. *Second*, the Swelbar Paper disregards the fact that, unlike Delta and virtually all other airlines, Southwest does not charge extra fees for checked baggage and reservation changes. By omitting these fees from its analysis, the Swelbar Paper makes it appear that fares at airports comparable to Love Field are materially lower and thus understates the amounts actually paid by passengers at all non-Love Field airports. *Third*, the 2007 baseline year adopted by the Swelbar Paper is inherently misleading because, at that time, Southwest's fuel costs were temporarily below industry levels due to favorable but unsustainable fuel hedges that were then ending. The Swelbar paper thus ignores the fact that between 2010 and 2014 all of Southwest's fares increased as these fuel hedges rolled off.

[1] "Evolving Trends of U.S. Domestic Airfares: The Impacts of Competition, Consolidation and Low-Cost Carriers," M. Wittman & W. Swelbar, No. ICAT-2013-07 (Aug. 2013).

DATED: September 3, 2015

Respectfully submitted,

*/s/ Kent D. Krabill*
John T. Cox, III
Texas Bar No. 24003722
Email: tcox@lynnllp.com
Kent D. Krabill
Texas Bar No. 24060115
Email: kkrabill@lynnllp.com
Britta Erin Stanton
Texas Bar No. 24036976
Email: bstanton@lynnllp.com
Stephen M. Cole
Texas Bar No. 24078358
Email: scole@lynnllp.com
**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3838 – Facsimile

**COUNSEL FOR DEFENDANT/CROSS-PLAINTIFF SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, the foregoing was served on all counsel of record who have consented to electronic service.

*/s/ Kent D. Krabill*
Kent D. Krabill

# EXHIBIT 1

**Brian M. Campbell, PhD.**
**Chairman**
**Campbell-Hill Aviation Group, LLC**

Professional Experience

Dr. Campbell's career has been heavily concentrated in the economic elements of commercial air transportation. After graduating from the Columbia University Graduate School of Business Administration in 1968, he was employed for seven years by Simat, Helliesen & Eichner, Inc., a transportation consulting firm. Prior to his resignation from that firm in 1975, he held the position of Vice President of the Washington office.

Between 1976 and 1982, Dr. Campbell was a co-founder and senior executive of two new-entrant (post-U.S. deregulation) airlines, with primary responsibilities for planning and finance. The first of these new companies was Midway Airlines, Inc., where he held the position of Vice President of Finance and Administration from 1977 to 1980. After resigning from Midway, Dr. Campbell formed Air Chicago, Inc. and served as its Chairman and Chief Executive Officer through the planning and initial capitalization period.

Dr. Campbell returned to the consulting profession in 1982, and from 1987 until December 1993, he was a founding member of Leeper, Cambridge & Campbell, Inc. He held the position of President from 1991 to 1993. In December 1993, he formed The Campbell Aviation Group, Inc., the predecessor to the Campbell-Hill Aviation Group.

Dr. Campbell's particular expertise is in the economic analysis of aviation issues and opportunities. This includes financial, marketing, planning, and operational aspects of airlines, airports, and equipment manufacturers. Dr. Campbell's experience is highly qualified from both research and executive viewpoints. He has served numerous clients in problem diagnosis, specification and analysis of alternative courses of action, development of strategic action plans, and implementation procedures and controls.

Throughout his career, Dr. Campbell has developed various analytical models and procedures for a broad variety of clients in all major sectors of the aviation industry. For instance, in his airport economic forecasting practice, he led the development of the only comprehensive airport activity and passenger forecasting model that realistically accounts for inter-airport competition within a single region. He also has created and implemented detailed costing, budgeting, and financial forecasting models for airlines.

Dr. Campbell's aviation expertise includes extensive consulting in air cargo and air express operations. Along with Rex Edwards, Vice President, he leads the firm's consulting services for air cargo and air express carriers including the Cargo Airline Association.

As a consultant, Dr. Campbell has appeared as an expert witness in more than 75 adversarial proceedings before regulatory boards or commissions, representing private as well as government and non-profit organizations. This cross-section of cases includes routes, fares, mergers, initial certification, and industry performance evaluations. The majority of these case

appearances were before the U.S. Civil Aeronautics Board and the U.S. Department of Transportation, and several occurred before the Canadian Transport Commission and the European Commission. Dr. Campbell has testified in U.S. federal courts, state administrative tribunals, the U.S. Congress, the Canadian Parliament. During the course of his consulting work, he has presented countless reports to U.S. DOT, DOJ, and OMB staff on behalf of airline clients.

As a senior airline executive, Dr. Campbell raised millions of dollars of venture capital for lease and debt financing of used aircraft. He has managed a SEC registration for a public stock offering by a new-entrant airline, negotiated and successfully secured purchase agreements for new and used flight equipment, spare parts inventories, training services, and airport and maintenance facilities. Moreover, he has directed the finance and accounting, purchasing and stores, planning, and administration departments of new operating carriers.

Areas of Specialization:

- Route system development and market planning
- Financial and economic impact analysis of environmental regulations
- Statistical modeling
- Demand forecasting (passenger, property, activity/operations)
- Aircraft evaluations and fleet planning
- Proforma financial statements and measures of performance
- Development and preparation of business plans for targeted purposes
- Presentations to financial institutions and boards of directors
- Financial services (equity and debt)
- Merger and acquisition analyses, recommendations, and integration plans
- Litigation support and expert testimony
- Federal and local airport and airways policy issues

Education:

- Bachelor of Commerce, McGill University
- M.B.A., University of Western Ontario
- Ph.D., Business Administration, Columbia University