## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CITY OF DALLAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:15-cv-02069-K** |
| | § | |
| **DELTA AIR LINES, INC., SOUTHWEST** | § | |
| **AIRLINES CO., VIRGIN AMERICA INC.,** | § | |
| **AMERICAN AIRLINES, INC., UNITED** | § | |
| **AIRLINES, INC., SEAPORT AIRLINES,** | § | |
| **INC., UNITED STATES DEPARTMENT OF** | § | |
| **TRANSPORTATION, and THE FEDERAL** | § | |
| **AVIATION ADMINISTRATION,** | § | |
| | § | |
| **Defendants.** | § | |

---

### ANSWER OF DEFENDANT VIRGIN AMERICA INC.
### TO ORIGINAL COMPLAINT OF CITY OF DALLAS

---

Defendant Virgin America Inc. ("Virgin America") hereby files this Answer to City of Dallas' Original Complaint.

### ANSWER

Any allegation not expressly admitted is denied.

### I.     INTRODUCTION

1.     Mandates from two federal agencies under color of federal law and conflicting legal claims and litigation threats by several airlines under federal law have put the City in an impossible situation that only this Court can resolve. An impending July 6, 2015, deadline that may cause chaos at Love Field requires the City to file this action now.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 1 and therefore denies them.**

2.      The City owns and operates the airport generally known as Love Field in the City and County of Dallas, Texas, within the Northern District of Texas. For decades, operations at Love Field were restricted by a federal law, the so-called Wright Amendment. In 2006, Congress amended and reformed the Wright Amendment so that certain restrictions expired in October, 2014. The City has lease agreements running through 2028 with Southwest Airlines Co. ("Southwest"), United Airlines, Inc. ("United"), and American Airlines, Inc. ("American") for the preferential use of the 20 gates at Love Field and for the use of other airport facilities. Some of the rights and/or access provided by the leases have been transferred to other air carriers: United has subleased its gates to Southwest, and American has subleased its gates to Virgin America Inc. d/b/a Virgin America Airlines Inc. ("Virgin"); Virgin allows Seaport Airlines, Inc. ("Seaport") to operate from a Virgin America gate under a gate use agreement; and Southwest allows Delta Air Lines, Inc. ("Delta") to operate under a gate use agreement. In October 2014, certain of the most significant restrictions, such as the prohibition against longhaul domestic flights by full-size passenger aircraft, under the Wright Amendment ceased but the legal number of gates at Love Field was reduced. This has triggered demands on the City for additional access and use of the limited number of gates. All of the Signatory Airlines' current leases at Love Field predate the reform (substantial repeal) of the Wright Amendment in 2006.

**RESPONSE: Virgin America admits that, pursuant to the authority of the Department of Justice and the Federal Court in United States et al. v. US Airways Group, Inc. and AMR Corporation, Case No. 1:13-cv-01236 (D.D.C.) and through the agreement with the City, it has subleased gates from American and allowed Seaport to operate from**

its gates under a sublease agreement. And Virgin America admits that certain changes resulted from the termination of the Wright Amendment, which are more clearly set forth in the Amendment itself. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 2 and therefore denies them.

3.     The City's leases with the Signatory Airlines at Love Field give each Signatory Airline the preferential right to use its gates and requires the City to mandate accommodation requests for gate use from new entrants to the airport, but only to the extent that granting such request would not unduly interfere with the Signatory Airline's flight schedule and if the requesting new entrant air carrier and the Signatory Airline cannot agree on voluntary accommodation terms. In addition, if there is voluntary or mandatory gate accommodation but the Signatory Airline and the new entrant cannot agree on all necessary terms of gate use, the City is to determine the missing terms (for example, the amount of compensation for gate use or duration or conditions of accommodation).

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 3 and therefore denies them.**

4.     The City has received conflicting demands and claims concerning the use of the limited number of gates at Love Field from some of the Airlines, principally between Southwest and Delta, and from the U.S. Department of Transportation ("DOT") and one of its subsidiary agencies, the Federal Aviation Administration ("FAA") (DOT and FAA together are referred to as the "Federal Agencies"). The City is faced with irreconcilable demands, each under color of federal law, that include explicit threats of litigation or risk of other legal sanctions.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 4 and therefore denies them.**

5.      DOT is the parent agency of FAA. The FAA administers most of the DOT and FAA grants received by the City for use at Love Field. DOT and FAA assert adverse consequences for the City's FAA grants if the City does not accommodate Delta in compliance with DOT's directions.

**RESPONSE: Virgin America admits the allegations contained in the first and second sentences of Paragraph 5. Virgin America does not have sufficient information to admit or deny the remaining allegations in Paragraph 5 and therefore denies them.**

6.      The City brings this action seeking a judgment declaring the rights and obligations of the City and of the Airlines and the Federal Agencies, and resolving conflicting interpretations of the federal statutes, federal regulations, other instruments, and the leases, in relation to gate accommodation at Love Field. The City brings this action to resolve the disputes, to enable it to perform its obligations, and to prevent disruption of service to the flying public. There is an imminent threat of irreparable harm to the public and to Love Field from air operations disruption at Love Field on and after July 6, 2015, when Delta's latest temporary permission to use gate slots for which Southwest claims preferential lease rights expires. This likely will necessitate temporary and preliminary injunctive relief unless these Airlines reach a voluntary resolution.

**RESPONSE: Virgin America admits that the City has made the allegations contained in Paragraph 6.  To the extent that this allegation states anything beyond the City's allegations, Virgin America does not have sufficient information to admit or deny the remaining allegations in Paragraph 6 and therefore denies them.**

7.      The Federal Agencies regulate many facets of Love Field operations. Among other things, under the authority of title 49, U.S. Code, DOT enforces competition standards for

Love Field and other airports and the FAA administers monetary grants to Love Field and other airports. In addition, FAA has authorized the City to collect passenger facility charges (sometimes called "PFCs") from departing Love Field passengers to help finance Love Field improvements. These Federal Agencies have told the City that the City's title 49 responsibilities to foster competition require the City to provide long-term gate accommodation to Delta at Love Field gates leased by Southwest regardless of Southwest's plans to uses the gates, at least if those plans were announced after Delta's gate request. The Federal Agencies further state that this accommodation must last for as long as Delta maintains the same pattern of service regardless of Southwest's future gate use plans.

**RESPONSE: Virgin America admits the allegations contained in the first three sentences of Paragraph 7. Virgin America is without sufficient information to admit or deny the remaining allegations in Paragraph 7. With regard to the last sentence of Paragraph 7, Virgin America defers to the text of the DOT letters dated December 17, 2014 and June 15, 2015 for their precise wording.  To the extent that the last sentence states anything beyond the text of those letters, it is denied.**

8.       However, these requirements disregard federal statutory provisions in the Wright Amendment Reform Act of 2006, Pub. L. 109-352 ("WARA") protecting Signatory Airlines' Love Field preferential gate rights from interference under color of title 49. The City has been unable to obtain an explanation from the Federal Agencies why those protections would not apply to Delta's accommodation requests. Some details of the accommodation obligations imposed on the City by these Federal Agencies, such as the duration of any accommodation, do not appear to be authorized by title 49 and do not appear consistent with gate accommodation policies at other airports. The City has been unable to obtain reconciliation from these Federal

Agencies between their requirements for Delta's accommodation request at Love Field and nationwide practices that the Federal Agencies appear to have sanctioned at other airports. The Signatory Airlines' Love Field provide leases two possible ways that these Federal Agencies might permissibly require the City to override the lease protections for the Signatory Airlines' lease rights without subjecting the City to suit for breaching the lease: (1) the Federal Agencies could expressly threaten the City's FAA grants for Love Field after reviewing the lease – the lease provides that such threat would require amendment of the lease to negate the threat – However DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well; or (2) the agencies might be able to enter into an agreement with the City – provide lease that the lease terms are subordinated to such agreements under certain circumstances. However the Federal Agencies have refused to consider negotiating an agreement with the City and the City does not believe that DOT and the City could negotiate a valid agreement that was inconsistent with WARA. A WARA provision provides the one avenue that could allow the agencies to override the Signatory Airlines' preferential gate lease rights at Love Field: they could adopt nationwide regulations that would be authorized by federal law to preempt preferential gate rights. However, the Federal Agencies' directives to the City are for Love Field only, whereas the governing federal statute, as shown below, requires that any such preemption be on a nationwide basis. Finally the Federal Agencies ignore WARA provisions, also as shown below, that provide that Signatory Airlines' and the City's compliance with and performance under a certain "Five Party Agreement" is deemed to constitute compliance with their respective title 49 obligations, and that agreement protects the Signatory Airlines' preferential gate rights at Love Field.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 8 and therefore denies them. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

9.     The City is faced with several options, all of which place the City at significant risk. The City could make a decision that appeared to benefit one Airline and face certain litigation from other Airlines. The City could comply with the Federal Agencies' interpretations of the City's legal obligations and face certain litigation from Airlines. The City could comply with its obligations under leases and other contractual commitments but would thereby face liability from the Federal Agencies and other Airlines. Most troublingly, the Federal Agencies have required that the City take actions that appear to violate the City's lease obligations, but have refused to impose their mandate in a form that might allow the City to comply with the Federal Agencies' directives without violating the City's lease obligations; all while retaining the FAA's option to deprive the City of aviation grant money if the City does not comply with the Federal Agencies' interpretations of the City's gate accommodation obligations. In short, the City needs judicial intervention to understand and perform its legal obligations and rights so it can move forward with management of its Love Field airport in a legal manner in the best interest of the flying public and the residents of the City of Dallas. Absent direction and declaratory relief from this Court, that would be impossible.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 9 and therefore denies them.**

## II.  JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1367; 5 U.S.C. 701 et seq.; and 28 U.S.C. § 2201. To the extent that any state law issues are involved, they so relate to the federal questions presented that they form part of the same case and controversy. 28 U.S.C. § 1367.

**RESPONSE:  Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.  To the extent this Paragraph 10 refers to other gates or issues, Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 10 and therefore denies them.**

11.    On December 17, 2014, DOT General Counsel sent the Dallas City Attorney a letter establishing DOT's position on Delta's gate accommodation request and instructing the City how to handle that request ("First DOT Letter"). On June 15, 2015, DOT General Counsel sent a Dallas Assistant City Attorney a letter incorporating the First DOT Letter by reference, and elaborating and expanding on several provisions of the First DOT Letter ("Second DOT Letter"). The Second DOT Letter, among other things, explicitly asserted that the City's aviation grant eligibility for Love Field would be conditioned on compliance with the views expressed in the First DOT Letter. The First DOT Letter and the Second DOT Letter (together the "DOT

Letters") each is a final agency action of DOT issued in violation of the Administrative Procedure Act ("APA") and WARA. WARA sets forth legal obligations for the operation of Love Field by which the federal government and others must comply. Judicial review of action under WARA is subject to section 706(2) of the APA.

**RESPONSE: Virgin America admits that the DOT General Counsel sent the Dallas City Attorney letters dated December 17, 2014 and June 15, 2015.    To the extent that Paragraph 11 is intended to state facts beyond the actual statements in the referenced letters, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 11 and therefore denies them. To the extent allegations in Paragraph 11 constitute legal conclusions, no response is required and Virgin America denies them.**

12.    Neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because DOT acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. DOT's powers with respect to Love Field gate allocation matters are unique due to the enactment of WARA (i.e., Love Field is the only U.S. airport to have such specific statutory directives). Concerning those matters, DOT is statutorily constrained to act within the context of WARA. See Section 5(d)(1). Therefore, any DOT action with respect to Love Field, regardless of the more general powers that DOT may have under other federal law, necessarily are authorized from the power granted to it pursuant to WARA. Therefore, neither the DOT Letters nor the DOT Action is subject to the judicial review provisions of 49 U.S.C. § 46110(a), because the agency acted pursuant to WARA and not pursuant to the parts of title 49 set out in 49 U.S.C. § 46110. The "plain language" of section 46110(a) expressly applies only to federal agency actions carried out under the designated parts in title 49 of the

United States Code. WARA does not appear in title 49 of the U.S. Code. *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2nd. Cir. 2003) (finding a lack of jurisdiction under earlier version of Section 46110 because the plain language "this part" authorized judicial review of only those actions carried out under Part A, not Part B); see also *City of Los Angeles v. FAA*, 239 F.3d 1033, 1035 (9th Cir. 2001) (same). Instead the DOT Action and the DOT Letters are reviewable under the Declaratory Judgment Act, 28 U.S.C. § 2201.

**RESPONSE: The allegations of Paragraph 12 constitute a legal conclusion to which no response is required and they are thus denied.  To the extent that Paragraph 12 is intended to state facts or legal conclusions beyond the actual statements in the referenced letters or the express language of the referenced statutes, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 12 and therefore denies them.**

13.    Alternatively, the DOT Action is not a final agency action but, through the DOT Letters, DOT and FAA have nevertheless in violation of their authority as restricted by WARA, interfered with and attempted to interfere with preferential gate use rights protected by Love Field leases and by WARA by issuing the DOT Letters. This interference materially prejudices the City as airport landlord and airport manager. DOT can interfere with Signatory Airlines' preferential gate rights under their leases but must act only on a nationwide basis, as required by section 5(e)(2)(B)(ii) of WARA. This Court has jurisdiction to declare that DOT must take action to fulfill the mandatory requirements that any agency action eliminating or limiting preferential gate rights at Love Field must be taken only through a nationwide action. DOT's failure to do so has been unlawfully withheld and unreasonably delayed in violation of the APA and WARA. See 5 U.S.C. § 706(1).

**RESPONSE: The allegations of Paragraph 13 constitute a legal conclusion to which no response is required and Virgin America denies them.   To the extent that Paragraph 13 is intended to state facts or legal conclusions beyond the actual statements in the referenced letters or the express language of the referenced statutes, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 13 and therefore denies them.**

14.    In the further alternative, even in the absence of the Federal Agencies, the Court still has jurisdiction of the controversy involving the Airlines and the City under its federal question and supplemental subject-matter jurisdictional authority. 28 U.S.C. §§ 1331, 1337, 1367.

**RESPONSE: The allegations of Paragraph 14 constitute a legal conclusion to which no response is required and Virgin America denies them.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

15.    Declaratory Judgment on the federal questions presented by the DOT Action is appropriate and within the Court's subject-matter jurisdiction because, among other things,

a.    the City claims the right under WARA not to be required to limit Signatory Airlines' preferential gate rights at Love Field to accommodate other air carriers when the accommodations will unduly interfere with the Signatory Airlines' flight schedules regardless of the limits imposed by the DOT Letters because the limits

on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

b.    The City claims the right under WARA to decline to mandate accommodation of gate use requests from Delta or any other air carrier to the extent that granting the request would unduly interfere with the flight schedules of any Signatory Airlines regardless of the limits imposed by the DOT Letters, because the limits on such City's rights imposed by the DOT Letters directly conflict with the express terms of WARA.

c.    The City claims eligibility under the authority of WARA for Airport Improvement Program (AIP) grants from the FAA under 49 U.S.C. § 47107, regardless of the disqualification for such grants imposed by the DOT Letters so long as the City provides gate access to preferential gates at Love Field in accordance with WARA.

d.    The City is protected by WARA from DOT and FAA interference with its compliance with the Five Party Agreement (hereinafter defined) and the leases for Love Field of the Signatory Airlines, except that DOT could interfere with the Signatory Airlines' preferential gate rights if it did so on a nationwide basis.

e.    The City is protected by the federal WARA statute from any obligation to modify its Love Field lease with Signatory Airlines that arguably might arise from the threat in the Second DOT Letter to the City's AIP grants because the circumstances of DOT's threat are not based on a review of the lease as required to trigger the lease modification requirement, and DOT has already reviewed and approved the City's competition plan, which incorporates the lease's scarce resource terms and WARA codifies those lease terms as well.

12

f.      If the City is obligated to mandate the terms of gate accommodations at Love Field, it is permitted by WARA to include in those terms an amount of compensation from the requesting air carrier to the accommodating Signatory Airline that include consideration of the Signatory Airline's indirect costs including amounts actually paid by the Signatory Airlines for the use of gates and fair market values of gates, despite the prohibition against such considerations in the DOT Letters.

g.      The Airlines claim competing and conflicting rights based on federal law, including WARA and title 49.

**RESPONSE:  The allegations of Paragraph 15 constitute a legal conclusion to which no response is required and Virgin America denies them.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

16.      Venue is proper with this Court pursuant to 28 U.S.C. § 1391.

**RESPONSE: The allegations of Paragraph 16 constitute a legal conclusion to which no response is required and Virgin America denies them.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

### III.   PARTIES

17.     The City is a Texas home rule municipal corporation with its principal offices located in Dallas County, Texas at 1500 Marilla Street, Dallas TX 75201.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 17 and therefore denies them.**

18.     Delta is a Delaware business corporation with its headquarters located in Atlanta, Georgia, authorized to do business in the State of Texas, and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 18 and therefore denies them.**

19.     Southwest is a Texas business corporation with headquarters in Dallas, Texas, authorized to do business in the State of Texas and may be served through its registered agent Corporation Service Company, 211 NE. 7th Street, Austin, Texas 78701-3218.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 19 and therefore denies them.**

20.     Virgin is a Delaware business corporation with headquarters in Burlingame, California, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE: Virgin America admits the allegations contained in Paragraph 20.**

21.     American is a Delaware business corporation with headquarters in Fort Worth, Texas, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 21 and therefore denies them.**

22.     Seaport is an Alaska business corporation, with headquarters located in Portland, Oregon, authorized to do business in the State of Texas, and may be served through its registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136. Seaport is named solely because its rights may be impacted by declaratory judgment related to Virgin.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 22 and therefore denies them.**

23.     United is a Delaware corporation, with its headquarters in Chicago, Illinois, authorized to do business in the State of Texas, and may be served through its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75210-3136.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 23 and therefore denies them.**

24.     DOT is a federal agency and may be served with process through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to the Anthony Fox, Secretary, Department of Transportation at 1200 New Jersey Ave. SE, Washington, D.C. 20590.

**RESPONSE: Virgin America admits that DOT is a federal agency but lacks information sufficient to admit or deny the remaining allegations in Paragraph 24 and therefore denies them.**

25.     The FAA is a federal agency and may be served through delivering or mailing the summons and complaint by registered or certified mail to the United States Attorney for the Northern District of Texas at 1100 Commerce Street, 3rd Floor, Dallas, Texas 75242-1699; by mailing copies by registered or certified mail to the United States Attorney General, 950 Pennsylvania Ave. NW, Washington, D.C. 20530-0001; and by mailing copies by registered or certified mail to Michael P. Huerta, Administrator, Federal Aviation Administration at 800 Independence Ave. SW Washington, D.C. 20591.

**RESPONSE: Virgin America admits that the FAA is a federal agency but lacks information sufficient to admit or deny the allegations contained in Paragraph 25 and therefore denies them.**

### IV. FACTS

#### Love Field History and the Wright Amendment

26.     Love Field was initially constructed as a United States Army airbase during World War I. In 1928, the City acquired the air field and commercial operations began.

**RESPONSE: Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 26 and therefore denies them.**

27.     In 1964 the Civil Aeronautics Board ("CAB"), an FAA predecessor, determined that the competition between the Dallas and Fort Worth airports was harmful and ordered Dallas and Fort Worth to reach a voluntary agreement designating one airport through which CAB-regulated carriers would serve both communities. The cities were unable to designate any

16

existing airports and instead agreed to construct a new airport, Dallas-Fort Worth International Airport ("DFW Airport"), located roughly midway between Dallas and Fort Worth (the two cities are approximately 32 miles apart). All federally certified air carriers agreed to cease operations at the cities' airports and move operations to DFW Airport. DFW Airport opened in 1974.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 27 and therefore denies them.**

28. Southwest was not a federally certified carrier at that time and continued its operations from Love Field. At the time, all of its flights were within the State of Texas. After passage of the Airline Deregulation Act of 1978, (Pub. L. No. 95-504, 92 Stat. 1705 (1978)), Southwest made plans to expand service outside of Texas from Love Field. Other air carriers announced plans for Love Field operations. In 1980, Congress adopted the Wright Amendment. (Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980)). Under the Wright Amendment, flight operations from Love Field were generally limited to Texas and four adjacent states.

**RESPONSE: Virgin America admits the last two sentences of Paragraph 28, but lacks information sufficient to admit or deny the additional allegations contained in Paragraph 28 and therefore denies them.**

29. In 1998, Congress adopted the so-called Shelby Amendment, which added Alabama, Kansas, and Mississippi as states that could be served directly from Love Field. (Pub. L. 105-66, § 337, 111 Stat. 1425 (1997)).

**RESPONSE: Virgin America admits the allegations contained in Paragraph 29.**

30.     In 2005, Congress adopted the so-called Bond Amendment to add Missouri to the states that could be served directly from Love Field. (Pub. L. No. 109-115, § 181, 119 Stat. 2396 (2006)).

**RESPONSE: Virgin America admits the allegations contained in Paragraph 30.**

31.     In early 2006, members of Congress suggested that the cities of Dallas and Fort Worth propose a long term solution to the Wright Amendment's limitations on Love Field flight operations.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 31 and therefore denies them.**

32.     On or about July 11, 2006, the City of Dallas, the City of Fort Worth, the Dallas-Ft. Worth International Airport Board, Southwest, and American entered into an agreement (referred to as the "Five Party Agreement"). The underlying principle of the Five Party Agreement was to resolve the manner in which service could be provided at Love Field in the future. The Five Party Agreement provided that Southwest would obtain preferential use of 16 gates, American would obtain preferential use of two gates, and ExpressJet Airlines, Inc. ("ExpressJet") would obtain preferential use of two gates. Southwest agreed not to operate from DFW Airport unless it surrendered a Love Field gate, up to eight gates, for each DFW gate that it acquired. Flight operations were limited to 6:00 a.m. to 11:00 p.m. and no international flights would originate from Love Field. The number of gates at Love Field would be reduced from the then existing 32 gates to 20. The agreement also stated, "To the extent a new entrant carrier seeks to enter Love Field, [the City] will seek voluntary accommodation from existing carriers" but if an agreement was not reached then the City agreed "to require the sharing of any

preferential lease gates, pursuant to the terms of existing lease agreements." (Five Party Agreement, para. 1.b.)

**RESPONSE: To the extent that Paragraph 32 is intended to state facts beyond the actual statements in the referenced agreement, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 32 and therefore denies them.**

33.     ExpressJet's leasehold interests were later acquired by United.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 33 and therefore denies them.**

### The Wright Amendment Reform Act of 2006

34.     On October 13, 2006, Congress adopted WARA. (Pub. L. 109-352, 120 Stat. 2011 (2006)). WARA incorporated and adopted many of the terms of the Five Party Agreement as federal law, although several other provisions of the Five Party Agreement remain in force as contractual obligations independent of WARA. The statute repealed the Wright Amendment limitations on long-distance domestic flights, with the repeal becoming effective in eight years (in 2014). Under the Five Party Agreement, international flights were banned from originating at Love Field and Southwest was barred from operating at DFW Airport unless it gave up a Love Field gate, up to eight gates, for each gate used at DFW. The City was required to reduce the 32 existing gates to a total of 20 gates. WARA also required the City to "determine the allocation of leased gates and manage Love Field in accordance with the contractual rights and obligations existing as of the effective date of [WARA] for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006. To accommodate new entrant air carriers, [the City] shall honor the scarce resource provision of the existing Love Field leases."

**RESPONSE: Virgin America defers to the text of the Act for precise wording and construction.   To the extent that Paragraph 34 is intended to state facts beyond the actual statements in the referenced documents and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 34 and therefore denies them.**

35.     WARA provided that neither FAA nor DOT could take action that was inconsistent with the Five Party Agreement or that challenged the legality of any provision of the agreement. As noted above, the Five Party Agreement gave the Signatory Airlines, including Southwest, preferential gate rights. WARA also provided that it did not limit FAA, DOT, or other federal agency from enforcing requirements of law or grant assurances that imposed obligations to make Love Field available on a reasonable and nondiscriminatory basis to air carriers seeking to use its facilities except that the Act could not be construed to require the City "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis."

**RESPONSE: Virgin America defers to the text of the Act for precise wording and construction.   To the extent that Paragraph 35 is intended to state facts beyond the actual statements in the referenced documents and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 35 and therefore denies them.**

36.     Further, WARA provided that the Five Party Agreement "and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code."

WARA § 5(d)(2). As noted above, both Southwest and the City are parties to the Five Party Agreement. Delta is not. American is a party and Virgin, as American's subtenant, may have American's WARA's gate rights protections. United is not a party. The Court may be asked to decide if Southwest's WARA gate protections extend to the gates it subleases from United.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in the last sentence of Paragraph 36 and therefore denies it. To the extent that Paragraph 36 is intended to state additional facts beyond the actual statements in the referenced agreement and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 36 and therefore denies them. Virgin America does admit that it has rights under American's WARA's gate rights protections. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

37.     Under WARA and the Five Party Agreement, any Love Field gates that revert to the City because of lease expiration or other reasons become common use gates. Thus Southwest has preferential gate use rights at Love Field for 16 gates under its direct lease with the City until 2028 and probably enjoys United's preferential gate rights for the two gates that it has subleased from United gates through 2028, unless any preferential gate rights are lost by lease termination or nationwide regulations adopted by a Federal Agency, or other reason. American retains preferential gate rights at Love Field subject to similar conditions until the expiration of its lease

on 2028. Virgin probably now exercises American's preferential gate rights as American's subtenant until 2028, again subject to the same conditions for keeping those rights. Delta and Seaport have no lease rights except by virtue of their contractual arrangements with other Airlines.

**RESPONSE: Virgin America defers to the text of the documents and statute for precise wording and construction.   To the extent that Paragraph 37 is intended to state facts beyond the actual statements in the referenced documents and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 37 and therefore denies them.  However, Virgin America admits that, pursuant to its sublease with American, it has American's preferential gate rights, which are also subject to the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American.**

### Grant Assurances

38.     The City has received federal grant funds for Love Field from the FAA. Each time the City receives a grant, the City enters into an agreement with the FAA. Each agreement contractually binds the City to various assurances to the federal government generally referred to as Grant Assurances. Grant Assurances are themselves mandated by federal law. 49 U.S.C. § 47107. Among the City's assurances are to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." FAA Airport Compliance Manual (FAA Order 5190.6B), Appx. A at 10, Grant Assurance 22.a. Another pertinent portion of Grant Assurance 22 reads:

e.      Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and use similar facilities, subject to reasonable classifications such as tenants or nontenants and signatory air carriers and nonsignatory air carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

*Id.*, Grant Assurance 22.e (emphasis added).

**RESPONSE: Virgin America defers to the text of the referenced documents and the Act for precise wording and construction.   To the extent that Paragraph 38 is intended to state facts beyond the actual statements in the referenced documents and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 38 and therefore denies them.**

**Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21)**

39.      In 2000, Congress adopted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (generally known as AIR-21). (Pub. L. No. 106-181, 114 Stat. 61 (2000)). One of its provisions requires that the City, as the proprietor of Love Field, must provide the FAA with a "Competition Plan" that outlines the City's methods for enhancing competition to ensure that all air carriers wishing to serve its airport are provided with a reasonable opportunity to provide such service. DOT has the right to periodically review the

implementation of Competition Plans of all covered airports and can conduct site visits to ensure that competition plans are being successfully implemented.

**RESPONSE: Virgin America defers to the text of the Act for precise wording and construction.   To the extent that Paragraph 39 is intended to state facts beyond the actual statements in the referenced documents and statute, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 39 and therefore denies them.**

40.    The City submitted its most recent update to its Competition Plan in 2009. The update explained that the City intended to accommodate requests for access by applying the gate sharing provisions contained in the current leases. Competition Plan Update for Dallas Love Field, letter from Daniel T. Weber, June 3, 2009, at page 5.

**RESPONSE:   Virgin America admits that the City submitted an update to its Competition Plan in 2009 and that the City made statements in that document.   To the extent that Paragraph 40 is intended to state facts beyond the actual statements referenced in the Competition Plan, Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 40 and therefore denies them.**

**Leases at Love Field**

41.    On or about February 13, 2009, the City and Southwest amended and restated a pre-existing master lease agreement for 16 gates at Love Field. The term of the lease lasts until September 30, 2028.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 41 and therefore denies them.**

42.     On or about March 11, 2009, the City and American amended and restated a preexisting master lease agreement for two gates at Love Field. The term of the lease lasts until September 30, 2028. With the consent of the City, which was given in conformity with the recommendation of the U.S. Department of Justice ("DOJ"), on or about May 12, 2014, American subleased its two Love Field gates to Virgin as part of a much broader program of gate divestitures imposed on American by DOJ through agreed federal district court judgments as a condition of DOJ not objecting to a merger between American's parent corporation and US Airways Group Inc. ("US Air").

**RESPONSE: Virgin America admits the allegations contained in Paragraph 42. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

43.     On or about October 1, 2008, the City amended and restated a preexisting master lease agreement with now-defunct Continental Airlines for two gates at Love Field. Continental later merged with United so that United is now the City's lessee for those two gates. The term of the lease lasts until September 30, 2028. After DOJ declined to object, and with the consent of the City, on or about January 28, 2015, United subleased its two Love Field Gates to Southwest, giving Southwest lease or sublease control over 18 of Love Field's 20 gates.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 43 and therefore denies them.**

**Terms of the Master Leases**

44.     Under the terms of the master leases for Love Field (which are essentially identical for each Signatory's master lease), the Signatory Airlines' lease specific space (but not including any gates) at the airport. Depending on which space was involved, the leased area could be for exclusive use or preferential use. Exclusive use space refers to those portions of the airport where the Signatory Airline has the sole right of use. No gate rights were exclusive. Preferential use space refers to those portions of the airport where the Airline was contemplated to be the primary but not sole user. Airlines were also given access to common use space. The leased gates were all part of the lessees' preferential use space. Each Signatory Airline agreed that when it had no scheduled use the Airline leasing the preferential gates would allow other scheduled and nonscheduled air carriers to use the gates as circumstances and the public interest required for loading and unloading but such use could not take precedence over the Signatory Airline's scheduled use. Each Signatory Airline acknowledged that the facilities "may become a scarce resource if a new entrant airline ... requests to provide service at the Airport" and agreed "to accommodate such Requesting Airline at its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airlines, taking into consideration all the circumstances of such an accommodation agreement." Each Signatory Airline retained priority in use of its leased gates if there was a scheduling conflict. The requesting air carrier could be charged fees which were to be based on the accommodating Signatory Airline's direct and indirect costs plus a reasonable allowance for administration. If a voluntary agreement for accommodation could not be reached, the lease created a procedure by which the City was notified of the accommodation request and that the City could select a Signatory Airline to

accommodate the requesting air carrier. If the air carriers could not reach agreement on the terms of the accommodation, the City could decide disputed terms of the accommodation request, including, if necessary, the amount of fees and charges.

**RESPONSE: Virgin America admits the express statements contained in the referenced Master Leases.  To the extent that Paragraph 44 is intended to state facts beyond the actual statements in the referenced Leases, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 44 and therefore denies them.**

45.     One lease provision requires lease modification if DOT threatens the City's AIP grants after reviewing the lease. This provision reads in full as follows:

> Section 14.02. Competitive Access.
>
> City and Airline acknowledge that certain portions of this Agreement may be subject to review by the DOT, including but not limited to, the FAA or any other Governmental Agency, concerning possible effects on airline competition and access at the Airport. In the event the federal government threatens to withhold federal assistance, or other sanctions, as a result of such review, City and Airline agree to modify this Agreement accordingly to reflect any necessary change as a result of such action.

**RESPONSE: Virgin America admits the express statements contained in the referenced Master Lease.  To the extent that Paragraph 45 is intended to state facts beyond the actual statements in the referenced Lease, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 45 and therefore denies them.**

46.     However, DOT has already reviewed and approved the lease provisions.

**RESPONSE: Virgin America lacks information to admit or deny the allegation contained in Paragraph 46 and therefore denies it.**

47.     Another term of the lease subordinates the lease provisions to certain agreements between the City and any federal agency. The subordination clause provides is full:

> Section 14.34. Subordination.

> This Agreement is subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof.

**RESPONSE: Virgin America admits the express statements contained in the referenced Master Lease.  To the extent that Paragraph 47 is intended to state facts beyond the actual statements in the referenced Lease, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 47 and therefore denies them.**

48.     Prior to receipt of the Second DOT Letter, the City informally suggested to DOT that DOT might wish to consider attempting to negotiate an agreement with the City to effectuate some of the positions expressed in the First DOT Letter. DOT informally declined this suggestion. Any such agreement between the City and the United States would not be valid or enforceable to the extent that it contained terms that were inconsistent with any terms of WARA. The City is aware of no agreement, and the DOT Letters cite none, between the City and any federal agency that come within the scope of section 14.34.

Another relevant lease section addresses force majeure and provides in full:

Section 14.12. Force Majeure.

Neither City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reasons of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, acts of the public enemy, acts of a superior Governmental Agency, weather conditions, floods, riots, rebellions, acts of sabotage, or any other circumstances for which it is not responsible or which are not in its control; provided, however, that this Section shall not apply to failures by Airline to pay the rentals, fees and charges specified under this Agreement.

**RESPONSE: Virgin America admits the express statement referenced from the Lease provision in the last sentence of Paragraph 48. The allegations contained in the third sentence of Paragraph 48 constitute a legal conclusion to which no response is required and Virgin America denies them. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 48 and therefore denies them.**

**American's Merger with US Air and Virgin's Sublease**

49.     In 2013, US Air and American's parent corporation, AMR Corp., announced plans to merge. On or about August 12, 2013, DOJ and six state attorneys general and the District of Columbia filed a civil antitrust lawsuit challenging the proposed merger. In November 2013, as part of a settlement of the pending action, DOJ required US Air and AMR to divest slots and gates at various airports across the country. The settlement agreement, which was embodied in an agreed federal district court judgment, required divestment of the two American gates at Love Field.

**RESPONSE: Virgin America admits the allegations contained in Paragraph 49.**

50.     Delta, Southwest, and Virgin each made proposals for American's lease rights to the two gates. DOJ approved the proposal made by Virgin and opposed the others. Accordingly, as stated above, the two American gates at Love Field were sublet to Virgin following the City's consent. Virgin and Seaport entered into a gate use agreement under which Seaport has two daily flights from Virgin's gates. On or about October 13, 2014, Virgin started commercial passenger operations at Love Field.

**RESPONSE: Virgin America admits the allegations contained in Paragraph 50, except that Seaport operated at Virgin America gates under a sublease agreement and notes that Seaport no longer operates at Love Field. Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in** *United States et al. v. US Airways Group, Inc. and AMR Corporation*, **Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

51.     Representatives of DOJ have informed the City that Virgin is not subject to any accommodation requirement under the lease for a reasonable period that shall be approximately one year from the start of its operations at Love Field on or about October 13, 2014, in order to allow Virgin time to solidify its position at the airport. Neither DOT nor FAA has commented to the City on that DOJ position.

**RESPONSE: Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American, Virgin America's rights to such gates are subject to the authority of the Department of Justice and the Federal Court in** *United States et al. v. US Airways Group, Inc. and AMR Corporation*, **Case No. 1:13-cv-**

**01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American. Otherwise, Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 51 and therefore denies them.**

52.     In filed court pleadings and related instruments, DOJ has repeatedly stated on behalf of the United States, and structured one or more agreed judgments to be consistent with its position, that Love Field and DFW Airport comprised a single market for commercial passenger air travel. The history underlying DFW Airport's creation also supports that market definition.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 52 and therefore denies them.**

53.     In 2014, United elected to cease current flight operations at Love Field. It initially entered into a gate use agreement with Southwest on or about September 18, 2014. Subsequently, Southwest acquired United's preferential gate use interest at Love Field through a sublease to which the City consented on or about January 28, 2015.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 53 and therefore denies them.**

54.     With the City's consent, on or about July 8, 2009, Delta entered into a month-to-month sublease with American for a portion of American's two gates. After its settlement with DOJ and upon entering into its divesting sublease with Virgin, American advised Delta that the sublease would be terminated effective October 12, 2014. On information and belief, Delta was selling tickets for flights after October 12, 2014 even though it had no then-current lease, sublease, or other arrangement for the use of Love Field after October 2014. The City is not aware that Delta informed its customers of its lack of gate rights at Love Field when offering or selling those tickets.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 54 and therefore denies them.**

### Requests for Accommodation

55.     On or about September 18, 2014, Delta advised the City that its sublease with American was about to expire and invoked the accommodation process under the master airport leases.  Delta then had and continues to have operation to and from DFW Airport.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 55 and therefore denies them.**

56.     The City conferred with the other Airlines and all Airlines (both Signatory Airlines and those operating under a sublease or gate use agreements) advised the City that any proposed accommodation would unduly interfere with their operations. Based on this information, the City advised Delta that the City could not accommodate their request at Love Field. Delta responded and invoked the City's competition plan, the grant assurances, and other unspecified federal law and urged immediate short-term accommodation and claimed it would otherwise suffer immediate and irreparable injury.

**RESPONSE: Virgin America admits that, *inter alia,* it advised the City that accommodation would unduly interfere with its operations and would violate its Lease and the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 56 and therefore denies them.**

57.     Shortly thereafter, representatives of City, DOT, FAA, and the Airlines conferred and attempted to reach a resolution regarding the accommodation request.

**RESPONSE: Virgin America admits that the representatives of City, DOT, FAA, and the Airlines conferred and attempted to reach a resolution regarding the accommodation request.  Otherwise, it is denied.**

58.     On or about November 6, 2014, United and Delta reached a temporary gate use agreement by which Delta could continue its operation of five flights a day using the two Southwest gates (which Southwest had subleased from United) until January 6, 2015. On or about January 6, 2015, United and Delta further agreed to continue the term of their gate use agreement until July 6, 2015. Southwest, after subleasing United's gates, agreed to honor United's extended gate use agreement with Southwest upon the expiration of the temporary gate use agreement.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 58 and therefore denies them.**

59.     On or about November 10, 2014, the City forwarded its proposed principles, criteria, and model to be used to determining any accommodation requests at Love Field to the Airlines and DOT. The Airlines responded with comments and revisions consistent with their respective positions. DOT did not provide any written comments.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 59 and therefore denies them.**

60.     On December 17, 2014, DOT's General Counsel sent the Dallas City Attorney the First DOT Letter, summarizing DOT's understanding of prior communications between DOT and the City and providing guidance as to DOT's position on the City's legal obligations with

respect to Delta's gate accommodation request. Pursuant to the City's request for guidance, the First DOT Letter detailed DOT's position on several key issues concerning the City's legal obligations with respect to any accommodation request at Love Field. The First DOT Letter stated once an air carrier had been accommodated, it was entitled to maintain its ongoing pattern of service even after the expiration of any agreement between the accommodated and accommodating air carriers as long as the pattern of operations remained unchanged. The First DOT Letter also stated that the accommodating Signatory Airline was limited to recovering only its pro-rata share of the subleased facilities lease rate plus a reasonable allowance for administration that may not exceed 25%.

**RESPONSE: Virgin America admits that statements were made in the documents referenced in Paragraph 60 but defers to the text of the documents for their precise wording, and to the extent that Paragraph 60 is intended to state facts beyond the actual statements in the referenced letters, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 60 and therefore denies them.**

61.    After confirming that the First DOT Letter could be released, the City advised the Airlines that the City would have no choice but to follow and abide by the guidance as stated in the First DOT Letter in formulating and applying its accommodation procedures until and unless judicial or other competent authority held the First DOT Letter not to enunciate binding standards.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 61 and therefore denies them.**

62.    DOT also provided informal advice to the City that supplemented and amplified the contents of the First DOT Letter. DOT informally advised the City that any accommodation

request should be evaluated as of the date of the request, using Airline operations as of a snapshot date. DOT further informally advised that future planned operations of incumbent Airlines could be considered but only as to a limited time in the future, such as six months, and only if tickets were being sold for the future flights.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 62 and therefore denies them.**

63.     At the time of the First DOT Letter, Love Field was experiencing rapid changes in is pattern of flight operations due mainly to reduction in the number of gates and initiation of long-haul air service as WARA became effective. Attached to and incorporated into the First DOT Letter by reference was a compendium of airport competition plan requirements, "Airport Competition Plans; Highlights of Reported Actions to Reduce Barriers to Entry and Enhance Competitive Access" (Nov. 2010). The First DOT Letter referred to the attachment as follows:

We are also enclosing a compendium of airport competition plan requirements and actions various airports have taken to facilitate entry and enhance competitive access. The compendium table focuses on airports that have developed procompetitive tools to accommodate requesting carriers in conformity with the competition plan requirements.

First DOT Letter at 2. None of the examples in the attachment included permanent accommodation mandates for preferential use gates. None of the examples were for airports that signatory carrier is prohibited by law from operating at a neighboring airport without surrendering gates, nor for airports for which the associated city could not be required to "to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis," as

required by WARA. None of the examples included airports for which a private agreement provided a safe harbor for deemed title 49 compliance as does WARA for Love Field respecting Five Party Agreement performance.

**RESPONSE: Virgin America admits that statements were made in the referenced documents in Paragraph 63.  To the extent that Paragraph 63 is intended to state facts beyond the actual statements in the referenced documents, Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 63 and therefore denies them.**

64.     Representatives of DOJ have told the City, consistent with DOJ's litigation position in the American-US Air merger controversy, that the relevant market for evaluating competition among local air carriers is the Dallas-Fort Worth Metroplex, including DFW Airport, and not just any one airport such as Love Field. Representatives of DOT have informally advised the City that DOT considers the relevant market for evaluating competition for accommodation purposes to be only Love Field. The City informed DOT and DOJ of those conflicting positions but has been unsuccessful in securing reconciliation of those conflicting positions from DOT and DOJ. As stated above, DOT has not commented to the City on DOJ's position.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 64 and therefore denies them.**

65.     On February 13, 2015, Southwest filed a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit seeking a review of the First DOT Letter. Southwest asserted the First DOT Letter was a final agency action pursuant to 49 U.S.C. § 46110, and that it was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of

statutory authority, and without observance of required procedures. Delta intervened in the action, defending the First DOT Letter as a valid final agency action. As noted above, the City does not believe that section 46110 applies to review of the First DOT Letter. The City is not a party to the D.C. Circuit proceeding.

**RESPONSE: Virgin America admits the allegations in Paragraph 65, except the statement of what the City believes is a legal conclusion, to which no response is necessary, and in any event, Virgin America lacks sufficient information to admit or deny that allegation and therefore denies it.**

66.     The Court of Appeals will not issue a final decision by the time the gate use agreement between United and Delta expires on July 6, 2015. Under the current scheduling order DOT's initial substantive brief is not due until July 22, 2015. The case remains pending as *Southwest Airlines Co. v. U.S. Dept. of Transp.*, Case No. 15-1036 (D.C. Cir.).

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 66 and therefore denies them.**

67.     On or about February 23, 2015, Delta demanded Southwest and the City permanently accommodate its current operating flights. On or about the same date, Delta gave notice to Southwest, Virgin, and Seaport demanding that an additional eight flights be accommodated at Love Field.

**RESPONSE: Virgin America admits that Virgin America received notice of Delta's demand to the City for accommodation of eight additional flights. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 67 and therefore denies them.**

68.     On or about February 27, 2015, Southwest responded and rejected both of Delta's accommodation demands. In its response, Southwest stated that it had been and was expanding service between Love Field and additional cities so that by August 9, 2015, it would be averaging at least 10 daily flights on all of the 18 gates to which it had rights (for a total of 180 flights per day) and there would be no capacity to accommodate any Delta flights. In its response, Southwest advised the City (with a copy going to others including Delta) that Southwest offered to extend the duration of Delta's use of Southwest gates past July 6, 2015, to July 19, 2015. The City is unaware that Delta ever accepted that offer and Delta's more recent communications are inconsistent with such acceptance.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 68 and therefore denies them.**

69.     On or about March 10, 2015, Virgin responded to Delta's request. It stated that any accommodation of Delta would be contrary to the DOJ's reasons for opposing divesture of American gates to Delta and to the settlement agreement regarding that divesture. Virgin also stated that it would be operating 19 daily flights starting in April 2015 and that it had an agreement with Seaport who was operating two flights on its gates for a total of 21 flights on two gates. Therefore Virgin stated it had no space to accommodate additional flights or Delta's request.

**RESPONSE: Virgin America admits that it responded to Delta's request and admits to the express statements made in its response.  To the extent Paragraph 69 is intended to state facts beyond the express statements contained in that response, it is denied.**

70.     Delta has subsequently advised the City that it never received a response from Seaport and considers its request to Seaport as rejected.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 70 and therefore denies them.**

71.     On or about April 9, 2015, American made a request to the City that up to 4 daily flights be accommodated at Love Field. However, the City is unaware of any American accommodation request to other Airlines for Love Field gates.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 71 and therefore denies them.**

72.     As a result of the many accommodation requests and current operations, the City faces requests for the following daily flights: 180 (Southwest) + 11 (Delta) + 4 (American) + 19 (Virgin) + 2 (Seaport) for a total of 216 operations at 20 gates which legally and safely can only accommodate up to 200 flights a day.

**RESPONSE: Virgin America admits that at the time of the City's Original Complaint, Virgin America had published a schedule for 19 daily flights beginning August 9, 2015. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 72.**

73.     The City cannot accommodate all 216 flights at Love Field. As a result, the City needs to consider the accommodation provisions under the master leases, WARA and the Five Party Agreement to determine how to allocate scarce gate resources at Love Field, in other words, to determine how many if any requested gate slots can be accommodated and mandate accommodation for those slots. However, the City must resolve the conflicting legal directions and positions detailed here before it can do so.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations in Paragraph 73 and therefore denies them.  Moreover, Virgin America states**

that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.

74.     On or about April 16, 2015, the City circulated a revised version of its draft accommodation procedures to the Airlines and to DOT for their comment. The Airlines responded on or about April 28, 2015. Many of their comments were highly critical of the revised procedure and provided revisions to advance their respective positions. The Airlines' positions were not consistent. DOT did not comment.

**RESPONSE: Virgin America admits the allegations contained in the first two sentences of Paragraph 74. Sentence 4 of Paragraph 74 is a legal argument to which no response is necessary and is thus denied. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 74 and therefore denies them.**

75.     On or about May 19 through 24, and again on June 11 and 12, 2015, the City attempted to negotiate an extended temporary or a long-term gate accommodation agreement between Delta and Southwest. Each Airline informally signaled what it might accept as a compromise, but rejected the proposals the other Airline floated. No agreement was reached.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 75 and therefore denies them.**

76.     Since shortly after receipt of the First DOT Letter, the City sought clarification and guidance from DOT and the FAA, and in particular asked that whatever terms DOT sought

to dictate as to gate accommodate be in the format of a mandate and not mere guidance. The City also requested the legal basis for DOT's conclusions and also requested clarification in light of the WARA provisions. On June 15, 2015, DOT responded to those requests by issuing the Second DOT Letter. After confirming that DOT did not object, the City circulated the Second DOT Letter to all of the Airlines on the same day.

**RESPONSE: Virgin America admits that the DOT sent the second letter on or about June 15 and that the City circulated the letter to the airlines. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 76 and therefore denies them.**

77.     The Second DOT Letter explained that DOT relied upon the grant assurance statute and the competition plan statute as the basis for its conclusions DOT reiterated that the City "is required to accommodate a requesting carrier unless Love Field's facilities are fully utilized at the time of the request, or the Signatory Airlines at the time of the request are selling tickets for future flights fully-utilizing the facilities." It stated that a Signatory Airline's planned future operations should not be considered unless the carrier was selling tickets for the future flights and consideration of such plans would be inconsistent with grant assurances. It repeated that an accommodated carrier must be allowed to continue a similar pattern of service. The letter concluded by stating that the decision on Delta's request was the City's responsibility but the City "must make this decision made in compliance with the grant assurances and [the City's] other legal obligations. The Letter contained no reference to WARA or to any specific lease provisions.

**RESPONSE: Virgin America defers to the text of the second DOT Letter for its precise wording. To the extent that Paragraph 77 is intended to state that DOT made**

statements beyond the express language in the referenced letter, Virgin America lacks information sufficient to admit or deny these additional allegations contained in Paragraph 77 and therefore denies them.

### Current Operations

78.     As of the date of commencing the instant litigation, Southwest leases 16 gates and subleases two additional gates from United at Love Field. Delta is currently operating its five daily flights from Southwest's gates. Virgin subleases the remaining two Love Field gates from American.  Seaport, through its agreement with Virgin, operates two daily flights.

**RESPONSE: Virgin America admits the allegations contained in Paragraph 78.**

79.     On information and belief, Delta is selling tickets for flights after July 6, 2015 even though it has no current lease, sublease, or other arrangement for the use of Love Field after that date. Southwest has stated it has starting selling tickets for its planned expansion, with flights starting in August and that it needs exclusive access to all of its gates starting on July 6 so that it can remodel them for its expanded service. Upon information and belief, Southwest and Delta are selling tickets for flights after July 6, 2015, that would require the use of the same Love Field gates simultaneously for two aircraft – one from each Airline. These actions create the risk of chaos at Love Field when passengers for two flights attempt to arrive or depart at the same gates at the same times, and even worse create safety issues should two aircraft try to use the same gate concurrently or if frustrated passengers get aggressive.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 79 and therefore denies them.**

80.     Beginning with its sublease from American through July 6, 2015, Delta has been operating at Love Field under month-to-month or six-month-at-a time-arrangements with flights to Atlanta, Georgia.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 80 and therefore denies them.**

81.     Southwest flights to and from Love Field since the effective date of WARA have served local Texas cities and cities throughout the United States. Southwest's announced intent to use the space and time now used by Delta would serve other cities rather than just Atlanta.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 81 and therefore denies them.**

82.     Delta currently has gate facilities and operations at DFW Airport. Southwest does not have a DFW Airport presence, and to obtain any future DFW Airport gates it would have to surrender Love Field gates.

**RESPONSE: Virgin America admits that Delta currently has gate facilities and operations at DFW Airport and that Southwest does not have a DFW Airport presence, but lacks information sufficient to admit or deny the remaining allegation contained in Paragraph 82 and thus denies it.**

83.     The City has granted no special or exclusive gate use privileges to Southwest, American, United, or their sublessees or gate users. These Airlines' rights to use gates derive from the preferential use terms of the master lease, the Five Party Agreement, and WARA. While DOT has provided the City with informal guidance and the DOT Letters set forth DOT's views on the City's obligations, neither DOT nor FAA has required or directed that the City take action to interfere with Southwest's, American's, United's, or their sublessees' preferential gate

use rights. Because of the explicit protection for preferential gate use rights in WARA, the City is uncertain whether DOT or the FAA could lawfully require the City to interfere with a Signatory Airline's, or its sublessee's, preferential gate use rights at Love Field unless that requirement were imposed on all airports in the country. Southwest has stated it would sue the City if the City violated Southwest's lease rights respecting gate use. In particular, Southwest threatened suit if it was forced to accommodate Delta flights past August 9, 2015. Despite the apparent lack of authority to enforce the DOT Letters, DOT and FAA claim the right to treat any departure from the terms of the DOT Letters by the City as a Grant Assurance violation.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 83 and therefore denies them. In addition, to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in _United States et al. v. US Airways Group, Inc. and AMR Corporation_, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

### V.   CONFLICTING DEMANDS, CLAIMS, AND INTERPRETATIONS

84.    The City has received conflicting claims, demands, and interpretations of the governing statutes, regulations, judgments, and the leases from the Airlines and the two Federal Agencies. A number of the carriers have implicitly or explicitly threatened litigation and/or other adverse consequences if the City takes any action that any party perceives is contrary to its interests or directions.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 84 and therefore denies them.**

85.     In its latest communications with the City, Delta:

a.      claims that the City must follow the First DOT Letter as a formal agency directive;

b.      has threatened that the City would be "better advised" to grant its accommodation requests as required by existing federal law;

c.      has invoked authority for its accommodation from the requirements related to the City's Grant Assurances and Competition Plan;

d.      claims that ample gate availability existed at the time of the requests for accommodation and that its pending requests should be granted without further delay;

e.      claims entitlement to a permanent or long term accommodation;

f.      argues that Congress emphasized the importance to maintain access to new entrants, and that it is a new entrant;

g.      requests immediate accommodation in accordance with the First DOT Letter as to its request for five flights and that within 30 days that a forced accommodation for its requested eight additional flights be issued;

h.      argues that the First DOT Letter is a final and binding directive;

i.      disputes that "pattern of service" is limited to the same equipment or city-pair;

j.      argues that any attempt to so define "pattern of service" would be contrary to federal law; and

k.      appears to assert that its rights to accommodation are superior to Southwest's, American's, United's, or their sublessees' preferential gate use rights under their leases.

l.      In addition, via telephone on June 17, 2015, a Delta attorney represented to an attorney for the City that Delta had drafted and was ready to file an administrative complaint with DOT against the City, essentially to enforce the DOT Letters.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 85 and therefore denies them.**

86.     In its latest communications with the City, Virgin:

a.      argues that accommodation requirements should not be for the benefit of large legacy Airlines, particularly those with significant operations at DFW;

b.      argues the policies should instead help develop low-cost entrant air carriers; and

c.      claims any forced accommodation imposed on it would unduly interfere with its rights, be contrary to its agreement with the City, and violate the DOJ settlement.

**RESPONSE: Virgin America admits that it made statements to the City, including the statements contained in Paragraph 86.   Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American Virgin America's rights to those Love Field gates are subject to the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American.**

87.     In its latest communications with the City, Southwest:

a.      claims it has the legal right to fully utilize all gates that it leases at Love Field and this right includes Southwest's ability to expand its own operations on those gates at any time;

    b.     claims that the City has no legal right to abrogate its rights to fully utilize its leased gates;

    c.     relies on WARA, the City's competition plan as approved by the FAA, the 1999 FAA/DOT "Airport Business Practices and Their Impact on Airline Competition," and Southwest's lease with the City;

    d.     claims that any attempt by the City to prevent Southwest from adding flights for its planned expansion would be unlawful, cause severe and irreparable harm, and would be subject to an immediate challenge by Southwest; and

    e.     claims a mandatory accommodation would be improper and unlawful, violate the terms of the lease, would reduce competition, and would constitute an unlawful taking of its property.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 87 and therefore denies them.**

88.    If the City fails to comply with duly authorized direction from the DOT, it faces immediate loss of its substantial grant funds, injunctive action and further penalties which would irreparably damage the City. The City seeks to ensure that its residents and the flying public are well served at Love Field but it is impossible to resolve the competing and conflicting claims without judicial interpretation, direction, and decision.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 88 and therefore denies them.**

88.    Examples of the conflicting interpretations, each of which is concrete and ripe, start with who is entitled to be accommodated. The accommodation provisions of the lease provide that "a new entrant airline (Requesting Airline)" should be accommodated if the

accommodation does not unduly interfere with the Signatory Airline's operating schedules. Delta asserts that it is a new entrant. Southwest asserts that Delta is not a new entrant since it has been continuously operating from Love Field since at least 2009 and that the term "new entrant" is not limited to Love Field but must also include consideration of air carriers currently at DFW Airport. DOT has told the City to treat Delta as a new entrant. DOT has rejected Southwest's contention (shared by DOJ) that DFW Airport and Love Field comprise a single competitive market.

**RESPONSE: The first sentence of Paragraph 88 [sic] above is a legal argument which requires no response and is thus denied. Virgin America admits to the actual statement from the referenced Lease in sentence 2 of Paragraph 88 [sic] above. To the extent that sentence 2 of Paragraph 88 [sic] is intended to state facts beyond the actual statements in the Lease, Virgin America lacks information sufficient to admit or deny the allegation. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 88 [sic] above and therefore denies them.**

89.     Conflicts exist as to what constitutes an accommodation and how long it must last. Delta acknowledges that it has been accommodated in the sense that it has been able to continue flight operations since its sublease with American was terminated. However, Delta asserts that it must be permanently accommodated regardless of Southwest or any other Airline's planned expansion or the terms of its agreement with United. Southwest asserts that Delta has no such rights and that Delta's accommodation must yield to the use of gates by those with contractual lease rights for the use of the gates. DOT has directed that Delta is a "new entrant," entitled to gate accommodation, because it is not a Signatory Airline, despite its operations history at Love Field, and that Delta has a continuing right to use the gate slots it may obtain

through accommodation as long as it continues its pattern of service even if the agreement by which Delta was voluntarily accommodated has a certain expiration date. When the City sought to define what constituted a pattern of service, DOT declined to provide advice and Delta has claimed that the City's proposed definition of DOT's term is unlawful.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 89 and therefore denies them.**

90.     Conflicts exist over how much should be paid for any accommodation. Delta asserts that whatever accommodation is provided, it only has to pay a pro rata share of lease payments made by the accommodating Airline to the City. Southwest asserts that any payment by Delta must include direct costs, indirect costs, lost profits, and administration costs, including as a cost component for what Southwest paid to United to obtain the rights to use United's gates. Virgin has asserted that Delta had the opportunity to enter into the market place, compete, and pay United for right to use some or all of the gates. Virgin contends that Delta should not be allowed to acquire the rights without competing in the open market and paying fair value. DOT tells the City that Delta need only pay the direct costs and administrative costs, regardless of what Southwest paid for any gates or of the fair market value of any gates.

**RESPONSE:   Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 90 and therefore denies them.**

91.     Conflicts exist over whether an accommodation is feasible. Stated differently, the Airlines disagree as to how and when the City should assess whether an accommodation would unduly interfere with the Signatory Airline's operations. Delta argues that a snapshot date should be used that limits consideration to the date of the request and a limited six month look ahead. DOT generally agrees with Delta's position. Both Virgin and Southwest dispute the position.

Virgin maintains any look-ahead must be at least 12 months and does not depend on the sale of tickets. Southwest disputes the entire contention. It has further contended that the timing of Delta's accommodation request, coinciding with rapid changes at Love Field due to the repeal of the Wright Amendment, make the use of any snapshot and look-ahead approach impractical and irrational as applied to Delta's current requests.

**RESPONSE: The first sentence of Paragraph 91 is a legal argument which requires no response and is thus denied. Virgin America admits the statements made regarding Virgin America in the third and fourth sentences of Paragraph 91. Virgin American lacks information sufficient to admit or deny the remaining allegations in Paragraph 91 and therefore denies them.**

92.     As to how to determine whether an accommodation is feasible, the Airlines disagree as to the applicable factors such as time on gate, time between turns, and buffer times between sequential flights. Virgin argues it needs more time because of the type of flights it offers. The Airlines disagree as to the maximum number of flights that can occur at any particular gate. DOT has told the City that from its perspective, it is the total number of passenger seats that operate through a particular gate that is determinative and that the goal should be to maximize the use of each gate.

**RESPONSE: Virgin America admits sentence 2 of Paragraph 92 but that statement is an incomplete summary of Virgin America's position and it lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 92 and therefore denies them.**

93.     Conflicts exist as to what criteria the City should or must use in making an accommodation decision. Delta argues that destination cities from Love Field are relevant, DOT

asserts that the City may not consider flight destinations and can only consider gate utilization (however that is measured).

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 93 and therefore denies them.**

94.     Conflict exists between the City and the Federal Agencies over whether, in making an accommodation decision, the City must, can or may not consider other air service in the Dallas – Ft. Worth metropolitan area.

**RESPONSE:   Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 94 and therefore denies them.**

95.     Conflicts exist among Virgin, the Federal Agencies and DOJ as to whether Virgin's gates may be considered in an accommodation decision or whether Virgin is exempt from making an accommodation and, if so, for how long.

**RESPONSE: Paragraph 95 is a legal argument that requires no response and Virgin America denies them.  Moreover, to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American, Virgin America's rights to such gates are subject to the authority of the Department of Justice and the Federal Court in _United States et al. v. US Airways Group, Inc. and AMR Corporation_, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American.**

96.     The communications between and among the City, the Airlines, and the Federal Agencies, and DOJ establish that the above conflicts each and collectively present a complex set of controversies that are concrete and ripe for judicial determination. There is a real and substantial controversy of sufficient immediacy and reality that exists between the parties having adverse legal consequences. The City has clear standing to seek judicial resolution of these

controversies. If the City, on or before July 6, 2015, directs Southwest and/or Virgin to accommodate Delta, Southwest and/or Virgin claim an immediate loss of valuable rights and interests (and injury to their passengers). If the City does not direct an accommodation on or before July 6, 2015, Delta claims an immediate loss of valuable rights and interests (and injury to its passengers). Whatever action or inaction the City takes, it faces the prospect of an enforcement action from DOT or FAA that could result in loss of the City's ability to collect passenger facility charges and to receive federal airport grants.

**RESPONSE: Sentences 1, 2 and 3 of Paragraph 96 contain legal arguments which require no response and Virgin America denies them. Virgin America admits that Virgin America will claim a loss of its rights if required to accommodate Delta. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 96 and therefore denies them.   Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

97.     There is simply not enough room to accommodate everyone. On information and belief, the Airlines are selling tickets to the public that regardless of the City's decision cannot all be honored. There are 20 gates and space for about 200 flights. Upon information and belief, the Airlines are selling tickets to far more than 200 flights. Delta has suggested that Delta may retain security to protect their continued use of the space they are currently using after July 6, 2015. The potential disruption to the flying public under such a circumstance would be enormous

and could have national ramifications immediately after the extraordinarily busy Independence Day weekend travel. Unless these controversies are resolved, the disruptions will continue to recur, and may rise to a level implicating public safety.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 97 and therefore denies them.**

98.     DOT and FAA have advised the City that any decision must be made with controlling effect given to the City's Grant Assurance obligations and its obligation to comply with its Competition Plan. DOT officials have stated that any decision not consistent with their understanding runs the risk of violating the terms of the Grant Assurance and Competition Plan. Delta characterizes DOT's communications as threats of enforcement action. However, DOT has carefully refrained from making an overt threat that failure to accommodate Delta or failure to comply with the terms of the First DOT Letter necessarily will be a violation of the City's Grant Assurances or Competition Plan. DOJ has advised that Virgin is exempt from any accommodation request for at least one year regardless of whether Virgin is fully utilizing the subleased gates. DOT has declined to opine on that issue.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 98 and therefore denies them. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

99.     The City believes that it is forced to conform to the standards stated in the First DOT Letter and DOJ communications or risk severe pecuniary loss and possible closure of Love Field if federal grants and ability to levy passenger facility charges are lost. The City has been and will be adversely affected by the DOT and FAA positions which involve the rights and obligations of the City and the Airlines and legal consequences flow from those positions.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 99 and therefore denies them.**

100.    Even without DOT or FAA involvement, there is an imminent threat of litigation against the City from the Airlines. Of course, two of the Airlines are already involved in litigation with DOT over the First DOT Letter. Southwest has advised the City that any City decision that interferes with its planned expansion "would be subject to an immediate challenge;" would constitute an unlawful taking; would create potential liability of millions of dollars; and the City should consider the potential liability before making any decision. Southwest has stated it will challenge in court any attempt by the City to force accommodation of Delta that prevents it from operating its new flights starting August 9, 2015. Delta and Virgin have been a bit more circumspect but the existence of an imminent threat of litigation from either is present. Delta has advised the City that a failure to accommodate will violate the City's federal obligations including its Grant Assurances; interfere with rates, routes, and fares that are explicitly preempted by federal law; be anti-competitive or contrary to the Competition Plan; and constitute serious (but unspecified) violations of the City's legal obligations. Delta states it has exhausted its efforts and that there has been no action by the City "despite the laudable efforts and enforcement threats by DOT."   Virgin claims there are compelling legal reasons why it cannot be forced to accommodate and that such action would be unlawful.

**RESPONSE: Virgin America admits the allegations contained in the last sentence of Paragraph 100. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 100, and therefore denies them.  Moreover, to the extent this paragraph is intended to refer to the gates subleased by Virgin America by American, Virgin America's rights to such gates are subject to the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American.**

101.    All parties claim competition as justification for their position with the ultimate goal of better service and fares. All note the unique circumstances at Love Field. Delta and Virgin claim Southwest has control of 90% of Love Field's gates. Southwest responds that it is barred from competing at DFW and relies on its historical impact on competition. The factual underpinnings of this case reflect the confusing and conflicting nature of the policies regarding competition as reflected in federal law.

**RESPONSE: Virgin America admits that Virgin America has claimed that Southwest controls 90% of Love Field's gates. Virgin America lacks information sufficient to admit or deny the remaining allegations contained in Paragraph 101 and therefore denies them.**

102.    The Federal Agencies insist on an accommodation decision according to their view of the law or the City risks enforcement actions for failing to comply with the required assurances and competition plan. But no matter what the decision, the City will be sued by one or more of the Airlines and perhaps even by the Federal Agencies and/or DOJ. The case and controversy is actual, concrete, and ripe for judicial decision.

**RESPONSE:  Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 102 and therefore denies them.**

103.    The City emphasizes that it seeks clarity of its obligations and rights rather than any particular result.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 103 and therefore denies them.**

104.    Although the City recommends that temporary injunctive relief be granted to preserve the status quo during this litigation if Southwest and Delta cannot resolve their issues, the City anticipates that Delta and Southwest will present evidence supporting their respective views of what the status quo should be. The City is not likely to need to take a position in that dispute other than to urge that a preliminary injunction will be necessary to preserve the status quo and prevent chaos at Love Field in the public interest during the busy summer travel season.

**RESPONSE: Paragraph 104 contains a legal argument that requires no response and is thus denied.  To the extent that Paragraph 104 intends to state factual allegations, Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 104 and therefore denies them.**

105.    As July 6, 2015, approaches, if Southwest and Delta have still not reached voluntary agreement, even if only a temporary further gate use extension, and the Court has not issued a preliminary injunction, the City likely will seek a temporary restraining order to preserve the status quo in order to prevent chaos at Love Field when Delta's current gate use arrangement with Southwest expires on that date.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 105 and therefore denies them.**

# VI.   CLAIMS

## CLAIM I:  The Federal Agencies have violated the APA and WARA

106.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105.

**RESPONSE:  Virgin America incorporates its answers to Paragraphs 1-105 as its answer to Paragraph 106.**

107.    The APA confers a right of judicial review on any party adversely affected by agency action. See 5 U.S.C. § 702. The DOT Letters and the DOT Action each is a final agency action issued in violation of the APA and WARA.

**RESPONSE: Paragraph 107 contains a legal argument that requires no response and is thus denied; moreover, Virgin America lacks information sufficient to admit or deny the allegation and therefore denies it.**

108.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**RESPONSE: Virgin America admits to the text of the Act.**

109.    Under WARA, federal agencies shall not make "findings or determinations, issue orders or rules . . . , or take any other actions . . . that are inconsistent with [the Five Party Agreement] . . . ." Pub. L. 109-352, Section 5(d)(1)(A). The Five Party Agreement requires respect for preferential gate leases at Love Field.

**RESPONSE: Virgin America admits to the text of the Act, and admits to sentence two, which is an incomplete statement of the reasons why Virgin America's lease should be respected.   Moreover, Virgin America states that to the extent this paragraph is intended**

**to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

110.    In the DOT Letters, the Federal Agencies direct the City to "continue the accommodation [of Delta] and ensure that space is available so that [Delta] is able to maintain its pattern of service on an ongoing basis . . . ." First DOT Letter at 2. By directing the City to accommodate Delta on an indefinite and ongoing basis, DOT has violated WARA by effectively forcing the City to abrogate preferential gates leases protected by the Five Party Agreement. The DOT Letters are therefore unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should issue judgment so declaring.

**RESPONSE: Paragraph 110 contains a legal argument that requires no response; moreover, Virgin America lacks information sufficient to admit or deny the allegation and therefore denies it.**

111.    Additionally, WARA mandates that the Federal Agencies shall not require the modification or elimination of preferential gate leases at Love Field "unless such modification or elimination is implemented on a on a nationwide basis." Pub. L. 109-352, Section 5(e)(2)(B)(ii). However, the DOT Letters require the City to eliminate preferential gates leases without requiring that the elimination be implemented on a nationwide basis. Thus, the DOT Letters and the DOT Action are each unlawful, arbitrary and capricious, and in violation of WARA and the APA, and the Court should enter judgment so declaring.

**RESPONSE: Paragraph 111 contains a legal argument that requires no response and is thus denied; moreover, Virgin America lacks information sufficient to admit or deny the allegation and therefore denies it.**

112.    Alternatively, if the any DOT Letter or the DOT Action is not a final agency action under the APA, the Federal Agencies' interference with preferential gate use rights protected by Love Field leases violates of the APA and WARA. Section 5(d)(1)(A) of WARA broadly and expressly prohibits the Federal Agencies from interfering with the Five Party Agreement and WARA further mandates that any elimination or modification of preferential gate leases at Love Field shall only be implemented on a nationwide basis. Pub. L. 109-352, Section (e)(2)(B)(ii). The Federal Agencies have failed to comply with WARA's mandate in violation of the APA, and the Court should enter judgment so declaring.

**RESPONSE: Paragraph 112 contains a legal argument that requires no response and is thus denied; moreover, Virgin America lacks information sufficient to admit or deny the allegation and therefore denies it.  In addition, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

### CLAIM II:    Declaratory Judgment

113.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE: Virgin America incorporates its answers to Paragraphs 1-105 and 107-109 as its answer to Paragraph 113.**

114.     In addition or in the alternative, pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City, the Airlines, and the Federal Agencies under WARA, title 49, and other federal law.

**RESPONSE: Paragraph 114 is a request for relief to which no response is necessary and is thus denied. To the extent the City seeks any relief against Virgin America, it is denied.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

115.     The DOT Letters have caused significant uncertainty as to the City's rights under WARA and to the rights and obligations of the City with respect to the Federal Agencies' directives in the Five Party Agreement, the leases and subleases with the Airlines, and the City's Grant Assurances and other obligations to DOT and FAA, and to the Airlines.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 115 and therefore denies them.   Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America by American, it is expressly denied.**

116.    In particular, the City requests that the Court declare, in consideration of WARA, the Five Party Agreement, the DOT Letters, the leases and subleases, the City's Grant Assurances and other obligations to DOT and FAA, and the Airlines, and all other applicable laws, regulations, and instruments, the terms, conditions, and scope at Love Field of:

a.    The City's right and obligation to determine pending gate accommodation requests in the absence of voluntary Airline accommodation agreements;

b.    The proper considerations and procedures for the City to adopt in considering and deciding gate accommodation requests at Love Field;

c.    The meaning of each Signatory Airline's preferential rights to gate use and obligations to accommodate other Airlines' gate use requests;

d.    Delta's rights to temporary and permanent gate accommodation;

e.    American's rights to temporary and permanent gate accommodation;

f.    DOT and FAA's authority under WARA and related federal laws and Grant Assurances to require the City to mandate that a Signatory Airliner, or sub-lessee, or other gate user provide permanent gate accommodation to other carriers if such accommodation would unduly interfere with their flight schedule, including defining "unduly interfere," declaring the durational requirements of any such mandatory accommodation, declaring the permissible considerations in mandating compensation for such mandatory accommodation, and declaring the circumstances under which each Signatory Airline's, sub-lessee's, or other gate user's schedule protects that carrier from having to provide gate accommodation; and;

g.    Such other and further declaratory relief as may be requested by the City and to which the Court may appear proper.

**RESPONSE: Paragraph 116 is a request for relief to which no response is necessary and is thus denied. To the extent the City seeks any relief against Virgin America, it is denied. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

### CLAIM III: Declaratory Judgment

117.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE: Virgin America incorporates its answers to Paragraphs 1-105 and 107-117 as its answer to Paragraph 117.**

118.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that any action or inaction that the City may take or decline to take respecting gate accommodation requests at Love Field shall not constitute violations of any Grant Assurances to FAA, the Competition Plan, or other federal law to the extent that such City action or inaction is consistent with the orders and judgment of the Court in this civil action.

**RESPONSE: Paragraph 118 is a request for relief to which no response is necessary and is thus denied. To the extent the City seeks any relief against Virgin America, it is denied. Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the**

authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.

## CLAIM IV:  Declaratory Judgment

119.   The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE: Virgin America incorporates its answers to Paragraphs 1-105 and 106-118 as its answer to Paragraph 119.**

120.   Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that if the City is compelled by the DOT, including by the DOT Action and any provisions of the DOT Letters, to interfere with any Signatory Airline's preferential gate use rights under the Signatory Airlines' lease, the City will have been prevented from performing any of its obligations [under the lease] by reasons of .. . acts of a superior Governmental Agency, . . . or any other circumstances for which it is not responsible or which are not in its control under the Southwest Lease (and Master Lease) section 14.12, and therefore be declared not to have breached said lease by such interference.

**RESPONSE: Paragraph 120 is a request for relief to which no response is necessary and is thus denied. To the extent the City seeks any relief against Virgin America, it is denied.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US***

*Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.

## CLAIM V: Declaratory Judgment

121.    The City incorporates and adopts every allegation in the preceding paragraphs numbered 1 through 105 and 107 through 109.

**RESPONSE: Virgin America incorporates its answers to Paragraphs 1-105 and 107-120 as its answer to Paragraph 121.**

122.    Pursuant to 28 U.S.C. § 2201, the City requests that the Court declare the rights and legal obligations of the City under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law by entering judgment declaring that the City's consent to the United-Southwest sublease of United's Love Field Gates was not anti-competitive and was not a violation of any Grant Assurance given DOJ's lack of objection, DOT's lack of objection, and further declaring DOT and FAA are estopped from finding that that the consent or the sublease, or the two together, was or were a Grant Assurance violation or from otherwise treating the consent or the sublease as a violation.

**RESPONSE: Paragraph 122 is a request for relief to which no response is necessary and is thus denied. To the extent the City seeks any relief against Virgin America, it is denied.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

### VII.   TEMPORARY INJUNCTIVE RELIEF MAY BE NECESSARY

123.    As described above, the voluntary temporary gate accommodation agreement, which allows Delta to operate, expires on July 6, 2015. Delta has announced that it is continuing to sell tickets for flights to and from Love Field for after July 6, 2015. Southwest has announced that it plans to operate flights in the times and gates currently being used by Delta. Both parties claim a right to fly to and from Love Field from essentially the same place and time and both have made demand on the City to enforce their respective positions. An additional purpose in filing this action is to allow the interested parties, if they so desire, to seek temporary injunctive relief and to provide further motivation for them to reconcile their differences until the Court can finally determine the respective rights of the parties.

**RESPONSE: Virgin America lacks information sufficient to admit or deny the allegations contained in Paragraph 123 and therefore denies them. To the extent the City seeks any relief against Virgin America, it is denied.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.**

124.    If other parties fail to do so in time for the Court to consider their requests, the City may find it necessary to seek a temporary restraining order or a preliminary injunction to prevent chaos at Love Field on and after July 6, 2015, during the pendency of this suit.

**RESPONSE: Paragraph 124 contains a legal argument that requires no response, and in any case Virgin America lacks information sufficient to admit or deny the allegations**

contained in paragraph 124, and therefore denies them.  However, to the extent the City seeks any relief against Virgin America it is denied.  Moreover, Virgin America states that to the extent this paragraph is intended to refer to the gates subleased by Virgin America from American and omits the authority of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) over the Love Field gates subleased by Virgin America from American, it is expressly denied.

## AFFIRMATIVE DEFENSES

Virgin America sets forth below its affirmative defenses. By setting forth these affirmative defenses, Virgin America does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the Plaintiff. Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the Plaintiff's allegations.

1.      Plaintiffs' claims, if any, against Virgin America are barred, in whole or in part, by the decision of the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.).

2.      Plaintiff's claims, if any, against Virgin America also are barred, in whole or in part, by the doctrines of laches, unclean hands, or acquiescence. The City, as well as the other Airlines, had the opportunity to challenge the determination by the Department of Justice and the Federal Court in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) and any failure to raise any of the arguments raised in this matter that relate to Virgin America before the DOJ and the Federal Court in the District of Columbia has prejudiced and harmed Virgin America and is thus inequitable, against the public interest as

determined by the Federal Court in the District of Columbia, and thus should require denial of any request for relief in this case.

3.     Plaintiff's claims are barred, in whole or in part, by contractual obligations that the City consented to, including Virgin America's Lease for the two gates at Love Field as well as the City's consent to the decision by the DOJ and the Federal Court in the District of Columbia.

4.     Plaintiff fails to state a claim upon which relief can be granted.

5.     To the extent that the City, Delta or Southwest Airlines or any other entity make any claims against Virgin America or its two leased gates at Love Field, such claims would be exclusively subject to the jurisdiction of the Federal Court in the District of Columbia in *United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.), and as such any attempt by either to make such a claim should be subject to the contempt power of the Federal Court in the District of Columbia and should also be subject to equitable estoppel and/or res judicata.

6.     Virgin America has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter. Virgin America reserves the right to amend or seek to amend its answer and/or affirmative defenses.

## PRAYER FOR RELIEF

Virgin America requests that the Complaint, as it pertains, if at all, to Virgin America be dismissed with prejudice, that the Court find that Plaintiff is not entitled to any judgment or relief, that the Court enter judgment in favor of Virgin America, and that the Court award Virgin America any and all such other and further relief as the Court deems just and proper.

Date: September 14, 2015        Respectfully Submitted,

/s/ John R. Robertson           /s/ Barry Barnett
John R. Robertson              Barry Barnett
State Bar No. 17064320        State Bar No. 01778700
Hogan Lovells LLP              Susman Godfrey L.L.P.
555 13th St. NW               901 Main Street, Suite 5100
Washington DC 20004          Dallas, TX 75202
Telephone: 202-637-5774       Telephone: 214-754-1903

Facsimile: 202-637-5910        Facsimile:  214-754-1933
robby.robertson@hoganlovells.com   bbarnett@susmangodfrey.com

**ATTORNEYS FOR VIRGIN AMERICA**   **ATTORNEYS FOR VIRGIN AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2015, my office submitted a true and correct copy of this Answer to the Clerk of the Court of the United States District Court, Northern District of Texas, using the CM/ECF system, and served a copy of it on all counsel that have appeared in this case through this Court's electronic filing system.

/s/ John R. Robertson
Counsel for Virgin America