UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

_____

| | |
|---|---|
| CITY OF DALLAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DELTA AIR LINES, INC., SOUTHWEST | ) |
| AIRLINES CO., VIRGIN AMERICA INC., | ) |
| AMERICAN AIRLINES, INC., UNITED | ) |
| AIRLINES, INC., SEAPORT AIRLINES, | ) |
| INC., UNITED STATES DEPARTMENT | ) |
| OF TRANSPORTATION, AND THE | ) |
| FEDERAL AVIATION | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |

_____ )

Civil Action No: 3:15-cv-2069-K

DELTA AIR LINES, INC.'S OPPOSITION TO CITY OF DALLAS'S MOTION TO DISMISS
DELTA'S AMENDED COUNTERCLAIMS

TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

Argument ...................................................................................................................... 3

    I.     Standard of Review ......................................................................................... 3

    II.    Delta Has Adequately Stated a Claim for Breach of Contract ....................... 4

       A.  The City Is Not Entitled To Governmental Immunity From This Action. ................. 4

          1.    The City Waived Immunity from Suit By Filing This Action. .............................. 4

          2.    The City Is Not Immune From Liability Because It Waived That Immunity By Entering Into The Leases. .................................................. 6

       B.  Delta Has Adequately Pleaded Standing To Sue For Breach Of Contract. .................. 6

       C.  Delta Has Adequately Pleaded Each Element of Its Breach-of-Contract Claim. ......... 7

          1.    Delta Has Pleaded The Existence Of A Valid Contract. ........................................ 9

             a.   Delta Is A New Entrant Under The Lease Agreements. ................................... 9

             b.   As A New Entrant at Love Field, Delta Qualifies As A Third-Party Beneficiary To The Lease Agreements ........................................... 10

             c.   Delta Is Also a Third-Party Beneficiary of the City's Promise To Comply with Federal Law Regarding Competition and the City's Agreements With the Federal Government ............................................. 14

          2.    Delta Has Adequately Pleaded That It Performed Any Obligations That It Owes To The City. ........................................................................... 14

          3.    Delta Has Adequately Pleaded That The City Breached The Lease Agreements by Failing To Force Accommodation of Delta on Reasonable Terms And By Approving Southwest's Sublease. ................................ 15

          4.    Delta Has Adequately Pleaded That It Suffered Damages. ................................. 19

          5.    Delta Has Stated A Claim For Specific Performance. .......................................... 20

    III.   Delta Has Adequately Stated a Claim for Declaratory Relief. ..................... 21

       A.  This Court Should Exercise Jurisdiction Over Delta's Declaratory Claims. .............. 21

       B.  This Court Should Not Dismiss Delta's Challenge To The City's Approval Of United's Sublease ............................................................................ 24

Conclusion ................................................................................................................. 25

TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Adelphia Cable Partners v. E & A Beepers Corp.*,
  188 F.R.D. 662 (S.D. Fl. 1999) ............................................................ 20

*Aguiar v. Segal*,
  167 S.W.3d 443 (Tex. App. 2005) ........................................................ 9

*Astral Health & Beauty, Inc. v. Aloette of Mid-Mississippi, Inc.*,
  895 F. Supp. 2d 1280 (N.D. Ga. 2012) .................................................. 21

*Block Corp. v. Nunez*,
  No. 08-cf-53, 2008 WL 1884012 (N.D. Miss. Apr. 25, 2008) ................. 20

*Brammer v. KB Home Lone Star, L.P.*,
  114 S.W.3d 101 (Tex. App. 2003) ......................................................... 20

*Brunswick Corp. v. Bush*,
  829 S.W.2d 352 (Tex. App. 1992) ......................................................... 11

*Cade v. BAC Home Loan Servicing, LP*,
  No. 10-cv-4224, 2011 WL 2470733 (S.D. Tex. June 20, 2011) .............. 13

*Carty v. State Office of Risk Mgmt.*,
  733 F.3d 550 (5th Cir. 2013) ....................................................... 3, 4, 6

*Centex Homes v. Lexington Ins. Co.*,
  No. 13-cv-719, 2014 WL 1225501 (N.D. Tex. Mar. 25, 2014) .............. 22

*City of Houston v. Williams*,
  353 S.W.3d 128 (Tex. 2011) ......................................................... 10, 13

*City of McAllen v. Casso*,
  No. 13-11-00749-CV, 2013 WL 1281992 (Tex. App. Corpus Christi March 28, 2013) ........ 21

*ConocoPhillips Co. v. Graham*,
  No. 11-cv-503, 2012 WL 1059084 (Tex. App. Hous., Mar. 29, 2012) ............ 10, 13

*Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*,
  48 F. Supp. 3d 984 (W.D. Tex. 2014) .................................................. 10

*Dallas/Fort Worth Int'l Airport Bd. v. INET Airport Sys., Inc.*,
  No. 13-cv-753-A, 2015 WL 1922376 (N.D. Tex. Apr. 27, 2015),
  *as amended* (June 8, 2015) ................................................................ 4

*Droplets, Inc. v. E*Trade Fin. Corp.*,
  939 F. Supp. 2d 336 (S.D.N.Y. 2013) ............................................ 10, 12

*Fed. Sign v. Tex. S. Univ.*,
  951 S.W.2d 401 (Tex. 1997) ................................................................ 6

TABLE OF AUTHORITIES (*CONT.*)

**Page(s)**

*Flamingo Express, Inc. v. FAA*,
   536 F.3d 561 (6th Cir. 2008) ........................................................ 11

*Holloway v. Wells Fargo Bank, N.A.*,
   No. 12-cv-2184, 2013 WL 1187156 (N.D. Tex. Feb. 26, 2013) .............. 13

*Hooters, Inc. v. City of Texarkana, Tex.*,
   897 F. Supp. 946 (E.D. Tex. 1995) ................................................ 20

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) ........................................................ 3

*Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*,
   457 F. Supp. 1158 (E.D. Pa. 1978) ............................................... 24

*Jungersen v. Miller*,
   125 F. Supp. 846 (N.D. Ohio 1954) .............................................. 24

*Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*,
   535 U.S. 613 (2002) ............................................................... 4, 5

*Leach v. Ross Heater & Mfg. Co.*,
   104 F.2d 88 (2d Cir. 1939) ......................................................... 24

*MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*,
   995 SW.2d 647 (Tex. 1999) ........................................................ 11

*Meyers ex rel. Benzing v. Texas*,
   410 F.3d 236 (5th Cir. 2005) .................................................. 4, 5, 6

*Mohamad v. Dallas County Cmty. Coll. Dist.*,
   No. 10-cv-1189, 2010 WL 4877274 (N.D. Tex. Oct. 5, 2010),
   *adopted* 2010 WL 4883436 (N.D. Tex. Nov. 30, 2010) ..................... 6

*Mullins v. TestAmerica, Inc.*,
   564 F.3d 386 (5th Cir. 2009) ................................................... 9, 19

*MW Petroleum Corp. v. Exxon Corp.*,
   No. 14-96-00040-CV, 1997 WL 634159 (Tex. App. Oct. 16, 1997) ........ 20

*Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*,
   756 F.3d 825 (5th Cir. 2014) ...................................................... 5

*Paterson v. Weinberger*,
   644 F.2d 521 (5th Cir. 1981) ...................................................... 3

*Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*,
   32 F.3d 205 (5th Cir. 1994) ........................................................ 3

*Seitz v. Rheem Mfg. Co.*,
   544 F. Supp. 2d 901 (D. Ariz. 2008) ............................................ 10

*Stine v. Stewart*,
   80 S.W.3d 586 (Tex. 2002) ........................................................ 10

TABLE OF AUTHORITIES (*CONT.*)

**Page(s)**

*Strickrath v. Globalstar, Inc.*,
No. 07-cv-1941, 2008 WL 2050990 (N.D. Cal. May 13, 2008) ............................................ 24

*Stryker Corp. v. Ridgeway*,
No. 13-cv-1066, 2014 WL 3704284 (W.D. Mich. July 24, 2014) ......................................... 22

*TCA Bldg. Co. v. Nw. Res. Co.*,
890 S.W.2d 175 (Tex. App. 1994) ....................................................................................... 20

*Texas v. Caremark, Inc.*,
584 F.3d 655 (5th Cir. 2009) .................................................................................................. 5

*Tooke v. City of Mexia*,
197 S.W.3d 325 (Tex. 2006) ............................................................................................. 4, 6

*Vanegas v. Am. Energy Servs.*,
302 S.W.3d 299 (Tex. 2009) ................................................................................................ 13

*Wiley v. U.S. Bank, N.A.*,
No. 11-cv-1241, 2012 WL 1945614 (N.D. Tex. May 30, 2012) ......................................... 13

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995) ............................................................................................................. 24

**Statutes**

Texas Local Government Code § 271.152 .............................................................................. 5, 6

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................. 20, 25

Fed. R. Civ. P. 12 ..................................................................................................................... 3

**Other Authorities**

6 Charles Alan Wright, *et al.*, Federal Practice and Procedure § 1406 ...................................... 24

**INTRODUCTION**

Delta Air Lines, Inc. ("Delta") has stated valid counterclaims to enforce and declare its rights to accommodation at Love Field under the lease agreements between the City of Dallas ("the City") and the three carriers—Southwest, American, and United Airlines—that leased gates at that airport (the "Signatory Airlines").  The leases unambiguously provide that the Signatory Airlines are required to accommodate a request by a non-signatory airline for accommodation so long as there is space in their operating schedules when the request is made, and that the *City* is required to order such accommodation if the Signatory Airlines fail to meet their obligations. Delta properly pleads causes of action for declaratory relief and breach of contract against the City because the City chose *not* to order accommodation, but instead to facilitate Southwest's exclusion of Delta by approving an anti-competitive and illegal sublease from United to Southwest of underutilized gate space.

Delta has properly pleaded that the City's conduct breached multiple provisions of the lease agreements.  Most simply, Section 4.06(F) of the lease sets forth a process pursuant to which a non-signatory airline like Delta can request accommodation at Love Field, invoking obligations by the Signatory Airlines and the City.  Delta properly requested accommodation for six flights (later reduced to 5) on June 13, 2014, when there was ample space available at Love Field based not only United's and Southwest's current schedules, but also their announced future schedules at that time.  Yet Southwest and United refused to accommodate Delta, and the City failed to compel them to do so.  A few months later, on February 23, 2015, Delta properly requested accommodation for an additional eight flights, when there was still ample space available at Love Field.  Yet Southwest—which had subleased the two gates United leases from the City such that it controlled 18 of the 20 gates at Love Field—again refused to accommodate Delta, and the City again failed to make them do so.  The City, Southwest, and United have thus

breached Section 4.06(F), and Delta is entitled to damages and/or specific performance.

The City also agreed to "operate the Airport . . . in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances," and indeed the leases are explicitly "subordinate to the provisions of any and all existing and future agreements between the City and the United States."  Lease §§ 14.19, 14.34.  As a participant in the FAA's Airport Improvement Program ("AIP"), the City agreed to the federal grant assurances in order to receive more than $20 million in airport-improvement grants, *and* permission to assess a $4.50 facility fee for each passenger at Love Field, amounting to over *$300 million* in funding for improvements at Love Field.  Through its grant applications and its Competition Plan, the City assured the FAA and/or the Department of Transportation ("DOT") that it would accommodate access to Love Field by non-signatory airlines like Delta and would not allow Southwest to control access to the airport.  And through sections 14.09 and 14.19 of the lease agreements, which incorporate these federal obligations into the leases, the City made the grant assurances and the Competition Plan enforceable by parties to and beneficiaries of the lease agreements.  Here again, the City shirked its contractual obligations, breaching Section 14.19 of the Lease both (1) by failing in its obligations to accommodate Delta and (2) by approving a sublease that violated the City's own Competition Plan and that effectively granted Southwest an exclusive right to the airport.

The City now attempts to avoid its contractual responsibilities by moving to dismiss Delta's counterclaims.  According to the City, even if the lease agreements require it to accommodate Delta, the City's governmental immunity bars any remedy in this Court.  But Texas law recognizes two types of governmental immunity—immunity from liability and immunity from suit—and the City can claim neither.  The City waived immunity *from liability*

under the lease agreements when it signed those agreements, and it waived any immunity from

suit when it voluntarily invoked this Court's jurisdiction by filing this action.   Once the

unsupportable immunity defense is swept away, the City's factual disputes over whether Delta

can prove its claim are both meritless and improper for a motion to dismiss.

The City's motion to dismiss should therefore be denied.

ARGUMENT

## I.      Standard of Review

Under Fed. R. Civ. P. 12(b)(6), this Court "accepts [Delta's allegations] as true, viewing

them in the light most favorable to [Delta]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191,

205 (5th Cir. 2007) (quotation marks omitted).   To survive the City's motion, Delta must plead

"enough facts to state a claim to relief that is plausible on its face." *Id.*   Similarly, "[i]n ruling on

a motion to dismiss for want of standing, [this Court] must accept as true all material allegations

of the complaint, and must construe the complaint in favor of the complaining party." *Rohm &*

*Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 207 (5th Cir. 1994).

The City's defense of "immunity from suit implicates [this] [C]ourt's subject-matter

jurisdiction," *Carty v. State Office of Risk Mgmt.*, 733 F.3d 550, 553 (5th Cir. 2013), and thus

arises under Federal Rule of Civil Procedure 12(b)(1).   Under Rule 12(b)(1), this Court is "free

to weigh the evidence" and "make factual findings" necessary to establish jurisdiction. *Paterson*

*v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).   That heightened standard is irrelevant here,

however, because as explained below, the City's defense of immunity from suit can be denied

based solely on the undisputed fact that the City filed this suit. *See infra* Part II.A.1.   The City's

"immunity from liability" under the lease agreements, *see infra* Part II.A.2, "does not affect

[this] [C]ourt's jurisdiction,'" *Carty*, 733 F.3d at 555 & n.14 (citation omitted), and thus turns on

the ordinary Rule 12(b)(6) standard for dismissal for failure to state a claim.

3

## II.     Delta Has Adequately Stated a Claim for Breach of Contract.

### A.     The City Is Not Entitled To Governmental Immunity From This Action.

The City argues that this Court "lacks jurisdiction over [Delta's] contract claim" because "[t]he City's governmental immunity" purportedly bars that claim.   Mot. 9.   "In Texas, governmental immunity has two components:  immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether."  *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *see also Carty*, 733 F.3d at 554.   The City is entitled to neither because each is waived:  The City waived immunity from suit when it chose to litigate its obligations to Delta in this forum, and it waived immunity from liability under the lease agreements by entering into those agreements.

### 1.     The City Waived Immunity from Suit By Filing This Action.

Under both Supreme Court and Fifth Circuit precedent, "'the question of whether a particular form of state action amounts to waiver [of immunity from suit] is a federal question that should be decided under a federal rule.'"  *Carty*, 733 F.3d at 553-54 & n.8.   In *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002), for example, the Supreme Court applied federal common law and held that a state had waived jurisdictional immunity from state-law claims when it removed those claims to federal court.  *Id.* at 623.   Under *Lapides*, federal waiver rules "apply equally to state and federal claims" without regard to "'the nature of the relief sought'" or "whether the state had waived its immunity from suit in its own courts."  *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 243, 246-47 (5th Cir. 2005); *see, e.g.*, *Dallas/Fort Worth Int'l Airport Bd. v. INET Airport Sys., Inc.*, No. 13-cv-753-A, 2015 WL 1922376, at *3 (N.D. Tex. Apr. 27, 2015), *as amended* (June 8, 2015) (federal waiver rules permitted monetary claims against local government entity even though state-law requirements for waiver were not met).   The City's authorities addressing waiver of immunity from suit *in*

*Texas state court* under Texas Local Government Code § 271.152 are therefore irrelevant. *See* Mot. 11-13.

Under federal law, a governmental entity that "voluntarily invokes federal court jurisdiction"—as the City did here by filing its complaint—waives immunity from suit in federal court. *Meyers*, 410 F.3d at 241. This "voluntary invocation principle" ensures that states may not "'achieve unfair tactical advantages'" by simultaneously "invok[ing] federal jurisdiction and claim[ing] immunity from federal suit in the same case." *Id.* at 242-43 (quoting *Lapides*, 535 U.S. at 621). Even when a "state's motive for [invoking federal jurisdiction] is benign," voluntary recourse to federal court operates as a waiver "for the sake of consistency, in order to prevent and ward off all actual and potential unfairness, whether egregious or seemingly innocuous." *Id.* at 243, 249. When a governmental entity "initiates a lawsuit," therefore, "it waives its sovereign immunity to the extent required for the lawsuit's complete determination." *Texas v. Caremark, Inc.*, 584 F.3d 655, 659 (5th Cir. 2009).

The City's waiver of immunity extends to Delta's counterclaims because they "aris[e] out of the same transaction or occurrence which is the subject matter of the government's suit" and therefore qualify as compulsory counterclaims. *Caremark*, 584 F.3d at 659. That "loose standard" is easily met here because both parties' complaints concern Delta's request for accommodation under the lease agreements. *See Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 835 (5th Cir. 2014); Countercl. ¶ 14; Compl. ¶ 4. The parties' allegations all relate to the same core events: Delta's repeated efforts to seek accommodation at Love Field and prevent Southwest and United from *blocking* competition. Having asked this Court to declare the City's "obligation to determine pending gate accommodation requests" and "Delta's rights to temporary and permanent gate accommodation," Compl. ¶ 116, the City cannot now contend that

Delta's counterclaims related to the same subjects are beyond this Court's power.[1]

### 2.   The City Is Not Immune From Liability Because It Waived That Immunity By Entering Into The Leases.

Unlike its waiver of immunity from suit, the City's waiver of immunity from liability is governed by state law.  *Meyers*, 410 F.3d at 253 ("[C]ourts must look to the law of the particular state in determining whether it has established a separate immunity against liability for purposes of waiver.").   Under Texas law, a "governmental entity" that "enter[s] into a contract . . . necessarily waives immunity from liability, voluntarily binding itself like any other party to the terms of agreement." *Tooke*, 197 S.W.3d at 332; *see also Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997) ("[T]he State is liable on contracts made for its benefit as if it were a private person.").   The City argues that Texas Local Government Code § 271.152 does not waive the City's immunity, but by its terms § 271.152 applies *only* to "immunity to suit."   It is irrelevant to whether the City has waived immunity from *liability* through its own commercial conduct.   By entering into the lease agreements, the City agreed to be bound by those agreements and waived any immunity from liability for its failure to perform.[2]

### B.   Delta Has Adequately Pleaded Standing To Sue For Breach Of Contract.

The City also argues that this Court lacks jurisdiction because Delta "lacks standing for

---

[1] The City's attempts to recast its merits arguments as grounds for immunity from suit are misplaced.  In addressing immunity, the City argues that "[t]here was no written and properly executed contract between the City and Delta" and "[a] valid  breach of contract claim is not stated" (Mot. 13-14)—arguments that it repeats in contending that Delta failed to state a claim, and which are refuted in that context below.  *See infra* Parts II.C.1, II.C.3.  But whether the City waived immunity from suit by filing this action in no way turns on the merits of Delta's counterclaims.

[2] The City argues that "[g]overnmental immunity of local governments such as the City for contractual claims is waived only to the extent specifically provided by statute."  Mot. 10 (citing *Mohamad v. Dallas County Cmty. Coll. Dist.*, No. 10-cv-1189, 2010 WL 4877274, at *3 (N.D. Tex. Oct. 5, 2010), *adopted* 2010 WL 4883436 (N.D. Tex. Nov. 30, 2010)).  But *Mohamad* addressed only "'*immunity to suit*'" under Section 271.152, which is applicable only in *Texas courts*. *Id.* (emphasis added). Although immunity to suit in Texas court may be waived only by the legislature, *immunity from liability* is "necessarily waive[d]" when a governmental entity "enter[s] into a contract." *Tooke*, 197 S.W.3d at 332.  And immunity from suit in *federal court* may be waived based on federal common law grounds that were not at issue in *Mohammad.  Carty*, 733 F.3d at 553-54.

any breach of contract claim." Mot. 14. That argument—which rises and falls on the City's contention that Delta is neither a "party" nor a "third-party beneficiary" to any "enforceable contract" with the City (*id*. at 15)—merely restates the City's separate contention that Delta has not stated a claim because there is no contractual relationship between Delta and the City. *See id*. at 15-24. As addressed in the next section, both arguments fail, and Delta has standing, because Delta is a third-party beneficiary of the lease agreements. *See infra* Part II.C.1.

C.     **Delta Has Adequately Pleaded Each Element of Its Breach-of-Contract Claim.**

The City moves to dismiss Delta's breach-of-contract claim for failure to state a claim, arguing that Delta has failed to adequately plead each of the elements of breach of contract. The City's motion is without merit.

In its pleadings, and at the hearing in this matter, Delta has detailed the City's failure to comply with its undertakings in the lease agreements. The City has breached, at a minimum, Sections 4.06(D), 4.06(F), and 14.19 of the lease agreements. Under Section 4.06(D)(4) of the lease agreements, "if 'a new entrant carrier seeks to begin service at' Love Field, the City is obligated to 'seek voluntary accommodation from its existing airline lessees to accommodate the new entrant service,' and '[i]f the existing carriers are not able or are not willing to accommodate the new entrant service, then the City *agrees to require* the sharing of' the incumbent airlines' leased gates." Countercl. ¶ 34. Section 4.06(F), in turn, lays out "a four-step process through which a potential new entrant carrier may seek accommodation at Love Field":

A.     The requesting airline must seek voluntary accommodation by attempting to secure gate space and other necessary facilities on a voluntary basis from one of the incumbent airlines at Love Field. (§ 4.06(F))

B.     After contacting the incumbent airlines and exhausting all reasonable efforts to secure voluntary accommodation, the requesting airline may notify the City's Director of Aviation, who must "notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt

7

of notice, the Director will select one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner." (§ 4.06(F)(2))

C.     At the end of the 30-day period, if no incumbent airline has agreed to voluntarily accommodate the requesting airline, the City must "select a Signatory Airline to accommodate the Requesting Airline" and send a written notice to that airline requiring accommodation within 30 days of receipt of the notice. (§ 4.06(F)(3))

D.     At the end of that second 30-day period, the incumbent airline that has been selected for accommodation must accommodate the requesting airline by sharing a portion of its leased gates and allowing the requesting airline to operate flights out of that shared gate space. (§ 4.06(F)(4))

Countercl. ¶ 36.  The City has failed to meet these obligations.  Moreover, the obligations must be construed in light of the explicit provision in the lease agreements providing that the agreements are "subordinate to the provisions of any and all existing and future agreements between the City and the United States of America relative to the operation, maintenance or development of the Airport, the execution of which may be required as a condition precedent to the expenditure of funds for the development of the Airport, or any part thereof."  Lease § 14.34.  Such "agreements" include the grant assurances and the City's competition plan.

Section 14.19 also provides that

City agrees to maintain and operate the Airport in accordance with all applicable standards, rules and regulations of the FAA or its successor.  City shall exercise its rights hereunder and otherwise operate the Airport with due regard for the operational requirements and long-term interests of the airlines and the interests of traveling public, in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances.

The City failed to satisfy this obligation because it defied the requirements of its grant assurances and its own Competition Plan.

Delta has adequately alleged the elements of a breach of contract claim as to each of these sections.  To state a breach-of-contract claim in Texas, Delta must allege:  "'(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of

the breach.'" *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App. 2005)).   Delta has adequately alleged each of these elements, as well as any conditions precedent, and has stated a claim for specific performance.

### 1.   Delta Has Pleaded The Existence Of A Valid Contract.

Delta has adequately pleaded the existence of a valid contractual obligation with the City. Delta has pleaded—and no party has disputed—that the leases are valid contracts.   Delta is a third-party beneficiary to the lease agreements and may therefore enforce those agreements.

### a.   Delta Is A New Entrant Under The Lease Agreements.

As an initial matter, Delta has adequately alleged that it is "a new entrant to Love Field" (Countercl. ¶ 103) because that term "includes any carrier that [like Delta] is not a signatory carrier at Love Field." *Id.* ¶ 25.  It is common sense that a "new entrant" would be a carrier other than the three incumbent carriers holding existing leases from the City.   Moreover, the evidentiary record developed in the course of the preliminary injunction motions only confirms that Delta is a "new entrant" for purposes of the lease agreements.  *See, e.g.,* Hearing Exh. 88 (Southwest formally proposing that "new entrant" include "any airline that is not already a lease signatory at Love Field"); 9/30/15 Tr. 150:18-25 (Southwest's Bob Montgomery confirmed that when complaining to the City that it was accommodating a "new entrant" at Love Field over Southwest's interests, he was referring to Delta).

The parties' own references to Delta as a "new entrant" at Love Field are entirely consistent with the controlling documents.   Both the leases and the Five Party Agreement contrast "new entrants" or "requesting airlines" with "existing airline lessees" or "existing carriers."  D.E. 52-5 ("Southwest Lease") §§ 4.06(D)(4), (F); Five Party Agreement, Compl. Ex. 4, Art. I.3.b.   The grant assurances and Competition Plan do the same.  *See* Tr.-Ex. 73 at 73.0002; Tr.-Ex. 98 at 98.0011.   Finally, the 1999 FAA/OST Study on Airport Business

9

Practices defines the term "new entrant" broadly and uses it interchangeably with "requesting airline." *See* Exhibit 304 at 304.0008, .0009, .0012, .0039.  The City's contrary definition of "new entrant" as "an air carrier that has been providing air transportation according to a published schedule for less than 5 years" (Mot. 22) would lead to the absurd result that Delta must first actually be ejected from Love Field before it can request accommodation.  Contract terms should not be interpreted to lead to such absurd results.  *See, e.g.*, *Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*, 48 F. Supp. 3d 984, 988 (W.D. Tex. 2014).  And in any event the motion to dismiss is not the proper point to weigh such attenuated arguments, since "it [is] premature at the motion to dismiss stage for the Court to delve into contractual interpretation." *Seitz v. Rheem Mfg. Co.*, 544 F. Supp. 2d 901, 910 (D. Ariz. 2008).

> **b.    As A New Entrant at Love Field, Delta Qualifies As A Third-Party Beneficiary To The Lease Agreements.**

As a new entrant airline at Love Field, Delta is a third-party beneficiary to the lease agreements between the City and the three incumbent carriers and can enforce those agreements. "Texas law recognizes that third parties have standing to recover under a contract that is clearly intended for their direct benefit." *City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011). Even if the contract was not executed "solely to benefit . . . a non-contracting party," that party may enforce its rights to any contractual benefit that the contracting parties intended "*at least in part*" to confer.  *Stine v. Stewart*, 80 S.W.3d 586, 591 (Tex. 2002) (emphasis added).  The agreement need not "identify that party by name" or contain an "express provision" granting rights in third-party beneficiaries.  *Droplets, Inc. v. E\*Trade Fin. Corp.*, 939 F. Supp. 2d 336, 347, 352 (S.D.N.Y. 2013) (citing *ConocoPhillips Co. v. Graham*, No. 11-cv-503, 2012 WL 1059084, at \*6 (Tex. App. Hous., Mar. 29, 2012)) (applying Texas law).

To qualify as a third-party beneficiary, a party "must show that he is either a donee or

creditor beneficiary of, and not one who is benefited only incidentally by the performance of, the contract." *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 SW.2d 647, 651 (Tex. 1999). "'If the performance promised . . . will, when rendered, come to the third person . . . in satisfaction of a legal duty owed to him by the promisee, he is a creditor beneficiary.'" *Brunswick Corp. v. Bush*, 829 S.W.2d 352, 354 (Tex. App. 1992).

Delta is a creditor beneficiary with respect to the City's obligations because Section 4.06(F) satisfies "a legal duty owed to [Delta] by the [the City]" under federal law. *MCI*, 995 S.W.2d at 651. Here, to secure AIP grants, *see* Countercl. ¶ 22-23, the City was required to make Love Field available "as an airport for public use on reasonable terms and without unjust discrimination," without directly or indirectly granting any carrier an exclusive right to use Love Field. *Id.* ¶¶ 109-10. For example, the City "may not deny an air carrier [such as Delta] access solely based on the nonavailability of existing facilities." FAA Order 5190, ¶ 9. These are "binding obligations," *Flamingo Express, Inc. v. FAA*, 536 F.3d 561, 563 (6th Cir. 2008) (quotations omitted), that the City owes "to all air carriers and users of Love Field," including Delta. Countercl. ¶ 24.

The City incorporated these legal obligations to Delta and others by agreeing, in the leases, to accommodate airlines seeking to serve Love Field. Moreover, the City agreed that, if no incumbent carrier voluntarily provided accommodation, the City ultimately "*will* select one of the Signatory Airlines to comply with the request for accommodation," Lease § 4.06(F)(2), and that, if necessary, the City "agrees to require the sharing of Airlines' Preferential Use Space and Gates." Lease § 4.06(D)(4); § 4.06(F)(3) (authorizing the City to order accommodation at the conclusion of a 30-day period after giving notice). These expressly binding promises confer no benefits or rights on either the City or the signatory airlines; their only legal effect is to create

rights in favor of other airlines seeking to serve Love Field.  *See Droplets*, 939 F. Supp. 2d at 350 (agreement created third-party beneficiary rights because it "confer[red] direct benefits that [were] independent of any benefits" to the contracting parties).

The City has confirmed its intent to be bound by the accommodation procedures by representing to DOT, in its initial Love Field Competition Plan, that the gate-sharing provisions in its leases with incumbent carriers "*requir*[*e*] accommodation of other airlines."  Countercl. ¶ 29 (emphasis added).  In its most recent competition plan, the City reaffirmed that "the City intends to accommodate [such] requests for access by applying the gate sharing provisions contained in the current lease," and *specifically* that "[o]nce the terminal redevelopment is completed, the City will accommodate Delta based on the gate sharing provisions of the preferential use lease. *Id*. ¶¶ 31-32.  By assuring DOT of its promises in the lease agreements to accommodate new entrant airlines, the City has secured more than $20 million in AIP grants, *and* permission to assess a $4.50 facility fee for each passenger at Love Field (which evidence at the preliminary injunction hearing established amounts to over *$300 million* in PFC revenue). *Id.* ¶ 23.  Having secured these benefits, the City cannot now reverse course and deny that the accommodation provisions have any enforceable legal effect.

The City also argues that the Five-Party Agreement disclaims third-party beneficiary rights.  Mot. 18.  But Delta is not suing for a breach of the Five-Party Agreement, but rather for a breach of the lease agreements, which do not incorporate that provision.  Indeed, the Five-Party Agreement is only briefly referenced in the introductory recitals of the lease and nowhere else. In contrast, when the parties intended to incorporate documents by reference, they did so explicitly.  Lease § 14.04(D)(3) ("incorporat[ing] by reference" stormwater discharge permit).

The City also urges that the lease agreements are analogous to a bank's agreement with

the federal government to participate in the Home Affordable Modification Program ("HAMP"), which is not enforceable by third-party beneficiaries.  Mot. 20-21 (citing *Holloway v. Wells Fargo Bank, N.A.*, No. 12-cv-2184, 2013 WL 1187156 (N.D. Tex. Feb. 26, 2013); *Cade v. BAC Home Loan Servicing, LP*, No. 10-cv-4224, 2011 WL 2470733 (S.D. Tex. June 20, 2011)).  But the participation agreements in *Holloway* and *Cade* were agreements with the federal government solely to implement a federal program in exchange for federal benefits.  *Holloway*, 2013 WL 1187156, at *13; *Cade*, 2011 WL 2470733, at *2.  In contrast, the lease agreements are between the City and the signatory airlines and create private rights with respect to both those signatory airlines and also new entrants, the intended third-party beneficiaries of the City's contractual commitments to force accommodation.  Moreover, in *Holloway* and Cade, the participation agreements conferred a benefit (federal financial incentive) on the banks.  Here, the accommodation provision confers no benefit on Southwest or the other signatory carriers.  The obvious—and, indeed, *only*—parties with an interest in enforcing the lease agreements' accommodation provisions are airlines such as Delta who seek to serve Love Field and who those provisions were intended to benefit.  Thus, unlike the provisions at issue in *Cade* and *Holloway*, the accommodation provision would have "no [e]ffect if [as the City contends] it cannot be enforced by a third-party."  *ConocoPhillips*, 2012 WL 1059084, at *6.[3]

---

[3] In the alternative, Delta is entitled to sue for breach of Section 4.06(F) because Delta entered into a unilateral contract with the City by initiating the accommodation process in the lease agreements.  Under Texas law, "'[a] unilateral contract . . . is created by the promisor promising a benefit if the promisee performs and becomes enforceable once the promisee performs.'" *Wiley v. U.S. Bank, N.A.*, No. 11-cv-1241, 2012 WL 1945614, at *8 (N.D. Tex. May 30, 2012) (quoting *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009)).  The City incorrectly contends that Delta relies on oral promises made by City employees.  *See* Mot. at 16-18.  The City's promise to accommodate Delta was made in section 4.06(F), which contains precisely the type of "mandatory" language "manifest[ing] [the City's] intention to act in a specific way," and "addressed to a discrete group of offerees," that creates an offer for a unilateral contract.  *See, e.g., City of Houston v. Williams*, 353 S.W.3d 128, 138 (Tex. 2011) (finding city ordinances' "extensive use of the word 'shall'" indicated intent to create binding unilateral contract).  Delta accepted the offer by performing via the process set forth in Section 4.06(F).

> **c.** **Delta Is Also a Third-Party Beneficiary of the City's Promise To Comply with Federal Law Regarding Competition and the City's Agreements With the Federal Government.**

The City also contends that Delta lacks standing to challenge United's unlawful sublease to Southwest. Delta's challenges to the sublease are based not only on Section 4.06(F), but also on other provisions of the lease agreement (including its incorporation of federally required commitments such as the grant assurances and the competition plan, *see* §§ 14.03(B), 14.09, 14.16, & 14.19) that are also designed to promote competition and to discharge the City's (and the Signatory Airlines') obligations to comply with federal law mandating that public airports built with public funds be available to all airlines. Delta has pleaded that it is an intended beneficiary of these provisions and thus has standing to challenge the sublease just as it has standing to invoke accommodation.

Moreover, the sublease undermined Delta's contractual right to accommodation. That is, by subleasing its gates to Southwest, United breached its obligation to accommodate Delta; by entering the sublease, Southwest tortiously interfered with United's performance of its obligation to accommodate Delta; and by approving the sublease, the City was complicit in United's breach and in Southwest's tortious interference, and breached the lease by failing to order United to accommodate Delta on those gates rather than subleasing them to Southwest. In short, by approving the sublease, the City breached its obligation to accommodate, an obligation for which Delta is clearly a third-party beneficiary.

> **2.** **Delta Has Adequately Pleaded That It Performed Any Obligations That It Owes To The City.**

The City does not meaningfully dispute Delta's allegation that it "performed its obligations under the Lease Agreements" by "seeking to provide service at Love Field and/or enter Love Field as a new entrant carrier, exhausting all reasonable efforts to secure voluntary

accommodation from the incumbent carriers, and taking the proper steps to invoke its right to forced accommodation." *See* Countercl. ¶ 104.  The City contends only that Delta has failed to "pa[y] the City for the term of [the] lease" it seeks.  Mot. 19.  But Delta owes the City nothing because the City never accommodated its gate request, and as a result no lease has been formed.

> **3.     Delta Has Adequately Pleaded That The City Breached The Lease Agreements by Failing To Force Accommodation of Delta on Reasonable Terms And By Approving Southwest's Sublease.**

Delta has stated a claim that the City breached at least two separate provisions of the lease agreements: Section 4.06 and Section 14.19.

**Section 4.06:**     The City has repeatedly breached the accommodation procedure established by Section 4.06(F).  Delta requested accommodation on June 13, 2014.  Delta informed the City it had exhausted reasonable efforts to seek accommodation on July 16, 2014— but the City took no action until September, despite its contractual obligation to order accommodation.  Then, when the City informed United it would need to accommodate Delta on September 19, it buckled to pressure and withdrew the accommodation requirement on September 29—again, despite its contractual obligation to order accommodation.

The City breached again in December.  Under Section 4.06(F)(3), the City's December 1, 2014 letter to Delta, Southwest, and Virgin America—acknowledging that Delta had exhausted all reasonable efforts to secure voluntary accommodation of its current five-flight schedule— triggered a 30-day period for the airlines to voluntarily accommodate that request.  Countercl. ¶ 107.  This letter was properly sent, because both at the time that Delta requested accommodation and at the time of the City's chosen snapshot date, Delta could be accommodated without undue interference with Southwest's or United's operating schedule. When that period ended on December 31, 2014, the City was obliged to select one of the Signatory Airlines to accommodate Delta's request.  *Id.*  The City breached this duty by failing

to mandate accommodation at that time or at any point after. *Id.*

The City also breached its obligations with respect to Delta's request for accommodation for eight additional flights on February 23, 2015.  When Delta made its request, Southwest's operating schedule permitted those flights to be added without undue interference.  When Southwest nonetheless refused to accommodate Delta's flights, Delta notified the City on April 28, 2015 that it had exhausted all reasonable efforts to secure voluntary accommodation for its request for eight additional flights. *Id.* ¶ 66.  Under Section 4.06(F)(2), that notice triggered the City's duty to "notify all Signatory Airlines in writing" of the need to accommodate Delta's request.  By failing to do so, the City again breached its obligations under the lease. *Id.* ¶ 107.

The City also did not order that any signatory airline accommodate Delta's request for eight additional flights.  Separate and independent of its obligation to notify the signatory airlines of the need to accommodate Delta's request, the City was required to order one of them to accommodate.  It failed to do this, even though "Delta provided written notice to the City confirming its 'exhaustion of [its] good-faith efforts to resolve [its] longstanding request for accommodation at Dallas Love Field.'" *Id.* ¶ 85.  The City's continued failure to accommodate either of Delta's requests after Delta exhausted its good-faith efforts constitute independent breaches of the agreement. *Id.* ¶ 107.

The City wrongly contends that Delta already "has been voluntarily accommodated" because Delta reached agreements to temporarily maintain the status quo after Southwest, United, and the City failed to meet their contractual obligations.  Mot. 22.  As an initial matter, this is not an argument that is amenable to resolution on the pleadings; Delta has adequately pleaded that it was entitled to long-term accommodation and that Southwest, United, and the City refused to provide it.  The factual argument by Southwest and the City that briefly

16

maintaining the status quo is an "accommodation" is improper for a motion to dismiss.

In any event, the City's construction of the lease is meritless.  The lease provides neither a time limit for an accommodation nor provisions for terminating an accommodation once made.  And permitting a brief license to discharge an obligation to accommodate would render the accommodation requirement meaningless.  Southwest, as the dominant carrier, could (as it has here) always prevent accommodation by unilaterally (1) offering short-term voluntary "accommodation"; (2) using the "accommodation" period to announce and begin selling tickets for an expanded operating schedule that would block the new entrant's request; and (3) claiming that further accommodation was now impossible.  Permitting Southwest and the City to defeat Delta's right to accommodation in this way would eliminate Delta's (and every other carrier's) right under the lease to be accommodated, for as long as it continues a similar pattern of service, if, *at the time of the request for accommodation*, such accommodation would "not unduly interfere" with the Signatory Airline's operating schedules.  Southwest Lease § 4.06(F); DOT Letter dated June 15, 2015, Compl., Ex. 2, at 1-3 ("DOT Letter").  There is no merit to the City's contention that Delta is asking the Court to "modify" section 4.06(F), Mot. at 14.  In fact, Delta asks the Court to properly construe and *enforce* section 4.06(F).[4]

**Section 14.19:**  The City also breached Section 14.19, which provides that the City will

---

[4] The argument that maintaining the status quo is an "accommodation" is also inapplicable to Delta's request for eight additional flights, which it has never been able to fly.  As to the eight flights, the City claims only that "Southwest announced and will implement its expanded flight operations within . . . six months of [that] request," and thus there is no space for Delta.  But the lease speaks of "operating schedule," not *future* operating schedules not yet announced.  *See* Countercl. ¶ 69 (DOT Letter mandates accommodation if possible "given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers").  Any contrary construction would allow Southwest to manipulate and eliminate the accommodation process.  The City's description of a six-month window as Delta's "own theory" is false, and cites only to Delta's description of *the City's* policy.  Countercl. ¶¶ 58-59.  The DOT's letters make it clear that future flights are relevant to the accommodation analysis under the lease only if those flights had been announced and offered for sale as of the date of the accommodation request, and it is undisputed that Southwest had neither announced nor started selling tickets for its expanded schedule of 180 flights on February 23, 2015.

"exercise its rights [under the Lease] . . . with due regard . . . for the interest of the traveling public" and "in a manner that is consistent with applicable law, [including] federal grant assurances." Countercl. ¶ 79-80.  The grant assurances, in turn, require that the City "make the airport available . . . without unjust discrimination" and prohibit the City from granting any airline the "exclusive right" to use Love Field. *Id*. ¶¶ 109-10.

By failing to force accommodation of Delta's two separate requests for accommodation and by approving United's sublease to Southwest, the City acted against the public interest and violated its own competition plan as well as the terms of the grant assurances, and therefore breached Section 14.19.  Countercl. ¶ 76-82.  As discussed at length at last month's hearing, the City's own 2005 Competition Plan Update provides that "the City's current policy is that carriers subleasing gates may not profit on those subleases and may collect only 15% above their own rental costs to reimburse them for administrative costs."  *See* Letter from Kenneth H. Gwyn, Love Field Director of Aviation, to Catherine M. Lang, FAA (Feb. 28, 2005), http://www.dallas-lovefield.com/pdf/CompetitionPlanUpdate_20050228.pdf (Hearing Exh. 222).   The Lease is *explicitly* "subordinate to the provisions of any and all existing and future agreements between the City and the United States of America," which by its terms includes the Competition Plan. Lease § 14.34.  Yet as the Court now knows—although Southwest concealed the information from the public until after the hearing began, so it could not be specifically pleaded in the Counterclaim—United subleased the two gates it controlled to Southwest for *$120 million* **in addition to** a pass through of direct rental costs (which amount to roughly $3-4 million per gate over the remaining 13 years of the lease term).

In addition to violating the competition plan, Delta has properly alleged that the Southwest-United sublease was against the public interest and contrary to the grant assurances

because it granted Southwest a "near monopoly" at Love Field in exchange for "an obscene sum of money" that reflected the value to Southwest—at the public's expense—of squeezing competitor airlines out of the airport.  *Id.* ¶ 77.  "The interests of the traveling public are in more, not less, options from Love Field," and approving the lease that granted Southwest control over 90 percent of Love Field's gates, while excluding Delta, was precisely the type of discrimination the grant assurances prohibit.  *Id.* ¶ 80.  That is evident from the fact that the Department of Justice even advised the City that permitting Southwest to "dominate 90% of Love Field gates" would "deny[] consumers the benefits of meaningful competition at this facilities-constrained airport."  *Id.* ¶ 7.  The City's approval of the sublease thus betrayed the public interest, violated the grant assurances and the City's Competition Plan, and thereby breached Section 14.19.

### 4.    Delta Has Adequately Pleaded That It Suffered Damages.

To state a claim for breach of contract, Delta need only allege facts making plausible that it sustained damages as a result of the City's breach.  *See Mullins*, 564 F.3d at 418 (listing elements).  Contrary to the City's assertions (Mot. 22), it has plainly done so.  Delta has alleged that because of the City's breach, it has been relegated to entering into a series of short-term gate use license agreements on "economic terms" that are not compliant with DOT requirements and are "less favorable than the terms the City offered Southwest."  Countercl. ¶ 56.  If the City had instead forced accommodation as the lease agreements require, Delta would be operating under more economically favorable terms, as required by the City's competition plan and FAA policy. In addition, it would be operating without the uncertainty of business disruption and/or lost goodwill.  Moreover, Delta is currently able to operate only five flights per day from Love Field, whereas it could be operating an *additional eight* flights per day if the City had lived up to its obligations.  Accordingly, Delta has adequately alleged that the City's breach has caused it to suffer "actual damages in excess of $75,000."  *Id*. at 35 ¶ h.

### 5.     Delta Has Stated A Claim For Specific Performance.

Delta also has adequately pleaded that it is entitled to specific performance because "[t]here is no adequate remedy at law for the City's breach of the Lease Agreements, and damages would be inadequate compensation." Countercl. ¶ 118. "An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 106 (Tex. App. 2003). "A right to recover damages can . . . be an inadequate remedy" if "damages may be very difficult to calculate." *TCA Bldg. Co. v. Nw. Res. Co.*, 890 S.W.2d 175, 179 (Tex. App. 1994). That will prove to be the case here if this Court agrees that "'there are too many unknowns in future operations,'" and "'too many variables to . . . quantify the loss.'" *MW Petroleum Corp. v. Exxon Corp.*, No. 14-96-00040-CV, 1997 WL 634159, at *6 (Tex. App. Oct. 16, 1997). Moreover, Delta alleges that "disruption of its scheduled service" could "displac[e] . . . its traveling customers," resulting  in "irreparable harm to its business reputation and good will." Countercl. ¶ 56. A "loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable." *Block Corp. v. Nunez*, No. 08-cf-53, 2008 WL 1884012, at *6 (N.D. Miss. Apr. 25, 2008); *accord Hooters, Inc. v. City of Texarkana, Tex.*, 897 F. Supp. 946, 949 (E.D. Tex. 1995) ("[D]amages [that are] difficult to calculate . . . also include the loss of customer goodwill.").

The City suggests that Delta's claim for specific performance is inconsistent with its "damage claim for undetermined amounts in excess of $75,000." Mot. 23. But it is well established that "the Federal Rules do not prohibit the pleading of equitable relief alongside a claim for monetary remedy." *Adelphia Cable Partners v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D. Fl. 1999); *see also* Federal Rule of Civil Procedure 8(a)(3) ("[A] demand for . . . relief . . . may include relief in the alternative."). The "one-satisfaction rule," which the City invokes

(Mot. 23), does not change that result:  It merely "provides that a plaintiff is entitled to only one *recovery* for any damages suffered."  *City of McAllen v. Casso*, No. 13-11-00749-CV, 2013 WL 1281992, *15 (Tex. App. Corpus Christi March 28, 2013) (emphasis added).  Here, Delta is seeking *separate* recovery—damages for the aspects of harm it has suffered thus far from the City's breach of contract that are reasonably provable, and specific performance to prevent it from suffering continued quantifiable *and* non-quantifiable harm.

## III.    Delta Has Adequately Stated a Claim for Declaratory Relief.

### A.    This Court Should Exercise Jurisdiction Over Delta's Declaratory Claims.

There is no merit to the City's request that this Court exercise its discretion to dismiss Delta's declaratory-judgment claims because, according to the City, those claims are "fully duplicative and redundant of the City's claim for declaratory relief."  Mot. 6.  This Court should exercise jurisdiction over Delta's declaratory-judgment claims because those claims are meaningfully different from the City's claims and necessary to protect Delta's right to relief.

As a threshold matter, the City's request is pointless.  Granting this portion of the City's motion would accomplish nothing; one way or another, this case will require the Court to decide the scope of the City's accommodation obligation under the lease agreements.   "Even if the counterclaim were wholly redundant" with the City's claims (which, as explained below, it is not), "this Court may exercise its discretion by not dismissing the counterclaim."  *Astral Health & Beauty, Inc. v. Aloette of Mid-Mississippi, Inc.*, 895 F. Supp. 2d 1280, 1284 (N.D. Ga. 2012).  In the interest of judicial economy, the Court should exercise its discretion to pretermit its consideration of the portion of the City's motion that seeks dismissal on grounds of redundancy.

Moreover, dismissal at this stage would be premature.   Before "dismiss[ing] a counterclaim on the basis that it is redundant," the Court should consider "whether the declaratory judgment 'serves a useful purpose' by asking 'whether resolution of plaintiff's claim,

along with the affirmative defenses asserted by defendants, would resolve all questions raised by the counterclaim.'" *Centex Homes v. Lexington Ins. Co.*, No. 13-cv-719, 2014 WL 1225501, at *14 (N.D. Tex. Mar. 25, 2014). "[E]ven when [t]here is a high degree of congruence between Defendant's counterclaims and affirmative defenses," the Court "should consider potential qualitative differences between merely prevailing in Plaintiff's lawsuit, and receiving an affirmative declaration of rights to a declaratory judgment." *Id.* (quotation marks omitted). The rule permitting dismissal of redundant claims thus "applies only to claims that 'exactly correspond' such that resolution of one claim would entirely dispose of the other claim." *Stryker Corp. v. Ridgeway*, No. 13-cv-1066, 2014 WL 3704284, at *1 (W.D. Mich. July 24, 2014).

This Court should retain jurisdiction over Delta's declaratory-judgment claims because Delta seeks unique relief that is not fully encompassed by the City's complaint. Each of the City's declaratory-judgment claims seeks a declaration under *federal law*. *See* Compl. ¶ 114 (Claim II) (requesting declaration of the parties' rights "under WARA, title 49, and other federal law"); *id.* ¶¶ 118, 120, 122 (Claims III-V) (each requesting declaration of the parties' rights "under WARA, the Five Party Agreement, title 49 (including its Grant Assurances and Competition Plan) and other federal law"). Delta's declaratory-judgment claims, in contrast, also encompass the parties' state-law rights and obligations under the lease agreements.

Moreover, only Delta seeks a declaratory judgment that the City must reclaim two gates for common use as a remedy for the City's unauthorized approval of the United-Southwest sublease. Countercl. ¶¶ 93-100. The City's only argument for characterizing this claim as "redundant" is that "[i]f Delta is entitled to accommodation, it does not matter whether the gates are leased by United or subleased by Southwest." Mot. 6-7. But if the gates are dedicated to common use, other airlines can use them, and Delta could request further flights out of them.

Accordingly, a declaration that the gates must be dedicated to common use is dramatically different than any declaration the City seeks.

Even if the parties sought identical relief, exercising jurisdiction over Delta's declaratory-judgment claims would be warranted because those claims serve two useful purposes:  *First*, Delta's declaratory-judgment claims underlie Delta's claim to preliminary injunctive (and other) relief.  Delta has moved this Court for "a temporary restraining order and a preliminary injunction prohibiting Southwest during the pendency of this lawsuit from evicting Delta from Love Field . . . , expanding its flight operations on Love Field, or taking any other action that is inconsistent with Delta's right . . . to . . . accommodation at Love Field."  D.E. 23, at 45.  The absence of an affirmative claim may affect a litigant's right to seek preliminary relief.  But there is no need to explore this question when Delta *has* an affirmative claim it seeks to make.

*Second*, Delta's declaratory-judgment claims are necessary to protect Delta's right to relief in case the City's claims are later dismissed or resolved on grounds not applicable to Delta's claims.  For example, the parties each invoke subject-matter jurisdiction on distinct grounds:  Each alleges that its claims fall within this Court's federal question jurisdiction (*see* Countercl. ¶ 17; Compl. ¶ 10), but Delta's counterclaim against the City is also within this Court's diversity jurisdiction.  *Compare* Countercl. ¶ 18, *with* Compl. ¶¶ 10-16.  Retaining Delta's declaratory-judgment claims would ensure that this Court preserves subject-matter jurisdiction even if a barrier arose to federal question jurisdiction.

Dismissal would be especially inappropriate at this stage because the full import of these kinds of qualitative differences may not surface until developed at trial.  Because it is often "'very difficult to determine whether [a] declaratory judgment counterclaim really is redundant prior to trial,'" the "'safer course . . . is to deny the request to dismiss the counterclaim.'"

*Strickrath v. Globalstar, Inc.*, No. 07-cv-1941, 2008 WL 2050990, at *5 (N.D. Cal. May 13, 2008) (quoting 6 Charles Alan Wright, *et al.*, Federal Practice and Procedure § 1406).   "No possible harm can result from the delay." *Jungersen v. Miller*, 125 F. Supp. 846, 847 (N.D. Ohio 1954).   Even if "it may turn out at trial that a decision on the merits of [the City's complaint] will dispose of the controversy between the parties completely," it would be "error to strike out the counterclaim at so early a stage." *Leach v. Ross Heater & Mfg. Co.*, 104 F.2d 88, 91-92 (2d Cir. 1939).[5]

### B.  This Court Should Not Dismiss Delta's Challenge To The City's Approval Of United's Sublease.

The City separately seeks dismissal, for lack of standing and for failure to state a claim, of Delta's request for a declaration that the City violated the lease agreements when it approved United's sublease to Southwest.   Mot 7-9; Countercl. ¶¶ 93-100.   Delta alleges that granting Southwest preferential rights to more than 16 gates at Love Field effectively provides it with an exclusive right to the airport and, as the DOJ described it, destroying "meaningful competition" at Love Field.   Delta further alleges that the proper remedy for this exclusive rights violation is for Southwest to divest two gates, likely by allowing them to revert to the City for common use.[6] The City's declaratory relief claims include none of these issues.

The City challenges Delta's standing to assert these breaches because Delta purportedly has "[n]o private right of action . . . under title 49 as to grant assurances, competition plans, and

---

[5] The City's related argument that Delta's breach-of-contract claims should be dismissed as redundant (Mot. 7) is frivolous.  While the Declaratory Judgment Act confers some discretion to dismiss *declaratory-judgment claims, see Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-88 (1995), there is "no rule preventing the assertion of a counterclaim [for breach of contract] merely because the theory relied upon is the converse of that in the complaint."  *Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158, 1161-62 (E.D. Pa. 1978).

[6] Evidence developed at the preliminary injunction hearing suggests that another potentially appropriate remedy would be unwinding the sublease, and then finding that United has relinquished its rights by wrongfully giving them to Southwest, such that *United* must divest the gates to common use.  Yet another alternative remedy is that United simply must accommodate all 13 of Delta's requested flights after the sublease is unwound.

the limitations imposed by WARA." Mot. 7. But Delta does not seek to challenge the City's wrongful conduct under Title 49; Delta seeks to enforce its contractual rights as a third-party beneficiary to the lease agreements. As explained above, Delta has standing as a third-party beneficiary to challenge the City's breach of the leases, including of the leases' incorporation of federal law, the grant assurances, and the Competition Plan. *See* Part II.C.1.c.[7]

Finally, the City argues that "Delta cannot assert that the rights under the leases are terminated" as a result of the City's approval of the sublease while "seek[ing] to likewise enforce" the same leases' accommodation provisions. Mot. 9. But Delta does not argue that all of the leases are terminated. If the City reclaims two gates for common use—as Section 4.06(E) requires it to do because it has breached Section 14.19 by approving the United-Southwest sublease—the lease agreements will remain in effect with respect to the remaining preferential-use gates, and the City can, and must, accommodate Delta's requests under those remaining leases if Delta is not able to fly 13 flights from the common use gates. And in any event, under Federal Rule of Civil Procedure 8(a)(3), Delta's "demand for . . . relief . . . may include relief in the alternative." *See also id.* Rule 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Delta can therefore allege, in the alternative, that either the City's lease agreements remain in force as to all current preferential-use gates, or some of those gates must be reclaimed for common use.

## CONCLUSION

The Court should deny the City's motion to dismiss.

---

[7] The City also argues, on several meritless grounds, that Delta has failed to state a claim because "Delta's pleadings do not allege a legal basis by which [the sublease parties'] rights should cease, terminate, or expire." Mot. 9. But the legal basis for that claim—namely, Section 4.06(E) of the lease agreements—is clearly outlined in Delta's counterclaims, Countercl. ¶¶ 94, 96-98, and not meaningfully disputed by the City. The City also complains that Delta "has not named" United and Southwest as parties to its counterclaim. Mot. 9. But Delta separately brought cross-claims against Southwest and United.

DATED:  October 23, 2015

Respectfully submitted,

*/s/ William B. Dawson*
William B. Dawson
Karl G. Nelson
Ashley E. Johnson
Russell H. Falconer
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201-6911
Telephone:  (214) 698-3100
Facsimile:  (214) 698-3400

Kenneth P. Quinn
Jennifer E. Trock
PILLSBURY WINTHROP SHAW PITTMAN
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8898

ATTORNEYS FOR DELTA AIR LINES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2015, a true and correct copy of the foregoing document was served via email upon all counsel of record.

/s/ William B. Dawson
William B. Dawson

.