IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-2069-K |
| | § | |
| DELTA AIRLINES, INC., SOUTHWEST | § | |
| AIRLINES CO., VIRGIN AMERICA | § | |
| INC., AMERICAN AIRLINES, INC., | § | |
| UNITED AIRLINES, INC., SEAPORT | § | |
| AIRLINES, INC., UNITED STATES | § | |
| DEPARTMENT OF | § | |
| TRANSPORTATION, and THE | § | |
| FEDERAL AVIATION | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The Court is asked by Plaintiff City of Dallas, Defendant Southwest Airlines Co., and Defendant Delta Air Lines, Inc. to grant a preliminary injunction, each party requesting different relief. The following motions are before the Court: (1) Defendant Southwest Airlines Co.'s Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction Against Delta Air Lines, Inc. (Doc. 10); (2) Plaintiff City of Dallas' Verified Cross-Motion for [Temporary Restraining Order] (Doc. No. 20); and (3) Defendant Delta Air Lines, Inc.'s Emergency Motion for a Temporary Restraining Order and a Preliminary Injunction

1

Against Southwest Airlines Co. (Doc. No. 22).   The Court held an evidentiary hearing ("injunction hearing") on these pending motions for injunctive relief on September 28-30, 2015.   The Court has carefully considered the motions, the responses, the replies, supporting appendices, pleadings, applicable law, and evidence offered at the injunction hearing.   Because the equitable factors related to injunctive relief weigh heavily in favor of Delta and not Southwest, the Court hereby **GRANTS** Delta's motion for preliminary injunction and **DENIES** the motion for injunctive relief filed by Southwest.   The City requests any one of several alternative forms of injunctive relief including the relief requested by Delta.   Because the equitable factors also weigh in favor of the City, the Court **GRANTS** the City's motion.

## I.      Factual and Procedural Background

<u>History of Love Field and The Wright Amendment</u>

Love Field Airport ("Love Field") was originally constructed as a United States Army airbase during World War I.   Plaintiff City of Dallas ("City") has owned and operated Love Field since 1928.   In the 1960s, the federal government ordered the cities of Dallas and Ft. Worth to designate one airport from which federally regulated air carriers could serve both cities.   The cities were unable to agree on the designation of either Love Field or the airport in Ft. Worth as the airport to serve both cities.   But the cities did agree to construct a new airport, Dallas-Ft. Worth International Airport ("DFW Airport"), which ultimately opened in 1974.   Every federally certified airline then operating at Love Field and the Ft. Worth airport agreed to relocate their

2

operations to DFW Airport.  At that time, Defendant Southwest Airlines Company ("Southwest") flew only within the State of Texas, so it was not a federally certified air carrier.  Although the other airlines left Love Field, Southwest continued its Texas-only flight operations from Love Field.

With the enactment of the Airline Deregulation Act of 1978, Southwest announced plans to expand its Love Field flight operations to airports outside of Texas.  In response to that announcement and in an effort to protect the development of DFW Airport, Congress passed the Wright Amendment in 1979; named for Jim Wright, a congressman from Ft. Worth who was later Speaker of the House.  The Wright Amendment restricted interstate flights from Love Field to Louisiana, Arkansas, Oklahoma and New Mexico, the four states surrounding Texas. In several later amendments to the Wright Amendment, direct service from Love Field to Alabama, Kansas, Mississippi and Missouri was allowed.  During this time of restricted flight operations, other air carriers moved in and out of Love Field, but Southwest remained.

<u>Reforming and Repealing the Wright Amendment</u>

At the suggestion of Congress in 2006, Dallas and Ft. Worth began working on a recommendation for a long-term solution to the Wright Amendment's flight restrictions at Love Field.  The result was an agreement entered into between the City of Dallas, the City of Ft. Worth, DFW Airport Board, Southwest, and Defendant

American Airlines ("American") on July 11, 2006 ("Five Party Agreement"). Important terms of the Five Party Agreement include the following:

1. A reduction in the total number of gates at Love Field from 32 to 20.

2. A prohibition of the subdivision of a gate in any form, including the use of hardstands which permit an airline to "ground load/unload" their passengers.

3. The allocation of 16 "preferential use" gates to Southwest, two "preferential use" gates to American, and two "preferential use" gates to ExpressJet Airlines, Inc..

4. A limitation on flight operations to the hours of 6:00 a.m. to 11:00 p.m.

5. A prohibition of international flights originating from Love Field.

In addition to these terms, the Five Party Agreement refers to the possibility of a new entrant airline seeking space to operate at Love Field under the new gate limitations:

> To the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas' existing lease agreements.

The Five Party Agreement does not define the term "preferential use" even though it is used in that agreement. At the time of the Five Party Agreement, three airlines had Lease Agreements with the City to use Love Field gates and space. (These airlines with Lease Agreements are referred to herein as "Signatory Airlines".) Unlike the

4

Five Party Agreement, the Lease Agreement does define the term "preferential use" as meaning the Signatory Airline has primary, but not sole, use of the leased space.

After the Five Party Agreement was formalized, the parties presented their agreement to Congress as the collaborative local effort for reforming and/or repealing the Wright Amendment.  Several, though not all, provisions of the Five Party Agreement were ultimately incorporated into the Wright Amendment Reform Act ("WARA"), which officially repealed the Wright Amendment when it was adopted on October 13, 2006; but maintained the long-distance flight restrictions from Love Field for eight more years until October 2014.  Just as in the Five Party Agreement, WARA addressed new entrant airlines needing space to operate at the now gate restricted Love Field, specifically providing that, "[t]o accommodate new entrant air carriers, the city of Dallas shall honor the *scarce resource provision* of the existing Love Field leases."  (Emphasis added.)  The substantive provisions regulating flights in and out of Love Field were incorporated into WARA.  The provisions of the Five Party Agreement which were not incorporated into and adopted by WARA are simply contractual obligations between the five parties that are independent of WARA, and do not include Delta.

### Post-WARA Changes

Certain changes to the original preferential gate assignments have occurred since the Five Party Agreement was entered into and WARA was enacted.  There were three airlines which entered into Lease Agreements with the City for "preferential

use" of the 20 gates at Love Field—ExpressJet Airlines, Inc. ("ExpressJet"), American, and Southwest.  In 2008, the ExpressJet gates were acquired by Continental Airlines, and then by Defendant United Airlines, Inc. ("United") as part of its merger with Continental.  With the merger, United became obligated as a successor to a Signatory Airline regarding all obligations under the Lease Agreement for those two gates. American is still a Signatory Airline, but in May 2014, Defendant Virgin America, Inc. ("Virgin") subleased American's two gates pursuant to a federal divestiture order related to the American and U.S. Airways merger which began in 2013 and was approved in 2014.  This action effectively removed American Airlines from flying out of Love Field.  (Southwest and Delta both sought those two American gates during the divestiture proceedings and both were rejected by the Department of Justice and the federal court.)  Virgin then entered into a gate usage agreement with Defendant Seaport Airlines allowing it to operate two flights daily from Virgin's two gates. Southwest continues to have a Lease Agreement with the City for preferential use of 16 gates.

<u>Terms and Provisions of the Lease Agreement</u>

The terms of each Lease Agreement for gates between the City and the respective Signatory Airline are essentially identical, according to the City.  The Signatory Airline has either exclusive use or preferential use of its leased space at Love Field, as described in the Lease Agreements.  "Exclusive use" pertains to that leased space that the Signatory Airline has the sole right to use.  "Preferential use", on the other hand,

6

applies to those leased spaces where the Signatory Airline is considered the primary, but not sole, user.  Under each Lease Agreement, no Signatory Airline has exclusive use of any gate, only preferential use.  There is exclusive use leased space at Love Field; but, there are no exclusive use gates at Love Field.

Just as both the Five Party Agreement and WARA recognized the limitations created by the gate restrictions, each Lease Agreement addresses the possibility of Love Field facilities becoming a "scarce resource".  The Lease Agreement anticipates a new entrant air carrier ("Requesting Airline") may seek to provide service at Love Field with the new gate restrictions.  Recognizing the need for "open access and uniform treatment", the Lease Agreement goes further and provides a procedure in Section 4.06F when accommodation is sought by a Requesting Airline.  This procedure requires the Requesting Airline first exhaust all reasonable efforts to secure a *voluntary* arrangement for accommodations from each Signatory Airline.  If the Requesting Airline's attempt for voluntary accommodation fails, then the City's Director of Aviation ("Director") will notify each Signatory Airline that if a voluntary accommodation is not made within the 30-day time frame under each Lease Agreement, the Director will select one of the Signatory Airlines to fulfill the accommodation request.  Notice will then be sent to the selected Signatory Airline which will have 10 days to comment on or dispute the Director's choice.  The Signatory Airline must accommodate the Requesting Airline unless the Director

rescinds his selection.   The accommodation procedure does not specify options or remedies the Requesting Airline might have if the Director rescinds his selection.

<u>Delta's First Accommodation Request</u>

Beginning July 2009, Delta entered into a month-to-month sublease with American for partial use of its two gates, which allowed Delta to begin service from Love Field.  Delta enjoyed uninterrupted service from Love Field under this month-to-month arrangement.  But Delta's service was placed in jeopardy when its month-to-month sublease with American was set to end on October 12, 2014, the effective date of American's divesting sublease with Virgin for those two gates.  Delta began contacting the Signatory Airlines, as well as Virgin, on June 13, 2014, to request voluntary accommodation for its five daily flights, but that effort was unsuccessful.  In a letter dated July 16, 2014, Delta requested the City initiate the mandatory or forced accommodation procedure set forth in each Lease Agreement with the Signatory Airlines.  Following Section 4.06F, Mr. Mark Duebner ("Mr. Duebner"), Director of the City's Department of Aviation, notified the Signatory Airlines that unless Delta was accommodated within 30 days, Mr. Duebner would select one Signatory Airline to comply with the accommodation order.   On September 18, 2014, Delta informed Mr. Duebner in a letter that no accommodation had been made even though the 30-day deadline had passed.  Delta emphasized the urgency of the situation with American terminating its agreement with Delta effective October 12, 2014.  Delta also reminded Mr. Duebner that "the Department of Aviation has

previously assured us that we would be accommodated, and we are relying on that commitment."   With no sublease or voluntary or forced accommodation in place, Delta entered into temporary gate usage agreements with different air carriers at Love Field at various points in time to ensure continued service, all while reasserting its accommodation request to the City.

During this time, United was operating only seven daily flights out of its two leased gates.  On September 19, 2014, Mr. Duebner notified United in a letter that the City selected United to accommodate Delta on one of its gates.  Mr. Duebner stated that the City's decision was based on United's actual gate usage at that time and he told United that the accommodation must be made within 30 days.  The day before that notification, on September 18, 2014, United entered into a gate usage agreement with Southwest for its use of United's two gates only for overflow purposes or irregular operations; United continued to operate its flights from both gates.

On September 23, 2014, Mr. Bob Montgomery ("Mr. Montgomery"), Vice President of Airport Affairs for Southwest, sent a letter to Mr. Duebner disputing and disagreeing with the City's decision to force United to accommodate Delta on these two gates Southwest had contracted to use for overflow or irregular operations.  To bolster Southwest's argument, Mr. Montgomery pointed to Southwest's recent gate usage agreement with United, Southwest's own desire and intent to "ramp up" its flight operations, and his interpretation of the Lease Agreement language providing only an accommodation process for requests, but not an actual requirement of the

Signatory Airline to accommodate.  The next day, September 24, 2015, Southwest

CEO Mr. Gary Kelly emailed Mr. AC Gonzalez, City Manager, that Southwest was

not happy with the City's decision:

> It has come to my attention that once again, as recently as this week, [the City] has taken steps to frustrate and impede Southwest Airlines' growth and success.  Further, the [C]ity has acted in a manner that again puts us in adverse positions legally.
>
> The 43-year history of Southwest Airlines has been a constant struggle to overcome [sic] with the City of Dallas.
>
> If anyone from the City Manager's Office or the Aviation Dept. had attended the program we hosted for Dallas leaders two weeks ago at our $100 million+ new training and operations center, they would have learned that Southwest, based on 2013 accumulated data:
>   --generated over $4 billion in local economic activity
>   --contributed $2 billion to the Dallas area GDP
>   --aided in the creation of over 22,000 jobs
>   --paid $1 billion in salaries, wages, and benefits to 8,000 Dallas area Employees
>   --paid $42 million in taxes in the Dallas area
>   --supported 428 local civic and charitable organizations with cash and/or free travel
>
> All of the above has been accomplished without financial incentives or tax abatements asked for or offered.  In return, Dallas has, by choice—not necessity, elected to reward competitors that have contributed nothing to Dallas while denying Southwest the opportunity to grow from Dallas Love Field, the airport [Southwest] first saved from elimination by the [C]ity and then [Southwest] rebuilt at no cost to the city.
>
> We thought that after working so hard to resolve the historic dispute between Dallas and Ft. Worth over our airports and then investing so massively to reinvent Love Field that we were finally past these acrimonious hardships with our hometown.  After 43 years of this, we have 'Dallas fatigue.'  We are moving on to focus

our corporate investments in those markets that place a value on them and their corporate residents.

On September 26, 2014, United sent a letter to the City objecting to the City's requirement that United accommodate Delta. United stated both of the gates would be fully utilized as of October 13, 2014, pointing to United's flight operations and the recent gate usage agreement with Southwest for overflow or irregular operations on those gates. United said that Delta could not be accommodated and asked the City to rescind its directive. On September 27, 2014, Southwest offered $120 million cash consideration for the preferential use of both United gates at Love Field, which was accepted by United on September 29, 2014. The City acquiesced to Southwest's demands on September 29, 2015, and decided to rescind the September 19 accommodation order to be implemented by United. In a letter dated September 29, 2014, the City notified Delta that it could no longer be accommodated on United's gates because of United's recently provided flight schedules which included the new gate usage agreement between Southwest and United.

<u>Delta's Second Accommodation Request</u>

Section 4.06F provides no options or alternatives for a Requesting Airline in the case of the Director rescinding his selection. After the City rescinded its original September 19 accommodation directive to United, Delta made a second request for forced accommodation with the City. Delta sent Mr. Duebner a letter dated October 2, 2015, asserting that the City had "obligations under Section 4.06 of the [Lease

Agreement], the Five Party Agreement, the City's recent promise to accommodate Delta, its commitment in its Airline Competition Plan filed with the [FAA]. . ., its Airport Improvement Program grant assurances, and Federal law" to act on Delta's accommodation request and designate a Signatory Airline to share its gate space with Delta on a more permanent basis.  The City began another accommodation process on December 1, 2014, and sent a letter to Virgin, United and Southwest stating that Delta's accommodation request had triggered the formal accommodation process set out in Section 4.06F.  The City stated that if none of the Signatory Airlines would voluntarily accommodate Delta, the City would choose one to accommodate Delta. None of the Signatory Airlines offered to voluntarily accommodate Delta in response to that letter.

<u>The City Asks DOT for Guidance on Accommodation Request</u>

On December 8 and 11, 2014, the City contacted Defendant Department of Transportation ("DOT") by phone for help and guidance on how to handle air carrier access at Love Field, specifically as it related to Delta's accommodation request.  The DOT responded with a letter dated December 17, 2014, outlining what the DOT understood the City's obligations to be regarding competition at Love Field. Specifically, the DOT stated that the City had legal obligations to accommodate Delta, which included the City's obligations under the federal Competition Plan statute and also the grant assurances the City made in relation to grants under the Airport Improvement Program.    The DOT emphasized the importance of

12

accommodating a requesting airline and ensuring competition at this "constrained" airport. As for the length of any accommodation, the DOT's position was that an accommodated airline "is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights."

### Southwest's Sublease of United's Two Gates Takes Effect

Although none of the Signatory Airlines agreed to voluntary accommodate Delta after Mr. Duebner's December 1 letter, the City chose not to select any of the airlines to comply with the accommodation request, even though that accommodation is required under Section 4.06F2: "[T]he Director will notify all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of the notice, the Director *will select one of the Signatory Airlines to comply with the request for accommodation* in a non-discriminatory manner." (Emphasis added.) Then on January 28, 2015, Southwest entered into a Sublease Agreement with United for Southwest's preferential use of United's two gates, which formalized the $120,000,000 deal agreed to on September 29. The United Lease Agreement with the City required the City to approve any sublease before that sublease could take effect. On January 28, the City consented to that Sublease Agreement between United and Southwest.

### The City Seeks DOT Guidance a Second Time

Although the City refused to select a Signatory Airline to accommodate Delta, Mr. Peter Haskell, the Assistant City Attorney, emailed the DOT on February 26, 2015,

asking for further guidance on the City's federal and legal obligations and also the proper duration for Delta's requested accommodation.  The DOT sent another letter to the City on June 15, 2015, again explaining the DOT's interpretation of the City's obligations.  The DOT reiterated that the grant assurances and the Competition Plan statute both require the City to accommodate a requesting airline if a voluntary accommodation cannot be arranged.  The DOT also stated that "the City is required to accommodate a requesting carrier unless Love Field's facilities are fully-utilized at the time of the request, or the signatory carriers at the time of the request are selling tickets for future flights fully-utilizing the facilities."   The DOT specifically noted that the City should not consider a Signatory Airline's unscheduled future expansion plans because it "may give a signatory carrier the ability to block a competitor's accommodation request by deciding or asserting, after a request is made, that it will expand service."   Finally, the DOT restated its position on the length of accommodation, which is that "once accommodated at Love Field, 'the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights' and that 'the accommodated carrier should not be pushed out by incumbent carriers at a later date.'"   The DOT concluded its response with a reminder that it is the City's responsibility to decide how to act on Delta's request.

14

<u>City of Dallas Files This Lawsuit—"Tell Us What to Do!"</u>

Ultimately, none of the Signatory Airlines (meaning an airline having a Lease Agreement with the City for use of Love Field space and gates) or Virgin (having a Sublease Agreement with American) offered to voluntarily accommodate Delta and the City refused to force an accommodation choosing not to follow the guidance the City solicited from the DOT.  Delta continued to operate flights from Love Field under a temporary gate usage agreement with United to use one of its preferential use gates for 180 days to operate Delta's five daily flights; Southwest offered to honor the temporary 180 day gate usage agreement after the effective date of the Sublease Agreement.  This temporary gate usage agreement was set to expire on July 6, 2015. As the expiration date loomed closer, Southwest rejected Delta's requests to extend it. Continuing to press the accommodation request with the City, Delta told the City it would refuse to cease operations at Love Field on July 7, 2015, because it had a right to accommodation.  In an attempt to avoid what it says would be potential chaos at Love Field beginning July 7, 2015, the City filed this lawsuit on June 17, 2015, seeking declaratory relief related to, among other things, its legal obligations and rights with respect to the Five Party Agreement, WARA, the Lease Agreements and federal regulations and laws affecting Love Field; essentially the City is asking this Court to "Please tell us what to do."  On June 19, 2015, Southwest filed the pending Verified Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction Against Delta.  The City filed the pending Cross-Motion for

TRO [sic] on June 23, 2015.  On the same date, Delta filed the pending Emergency Motion for a Temporary Restraining Order and a Preliminary Injunction Against Southwest.

Taking into account the complexity of this case and the importance of this matter to the citizens of Dallas and the Metroplex, the Court urged the parties to come to a temporary agreement related to Delta's gate usage at Love Field in order to allow the parties adequate time to brief the injunctive relief requests and responses, as well as allow the Court time to conduct a hearing.  Southwest and Delta reached a temporary gate usage agreement whereby Southwest would permit Delta to continue operating its five flights daily until the Court rules on the pending motions for injunctive relief.  The Court conducted a three-day hearing on the motions on September 28-30, 2015.

## II.   Legal Standard

 "'The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits.'"  *Serna v. Tex. Dept. of State Health Services, Vital Statistics Unit*, No. 1-15-CV-446-RP, 2015 WL 6118623, at 13 (W.D. Tex. Oct. 16, 2015) (quoting *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 560 (5th Cir. 1971)).  To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors:   (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the

16

movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *see also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (quoting *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009)). Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has "'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water*, 577 F.3d at 253 (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)). Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). Any factual findings and/or conclusions of law the Court makes herein are not binding at a trial on the merits. *Jonibach Mgmt. Trust v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 491 (5th Cir. 2014).

## III.   Analysis

At this juncture, the Court is only concerned with the need for immediate relief pending a trial on the merits.

### The City's Request

The City moves for injunctive relief in the form of the Court granting either the relief requested by Southwest, or alternatively, the relief requested by Delta, or further in the alternative, the Court limiting both Southwest's and Delta's flight

17

operations in order to prevent double-booking and limit interference with gate rights. The City takes no position on precisely what the injunctive relief should be. The City simply moves for some sort of injunctive relief, whatever the Court determines that to be, while the legal issues are decided.

### Delta's Request

Delta seeks injunctive relief against Southwest to "freez[e] the status quo . . . allowing Delta to continue operating its limited schedule of five daily flights . . . pending final resolution of this proceeding." Delta specifically asks the Court to issue a preliminary injunction prohibiting Southwest from (1) evicting Delta from its gate(s) at Love Field, (2) expanding its flight operations at Love Field, or (3) any other action inconsistent with Delta's right to long term accommodation.

### Southwest's Request

Southwest seeks injunctive relief against Delta to protect "Southwest's property rights and to protect the rights of the flying public." Specifically, Southwest seeks a preliminary injunction prohibiting Delta from trespassing on Southwest's gates at Love Field after the expiration of the temporary gate usage agreement.

**A. Delta's Motion for Preliminary Injunction**

1. Likelihood of Success on the Merits

In establishing a "substantial likelihood of success", the movant "is not required to prove [his] entitlement to summary judgment" for purposes of preliminary injunction. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009); *see also*

*Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011).  The district court "look[s] to 'standards provided by the substantive law'" to determine likelihood of success on the merits.  *Janvey*, 647 F.3d at 596 (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).

At the time Delta filed its motion, it had not yet filed an answer or any counter- and/or crossclaims.  At the time of the injunction hearing, Delta had filed its amended cross-claims against Southwest seeking or asserting:  (1) a declaratory judgment that the Sublease Agreement between United and Southwest violated the Lease Agreements; (2) a declaratory judgment that Delta is entitled to be accommodated; (3) a claim for breach of the Southwest Lease Agreement; and (4) a claim for tortious interference with the United Lease Agreement.  The Court need only consider whether Delta has a likelihood of success on the merits of one of its claims.  *See Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, Civ. No. 3:01-CV-306-D, 2001 WL 540213, at *1 (N.D. Tex. May 17, 2001)(Fitzwater, J.).

To establish a breach of contract claim under Texas law, the party must prove: (1) the existence of a valid contract; (2) that the [party] performed or tendered performance; (3) that the other party breached the contract; and (4) that the party was damaged as a result of the breach.  *Cordero v. Avon Products., Inc.*, No. 15-40563, 2015 WL 6530721, at *2 (5th Cir. Oct. 29, 2015).  A party must establish its privity to the contract or its status as a third-party beneficiary in order to sue for breach of contract.  *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 756-57 (Tex.App.—Ft.

19

Worth 2012).   Delta's breach of contract claim is based on the Lease Agreement entered into by the City and Southwest.   Because Delta is not a signatory to the Lease Agreement, the Court must determine as a threshold matter that Delta has standing as a third-party beneficiary to enforce the Lease Agreement.

a.   Is Delta a Third-Party Beneficiary?

Texas courts have traditionally "presumed that a party contracts only for its own benefit and have therefore maintained a presumption against third-party beneficiary agreements."   *Id.* at 757.   Unless there is clear and unequivocal representation that the contracting parties intended to directly benefit a third-party, courts will not infer such intent in order to confer third-party beneficiary status. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).   The contract does not need to specifically name the third-party, but it must adequately describe or designate the third-party.   *Maddox*, 361 S.W.3d at 757.   A third-party beneficiary is either a donee beneficiary or creditor beneficiary.   *Id.*   When the completed contracted performance comes to the party as a pure donation, that party is a donee beneficiary.   *Id.* (citing *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). When the contracted performance satisfies a duty or legally enforceable commitment owed to the party by the promisee, the party is considered a creditor beneficiary.   *Id.* A party is not a third-party beneficiary if it simply benefits incidentally from the contract.   *Maddox*, 361 S.W.3d at 757.

20

Delta contends that a "new entrant airline" is an intended, contemplated, and/or third-party beneficiary of the Lease Agreement between the Signatory Airline and the City.  Delta contends that its request for voluntary accommodation from Southwest, beginning in June 2014, satisfied Delta's obligations as a "new entrant airline" or "Requesting Airline" under Section 4.06F.  Delta, the City and Southwest disagree as to the exact definition of "new entrant airline".  The Five Party Agreement, WARA, and the Lease Agreement do not define "new entrant airline". The Court must first define "new entrant airline" before it can address the third-party beneficiary analysis.

i.   "New Entrant Airline" Defined

Delta defines "new entrant airline" as any airline that is not a Signatory Airline in a Lease Agreement with the City.  Southwest defines "new entrant airline" as an airline that does not currently operate at Love Field.  The City does not offer a definition, but instead asks the Court to define it.  The Lease Agreement uses the term "new entrant airline" in Section 4.06F interchangeably with "Requesting Airline", but the Lease Agreement does not define "new entrant airline".  The Lease Agreement does define "Requesting Airline" in Section 1.50, but the definition is limited, stating only that the term has the meaning given to it in Section 4.06F.  The Lease Agreement provides in Section 4.06F:

> Airline and City agree that although most of the airline areas
> in the Terminal Building [at Love Field] are or will be leased to
> Signatory Airlines for their exclusive or preferential use, and

21

Terminal Building facilities [which includes gates] at the Airport may become a *scarce resource* if a new entrant airline ("Requesting Airline") requests to provide service at the Airport.  In such circumstances, Airline agrees to accommodate such Requesting Airline as its Leased Premises at such times that will not unduly interfere with its operating schedule and upon such reasonable terms as may be agreed upon between Airline and the Requesting Airline[], taking into consideration all the circumstances of such an accommodation agreement. . . .  To insure compliance with this obligation and to provide open access and uniform treatment for all airline tenants, the following [accommodation] procedure is established. . . .

By signing the Lease Agreement which contains this language, all parties acknowledge the potential scarce resources at Love Field.  The language is clear that the purpose of the accommodation procedure is to insure there would be open access for an airline requesting accommodation for gate space at Love Field in light of the gate limitations and overall constraints which the parties all recognized.  The language discusses the potential scarcity of Love Field facilities because most "are or will be leased to Signatory Airline for their exclusive or preferential use".  Because of this, the Signatory Airline agrees to provide space to a new entrant airline seeking to provide service at Love Field.  There is no language limiting the new entrant airline to one not currently operating at Love Field.  The Lease Agreement language does not limit the parties' accommodation obligation to an airline not currently operating at Love Field.  Such a narrow construction of "new entrant airline" is unreasonable and too restrictive in light of the language of section 4.06F of the Lease Agreement.  The Court agrees with Delta's proposed definition of "new entrant".  Although the Lease

Agreement language is not artfully drafted, the Court finds "new entrant airline" to mean any airline that is not a Signatory Airline in a Lease Agreement with the City and an airline needing space at Love Field to provide service.

   ii.   Is Delta Able to Bring Breach of Contract Claim as a "New Entrant Airline"?

Having defined "new entrant airline", the Court now turns to whether Delta, as a "new entrant airline", can be a third-party beneficiary to the Lease Agreement and bring its breach of contract claim.  The Court finds Delta is a creditor beneficiary because the duty owed to Delta is a contractual obligation or some other legally enforceable commitment under the Lease Agreement.  *See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002).    Section 4.06F specifically provides that when an accommodation request is made, Southwest as the Signatory Airline agrees to accommodate the "Requesting Airline", here Delta, at times that would not unduly interfere with Southwest's schedule.  This agreement by Southwest satisfies a duty or legally enforceable commitment owed to Delta once Delta made that accommodation request in compliance with section 4.06F.  The Court finds the Lease Agreement is clear and unequivocal that the City and the Signatory Airlines intended to directly benefit a "new entrant airline" or "Requesting Airline", in this case Delta, with this accommodation provision.  *See Tawes*, 340 S.W.3d at 425.

Delta would not simply benefit incidentally from the accommodation provision.  *See Stine*, 80 S.W.3d at 589.  The parties drafted an accommodation

procedure that would be triggered upon a request from a "new entrant airline" and this was incorporated into the Lease Agreement.  The purpose of that procedure is explained in the Lease Agreement as providing a "new entrant airline" access to scarce space at Love Field.  Obviously, the Lease Agreement does not specifically name Delta as a beneficiary, but it does adequately describe or designate Delta by use of the term "new entrant airline" or "Requesting Airline".  *See Maddox*, 361 S.W.3d at 757.  If the City and Southwest as parties to the Lease Agreement did not intend for a "new entrant airline" to have the right to enforce this section, there would be no other way for the accommodation procedure to work and no remedy for the "new entrant airline" should the City and/or Southwest not comply with their agreement. There is no reasonable interpretation of this accommodation provision other than that the "new entrant airline" is in fact the only intended beneficiary.  Otherwise, this is superfluous language because no one benefits from this provision.  The Court finds at this preliminary stage that Delta has standing to bring its breach of contract claim against Southwest as a third-party beneficiary.

### b.  Did Southwest Breach the Lease Agreement?

The Court now turns to Southwest's alleged breach of the agreement.  To establish a substantial likelihood of success on the merits of its breach of contract claim, Delta must to prove:  (1) the existence of a valid contract; (2) that Delta performed or tendered performance; (3) that Southwest breached the contract; and (4) that Delta was damaged as a result of the breach.  *See Cordero*, No. 15-40563,

24

2015 WL 6530721, at *2.   There is no dispute that a contract, the Lease Agreement, exists and the Court has already determined Delta is a third-party beneficiary, so the first factor is established.   As for Delta's performance, the record establishes that Delta performed its obligation under the accommodation procedure in section 4.06F by contacting all Signatory Airlines and any airline subleasing gate space from a Signatory Airline beginning June 13, 2014, to try to secure voluntary accommodation.

Section 4.06F provides that the Signatory Airline "agrees to accommodate such Requesting Airline at its Lease Premises at such times that will not unduly interfere with its operating schedule."   The Lease Agreement does not define "unduly interfere with".   The Court finds it very interesting that former Mayor Laura Miller testified about this exact phrase in the Lease Agreement at the Congressional subcommittee hearing on reforming the Wright Amendment Act.   In response to a subcommittee member's question about the meaning of the undefined and "vague" term "unduly interfere with", Ms. Miller testified:

> Well it was crafted by the Dallas City Attorney's Office and we understand, since it has never been tested, we have never had a conflict; that *we should, if we are responsible, create a very clear policy using this as the template for how we are in real terms going to be executing this*.   This [term] gives us the authority to tell [a Signatory Airline], you have to make room.   But I think that like other airports like you cited that have this issue of capacity, *we need to have a very clear policy in place so that the tenants have a clear expectation for how its going to work when the director say we shall make room for [a Requesting Airline] and this is how we are going to do it.*

Ex. 631, p. 0052.   As we now know, the City wholly failed to craft any policy, let alone a clear one, setting forth how the accommodation procedure and process would work in reality.   This "vague language about 'unduly interfere with'" was drafted by the City itself and was noted by at least one concerned subcommittee member of contributing to "Southwest [being] in the catbird seat".   And worse, then Mayor Laura Miller acknowledged the need for the City, "*if we are responsible, [to] create a very clear policy . . . for how we are in real terms going to be executing this.*"   Now in this case, the Court is asked to follow through with what the City should have done years ago.

### i.   "Unduly Interfere With" Defined

The Court concludes, for purposes of this preliminary injunction, that "unduly interfere with" in section 4.06F means the requested flight accommodation can fit within the Signatory Airline's existing published schedule, at the time the accommodation request is made, without causing the Signatory Airline's existing schedule to reach maximum usage.   The evidence establishes that Southwest considers maximum usage or "full utilization" of gates at Love Field to be 10 flights daily per gate.   The Court finds Delta provided evidence that, at several points in time after its initial accommodation request in June 2014, Southwest was able to accommodate Delta's five daily flights on Southwest's 16 gates without unduly interfering with Southwest's existing operating schedule.

At the time of the Delta's original accommodation request in June 2014, Southwest was flying approximately seven flights daily out of 16 gates.   The evidence

26

shows that as of October 1, 2014, prior to the repeal of the Wright Amendment, Southwest operated 118 flights daily out of 16 gates, approximately seven flights daily per gate.  That flight schedule would certainly have permitted accommodation of Delta's five flights daily without reaching Southwest's interpretation of "full utilization" as 10 flights daily from each gate.  The Court recognizes this was before the lifting of domestic flight distance restrictions and Southwest planned to increase its flight operations.  Even if the Court considers Southwest's post-WARA increased flight operations schedule, there was room in Southwest's schedule to accommodate Delta.  The evidence shows that Southwest was operating 149 flights daily out of 16 gates as of November 3, 2014.  That is nine flights daily per gate.  Once the Sublease Agreement between United and Southwest took effect at the end of January 2015, Southwest was operating 153 flights daily out of 18 gates or 8.5 flights daily per gate. It was not until February 26, 2015, that Southwest announced it was increasing flight operations to 180 flights daily out of 18 gates beginning August 9, 2015. Southwest's claim that Delta's five flights daily unduly interferes with Southwest's operations is simply not supported by the evidence.  Up until its announcement on February 26, 2015 of increased flight operations, the evidence establishes that Southwest was able to accommodate Delta without "unduly interfering with" Southwest's own operations.

Taking the Court's definition of "unduly interfere with" into consideration, Southwest could have voluntarily accommodated Delta's five flights without unduly

interfering with Southwest's schedule when the initial request was made in June 2014.  Southwest's schedule still allowed for accommodation of Delta's five flights without undue interference if the Court were to consider Southwest's schedules at each of the following points in time:  June 13, 2014, November 3, 2014, and January 28, 2015.  Southwest did not announce plans to increase its flight operations to 180 flights daily out of 10 gates until February 26, 2015.  It was not until August 2015, over one year after Delta's first voluntary accommodation request in June 2014, that Southwest's increased operating schedule actually reached "full utilization" of 10 flights daily from each gate.

Under the Lease Agreement, preferential use of airport facilities means the Signatory Airline is the primary, but not sole, user.  Exclusive use means the airline has the sole right to use the space.  There are no exclusive use gates at Love Field. Southwest has preferential use of the gates it leases from the City and subleases from United.   Therefore, Southwest is considered to be the primary, but not sole, user of the gates.  Southwest does not have an unfettered right to the gates it has leased; and, despite Southwest's argument to the contrary, the preferential use rights are subject to the accommodation provision contained in the Lease Agreement, which Southwest agreed to and signed.   Southwest's position is that accommodation is not required as long as they are using the gates at full utilization of 10 flights daily out of each gate. Southwest did not "fully utilize" its gate space until, at the earliest, its announcement on February 26, 2015 of increased flight operations, or, at the latest, until August

28

2015 when the actual increase was fully realized.  Southwest cannot "ramp up" its flight schedule to thwart the pending accommodation request by Delta.

As testimony from the Congressional subcommittee hearing on reforming the Wright Amendment Act revealed, these accommodation procedures were intended to help "fit those people in" when a Requesting Airline makes an accommodation request.  Also during the subcommittee hearing, certain City officials, government representatives, and local business leaders stated that competition at Love Field would be ensured if the Five Party Agreement was enacted into legislation.  Mr. Herb Kelleher, then-CEO of Southwest, testified at the hearing.  He testified that "[A]ny carrier that is desirous now of serving Love Field can easily be accommodated even after those [12] gates come down," limiting Love Field to 20 gates.  In response to a question involving a very similar scenario as to that which the Court has before it today, Mr. Kelleher testified,

> And it is very simple.  There is no mystery to the way it operates, and that is, I can show you Southwest Airlines schedule, gate schedules, we have got hours on our gates where another carrier could operate there. . . .  And we would simply be told by the City of Dallas, you have got these vacant spaces in your gate utilization and by golly you are going to put another carrier in there.

Subcommittee member responded, "They would be able to tell you that?"  Mr. Kelleher answered, "That is the way it works, oh, yes absolutely."  Ex. 631, p. 0054.  Apparently at that time, Mr. Kelleher understood Southwest's obligations, as well as the City's. In spite of that understanding, no accommodation ever happened.

Southwest agreed in Section 4.06F that it would accommodate a "new entrant airline" when accommodation would not "unduly interfere" with its own operating schedule.  As the Court has found, Southwest's schedule would clearly accommodate Delta when it made its initial request for voluntary accommodation in accordance with Section 4.06F, and for several months after.  Delta has established Southwest did not comply with its contractual obligation and, therefore, breached Section 4.06F, the accommodation provision, of the Lease Agreement.

c.   <u>Was Delta Harmed by Southwest's Breach?</u>

Delta has shown that it suffered harm, the fourth element of breach of contract, because there is no longer available gate space at Love Field able to accommodate its current flight operations.  Delta has indicated a desire to expand its service at Love Field, but as it stands, there is arguably no possibility that Delta will be able to expand.  Southwest currently leases or subleases 18 gates, and Virgin subleases the remaining two gates.  The evidence indicates that because Virgin subleased those gates under very different circumstances involving a forced divestiture from American, and the DOJ specifically rejected Delta (and Southwest) from subleasing those gates from American, the only possibility for accommodation of Delta comes from Southwest.

At this point, Delta will be locked out of Love Field.  Testimony at the injunction hearing established that accommodations are common at other airports, and those accommodations can take many forms, such as subdividing a gate, using hardstands

30

to load/unload passengers, or building additional brick-and-mortar gates.   None of these options are available at Love Field because of the terms of WARA and the Five Party Agreement.   The Court finds Southwest and the City are playing a game of musical chairs with Love Field gate space, and with Virgin's "chairs" not in play in this game, there's no "chair" for Delta—Southwest occupies all 18 gates and the City consents.   The Court finds Delta has established it suffered harm from Southwest's failure/refusal to follow its contractual obligation under section 4.06F of the Lease Agreement.

Having established all four factors of a breach of contract claim, the Court concludes that Delta has established a substantial likelihood of success on the merits of its breach of contract claim against Southwest.

Even if Delta did not make a sufficient showing on its breach of contract claim, the Court finds Delta has established a substantial likelihood of success on the merits of its declaratory judgment claim that it is entitled to be accommodated by Southwest.   The Declaratory Judgment Act provides:   "In a case of actual controversy within its jurisdiction, . . . any court in the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."   28 U.S.C. § 2201(a).   The party seeking the declaratory judgment "must have suffered 'an invasion of a legally protected interest,' which is 'traditionally thought to be capable of resolution through the judicial process,' and is currently fit

for judicial review." *Crane v. Napolitano*, 3:12-CV-2347-O, 2013 WL 1744422, at *13 (N.D. Tex. Apr. 23, 2013)(O'Connor, J.) (quoting *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997)).   As previously set out, the Court's discussion of "new entrant airline", "unduly interfere with", and Southwest's obligation under Section 4.06F of the Lease Agreement regarding accommodation hold true to Delta's claim for declaratory judgment.   As it pertains to injunctive relief, Delta has shown that, as a new entrant or "Requesting Airline", Southwest had an obligation under the Lease Agreement to accommodate Delta at the time of its request because such accommodation would not "unduly interfere with" Southwest's existing flight schedule.   Delta has shown a substantial likelihood of success on the merits of its (1) breach of contract claim against Southwest and (2) declaratory judgment claim that it is entitled to be accommodated by Southwest.

## 2. Substantial Threat of Irreparable Harm

The second factor in the preliminary injunction analysis is a threat of irreparable harm.   To establish this factor, Delta must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).   Irreparable injury may be established where damages cannot be easily calculated. *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ).   Where the potential damage to a party's business cannot be easily calculated, such as loss of good will, a legal remedy is

inadequate. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

Delta has established that immediate and irreparable harm may result if it is prohibited from operating its current schedule of five flights and is forced out of Love Field during the pendency of this case. Thousands of passengers, both traveling to and from Love Field, would have to be refunded or rebooked if Delta is forced to discontinue its service at Love Field. Loss of business and goodwill are immeasurable through money damages. *Simmons v. Quixtar, Inc.*, No. 4:07CV389, 2007 WL 3256244, at *5 (E.D. Tex. 2007). If Delta is forced to discontinue service immediately from Love Field, the extent of lost business Delta would suffer plus the extent of loss of goodwill cannot be known. *See Henson Patriot Ltd. Co. LLC v. Medina*, Civ. Action No. SA-14-CV-534-XR, 2014 WL 4546973, at *5 (W.D. Tex. Sept. 11, 2014). Without an injunction, Delta would have no adequate remedy at law because it will most certainly suffer a loss of business and goodwill.

Despite Southwest's argument to the contrary, the Court does not find Delta's harm minimized or eliminated simply because it has or can secure gate space at DFW Airport. The Court need not address Southwest's "one marketplace" argument at this juncture. The Court is addressing the requested injunctive relief based on accommodation at Love Field as required under the Lease Agreement. The Lease Agreement does not contemplate accommodation at DFW Airport; not one word is said that the accommodation procedure includes consideration of DFW Airport,

whether a party has access to gate space at DFW Airport, and DFW Airport is not a party to these Lease Agreements in this case.

To deny Delta's injunctive relief would remove Delta from Love Field and, were the Court or a jury to ultimately determine Delta has a right to accommodation, Delta would have lost business and endured negative impact to its name and brand during that period. The Court also agrees with Delta that it would "have to fight an uphill battle" to make the public aware of its presence once again at Love Field. All of this would undoubtedly cause Delta to suffer great injury in such a way that is immeasurable and could be irreparable. Therefore, the Court finds that the risk of substantial threat of irreparable harm weighs heavily in favor of Delta.

### 3. Balance of Harms and the Public Interest

The Court now turns to the balance of harms, considering whether the threatened injury to Delta outweighs the threatened harm to Southwest. As previously discussed, the Court found the potential harm Delta would likely suffer upon being removed from Love Field is great—damage to reputation, name, brand and overall goodwill in addition to monetary harm. Southwest argues it will suffer harm in the form of cancelled flights or untold delays or inability to fully utilize its gate if it is forced to continue allowing Delta to fly its five flights daily. First, Southwest has suffered no harm as it relates to an inability to fully utilize its gates. Not only has Southwest been able to "fully utilize" its 18 gates with its own schedule of 180 flights daily, Delta has operated its five flights daily, for a total of 185 flights

34

daily out of 18 gates.  Furthermore, the evidence before the Court does not establish Southwest has suffered any harm or the threat of harm in the form of cancelled flights because of Delta's use of the gates.  At the injunction hearing, Southwest offered testimony that it has experienced some flight delays as well as two instances of equipment damage due to Delta's presence at the gates.  Assuming without deciding these flights delays and equipment damage have harmed or threaten to harm Southwest, this in no way outweighs the threatened harm to Delta if it is forced to leave Love Field while these legal issues are resolved.  Although Southwest may not be able to run its flights and operations as efficiently as it would like because of Delta's presence, that factor simply does not outweigh the potential harm to Delta from removing it from Love Field altogether.

In considering the public interest, the Court finds the chaos and inconvenience of disrupted service by removing Delta from Love Field before the legal issues are decided would be a great disservice to the public.  Forcing Delta to cease flight operations at Love Field would necessarily require its passengers to be rebooked on a Delta flight from another airport or to have their ticket purchase refunded, requiring them to find alternate travel arrangements, possibly at greater expense if on short-notice.  Also, Love Field is owned by the City which obviously vests its citizens with an interest in the airport and issues surrounding it.

The Court finds the balance of harms and the public interest both weigh heavily in favor of Delta.

35

In conclusion, the Court finds Delta has established all four equitable factors entitling it to injunctive relief.   Therefore, the Court **grants** Delta's motion for injunctive relief and the requested relief that Southwest be enjoined from evicting or otherwise removing Delta from Southwest's gate(s) at Love Field, or otherwise interfering with or preventing Delta's continued use of Southwest's gate(s) to operate Delta's five daily flights.

### B.  Southwest's Motion for Preliminary Injunction

Also pending before the Court is Southwest's competing motion for preliminary injunction, which was filed first before either the City's motion or Delta's motion. To establish entitlement to a preliminary injunction, Southwest must satisfy all four equitable factors to obtain a preliminary injunction.  *See TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*, 652 F.Supp.2d 763, 767 (N.D. Tex. 2009)(Fitzwater, C.J.).

Southwest cannot establish a likelihood of success on the merits of its trespass claim against Delta because Delta is not trespassing at this point.  The gates are not exclusive use, but rather preferential use; there can be no trespass on preferential use gates.  Southwest's payment of $120,000,000 to sublease United's two gates does not convert those gates from preferential use to exclusive use.  Though expensive, trespass would not lie for a preferential use gate which is subject to accommodation. Southwest's other argument that Delta is a "trespasser" because it is "invading the possession of [Southwest's] property," and that requires no additional showing of

36

irreparable injury, also fails.  Southwest must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana*, 804 F.2d at 1394.  Southwest fails to make this showing.  The Court does not find that Southwest has established a substantial likelihood of success on the merits of its trespass claim against Delta.  The Court has also previously determined that the balance of harms and public interest weight heavily in favor of Delta; therefore, Southwest would be unable to satisfy all four equitable factors.

The Court finds that Southwest has not proven all the equitable factors to establish entitlement to a preliminary injunction.  *See TGI Friday's*, 652 F.Supp.2d at 767.  Accordingly, the Court **denies** Southwest's motion for preliminary injunction.

### C. City's Motion for Preliminary Injunction

In its motion, the City's requested injunctive relief includes an injunction "allowing Delta to continue using Southwest's Love Field gates temporarily and barring all others from interfering in that temporary use."  Because the City has refused to take action on Delta's accommodation request, the Court is forced to impose some sort of injunctive relief to maintain order at Love Field.

The Court has already determined that Delta's motion for injunctive relief should be granted.  However, even if the Court could not grant Delta's motion, the Court **grants** the City's motion, finding that the City has satisfied each of the equitable factors to establish entitlement to injunctive relief.  In its Original Complaint, the

37

City seeks declaratory judgment relief from this Court.  Specifically, the City requests the Court declare the City's rights and responsibilities under the Five Party Agreement, WARA, the DOT letters, the Lease Agreements, the Sublease Agreement, the grant assurances and other obligations to the DOT and FAA, and any other applicable federal law as related to accommodation requests, the Signatory Airlines' preferential use rights and the City's consent to the Sublease Agreement.  It is well established there is a dispute between Delta and Southwest.  Essentially, the City asks the Court to declare what the City is required to do.  Ultimately, the Court will make such declarations giving the clarification and certainty being sought.  Therefore, the Court finds that the City will prevail on its declaratory judgment claims once the Court determines and declares the City's rights and responsibilities pertaining to accommodation requests made by Delta as well as any future requests.  The first equitable factor has been established.

To establish irreparable harm, the City must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana*, 804 F.2d at 1394.  Irreparable injury may be established where damages cannot be easily calculated. *Miller Paper*, 901 S.W.2d at 602.  Removing Delta from Love Field will negatively impact the flying public who have paid tickets flying into/out of Love Field.  In turn, this likely would negatively impact the reputation of Love Field and the City, which owns Love Field.  The Court finds the City faces the threat of irreparable harm if Delta is removed from Love Field

38

while the legal issues are determined.  Finally, the balance of harms and the public interest weigh in favor of granting injunctive relief.  The harm or threat of harm to Southwest is minimal in comparison to potential chaos if injunctive relief were not granted and Delta was removed.  Furthermore, some amount of certainty among the flying public as to the gate situation and generally flight operations at Love Field is in the public interest.

The Court finds all four equitable factors were established entitling the City to injunctive relief.  The Court finds that a preliminary injunction order enjoining Southwest from evicting or otherwise removing Delta from Southwest's gate(s) at Love Field, or otherwise interfering with or preventing Delta's continued use of Southwest's gate(s) to operate Delta's five daily flights is the proper injunctive relief in this case.  This is the same injunctive relief requested by Delta which the Court granted on Delta's motion.  So, even if the Court did not to grant Delta's motion, the Court **grants** the City's motion for injunctive relief.

As previously stated, none of these factual findings and/or conclusions of law are binding at a trial on the merits.

## IV.    Conclusion

Love Field is unique in that it is the only airport in the United States that is controlled by a federal statute and is gate-constrained, thereby freezing growth.  Love Field is in that respect the most unique airport in the world; no other airport has to deal with the Congressionally mandated no-growth and limited hourly flight

39

restrictions.  Assuming WARA is constitutional since no one is attacking the statute at this point, the constraints imposed on this airport by WARA are constraining to the point of being out of date.   These are political constraints, not constraints resulting from business related development.  Love Field does not have the expansion options available to other airports which allow future growth.

As Delta so succinctly stated, "At most airports, accommodation is not the equivalent of access."  Love Field is the exception to this rule.  Unless circumstances change, accommodation is the only means by which Delta can have long-term access with any certainty at Love Field.  These airlines understandably fight tooth-and-nail for virtually non-existent expansion of gate space.  The City clearly does not want to force accommodation on any airline, particularly one that has paid $100s of millions in improvements to Love Field and controls 90% of the airport's flights.  Southwest is a model for running an airline.  Understandably it is aggressively trying to gain 100% of the gates at Love Field.  Mr. Montgomery of Southwest testified that Southwest would buy the last two gates at Love Field and control all 20 if it could.  Southwest is contractually and legislatively bound to not expand to DFW Airport without relinquishing preferential use of its gates at Love Field.  As Southwest has said, there may be a time when no future accommodations can be made at Love Field.  Today is not that time.  With the evidence before the Court, the Court finds Southwest must accommodate Delta under the Lease Agreement it signed because an accommodation would not have "unduly interfered with" Southwest's operations schedule at the time,

nor Southwest may not add flights after the accommodation request is made to thwart the accommodation.  The Court also finds Delta's five flights currently do not unduly interfere with Southwest's schedule.

Love Field will continue to face these challenges being so severely gate constrained.  To change this no-growth situation at Love Field, Congress will need to act.  The political powers-that-be can address and correct these issues that face Love Field and new entrant airlines through repealing legislation unique to this airport. Without this change, new entrant airlines, the City, Signatory Airlines, and the citizens of Dallas will continue to face dilemmas like this one.  The flying public deserves more courage from its elected officials about travel to and from Love Field. The time for these elected officials to consider an end to all constraints on Love Field is now.

The Court **DENIES** Southwest's motion for preliminary injunction.  The Clerk of the Court is hereby **directed to terminate** the City's motion for preliminary injunction as moot.  The Court **GRANTS** Delta's motion for preliminary injunction. Southwest is hereby **enjoined** from evicting or otherwise removing Delta from Southwest's gate(s) at Love Field, or otherwise interfering with or preventing Delta's continued use of Southwest's gate(s) to operate Delta's five daily flights.  Southwest is also **enjoined** from adding additional flights on any Southwest gate(s) Delta uses to operate its five daily flights.  Furthermore, Southwest must inform the Court in writing within five (5) days of **<u>any reduction and/or change in Southwest's flights</u>**

41

**operations at Love Field** so that the Court can evaluate what the Court considers to be full utilization of the gates and other leased space at Love Field.  Reduction and/or change in flight operations includes, but is not exclusive of, destinations, hours of flights, and number of flights each day.  Furthermore, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Delta must post a bond in the amount of one hundred thousand dollars ($100,000) on or before January 15, 2016, at 4:00 P.M., to secure payment of any damages sustained if Southwest is found to have been wrongfully enjoined.  Also pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the City must post a bond in the amount of one hundred dollars ($100) on or before January 15, 2016, at 4:00 P.M., to secure payment of any damages sustained if Southwest is found to have been wrongfully enjoined.

   **SO ORDERED.**

   Signed January 8th, 2016.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE