IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST | § | CIVIL ACTION NO. 3:15-CV-02069-K |
| AIRLINES CO., VIRGIN AMERICA INC., | § | |
| AMERICAN AIRLINES, INC., and UNITED | § | |
| AIRLINES, INC. | § | |
| | § | |
| Defendants. | § | |

**VIRGIN AMERICA'S OPPOSITION TO
CITY OF DALLAS'S MOTION FOR SUMMARY JUDGMENT**

Virgin America Inc., together with Alaska Airlines, Inc. ("Virgin/Alaska"),[1] oppose the City of Dallas's motion for a summary judgment (Dkt. 436) that would purportedly end the litigation by sanctioning an airline gate accommodation policy opposed by all of the other parties because its terms and implementation raise grave concerns, including the proposed policy's unlawful and arbitrary discrimination against Virgin/Alaska's gate use rights. Virgin/Alaska respectfully shows the Court the following:

**Reason for Opposition**

The heart of this dispute has always been the quarrel between Delta and Southwest, two of the largest airlines in the world, over Delta's access to gates at Love Field. The rights of Virgin/Alaska, which uses only two of the 20 Love Field gates, have not been and should not be

---

[1] As of April 25, 2018, all Virgin America flights are operated and marketed by Alaska Airlines and its regional affiliates, though Alaska Airlines, Inc. and Virgin America Inc. remain separate corporate entities.

implicated—and indeed, cannot be, due to Virgin/Alaska's unique legal rights to these gates, as granted by the Department of Justice.

Only now, more than three years into this litigation, the City advanced a proposal to make radical and potentially discriminatory changes in the rules governing how the City may resolve accommodation requests like Delta's. This proposal has the potential effect of superseding Virgin/Alaska's existing gate-usage rights at Love Field, in contravention of Virgin/Alaska's use and lease agreement, as well as its rights granted by federal regulators. The City provides no justification for prejudicing Virgin/Alaska's rights and fails to show as a matter of fact and law that the new rules would treat Virgin/Alaska fairly and lawfully. The serious questions about the lawfulness and effects of the City's proposal will be the subject of fact and expert testimony at trial, and are still being developed in discovery. The Court should deny the City's motion, because the City has not demonstrated that it is entitled to relief as a matter of law.

## I. The City's Proposed Policy Unfairly Discriminates against Virgin/Alaska, in an About-Face from Its Previous Arguments

The City's new proposed accommodation policy represents a 180-degree turn from the issues and positions presented and developed at the outset of the litigation. Throughout the entirety of the trial court proceedings and subsequent appeal to the Fifth Circuit, Virgin/Alaska's gates were not at issue—this is because Virgin/Alaska's gates have been subject to unique legal constraints due to the U.S. Department of Justice's oversight and settlement order arising from the American Airlines and U.S. Airways merger, *see United States et al. v. US Airways Group, Inc. and AMR Corporation*, Case No. 1:13-cv-01236 (D.D.C.) (approving the Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, United States, et al. v. US Airways Group, Inc. and AMR Corp., Case No. 1:13-cv-01236, Dkt. No. 159, at 7 (D.D.C.

Mar. 10, 2014), and the settlement order arising from the Alaska Airline and Virgin America merger, *see United States v. Alaska Air Grp., Inc.*, No. CV 16-2377 (RBW), 2017 WL 3674773 (D.D.C. June 23, 2017).

Delta repeatedly acknowledged in this Court that it did not seek access to Virgin/Alaska's gates:

> COURT: Why did you leave [Virgin] out?
>
> DELTA: Because they are under a Department of Justice deal where American had to give them their two gates….it doesn't change anything to do with this case. ***They're not involved in this case on those***.

Dkt. 211 (Tr. Vol. I) at 28:8–18 (all emphasis in this response is added). Southwest also acknowledged that the Department of Justice would not approve either of Delta or Southwest to lease the two Virgin/Alaska Love gates:

> COURT: So would you at least agree that the Government, Federal Government, would rather Virgin have them than you have them?
>
> SOUTHWEST: Yes. They gave them to Virgin.

*Id*. at 86:20–25.

This understanding by Delta and Southwest results from Judge Kollar-Kotelly's Order in the American Airlines-U.S. Airways merger, in which the Court approved Virgin/Alaska as the acquirer of the two Love Field gates after considering and *rejecting* competing proposals from Delta and Southwest. Judge Kollar-Kotelly ordered that the divestiture of the two gates at Love Field be determined by the DOJ in its "sole judgment," to solve the nationwide competitive issues raised by the American-U.S. Airways merger. The DOJ then took "all competitive factors into account when determining which acquirer to approve," reviewed the "possible effects on airline competition and access at the Airport," and determined that Virgin/Alaska (and not Delta

or Southwest) should have access to the two gates. *See* Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, *United States, et al. v. US Airways Group, Inc. and AMR Corp.*, Case No. 1:13-cv-01236, Dkt. No. 159, at 7 (D.D.C. Mar. 10, 2014) (available in this docket at Dkt. 110-1, Ex. C).

Specifically, the DOJ stated that "Delta is not an appropriate divestiture candidate" for the two gates, because, among other reasons:

- Providing Delta access to the gates would "fail to address the harm arising from the merger and would be inconsistent with the goals that the remedy seeks to achieve." Id. at 40.

- The "goal of the divestiture remedy is to enhance the ability of [low cost carriers] to frustrate coordination among the legacy carriers" and "[a]llowing Delta to acquire divestiture assets would undermine the effectiveness of the remedy to accomplish this goal." *Id*.

- "Obtaining access to Love Field will significantly enhance [Virgin/Alaska's] ability to meaningfully compete against New American, thereby furthering the overall goals of the remedy…. In contrast, Delta, given its overall size and scope as well as its presence at DFW, can and does challenge New American for the business of corporate customers flying to and from the Dallas area." *Id*.

Relying on the DOJ's determination, Judge Kollar-Kotelly agreed that the merger settlement was "in the public interest" and ordered that the two Love Field gates be divested to Virgin/Alaska as "approved by the United States in its sole discretion." Dkt. 110-1 at App.000003, App.000025. Accordingly, any change to gate usage at Love Field that would deprive Virgin/Alaska of its gate usage should be reviewed by DOJ and decided by Judge Kollar-Kotelly, whose judgment does not expire until ten (10) years after its entry, and who has specifically retained jurisdiction over the allocation of the two Love Field gates. Dkt. 110-1 at App.000025.

When Alaska Airlines and Virgin America announced their merger in 2016, the Department of Justice raised concerns that Alaska's existing code-share relationship with American could reduce competition. After review and a proposed settlement, Judge Walton

entered a Final Judgment on June 23, 2017, confirming the merger under certain terms, including that Virgin/Alaska "*shall not directly or indirectly sell, trade, lease, or sub-lease any of the UA/AAA Divestiture Assets*"[2]—e.*g.*, the Love Field gates—"without the prior written consent of the United States." *United States v. Alaska Air Grp., Inc.*, No. CV 16-2377 (RBW), 2017 WL 3674773, at *3 (D.D.C. June 23, 2017). The Final Judgment further confirmed that Alaska/Virgin shall not be prevented from "continuing the subleases of the UA/AA Divestiture Assets already in place as of December, 6, 2016." *Id*. Judge Walton also retained jurisdiction for ten years to issue orders or directives as necessary to carry out or construe the Final Judgment. *Id*.

As set out further in Virgin/Alaska's opposition (Dkt. 444) to the City's Motion to Modify the Preliminary Injunction (Dkt. 431) and incorporated here, the City's proposal would subvert the will of the DOJ and two separate district courts in awarding the gates to Virgin/Alaska and requiring that Virgin/Alaska maintain their competitive use and would in fact permit discrimination against Virgin/Alaska as compared to other preferential gate holders, in particular Southwest, because Virgin/Alaska is a sub-lessee of the Love Field gates, and not an original "Signatory" member of the Five-Party Agreement.

In brief, the City's proposal would prioritize Signatory Airlines—namely, Southwest—in determining who should be required to make gate accommodation at Love Field for new airlines. The City's proposal states that it intends to "*first* evaluate whether any non-signatory airline"— i.e., Virgin/Alaska—"has the capacity to accommodate a requesting airline for all or part of the request." Dkt. 431-1 at 6 (Gate Utilization Analysis, § 2). If no capacity, only then would the

---

[2] "US/AA Divestiture Assets" were defined by the court as "all rights and interests" held by Alaska/Virgin "in the two gates at Dallas Love Field," and other gates "acquired by Virgin pursuant to the Final Judgment entered in United States v. US Airways Group, Inc., Case No. 1:13-cv-01236 (CKK) (Dkt. No. 170) (D.D.C. Apr. 25, 2014)."

City consider whether a Signatory Airline (like Southwest) might be required to provide accommodation only after determining "that no non-signatory airline has the capacity to accommodate a requesting airline." *Id*. The practical effect is a clear priority of Southwest' rights over Virgin/Alaska's.

The City's proposal also adopts a definition of "Gate Slot" and gate utilization that indefensibly offers preferential treatment to Southwest over full-service carriers with differing needs, like Alaska/Virgin. By defining "Gate Slots" as "102 minute increments of time starting at 6:00 a.m. and concluding at 11:00 p.m. for each day," the City decides that "full utilization" of a gate requires "10 daily flights per gate." This definition aligns perfectly with Southwest's operations and Love Field schedule—but it does not take into account the operational challenges that full-service carriers face, including potentially larger aircraft, greater numbers of passengers deplaning and enplaning, greater numbers of checked baggage, longer refueling, and longer cleaning and servicing of aircraft.[3] The City's proposal and motion make no effort to explain the justification for the "Gate Slot" definition, or explain why it is permissible to adopt a utilization analysis that unfairly targets Virgin/Alaska in a way to make it the first target for potential accommodation.

Under Grant Assurance 22, the City may (and is contractually required to) honor the Signatory Airlines and Sub-Lessee Airlines' "preferential use" rights to Love Field Facilities, but

---

[3] For example, Virgin/Alaska, unlike Southwest, operates at only two gates, thereby severely limiting Virgin/Alaska's ability to juggle multiple overlapping aircraft arrivals and departures. Yet, Virgin/Alaska's significant West Coast focus means that its flights must operate at specific times of the day attractive to its customers, thereby limiting Virgin/Alaska's ability to equally spread its arrival/departure times throughout the day. Also in contrast to Southwest, Virgin/Alaska serves some of the nations most congested airports, including New York LaGuardia, Ronald Reagan Washington National Airport, San Francisco International Airport, and Los Angeles International Airport.

may not extend different treatment to different airlines absent a "reasonable" basis for doing so, which the City must explain. The City did not do so.

## II. The City's Motion Does Not Provide Legal Authority Demonstrating Entitlement to Relief as a Matter of Law.

The City's authority to enact any proposed accommodation policy is circumscribed by this lawsuit, in which the City sought declaratory relief from this Court to "declare what the City is required to do." The motion identifies no changed circumstances that would warrant a change to the preliminary injunction. And the City's motion and proposed policy do not obviate the necessary analysis of the parties' rights and responsibilities under the various lease and sublease agreements, the Five Party Agreement, WARA, Department of Transportation and FAA authorities, and other applicable federal law. This Court must still interpret and apply the relevant agreements, regulations, and laws and ***find the relevant facts*** in assessing what declaratory relief the City and the other parties should receive.

### A. A three-year mandatory accommodation is not reasonable.

As previously noted in Virgin/Alaska's opposition to the City's motion to modify the protective order, the City's new proposal has made a radical change to the length of time that a lease holder must accommodate another airline. As opposed to the six-month accommodation proposed in the City's October 2017 initial draft gate accommodation policy, the City now proposes an accommodated airline be permitted to continue using a Gate Slot for a minimum of 3.5 years after accommodation. (The proposal states an accommodated airline can use the Gate Slot for a "minimum of three years," and only allows the leaseholder airline to give the six-month notice of intent to recover the Gate Slot *after* the three-year period, *see* Dkt. 431-1 at 9).

The City baldly asserts at page 5 that this Court should declare that "three years for mandatory accommodation is reasonable," yet notes that it "has not located any authority as to

7

how long an accommodation should be." This Court is the only authority who can determine whether a 3-year mandatory accommodation provision is "reasonable" under all of the circumstances, and it can only fully consider that request if it is able to hear full arguments and evidence by all parties at trial.

### B. Delta's and American's accommodation requests implicate important and disputed facts and points of law.

The City contends that summary judgment be granted in favor of Delta's accommodation request for its current five daily flights, and then summary judgment should be denied against Delta's request for eight new flights, and also American's accommodation request for four daily flights. Yet, the City suggests that, although Delta would not currently be entitled to accommodation on its request for eight additional flights, upon making a "new" request, the City would consider "whether all or part of the request could be accomplished on Virgin/Alaska's gates." Mot. page 10 & n.4. The City essentially suggests that upon a new application by Delta, the City would require Virgin/Alaska to accommodate.

None of these issues is appropriate for summary judgment at this time—all require fact-finding by this Court on issues such as gate utilization and the snapshot date theory of utilization that existed under the relevant facts and policies applicable at the time the City initiated this lawsuit. Nor does the City's proposed new accommodation policy remove the need for Court to engage in both fact-finding and extensive analysis of the various contractual agreements, leases, and federal law. In fact, the City's efforts to create a new policy confirm the need for this Court to hear all of the issues and arguments from all parties at a final hearing or trial.

### C. There is no legal basis to apply the City's prospective proposed policy to Virgin/Alaska.

The City contends at page 12 that summary judgment should be granted to "apply[] the city's proposed policy to Virgin/Alaska," so that "*if* application of the policy results in a finding

8

of underutilization" by Virgin/Alaska, then "the City would have the option to search for other airlines to operate at Love Field or to direct Virgin/Alaska to accommodate a requesting airline, including a new request by Delta." The City's request is improper and unlawful for the reasons set out in Virgin's opposition to the City's motion to modify the preliminary injunction.

Further, the City's motion is not ripe—this Court should not consider whether the prospective application of the City's proposal is proper at the risk of providing a mere advisory opinion. *See Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 880, 883 (N.D. Tex. 2008); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). The City does not reference any claim or allegation from the Complaint that would support declaratory relief related to this new accommodation policy, let alone an accommodation policy that would apply only to future requests. Furthermore, under the proposed policy, the City expressly retains the power to change it at any time. Dkt. 431-1 at 3. Seeking relief in the form of a policy that can be changed before any new accommodation request is made is facially unripe. "It is not the function of district courts to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass." *Villas at Parkside Partners*, 577 F. Supp. 2d at 883 (citing *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 666 (5th Cir. 1967)). The Court simply does not have jurisdiction to provide the City with pre-clearance of its attempted accommodation policies and procedures.

### D. The City's remaining issues should be carried along with the Court's final adjudication.

As to all other issues urged in the City's motion, Virgin/Alaska suggests that they should be denied at this time without prejudice to re-raise them at trial. The City's improper efforts to create and implement a new proposed accommodation policy in the middle of this litigation have

muddled the factual and legal framework between all of the parties. Fact and expert discovery is ongoing. It is not appropriate for this Court to determine as a matter of law at this time that the City has not violated its grant assurances, competition plan, federal law, or other agreements in light of the uncertainty presented by the City's new accommodation proposal. Virgin/Alaska respectfully reserves all rights to contend that the City's new proposal violates federal law, the Grant Assurances, the Competition Plan, the Use and Lease Agreements, the City's Consent to Sublease, and other agreements, should the proposal be permitted to be put in place.

### III. Conclusion

Virgin/Alaska respectfully requests the Court to deny the City's motion without prejudice to litigation of the issues it raises in due course.

Date:  June 13, 2018

Respectfully submitted,

s/Barry Barnett
Barry Barnett
State Bar No. 01778700
Susman Godfrey L.L.P.
8115 Preston Road, Suite 575
Dallas, Texas 75225
Telephone: 713-651-9366
Facsimile: 713-654-6666
bbarnett@susmangodfrey.com

Abigail C. Noebels
State Bar No. 24083578
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Phone: 713-651-9366
Fax: 713-654-6666
anobebels@susmangodfrey.com

**ATTORNEYS FOR VIRGIN AMERICA, INC.**

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 13th day of June, 2018, my office submitted a true and correct copy of this Virgin America's Opposition to City of Dallas's Motion for Summary Judgment to the Clerk of the Court of the United States District Court, Northern District of Texas, using the CM/ECF system, and served a copy of it on all counsel that have appeared in this case through this Court's electronic filing system.

                                                                           s/Barry Barnett
                                                                           Barry Barnet