## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CITY OF DALLAS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | |
| | § | |
| **DELTA AIR LINES, INC.,** | § | **Civil Action No. 3:15-cv-02069-K** |
| **SOUTHWEST AIRLINES CO.,** | § | |
| **VIRGIN AMERICA INC.,** | § | |
| **AMERICAN AIRLINES, INC., and** | § | |
| **UNITED AIRLINES, INC.,** | § | |
| | § | |
| *Defendants*. | § | |

---

## SOUTHWEST'S BRIEF IN RESPONSE TO CITY OF DALLAS'S MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 4

I.      The Court lacks subject matter jurisdiction to preapprove the City's
        accommodation policy. ..........................................................................................4

        A.      The City continues to seek an impermissible advisory opinion. ..............................4

        B.      The City lacks standing to seek declaratory relief concerning a policy that
                has not taken effect.................................................................................................6

        C.      The City has no claim or allegations that would permit summary judgment
                related to a proposed accommodation policy. .........................................................7

        D.      Alternatively, the City cannot move for summary judgment on a non-
                cognizable declaratory judgment claim...................................................................8

II.     There is no underlying cause of action that would allow the Court to determine
        the City's compliance with federal aviation law, and regardless, the City
        dismissed a party necessary for any such determination. ...................................9

III.    Assuming subject matter jurisdiction exists, disputed fact issues remain with
        respect to the City's attempt to apply its proposed accommodation policy to
        Delta's request for accommodation of five flights. .........................................11

        A.      The Lease does not grant the City unfettered discretion to interpret
                ambiguous lease terms..........................................................................................11

        B.      There is a disputed fact issue over whether Delta qualifies as a "new
                entrant." ...............................................................................................................12

        C.      There is a disputed fact issue over when and how to evaluate Southwest's
                operating schedule for purposes of accommodation. .............................................13

        D.      There is a disputed fact issue as to the term of Delta's accommodation.................16

                1.      A long-term accommodation tramples on the Signatory Airline's
                        20-year priority in use of its leased gates..................................................17

                2.      Delta's position that airlines without a lease at Love Field are
                        entitled to permanent accommodation would eviscerate the
                        Signatory's 20-year preferential use right..................................................18

(i)

3. A 3.5-year term of accommodation conflicts with the City's interpretation of the Lease, the City's prior course of performance, and industry custom and usage....................................................21

4. A 3.5-year term of accommodation is arbitrary and capricious. ................24

5. The Lease grants the Signatory Airlines discretion to set a reasonable length for the accommodation, not the City. ...........................24

E. At a minimum, the City's decision to apply the policy retroactively but start the clock for Delta's term of accommodation prospectively is unreasonable and arbitrary. ...........................................................................................25

IV. Other provisions in the City's proposed policy violate the Lease and federal law............26

V. Southwest agrees with the City that certain issues should be decided as a matter of law.................................................................................................................................29

A. Delta's February 2015 accommodation request for eight additional flights should be denied. .................................................................................................29

B. Delta's declaratory judgment and contract claims should be dismissed; it is not a third-party beneficiary of the Lease and has no unilateral contract with anyone. .........................................................................................................31

C. Southwest agrees that the City properly consented to the United-Southwest sublease. ........................................................................................................33

D. Southwest agrees that the City should evaluate Alaska's gate usage and move Delta's five flights there given Alaska's recent reduction of flights.............35

VI. Southwest abandons its damages claims against the City for breaches of the Lease. .................................................................................................................................35

**CONCLUSION** ....................................................................................................................**36**

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,* 532 U.S. 275 (2001) ................................................................. 10

*Allan v. Nersesova,* 307 S.W.3d 564 (Tex. App.—Dallas 2010, no pet.) .................................... 32

*American Airlines, Inc. v. DOT,* 202 F.3d 788 (5th Cir. 2000) .................................... 28

*Brown v. Delta Air Lines,* No. CIV-03-871-L, 2004 U.S. Dist. LEXIS 28508 (W.D. Okla. Oct. 8, 2004) .................................................................................................................. 10

*City of Dallas v. Delta Air Lines, Inc.,* 847 F.3d 279 (5th Cir. 2017) (Jones, J, dissenting) ....... 12

*Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN),* 915 F.2d 167 (5th Cir. 1990) ................................................................... 9

*Consol. Cos. v. Union Pac. R.R. Co,* 499 F.3d 382 (5th Cir. 2007) .................................... 7

*Davray, Inc. v. City of Midlothian,* No. 3: 04-CV-0539-B, 2005 U.S. Dist. LEXIS 41520 (N.D. Tex. 2005) ................................................................................................. 11

*Evergreen Nat'l Indem. Co. v. Tan It All, Inc.,* 111 S.W.3d 669 (Tex. App.—Austin 2003, no pet.) .......................................................................................................... 23

*Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) .................................... 33

*Forest Oil Corp. v. Strata Energy,* 929 F.2d 1039 (5th Cir. 1991) .................................... 23

*Garcia v. Bank of Am. Corp.,* 375 S.W.3d 322 (Tex.App.—Houston [14th Dist.] 2012, no pet.) ................................................................................................................ 32

*Harris County Texas v. MERSCORP Inc.,* 791 F.3d 545 (5th Cir. 2015) .................................... 9

*Harris Trusts and Savings Bank v. E-II Holdings, Inc.* 926 F.2d 636 (7th Cir. 1991) ................ 8

*Harris v. Rowe,* 593 S.W.2d 303 (Tex. 1979) ................................................................... 31

*James Stewart & Co. v. Law,* 233 S.W.2d 558 (Tex. 1950) ................................................. 31

*Kirkindoll v. Nat'l Credit Union Admin. Bd.,* Civil Action No. 3:11-CV-1921-D, 2014 U.S. Dist. LEXIS 174675 (N.D. Tex. 2014) ............................................................... 7

*Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.,* 723 F.2d 1173 (5th Cir. 1984) ............ 9

*Luckenbach S.S. Co. v. United States,* 312 F.2d 545 (2d Cir. 1963) .................................... 9

*McCasland v. City of Castroville, 514 F. App'x 446 (5th Cir. 2013)*...................................... 10, 32

*MCI Telecomm. Corp. v. Texas Utilities Elec. Co., 995 S.W.2d 647 (Tex. 1999)*........................ 32

*McMillin v. State Farm Lloyds, 180 S.W.3d 183 (Tex. App.—Austin 2005)* ................................ 12

*Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S.Ct. 843 (2014)*.................................... 9

*Princeton University v. Schmid, 455 U.S. 100 (1982)* .................................................................... 8

*Royal Maccabees Life Ins. Co. v. James, 146 S.W.3d 340 (Tex. App.—Dallas 2004)* ................ 11

*St. Michael's Convalescent Hosp. v. California, 643 F.2d 1369 (9th Cir. 1981)*......................... 28

*Stokes v. Sw. Airlines, 887 F.3d 199 (5th Cir. 2018)*.................................................................... 10

*Texas v. Travis Cty., 272 F. Supp. 3d 973 (W.D. Tex. 2017)*................................................. 5, 6, 7

*Villas at Parkside Partners v. City of Farmers Branch, 577 F. Supp. 2d 880 (N.D. Tex. 2008)* ........................................................................................................................................... 4, 5, 6

*W.L. Wearly v. FTC, 462 F. Supp. 589 (D.N.J 1978)* ................................................................... 28

**Statutes**

*49 U.S.C. § 41713* ........................................................................................................................ 28

*49 U.S.C. § 47106* ........................................................................................................................ 10

## INTRODUCTION

The Court should **deny in part and grant in part** the City's Motion (Dkt. No. 436). Summary judgment is improper with respect to the City's request for judicial preapproval of its proposed accommodation policy due to both procedural and substantive defects. At the same time, Southwest has no objection to and agrees with certain of the City's positions in its Motion.

**Southwest's Disagreements with the City's Motion for Summary Judgment.** The City's request for judicial preapproval of its proposed accommodation policy should be denied due to several procedural defects:

- *First*, the City again seeks a non-justiciable advisory opinion: The proposed policy is not yet effective and improperly contingent on a favorable ruling from the Court.

- *Second*, the City lacks standing to seek relief because it fails to identify any actual, imminent harm absent preapproval of the policy.

- *Third*, the City's Complaint is devoid of any claim or allegations proposing an accommodation policy or seeking its approval. Indeed, the City never explains the legal basis for a final judgment related to pre-approval of a policy that is not yet in effect and, by its terms, can be changed at any time.

The City's request for preapproval of its proposed policy should also be denied on the merits to the extent it is inconsistent with and interferes with the Southwest's preferential rights under the lease:

- *First*, the policy's 3.5-year term for an accommodation (which would not even start to run for Delta until the policy becomes effective) is simply pulled out of thin air and would divest Southwest of its preferential right to use its leased gates for an unreasonable amount of time.

- *Second*, the City's Motion ignores the many factual disputes related to Delta's initial accommodation request for five flights.

- *Third*, several key provisions of the policy violate the plain language of the Lease.

**Southwest's Agreements with the City's Motion for Summary Judgment.** Southwest agrees that summary judgment is proper as to certain issues and claims raised by the City in its Motion.

- *First*, Delta's February 2015 accommodation request for eight additional flights should be denied because Southwest had made concrete plans to increase flights on its newly subleased gates *before* Delta requested this accommodation.

- *Second*, Delta has no viable claims under the Lease, against the City *or* Southwest, because it is not a third-party beneficiary of the Lease.

- *Third*, all claims related to the City's consent to the United-Southwest sublease should be dismissed. Delta has wrongly interpreted the language of the City's Competition Plan, and it has no private right of action with which to enforce the Plan or otherwise challenge the sublease.

- *Fourth*, Southwest agrees that the City should evaluate Alaska's (formerly Virgin's) gate usage and move Delta's five flights to those gates because of Alaska's public announcement that it will reduce its operating schedule at Love Field to 5.5–6.5 daily flights per gate starting in November 2018 – a level of use far below that of Southwest, and one which would allow for the accommodation of Delta's 5 daily flight without undue interference with the operating schedule of either Southwest or Alaska.

**Southwest's Breach of Contract Claims**. Finally, Southwest abandons its damages claims for breach of contract against the City. Southwest has elected not to offer evidence of

damages and instead reserves the right to recover wrongful injunction (or restitutionary) damages from the City after trial on the merits. Southwest's new position with regard to the City is limited, however, to damages. Southwest continues to seek declaratory relief relating to (1) the City's failure to timely reach a decision on accommodation requests and (2) the City's failure to evaluate gate usage on an ongoing basis and adjust any accommodation accordingly. Summary judgment in favor of the City on Southwest's claims for declaratory and injunctive relief concerning these obligations would be improper.

## BACKGROUND

Southwest will not repeat the full background of the case for the Court. It fully incorporates by reference the relevant factual background (and supporting evidence from the accompanying appendix) from its Response to Delta's Motion for Partial Summary Judgment (Dkt. No. 381).

Nevertheless, Southwest emphasizes a few additional facts for the Court. *First*, the City's proposed accommodation policy is not yet effective, and its effectiveness is tied to a contingent event: A Court order in its favor.[1] As explained below, this poses several insurmountable jurisdictional problems for the Court.

*Second*, there has been a change in circumstances from the preliminary injunction hearing, and Alaska's gates at Love Field are now available for accommodation.[2] While Southwest has averaged 10 daily flights on each of its 18 gates since August 2015, Alaska has routinely flown smaller planes and fewer flights. Now Alaska has announced that it will reduce its schedule to 5.5–6.5 daily flights per gate starting in November 2018. A clear solution to this dispute would be to move Delta's five flights at Love Field to Alaska's available and underutilized gates.

---

[1] *See* City App. 334 ¶ 9.
[2] Mot. at 12.

*Third*, Delta's latest filing, in response to the City's Motion to Modify the Preliminary Injunction, reveals its true intent: rewriting the Lease's accommodation provision to wrest preferential lease rights from the current leaseholders.[3] It should be obvious that any property right an airline might obtain through accommodation cannot be equivalent to or greater than those of the actual leaseholders (otherwise, why sign a preferential lease at all?). But Delta's newest interpretation of the Lease turns the notion of property rights on its head, asserting a permanent right to more than one of Southwest's gates, with free reign to choose both schedule and destinations. In short, Delta now seeks a perpetual lease with rights far more expansive than a Signatory Airline's. Even the disavowed DOT letters did not go *that* far.

## ARGUMENT

### I.     The Court lacks subject matter jurisdiction to preapprove the City's accommodation policy.

#### A.     The City continues to seek an impermissible advisory opinion.

Like its recent Motion to Modify the Preliminary Injunction, the City's Motion for Summary Judgment seeks judicial preapproval of an accommodation policy for Love Field. This time, however, the City seeks to apply the policy to past accommodation requests like Delta's. But the same jurisdictional flaw remains: A request to preapprove a policy before it goes into effect— and tying its effectiveness to court approval—does not present a justiciable controversy for the Court.

As Southwest discussed more extensively in responding to the City's Motion to Modify (Dkt. No. 442)—which it fully incorporates by reference here—the case law recognizes that preapproval of a municipal policy or ordinance is unquestionably and impermissibly advisory. In *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 880 (N.D. Tex. 2008),

---

[3] *See, e.g.*, Dkt. No. 448 at 14, 18 (insisting that Delta be allowed to change times and destinations for its flights).

Farmers Branch adopted a new housing ordinance in the middle of litigation that, like the City here, tied the effective date to a court ruling in its favor. *See id.* at 881 ("The New Ordinance shall become effective on the 15th day after the date on which a final and appealable judgment is rendered by the court in this case."). Farmers Branch then moved to add a declaratory judgment claim approving the ordinance. Recognizing the jurisdictional concerns raised by this maneuver, the district court refused to allow Farmers Branch's claim to proceed.

The court deemed Farmer's Branch's request "the quintessential advisory opinion": Not only had the new ordinance not gone into effect, "but a contingent event [a final judgment] that will trigger its effective date has not occurred." *Id.* at 885. The district court rightly feared opening a "Pandora's box" of litigation, namely "invit[ing] every local government to seek a court's judicial blessing on an ordinance by giving it a prospective effective date and filing legal action to obtain an advisory opinion . . . before it went into effect." *Id.* at 884-85.

Importantly, the court considered and rejected Farmers Branch's attempt to derive an "actual controversy" from its not-yet-effective ordinance. Farmers Branch advanced several counterarguments that Southwest anticipates the City will raise here: that "the dispute is not hypothetical because the New Ordinance will become effective upon the court's entering judgment in this case"; that the affected parties had "publicly avowed to contest" the ordinance; that the ordinance raised real concerns between parties with directly adverse interests. *Id.* at 884. None of those arguments avoided Article III's bar on Farmers Branch's unripe (and therefore advisory) request for preapproval of an ordinance. Here too, the City cannot avoid Article III's strictures.

More recently, another district court rejected the State of Texas's attempt to force an advance ruling on a not-yet-effective immigration statute. *Texas v. Travis Cty.*, 272 F. Supp. 3d 973, 980 (W.D. Tex. 2017). Similarly characterizing the request as advisory, the court concluded

that it lacked subject matter jurisdiction to declare an immigration statute constitutional in advance of it taking effect, particularly in the absence of evidence that "it was clear Defendants planned to violate the law once it takes effect." *Id.* Rather, the State "face[d] the same potential threat every government agency at every level faces when it enacts a new law—the threat that someone may challenge the constitutional validity of the law. That is not a justiciable injury." *Id.*

Here, the unripe, advisory nature of the City's requested declaration stands in even starker relief. Texas's immigration statute would have eventually taken effect, yet the court lacked subject matter jurisdiction to rule. By contrast, the City's accommodation policy will *never* take effect absent a court ruling. In other words, the City even more clearly aims to (impermissibly) employ the Court as "legal counsel" with respect to its accommodation policy. *Villas of Parkside*, 577 F. Supp. 2d at 885.

The City has not cited a single case supporting the exercise of subject matter jurisdiction over a government entity's request to preapprove a policy, ordinance, or law. The City is free to adopt an accommodation policy and defend it in Court. But there is no legal basis—or federal court jurisdiction— for submitting the policy for judicial preapproval.[4]

> **B.      The City lacks standing to seek declaratory relief concerning a policy that has not taken effect.**

The City's request for declaratory relief related to its proposed accommodation policy steamrolls over yet another jurisdictional requirement: standing. Like the interrelated ripeness doctrine and ban on advisory opinions discussed above, a party invoking federal jurisdiction must show an "injury in fact" that is "both concrete and particularized" and "actual or imminent."

---

[4] At a minimum, the Court lacks subject matter jurisdiction to grant wholesale preapproval of the City's proposed policy. Many aspects of the policy are entirely inapplicable to the dispute actually before the Court, and the ripeness concerns raised in this section therefore carry even more weight.

*Consol. Cos. v. Union Pac. R.R. Co*, 499 F.3d 382, 385 (5th Cir. 2007). The City cannot meet this burden.

Like the plaintiff in *Texas v. Travis County*, the City "has produced no evidence" that Southwest, or any other airline defendant, plans "to violate the [policy] once it takes effect." 272 F. Supp. 3d at 980.[5] Therefore, there is no concrete, actual, or imminent threat that its requested declaration might conceivably address. Indeed, "it is impossible for [the airline defendants] to take any action that would violate the not-yet-effective" policy. *Id.* at 979.

### C.     The City has no claim or allegations that would permit summary judgment related to a proposed accommodation policy.

The Court lacks subject matter jurisdiction for yet another reason: The City has not pled a claim (or requested relief) related to an accommodation policy. Indeed, the City's Complaint never mentions such a policy (or takes a position on accommodation at all).[6] "A movant can neither obtain summary judgment nor avoid the opposing party's summary judgment motion based on an unpled claim." *Kirkindoll v. Nat'l Credit Union Admin. Bd.*, Civil Action No. 3:11-CV-1921-D, 2014 U.S. Dist. LEXIS 174675, at *20 (N.D. Tex. 2014). Here, the City cannot obtain summary judgment on an unpled claim to adopt and implement an accommodation policy.

Further, on a more practical level, the City never explains why it needs Court preapproval of the policy to adopt it, particularly when the policy expressly grants the City discretion to change the it at any time. There is nothing in the preliminary injunction or elsewhere that forbids *adoption*

---

[5] Should the City adopt and apply the policy, Southwest intends to vigorously contest those aspects of it that violate the Lease or exceed the discretion reasonably granted to the City under the Lease. Such challenges, of course, will only become ripe after the City adopts the policy and implements it in a manner contrary to the Lease that causes (or threatens to cause) harm to Southwest.

[6] In the City's Reply in Support of its Motion to Modify the Preliminary Injunction (Dkt. No. 455), it asserts that its Complaint includes a request for "the proper considerations and procedures for the City to adopt in considering and deciding the gate accommodation." This is hardly a request for the Court to approve an 11-page, single-spaced policy drafted three years after the filing of the lawsuit. At best, it is a request is for the Court to *write* an accommodation policy for the City; as discussed in the section below, that claim is non-justiciable because it takes no adverse position against any party and therefore seeks an advisory opinion.

of a policy by the City while litigation is pending, even if certain *applications* of the policy will ultimately violate the Lease.

> ### D. Alternatively, the City cannot move for summary judgment on a non-cognizable declaratory judgment claim.

The City's only accommodation-related claim is an outcome-neutral request for a declaration telling the City what decision to make. As explained in prior filings with the Court—which Southwest fully incorporates by reference here[7]—that claim is non-cognizable. To summarize: A long line of unrebutted cases hold that a declaratory judgment plaintiff must take an adverse legal position against a defendant to remain in Court. *See, e.g., Harris Trusts and Savings Bank v. E-II Holdings, Inc.* 926 F.2d 636, 640 (7th Cir. 1991); *Princeton University v. Schmid*, 455 U.S. 100, 101 (1982). This same line of cases holds that failing to take a legal position (i.e., "Tell us what to do!") is the equivalent of failing to take an adverse position. "[T]he requirements of Article III are not met when parties merely allege . . . that they are 'at a loss to know what course to pursue.'" *Harris Trusts and Savings Bank*, 926 F.2d. at 641.

That is exactly what the City alleged in its declaratory judgment claim. Nowhere in the Complaint does the City advocate for a particular interpretation of the Lease or its *own* desired outcome. Instead, it sets forth the two opposing positions taken by the airlines most affected by the accommodation decision and throws up its hands. Federal courts have no power to hear such claims.

---

[7] Specifically, Southwest incorporates by reference its briefing on this issue in its Response to Delta's Motion for Partial Summary Judgment (Dkt. No. 381) and its Motion to Dismiss briefing (Dkt. Nos. 394 & 428).

## II. There is no underlying cause of action that would allow the Court to determine the City's compliance with federal aviation law, and regardless, the City dismissed a party necessary for any such determination.

As part of the requested judgment, the City seeks a declaration that its actions did not violate federal law, including the grant assurances and the City's Competition Plan.[8] The federal declaratory judgment statute, however, is procedural not substantive. *See Harris County Texas v. MERSCORP Inc.*, 791 F.3d 545, 552–53 (5th Cir. 2015) ("[T]he Declaratory Judgment Act alone does not create a federal cause of action."); *Luckenbach S.S. Co. v. United States*, 312 F.2d 545, 548 (2d Cir. 1963) ("Declaratory relief is a mere procedural device by which various types of substantive claims may be vindicated."). The City must therefore identify an underlying cause of action that would allow a determination of whether violations of the federal aviation statutes occurred.

Further, because the City seeks a declaration of non-liability, it is the *declaratory defendants* that must hold the underlying substantive right. *See Luckenbach S.S. Co.*, 312 F.2d at 549 ("Non-liability is the negative of the claim or cause of action with respect to which the declaration is sought. . . . So long as the claim can be made, its negative can be asserted."); *Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action.").[9] The City, however, fails to identify any private right to enforce the City's

---

[8] *See* Mot. at 20.

[9] *See also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S.Ct. 843 (2014) (treating plaintiff's claim seeking a declaration of patent non-infringement as litigating a claim for infringement brought by the declaratory defendant); *Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) (noting that a declaratory judgment action typically litigates "the precise issue which could have been litigated in federal court in a coercive action brought by the declaratory defendant.").

federal obligations in these circumstances, and there is none. *See McCasland v. City of Castroville*, 514 F. App'x 446 (5th Cir. 2013) (concluding that airlines have no private right of action to enforce the federal aviation statutes against airport operators).[10] At most, the City is entitled to dismissal of *Delta's* claims attempting to enforce federal law against the City. But there is no legal basis for a merits determination as to the City's compliance with federal law.[11]

There is yet another procedural barrier to the City's requested declaration: A "Required Party" under Federal Rule of Civil Procedure 19, the Department of Transportation/Federal Aviation Administration ("DOT" and "FAA"), is absent. Indeed, the federal government was recently dismissed from this case at the request of the City.  Under Rule 19, a person "must be joined as a party if . . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. Fed. R. Civ. P. 19(a)(1)(B).

The DOT/FAA satisfies this definition. As the exclusive enforcer of the federal aviation statute it maintains an interest in the City's conduct at Love Field. And any determination of

---

[10] WARA does not provide Delta with a private right of action either. Elsewhere, Delta has suggested that the Court could imply one for Delta. WARA, however, lacks the clear Congressional intent "to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). No court has ever held that WARA creates a private right of action, and recent Supreme Court opinions express a deep skepticism of judicial attempts to imply such rights. *See id.*; *see also Stokes v. Sw. Airlines*, 887 F.3d 199, 202–03 (5th Cir. 2018) (holding that *Sandoval* overruled a prior 5th Circuit opinion inferring a private right of action under the Air Carrier Access Act and holding that no such right existed primarily because the Act "combines with other federal aviation statutes to form a comprehensive *administrative* scheme" with only narrow roles for private litigants) (emphasis in original).

[11] The lack of an enforceable legal interest on the part of the airlines is even clearer with respect to the Competition Plan. The Plan is informational; the only requirement imposed on airport operators is to submit a plan for agency review if they would like to use a particular funding mechanism. *See* 49 U.S.C. § 47106(f)(1) & (2). There is nothing in the Plan itself, or the competition plan statutes or regulations, that empowers the federal government to enforce the plan, much less a private right of action afforded to Delta or any other party. *See Brown v. Delta Air Lines*, No. CIV-03-871-L, 2004 U.S. Dist. LEXIS 28508, *13-14 (W.D. Okla. Oct. 8, 2004) (concluding that a related Title 49 provision does not contain an express or implied right of action and noting the many other cases holding "that Congress did not intend to provide for private rights of action under other statutes governing the airline industry").

compliance with federal law may "as a practical matter impair or impede" the DOT/FAA's ability to protect its interests in regulating the City's administration of Love Field. Having just recently dismissed the DOT/FAA,[12] the City cannot now seek court rulings that would bind those agencies' hands.

### III. Assuming subject matter jurisdiction exists, disputed fact issues remain with respect to the City's attempt to apply its proposed accommodation policy to Delta's request for accommodation of five flights.

#### A. The Lease does not grant the City unfettered discretion to interpret ambiguous lease terms.

Much of the City's argument in favor of adopting its proposed accommodation policy is a mistaken view of the discretion granted to it in the Lease. The Lease is a private contract; thus, the interpretation of ambiguous terms and whether a breach (or potential breach) occurred are questions of fact for the jury. *See, e.g.*, *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 346 (Tex. App.—Dallas 2004) ("Once a contract is found to be ambiguous, the interpretation of the contract becomes a fact issue."). The "arbitrary and capricious" standard that the City lifts from administrative law has no relevance here absent express contractual language to the contrary. There is no such language in the Lease, and the City cites none. The cases cited by the City concern the scope of municipal discretion under state law or federal constitutional law. *See, e.g.*, *Davray, Inc. v. City of Midlothian*, No. 3: 04-CV-0539-B, 2005 U.S. Dist. LEXIS 41520, at *29 (N.D. Tex. 2005) (discretion under state competitive bidding statutes). The City offers no legal basis for applying a heightened standard of judicial deference to the exercise of discretion under a private contract, especially when that contract contains clear language *constraining* that discretion.[13] To

---

[12] Dkt. Nos. 402 & 406.
[13] *See generally* City App. 38–39 (Lease) § 4.06(F) (setting the "undue interference" standard and defining the City's role in the accommodation procedure).

hold otherwise impermissibly rewrites the Lease to inoculate the City's accommodation decisions from judicial review.

In short, the City cannot avoid a jury trial by claiming that its interpretation of the Lease is reasonable and non-arbitrary. As explained below, a number of material, disputed fact issues exist. Indeed, the question of what is "reasonable" under a contract falls squarely within the province of the jury. *See McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 205 (Tex. App.—Austin 2005) ("The question of reasonableness is one peculiarly tailored to the province of the jury."). More importantly, the Lease does not grant the City discretion to interpret ambiguous terms.

### B.       There is a disputed fact issue over whether Delta qualifies as a "new entrant."

Only "new entrants" are entitled to request accommodation under Section 4.06(F) of the Lease. Thus, step one in the accommodation process is answering whether the requesting airline qualifies as a "new entrant." By any definition—new to the airport, market, or industry—Delta fails to qualify. Indeed, "[d]enominating Delta a 'new entrant' for any purpose stretches language and reality." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 293 n.2 (5th Cir. 2017) (Jones, J, dissenting).[14]

This issue has been fully briefed in Southwest's Motion for Partial Judgment on the Pleadings (Dkt. No. 364) and its Reply in Support (Dkt. No. 417). Instead of repeating those arguments, Southwest incorporates that briefing by reference. It is significant to point out, however, that the City previously *agreed* with Southwest about Delta's status as a "new entrant":

> Without authority, Delta asserts it is a new entrant by creating a definition that only fits Delta. The definition does not appear in any of the controlling documents and the City has not located any other source for the definition. . . . Because Delta has been and is currently operating at Love Field since 2009, it is neither new to Love Field nor an entrant. Delta is not a "new entrant" and therefore is not

---

[14] The majority opinion assumed without deciding that Delta was a "new entrant" airline. Thus, Judge Jones is the only appellate judge who addressed this issue.

entitled to any possible relief of any accommodation provision under the leases as a third-party beneficiary.[15]

Further, ***Delta has also admitted it is not a new entrant***:[16]

```
  7        A.  What is your question?
  8        Q.  Delta is not a new entrant into the Love Field
  9   market?
 10        A.  No, we are not.
```

Although the City and Delta take a different position now, at most that demonstrates that interpretation of the term presents a fact issue for the jury. There is no unambiguous interpretation of the term "new entrant" that includes an airline already flying from Love Field, with a large operation at DFW Airport down the road, and with many decades of *hindering* competition in the airline industry.[17]

### C.   There is a disputed fact issue over when and how to evaluate Southwest's operating schedule for purposes of accommodation.

Before mandating accommodation, the City must first assess whether the requested accommodation would "unduly interfere" with a Signatory Airline's "operating schedule."[18] The parties disagree about how and when to assess undue interference, and the Lease is ambiguous. Thus, the question is one for the jury.

Although not altogether clear, the City evaluates "undue interference" by reference to the Signatory Airlines' operating schedules sometime before August 2015. But that is not the correct date by which to evaluate undue interference under either the Lease language or the facts of this case. Both the City (and Delta) ignore that Delta *was* accommodated under the Lease through

---

[15] Dkt. No. 79 at 29.
[16] SWA App. 8 (Dep. of Delta Corp. Rep. (J. Esposito)) at 194:7-10.
[17] SWA App. 52-56 (Inj. Ex. 412, Resp. of U.S. to Public Comments on Final J.).
[18] City App. 38 (Lease) § 4.06(F).

August 2015. The fact that the City did not *require* accommodation does not make the licenses under which Delta operated any less of an accommodation. In fact, an initial step in the accommodation process is a request for *voluntary* accommodation.[19]

Further, the temporary nature of the accommodation does not make it any less of an accommodation: An accommodation need only consist of "such reasonable terms as may be agreed upon between the Airline and Requesting Airline, taking into consideration all of the circumstances."[20] There is nothing unreasonable about an accommodation that lasts until the preferential leaseholder reaches the schedule it had long-planned for its leased gates. ***Indeed, Delta agreed to such an arrangement not once but twice, and itself characterized them as accommodations***.[21] And considering "all of the circumstances"—the abrupt start of long-haul flights in a brand-new terminal at the end of the Wright Amendment restrictions, as well as government delays in reviewing and consenting to the United-Southwest sublease—the length of Delta's two accommodations was more than reasonable.

The relevant inquiry thus occurs at the end of the final voluntary accommodation, after Southwest told Delta that the accommodation could not continue. In other words, the question is whether Delta's five flights unduly interfere with Southwest's "operating schedule" as of August 2015 (or at some later date when the Signatory Airline might choose to expand its schedule pursuant to its "priority in use"). And the answer, undisputedly, is yes.

---

[19] *See, e.g.*, Dkt. No. 1 (City Compl.) ¶¶ 3, 32, 44 *et seq.*; Dkt. No. 66 (Delta Countercl. & Answer to City Compl.) ¶ 25 on 66 ("The requesting airline must seek *voluntary* accommodation by attempting to secure gate space and other necessary facilities *on a voluntary basis* from one of the incumbent airlines at Love Field . . . If the requesting airline has contacted all of the incumbent airlines and exhausted all reasonable efforts to secure *voluntary* accommodation, the requesting airline may notify the City's Director of Aviation . . .") (emphasis added).

[20] City App. 38 (Lease) § 4.06(F). Indeed, the temporary 3- and 6-month accommodations agreed to by United and Southwest were *more secure* than the month-to-month sublease that Delta had in place from 2009–2014.

[21] *See* SWA App. 68 (Dep. of Delta Corp. Rep. (H. Shannon)) at 346:17-19 ("I think we're under a temporary accommodation.").

*First,* under the City's proposed policy, undue interference is assumed once a Signatory Airline averages 10 daily flights per gate.[22] Even Delta has admitted that nine or ten flights a day is "a little bit above" full utilization (another way of describing the number of flights at which sharing a gate unduly interferes with operations):[23]

```
17       Q.    You think Delta is able to do nine to ten
18  turns per gate at Love Field?
19       A.    Sure.  We do it at most -- a lot of our hubs.
20  We turn LAX at ten and a half.  We turn Atlanta at nine.
21  We turn LaGuardia, our hub, at nine.  So yeah, it's
22  normal.
23       Q.    And is that full utilization of your gates?
24       A.    I would say.  I would say it's a little bit
25  above.
```

Indeed, Delta averages only "6 or 7" flights a day "across the airline."[24] And United has also testified that "between six and eight" daily flights per gate is full utilization.[25]

*Second*, Southwest has met or exceeded any metric for full use since at least August 2015 (if not before) when it began operating an average of 10 daily flights per gate.[26] Accordingly, Delta should not have been accommodated under the Lease after August 2015. It is true that the Court viewed the facts, and construed the Lease, differently at the preliminary injunction stage. But it had no choice but to assume the role of factfinder at that stage. That does not mean, however, that

---

[22] City App. 335 ¶ 4.

[23] SWA App. 67 (Dep. of Delta Corp. Rep. (H. Shannon)) at 190:17-25.

[24] SWA App. 66 (Dep. of Delta Corp. Rep. (H. Shannon)) at 81.

[25] SWA App. 78-79 (Inj. Hrg. Tr., Vol. 2) at 246:15-247:2; *see also* SWA App. 82 (Inj. Ex. 464) at 1 (internal Delta presentation stating that ATL gate constraints arise at 7.7 daily turns per gate).

[26] SWA App. 89-90 (Inj. Hrg. Tr., Vol. 3) at 39-40.

the Lease is unambiguous or material facts are undisputed on the merits, and does not determine how a jury would construe this language at trial.

The Lease's standard does not ask whether it would be *impossible* for a Signatory Airline to find space for the requested flights but rather whether it would be reasonable to anticipate undue interference at the start of the accommodation (after all, unlike the City's course of action here, the accommodation decision is supposed to occur *before* the accommodation begins). Put differently, nothing in the Lease's accommodation provision forces a Signatory Airline to create operational efficiencies that did not previously exist to allow accommodation. And under that standard, even if it is possible to accommodate another airline at 10 daily flights per gate, such an accommodation would unduly interfere with the priority rights and preferential use of the leaseholder. There is at least a disputed question of fact for the jury on this issue.

### D.   There is a disputed fact issue as to the term of Delta's accommodation.

Assuming Delta's five flights would not have unduly interfered with Southwest's operating schedule in August 2015, the City could have ordered Southwest to accommodate Delta. But, as the City acknowledges, that does not answer how long Delta's accommodation should last. In a startling change from the position it took at the preliminary injunction hearing, the City now argues that approximately 6.5 years—3.5 years from 2018 at the earliest—is reasonable and non-arbitrary. This argument fails on both fronts: A 6.5-year term of accommodation is absolutely unreasonable and arbitrary. At a minimum, the reasonableness of the City's proposed term of accommodation presents yet another disputed question of fact for the jury.

> 1. *A long-term accommodation tramples on the Signatory Airline's 20-year priority in use of its leased gates.*

The City admits there is no support for a 6.5-year or even a 3.5-year term of accommodation in the Lease. But the City then asserts that it can require an accommodation of this length as an exercise of its contractual discretion. The Lease, however, says otherwise.

Instead, in exchange for a 20-year financial commitment to Love Field and the City of Dallas, the Lease grants a Signatory Airline the right to *20 years* of preferential use of its leased gates. The Lease repeatedly emphasizes the priority in use given to the leaseholder over airlines without a lease:

- Section 4.06(C) of the Lease specifically grants Southwest "the preferential use of its assigned Gate(s)" for the term of the Lease.[27]

- The same section acknowledges that there may be instances in which another airline can use the gates but also affirms that ". . . in no event shall said use by others take precedence over [Southwest]'s scheduled use."[28]

- Section 4.06(F)(4)(a) makes clear that in "case of a conflict between schedules of [Southwest] and [any other airline], [Southwest] *will have priority in use of its personnel and its Leased Premises*."[29]

- Section 4.06(F) says that a new entrant may be allowed to use unused gate space in certain circumstances, but only "*at such times that will not unduly interfere with [Southwest']s operating schedule*[.]"[30]

Just as important is what is *not* present in the Lease: any language expressly or impliedly terminating or temporarily extinguishing the Signatory Airline's preferential use in the case of a forced accommodation. Without express language to the contrary, there is no contractual basis for a long-term accommodation that fails to account for a Signatory Airline's desired use. Simply put,

---

[27] City App. 38 (Lease) § 4.06(C).

[28] *Id.*

[29] City App. 39 (Lease) § 4.06(F)(4)(a) (emphasis added).

[30] City App. 38 (Lease) § 4.06(F) (emphasis added).

a term of accommodation, like the one proposed by the City here, that prevents the Signatory Airline from a good faith increase in use violates the preferential use right granted by the Lease.

> ### 2. *Delta's position that airlines without a lease at Love Field are entitled to permanent accommodation would eviscerate the Signatory's 20-year preferential use right.*

In its Response to the City's Motion to Modify, Delta ventures even further from the Lease language, arguing that despite preferential use leases, a Signatory Airline's gate space is "use it or lose it." But this concept—found nowhere in the Lease—cannot be squared with the continuing use preference granted to the Signatory Airline. It defies all principles of contract interpretation, as well as industry custom and usage, to interpret the lease as extinguishing the Signatory Airline's use without a clear expression of that intent in the Lease. Instead, as Southwest's expert explains, accommodation provisions create a "use it or share it" regime in which Signatory Airlines may not sit on empty gates, but may still use the gates in the future should the need arise.[31] Delta reaches its desired result only by inventing a novel rule of contract interpretation: Contracts should be construed in favor of a non-party.

Before this lawsuit began, Delta understood the Lease's accommodation provision exactly as Southwest and the other Signatory Airlines do, namely that accommodation is temporary and always "second fiddle" to the Signatory Airline's schedule:

- In 2013—despite the existence of an accommodation provision and then empty gates at Love Field—Delta acknowledged in an internal presentation that it could not obtain permanent access to gates:[32]

---

[31] SWA App. 94-95 (Dec. of R. Hazel, dated May 18) ¶¶ 5-6.
[32] SWA App. 101 (Inj. Ex. 118).

**Delta Does Not Have Access to Permanent Love Gates**

All 20 gates currently under assignment to WN, AA and UA

- Love Field's terminals were built prior to the 2005 legislation limiting the airport to only 20 gates; the new construction (scheduled to be completed just before Wright lifts in 4Q14) reduces the footprint of the terminal and permanently limits the airport to only 20 gates.

- In May 2014, a Regional Director in Corporate Real Estate for Delta with oversight of Love Field, admitted that even if accommodated, Delta would "have to follow the schedules of the Signatory":[33]

   If we intend to operate out of DAL the accommodation process will take a minimum of 60 days.  Also, if we are accommodated, we are always second fiddle, and will have to follow the schedules of the Signatory. This means we could be required to use a different gate, reschedule our flights, etc. Not good for the brand.

- In that same email, Delta divulged that its post-WARA flights at Love Field would be unprofitable (and thus intended solely to stake a claim in Southwest's "backyard"):[34]

   If we really think we are going to make money flying Regional Jets to the same markets as WN and VX, in WN's backyard I would like for someone to show me.  We should take these aircraft and use them on more profitable routes. I can give you many.

- In October 2014, Mr. Shannon's direct report in Delta's Corporate Real Estate Strategy group recognized ████████████████████████████████████████:[35]

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Irrespective of Delta's thoughts on the matter, the City has long rejected a "use it or lose it" interpretation of the Lease's accommodation provision. In the 2001 Competition Plan, under a heading asking whether the City had "[u]se/lose or use/share policies for the gates and other facilities," the City characterized a materially similar provision[36] as requiring only "use it or share it."[37] Further, the City emphasized that although the accommodation provision "allows the City to

---

[33] SWA App. 107 (DELTA0023187).

[34] SWA App. 108 (DELTA0023188).

[35] SWA App. 109 (DELTA0020166) (emphasis added).

[36] The 2009 Leases amended and restated the 2001 Leases. The substance of the accommodation provision did not materially change with respect to this issue.

[37] SWA App. 129 (Inj. Ex. 220)

require Airline to share gates that are not fully used . . . ***there is no provision [allowing the City] to 'recapture' gates***."[38] What is "use it or lose it" if not another name for recapturing a gate for another airline's use? Both concepts require the Signatory Airline to permanently relinquish leased space.

The 2005 update to the City's Competition Plan confirms that the Leases are "use it or share it." Discussing American's completely unused gates, the City explained that it had not negotiated "use it or lose it" lease language, as previously suggested by the FAA.[39] There would not be a need to negotiate such language if the Leases, which are essentially identical,[40] already contained it.

Finally, applying "use it or lose it" is particularly inappropriate here. Delta requested accommodation in June 2014. But from the moment Southwest reached an agreement with United for its Love Field gates in May 2014 (if not before), Southwest had, and continues to have, every intention of fully using its leased gates.[41] Indeed, Delta knew about a potential deal between United and Southwest when it made its accommodation request.[42]

Although Southwest did not reach its full schedule of 180 flights until August 2015, Southwest phased in its expansion because of a brand-new terminal, the abrupt transition to long-haul flights effected by WARA in October 2014, and government delays in reviewing and consenting to the sublease. Southwest should not be punished for an operationally-wise decision

---

[38] SWA App. 128 (Inj. Ex. 220)

[39] SWA App. 111 (Inj. Ex. 329).

[40] Dkt. No. 198 ¶ 40.

[41] SWA App. 115 (Dec. of A. Watterson, dated Mar. 2, 2018) ¶¶ 5–8.

[42] SWA App. 122 (COD60377) (M. Anastas of Delta emailing Duebner at the City two days before Delta's June 13, 2014 accommodation request, "We have heard that Southwest may be attempting to enter into a sublease agreement with United.").

by awarding Delta a minimum 6.5-year accommodation on gates that Southwest had and has every intention of fully using.

      3.     *A 3.5-year term of accommodation conflicts with the City's interpretation of the Lease, the City's prior course of performance, and industry custom and usage.*

Not only does Southwest continue to believe that the Lease unambiguously allows only short-term accommodations that yield to good faith expansions in a Signatory Airline's schedule, the extrinsic evidence all points to the same interpretation. The City has consistently admitted under oath that it interprets the Lease the same way:[43]

```
12    Q.   All right.  So just so I'm clear, you, certainly, as the
13    airport director, and nobody at the City, ever contemplated
14    that an accommodation under 4.06 would be permanent, correct?
15    A.   That's correct.
16    Q.   And if you were forced to make an accommodation -- forced
17    to make an accommodation to, say, to a signatory carrier you
18    have to accommodate, it is the City's opinion that that
19    accommodation would be for a reasonable period such as six
20    months or a year, right?
21    A.    The initial term of the forced accommodation I would
22    expect to be six months or a year, but it could be revisited
23    depending on the changing environment.  If the signatory
24    carrier continued not to need that gate space, the
25    accommodation would continue.
```

The City's prior course of performance under the Lease also shows that it understood accommodations to be temporary. In September 2014, the City initially ordered United to

---

[43] SWA App. 91 (Inj. Hr'g Tr., Vol. 3, Test. of M. Duebner) at 231; *see also* SWA App. 186-189 (Dep. of City Corp. Rep. (M. Duebner) at 24-27 ("**Q.** So put differently, is it the City's opinion that even if it does have to force accommodation, the signatory airline still has a right to expand its operation on its leased gates in the future? . . . . **A.** Yes, it is our opinion.").

accommodate Delta before rescinding that decision, as allowed under the Lease. Importantly, however, that initial accommodation decision only required United to accommodate Delta *until January 2015*. If the City understood (or intended) the accommodation provision to require a 3.5-year term, it gave no indication then.

Further, Robert Hazel, an industry expert with years in the aviation business, confirms that there is no precedent for long-term accommodation.[44] Absent express language to the contrary, the airline industry custom and usage is that forced accommodations do not last more than a year, and Signatory Airlines retain the right to end the accommodation on short notice.[45] Despite 35 years in the industry, Mr. Hazel has *never* heard of an airline obtaining a long-term, let alone permanent, accommodation. Consistent with Mr. Hazel's view, the DOT confirmed in its interrogatory responses that it knew of no long-term accommodations at any U.S. airport in the last 20 years.[46]

Even the FAA—years before the disavowed letters that resulted from an intense Delta lobbying effort—interpreted the Lease's grant of preferential use and gate-sharing provisions to allow the Signatory Airline to expand its gate use onto space used by an accommodated airline:[47]

> **Leasing or Subleasing**
>
> We also encouraged the City to negotiate the addition of a "use or lose" provision with American Airlines on the carrier's three unused gates at the main terminal. The FAA was concerned that the current arrangement may place a new entrant at a competitive disadvantage by requiring it to sublease the gates, thereby incurring surcharges and the potential of being bumped in use by the prime tenant. You replied that, although American has informally indicated a desire to terminate the lease, such an action would result in a negative financial impact on the City. We do not consider the Competition Plan requirement to mandate that an airport suffer a substantial reduction in lease revenue by terminating leases when no alternative users are seeking access to the airport. Therefore, at this time, FAA bas no objection to...

---

[44] SWA App. 94 (Dec. of R. Hazel).

[45] *Id.*

[46] SWA App. 161 (DOT and FAA Resps. to City's 1st Set of Interrogs.). This set of verified interrogatory responses make it clear that the FAA considers its letters "non-binding" and that the letters "did not require the City to reach a particular decision." *See, e.g.*, App. 158.

[47] SWA App. 169 (COD08501, 2003 Letter from FAA to City) (emphasis added).

Nothing has changed that would alter the FAA's 2003 reading of the Lease's accommodation provisions. The City never negotiated new "use it or lose it" language,[48] and the "use it or share it" language carried over largely unchanged for all three Signatory Airlines. In short, a 3.5-year term of accommodation, which includes no termination right should the Signatory wish to use the gate space, eviscerates the Signatory's property rights.

Finally, even if there was no extrinsic evidence at all, any "tie" between reasonable interpretations of the Lease goes to the Signatory Airline because the City drafted the accommodation provision.[49] Under the doctrine of *contra proferentum*, any ambiguity must be construed against the drafter. *See, e.g.*, *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 677 (Tex. App.—Austin 2003, no pet.) ("Under the doctrine, an ambiguous contract will be interpreted against its author.").[50] "It is essentially a tie-breaking device used to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Id.* (citing *Forest Oil Corp. v. Strata Energy*, 929 F.2d 1039, 1043-44 (5th Cir. 1991). Here, that means that Southwest's (and United's and Virgin/Alaska's) imminently reasonable interpretation of the accommodation provision—short-term accommodations subject to the Signatory Airline's good faith intent to increase flights—prevails over the City's entirely arbitrary 3.5-year term.[51]

---

[48] SWA App. 110-113 (Inj. Ex. 329).

[49] *See, e.g.*, Dkt. No. 257 (PI Opinion) at 25-26 (citing WARA's legislative history and Ex. 631). The post-WARA amended and restated leases hew closely to the leases that pre-date WARA. *See* SWA App. 129 (Inj. Ex. 220) 2001 Comp Plan, Attachment]. The accommodation provisions carry forward mostly intact.

[50] Further, a court cannot construe an ambiguous term to conflict with or render meaningless unambiguous terms, such as "preferential use" and "priority in use." *See Foster Wheeler Energy Corp. v. An Ning Jiang MV, Etc.*, 383 F.3d 349, 358 (5th Cir. 2004) ("[W]e adhere to the maxim that, in a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

[51] City App. 38 § 4.06(F).

   4.      *A 3.5-year term of accommodation is arbitrary and capricious.*

Although Southwest disagrees with "arbitrary and capricious" standard argued by the City, the City's proposed term of accommodation fails to meet even this highly deferential standard. The City offers no explanation for choosing 3.5 years versus any 1 year, 2 years, or any other number. That is the definition of arbitrary. Indeed, the City's corporate representative testified in this case that the appropriate term of accommodation under the Lease was six months to a year. Prior drafts of the City's proposed accommodation policy also set the duration of any accommodation at 6 months. The City offers no justification for its sudden extension of the length of any mandatory accommodation from the six months proposed in its initial policy and supported by the sworn testimony of its Director.

Tellingly, the City Attorney's public comment issued immediately after releasing the proposed accommodation policy stated that the "three-year period was chosen because it seemed like a fair time period and would serve as a good starting point for negotiations."[52] Such public statements demonstrate that this time period is arbitrary and not tethered to any recognized standard; at a minimum, it presents an issue of fact that cannot be resolved through this Motion.

   5.      *The Lease grants the Signatory Airlines discretion to set a reasonable length for the accommodation, not the City.*

The City errs in yet another way. The City is not entitled to set the length of an accommodation, the Signatory Airline is. Although the City has the authority to force an accommodation in certain circumstances, the details of the accommodation arrangement are left to the discretion of the Signatory Airline: "If requested to accommodate another carrier pursuant

---

[52] SWA App. 181-182 (Dallas Morning News Article, dated May 7, 2018)

to this paragraph, the Signatory Airline will use its good faith efforts to effect such accommodation in a reasonable and equitable manner."[53]

Thus, *it is the Signatory Airline's good faith determination of what is "reasonable and equitable" with respect to accommodation on its gates that is entitled to deference*. The City, of course, retains the power to resolve any dispute "in good faith and in a non-discriminatory manner."[54] And here, given the Director of Aviation's testimony and the City's course of performance, the City has no good faith, non-discriminatory reason to disagree with Southwest's entirely reasonable understanding that any accommodation of Delta is a short-term arrangement that ends when Southwest needs the space and provides reasonable notice to Delta.[55]

### E.    At a minimum, the City's decision to apply the policy *retroactively* but start the clock for Delta's term of accommodation *prospectively* is unreasonable and arbitrary.

The City's proposed policy mandates that Delta would obtain a mandatory accommodation for the 5 flights per day it initially requested in June 2014.[56] But instead of starting the 3.5-year term of accommodation at the start date requested by Delta—either October 2014 or August 2015—the policy starts the 3.5-year term at some indeterminate date in the future. That extends Delta's accommodation until at least 2021, which is at least 6 to 7 years after the accommodation would have started. That also means that the City will have deprived Southwest of full use of Gate 15 for nearly the same amount of time.

In typical fashion, the City offers no explanation for this outcome. It is also inconsistent with how the City applies other aspects of the policy. The City generally seeks to apply the policy

---

[53] City App. 39 (Lease) § 4.06(F)(4)(b)).

[54] *Id.* at § 4.06(F)(4)(c).

[55] *See supra* note 43; *see also* City App. 39 (Lease) § 4.06(F)(4)(a) ("In case of a conflict between schedules of the Signatory Airline and the Requesting Airline, the Signatory Airline will have priority in use of its personnel and its Leased Premises.").

[56] *See* City App. 334 ¶ 9.

retroactively, denying, for example, Delta's and American's 2015 accommodation requests. But when it comes to the length of accommodation, the City starts the clock *prospectively*, only once it has a final judgment in hand. There is no non-arbitrary basis for doing so. As explained above, that length of accommodation is also unheard of in the industry and unsupported by any language in the Lease.

A 6 to 7-year accommodation is particularly arbitrary given Delta's history at Love Field. ***As a non-Signatory Airline, it has always operated at Love Field on a short-term basis***. Delta restarted service at Love Field in 2009 on a month-to-month lease with American that was terminable on thirty days' notice.[57] Delta operated for more than five years on this basis. Thus, when Southwest and then United temporarily accommodated Delta in 2014 and 2015—with licenses lasting several months each—it actually gave Delta a *more secure* presence at Love Field. In this context, the City's latest proposal of 6 to 7 years, and Delta's demand for permanency, lacks any rational justification. Only in a courtroom could the City argue with a straight face that it is reasonable and non-arbitrary to seize a long-term property right from a Signatory that was fully using its property (and expanding its use of that property), and award it to a non-Signatory that did not hold such a right and that had been operating on a month-to-month basis for years.

## IV.    Other provisions in the City's proposed policy violate the Lease and federal law.

As discussed above, the City seeks a non-justiciable advisory opinion by asking the Court to preapprove the City's proposed accommodation policy. In making this request, the City impermissibly asks the Court to play airport administrator—a job the City is contractually obligated to perform. Nonetheless, to the extent the Court evaluates the merits of the City's

---

[57] Dkt. No. 198 ¶ 44.

proposed policy, it suffers from obvious flaws that call into doubt the viability of the entire policy.[58]

*First*, the proposed accommodation policy repeatedly violates the plain language of the Lease. One violation is pervasive: the extensive discretion the City grants itself. Although the Lease grants some discretion to the City related to accommodation decisions, that discretion is not boundless in the face of the continuous priority in use that is expressly granted to the Signatory Airlines (who are making a 20-year financial commitment to the airport). Further, Section 4.06(F) restricts the City's discretion in key ways. The policy ignores these restrictions on the City's discretion.

The policy contains more specific violations of the Lease as well:

- **Power to Interfere with the Preferential User's Flight Schedule** – The policy allows the City to shift a Signatory Airline's flight operations from one gate to another to accommodate a new entrant.[59] This violates the Lease, which states that an accommodation shall not "take precedence over Airline's scheduled use" and an accommodation "will not unduly interfere with [an Airline's] operating schedule."

- **Use of Arbitrary "Gate Slots"** – The City divides each gate into a fixed number of 102-minute "Gate Slots" throughout the day. Not only are these Slots an invention of the City, but the 102-minute intervals flout the Lease's guarantee of 30 minutes before and after unloading and loading ("turning") a plane unless the Signatory Airline can turn its planes in an arbitrary 42 minutes or less. The Lease imposes no such "turn" requirement on Signatory Airlines, and the accommodation policy inconsistently provides elsewhere that airlines have up to 60 minutes for each "turn."[60]

- **Required Reporting of Highly Confidential Information** – The City's required monthly reporting demands that Signatory Airlines turn over confidential and proprietary information relating to the number of passengers on board each flight to and from Love Field. This information is not publicly available or otherwise reported by Southwest.[61] The

---

[58] Although Southwest summarizes the primary flaws with the City's policy in this section, the discussion is not exhaustive due to the impossibility of evaluating every possible future application of the City's policy (as well as the lack of clarity present in certain provisions). Should the Court decide that evaluation of the entire policy on the merits an appropriate subject for summary judgment, Southwest requests the opportunity for further briefing.

[59] City App. 338 ¶ 7.

[60] *Id.* at ¶ 6.

[61] SWA App. 120 (Dec. of A. Watterson, dated May 21, 2018). Indeed, all airlines treat this type of information as highly confidential and do not publish or otherwise disclose it. *Id.*

Lease does not obligate Signatory Airlines to provide such information and does not entitle the City to request it. Moreover, compliance with this provision could cause significant competitive injury to Southwest because it would give the City proprietary and trade secret information without any express commitments from the City to protect such information from disclosure. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6) (defining a "trade secret" as to include "all forms and types of information" to the extent the information is secret and the owner derives "independent economic value" from the information).[62]

- **Penalties Related to Reporting Failures** – The failure to timely provide gate usage information potentially subjects a Signatory Airline to draconian penalties (forced accommodation for three years regardless of the Signatory Airlines's schedule). The Lease contains no such penalties.

*Second*, specific provisions in the proposed policy are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ("ADA"), because they seek to interfere with air carrier decisions regarding which routes to fly to and from Love Field.[63] For example, the policy states

---

[62] *See also W.L. Wearly v. FTC*, 462 F. Supp. 589, 598 (D.N.J 1978), *vacated on other grounds*, 616 F.2d 662 (3rd Cir.1980) ("Failure to provide adequate protection to assure confidentiality, when disclosure is compelled by the government, amounts to an unconstitutional 'taking' of property by destroying it, or by exposing it to the risk of . . . disclosure to competitors. The constitutional limitation cannot be altered by any branch of government."); *St. Michael's Convalescent Hosp. v. California*, 643 F.2d 1369, 1374 (9th Cir. 1981) (same).

[63] "Congress passed the ADA in 1978 in an effort to both end federal economic regulation of commercial aviation and to promote competition within the airline industry." *American Airlines, Inc. v. DOT*, 202 F.3d 788, 805 (5th Cir. 2000). "In reducing federal economic regulation of the field . . . Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local taxation." *Id.* (cleaned up). To that end, the ADA includes an express preemption provision, § 41713(b)(1), which generally prohibits states and local governments from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier."49 U.S.C. § 41713(b)(1). A decision relating to which cities a carrier can operate to and from Love Field constitutes a law "related to a . . . service of an air carrier." *See id.* at 805-06 (the "restrictions on service at Love Field under the Ordinance appear to operate as limitations 'relating to . . . routes' within the meaning of § 41713(b)(1)).

     The narrowly construed "proprietary powers" exception in 49 U.S.C. § 41713(b)(3), does not authorize the City to decide or otherwise influence which city-pair routes are served by carriers at Love Field. Section 41713(b)(3) states that "this subsection . . . does not limit a State, political subdivision of a State, or other political authority of at least two States that owns or operates an airport . . . from carrying out its proprietary powers and rights."

     In *American Airlines*, the Fifth Circuit affirmed a DOT determination that a municipal ordinance imposing restrictions on airline passenger service from Love Field (which was inconsistent with the Shelby Amendments to the Wright Amendment) was preempted by the ADA. The court rejected the argument that the restrictions on service at Love Field fell within Dallas' proprietary powers. The court stated that the "precise scope of an airport owner's proprietary powers has not been clearly articulated by any court." 202 F.3d at 806. But the court added that "courts have recognized that **local proprietors play an extremely limited role** in the system of aviation regulation." *Id.* (emphasis added). "In defining the permissible scope of a proprietor's power to regulate under § 41713(b)(3), federal courts have repeatedly held that an airport proprietor can issue only reasonable, non-arbitrary, and nondiscriminatory rules that advance the local interest." *Id.* (citations omitted). No court has authorized local governments that own or operate an airport to interfere with carrier decisions regarding which routes to serve or how and when such service should be provided.

     In sum, the proprietary powers exception has never been applied to allow airport operators to pick and choose which destinations are served by airline operations at their facility.

---

that an accommodation decision may reflect the "[e]xtent to which the accommodation will *introduce service to new destinations*."[64] In addition, the policy states that the City intends to base its accommodation decisions on what it considers to be "the public interest" and the "best interest of the City."[65] The terms "public interest" and "the best interest of the City" are vague. All parties want what is best for the public and the City. But these phrases cannot be used to interfere with market decisions regarding airline routes, prices, and services, without violating the ADA. At a minimum, a court order adopting the policy should specify that no accommodation decision can be rendered by the City which directly or indirectly relates to an airline price, route, or service.

## V.   Southwest agrees with the City that certain issues should be decided as a matter of law.

### A.   Delta's February 2015 accommodation request for eight additional flights should be denied.[66]

Southwest agrees with the City that summary judgment should be granted as to Delta's February, 23 2015 request for accommodation of eight additional flights. As the City notes, Delta finds space for eight additional flights[67] only by ignoring Southwest's concrete plans to expand its schedule to 180 flights *before* Delta's request for accommodation.[68] Indeed, the February 23rd email cited by the City indicates that Southwest circulated the August schedules internally as early as February 19, 2015:[69]

---

[64] City App. 339 ¶¶ 1 & 2(b) (emphasis added).

[65] City App. 333–34 ¶¶ 4(b) & 7.

[66] For the myriad reasons given in the City's Motion, Southwest likewise agrees that American's request for accommodation should be denied.

[67] It is worth noting that Delta admitted at the time that 2 of the 8 flights would not allow for the 30-minute "separation periods" required by the Lease in Section 4.06(C). *See* SWA App. 173 (PI Ex. 231). Thus, even under Delta's erroneous "snapshot date" theory, it would only be entitled to 6 flights.

[68] City App. 263-64; SWA App. 115 (Dec. of A. Watterson, dated Mar. 2, 2018).

[69] City App. 263 (emphasis added).

We will again be adding new nonstop markets to/from DAL as well as additional frequency in existing DAL markets, effective August 9th, 2015. Attached for your reference is an updated Station Changes Report to include these market changes in August 2015.

Below are the timelines we have planned as well as the market details:

**DAL August Base Expansion**
· Effective:
  ○ August 9th, 2015
· Sent (internal):
  ○ Thursday February 19th
· Open:
  ○ Thursday February 26th
    § Schedules will be processed starting as early as 05:00AM
    § All markets have existing one-stop/connecting service therefore the new nonstop flights will appear as they get processed

This planned expansion was no secret. Four months earlier, in October 2014, Delta's Corporate Real Estate Strategy group recognized ███████████████████ ██████████████████████████████████████████████████████████████ ████████ ,"[70]

Delta ignores too that Southwest could not publish an expanded schedule (i.e., sell tickets to the public) until the City consented to the Southwest-United sublease. That did not happen until January 28, 2015.[71] In less than a month, Southwest published a full schedule for those two gates. And Southwest began planning for operating a full schedule on those gates even earlier; the initial sublease agreement with United occurred in May 2014—before Delta's June 2014 accommodation request.[72] Indeed, Southwest calculated its offer to United ***based on an assumed schedule of 10 daily flights per gate***.[73]

Not once has Delta submitted evidence that Southwest acted in bad faith in either entering into the sublease or expanding its schedule onto those gates. Indeed, given that Delta (1) sent the request through litigation counsel and (2) only requested eight additional flights *after* the City

---

[70] SWA App. 109 (DELTA0020166).

[71] Dkt. No. 198 ¶ 56 *et seq.*

[72] SWA App. 115 (Dec. of A. Watterson, dated Mar. 2, 2018) ¶¶ 5–8.

[73] *See* SWA App. 183 (Inj. Ex. 194, Valuation Spreadsheet).

consented to the sublease and Southwest announced a first wave of flights for those two gates, it is *Delta's* request that appears designed to thwart Southwest's leasehold property rights. Why wait until months after the accommodation dispute begins (during which you are told there is no space for even 5 flights starting in mid-2015) to request additional flights? And why request these flights after you have acknowledged in internal planning documents that "███████████████████ ██████████████████████████████████████████████████"[74] Delta's timing smacks of litigation posturing rather than a sincere accommodation request.

Finally, from a contractual standpoint, the only two parties to the Lease agree that the inquiry into undue interference with a Signatory's "operating schedule" allows for consideration of planned schedules. A "court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary." *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979); *see also James Stewart & Co. v. Law*, 233 S.W.2d 558, 561 (Tex. 1950) ("Courts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed."). Delta's interpretation of the provision is irrelevant.[75]

### B. Delta's declaratory judgment and contract claims should be dismissed; it is not a third-party beneficiary of the Lease and has no unilateral contract with anyone.

Southwest also agrees with the City (and Judge Jones) that Delta lacks any legal interest that would allow it to bring claims under the Lease or one of several unilateral contracts Delta alleges exist. Southwest covered these issues in depth in its Motion for Judgment on the Pleadings

---

[74] SWA App. 109 (DELTA0020166).

[75] Delta's view also conflicts with the plain meaning of the term "operating schedule." The broad language in the Lease indicates that the parties intended to consider multiple factors that might interfere with the Signatory's operating schedule. Had they intended to tie the inquiry to "published schedules" only, they knew how to say so.

and Response to Delta's Motion for Partial Summary Judgment (Dkt. Nos. 364 and 381). That briefing is fully incorporated here by reference.

In the main, Delta cannot overcome Texas's presumption against third party beneficiaries. *MCI Telecomm. Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999) ("[T]here is a presumption *against*, not in favor of, third-party beneficiary agreements.") (emphasis added). Southwest's prior briefing gave numerous reasons why Delta fails to overcome that presumption with respect to the Lease. For brevity, Southwest discusses two of the most important.

*First,* Delta cannot point to any preexisting, legally enforceable obligation that Southwest owed Delta for which the City's alleged promise to force accommodation was intended to satisfy. In the commercial context, Texas law requires a third party seeking to enforce a contract right to prove it is a "creditor beneficiary." *See Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App.—Dallas 2010, no pet.) ("Donee and creditor beneficiaries may bring suit to enforce a contract; incidental beneficiaries may not."). Further, the "creditor" obligation must run from the promisee to the third party, *Garcia v. Bank of Am. Corp.*, 375 S.W.3d 322, 326–27 (Tex.App.—Houston [14th Dist.] 2012, no pet.) ("A party is a creditor beneficiary if . . . performance will satisfy an actual or asserted duty of the *promisee to the beneficiary*."). (This rule makes sense. Why else would a promisee ask the promisor to confer a benefit on someone else?)

For Delta's claims against the City—which seek to enforce alleged promises by the City—Southwest is the promisee. ***But Southwest owed no preexisting "creditor" obligation to Delta that would qualify Delta for third-party beneficiary status***. Not once has Delta attempted to even identify such an obligation.[76]

---

[76] Nor is Delta a "creditor beneficiary" with respect to the alleged promises of Southwest to the City. The City had no preexisting, legally enforceable obligations to Delta. The only potential source of obligation—the grant assurances and the Competition Plan—contain no promises to third parties, a point illustrated by the lack of a private right of action to enforce them. *See, e.g.*, *McCasland v. City of Castroville*, 514 Fed. App'x 446, 448-49 (5th Cir. 2013).

*Second*, the nature of the accommodation process does not clearly evidence an intent to confer a right to accommodation on new entrants. There is simply too much discretion granted to Signatory Airlines and the City—both *not* to order accommodation and to set the terms of the accommodation. The accommodation process starts with a request for *voluntary* accommodation from multiple airlines (a characterization that Delta itself repeatedly used,[77] even in the early stages of this lawsuit); it may or may not result in a mandatory accommodation ordered by the City; and if ordered, the obligation might fall on only one of several Signatory Airlines.[78] Even then, a forced accommodation requires further negotiation of "reasonable terms . . . taking into consideration all the circumstances" to implement it.[79]

In short, Section 4.06(F)'s reflects agreement to follow an accommodation process that may indirectly benefit new entrants. But it does *not* "clearly and fully spell[] out" an intent to confer a direct, enforceable benefit on them sufficient to overcome the presumption against third party beneficiaries. *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1075 (5th Cir. 2002) (quoting *MCI Telecomm.*, 995 S.W.2d at 651).

### C.    Southwest agrees that the City properly consented to the United-Southwest sublease.

Southwest also agrees with the City that summary judgment should be granted with respect to Delta's claims regarding the sublease. As the City notes, the DOJ (in consultation with the DOT)

---

[77] *See, e.g.*, Dkt. No. 66 (Delta Countercl. & Answer to City Compl.) ¶ 25 on 66 ("The requesting airline must seek *voluntary* accommodation by attempting to secure gate space and other necessary facilities *on a voluntary basis* from one of the incumbent airlines at Love Field . . . If the requesting airline has contacted all of the incumbent airlines and exhausted all reasonable efforts to secure *voluntary* accommodation, the requesting airline may notify the City's Director of Aviation . . .") (emphasis added). More broadly, why include a detailed process that allows the City to force an accommodation if the accommodation obligation is mandatory in the first instance?

[78] *See* City App. 39  (Lease) § 4.06(F)(3) (using the word "may" to describe the City's selection of a Signatory Airline to accommodate a new entrant).

[79] *See* City App. 38 (Lease) § 4.06(F).

cleared the transaction. Delta has stipulated to this fact.[80] Delta now claims the DOJ and DOT got it wrong because the Competition Plan forbids paying market value for the right to enter into a sublease at Love Field. But that disregards that (1) the Plan is informational only and (2) the language cited by Delta ***pertains to the forced accommodation of new entrants***, not private, arms-length transactions between airlines. Just as important, Delta has not identified any legal right that allows it to enforce the Competition Plan against the City or Southwest.[81]

Most telling, however, are Delta's admissions that it has no problem with the legality of buying or swapping gates when it is the one doing it:[82]

```
14      Q.  What has Delta done to try and obtain gate
15   space at JFK and LAX?
16      A.  Work with the airport authorities under
17   Shannon's, under Holden's leadership.
18      Q.  Trying to purchase or trade gate space from
19   those airlines?
20      A.  Sure.
21      Q.  I mean, from any airline?
22      A.  Any -- well, either them or through the
23   airport authority or any means we can.

                          ***
6       Q.  Has Delta entered into those swaps before?
7       A.  For which assets?
8       Q.  For gate space or slots.
9       A.  We have, yes.
```

---

[80] Dkt. No. 198 ¶ 59.

[81] To the extent Delta relies on Article 14, Southwest has previously briefed why that argument fails in its Response to Delta's Motion for Partial Summary Judgment. Most notably, none of Article 14's provisions grant any rights to "new entrants," let alone Delta.

[82] SWA App. 6-7 (Dep. of Delta Corp. Rep. (J. Esposito)) at 185–86.

Indeed, ***Delta attempted to buy or swap for the very gates at issue throughout Spring 2014***.[83]

More generally—and setting aside Delta's incorrect interpretation of the Competition Plan—the only party harmed by a provision that limits the amounts paid for a sublease is ***the party paying for the sublease***. Here, that party is Southwest not Delta, and Southwest has not taken issue with the payment. Delta has no right to invalidate a transaction that has engendered no complaints from the party harmed by the alleged violation.

> **D.     Southwest agrees that the City should evaluate Alaska's gate usage and move Delta's five flights there given Alaska's recent reduction of flights.**

Finally, Southwest agrees that Alaska's underutilized gates are fair game. As explained in its Response to Delta's Motion for Partial Summary Judgment—already fully incorporated by reference—the City has continuing obligations to assess gate usage at the airport.[84] Further, to the extent the Lease allows long-term accommodation at all, certainly the City may not force the accommodation to remain on gates that one Signatory Airline would like to use while another Signatory Airline's gates go unused. The City acknowledges this obligation in its proposed policy, and the Lease contemplates this result as well.

**VI.     Southwest abandons its damages claims against the City for breaches of the Lease.**

The City seeks summary judgment on Southwest's breach of contract claims against the City. To the extent this refers only to Southwest's claims for damages—and not its claims for declaratory and injunctive relief—Southwest agrees. Southwest elects not to put on proof of its damages at this time. Should Southwest prevail at trial, however, it reserves the right to recover

---

[83] SWA App. 195 (Inj. Ex. 463) (email discussing Delta's willingness to pay a "lump sum" to United for a gate at Love Field in February 2014); SWA App. 79-80 (Inj. Hr'g Tr., Vol. 2 at 247:12-248:22) (Test. of Kate Gebo at United) (explaining Delta's offer of an "economic incentive" for gates at Love Field, which she understood as cash). Additionally, United also had discussions with Spirit and Virgin regarding United's Love Field gates, and Virgin too made an offer for the gates. SWA App. 75-77 (Inj. Hr'g Tr., Vol. 2) at 242:24-244:4.

[84] City App. 38 (Lease) § 4.06(F).

damages incurred for the period the preliminary injunction has been in effect through the injunction bond or by restitution.

Southwest assumes any disposition of these two claims will be limited to the lack of quantifiable damages. But in the event the Court reaches the merits of the City's contractual obligations to Southwest related to these claims, Southwest disagrees with the City. With respect to the City's failure to timely reach an accommodation decision, the Lease's accommodation process imposes several deadlines on the City and requires "good faith" in rendering decisions.[85] The City cannot possibly argue that it has no contractual duty to come to a final decision within a reasonable amount of time.

With respect to City's failure to evaluate gate usage, the City has implicitly agreed— through its proposed policy—that the Lease requires ongoing evaluation of gate usage and a duty to move an accommodation to underused gates. Why else include provisions that allow just that in the policy? Finally, if further explanation is needed, Southwest refers the Court to its Response to Delta's Motion for Partial Summary Judgment discussing the Virgin/Alaska gates.[86]

## <u>CONCLUSION</u>

For the foregoing reasons, Southwest requests that the Court grant the City's Motion for Summary Judgment as it relates to the issues set forth in Section V(A)-(D) above, and deny the remainder of the City's Motion for Summary Judgment.

---

[85] *Id.*
[86] Dkt. No. 381 at 35–37.

DATED: June 13, 2018                    Respectfully submitted


                                        */s/ Eric W. Pinker*
                                        Eric W. Pinker (epinker@lynnllp.com)
                                        Texas Bar No. 16016550
                                        Kent D. Krabill (kkrabill@lynnllp.com)
                                        Texas Bar No. 24060115
                                        Britta Erin Stanton (bstanton@lynnllp.com)
                                        Texas Bar No. 24036976
                                        Russell Herman (rherman@lynnllp.com)
                                        Texas Bar No. 24083169
                                        Jervonne Newsome (jnewsome@lynnllp.com)
                                        Texas Bar No. 24094869
                                        **LYNN PINKER COX & HURST, LLP**
                                        2100 Ross Avenue, Suite 2700
                                        Dallas, TX 75201
                                        Telephone: 214.981.3830
                                        Facsimile: 214.981.3839

                                        **ATTORNEYS FOR DEFENDANT**
                                        **SOUTHWEST AIRLINES CO.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 13, 2018, the foregoing document was served on all counsel of record through the Court's ECF system.

*/s/ Russell Herman*
Russell Herman