## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| DELTA AIR LINES, INC., SOUTHWEST | § | CIVIL ACTION NO. 3:15-CV-02069-K |
| AIRLINES CO., VIRGIN AMERICA INC., | § | |
| AMERICAN AIRLINES, INC., UNITED | § | |
| AIRLINES, INC., SEAPORT AIRLINES, | § | |
| INC., UNITED STATES DEPARTMENT OF | § | |
| TRANSPORTATION, AND THE FEDERAL | § | |
| AVIATION ADMINISTRATION | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## DELTA AIR LINES, INC.'S BRIEF IN SUPPORT OF ITS RESPONSE TO PLAINTIFF CITY OF DALLAS'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ...................................................................................................... 1

II. ARGUMENT ............................................................................................................... 2

    A.  The City's Motion for Summary Judgment Permitting an Unlawful
        Accommodation Policy Should Be Denied. ........................................................ 2

        1.  The City May Not Impose an Arbitrary Three-Year Limitation on an
                Accommodation. .................................................................................. 2

        2.  The City Has No Authority To Deny Delta's Request for Eight
                Flights. ................................................................................................. 9

        3.  The City's Request that the Court Declare Application of Its Policy
                to Virgin/Alaska Is Not Proper. ....................................................... 11

    B.  The City Is Not Entitled to Summary Judgment Regarding Its Consent to the
        Sublease. ............................................................................................................. 12

    C.  The City Is Not Entitled To a Declaration That Its Unlawful Actions Did
        Not Violate the Grant Assurances, Competition Plan, or Other Federal Law. .......... 17

    D.  The City's Conclusory Challenges to Delta's Counterclaims Provide No Basis
        for Summary Judgment. ................................................................................... 19

        1.  This Court Properly Concluded that Delta Is a Third-Party
                Beneficiary. ......................................................................................... 19

        2.  The City Has No Basis for Summary Judgment on Delta's Unilateral
                Contract Claim. .................................................................................. 20

        3.  The City's Miscellaneous and Conclusory Contract Challenges Fail. .............. 21

        4.  The City's Rehash of Its Tortious Interference Argument Fails. .................... 21

        5.  Governmental Immunity Does Not Bar Delta's Counterclaims. .................... 21

        6.  The City Is Not Entitled to Summary Judgment on Delta's WARA
                Counterclaim. ..................................................................................... 21

III. CONCLUSION ......................................................................................................... 22

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*41 N. 73 W., Inc. v. U.S. DOT,*
    408 Fed. App'x 393 (2d Cir. 2010) .................................................................14

*City of Dallas v. Delta Air Lines, Inc.,*
    847 F.3d 279 (5th Cir. 2017).........................................................................3, 5

*Gamma Grp., Inc. v. Transatlantic Reinsurance Co.,*
    242 S.W.3d 203 (Tex. App.—Dallas 2007) ........................................................7

*Pompano Beach v. Federal Aviation Admin.,*
    774 F.2d 1529 (11th Cir. 1985) ......................................................................14

**Statutes**

49 U.S.C. § 40117(k) .......................................................................................16

49 U.S.C. § 40117(k)(2) ...................................................................................16

49 U.S.C. § 47106(f).........................................................................................16

**Other Authorities**

152 Cong. Rec. H8002–01 (daily ed. Sept. 29, 2006)...........................................6

**Regulations**

14 C.F.R. § 158.19(b)........................................................................................17

14 C.F.R. § 158.29(a)(viii) ................................................................................17

14 C.F.R. § 158.81.............................................................................................17

14 C.F.R. § 158.87.............................................................................................17

## I.   INTRODUCTION

Nearly three years ago, the City filed this lawsuit to obtain the Court's declaration of its legal obligations to preserve competition at Love Field.  In its motion for summary judgment, the City now seeks to ignore the findings of this Court and the Fifth Circuit about that obligation, and it asks this Court to instead conclude that the City has no legal obligation at all, but rather discretion.  The City argues that this Court should *not* decide whether the public should be the beneficiary of competition at Love Field, and instead should defer to the discriminatory policy the City belatedly drafted to codify Southwest's control over Love Field.  The City thus seeks a declaration that its policy—complete with entirely arbitrary provisions invented out of whole cloth, such as the conferral of a right on Southwest to evict Delta from Love Field after three years have passed—resolves all claims in this litigation because the City has "discretion" to decide the very claims the City brought to the Court for decision.

Delta agrees with the City that there are no genuine issues of material fact in this litigation and that the case is ripe for summary judgment.  But that is because the law of the case, the plain language of the lease agreements, and the unambiguous rules and statements of the DOT and FAA dictate the outcome:  Delta is entitled to be accommodated for 13 flights on a use-it-or-lose-it basis.  The City's policy, rather than providing that accommodation, destroys any prospect of future competition at Love Field by permitting Southwest, which controls 90% of gates at Love Field and flies over 90% of the passengers, to further expand its dominance at the airport by pushing out the competition that Delta offers.  The City cannot justify this violation of every governing authority by simply announcing that it has now decided to make its support for Southwest explicit.  The City's motion for summary judgment should be denied, and Delta's competing motion for summary judgment, which is grounded in this Court's opinion, the lease agreements, and federal law, should be granted.

## II.   ARGUMENT

### A.   The City's Motion for Summary Judgment Permitting an Unlawful Accommodation Policy Should Be Denied.

Undeterred by the many flaws in its accommodation policy pointed out by Delta and, in some respects, American and Virgin, the City now doubles down, asking this Court to grant summary judgment "allowing the City to adopt, implement, and apply its proposed accommodation policy."  Mot. at 4.  Under that policy, the City would deny Delta's pending request for accommodation for eight flights and permit Southwest to end Delta's current five flights as soon as three years pass, solidifying Southwest's total control over 18 of the 20 gates at Love Field and ensuring no future competition will enter Love Field.

As set forth at more length in Delta's own motion for summary judgment and Delta's response to the City's motion to modify the preliminary injunction, which Delta incorporates herein by reference, the City's proposed policy defies the law-of-the-case doctrine and the mandate rule, violates the lease agreements, and ignores the requirements of federal law.  *See generally* Dkt. 448.  Each of those authorities supports summary judgment in favor of Delta, as requested in Delta's motion for summary judgment, and prohibits the policy the City seeks to adopt.  Accordingly, Delta respectfully requests that the Court not endorse or approve that policy, and that the Court deny the City's motion for summary judgment and grant summary judgment to Delta.

### 1.   The City May Not Impose an Arbitrary Three-Year Limitation on an Accommodation.

The City admits in its motion that the Court can and should resolve this case on summary judgment.  As the City correctly recognizes, "There are no genuine issues of material fact; only issues of law remain."  Mot. at 1.  As a result, the City acknowledges, whether Delta is "entitled to accommodation and the nature and duration of any accommodation are questions of law."  Mot. at 1.

The City also admits in its motion that Delta is entitled to summary judgment that its five currently existing flights must be accommodated.  Mot. at 6–7.  This admission is plainly correct; indeed, this Court and the Fifth Circuit have already reached the same conclusion for purposes of likelihood of success on the preliminary injunction.  *See City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 290 (5th Cir. 2017) (the lease agreement between Southwest and the City "plainly establishes a duty to accommodate by both Southwest and the City"); Dkt. 257 at 30 ("Delta has established Southwest did not comply with its contractual obligation and, therefore, breached Section 4.06F, the accommodation provision, of the Lease Agreement.").

The City tries to limit the effect of its admission by adopting, without citation or explanation, an arbitrary three-year limit on Delta's accommodation.  The City argues that the Court should approve its proposed policy imposing this limitation because three years is supposedly a "reasonable" length of time for Delta to fly its existing flights.  Mot. at 5.

The City's appeal to "reasonableness" is both irrelevant and incorrect.  Federal law and the grant assurances require accommodation of competition at public airports like Love Field.  As a result, they prohibit discrimination in favor of a dominant airline, regardless of whether it is "reasonable" for an airport operator to discriminate.[1]  That is, the question of how long an accommodation must continue is not a policy question for the City, as to which the City may adopt any length it prefers so long as it meets some rational basis standard.  Nor is it a question of the airport operator's "discretion," as the City repeatedly claims.  Mot. at 6.  Instead, the City must ensure that "[w]hen a carrier will be operating at the airport as a subtenant," the "terms and conditions in the sublease provisions are reasonable and that similar users are subject to substantially comparable charges."[2]  The incumbent

---

[1]   *See* Delta App. 280 (Exh. 304 at 304.0008) ("Federal law requires airport operators to provide access to all qualified air carriers on reasonable terms and without unjust discrimination.").

[2]   *Id.* at 314 (Exh. 304 at 304.0042).

Page 3

airline has a preferential right to use the gate space, subject only to losing that right to an accommodated carrier when there is unused space available when the accommodation request is made. Denying that same use-it-or-lose-it right to the accommodated carrier is impermissible discrimination.

The City's proposed three-year limit on an accommodation violates federal law—and the provisions of the airport use and lease agreements incorporating federal law—for the additional reason that it would allow Southwest, Love Field's "dominant airline," to "become [the] de facto airport manager[]" at Love Field.[3]  The grant assurances prohibit the City from "defer[ring] completely to incumbent tenants' determinations on whether or not, and how, to accommodate requesting airlines."[4]  Yet under the City's proposed policy, after three years had elapsed Southwest would have an absolute right to expand its schedule, end the ongoing accommodation, and evict Delta from the airport; the City would defer completely to Southwest's scheduling determination.   For this reason as well, the City's policy is inconsistent with federal law: "airports cannot use [contractual arrangements] to cede control over airport facilities to tenant airlines."[5]

Instead, the accommodation provision in the use and lease agreement requires the City to ensure that Delta is accommodated on a use-or-it-or-lose-it basis.  As Delta has briefed at length elsewhere, including in its motion for summary judgment and its response to the City's motion to modify the preliminary injunction,[6] this understanding of the accommodation provision is confirmed by (1) the decisions of this Court and the Fifth Circuit, which are the law of the case, both of which held at the preliminary injunction stage that Delta was entitled to be accommodated; (2) the lease agreements, which do not provide a mechanism to terminate an accommodation; (3) the DOT's and

---

[3]  *See id.* at 279 (Exh. 304 at 304.0007).

[4]  *Id.* at 281 (Exh. 304 at 304.0009).

[5]  *Id.* at 344 (Exh. 304 at 304.0072).

[6]  Delta incorporates its briefing on its motion for summary judgment and its response to the City's motion to modify the preliminary injunction by reference as if fully set forth herein.  (Dkt. 361–63, 413, 415, 432, 448, 449).

FAA's statements, including two letters sent by the DOT to the City in this case, in which the DOT authoritatively construed the requirements of the federal grant assurances to require "use-it-or-lose-it" accommodation; and (4) the grant assurances themselves. Although Delta has repeatedly pointed the parties to these authorities, the City claims that "[o]ther than the DOT Letters, the City has not located any authority as to how long an accommodation should be." Mot. at 5. Although it is striking that the City would summarily dismiss the guidance of *the governing agency* addressing the proper construction of the grant assurances that the agency is charged with construing and enforcing, particularly when the City freely acknowledges it has found no contrary authority, the City also ignores multiple sources of authority requiring that an accommodation continue on a use-it-or-lose-it basis.

First, it is nothing short of contemptuous of this Court and the Fifth Circuit for the City to ignore the very findings and conclusions it asked of them by filing this suit. This Court and the Fifth Circuit—which held that the lease agreement "plainly establishes a duty to accommodate by both Southwest and the City," *City of Dallas*, 847 F.3d at 290—both concluded that a preliminary injunction is appropriate because it is likely that the lease will ultimately be construed to entitle Delta to continue to fly its five flights. *City of Dallas*, 847 F.3d at 290-91; Dkt. at 257 at 30, 36. Neither concluded that the duty to accommodate was likely to expire in the near term, a finding that would have suggested a time limit to the preliminary injunction. Yet the City contends that its newly minted "policy" can overrule those decisions.

Second, the lease agreement provides a *detailed* outline of how the accommodation process will work—what the requesting airline must do to request accommodation, what the signatory airlines must do to respond, and what the City must do to ensure accommodation occurs (and on what timeframe).[7] The purpose of the accommodation process, as this Court explained, is "to insure there

---

[7] *See generally* Delta App. 93–94 (Exh. 25 at 25.0027–28).

would be open access for an airline requesting accommodation for gate space at Love Field in light of the gate limitations and overall constraints which the parties all recognized."[8]   Southwest and the City acknowledged this in lobbying for WARA's passage, responding to Congressional concerns about "how will new competition come into Love Field?" and "[w]here is room for competition?" by assuring Congress that the accommodation provisions in the lease would provide the desired competition.[9] Southwest's then-Chairman, Herb Kelleher, reassured Congress that, if Southwest had gate space available, "we would simply be told by the City of Dallas, you have got these vacant spaces in your gate utilization and by golly you are going to put another carrier in there."[10]   Congressman Oberstar, who originally expressed significant concern about the effect of WARA on competition, ultimately endorsed the bill because WARA "preserves the FAA's authority to enforce grant assurances that obligate Love Field to make its facilities available on a reasonable and non-discriminatory basis," and therefore "ensure[d] that a prospective new carrier would have reasonable access to these 20 gates at Love Field."[11]

Unsurprisingly, given this widespread agreement that the lease agreements would permit and require accommodation of competition, the lease includes *no* language contemplating that an accommodation could be ended at the will of the dominant carrier, much less any outline of the circumstances under which such termination would be permissible.  The City's adoption of a termination process under which the accommodating airline may terminate any accommodation after three years simply makes up a contract term to which the parties never agreed—a term that Congress never contemplated and that violates the FAA's prohibition on granting Southwest an exclusive right to the

---

[8]   Dkt. 257 at 22.

[9]   Delta App. 401, 439–41 (Exh. 631 at 631.0009, 631.0047–49).

[10]   Delta App. 446 (Exh. 631 at 631.0054).

[11]   Delta App. 57–58 (152 Cong. Rec. H8002–01, H8003–04 (daily ed. Sept. 29, 2006) (statement of Rep. Jim Oberstar)).

airport.  But Texas courts "do not rewrite contracts to insert provisions parties could have included or imply restraints for which they did not bargain," and "may not add to a contract under the guise of interpretation."  *Gamma Grp., Inc. v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203, 212 (Tex. App.—Dallas 2007).  At other airports, where capacity may be added to ensure demand is met, the FAA has noted that some leases *do* contain "bumping" provisions, although the FAA has not suggested that such provisions would be enforceable if an airport was fully utilized.[12]  The Love Field lease agreements have no such provisions.

Third, the DOT's letters were simply the latest in a consistent history of DOT and FAA statements on the topic.  The definitive FAA guidance document on preservation of competition at airports, *Airport Business Practices and their Impact on Airline Competition*, made clear nearly two decades ago that incumbent carriers with preferential use rights lease gates on a "use-it-or-lose-it" basis.[13]  If, as the City proposes, a dominant airline may take back space as soon as it wants to do so, or after a brief period of accommodation, then it can never "lose" its right to use gates—it always retains control. The FAA also has explained clearly that "all federally assisted airports are bound by federal grant assurances that require the airport operator to accommodate reasonable requests for access by a new entrant carrier or by an incumbent carrier that wants to expand its operations."[14]  And the FAA indicated that the "federal grant assurances' overriding policy [is] to assure that the airport is operated for the benefit of the public and is available for public use."[15]  That "overriding policy" is not served by permitting a dominant airline to drive out all competition so long as it waits three years to do so.

---

[12]  Delta App. 335–36 (Exh. 304 at 304.0063–64).

[13]  *Id.* at 335–36, 373 (Exh. 304 at 304.0016, 0063–64, 0101).

[14]  *Id.* at 285 (Exh. 304 at 304.0013).

[15]  *Id.* 281 (Exh. 304 at 304.0009).

Finally, fact and expert witnesses for both Delta and Southwest agree that the industry has *never seen* a dominant carrier force an accommodated airline to cease its service—strong evidence that a dominant carrier lacks authority to do so.  Delta's Senior Vice President – Corporate Real Estate Holden Shannon testified at the preliminary injunction hearing that, despite having worked on issues of airport access for over 20 years, he had never "seen an airline be forced to stop existing service and leave an airport over failure to give accommodation."[16]  In a deposition last week, Southwest's expert Robert Hazel agreed, testifying that he is not aware of *any* "accommodated airline having to stop service" due to the termination of an accommodation.[17]  As Mr. Hazel put it, "I have not seen that situation where an airline that was accommodated was forced to stop service when the accommodation ended."[18]  The City seeks authority to take action—the termination of Delta's ongoing pattern of service at the airport based on Southwest's desire to expand service—that no dominant carrier or airport operator has ever exercised or purported to have.[19]

Put against this authority, the City's entirely unexplained adoption of three years as the length of an accommodation is not only not "reasonable"—it is unlawful, impermissibly discriminatory, and a breach of the lease agreements.

---

[16]  Delta App. 7:19–22 (Transcript of Sept. 28, 2015 Preliminary Injunction Hearing at 141:19–22) (testimony of Holden Shannon) (ECF No. 211).

[17]  Delta App. 14–15 (Deposition Transcript of Robert Hazel (Rough) at 248:1–2).

[18]  *Id.* at 12–13 (Deposition Transcript of Robert Hazel (Rough) at 210:19–21).

[19]  The City also notes that Delta's accommodation could be terminated even more quickly if Delta does not "maintain[] the same pattern of service" by flying to the same cities.  Mot. at 6.  The City indicated in its reply brief in support of its motion to modify the injunction that it was abandoning this requirement (Dkt. 455 at 4–5); to the extent the City intends to retain it, it is improper for the reasons Delta laid out in its response to the motion to modify (Dkt. 448 at 10–11).

## 2.      The City Has No Authority To Deny Delta's Request for Eight Flights.

As set forth in Delta's motion for summary judgment, Delta is entitled to summary judgment on its request for accommodation for eight flights for precisely the same reasons it is entitled to summary judgment on its request for accommodation of the five flights.[20]  In an attempt to circumvent this inconvenient reality, the City summarily announces (again without explanation or authority) that, under its policy, "all pending but unfulfilled accommodation requests are deemed denied on the effective date of the policy."  Mot. at 8.  But the DOT has already told the City that it must apply a "snapshot date" approach, where it considers whether there is space available for a requested flight when the request is made.[21]  And that approach is the only one that makes sense in the context of the "use-it-or-lose-it" nature of the preferential use lease.  If an airline is not using the space, then another airline has a right to be accommodated on a non-discriminatory basis.

The City appears to recognize that it has no basis to categorically deny all pending requests to provide competition to Southwest, dedicating most of its analysis of this issue to its alternative argument that the snapshot date theory would also require Delta's request to be denied.  But that ignores the undisputed facts:  when Delta requested accommodation for 8 flights, bringing its total request to 13 flights, Southwest was flying only 153 flights on the 18 gates it leased or subleased,[22] and United was flying none at all.  Even giving Southwest the benefit of flights it had announced but was not yet flying, Southwest could be credited only with 166 flights,[23] leaving space for at least 14 more without exceeding 10 flights per day per gate, and at least 19 more flights to match the current usage at Love Field.  All parties agree to these numbers.

---

[20]   Dkt. 362 at 14–16, 20–36.

[21]   Delta App. 226, 230 (Exh. 71 at 71.0002; Exh. 73 at 73.0003).

[22]   Delta App. 240 (Exh. 95 at 95.0004).

[23]   Delta App. 39 (February 12, 2015 Press Release regarding 166 flights); *see also* Delta App. 240 (Exh. 95 at 95.0004). Delta requested accommodation of the eight additional flights on February 23, 2015.  Delta App. 267–70 (Exh. 160).  Southwest announced an intent to expand to 180 flights on February 26, 2015.  Delta App. 232–36 (Exh. 93).

Undeterred by the facts, the City tweaks its application of the snapshot date to apply a "modified version" under which Southwest is entitled to consider flights not yet announced for sale if that is necessary to block Delta's desired competition.  Mot. at 9.  Because Southwest *later* announced it would fly 180 flights, the City reasons, Delta was not entitled to accommodation when it made its request.  The City acknowledges that the DOT explicitly rejected this approach, finding that future plans for flights neither announced nor published were not "sufficiently reliable indicators of future utilization," and that considering such plans would facilitate dominant carriers engaging in bad faith actions to block accommodation.  *Id.* at 8–9 (quoting Exh. 71, 73).  But the City concludes that Southwest did not act purely to block Delta, and that it can therefore ignore the DOT's guidance.  *Id.* at 9–10.

The City's conclusion ignores the DOT's primary basis for rejecting consideration of future, unpublished, unscheduled, unannounced plans:  such plans are not "sufficiently reliable indicators of future utilization."  The City offers no explanation of how it would decide when plans are sufficiently certain that they should be considered.  After all, Delta certainly contemplated offering expanded competition at Love Field long before it made the request; in early 2014, in attempting to obtain access to the gates leased by American, Delta notified the City of the expansion of service that it intended to undertake when it acquired the necessary gate space.[24]  There is simply no way to make an objective, predictable resolution of competing claims over a gate by trying to decide *when* Delta's plans, or Southwest's plans, were sufficiently firm that they warrant consideration.  The City addresses this issue by conferring unbounded discretion on itself to determine whether "there is compelling evidence that the planned operations should be considered"—and then, unsurprisingly, determining that Southwest has such evidence.  Mot. at 9–10.

---

[24]  Delta App. 581–83 (Exh. 652 at 652.0001, 0004–06); *see also* Delta App. 569 (Exh. 651 at 651.0003).

This approach is discriminatory and improper.  While the City ignores *Delta's* plans until they are formalized into an accommodation request, it proposes to consider *Southwest's* plans anytime it chooses to do so (which is to say, always).  The DOT properly concluded that the only "sufficiently reliable" plans to premise a gate allocation on are those that are actually announced and for-sale.  Because Southwest had only 166 flights per day announced and for-sale when Delta requested accommodation, Delta is entitled to accommodation for its eight requested flights, as well as the five requested flights, under a snapshot theory.

### 3.   The City's Request that the Court Declare Application of Its Policy to Virgin/Alaska Is Not Proper.

The City and Southwest are unified in the view that if Delta is to be accommodated, it should be by Virgin/Alaska, not Southwest.  Accordingly, the City includes a request that the Court declare that the City may determine whether Virgin/Alaska is underutilizing its gates.  Mot. at 12–13.

The fact that Southwest and the City would prefer that Virgin/Alaska accommodate Delta does not provide a basis to deny Delta's request for summary judgment that it is entitled to be accommodated on Gate 15 and, to the extent necessary, Gate 17.  *See* Dkt. 413 at 24.  What is happening *now* at Love Field does not dictate the outcome of this case.  Delta requested accommodation of five flights in June 2014, when both Southwest and United had space available to accommodate those flights; Delta requested accommodation of eight flights in February 2015, after the United-Southwest sublease, when Southwest had space available to accommodate Delta for those requested flights as well.  Accordingly, Southwest (at both points) and United (in June 2014) were obligated to accommodate Delta's flights, and the City was obligated to order it when Southwest and United defied their contractual obligations.  Indeed, on September 19, 2014, the City wrote a letter to United ordering it to accommodate Delta on the gates United had the preferential (but not exclusive) right to use, although the City withdrew that letter when Southwest's CEO angrily objected and threatened to pull

Southwest out of Dallas.[25]

Whether Virgin/Alaska is *now* underutilizing its gates, and whether the DOJ would *now* permit forced accommodation on those gates if a request were made today, are not questions that can or should be considered before determining whether Southwest (and, in 2014, United) were obligated to allow competition by accommodating Delta when it requested accommodation. Delta has been seeking to compel Southwest and the City to provide the required accommodation for over three years. The City's argument that this Court should permit it to deny Delta's existing request, leaving Southwest with control of 90% of the airport's gates and leaving Delta to start over with an attempt to instead obtain accommodation from Virgin/Alaska, is baseless. This Court can and should resolve the claims in *this* case with regard to the requests at issue, which were made in June 2014 and February 2015.

**B.     The City Is Not Entitled to Summary Judgment Regarding Its Consent to the Sublease.**

The City seeks a declaration from the Court that its consent to the sublease is proper. The undisputed facts establish that the City's consent was plainly *not* proper, and that the sublease is void *regardless* of whether the City's consent was appropriate. There is no genuine dispute of material fact with respect to either of these issues.

Delta's claim, as the City acknowledges, is not limited to the City's consent; instead, Delta's claim is that "the United-Southwest sublease is void" because of flaws in the sublease itself *and* because the City should not have consented to it. Mot. at 14. On the latter point, the DOT was explicit with the City that it must not consent to the sublease.[26] As the City's counsel described it a November 4,

---

[25]   Delta App. 217–20 (Exh. 56) (letter from City to United re Accommodation at Love Field); *see also* Delta App. 222–24 (Exh. 59 at 59.0002–04) (email exchange between City Manager A.C. Gonzalez and Southwest CEO Gary Kelly re decision to accommodate Delta).

[26]   Delta App. 271 (Exh. 246 at 246.0001).

2014 email to the DOT—only a month after the sublease was submitted, and several months before it was approved—the DOT had "clearly stated that DOT does not want the City of Dallas to consent to the proposed sublease from United Airlines to Southwest Airlines of UA's two Love Field Dallas gates until & unless there is a permanent accommodation for Delta Airlines at Love Field per its pending accommodation request."[27]  The City even asked the DOT on November 4, 2014 if this view had changed—noting that Southwest had told the City DOT had changed its mind—and DOT promptly reiterated in writing to the City that "[w]e have not changed our position on anything."[28] The City implicitly acknowledges this objection, carefully stating in its brief only that the *DOJ* did not voice any objection to the sublease.  Mot. at 16.  Given that the *DOT* had explicitly objected, the City's suggestion that it had *no idea* that the sublease was unlawful defies reality.

 The City nonetheless defends itself by asserting that it did not know of Southwest's and United's excessive sublease fee, which violated the City's federally mandated Love Field competition plan.  Mot. at 15, 16.  After all, Southwest and United carefully concealed the amount of that sublease from the City, breaking their agreement into two separate documents so that they could submit to the City a sublease that did not reference the $120 million.  The City thus claims that its approval was appropriate because it simply abdicated any responsibility for reviewing the sublease, ignored the DOT's objection that it had to ensure that Delta was accommodated first, and then approved the sublease as soon as the DOJ did not bring a challenge under the antitrust laws.  Mot. at 15–16.

 Even assuming Southwest and United succeeded in concealing the amount of the sublease from the City, the City had *multiple* other reasons to prevent the sublease.  As the DOT had noted, the City should not have approved a sublease when there was a pending accommodation request.  The DOJ's decision not to bring an antitrust lawsuit, whether due to resource allocation or to the fact that

---

[27]   *Id.* (Exh. 246 at 246.0001).

[28]   *Id.* (Exh. 246 at 246.0001).

the DOJ focuses on broader, metropolitan area antitrust markets while the DOT enforces competition at individual airports, has nothing to do with that failure. The City claims that it protected itself by providing that the consent was subject to any accommodation required by law (Mot at 19), but the City *never ordered accommodation* after approving the sublease. As a result, making the sublease subject to accommodation provided no protection to competition given that when Southwest announced an intent to fill the gates that United had been barely utilizing and on which Delta had requested accommodation, the City treated that use as sufficient to prevent Delta's accommodation. Whatever the City *said* about how it would treat the accommodation request, the *reality* is that the City permitted Southwest to expand to block accommodation once it subleased United's gates.

The City also attempts to disclaim any responsibility for enforcing its competition plan or complying with the grant assurances, instead asserting that "the congressionally appointed guardians and overseers of airport competition are DOJ and DOT." Mot. at 18. But the grant assurances are a *contract* between the City and the federal government, and the City must comply with them *even if* the federal government does not "sue[] to prevent the sublease." *Id.* And the City's statement that the federal agencies never "advised the City not to grant its consent to the sublease" is proven false by the DOT's email doing precisely that.[29] *Id.* The City must comply with the grant assurances in *all* circumstances, and the grant assurances prohibit the City from taking—or allowing a dominant carrier to take—any action that either "has the practical effect of imposing a significant burden on an entity's ability to engage in a particular aeronautical activity" or makes "it virtually impossible for . . . any applicant . . . to start a similar business" in competition with an existing tenant. *See 41 N. 73 W., Inc. v. U.S. DOT*, 408 Fed. App'x 393, 400 (2d Cir. 2010); *Pompano Beach v. Federal Aviation Admin.*, 774 F.2d

---

[29]   The City also misleadingly suggests that the FAA approves of its conduct because, the City claims, the FAA's Notice of Investigation "has been withdrawn." That the FAA dropped its investigation (without prejudice) once the Fifth Circuit affirmed this Court's injunction, suggesting that the courts would resolve the matter without FAA intervention, certainly does not suggest that the FAA *approved* the City's unlawful conduct.

1529, 1544 (11th Cir. 1985).  These are independent obligations *on the City*, regardless of what the DOT, FAA, or DOJ does or could do.

The City thus did not need further assistance from the DOT and the DOJ to know that the sublease violated the grant assurances.  It plainly knew that Southwest's sublease of the available gate space from United, combined with the City's dereliction of its duty to order accommodation, would have the "practical effect" of imposing a "significant burden" on Delta's ability to operate at Love Field, and would make it "virtually impossible" for Delta to maintain access to the airport.  The City also knew that Southwest controlled 16 of the 20 gates at the airport, and thus that its sublease of two *more* gates would, as the DOJ put it, enable Southwest to "dominate 90% of Love Field gates, thereby denying consumers the benefits of meaningful competition at this facilities-constrained airport."[30]  Accordingly, the City plainly would not have "unreasonably withheld" approval of the sublease if it had refused to acquiesce in Southwest's and United's machinations to exclude Delta from the airport.[31]

Equally importantly, even if the City's *consent* were appropriate, that would not salvage the sublease.  The sublease is also void for reasons that are independent of the City's consent.  The sublease is void because it violates the City's federally mandated competition plan, which explicitly provides that "carriers subleasing gates may not profit on those subleases and may collect only 15% above their own rental costs."[32]  United profited on its sublease; it collected $120 million in profit in addition to its own rental costs, and therefore violated the Competition Plan.[33]  The sublease also is void under the grant assurances, which require the City to ensure that "anti-competitive effects do not result from

---

[30]  Delta App. 216 (Exh. 45 at 45.0003).

[31]  The City confusingly suggests that WARA somehow immunizes its approval of the sublease because WARA provides that actions reasonably necessary to implement the lease comply with Title 49.  Mot. at 18.  Given that there were ample reasonable grounds for the City to deny approval of the sublease, the City's approval was plainly not necessary to implement the lease.

[32]  Delta App. 389 (Exh. 329 at 329.0003) (2005 Competition Plan Update).

[33]  Delta App. 596 (Exh. 724 at § 2.02) (Asset Transfer Agreement).

[the City's] actions" at Love Field, and the lease agreements, in which both the City and the airlines agree to comply with the grant assurances.[34]   Moreover, the sublease increased Southwest's dominance at Love Field by giving it control of 90% of gates, ensuring that the public would be denied the benefit of the competition that Delta sought to offer.

Because of the unlawful $120 million payment and the dominance the sublease gave Southwest at Love Field, the sublease violates the competition plan and Grant Assurance 22, which requires the City to make Love Field available "for public use on reasonable terms and without unjust discrimination."[35]   It is indisputable that United was well aware that it could not sell its gate for above pass-through rent and a reasonable administrative charge; United's internal documents reflect its real estate team's acknowledgment that "anything we sublease has to be at about the same rate we pay to DAL."[36] Indeed, Southwest and United *both* knew of the risk they took; in addition to concealing the payment from the City, they concealed it from the DOT, and included in the sublease agreement a provision to address what would happen if the unlawful transaction were ultimately unwound.[37]   Southwest's and United's knowing violation of the competition plan and grant assurances also ran afoul of Section 14.03(B)(1) of their lease agreements, in which the airlines agreed to "[c]omply with and conform to all applicable present and future [federal] laws, statutes, grant assurances and ordinances, and all the regulations promulgated thereunder . . . that apply to or affect, either directly or indirectly, Airline or Airline's operations and activities" at Love Field.[38]   The sublease is void and cannot be used to defeat accommodation.

---

[34]   Delta App. 310 (Exh. 304 at 304.0038).

[35]   Delta App. 591 (Exh. 653 at 653.0004).

[36]   Delta App. 391 (Exh. 330 at 330.0001).

[37]   Delta App. 596, 601–05 (Exh. 724 at 724.0004, 0009–13 (§§ 2.02, 9.01(c), 9.02(b), 10.02, 10.03)).

[38]   Delta App. 130–31, 516–17 (Exh. 25 (Southwest Lease) at 25.0064–65), (Exhibit 638 (United lease) at 638.0064–65). The City's Competition Plan is promulgated under federal statutes—specifically, 49 U.S.C. §§ 47106(f) and 40117(k)—and it is binding and enforceable as a matter of federal law. *See* 49 U.S.C. § 40117(k)(2) (DOT must ensure

The City's consent, while wrongful, thus is but one aspect of the unlawful characteristics of the sublease. The sublease is void and improper for multiple other reasons. Accordingly, the City's motion for summary judgment should be denied because it ignores the clear reasons the City was required to deny the request for approval of the sublease and sidesteps the key question raised in the sublease claim of whether the sublease itself was void.

## C.   The City Is Not Entitled To a Declaration That Its Unlawful Actions Did Not Violate the Grant Assurances, Competition Plan, or Other Federal Law.

The City also seeks summary judgment generally declaring that nothing the City has done in response to Delta's requests for accommodation violates the grant assurances, competition plan, or federal law. As set forth at length in Delta's motion for summary judgment, Delta's response to the City's motion to modify the injunction, and *supra* Sections II.A and II.B, the City's decisions not to enforce its competition plan, not to enforce the grant assurances, not to comply with the lease agreements, to give Southwest an exclusive right to the airport, and to unjustly discriminate against Delta violate the grant assurances, the lease agreements, the competition plan, *and* federal law. Delta incorporates that briefing by reference here.

Notably, the City appears in its motion to misunderstand what this lawsuit is about. The City asserts, without citation, that the "principal violation claimed by Delta and Southwest is that the City did not make a final accommodation decision." Mot. at 20. In fact, Delta's claim is that the City made an *unlawful* decision that breached its contractual obligations. The City was required by the lease agreements, the grant assurances, the competition plan, and federal law to order Southwest and United to accommodate Delta. It chose not to do so. That was error. Accordingly, the City's claim elsewhere that its policy and its motion for summary judgment "mooted" all of the claims in this lawsuit is

---

that the City "successfully implements its plan" for Love Field); *accord* 14 C.F.R. § 158.19(b). Promulgation and implementation of an FAA-approved Competition Plan is a prerequisite to the receipt of PFC funding and AIP grants. *See* 14 C.F.R. § 158.29(a)(viii); Delta App. 30–37 (FAA Order 5100.38D at App. X). Failure to implement the competition plan can result in the termination of federal funding. *See* 14 C.F.R. §§ 158.81, 158.87.

**Page 17**

nonsensical. Dkt. 455 at 1. One of Delta's central claims is that it is entitled to be accommodated for 13 flights on a use-it-or-lose-it basis. The City's decision *not* to require Delta's accommodation in that way is the basis of Delta's claim against the City, and the policy continues the City's failure to require accommodation.

In any event, the City's defense of its refusal to commit to a final decision misunderstands the lease. The City, in support of its position that it has discretion to defy the law, notes a timing provision of the accommodation procedure that indicates that, once 30 days have passed from the City's notification of the airline carriers that it *will* order accommodation, the City "may select a Signatory Airline to accommodate the Requesting Airline." Southwest has long made this argument, and the City's parroting of it is no more persuasive than when Southwest made the argument. The City's argument cherry-picks the one timing provision and ignores:

- Section 4.06(D)(4) of the lease, which provides that "If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City *agrees to require* the sharing of Airlines' Preferential Use Space and Gates, also as provided for in Section 4.06.E below." (emphasis added).

- Section 4.06(F)(2) of the lease, which provides that "[i]n the event the Requesting Airline has demonstrated to the DOA that it has contacted all airlines and has exhausted all reasonable efforts to secure accommodations, the Director *will notify* all Signatory Airlines in writing that if Requesting Airline is not accommodated within thirty (30) days from the receipt of notice, the Director *will select* one of the Signatory Airlines to comply with the request for accommodation in a non-discriminatory manner." (emphasis added).

- Section 14.19 of the lease, which provides that the City will "operate the Airport . . . in a manner that is consistent with applicable law, federal aviation regulations, federal grant assurances, and City airport revenue bond ordinances." Federal law, in turn, "requires airport operators to provide access to all qualified air carriers on reasonable terms and without unjust discrimination, and prohibits them for granting an exclusive right to operate at their airports."[39]

Put simply, however much the City might wish it were otherwise, the City simply does not have discretion to decline to order accommodation to the advantage of the dominant carrier or to eliminate

---

[39] Delta App. 280 (Exh. 304 at 304.0008).

all possibility of competition at Love Field.  Accordingly, it is not entitled to summary judgment conferring that right on it.

**D.     The City's Conclusory Challenges to Delta's Counterclaims Provide No Basis for Summary Judgment.**

In January 2018, the City moved to dismiss Delta's counterclaims on multiple grounds, including a failure to plead the elements of the contract claims; governmental immunity; and a failure to plead tortious interference.  The Court denied the motion.  Dkt. 395.  The City now effectively re-urges the same motion, advancing the same legal arguments.  The City does not allege that factual development has disproven the allegations in Delta's counterclaim; instead, the City simply re-argues the arguments it made five months ago.  In fact, there has been no new factual development.  The City's motion is simply the same arguments repackaged into a brief with a new title.  Delta respectfully requests that the Court deny this aspect of the motion just as it did the last time these arguments were made.  Delta incorporates by reference its briefing on each of these issues, as cited below.

Delta also urges that the Court deny these claims for a second reason:  none need to be addressed to resolve Delta's motion for summary judgment on the City's declaratory relief claim.  Delta's motion sidesteps all of the issues the City raises.  Rather than delve into those issues, which do not resolve this case, Delta respectfully requests that the better course is to first resolve Delta's motion for summary judgment.  If that motion is granted, many of the other claims in this litigation may be able to be resolved straightforwardly.[40]

**1.     This Court Properly Concluded that Delta Is a Third-Party Beneficiary.**

The City first contends that Delta is not a third-party beneficiary of the lease.  As an initial matter, before addressing the third-party beneficiary issue, the City inexplicably claims that the "basic relief sought by Delta through its breach of contract claims will be provided by the implementation

---

[40]  Accordingly, the City's cleanup attempt to resolve all other potential claims (Mot. at 47–48) is ill-advised.  The parties can address the disposition of the remaining claims once the primary declaratory relief claim is decided.

of the City's proposed policy." Mot. at 29.  But the "basic relief" Delta seeks through its breach of

contract claims is ongoing accommodation on a use-it-or-lose-it basis for its 13 requested flights.

Given that the City's policy proposes to *deny* Delta's request for eight flights, and to permit Southwest

to *terminate* Delta's ongoing five flights in three years, the policy provides *none* of the relief that Delta

seeks.

With respect to the third-party beneficiary issue, this Court has already decided that Delta is a

third-party beneficiary, at least for purposes of the preliminary injunction.  Dkt. 257 at 23.  And the

parties have briefed the issue extensively.  *See, e.g.*, Dkt. 357 at 12–14 (City motion to dismiss on basis

of third-party beneficiary argument); Dkt. 368 at 8–12 (Delta's response to the City's arguments on

this point); Dkt. 388 at 10–20 (Delta's argument in response to Southwest's motion for judgment on

the pleadings that it is a third-party beneficiary of the lease agreements).  Delta incorporates its earlier

briefing by reference.  Moreover, Delta notes that the City makes no attempt to explain why the Court

erred in concluding that Delta was a creditor beneficiary of the lease.  Dkt. 257 at 23.  Nor does the

City explain how it can be that the accommodation provision—which was included specifically to

provide the mechanism by which non-signatory airlines could request access to the airport—does not

have as its manifest purpose providing a direct benefit to non-signatory airlines that may request access

to the airport.  *See* Dkt. 388 at 14–20.

### 2. The City Has No Basis for Summary Judgment on Delta's Unilateral Contract Claim.

The City's motion with respect to Delta's unilateral contract claim can be resolved on similar

bases.  The unilateral contract issues have been previously briefed at length in connection with the

City's motion to dismiss and Southwest's motion for judgment on the pleadings.  *See* Dkt. 357 at 9–

12 (City's motion to dismiss unilateral contract claim); Dkt. 368 at 12–16 (Delta's response to the

City's argument on this point); Dkt. 388 at 25 (Delta's argument in response to Southwest's motion

for judgment on the pleadings on this point).  Delta incorporates its prior arguments on this point by reference.

### 3.      The City's Miscellaneous and Conclusory Contract Challenges Fail.

The City also offers a series of brief, conclusory arguments that there was no enforceable contract, that Delta never performed, that the City did not materially breach the contract, and that there were no damages.  The City took a similar approach in its motion to dismiss, rejecting each element of Delta's claimed contract.  *See* Dkt. 357 at 8–16.  For the reasons set forth in Delta's response to that motion, *see* Dkt. 368 at 7–18, each of these arguments fails.

### 4.      The City's Rehash of Its Tortious Interference Argument Fails.

The City next reiterates its arguments that Delta does not have a valid tortious interference claim.  *Compare* Dkt. 357 at 17–20, *with* Mot. at 37–41.  This argument, too, fails for the reasons set forth in Delta's response to the City's motion to dismiss.  Dkt. 368 at 20–23.

### 5.      Governmental Immunity Does Not Bar Delta's Counterclaims.

The City also repeats its argument from its motion to dismiss that it has government immunity to protect it from all of Delta's claims.  Mot. at 41–46.  As Delta set forth in its response to the motion to dismiss, the City waived immunity from suit by filing this lawsuit, and waived immunity from liability by entering into the lease agreements.  Dkt. 368 at 3–6.  And the City lacks immunity from Delta's tortious interference claims because its challenged acts were proprietary functions.  *Id.* at 6–7.  Accordingly, the City's argument fails to defeat Delta's counterclaims for the reasons set forth in Delta's response to the City's motion to dismiss.  *See* Dkt. 368 at 3–6.

### 6.      The City Is Not Entitled to Summary Judgment on Delta's WARA Counterclaim.

Finally, the City repeats its argument that Delta has no private right of action under WARA.  Dkt. 356 at 11.  Delta incorporates its response to this argument made in connection with the City's motion to dismiss.  *See* Dkt. 368 at 18–20.

### III.   CONCLUSION

Years after filing this lawsuit, the City now asks this Court to defer to the City's resolution of the very issues the City asked this Court to resolve.  But the law dictates resolution of the City's claims in Delta's favor, and the City cannot escape that by declaring what it wants the answer to be.  The City's motion for summary judgment should be denied and Delta's motion for summary judgment on the City's declaratory judgment claim should be granted.

DATED:  June 13, 2018                    Respectfully submitted,

                                        */s/ William B. Dawson*
                                        William B. Dawson
                                        SBN 05606300
                                        Ashley E. Johnson
                                        SBN 24067689
                                        Russell H. Falconer
                                        SBN 24069695
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2100 McKinney Avenue, Suite 1100
                                        Dallas, Texas  75201-6911
                                        Telephone:  (214) 698-3100
                                        Facsimile:  (214) 698-3400
                                        wdawson@gibsondunn.com
                                        ajohnson@gibsondunn.com
                                        rfalconer@gibsondunn.com

                                        **ATTORNEYS FOR DELTA AIR LINES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of June, 2018, a true and correct copy of the foregoing brief was served via the Court's CM/ECF System upon all counsel of record.


*/s/ William B. Dawson*
William B. Dawson