IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-02069-K |
| | § | |
| DELTA AIR LINES, INC., *et al.,* | § | |
|     Defendants. | § | |

**PLAINTIFF CITY OF DALLAS'S REPLY TO AIRLINES' RESPONSES TO CITY'S MOTION FOR LEAVE TO FILE A SUPPLEMENT TO ITS MOTION FOR SUMMARY JUDGMENT AND THE SUPPLEMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, the City of Dallas (the "City"), files this reply to the responses filed by Alaska Airlines, Inc. ("Alaska"); Southwest Airlines Co. ("Southwest') and Delta Air lines, Inc. ("Delta") (respectively Dkt. Nos. 601, 597, and 602) to the City's motion for leave to file a supplement to its motion for summary judgment. (Dkt. No. 567).

### I. OVERVIEW

The City has previously sought summary judgment based on the implementation of its accommodation policy. (Dkt. Nos. 436, 437). Subsequently, Alaska advised the Court of its reduction of flight operations. (Dkt. No. 504). Based on that reduction, the City sought to allow Delta to operate on Alaska gates according to the terms of the accommodation policy. (Dkt. No. 567). As predicted, Alaska, Southwest, and Delta opposed the request with familiar arguments.[1]

### II. REPLY TO ALASKA'S OPPOSITION

Only Alaska raises a procedural complaint arguing that the City's request is outside the Court's deadline for filing dispositive motions. (Dkt. No. 601 at 7-8). The dispositive motion

---

[1] They repeat and incorporate by reference their arguments in response to the City's earlier motions. The City incorporates its motions, briefs, and replies. (Dkt. Nos. 431, 437, 455, 472).

City of Dallas's Reply to Airlines' Response to City's Motion for Leave to File a Supplement to Its Motion for Summary Judgment and Supplement - Page 1

deadline was August 10, 2018. (Dkt. Nos. 371, 373). The reason for seeking leave is to obtain the Court's permission to file beyond earlier scheduling orders and local rule limitations. Notice of Alaska's reduced operations was given on August 17, 2018 (Dkt. No. 504) and confirmed at its corporate representative's deposition on September 11, 2018. (City App'x at 21-25). These events were after the dispositive motion deadline and contrary to prior representations by Virgin's and Alaska's representatives about their operations. These new facts are sufficient to warrant granting leave. Further, Alaska asserts no possible harm from the grant of leave.

Without authority, Alaska next argues that the City's motion is moot because Alaska has now altered its plans and will now expand flight operations to such a degree that it will not be able accommodate any other airline. (Dkt. No. 601 at 1-2). The expansion has yet to occur and Alaska and its predecessor made prior unfulfilled claims of future expansion.[2] More basic, under the analysis adopted by the Court and affirmed by the Fifth Circuit, Alaska's announcement of planned expansion is irrelevant. In addressing Delta's initial accommodation request to continue flying five flights, the Court emphasized that at the time of the request, Southwest was able to accommodate the Delta flights and Southwest could not "'ramp up' its flight schedule to thwart the pending accommodation request." *City of Dallas vs. Delta Airlines, Inc.,* No. 3:15-cv-02069-K, 2016 WL 98604,*10-11 (N.D. Jan. 8, 2016) aff'd 847 F.3d 279 (5th Cir. 2017). Since Virgin started flight operations in October 2014 and through Alaska's current operations, the Virgin/Alaska gates have been underutilized. Since at least October 2018, the underutilization increased and Alaska has underutilized gate capacity and can currently accommodate Delta. Under

---

[2] *See e.g.* (Dkt. No. 445 at 8 [¶ 1.1]) (where on May 12, 2014 Virgin represented to the City that Virgin's initial flight schedule at Love Field would consist of thirteen daily flights operating "and Virgin America is planning to increase its flight schedule from Love Field in 2015.") *Also see* https://blog.alaskaair.com/destinations/more-to-love-dal/

the Court's interpretation of the accommodation obligations and duties, Alaska likewise cannot "ramp up" to thwart an accommodation request. The City's motion is not moot.

Alaska's central argument is that it simply is not subject to any accommodation obligation because of the Commitment Agreement. (Dkt. No. 601 at 2-7). This is a contention Alaska previously raised and has been addressed by the City. (Dkt. No. 455 at 8-9). Virgin agreed that the commitment agreement did not "modify, abrogate, change, or affect any provision of the Lease and shall not in any manner affect, waive or change any of the provisions thereof." (Dkt. No. 445 at 15). Alaska does not dispute that its interpretation of the accommodation obligation in the commitment agreement is contrary to the Court's interpretation of the accommodation obligation in the lease.

Nonetheless, without authority, Alaska suggests that the lease is just between the City and American Airlines and its terms do not apply to Alaska. (Dkt. No. 601 at 6). It contends that the accommodation provisions in the commitment agreement would become meaningless if subject to the lease terms. (*Id*.). However, Alaska ignores that its argument renders the no "modify, abrogate, change, or affect any provision of the Lease" meaningless. The accommodation provision in the lease controls and the commitment agreement expressly recognized that the lease controlled. *See Tenet Health Sys. Hosps. Dallas, Inc. v. N. Tex. Hosp. Physicians Group, P.A.*, 438 S.W.3d 190, 198-99 (Tex. App.—Dallas 2014, no pet.) (sublease term that sublease was subordinate to lease meant sub-lessee's obligations to sub-lessor arose in tandem with lessee's to landlord). Additionally, the lease's accommodation provisions are not just a matter of contractual requirement, they are required by federal law. The Wright Amendment Reform Act of 2006 ("WARA") states, "[t]o accommodate new entrant air carriers, the city of Dallas shall honor the scarce resource provision of the existing Love Field leases." (WARA § 5(a)). Alaska is bound and

governed by the accommodation provisions in the leases. If Delta has made an accommodation request during a time that Virgin was underutilizing its gates, then Alaska should be directed to accommodate.

### III. REPLY TO DELTA'S OPPOSITION

Previously, Delta argued its presence at Love Field is necessary for effective competition and argued it could squeeze its flights in the gaps of Southwest's operations. (City App'x at 12). It contends that its second accommodation request is genuine and any contention to the contrary is baseless. (Dkt. No. 602 at 13). Yet, now with identified gaps of time, it asserts any operations would require "further evaluation in light of other scheduling requirements (such as aircraft availability, gate (and potentially slot) availability at other airports, and other operational requirements) before Delta could confirm that it is commercially and operationally feasible." (*Id*. at 2). It evaluated the possibility but this was "not a final conclusion that it could or would fly" the flights. (*Id*. at 12). It labels a possible schedule as hypothetical and would require "further evaluation" as to whether it is "commercially and operationally feasible." (*Id*. at 2). It does not contend that it has evaluated whether the prior gaps in Southwest's operation were not likewise limited by "scheduling requirements" or whether "commercially and operationally feasible." Instead, without authority and simply ignoring the rights of the lessor, lessees and sub-lessees, Delta now urges that it should just be given a gate. (*Id*.).

As predicted, Delta urges that any request for additional flights should be accommodated on Southwest's gates. It repeats its arguments that it was entitled to accommodation when the request was made and the United-Southwest sublease is invalid. (*Id*. at 3-6, 8). Delta presents no new evidence, authority, and argument and the City has previously addressed these contentions. (*E.g.* Dkt. Nos. 216 at 17-24; 437 at 20-24, 27-33; 472 at 14-16, 27-28). If Delta's request for an

additional eight flights is solely evaluated at the time when made or later, Delta is not entitled to accommodation on Southwest's gates. (Dkt. Nos. 437 at 20-24; 472 at 14-16). At the time of the second request and thereafter, even assuming it was a valid and proper request, any additional Delta flights would unduly interfere with Southwest's flight operations. (*Id*.). Likewise, the sublease's invalidity will not result in Delta's accommodation of these additional flights. (Dkt Nos. 437 at 27-33; 472 at 27-28). Finally, Section 4.06(F) of the lease states "the Director will … render a decision … which will be binding on the Signatory Airline and the Requesting Airline." (Ex. 25., p.23). Pursuant to the authority granted in the lease, the City is exercising its discretion.

Delta repeats its complaint that the City's policy of granting guaranteed accommodation for three years is inadequate and must instead be forever. (Dkt. No. 602 at 7, 9). It claims this Court and the Fifth Circuit already made a contrary decision. Nothing in either decision addresses how long any accommodation must be. *See City of Dallas vs. Delta Airlines, Inc*., 847 F.3d 279 (5th Cir. 2017); *City of Dallas vs. Delta Airlines, Inc*., 2016 WL 98604. Nothing in the leases, the City's competition plan, or federal law requires that a mandatory accommodation last the duration of the lease. A three-year term is reasonable and balanced and a proper exercise of the discretion granted in the leases. And the term could continue longer if the accommodating airline does not expand its operations after three years. The term could also continue longer if a voluntary agreement between the accommodating and accommodated airlines was reached.

Delta also repeats its complaint that, after three years, an accommodating airline could regain use of gates with a six-month notice. (Dkt. No. 602 at 9-10). It complains that Southwest and Alaska are not subject to such a possibility, only Delta. (*Id*.). Delta's contention highlights its fundamental misunderstanding of its limited rights. Southwest and Alaska are lessee and sub-

lessees. Delta is neither. Any rights that an accommodated airline may have are subject to the rights of leasing and subleasing airlines.

Delta complains about the Remain Overnight ("RON") spaces (Dkt. No. 602 at 9-10) but fails to note that it is already using one of the unassigned RON spaces. Nor does it explain how this impacts its ability to be accommodated on Alaska's gates.

In sum, it remains unclear whether Delta actually seeks additional accommodation at Love Field or just accommodation on Southwest's gates. If the latter, the request must be denied. If the former, then accommodation on Alaska's gates should be ordered. However, because of Delta's equivocal position, the City repeats its request that it be allowed to seek out other airlines willing to operate out of any underutilized gate at Love Field.

## IV. REPLY TO SOUTHWEST'S OPPOSITION

It is not clear how Southwest has any standing to complain about Delta being accommodated on Alaska's gates. Southwest's obligation to accommodate Delta's first request regarding the five flights is independent of the second request or the availability of gate capacity of another airline to accommodate the second request. Southwest would not suffer an injury-in-fact if the City's requested relief was granted. *See Consol. Cos. v. Union Pac. R.R. Co*, 499 F.3d 382, 385 (5th Cir. 2007) (a party invoking federal jurisdiction must show an "injury in fact" that is "both concrete and particularized" and "actual or imminent"). Even if Southwest has standing, its contentions do not defeat the requested relief.

Initially, Southwest does not dispute that as of October 2018, Alaska was not fully utilizing its gates. It does not dispute that Alaska then had capacity to accommodate another airline without unduly interfering with Alaska's flight operations.

Southwest begins by claiming that the City's request is an attempt at negotiation by motion and repeats its argument that an advisory opinion is sought. (Dkt. 597 at 1-3). There is no negotiation and the City does not seek preapproval of policy. Based on the Court's earlier interpretation of the City's accommodation obligations, the City requests that it be allowed to immediately implement the policy and seeks the specific relief that five Delta flights be accommodated on Southwest gates and additional flights be accommodated on Alaska's gates for a period of three years. (Dkt. Nos. 436, 437, 567). With or without a policy, the City has moved for the specific remedy it seeks in a final judgment. There is nothing advisory about the relief sought. Southwest defeats its own argument because it opposes the requested relief and contends it should not have to continue accommodating Delta. (Dkt. No. 597 at 8-9).

Southwest next complains that Delta's second accommodation request was different than what the City proposes in its motion. (Dkt. No. 597 at 3-4). It also complains that the City has previously urged that the second accommodation request be denied and would be denied under the City's policy. (*Id*. at 6-7, 7-9). The City has not changed its position. If the Court concludes that Delta has only made one accommodation request regarding the additional eight flights based on the request made in 2015, then the Court should enter final judgment denying the second accommodation request and resolving Delta's request to continue its five flights. However, if the Court concludes that the second request is ongoing then the Court may grant relief as proposed by the City. The goal of the City remains unchanged: the maximization of the use of the gates at Love Field within the limitations imposed by WARA, the Five-Party Agreement, the leases, and federal law.

Southwest next argues that the requested relief is preempted by the Airline Deregulation Act. (Dkt. No. 597 at 5-6). It contends that the City's request somehow regulates the price, route,

or service of an airline. Southwest contends that an accommodation directive is a local government's effort to redesign one airlines schedule to fit within another and therefore is a regulation as to "routes." Southwest cites *American Airlines, Inc. v. Department of Transportation*, 202 F.3d 788, 796 (5th Cir. 2000). In that case the "Ordinance" found to be preempted was an ordinance agreement by the cities of Dallas and Fort Worth that required the "phase-out" of airline service at Love Field and other area airports and transfer of all certificated air carrier services to DFW Regional Airport. *Id*. at 793. A state court had found Dallas was obligated by the Ordinance to bar airlines from flying between Love Field and areas outside Texas and the four-state service area authorized by the Wright Amendment. *Id*. at 795. In finding preemption, the Fifth Circuit held "[t]he restrictions on service at Love Field under the Ordinance appear to operate as limitations 'relating to ... routes' within the meaning of § 41713(b)(1), *see Western Air Lines*, 658 F. Supp. at 952 (finding that a perimeter rule "relat[ed] to routes"), and the parties present no significant argument to the contrary." *Id*. at 805. The regulation at issue in the *American Airlines* case was the complete elimination and prohibition of routes.[3]   Southwest fails to explain how the requested summary judgment relief has anything to do with what routes are to be flown, the prices to be charged, or the services to be provided. The proposed policy merely provides the opportunity to provide routes and services that are not currently being provided. Finally, Southwest simply fails to address that the accommodation obligation is imposed by the preempting federal law.

Next, Southwest contends there are fact issues to be resolved referencing that the lease terms are ambiguous. However, as it relates to accommodation, the lease is a matter of construction of federal law, not contract interpretation. *See Love Terminal Partners v. United*

---

[3] The other case cited by Southwest, *Legend Airlines, Inc. v. City of Fort Worth*, 23 S.W.3d 83 (Tex. App.– Fort Worth 2000, pet. denied) involved the same Ordinance with the same result as to preemption and reversed the state court decision referenced in the *American Airlines* case.

*States,* 97 Fed. Cl. 355, 406, 410-15 (2011) (holding that WARA rendered the obligations in the Five-Party Agreement "matters of federal law;" and "WARA requires that Dallas manage Love Field in accordance with the contractual rights and obligations existing for certified air carriers providing scheduled passenger service at Love Field on July 11, 2006.")  The City's accommodation obligations are matters of the construction of federal law as found in the leases, the Five-Party Agreement, and WARA.  Only issues of law are presented.  *City of Clinton v. Pilgrim's Pride Corp.*, 653 F. Supp. 2d 669, 672 (N.D. Tex. 2009) ("An issue of statutory construction is a question of law for the Court to decide." (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995)).  There are no genuine issues of material fact as to the events and circumstances involving the accommodation requests and the level of flight operations at Love Field.  The issues are ripe for disposition as matters of law.

Finally, Southwest contends that Delta's five flights should be excluded or forced to operate on Alaska's gates. (Dkt. No. 597 at 9).  Again, this ignores the prior holding of this Court that Southwest breached its lease and the remedy is for Southwest to continue to accommodate Delta's five flights.  The City simply seeks finality to the Court's earlier determination.

### V.  IN THE ALTERNATIVE, THE CITY'S REQUEST TO SEEK OTHER AIRLINES TO OPERATE AT LOVE FIELD

None of the airlines addressed the City's alternative relief that it be allowed to solicit interest from other airlines, excluding the signatory airlines, who would be willing to operate at Love Field on Alaska's gates during the periods of time of underutilization.  As noted, Delta's response is equivocal.  The City seeks full utilization of its gates at Love Field and requests the opportunity to seek other airlines to provide passenger service at Love Field.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the City requests the Court grant the City leave to file the supplement, consider this supplement, and grant the City such other relief as the Court finds just.

                          Respectfully submitted,

                          OFFICE OF THE CITY ATTORNEY
                          CITY OF DALLAS, TEXAS

                          CHRISTOPHER J. CASO
                          INTERIM CITY ATTORNEY
                          Texas Bar No. 03969230
                          Email: chris.caso@dallascityhall.com

                          By: *s/ Charles S. Estee*
                          Charles S. Estee
                          Senior Assistant City Attorney
                          Texas Bar No. 06673600
                          Email: charles.estee@dallascityhall.com

                          Stacy Jordan Rodriguez
                          Executive Assistant City Attorney
                          Texas Bar No. 11016750
                          Email:  stacy.rodriguez@dallascityhall.com

                          7BN Dallas City Hall
                          1500 Marilla Street
                          Dallas, Texas 75201
                          Telephone – 214/670-3519
                          Telecopier – 214/670-0622

                          ATTORNEYS FOR THE CITY OF DALLAS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2019, I electronically filed the foregoing document with the Clerk of Court for the United States District Court for the Northern District of Texas using the electronic case filing system of the Court.  Service on all attorneys of record who are Filing Users will be automatically accomplished through Notice of Electronic Filing.

*s/ Charles S. Estee*
Charles S. Estee
